**EXPERT REPORT OF DR. DORA SCHRIRO**

**Karen Backues Keil v. MHM Services, Inc., John Dunn, John or Jane Doe #1, Edward Bearden, Vevia Sturm, John or Jane Doe #2, and John or Jane Doe #3, Case 5:18-cv-06074-BP**

I.   WITNESS QUALIFICATIONS

I am a career public servant who has served as an executive-level administrator, policy maker, and homeland security advisor. I was appointed to lead two city and three state agencies and a federal office.

I was the Commissioner of the Connecticut Department of Emergency Services and Public Protection encompassing six state agencies including the Connecticut State Police, Homeland Security and Emergency Management, and Scientific Services (the state's crime lab) from 2014 through 2018. I served concurrently as Connecticut's Homeland Security Advisor from 2016 through 2018. My DHS security classification clearance was Top Secret.

I was the Commissioner of two city jail systems, the St. Louis City Division of Corrections, from 2001 to 2003, and the New York City Department of Correction from 2009 to 2014. I was also the Warden of the Medium Security Institution, St. Louis City, Missouri, from 1989 to 1993.

I was the Director of two state correctional systems, the Missouri Department of Corrections encompassing state prisons and probation and parole, from 1993 to 2001, and the Arizona Department of Corrections encompassing state prisons and parole, from 2003 to 2009. During my tenure as Director of the Arizona Department of Corrections, we were the first correctional system to be selected Winner of the Innovations in American Government awards program, for our prison-based reform, Parallel Universe, pre-release preparation in which all inmates participated from the first to the last day of their incarceration guided by norms and values mirroring those of the community. As Director of the Missouri Department of Corrections, I also served on the state's Sentencing Commission.

I was also Senior Advisor to Department of Homeland Security (DHS) Secretary Janet Napolitano on Detention and Removal, and the founding Director of the Immigration and Customs Enforcement Office of Detention Policy and Planning in 2009.

I was a member of the adjunct faculties of University of Missouri-St. Louis Department of Criminology from 1990 to 1998, St. Louis University School of Law from 2000 to 2002, and Arizona State University Sandra Day O'Connor School of Law from 2005 to 2008 and taught graduate-level Criminology and Correctional Law courses and led Sentencing Seminars.  Earlier in my career, I was Executive Director of the Bergen County N.J. Planned Parenthood affiliate in Hackensack, New Jersey.  We provided care and counseling to victims of sexual assault.

I am knowledgeable about the case law and legislation specific to pretrial and sentenced populations, and to civil detainees, including the Prison Rape Elimination Act (PREA). I am also knowledgeable about the American Correction Association and ICE Performance-based National Detention Standards including PREA.  I also participated in the writing of American Bar Association standards for correctional systems and ICE detention facilities.

1

I am knowledgeable about the operation of criminal pretrial and sentenced correctional facilities, civil detention, and the individuals in the custody of both criminal and civil justice systems.

I have served as a Corrections expert to the California Department of Justice, Disability Rights California, the Hampton County, Massachusetts Sheriff's Department, and the American Civil Liberties Union. I am currently engaged by the California Department of Justice, St. Louis University School of Law, and the Southern Poverty Law Center.

A complete and correct professional vita, including a list of my publications over the last ten years, is attached as Appendix A.

II.     EDUCATION

Northeastern University, BA cum laude, 1972

University of Massachusetts-Boston, M.Ed., 1974

Columbia University, Ed.D., 1984

St. Louis University, JD, 2002

III.    RELATED CORRECTIONAL EXPERIENCE

Recent Publications

Smart and Safe: Making the Most of Adolescents' Time in Detention, the Physical Plant, Our Workforce, and the "What Works' Literature, in The State of Criminal Justice, American Bar Association (2013)

Corrections: The Justice-Involved Mentally Ill, A Practitioner's Perspective, in The State of Criminal Justice, American Bar Association (2012)

Good Science, Good Sense: Making Meaningful Change Happen – A Practitioner's Perspective, Criminology & Public Policy, Vol. 11, No. 1, Special Issue (February 2012)

Is Good Time a Good Idea? Federal Sentencing Reporter, Vol. 21, No. 3 (February 2009)

Related Affiliations

Member, ABA Criminal Justice Standards Subcommittee and co-author, the ABA revised criminal justice standards for correctional facilities (2005 – 2008)

Recent, Related Recognition

U.S. Department of Justice, Office for Victims of Crime, Allied Professional Award, 2012

Hofstra University (Hempstead, New York) Presidential Medal, 2010

National Governors Association, Distinguished Service to State Government Award, 2006

Association of Correctional Administrators, Michael Francke Award for Outstanding Leadership, 1999

## IV. OTHER CASES

I testified recently as an expert by deposition in the matter of Endicott v. Hurley et al., No. 2:14-CV-107 DDN (E.D., N. Div.). I have not testified as an expert in any other case during the past four years.

## V. COMPENSATION

My standard hourly rate is $250.

## VI. ASSIGNMENT

I have been asked to provide a Statement of Opinions concerning certain conditions of confinement which Ms. Karen Backues Keil (Ms. Keil), formerly an inmate assigned to the Chillicothe Correctional Center (CCC), a secure women's correctional facility in Chillicothe, Missouri, encountered as set forth in Karen Backues Keil v. MHM Services, Inc., John Dunn, John or Jane Doe #1, Edward Bearden, Vevia Sturm, John or Jane Doe #2, and John or Jane Doe #3, case 5:18-cv-06074-BP. The conditions of confinement to which Ms. Keil was subjected as an inmate during her incarceration in the Missouri Department of Corrections (the Department) concern (1) repeated sexual harassment and sexual assault by Correction Officer I (CO I) Edward Bearden, a state employee, (2) repeated sexual harassment and sexual assault by Licensed Professional Counselor (LPC) John Dunn when an employee of MHM Services, Inc., (MHM) and (3) the failure of the agents of the Department and its health care contractor whose collective responsibility it was to comply in full with federal law and Department policy including law and policy to prevent, detect, and respond to offender sexual abuse, harassment, and retaliation.

The facts and data upon which I relied in preparing this Statement included Case 518-cv-06074-BP, statements by Ms. Keil, Mr. Bearden and Mr. Dunn, the MODOC Department Procedure Manual D1-8.13 Offender Sexual Abuse and Harassment, the MODOC Employee Handbook dated January 2018, the 2016 and 2019 CCC Prison Rape Elimination Act (PREA) Audits, the Department's 2010 – 2019 Annual PREA Reports, and the CCC PREA Investigations of Ms. Keil's complaints about the repeated sexual harassment and sexual assaults by Mr. Bearden and Mr. Dunn. I also referred to the Prisoner Rape Elimination Act Prisons and Jail Standards, National Standards to Prevent, Detect, and Respond to Prison Rape under the Prison Rape Elimination Act (PREA) 28 C.F.R. Part 115, Docket No. OAG-131, RIN 1105-AB34 (U.S. Department of Justice, May 1, 2012); A National Protocol for Sexual Assault Medical Forensic Examinations Adults/Adolescents, Second Edition (U.S. Department of Justice, Office on Violence Against Women, April 2013); National Best Practices for Sexual Assault Kits: A Multidisciplinary Approach (U.S. Department of Justice, National Institute of Justice, 2017); Form SSV-2, Survey of Sexual Victimization, State Prison Systems Summary Form (U.S. Department of Justice, 2017), and the American Correctional Association Adult Correctional Institution Standards, 5th Edition.

**OPINIONS**

I. Karen Backues Keil's reporting of staff-on-inmate sexual abuse by CO I Edward Bearden and LPC John Dunn during her incarceration at the Chillicothe Correctional Center is supported by the facts.

II. CO I Edward Bearden had the means and opportunity to repeatedly sexually assault and harass Ms. Keil and he caused her to suffer physical and emotional injury.

III. LPC John Dunn had the means and opportunity to repeatedly sexually assault and harass Ms. Keil and he caused her to suffer physical and emotional injury.

IV. The Missouri Department of Corrections and MHM Services, Inc., the Department's contract provider for offender health care, failed to provide the protection owed Ms. Keil throughout her incarceration.

V. The failure of Missouri Department of Corrections and its agents to assess and act upon her complaints and those of other inmates, contributed to the increase in substantiated staff sexual misconduct and staff sexual harassment and caused additional offenders to suffer needlessly.

I.  **Karen Backues Keil's reporting of staff-on-inmate sexual abuse by CO I Edward Bearden and LPC John Dunn during her incarceration at the Chillicothe Correctional Center is supported by the facts.**

   A. There are two forms of Staff-on-Inmate Sexual Abuse. They are Staff Sexual Misconduct and Staff Sexual Harassment. Staff Sexual Misconduct is any behavior or act of a sexual nature directed toward an inmate by an employee, volunteer or contractor, official visitor or other agency representative, whether consensual or non-consensual and including intentional touching unrelated to official duties; or with the intent to abuse, arouse, or gratify sexual desire, or completed, attempted, threatened, or requested sexual acts; or indecent exposure, invasion of privacy, or voyeurism or sexual gratification. Staff Sexual Harassment is repeated verbal comments or gestures of a sexual nature to an inmate by an employee, volunteer or contractor, official visitor or other agency representative including demeaning references to gender, or sexually suggestive or derogatory comments about body or clothing; or repeated profane or obscene language or gestures. See Form SSV-2, Survey of Sexual Victimization, State Prison Systems Summary Form (U.S. Department of Justice, 2017).

   B. Ms. Keil was sexually harassed and sexually assaulted repeatedly by CO I Edward Bearden from 2013 and to her release in 2017 from the Chillicothe Correctional Center. She reported the abuse by CO I Bearden to LPC John Dunn, her assigned mental health counselor and subsequently, was sexually harassed and sexually assaulted repeatedly by LPC Dunn. Mr. Greg Link, the department's health care contract Mental Health (MH) Director for both MHM and Corizon, concerned by what he believed to be LPC Dunn's "over-familiarization" with Ms. Keil, took no other action but to direct LPC Dunn have no further contact with her. Dunn disobeyed MH Director Link's directive and continued to sexually abuse her. Neither did LPC Dunn report CO I Bearden's sexual abuse nor did MH Director Link report LPC Dunn's sexual abuse.

   C. Ms. Keil did not report the repeated sexual abuse that she endured by Bearden and Dunn during her incarceration at CCC. She feared she would be "written up" and put in "the hole," which is to say administrative segregation, thereby losing her visits with her daughter and her work assignment, and that her release on parole would be jeopardized. Ms. Keil was admitted to the Department on June 15, 2011 and released on parole on February 1, 2017.

   D. On October 16, 2017, LPC Dunn, an employee of the Department's contract health care provider, was discovered in his office sexually assaulting another female offender, K. H. He was terminated and referred to the licensing board by his employer. He was also charged with Sexual Contact with an Offender, RSMo 566.145, and sentenced to 120 days in the county jail.

   E. On November 17, 2017, CCC PREA Investigator Bentley determined LPC Dunn sexually abused another female offender, T. K. He also determined that he had sexually harassed "multiple other offenders" during counseling sessions at CCC, and used a department computer to access, view, and display pornography to K. H. See, Case No. 2017090067; MDOC 2017090067 ff.

F.  In the course of investigating LPC Dunn, a co-worker, LPC Carpenter, recalled that he had been disciplined previously for over-familiarization with Ms. Keil. As a result, on January 18, 2018, Ms. Keil was interviewed during which, under oath, she disclosed that she had been sexually abused repeatedly by both LPC Dunn and CO I Bearden. MDOC 001696.

G.  On March 28, 2018, Investigator Bentley having considered the evidence Ms. Keil provided concerning LPC Dunn concluded, "Due to the consistency of Backues' [Keil] statements when compared to those of the other witnesses against Dunn, the original finding of SUBSTANTIATED remains unchanged." See, Supplemental Report to 2017090067.

H.  On May 29, 2018, Ms. Keil filed Case 5:18-cv-06074-BP in the U.S. District Court for the Western District of Missouri. Defendants included Edward Bearden and John Dunn.

I.  Shortly thereafter, four additional women, previously or currently incarcerated at CCC, came forward, or were brought forward, all victims of sexual abuse by CO I Bearden.

   1. Ms. Lynnsey Betz, previously incarcerated at CCC, stated she was sexually abused on three separate occasions by CO I Bearden between July 13, 2012 and July 30, 2016. On June 5, 2018, she filed Case 5:18-cv-06079-FJG in the U.S. District Court for the Western District of Missouri.

   2. A.O.Z., previously incarcerated at CCC, stated she was sexually abused by CO I Bearden between January 2014 and May 10, 2017.  MDOC 001735.

   3. T.D., still incarcerated at CCC at the time of reporting, was sexually abused by CO I Bearden, dates not initially known. CCC Institutional Investigator York learned of her abuse on July 12, 2018 while monitoring inmate phones.  MDOC 001708 ff.

   4. N.G., still incarcerated at CCC at the time of reporting, was sexually abused by CO I Bearden between September and November 2017.  Her sexual abuse was reported on July 20, 2018 by her fiancé. MDOC 001717 ff.

J.  On June 14, 2018, shortly after the filing of the lawsuits on May 29, 2018, by Ms. Keil, and on June 5, 2018, by Ms. Betz, Investigators Pfeifer and Albach closed Case No. 201810067 as unsubstantiated. MDOC 001687 ff. They concluded given the time that had elapsed between the assaults and their discovery, in combination with insufficient information such as the specific dates Bearden assaulted her, could not be overcome. MDOC 001694. They should have concluded due to the consistency of Keils' statements when compared to those of the other witnesses against Bearden, the allegations are substantiated.

II. **Former CO I Edward Bearden had the means and opportunity to repeatedly sexually assault and harass Ms. Keil and he caused her to suffer physical and emotional injury.**

   A. Every inmate must follow the order of any correction officer. Any correction officer can write-up any inmate for failure to follow their order. The word of the correction officer is presumed to be true, and that of the inmate, untrue. Inmates are also "written-up" by officers for making false statements. The write-up can result in the loss of specific privileges such as the female offenders' PATCH visits with their children and jeopardize their parole release date. It can also result in reassignment to administrative segregation, restrictive housing serving three purposes – a temporary assignment pending completion of an investigation (TASC) that may take 70 or more days, a disciplinary assignment of relatively short duration usually not to exceed 30 days, or protective custody of indefinite duration. Regardless of its intent, offenders experience all assignments to segregation as punitive. Movement is limited, the number of hours locked down daily is significant, and all privileges including outdoor recreation with other inmates, a paid job, contact visits, phone calls and commissary are lost. In sum, whether a victim of sexual abuse is assigned to the "hole" pending the outcome of the investigation of her allegation for her own protection, or longer because she is no longer safe to remain in general population, or was found to have filed a false report, its effect on reporting is chilling.

   When CO I Bearden directed Ms. Keil to submit to a pat-down during the period while cross-gender searches were still conducted, or to follow him to the property room "to retrieve her television set" or perform some other task, or come with him to the laundry, she had no choice but to obey. MDOC 030420.

   B. CO I Bearden demonstrated heightened awareness of the facility's security cameras locations. When Bearden sexually abused Ms. Keil in a nearby property room at CCC, and she told him that he would be captured on the security camera if he did not stop, he responded that the cameras did not cover that area. MDOC 030420. When Bearden sexually abused another offender assigned to the barbershop, while she cut his hair, she told him to stop or he would be caught on camera. He told her he could not be seen from the barber's chair where he was sitting and while wearing the cape. MDOC 001717 ff.

   C. Upon graduating from the Academy, CO I Bearden was assigned to and remained at the CCC, and much of that time he worked as a Utility Officer; that is, an officer who is dispatched to various assignments in the course of a shift and over time. Given the inherent mobility of these assignments, direct supervision of utility officers by superior officers is limited; more so due to the facility's chronically low staffing levels. He knew it well and used that information to his advantage.

   D. It is my opinion CO I Bearden demonstrated the predatory behaviors of a sex offender. He appeared to select individuals who would be reluctant to report him, women fearful of losing PATCH visits with their children, or their earliest parole date, women of low self-esteem, women who had been previously sexually abused, women who had a lot of time to serve – women like Ms. Keil. His conduct as aggressive as it was, was also controlled; he appeared to be careful even as he grew more forceful in his assaults so as to continue to avoid being discovered and reported. When he raped Ms. Keil in the laundry, and she struggled to separate herself from him she sustained bruising; he came back the next day to assess her state of mind and physical

7

injuries. When she told him, she was not going to report him, he grew bolder. Over time he came with greater frequency to see her in the housing unit and in the gym where she worked, once he sent her a card, and with confidence repeatedly directed her to follow him to the property room or other remote locations in the facility where he would sexually assault her and then back to her housing unit to shower and destroy the evidence of his abuse. After she was released, he continued to ask two former cellmates where she was and how she was and told them he knew where she worked, and he wanted to see her.

E. At no time, did the Department take substantive action to protect Ms. Keil.

III. **Former LPC John Dunn had the means and opportunity to repeatedly sexually assault and harass Ms. Keil and he caused her to suffer physical and emotional injury.**

A. Ms. Keil asked to speak with a counselor to help her cope with the abuse she suffered from CO I Bearden. She was assigned LPC John Dunn as her mental health counselor. Medical and mental health staff members are required to inform offenders at the initiation of services of the practitioner's duty to report in accordance with statutes. Department Procedure D1-8.13. 8.a. Offender Sexual Abuse and Harassment, p. 6. LPC Dunn failed to do so. When Ms. Keil disclosed to LPC Dunn that she had been sexually abused by CO I Bearden, he also failed to report the abuse. Instead, Dunn specifically counseled her not to report Bearden's sexual abuse. He told her it would not be good to report this abuse because she would likely lose her progress in various programs and would probably go to "the hole." LPC Dunn told her he wanted to help and protect her. Instead, he encouraged her to disclose to him the details of the abuse she suffered at the hands of CO I Bearden, for his own sexual gratification. His sexual abuse of Ms. Keil continued. After this conversation, Dunn scheduled weekly sessions with her. Then, he used her to co-facilitate his classes, increasing their meetings in his office to three times weekly for "class preparation." MDOC 030420.

B. Inmates do not select their mental health counselor and cannot change counselors without cause. Counselors are assigned clients by the Mental Health Unit. At CCC, an inmate wishing to change her counselor first must confront that counselor and state the reason for her request. In theory, the intent, as explained by MH Director Link, was to encourage conflict resolution between counselor and client. See Case No. 201090067; MDOC 022685 ff. In practice, it discouraged offenders from reporting situations and circumstances because so many of them felt powerless to come forward. As noted in Section II, above, offenders are not on a level playing field with staff: The word of an officer and any other employee with a title or rank carries more weight than does that of an offender, and the consequences for being deemed untruthful or untrustworthy are significant. If Ms. Keil could have told LPC Dunn to stop, she would have already done so.

C. It took months for MH Director Link, LPC Dunn's supervisor, to surmise the frequency and duration of his sessions with Ms. Keil were excessive and inappropriate, and despite his clinical training, did not take the action required to protect her. On October 21, 2013, having

8

determined LPC Dunn was "over-familiar" with Ms. Keil, he directed Dunn have no further contact with her. Case No. 2017090067, MODOC 022687 ff. Link overlooked the obvious.

D. Director Link also failed to report Dunn to the authorities. If he had, Dunn's continual abuse could have been addressed. The MH unit, however; did inform Ms. Keil that she would no longer see LPC Dunn for counseling or attend his classes. When she received this news, she was fearful Dunn would accuse her of getting him in trouble. She explained to Investigator Bentley, "I figured he would blame me for the relationship he was pushing in his office." Link's direction did not deter LPC Dunn, however. He sought out Ms. Keil on the recreation yard on numerous occasions. He offered to write a favorable recommendation to the Parole Board for her release; which she declined. He also asked her if she would visit him after she was released. She said no.

E. The Department and MHM continued to fail to recognize and respond to Link's lax supervision and Dunn's predatory conduct, and when the contract for health care passed from MHM to Corizon both Link and Dunn were retained, placing other offenders at risk.

1. M.P., an offender at CCC, alleged inappropriate physical contact and sexual harassment by LPC Dunn during a counseling session in his office on or about April 27, 2015.

    PREA investigators concluded her complaint could not be substantiated because there were no video cameras in the counselors' offices and the video camera in the waiting area was inoperable. They did not sustain her allegations despite the consistency of her statements with those of the other witnesses against Dunn.

    Further, following this investigation, there is no information indicating additional rounds by correction officers and supervisors in the rank of lieutenant or higher were added, no additional video cameras were installed, MHM's keep-the-office-door-open-and-do-not-latch-it policy was not re-enforced by either security staff or clinical supervisors, nor were any security mirrors installed in counselors' offices or doors to the offices replaced with ones that had larger windows to increase visibility while maintaining client confidentiality.

2. More than a year passed before MHM and Link, and later Corizon, took any additional measures to address Dunn's conduct, all of which were also inadequate. MDOC 022687.

    a. On October 26, 2016, Link issued Dunn a Final Written Warning for Failure to Report Inappropriate Offender Interaction, and directed him attend two classes, Prohibitive Association in October 2016, and Working with Female Offenders in November 2016.

    b. On April 28, 2017, following a complaint by M.W., an offender at CCC, regarding sexual harassment, MHD Link issued Dunn another memorandum.

    c. On June 9, 2017, following another PREA investigation that Dunn had failed to report inappropriate comments by T.K., an offender at CCC, he issued Dunn another memorandum.

9

F. Several years also passed before CCC PREA Investigators substantiated allegations by female offenders and concluded those of Ms. Keil were consistent with theirs.

   1. On December 12, 2017, the investigation substantiated LPC Dunn sexually harassed V.D. Case No. 201700084.

   2. On January 16, 2018, the investigation substantiated allegations by numerous female offenders, all of whom were his patients, that LPC Dunn had sexually abused them. Case No. 2017090067; MDOC 022685 ff.

      a. Sexually abused and engaged in avoidable contact with K.H., an offender, in his office.

      b. Sexually abused T.K., an offender, in his office at CCC.

      c. Sexually harassed M.W., T.C., and V.D., offenders, in his office at CCC.

      d. Used a department computer to access, view and display pornography to T.K., an offender, in his office at CCC.

   3. On March 28, 2018, the investigation concluded, "Due to the consistency of Backues' (Ms. Keil) statements when compared to those of other witnesses against Dunn, the original finding of SUNSTANTIATED remains unchanged." Supplemental Report to Case No. 2017090067.

G. LPC Dunn's predatory conduct was widely recognized well before the Department and its health care contract providers, MHM then, Corizon, took substantive action to protect the offender population. PREA Manager Sturm, stated the obvious when she wrote in a November 20, 2017, memo to Investigator Bentley, "Everyone thought he was a creep …" See MDOC 025523.

H. At no time, however; did the Department or MHM take substantive action to protect Ms. Keil.

IV. **The Missouri Department of Corrections failed to provide the protection owed Ms. Keil during her incarceration.**

   A. The Department is responsible for the care, custody and control of all the inmates in its custody. The Department may delegate activities such as health care by means of a contract, but it can never delegate its statutory duty to ensure the safety and well-being of all the offenders in its custody and under its control.

   The Department contracts for inmate medical and mental health care previously with MHM and currently with Corizon therefore, oversees their activities and ensures their compliance. "The contract monitoring staff of the Medical Services section of the Division of Offender Rehabilitative Services ensures that offenders receive medical care that is equivalent to the community standard and that all mandates of the contract are fulfilled." See

10

https://doc.mo.gov/divisions/rehabilitative-services." "Mental health care services are audited by Division of Offender Rehabilitative Services' mental health contract monitoring staff to ensure mental health care meets both current standards and contract requirements." See https://doc.mo.gov/divisions/rehabilitative-services.

The Department also issued a written policy mandating zero tolerance toward all forms of sexual abuse and sexual harassment and outlining its approach to preventing, detecting, and responding to such conduct. 28 CFR Part 115, Prison Rape Elimination Act National Standards. Department Procedure Manual D1-8.13 Offender Sexual Abuse and Harassment is the Department's policy establishing zero tolerance for offender sexual abuse and harassment, and its strategies and responses to reduce and prevent offender sexual abuse and harassment. This effort is led by the Department's PREA Manager with the help of a PREA site coordinator at the level of deputy warden at each facility. There are also ten PREA investigators, several of whom are assigned to the CCC. It is my opinion the Department and its health care provider, MHM, failed to provide the protection owed Ms. Keil during her incarceration.

Key to the commitment that the Department and MHM prevent, detect and respond to all forms of staff-on-inmate sexual abuse are the following.

1. Personnel Selection, Training, and Retention. Department policy requires all paid, unpaid and contract employees undergo a background and records check. Only applicants with convictions must not be offered employment.

    a. Defendant Edward Bearden worked previously for the State of Missouri at the Department of Transportation as a crew leader from 1983 to 2001. He was involuntarily terminated following an incident of sexual harassment of a female co-worker. See Form MO 931-1419 (1-08), D. Employment Record.

    The Department hired Bearden as a Correction Officer I in 2009. Over the next nine years, he attended a number of classes specific to offender sexual abuse including Working with the Female Offender, Staff and Offender Relations ("It Could Never Happen to Me"), Anatomy of a Set-Up, and PREA refresher training, between two and eight hours each in duration. MDOC 000628 – 000639. Although his annual performance ratings were average, with knowledge of work beginning at a score of 4 of out 10 and ending at a score of 6 out of 10, and quality of work beginning at a score of 5 out of 10 and ending at a score of 7 out of 10, Bearden also served as a Field Training Officer for probationary uniformed personnel at CCC.  MDOC 030255.

    Bearden was investigated six times for staff-on-inmate sexual abuse between February 2014 and July 2018. The first investigation concerned off-duty conduct determined not to involve criminal activity. The second, concerning Ms. Keil, resulted in unsubstantiated sexual allegations due to the time between the events and their reporting. The remaining four investigations, all concerning offender sexual abuse as well, were open and ongoing when he retired September 1, 2018.

11

b. Defendant John Dunn worked previously as a mental health counselor for the Kansas Department of Correction at its facility for female offenders in Lansing, KS. His employment was terminated.

MHM employed John Dunn to work as a licensed professional counselor at CCC. Department policy stipulates all contract staff will receive PREA training specific to their classification as determined by the appropriate division director and chief of staff training. D1-8.13 III. B. 4. e. (1). Policy also provides medical and mental health staff will receive annual, specialized PREA training. D1-8.13 III. B. 5. f. a. Dunn's training records were unavailable.

On September 22, 2017, a CO I assigned to monitor the mental health waiting area reported Dunn and a female offender were engaged in sexual activity in Dunn's office. The Chillicothe Police Department responded to the facility with an arrest warrant and requested that he submit to a DNA swab. Dunn refused to cooperate. He was placed on administrative leave then terminated.

On November 17, 2017, the facility determined Dunn had sexually abused two offenders, sexually harassed others, and used a department computer for impermissible purposes. Case No. 2017090067, p. 13.

c. The Department employed CO I Bearden and MHM employed LPC Dunn, both of whom had questionable employment histories. Both completed the training provided, limited as it was, and neither performed above average during their tenures. Bearden and Dunn both engaged in unlawful sexual misconduct with offenders in their care and under their control during their tenures at the Department and MHM, conduct that warranted closer consideration which was not given.

2. Staffing Levels and Video Monitoring. Department policy requires there shall be sufficient uniformed line staff and supervisors to conduct scheduled and unscheduled security rounds to monitor staff and offender activity to prevent, detect, and respond to offender sexual abuse. See D1-8.13 III A.11. The PREA Standards upon which Department policy is based, also require there are sufficient recording video cameras. See §115.13.c.2. Supervision and Monitoring. Sufficiency is a function of facility capacity, the census, and the population's complexity.

The CCC designed capacity is 1,636 adult female offenders in all custody classification levels. The facility consists of general population and administrative segregation housing, medical, mental health, and substance abuse units, and central services and programs services, as well as an administration building, state garage and powerhouse. There are 14 buildings on the 55-acre fenced campus. The most recent census information available is a one-day snapshot from June 2019 at which time, there were 1,425 adult female offenders and just 307 security staff, presumably encompassing all ranks from the Superintendent to Correction Officer. See 2019 CCC PREA Audit, p. 4.

12

a. Department policy requires the staffing plan consider blind spots and areas where staff or offenders may be isolated, the composition of the offender population, and the prevalence of substantiated and unsubstantiated offender sexual abuse allegations when considering its sufficiency. See D1-8.13, III A. 11. The policy requires the facility comply with the staffing plan, document staffing deviations, and provide justification for deviations in staffing. See D1-8.13, III A. 12. The policy also requires the facility ensure the classification of lieutenant or above conducts and documents unscheduled and unannounced rounds to identify and deter offender sexual abuse. See D1-8.13, III A. 13.

   Assuming a shift-relief factor of 5.2 officers is needed to cover each 40-hour post every day of the year, there would be no more than 59 uniformed staff in all ranks available to supervise between 1,425 and 1,636 female offenders, a ratio of one officer of any rank to 24 to 28 inmates. All officers are not deployed to supervise inmates, however. Some monitor the perimeter, transport offenders off-site to court and scheduled medical appointments and procedures, and others are assigned maintenance, training, and clerical duties. When uniformed staff in the supervisory and managerial ranks, all of whom provide indirect supervision, are removed from the pool of 307, the ratio of uniformed staff providing direct supervision to inmates, increases appreciably.

   The Department requires staff of one gender to announce themselves upon entering the housing unit where offenders of the other gender are housed. The Department also prohibits cross-gender viewing. CO I Bearden frequently visited the housing units to which Ms. Keil was assigned and spoke with her at her cell. He also positioned himself in her assigned housing units from vantage points from which he could observe her in the shower area. After her release from prison, Bearden continued to enter the housing units to which her former cellmates were assigned and go to their cells to ask them about her and to convey messages to her. There is no indication that the officers assigned to those units, or supervisors making random inspections, either made those inspections or challenged his entry. It is also noteworthy in 2016, a PREA auditor determined cross-gender viewing was occurring during security checks in CCC's segregation and crisis level units but did not recommend or require any modifications to the physical plant or to agency policy and practice. 2016 CCC PREA Audit Report, p. 2.

b. The Department reported CCC used 449 video cameras to surveil its 14 buildings and grounds. This number is not as large as it may appear. The facility includes four general population dormitories with 38 multiple occupancy, multi-story housing units and a 58-cell administrative segregation housing unit, plus the medical, mental health and substance abuse units, the support, program, visitation, and administrative areas, the powerhouse and state garage, each of which has its own combination of wings, corridors, storage closets, breakrooms, restrooms, and stairwells. 2019 PREA Audit Report, p. 3 at https://doc.mo.gov/sites/doc/files/PREA/CCCFinalPREAReport72119.pdf.

   In 2015, the Department reported additional video cameras had been requested to enhance video monitoring. See MODOC 2014 PREA Annual Report, p. 4.

13

A recent memo from the Physical Plant Supervisor III confirmed, "The facility has not added any additional cameras to the general population housing units since its construction in 2008. The laundry room cameras are original equipment."

c. Monitoring offender phone conversations and mail are two other means by which correctional facilities identify and investigate serious violations of department rules and unlawful conduct.

   In 2014, an investigator discovered CO I Bearden had engaged in off duty conduct with a former female offender while randomly monitoring phone conversations and recommended that the matter be referred to AIO. No information was provided to indicate whether this recommendation was acted on, or its outcome. In 2018, Ms. Keil reported in her deposition that CO I Bearden had directed her to memorize his phone number because he wanted her to call him after she was released.

   In 2018, an institutional investigator discovered while monitoring offender phone calls that Bearden has sexually abused another female offender at CCC, and he opened an investigation that was substantiated.

   As more victims of sexual assault by Bearden were identified, a WERDCC PREA investigator requested additional resources from his supervisor on July 3, 2018, to find and follow leads by means of monitoring more recorded conversations.

   Ms. Keil also reported in her interview that CO I Bearden had mailed a card to her while she was still incarcerated. It was not intercepted in the Mail Room nor by correction officers during subsequent institutional searches.

d. The most reliable measure of sufficiency is the outcome; specifically, whether female offenders come forward to report abuse, investigations are objective, thorough and timely, and offender sexual abuse rises, falls, or remains constant. Based upon the available information, which is limited, female offenders continue to suffer sexual abuse by state employees and contract staff. During the most recent 12-month PREA reporting period, the facility recorded 186 PREA allegations including 93 allegations involving sexual contact by state or contract employees or offenders and 93 allegations involving sexual harassment by state or contract employees or offenders. See https://doc.mo.gov/sites/doc/files/PREA/CCCFinalPREAReport72119.pdf, pp. 5 – 6 .

   i. Sexual Contact. There are three types of sexual contact. They are inmate-on-inmate nonconsensual sexual acts and abusive sexual contact, and staff-on-inmate staff sexual misconduct. The 2019 PREA Audit Report noted 93 allegations of sexual contact (50%) of which, 60 were inmate-on-inmate and 33 were staff-on-inmate. Of the 60 inmate-on-inmate allegations, six were substantiated, ten unsubstantiated, 32 unfounded, and 12 investigations not completed. Of the 33 staff-on-inmate allegations, three were unsubstantiated, 14 unfounded, and 16 investigations not completed.

14

ii. Sexual Harassment. There are two types of sexual harassment. They are inmate-on-inmate sexual harassment and staff-on-inmate sexual harassment. The 2019 PREA Audit Report also noted 93 PREA allegations of sexual harassment (50%) of which, 78 were offender-on-offender and 15 were staff-on-offender. Of the 78 inmate-on-inmate allegations, 13 were substantiated, 36 were unsubstantiated, 26 unfounded, and three investigations not yet completed. Of the 15 staff-on-inmate allegations, one was substantiated, four were unsubstantiated, eight 8 unfounded, and two investigations not yet completed.

iii. Outcomes. Over one-third, 33 of 93 sexual contact allegations, involved staff whereas 78 of 93 sexual harassment allegations, almost 85 percent, involved inmates only. When staff was involved in offender sexual abuse, most often it involved sexual contact including penetration.

Almost one-third, 28 of 93 investigations of allegations of offender sexual abuse (30%), were not yet completed whereas most allegations of sexual harassment, 88 of 93 (95%) had been completed.

Fewer than one-third, 53 of all 186 allegations (28.5%), were unsubstantiated; fewer than one half, 90 of 186 (48%), was unfounded.

iv. Analysis. It is my opinion there is insufficient security staff, investigators, and video monitoring to prevent, detect, and respond to offender sexual abuse at CCC. I believe the Department should allocate more resources to, and place greater emphasis on, preventing, detecting, and responding to offender sexual abuse allegations sooner. Specifically, the Department should increase security rounds by correction officers and unannounced security checks by supervisors in the rank of lieutenant and above at CCC. It should also increase routine monitoring of offender phone calls and mail by facility investigators and add or reallocate PREA investigators to complete investigations of PREA allegations timely. Additionally, the Department should add more video cameras and consider increasing video retention beyond 30 days. Earlier identification and investigation will also encourage more victims of sexual abuse and witnesses to come forward and lower the numbers of unsubstantiated and unfounded allegations.

3. Practice the Zero Tolerance Policy. Department policy states it has a zero tolerance for all forms of offender sexual abuse, harassment, and retaliation however, it employs protocols and practices that impede realization.

   a. Offenders' Vulnerability for Sexual Assault by State, Contract, and Unpaid Employees is not assessed. Department policy requires an assessment of all offenders at intake and periodically thereafter for victimization of, and by, other offenders, but not victimization by state, contract, and unpaid employees. While the policy recognizes members of the workforce may sexually abuse offenders, as a practice, the Department is reluctant to do so.

15

b.  Reporting Sexual Abuse. Department policy makes provision for more than one way to report sexual abuse including anonymously, by means of informal resolution, the formal grievance process, to a staff member, the PREA hotline, an advocacy agency, or the Department of Public Safety, Crime Victims Services Unit. The policy specifically states it will not require an offender to use the grievance process, to resolve alleged incidents of sexual abuse. However, Affidavits of CCC Warden Chris McBee and several other administrators call out female offenders who had been subjected to sexual abuse and had not filed or followed the grievance procedure. There is no requirement in policy that they do so.

c.  Administrative Segregated Housing. Department policy provides both temporary (TASC) and indefinite administrative segregated housing may be used in the course of a PREA investigation (i) temporarily, to protect the victim, witness, and/or another offender assisting the victim, pending the outcome of an investigation, (ii) indefinitely, to protect the victim, witness, and/or another offender assisting the victim, following the outcome of an investigation, and (iii) for a specified term, as punishment for the victim, witness, and/or another offender assisting the victim, found to be intentionally lying in the course of sexual abuse investigations.

    Department policy stipulates TASC should not be considered as the first option to ensure the safety the victim, witness, and/or another offender assisting the victim, pending the outcome of an investigation, and sets a high threshold for punishing an offender who lies intentionally in the course of sexual abuse investigations – but it allows for both. See D1-8.13 III. H.2 and H.3, and N.1. Its effect is chilling. Many female offenders are certain if they come forward, they will be put in "the hole" for the entire investigation during which time, they will also lose all the privileges they enjoyed in general population. Their belief is informed by their own experiences and the threats made by their abusers who are members of staff.

d.  Offender Concerns about Credibility. Many victims of sexual abuse are fearful they will not be believed should they come forward to report sexual abuse. This is true in the community and more so in prison, where female offenders are also concerned that they will be punished.

    MH Director Link's requirement that female offenders seeking reassignment to another counselor meet first with their assigned counselor, was an insurmountable barrier to relief for many of the victims of sexual abuse by LPC Dunn. Insisting that counselor and client mediate their differences in every instance, failing to recognize the significant number of offenders transferring from Dunn to others for cause, only made it more difficult for his victims to seek relief. In order to secure a transfer, they would first have to "out him" to his supervisor, increasing the risk every victim assumes when he or she comes forward. Many are also fearful that their complaints of sexual assault against staff will result in delays or denial of parole, a penalty even more foreboding than TASC for coming forward. Ms. Keil was among those who faced this prospect.

CO I Bearden threatened to write-up Ms. Keil if she reported his conduct jeopardizing her parole date. LPC Dunn threatened to write the Parole Board to recommend she not be paroled if she did not comply with his desires. MDOC 030420.

Another victim of sexual assault by Dunn told the investigator, "I'm just an inmate, and that man is a professional man. I'll just be locked up and nobody'll give a shit. He'll continue to work. He'll write a letter just like he says, the parole board, and I'll have to stay the whole time." When asked if Dunn threatened to write a letter against her, she stated he did so a long time ago. MDOC 025527.

4. Impeded Access to Emergency Medical Treatment and Crisis Intervention Services. Department policy states victims of sexual abuse will receive timely, unobstructed access to emergency medical treatment and crisis intervention services.

    a. Department policy states in the event of an allegation of a penetration act, the first responder shall request the victim not take any actions that may destroy physical evidence including washing, brushing teeth, and changing clothes.

    CO I Bearden escorted Ms. Keil back to her housing unit immediately after each sexual assault, directed her to shower, and remained in the area to ensure that she did. His intimidation and threats of retaliation undermined her credibility and destroyed the physical evidence of his sexual assault of her.

    b. Department policy states when the alleged perpetrator is a staff member, the victim shall be transported to the community emergency room for a sexual assault examination.

    CO I Bearden's and LPC Dunn's intimidation and threats of retaliation prevented Ms. Keil from coming forward and receiving timely, unobstructed access to sexual assault examinations by a SANE or SAFE provider and other emergency medical treatment.

    c. Department policy states victims of sexual abuse are also assured timely, unobstructed access to crisis intervention services.

    CO I Bearden's and LPC Dunn's intimidation and threats of retaliation further prevented Ms. Keil from receiving crisis intervention services.

5. Core Accountability. Department personnel and contract employees failed to protect Ms. Keil. Department personnel and contract employees commit to the care, custody, and control of offenders. All are mandated reporters and first responders. Those who did harm and those who failed to report the harm that was done, all failed to protect Ms. Keil.

    a. CO I Bearden was not discrete. He was open and obvious in his conduct. Bearden regularly singled out Ms. Keil for pat-downs when the facility conducted cross gender

searches. He spent time in the housing units to which Ms. Keil was assigned, and at the doorway to her cell whether or not he was assigned to a post in that housing unit, and in the gym where she worked, where he was never assigned to a post. Bearden also spent time in the housing units where Ms. Keil's former cellmates were housed, and at the doorway to their cells, to inquire about her and ask that they convey messages to her from them. He also admitted to stopping to speak to a former cellmate of Ms. Keil on the recreation yard. His conduct should have attracted attention and redirection by his supervisors. It was not until January 2018 however, when Ms. Keil who was no longer in the custody of the state, stated an interview following the sexual assault of another female offender at CCC, that she had been sexually assaulted by both CO I Bearden and LPC Dunn, that the department acknowledged it was on notice.

b. LPC Dunn, a contract employee, was not discrete. He was open and obvious in his conduct. Dunn was widely recognized to be sexually inappropriate with co-workers and many of the female offenders whom he counseled. MDOC 025523-025539.

MH Director Link, Dunn's supervisor, had instructed him early in his tenure to keep his door ajar and not to latch it when there was a client in his office with him. Dunn did not heed. Most of Dunn's co-workers reported his door was kept closed, and offenders expressed concern that it was always latched. They also objected to his invitations to call him by his first name, John, when they met with him in his office, and he would do the same, call them by their first name when they were with him in his office.

LPC Heldenbrand reported, LPC Dunn was "always" asking her out on a date, and that a number of the offenders he counseled had requested a different counselor because he made them feel uncomfortable. When asked if there was a similarity among them, she said they were younger and attractive, and added, "He's always trying to switch one of my attractive ones for one of his ugly ones."

LPC Eaton described a conversation he initiated with her about a book he was reading in which two women were in a homosexual relationship. It made her uncomfortable. She also knew of several female offenders who asked to be reassigned to another counselor.

LPC Pittman kept her distance from him. She said, "He set my radar off."

Several of his co-workers had also observed him in close physical proximity to the women he was counseling in his office. None of them reported it.

CO I Mc Coy, on post in the mental health waiting room, was aware of a particular offender's discomfort with Dunn, and that she didn't want to see him, but Dunn continued to schedule appointments with her. As appointments could only be cancelled in person, she had to come to the unit whether or not she intended to keep it. Dunn sexually abused her, too.

c. It is my opinion that the summation of Dunn's investigation is also applicable to Bearden, "…it appears that a collective failure to act contributed to an environment

18

which enabled Dunn to perpetrate harassment and misconduct on the female offenders with whose care he was entrusted." Case No. 2017090067, p. 13.

   d. Failure to report offender sexual abuse is a class A misdemeanor. See D1-8.13. III.A.8.

6. Investigative Integrity and Organizational Transparency. Agencies and individuals in their employ make mistakes, errors in judgement, not integrity; administrative errors, not criminal violations. What distinguishes the better from the bad organization is how quickly and comprehensively those agencies assess and act upon their assessments to prevent reoccurrences.

   a. PREA Manager Sturm requested of the Department's Office of Professional Standards that a CVSA administrator be available when the PREA investigator met with CO I Bearden, before his upcoming interview with the Attorney General's office. He approved her request. July 5, 2018 memos to and from the Director of Professional Standards Briesacher and PREA Manager Sturm.

   This is of concern to me. When a state's Attorney General has determined it will interview an employee, it is unusual and irregular for the agency to interview that individual as well, and particularly before the AG has had an opportunity to do so.

   b. Manager Strum heavily edited the investigative report, Case No. 2017090067, concerning allegations of sexual abuse by LPC Dunn of offenders K.H., T.K., M.W., T.C., V.D., and N.W.  MDOC 025524-025539.  She directed the investigator shift all responsibility from the Department to the vendor.

   > "I have a lot of comments. Mostly… I want the negative stuff regarding York [a facility investigator] removed. We can write an operational memo and request he receive additional training. The real issue is… I think Corizon failed in their supervision of Dunn. I want more emphasis placed on Link and his supervisor, what they knew, what they did. Did they follow Corizon policy? Who reassigns offenders to counseling?? Did staff report anything to Link? Everyone thought he was a creep… Link had to know something. Is there anything in his personnel file from MHM???  Did you interview Hennessey?? There was nothing in the report regarding the interview."  MDOC 025523.

   c. In comparison, Bearden's file was kept clean. With one investigation of sexual abuse recently closed as unsubstantiated and four investigations of sexual abuse involving multiple offenders open and ongoing, he continued to work in the facility, with no limitations on offender contact, until July 2, 2018 when a reporter asked why he had not been removed. Only then he was reassigned, temporarily, to the control center, a non-contact post, still within the secure perimeter. He retired in good standing effective September 1, 2018.

19

**V. The failure of Missouri Department of Corrections and its agents to assess and act upon Ms. Keil's complaints and those of other inmates contributed to the increase in substantiated staff sexual misconduct and staff sexual harassment and caused additional offenders to suffer needlessly.**

A. Missouri was among the first states to report that it complied with PREA but that is not case. The PREA auditors found all the components of 28 C.F.R. Part 115 in place during their audits of 2016 and 2019 and still, the Department repeatedly failed to follow the Procedure it promulgated to comply with federal regulation as identified in Sections I, II, III, and IV.

B. Further, PREA sets out minimum standards to eliminate prison rape. An agency may need to do more realize this goal. It is my opinion that the Department is such an agency. Defendants' PREA policy and procedures failed to prevent, detect, and respond to the repeated staff-on-inmate sexual abuse of Ms. Keil at the CCC by CO I Bearden and LPC Dunn, her mental health counselor, as well as the sexual abuse of other offenders by state staff and contract employees during their incarceration in the Department.

Over one-third of all substantiated incidents of sexual abuse and sexual harassment in the past three reported years, 2015 – 2017, were inflicted by correctional personnel and contract employees. Moreover, the number of substantiated incidents of sexual abuse and sexual harassment by staff rose from 75 in 2015, to 83 in 2016, to 105 in 2017. Finally, the incidents of substantiated staff-on-offender sexual misconduct, the most serious form of unwanted and unlawful sexual offending, rose from 17% in 2015, to 24% in 2016, to 26.5% in 2017.

| MO Department of Corrections *Substantiated* Staff-on-Inmate Sexual Abuse* | | | | |
|---|---|---|---|---|
| Incident Type by Year: | 2015 | 2016 | 2017 | Total |
| **Inmate-on-Inmate, all substantiated complaints** | **49 (65%)** | **50 (60%)** | **68 (65%)** | **167 (63.5%)** |
| **Staff-on-Inmate, all substantiated complaints** | **26 (35%)** | **33 (40%)** | **37 (35%)** | **96 (36.5%)** |
| Staff Sexual Misconduct, all substantiated | 13 (17%) | 20 (24%) | 28 (26.5%) | 61 (23%) |
| Staff Sexual Harassment, all substantiated | 13 (17%) | 13 (16%) | 9 (8.5%) | 37 (13%) |
| **Totals** | **75** | **83** | **105** | **263 (100%)** |

* MODOC 2015 PREA Annual Report at https://doc.mo.gov/sites/doc/files/2018-01/2015_PREA_Data.pdf, MODOC 2016 PREA Annual Report at https://doc.mo.gov/sites/doc/files/2018-01/2016_PREA_Data.pdf, and MODOC 2017 PREA Annual Report at https://doc.mo.gov/sites/doc/files/media/pdf/2019/02/2017_PREA_Data.pdf

It is my opinion, Defendants failed to meet the duty of care owed Ms. Keil and other victims of offender sexual abuse during her incarceration as enumerated in the Prison Rape Elimination Act and promulgated by the Department as Department Procedure Manual, Policy D1-8.13, Offender Sexual Abuse and Harassment. As the data above indicates, the Department and its agents continue to fail to meet the duty of care owed all offenders since Ms. Keil's release from the state's custody.

I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Jara B. Serrio/*

October 14, 2019