1           **IN THE UNITED STATES DISTRICT COURT**
              **WESTERN DISTRICT OF MISSOURI**
2                  **WESTERN DIVISION**

3

    **KAREN BACKUES KEIL,**          **)  No. 18-06074-CV-W-BP**
4   **LYNNSEY CHRISTIE BETZ,**       **)    18-06079-CV-W-BP**
    **ASHLEY OLSEN ZIESER, and**    **)    18-06103-CV-W-BP**
5   **TRENADY GEORGE,**            **)    19-06161-CV-W-BP**
                          **)**
6          **Plaintiffs,**     **)  April 25, 2022**
                          **)  Kansas City, Missouri**
7       **V.**                  **)  CIVIL**
                          **)**
8   **EDWARD BEARDEN,**            **)  VOLUME I**
                          **)  (Pages 1-103)**
9           **Defendant.**      **)**
                          **)**

10

11              **TRANSCRIPT OF JURY TRIAL**

12       **BEFORE THE HONORABLE BETH PHILLIPS**
           **UNITED STATES DISTRICT JUDGE**
13

     **Proceedings recorded by electronic stenography**
14       **Transcript produced by computer**

**Kathleen M. Wirt, RDR, CRR**
**United States Court Reporter**
**400 E. 9th Street, Suite 7452 * Kansas City, MO 64106**
**816.512.5608**

1                              APPEARANCES

2      For Plaintiffs:         MS. SUSAN MCGRAUGH
                               MR. JOHN J. AMMANN
3                              MR. BRENDAN D. ROEDIGER
                               Saint Louis University School of Law
4                              100 N. Tucker, Suite 704
                               St. Louis, MO 63101
5
                               MS. JENIFER C. SNOW
6                              Law Office of Joan M. Swartz
                               3348 Greenwood Blvd.
7                              Maplewood, MO 63143

8      For Defendant:          MR. NICOLAS TAULBEE
                               MS. ABBIE ROTHERMICH
9                              Missouri Attorney General's Office
                               615 East 13th Street, Suite 401
10                             Kansas City, MO 64106

11                             MS. CARA HARRIS
                               Missouri Attorney General's Office
12                             149 Park Central Square, Suite 1017
                               Springfield, MO 65806
13

14

15

16

17

18

19

20

21

22

23

24

25

# I N D E X

## VOLUME I
### (Pages 1-103)

APRIL 25, 2022

Pretrial matters                                    7
Jury sworn                                          17

Plaintiffs' opening statement                      17
Defense opening statement                          28

PLAINTIFFS' WITNESSES:

   ASHLEY ZIESER
     Direct Examination by Ms. McGraugh         34
     Cross-examination by Ms. Rothermich        74
     Jury Questions asked by the Court           99
     Further Cross by Ms. Rothermich           100

- - -

## VOLUME II
### (Pages 104-407)

APRIL 26, 2022

PLAINTIFFS' WITNESSES (continued):

   TRENADY GEORGE
     Direct Examination by Ms. McGraugh        116
     Cross-examination by Mr. Taulbee          163
     Redirect Examination by Ms. McGraugh      193
     Jury Questions asked by the Court         196

   KAREN KEIL
     Direct Examination by Mr. Ammann          199
     Cross-examination by Mr. Taulbee          247
     Redirect Examination by Mr. Ammann        283
     Recross-examination by Mr. Taulbee        284
     Voir Dire Examination by the Court        289
     Jury Questions asked by the Court         293

   TERI DEAN
     Direct Examination by Ms. Snow            295
     Cross-examination by Ms. Harris           315
     Redirect Examination by Ms. Snow          333
     Jury Questions asked by the Court         337

1   LYNNSEY BETZ
        Direct Examination by Ms. McGraugh          339
2       Cross-examination by Ms. Rothermich         373
        Redirect Examination by Ms. McGraugh        396
3       Recross-examination by Ms. Rothermich       398
        Jury Questions asked by the Court           401
4       Further Recross by Ms. Rothermich           402

5                          - - -

6                      VOLUME III
                   (Pages 408-699)
7
    APRIL 27, 2022
8
    PLAINTIFFS' WITNESSES (continued):
9
    DORA SCHRIRO
10      Direct Examination by Mr. Ammann            417
        Cross-examination by Ms. Harris             447
11      Redirect Examination by Mr. Ammann          476
        Recross-examination by Ms. Harris           477
12      Jury Questions asked by the Court           479

13  MELISSA PIASECKI
        Direct Examination by Mr. Roediger          481
14      Cross-examination by Ms. Harris             523
        Resumed Cross-examination by Ms. Harris     570
15      Redirect Examination by Mr. Roediger        582
        Recross-examination by Ms. Harris           585
16      Jury Questions asked by the Court           586

17
    DEFENSE WITNESSES:
18
    KENNETH CHRISTOPHER McBEE
19      Direct Examination by Mr. Taulbee           588
        Cross-examination by Mr. Ammann             626
20      Redirect Examination by Mr. Taulbee         636
        Jury Questions asked by the Court           641
21
    EDWARD BEARDEN
22      Direct Examination by Mr. Taulbee           645
        Cross-examination by Ms. McGraugh           660

23

24                         - - -

25

1                          VOLUME IV
                      (Pages 700-843)
2

       APRIL 28, 2022
3

       DEFENSE WITNESSES (continued):
4

          DAVID SAVAGE
5              Direct Examination by Ms. Harris            717
               Cross-examination by Ms. McGraugh           753
6              Redirect Examination by Ms. Harris          761
               Recross-examination by Ms. McGraugh         770
7              Jury questions asked by the Court           776

8         ROBIN DYSART
               Direct Examination by Ms. Rothermich        778
9              Cross-examination by Ms. McGraugh           804
               Jury questions asked by the Court           807
10             Further Redirect by Ms. Rothermich          808

11
                              - - -
12
                        E X H I B I T S
13

       PLAINTIFFS' EXHIBITS              OFFERED   ADMITTED
14
       21 - Bible cover and page           150       151
15
       22 - CV of Dr. Schriro              447       447
16

17     DEFENDANT'S EXHIBITS              OFFERED   ADMITTED

18     1-7 - time and attendance records   566       567

19     8 - duty assignments                566       567

20     9 - duty assignments                566       567

21     10 - duty assignments               566       567

22     11 - FMLA notice                    566       567

23     12 - letter regarding sick leave    566       567

24     13 - ENGAGE meeting notes           566       567

25     14 - Bearden resignation memo       566       567

| | | | |
|---|---|---|---|
| 1 | 15 - resignation acceptance | 566 | 567 |
| 2 | 19 - building layouts | 110 | 110 |
| 3 | 21 - memo regarding COs | 763 | 764 |
| 4 | 22 - Dean work summary | 567 | 567 |
| 5 | 23 - Dean housing history | 567 | 567 |
| 6 | 24 - Keil mental health records | 567 | 567 |
| 7 | 25 - Keil mental health records | 567 | 567 |
| 8 | 26 - Keil mental health records | 567 | 567 |
| 9 | 27 - Keil mental health records | 567 | 567 |
| 10 | 28 - Betz mental health records | 567 | 567 |
| 11 | 29 - Betz mental health records | 553/567 | 553/567 |
| 12 | 30 - Zieser mental health records | 567 | 567 |
| 13 | 32 - George mental health records | 125 | 126 |
| 14 | 33 - George mental health records | 527 | 528 |
| 15 | 40 - Keil housing history | 567 | 568 |
| 16 | 41 - Keil roommate history | 567 | 568 |
| 17 | 42 - Zieser housing history | 567 | 568 |
| 18 | 43 - Zieser roommate history | 567 | 568 |
| 19 | 44-110 - chronological logs | 568 | 568 |
| 20 | 111-199 - photos of facility | 568 | 568 |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

* * * * *
* * * *

APRIL 25, 2022

- - -

(The following proceedings were had in the courtroom out of the presence of the jury panel:)

THE COURT: Good morning. We're here in the case of Keil, et al., versus Bearden, Case No. 18-6074. Could counsel please enter their appearance?

MS. McGRAUGH: Susan McGraugh for the plaintiffs, Your Honor.

THE COURT: Thank you.

MR. ROEDIGER: Brendan Roediger for the plaintiffs, Your Honor.

THE COURT: Thank you.

MS. SNOW: Jenifer Snow for plaintiffs, Your Honor.

MR. AMMANN: Good morning, Your Honor. John Ammann for the plaintiffs.

THE COURT: Thank you.

MR. TAULBEE: Nicolas Taulbee on behalf of the defendant.

MS. ROTHERMICH: Abbie Rothermich on behalf of the defendant.

MS. HARRIS: Cara Harris on behalf of the defendant.

THE COURT: Thank you. Well, we should have a panel ready, hopefully, by 9 o'clock here in a few minutes. What I've decided to do is pick the jury down in the jury assembly

room so that they can be spaced out.  Which means, then, that

when doing your jury selection, I think it's easiest if you

remain seated because -- I don't know if you've been down there

yet, but there's two long tables that each side will be seated

at, and if you are standing, I think it's going to be difficult

to speak into a microphone and for the panel to be able to hear

you.  So during that process -- I realize for some it's a

little unnatural to remain seated and pick a jury, and I

apologize for that.  I just think that's the best way -- best

way to do jury selection down there.

After we pick the jury, which, given the time limits

on jury selection, I would assume would be 12:30, 1 o'clock,

the jury will come up here, and Shauna is then going to talk

with the jury and determine how those eight people, how

comfortable those eight people are not wearing masks and seated

in the jury box, therefore, with limited social distancing.

She's going to ask each of them to anonymously put on a card

whether or not they want to wear masks and whether or not they

are comfortable being in the jury box.  If it's not unanimous,

then what we'll do is have the jurors split between the jury

box and back there so that those that want to remain socially

distanced can.

For what it's worth, other judges have been using

this same system recently, and all the jurors have been

comfortable sitting in the jury box.  We'll see what this

1  unknown group of eight individuals decide.  But, to me, that's

2  a way to make sure that those who are not comfortable not

3  social distancing can still participate in the trial.

4  So after we finish the jury selection, I'm going to

5  ask that you wait in the jury room -- or the jury assembly room

6  for a few minutes so that they can come up here, see what the

7  setup is and then vote, quote, unquote, before then going off

8  to lunch.

9  So that's really all of the issues or kind of

10  day-of-trial modifications that I've made.  Before we go down

11  to the jury room, are there any issues that either of the

12  attorneys would like to take up?

13  MS. McGRAUGH:  Your Honor, this is Susan McGraugh,

14  for the record.

15  One of our plaintiffs, Lynnsey Betz, is coming from

16  Daviess County Jail.  As of about 15 minutes ago, she had not

17  arrived, and we are requesting that the Court consider waiting

18  on the voir dire until she is able to be present.

19  THE COURT:  Do we know where she is or why she's not

20  here yet?

21  MS. McGRAUGH:  Your Honor, the marshals told me they

22  did not even know she was coming.

23  THE COURT:  Do we know that she is coming?

24  MS. McGRAUGH:  They got the writ, so I didn't think

25  to call and confirm, and I apologize for that.

1    THE COURT:  Shauna, have you heard anything?

2    COURTROOM DEPUTY:  I have not, but I have

3  confirmation they received the writ and processed it.

4    MS. McGRAUGH:  We have clothing for her that we left

5  with them.  I would be glad to go back down and see if they

6  have any more information.

7    THE COURT:  I think that if they had any

8  information, the marshal's service probably -- have you been in

9  touch with them this morning, the marshal's service?

10    COURTROOM DEPUTY:  I have not.

11    THE COURT:  Shauna will give them a call and see

12  what the marshals know.

13    MS. McGRAUGH:  Thank you.

14    THE COURT:  So what is the thought regarding how

15  long the trial will take?  And when does plaintiff expect to

16  conclude your case-in-chief?

17    MS. McGRAUGH:  I believe Wednesday we are planning

18  on concluding, Your Honor.

19    THE COURT:  End of the day Wednesday or --

20    MS. McGRAUGH:  No, Your Honor, by lunchtime.

21    THE COURT:  By lunchtime?  Your co-counsel looks

22  surprised.

23    MS. McGRAUGH:  You can see him, I can't.

24    MR. ROEDIGER:  There's hope and there's what we

25  should plan.  I think it's more realistic to say that we will

be done Wednesday, and that could be in the afternoon.

        THE COURT:  Okay.  And how long does the defendant's case-in-chief, do you expect it to be?

        MR. TAULBEE:  I would expect no more than a day, Your Honor.

        THE COURT:  Okay.

        MR. TAULBEE:  And I think that's long.  I mean, I would think no more than a day, probably a little over half a day maybe.

        THE COURT:  So you think that we could conclude the case by Thursday, Thursday afternoon?  The evidence by Thursday, Thursday afternoon?

        MR. TAULBEE:  I would really hope so, Your Honor.

        THE COURT:  Okay.  And do you agree with that assessment?

        MS. McGRAUGH:  I do, Your Honor.

        THE COURT:  I ask that because that is, to me, part of the equation as to whether or not we wait for the plaintiff to get here, if we can still get the case done by Friday. Let's find out kind of where she is and what's going on with that, and then I'll make a decision based upon what information we have on that.

        Is there any other topic that the plaintiff would like to discuss at this point?  Plaintiffs?

        MS. McGRAUGH:  Just briefly.  I spoke to Mr. Taulbee

1    about this.  The plaintiff who is coming in is confined on new

2    cases and a probation revocation on an old case, and I would

3    request that the Court bar questioning about the new cases or

4    the fact that she's incarcerated.

5              THE COURT:  Mr. Taulbee, what's your position on

6    that issue?

7              MR. TAULBEE:  Your Honor, I don't think we intend to

8    ask about any new cases.  I believe she's pled guilty to two

9    new cases.  I think we should be able to ask about the ones

10   she's pleaded guilty to, but not about her confinement in the

11   jail or the cases that don't have --

12             THE COURT:  Do you agree -- given my previous

13   rulings regarding cross-examination on or evidence of prior

14   convictions, do you agree that the two new cases that she's

15   pled guilty to are appropriate?

16             MS. McGRAUGH:  Yes, I do, Your Honor.

17             THE COURT:  Okay.  Any other topics that you'd like

18   to discuss?

19             MS. McGRAUGH:  No, ma'am.

20             THE COURT:  Anything on behalf of defendant?

21             MR. TAULBEE:  I just have a question, Your Honor.

22   If the jury chooses to be in the jury box, are spectators going

23   to be in a different courtroom or --

24             THE COURT:  Regardless, we're just going to have

25   spectators on one side, jury on another, rather than having a

1  feed to another courtroom.  So if they do want to be in the

2  back, which is why we have that television set up the way that

3  it is, it can be turned around, we could -- what we typically

4  do, ages ago, pre-Covid, is we would have the bigger TV over

5  here, and so I leave it to the parties as to how they would

6  prefer to have the TVs set up.  But regardless, we'll have the

7  jury on that side and spectators on that side.

8           MR. TAULBEE:  And then sort of the same thing about

9  what the jury decides, will that dictate whether we need to

10  wear masks or not?

11           THE COURT:  No, I'm not going to require anyone else

12  to wear masks, just if they want to wear a mask.  I'm not going

13  to require -- if one person wants to wear a mask, I'm not going

14  to require all of the jurors to wear masks.  That person can

15  then -- that person or persons can be socially distanced in the

16  back.  But, no, I'm not going to require people to wear masks

17  at this time.

18           MR. TAULBEE:  Okay.  Thank you.

19           MR. ROEDIGER:  Your Honor, I would ask just very

20  briefly if I could approach with counsel for the defense to

21  discuss one matter?

22           THE COURT:  I assume this is on the record?

23           MR. ROEDIGER:  It can be.

24           THE COURT:  Then we probably need the white noise.

25           (Counsel approached the bench and the following

1  proceedings were had:)

2  THE COURT:  Just so you know, when the white noise

3  comes up, this microphone comes on.  So don't put papers or

4  things on the microphone because then it's amplified for the

5  court reporter.

6  MR. ROEDIGER:  I told --

7  (Reporter interruption.)

8  THE COURT:  As a result, then, you can talk in a

9  normal voice.

10  MR. ROEDIGER:  Okay.  I'm losing my voice, which is

11  part of the problem, so I'll speak up.

12  I talked to Mr. Taulbee last week.  My son is a

13  newborn, and he's having surgery at Children's Mercy today.

14  It's not a previously planned surgery, and I won't give the

15  whole story, but it's serious enough that today I would like

16  permission to absent myself.

17  THE COURT:  Yeah, I have no problem with that.

18  MR. ROEDIGER:  Just for the Court to know I'm not

19  being disrespectful, and I've talked to Mr. Taulbee.

20  THE COURT:  Sure.  I have no problem with that.

21  Like I said before, I have no problems with counsel leaving the

22  courtroom and coming back in in the middle.  As long as it's

23  not your witness, I have no problem with you leaving.

24  MR. ROEDIGER:  It's possible it would be the whole

25  day.

1          THE COURT:  That's fine.  Again, I have no problem

2   with that.

3          MR. ROEDIGER:  Thank you, Your Honor.

4          THE COURT:  So anything else?

5          MR. ROEDIGER:  No, thank you.

6          THE COURT:  Okay.

7          (The following proceedings were had in open court:)

8          THE COURT:  Okay.  If there's nothing else, then we

9   will contact the marshals to determine if they know anything

10  regarding the witness and we will -- hopefully, we'll learn

11  something and we'll start at 9:00.  If not, we'll be back out

12  and let you know what the decision is.

13          (A recess was taken at 8:48 a.m.  Jury selection was

14  conducted, after which the following proceedings were had in

15  the courtroom out of the presence of the jury beginning at

16  2:06 p.m.:)

17          THE COURT:  Good afternoon.  Are we ready to bring

18  the jury in?

19          MS. McGRAUGH:  Yes, Your Honor.

20          MR. TAULBEE:  Yes, Your Honor.

21          THE COURT:  Okay.

22          MS. McGRAUGH:  Judge, am I correct that we can use

23  this podium for opening?

24          THE COURT:  Yes.

25          MS. McGRAUGH:  Thank you.

1    (The following proceedings were had in the courtroom

2 in the presence of the jury:)

3    THE COURT:  Please be seated.  Ladies and gentlemen

4 of the jury, when you come in, go ahead and be seated.  You

5 initially stood in deference to the role that I played in the

6 trial; but now, since you've been actually seated as jurors, we

7 stand in deference to the role that you play in the trial.  So

8 when you come in, feel free to be seated.

9    I also forgot to mention, I apologize, the cafeteria

10 situation is not ideal.  Unfortunately, our cafeteria in the

11 building became a victim of Covid and we just didn't have

12 enough people in the building for such a long period of time

13 that they weren't able to keep it open.  They're transitioning

14 it to a self-serve, but it's taken much longer than what we

15 originally thought.  So to the extent an hour is not long

16 enough for you to have lunch, knowing that you're -- No. 1,

17 feel free to bring lunch with you; but, No. 2, if it takes a

18 little bit longer, just let me know, and we can modify how long

19 we actually take for lunch breaks for the remaining few days.

20    So what we're going to do now is I have a set of

21 instructions that I'm going to read you for things -- for you

22 to keep in mind during the trial, then we'll move into opening

23 statements and actually hear some evidence today.

24    Earlier this morning, you took an oath, and that was

25 an oath to answer the questions that were propounded to you

truthfully and thoroughly.  Now that you're the actual jurors in this case, we have a slightly different oath that we would like for you to take.  So if you could please stand, and Shauna will give you that oath.

(The jury was sworn by the courtroom deputy, and the opening instructions were read by the Court.)

THE COURT:  That concludes the initial instructions in this case.  Counsel for plaintiff, are you ready for opening statement?

MS. McGRAUGH:  Yes, I am, Your Honor.

THE COURT:  Okay.  You may proceed.

MS. McGRAUGH:  May it please the Court, counsel.

Good afternoon.  The case that you're about to hear is about sexual assault, and the evidence may shock and alarm you.  You will hear evidence of sexual assault, sexual harassment, and rape.  You will hear how one man, a man who considered the women's prison to be his personal hunting ground, put these women through forcible sexual assault, and the damage that that did to them.  That man is Edward Bearden.

Now, you're going to hear evidence that Mr. Bearden's sexual abuse of each of the women followed a general pattern.  Step 1 was grooming, giving the women compliments, sodas, candy, favors; step 2, sexual harassment, comments about their bodies, their breasts, and their buttocks; step 3, isolating the women, maneuvering them into closets and

other small spaces; and, 4, sexually assaulting and raping these women.

During this trial, you're going to hear evidence about prison life. You'll hear how the plaintiffs in this case, Ashley Zieser, Karen Keil, Lynnsey Betz, and Trenady George, accepted their prison sentence, and they accepted the fact that they were going to be isolated from their children, from their families, and from their communities.

And they will tell you that when they got to the penitentiary, they sought to better themselves through education, job training, and work. But they will tell you the actions of Edward Bearden, who raped, sodomized, and sexually assaulted them, caused them immense physical and mental pain. They are going to tell you that at the time this abuse happened, they did not report Edward Bearden to the prison until they were in a position where they were safe from whatever he could bring down on their heads.

I'm going to take a minute now to review briefly what the testimony of each woman will be because you will need to consider each case individually.

First, Ashley Zieser. She was in Chillicothe women's prison in the state of Missouri from 2014 to 2017. She will tell you that in 2015, Edward Bearden began making sexually suggestive and harassing comments to her at the prison. She will tell you that this behavior escalated, and it

escalated to him coming up behind her in a small room, slipping his hands under her work pants and under her underwear, and forcibly penetrating her vagina with his fingers.  And that it hurt.

She will tell you a week later, Edward Bearden again maneuvered her into a small space, a small cameraless space, and again forcibly put his fingers into her vagina, injuring both the inside and outside tissues of the vagina, causing pain, pain upon urination, and bleeding.

The last time that Edward Bearden attempted to sexually assault Miss Zieser, he attempted to make her perform oral sex on him, attempting to put his penis into her mouth. Ashley will tell you that after this happened, she went to a caseworker, desperate to receive a transfer out of that job assignment, and she was transferred away from Edward Bearden, and the assaults stopped.

Ashley will tell you how the pain and trauma of that sexual assault continued to haunt her life after she left Chillicothe.  She will tell you how she suffers from panic attacks, post-traumatic injuries, and anxiety; how she developed a fear of men, especially strange men, but also of her own husband; that she began to be unable to give or receive physical contact from any person, including her own children. But she will also tell you that she is determined to thrive.

The second woman -- another woman you will hear from

is Lynnsey Betz. She's wearing the royal blue sweater.
Lynnsey was in Chillicothe from 2014 to 2016 for burglary and
stealing. Lynnsey will tell you that she managed to get a job
in vocational technology, which she'll refer to as vo-tech.
It's a building in the prison, and we have maps we're going to
show you where all of these things happened.

And that she enjoyed her job, she enjoyed the women
she worked with, she liked working with her supervisor,
Mrs. Gilgour. But one week Mrs. Gilgour went on vacation, and
the person who was ordered to fill in for Mrs. Gilgour was
Edward Bearden.

She will tell you that her contact with Mr. Bearden
began with compliments, compliments about her buttocks. He
would say to her, "I like the way your ass moves." She will
tell you how he left contraband items for her, a Mountain Dew
and some candy, in a room where she was working. Those items
she is forbidden to have, and she disposed of them quickly
before she got caught.

The first sexual assault Lynnsey will tell you she
suffered was when she was going into a small cleaning closet
where they kept the chemicals for cleaning and a shop vac. And
that she had to be escorted to this closet by Edward Bearden,
and that when she got into the closet, also one of the few
places without a camera, he pushed her up against the wall
forcibly and, without her consent, grabbed her vagina through

her clothing, forcefully, and struck her head against the wall
hard enough to get -- cause swelling.  He put his hand over her
mouth and reached one hand down to unzip his pants.  He forced
his hand into her pants under her work clothing, under her
underwear, and forced his fingers into her vagina.

She'll tell you that this was extremely painful.
She'll tell you that her vagina was injured and that she had
blood and pain for over a week afterwards from the injuries, as
well as a lump on the back of her head from the force used to
shove her into the side of the closet.

She will further tell you that there were
extraordinary injuries to her mental health.  Lynnsey Betz is a
survivor of a previous rape, and then had this physical sexual
assault on top of it that further degenerated her mental
health.  She was diagnosed with post-traumatic stress disorder,
anxiety, and fear, severe night terrors that cause her memories
to replay again and again.

But Lynnsey will also tell you that she is not
defeated, that her husband and her child Blaze give her hope to
keep moving forward.

You will also hear from Karen Keil.  Karen was in
Chillicothe from 2011 to 2017 on an embezzlement charge.  She
will tell you how the sexual abuse she suffered from Edward
Bearden began in 2011 when he would single her out for
pat-downs leaving the cafeteria.  He would linger on her

1  breasts and her buttocks as he patted her down.

2          Now, like in the other two cases, those sexual

3  assaults escalated, and in 2012, Edward Bearden pushed her

4  against a wall in the prison laundry room and stuck his tongue

5  in her mouth.  He also put his fingers forcefully without

6  consent into her vagina.  Beginning in 2012 and up until 2015,

7  Edward Bearden sought out Karen Keil and raped her over 20

8  times.  She'll tell you the rapes occurred in a storage room in

9  the back of the prison.  She'll tell you that during these

10 rapes, Edward Bearden, without consent and very forcefully,

11 pushed his erect penis into her vagina and that she suffered

12 extreme pain after each rape, that it was painful to urinate

13 after she was raped, it was painful to walk, her vagina was

14 sore and tender for up to a week afterwards.  And she'll tell

15 you that as a result of those experiences, she also has

16 suffered extreme mental trauma.

17          But Karen is going to tell you that she's worked to

18 put her life back together.  She has moved, she is gainfully

19 employed and living with her husband, and she's determined not

20 to be stopped.

21          The last of these plaintiffs you will hear from is

22 Trenady George, who is the woman in the maroon sweater.

23 Trenady was in Chillicothe from May 2015 to 2017 for identity

24 theft and, like the other women, she got to Chillicothe,

25 learned to adjust, and decided to make the best out of the

1  situation.

2       She was very active in the sports programs. She
3  enrolled in the cosmetology school because, although she had
4  jobs before she got to prison, she has a bachelor's and two
5  other degrees, that she had always wanted to open her own
6  children's beauty salon, and she will tell you about that. So
7  she determined, while she was in the Department of Corrections,
8  to earn her way into the cosmetology school.

9       Before she got into the school, she was working in
10 the canteen. And who would come by whenever he could but
11 Edward Bearden, to stare at her, flatter her, to compliment her
12 buttocks, and to ask her to bend over and pick up a box again
13 so he could get a better view.

14      This behavior, of course, then escalated into
15 serious physical assaults. She'll tell you how she worked
16 cleaning the cosmetology classroom, and we'll show you on a
17 map. Again, a room with no camera. That she had to obtain her
18 cleaning materials, and that Edward Bearden would follow her
19 into the room, place his hand on her shoulder, force her onto
20 her knees, take his penis out of his pants and force it into
21 her mouth, and that he would stay that way until he ejaculated
22 into her mouth. This was done forcefully and without her
23 consent. And when he was done, he would take a rag and throw
24 it at her and tell her, "Clean yourself up."

25      But Trenady is going to tell you that, despite the

mental and physical, very real physical harm she suffered as a
result, that she has goals and she's moving ahead on her goals.
And she's with her family, and she's determined to move
forward.

You're going to hear other witnesses besides our
women. You're going to hear a woman named Teri Dean, who was
in Chillicothe from July 2012 to October 2018. She will tell
you she worked in a barber shop, which is where the guards
could go get their hair done, and that Edward Bearden would go
in there on a regular basis. And when Teri Dean would cut his
hair, he would rub his head and his face in her breasts and
lean his body against her breasts and run his hands up her leg
and touch her vagina.

She will tell you that Bearden also followed her
into a closet to take an opportunity to run his hands over her
and that he did this often, always over her clothing. And she
will also tell you about the fallout from that abuse.

Now, some of our evidence that you're going to hear
is evidence from Edward Bearden. You'll hear that he's
testified under oath that he did not sexually assault, rape, or
sodomize any of the women and that he denies these allegations.
He made those statements under oath. He made two statements.
He made one to me in November of 2018, and in 2021 he made
another one, and you will hear about the evolution of
Mr. Bearden's statements. You will hear that in the

1  deposition, that's the sworn statement he gave --

2  　　　　MR. TAULBEE:  Your Honor, I'm going to object.

3  　　　　THE COURT:  Could counsel please approach?

4  　　　　(Counsel approached the bench, and the following

5  proceedings were had:)

6  　　　　MR. TAULBEE:  His deposition is not substantive

7  evidence, Your Honor.

8  　　　　THE COURT:  But the statements are.  I don't know

9  how a statement would not be substantive evidence.

10 　　　　MR. TAULBEE:  She can talk about what his testimony

11 is going to be, but I don't think she can talk about --

12 　　　　THE COURT:  Not frame it in terms of the deposition?

13 　　　　MR. TAULBEE:  Yeah.

14 　　　　MS. McGRAUGH:  We've stipulated to the deposition

15 evidence, though, Judge.

16 　　　　THE COURT:  Just reframe it to say this is his

17 testimony.

18 　　　　MS. McGRAUGH:  Yes, ma'am.

19 　　　　(The following proceedings were had in open court:)

20 　　　　MS. McGRAUGH:  The testimony will be that

21 Mr. Bearden, under oath, originally denied knowing Karen,

22 Ashley, and Lynnsey, but that as the deposition progressed, you

23 will hear testimony that he began to slip and recall statements

24 and conversations with Karen Keil as the questioning went

25 further, exact conversations that he had had.

1          You will also hear testimony that at that initial

2    deposition, he was asked if he had more than one cell phone

3    when he was in Chillicothe, and he said no.  You will hear that

4    later on, a phone number that he had given to Trenady George

5    was discovered to have been to an anonymous Tracfone that he

6    owned and purchased for the purpose of speaking to the women in

7    prison.  The women in prison aren't allowed, and the guards are

8    certainly not allowed to communicate privately.  You will hear,

9    when confronted, that Mr. Bearden admitted he had, in fact, had

10   two phones, and he had used that phone to call Trenady George

11   under an assumed number.

12          You will hear that after these allegations surfaced,

13   Mr. Bearden retired, three months before his 25th anniversary

14   and pension with the Missouri Department of Corrections.

15          There are going to be two expert witnesses that are

16   going to talk to you to try to help clarify what you're

17   hearing.  The first is a doctor named Melissa Piasecki.  She's

18   the dean of the medical school at University of Nevada, Las

19   Vegas.  She is an expert in women's psychological/psychiatric

20   ailments.  She's a psychiatrist with multiple years of

21   experience working with women who have been sexually abused,

22   and she will tell you that she spoke to these women, she will

23   tell you she reviewed their records, she will tell you she

24   reviewed records of the mental health treatment when they got

25   out of prison, and she will tell you that the trauma they

suffered from being sexually assaulted and raped by Edward
Bearden is very real and very debilitating, and it now has and
will continue to have a lasting impact on their health.

The second expert you're going to hear from is a
woman named Dora Schriro. Dora Schriro was the Director of the
Missouri Department of Corrections. She ran these prisons,
including Chillicothe. She's got a lifetime of experience
talking about what goes on in prisons.

She will tell you about the life of women in
prisons. She will tell you the role that the guards play in
determining how well a woman fares while she's in prison. She
will talk to you about why women in prison, like our women, do
not report sexual abuse when it occurs. She will tell you
about the hole, what the ladies call the SHU, administrative
segregation. She will tell you that if you report being
sexually abused, you are immediately placed in administrative
segregation, you lose your visits, you can't take your pictures
of your kids, you can't take your cards, you can't take your
letters. You can't take the things you've earned, and you are
removed from those hard-to-earn jobs and programs and forced to
start over once the investigation is complete.

She'll tell you that guards like Bearden know every
inch of that prison, including where the cameras are and where
the cameras aren't. She'll tell you there are no records that
track Mr. Bearden's movements through the prison on those days.

1      You will hear the women talk about why they didn't
2   report, because they feared losing their jobs, their visits,
3   feared being sent to the SHU if they kept -- if they reported
4   these while they were -- excuse me -- assaults.

5      You will hear that the process of retelling the act
6   of being raped, the act of being forced to perform oral sex on
7   someone has caused them great distress and that every time they
8   have to retell it, they experience that distress all over
9   again.  And they will tell you, "I have had to give a
10   statement, I have had to retell and relive this, and sometimes
11   I stumble.  Sometimes I stumble."  But that that stumbling
12   comes from the stress of having to stand in front of people
13   they don't know and describe being raped in detail.

14      At the end of all of the evidence, I will ask you to
15   find in favor of these women and to award them damages to
16   compensate them for the horrors that this man wreaked on their
17   lives.  Thank you for your time.

18      THE COURT:  Counsel for defendant ready to give your
19   opening statement?

20      MR. TAULBEE:  Yes, Your Honor.  May it please the
21   Court.

22      THE COURT:  You may proceed.

23      MR. TAULBEE:  Ladies and gentlemen, this did not
24   happen.  This case --

25      MS. McGRAUGH:  Objection, Your Honor, argumentative.

1          THE COURT:  Overruled.

2          MR. TAULBEE:  This case is about who you believe,

3  what you believe.  Karen Keil, Lynnsey Betz, Ashley Zieser, and

4  Trenady George were in prison at Chillicothe Correctional

5  Center.  They were in prison for crimes like fraud, forgery,

6  burglary, stealing, embezzlement, identity theft, assault on a

7  law enforcement officer.  Several of those are crimes of

8  dishonesty.

9          Their stays at Chillicothe overlapped.  Those aren't

10 four strangers sitting there, ladies and gentlemen.  In a

11 prison of over 1400 offenders, they're all connected.  They all

12 know each other from recreation.  Karen Keil was their

13 instructor.  Before Lynnsey Betz and Ashley Zieser filed their

14 lawsuits, they spoke with Karen Keil.  Karen Keil spoke with

15 Trenady George in November and December of 2017, shortly after

16 Ms. George got out of Chillicothe, shortly before Miss Keil

17 reported her accusations to the Department of Corrections for

18 the first time.  This did not happen.  That's what Edward

19 Bearden will tell you.

20         I want to talk to you a little bit about Edward

21 Bearden.  He began working at Chillicothe Correctional Center

22 in 2008.  He worked there for nearly ten years.  He retired in

23 September of 2018.  He was a Corrections Officer I, but he was

24 also a field training officer, which meant he assisted with the

25 on-the-job training for the new employees, showing them the

proper procedures for various assignments or posts within the prison to ensure the safety and security of the facility. And he took pride in that role.

Before 2018, Mr. Bearden had never been accused of anything like this while at Chillicothe Correctional Center, nothing until Karen Keil accused him in January of 2018, nearly a year after she left Chillicothe, and then her and her students filed these lawsuits.

From 2014 until he retired, Edward Bearden worked the day shift as a utility officer, which meant he could be assigned throughout the prison wherever, whatever post needed coverage that day. So his assignments were unpredictable. But just because he was assigned throughout the prison doesn't mean he could go wherever he wanted. Because when you were assigned to a post, you stayed at your post unless you're assigned elsewhere, because the safety and security of the institution is of the utmost importance, and a corrections officer being where they're not supposed to be or a corrections officer not being where they are supposed to be is a safety and security issue. So is familiarity with inmates and so is sexual contact, or really any physical contact with inmates.

Chillicothe Correctional Center is a busy place. There are a lot of inmates. There are a lot of people. The areas of the institution that you're going to hear about are busy places.

1          You'll hear about the recreation area.  It's the hub

2   of inmates' social activity.  It has the chapel, the barber

3   shop, the lieutenants and the captains have their offices

4   there.  There are institutional activities coordinators.  There

5   are people working in all of those parts of the prison.

6          It also has the gymnasium.  At one end of the

7   gymnasium, there are exercise machines, weight machines, there

8   are inmates using these facilities.  There's an exercise room

9   where they do group exercise classes.  There are inmates

10  playing basketball, playing other activities.  There are tables

11  at the other end of the gymnasium where offenders can check out

12  games or cards and play games or cards, they can sit around and

13  socialize.  It's a busy place with a lot of people, with a lot

14  of staff.

15         The housing units are busy places.  Most of the

16  housing units have four wings, around 64 offenders.  They have

17  what's -- they have three to five corrections officers working

18  in those wings.  And they're watching the offenders, and

19  they're watching each other to make sure everybody is safe.

20         There's also what's called classification staff, and

21  they work in what they refer to as the E-Wing or the back

22  offices.  And the classification staff, those are the people

23  who work with the offenders on a one-on-one basis on a daily

24  basis to get them ready to leave the institution.  And so the

25  case managers will have open office hours for the offender,

1 they'll have meetings with the offenders.  So there will be
2 offenders in line to meet with their case manager.  There are
3 people moving about.  It's unpredictable what their movements
4 are.  Chillicothe has an open campus, so they're not just on
5 lockdown 23 hours a day or anything like that.

6          The vocational-education building is a busy place.
7 There are four to five classes of 15 to 20 offenders each.
8 There's teachers, there's a corrections officer assigned there,
9 there's the head of vocational-education and her secretary, and
10 staff are expected and obligated to report it if they see
11 something inappropriate.  And they know that's the expectation,
12 or they believe that they'll get fired, they'll lose their job
13 if they don't, because safety and security of the institution,
14 the staff, and the inmates are of the utmost importance.

15          And ladies and gentlemen, Chillicothe Correctional
16 Center has a lot of cameras, a lot of them.  And you're not --
17 you're probably wondering.  You're not going to see any video
18 because the department only keeps video for around 30 days.
19 They have to have a reason to keep it beyond that, and nobody
20 reported anything amiss here, so they didn't have any reason to
21 keep it.  So you won't see any video.

22          And even if they don't have video in the mop closet,
23 generally in the areas where there aren't cameras, there's
24 cameras right outside of it.  You won't see any videos here
25 because it wasn't reported, and that could have been a report

by a corrections officer or another employee, any one of the
540 employees that work at Chillicothe Correctional Center.  It
could have been by an offender, one of these women, or another
offender.  Any one of the more than 1400 offenders who live at
Chillicothe Correctional Center.  And offenders may have their
own reasons, their own incentives, both well-intentioned or
not, for reporting something amiss.

You're going to hear, and you have heard, a lot of
horrible accusations during the course of this trial.  You will
hear Mr. Bearden deny those horrible accusations.  In a few
days, I'll come back up here, and I'll talk to you again about
what you've seen and what you've heard, about what you haven't
seen and what you haven't heard.  And when I do, I'll ask you
to enter a verdict in favor of Edward Bearden on each of the
claims against him, finding that he did not rape or sexually
assault Karen Keil, Lynnsey Betz, Ashley Zieser, or Trenady
George.

Thank you, ladies and gentlemen.

THE COURT:  Is the plaintiff ready to call your
first witness?

MS. McGRAUGH:  Thank you, Your Honor.  The
plaintiffs would call Ashley Zieser.

THE COURT:  Ma'am, if you could step forward to this
lady right here first.  She's going to swear you in.

- - -

1    ASHLEY ZIESER,

2  being first duly sworn by the courtroom deputy, testified as

3  follows:

4         THE COURT:  If you could have a seat right up there

5  at the witness chair to my right.

6         MS. McGRAUGH:  Your Honor, would you prefer I be at

7  this podium?

8         THE COURT:  Yes, please.

9                    - - -

10                 DIRECT EXAMINATION

11  By Ms. McGraugh:

12  Q.    Good afternoon, Ashley.

13  A.    Hi.

14  Q.    Could you tell the jury your name, please?

15  A.    Ashley Marie Olsen Zieser.

16  Q.    Where do you live?

17  A.    In Merriam Woods, Missouri.

18  Q.    Are you married?

19  A.    Yes.

20  Q.    And do you have any children?

21  A.    Yes.

22  Q.    How many children?

23  A.    Four.

24  Q.    Could you tell the jury what their names are and their

25  ages?

1  A.     Yes.  Makayla, Branden, Chloe, and Grayson.  They are

2  17, 15, 13, and ten months.

3  Q.     Ten months.  And Grayson is the one that's ten months?

4  A.     He is.

5  Q.     So I'm going to ask you to try to keep your voice up.

6  I'm wondering if I could --

7          THE COURT:  You could also move that microphone a

8  little bit closer to you.  Yes, I think that would help.  And I

9  think that chair will move in a little bit closer to the

10 microphone, if that helps.

11 BY MS. McGRAUGH:

12 Q.     Ashley, can you tell the jury what your work history

13 is?

14 A.     I have been in sales and marketing, a CNA at Christian

15 Health Care East, and also a housekeeper at the Welk Resort and

16 Hilton.

17 Q.     And where were those resorts?

18 A.     In Branson.

19 Q.     Did you work in a family business?

20 A.     Yes.  My husband actually just reopened our business.

21 We had to close during the pandemic, but we just opened a

22 telemarketing room down in Harrison, Arkansas.

23 Q.     And are you employed by that company?

24 A.     Yes.

25 Q.     What's your role?

A.    I'm the administration.

Q.    Which of those positions did you hold after you were released from Chillicothe?

A.    The Welk, housekeeping.

Q.    And what about the position with the family business?

A.    The marketing and sales.

Q.    Ashley, I want you to tell the jury about your criminal convictions.  Were you incarcerated at Chillicothe Correctional Center?

A.    I was.

Q.    Is that also called CCC?

A.    Or Chilly.

Q.    So if you say Chilly, you mean Chillicothe prison?

A.    Yes.

Q.    What were you convicted of that you went to Chillicothe?

A.    I have three possessions and an assault on a law enforcement officer.

Q.    Possession of what?

A.    A controlled substance.

Q.    And were those convictions from one time or from separate times?

A.    They were from one close -- two of them were together, and one of them was a couple of weeks before that, so they were all right around the same time frame.

1  Q.     When did you get to Chillicothe?

2  A.     In January of 2014.

3  Q.     Are you good on all of these dates?

4  A.     No, no, I'm not.  And it was a long time ago, and I'm

5  very nervous.

6  Q.     All right.  Did you attend drug treatment at

7  Chillicothe Correctional Center?

8  A.     Yes, I did.

9  Q.     Do you recall when that was?

10  A.     In -- I got out in April of 2014.

11  Q.     Were you addicted to drugs at that time?

12  A.     Yes, I was.

13  Q.     Can you tell the jury what drug you were addicted to?

14  A.     Methamphetamine.

15  Q.     What was your sentence on the

16  possession-of-controlled-substance charges?

17  A.     Seven years.

18  Q.     Do you think the sentence that you received was fair?

19  A.     Absolutely.

20  Q.     Did you go automatically to Chillicothe, or did you go

21  to a different prison before going to Chillicothe?

22  A.     No, I went to Vandalia first.

23  Q.     And that's another women's prison?

24  A.     Yes.

25  Q.     Do you recall when you transferred from Vandalia to

1  Chillicothe?

2  A.    No.

3  Q.    Did you do the remainder of your sentence at

4  Chillicothe?

5  A.    Yes.

6  Q.    Do you recall when you got out of Chillicothe?

7  A.    Yes.

8  Q.    When was that?

9  A.    In May of 2017.

10  Q.    Now, you mentioned two possessions, three possessions

11  and assault of a law enforcement officer.  Did you ever get

12  convicted of forgery?

13  A.    Yes, I got two forgeries when I was, I think, 18 years

14  old.

15  Q.    Do you recall what year that was?

16  A.    Maybe 2004 or '05.

17  Q.    Are you unsure?

18  A.    Yes.

19  Q.    Now, Ashley, I'd like to take a minute to ask you some

20  questions that can help everybody kind of understand how life

21  in prison works.

22  A.    Okay.

23  Q.    Tell me what your introduction to the women's prison in

24  Chillicothe was like.

25  A.    It was terrifying.  You go there, and it's gray and

1  scary.  You're just shell-shocked.  You're terrified.  You

2  haven't talked to anyone, they really take everything from you,

3  and it's terrifying.

4  Q.    And you say they take everything from you.  Does that

5  include your clothing?

6  A.    Yes.  Yes, it does.

7  Q.    Are you provided with clothing?

8  A.    Yes, you are.

9  Q.    What are you provided with?

10  A.    A pair of khaki pants and a khaki top and some granny

11  panties and a sports bra.

12  Q.    How many of those can you have in your possession at

13  one time, if you recall?

14  A.    I think four of the khaki bottoms, four khaki tops, two

15  pair of underwear, and two pair of bra.

16  Q.    Can you go do your own laundry?

17  A.    No.

18  Q.    Did you do any educational classes?

19  A.    I did.

20  Q.    What classes did you do?

21  A.    I got enrolled in my G.E.D. classes, and I got my

22  G.E.D. and completed it there.

23  Q.    How long did it take you to pass your G.E.D. test?  And

24  G.E.D., am I correct, is a high school equivalency exam?

25  A.    Uh-huh, it is.  I think almost about a year.

1  Q.      Do you know if there was a reason it took you so long?

2  A.      It was very hard.  I dropped out of high school pretty

3  early.  I was really bad with math, and I had to work really

4  hard at a couple of things before I could take the test to pass

5  it.

6  Q.      Are you allowed to have money at the prison?

7  A.      No.

8  Q.      Are you allowed to have funds?

9  A.      You can have funds.  It's called your books where

10 people can put money on your books.  Like your outside family

11 or friends can put money on your books, and then you take the

12 money, and you can go to canteen to get stuff you need, like

13 shampoo, soap, toothpaste.

14 Q.      When you got to Chillicothe and they handed you your

15 clothing, what personal care items did they provide you with?

16 A.      A bar of soap and a toothbrush that was this big.

17 Q.      Toothpaste?

18 A.      No.

19 Q.      How do you get the things that you need for your daily

20 life in there?

21 A.      You have to buy it on commissary.

22 Q.      And what is commissary?

23 A.      Where you can use your money that goes on your books,

24 and it's called commissary or the store.

25 Q.      Is it the same as canteen?

1    A.    Yes.

2    Q.    Did you have family putting money on your books?

3    A.    No, I did not.

4    Q.    So if you needed shampoo, what would you do?

5    A.    Borrow it.

6    Q.    Did the government give you money every month for

7    essentials?

8    A.    They gave you $7.50 a month, I think.  If you didn't

9    have any money on your books that no one helped you, they would

10   give you $7.50 a month, and you could take that, and you could

11   spend that at the store to get, like, shampoo, toothpaste, bar

12   of soap.

13   Q.    Did anybody put money on your books?

14   A.    No.

15   Q.    Were you able to get a job?

16   A.    I was.

17   Q.    What was your first job?

18   A.    I believe my first job was in the warehouse.

19   Q.    And how much money do you make working in the

20   warehouse?

21   A.    $7.50 a month.

22   Q.    Okay.  Is there a way to make more money?

23   A.    There is.

24   Q.    What is that way?

25   A.    In the work-release program, they make $7.50 a day, or

1  at least they did when I was there.  But it's extremely
2  privileged, so you have to be -- you have to have your G.E.D.
3  or high school diploma first, you have to be violation-free for
4  90 days or better, you have to be well-behaved.  You have to be
5  very -- because it's like an honors dorm.  You can use the
6  phone late at night.  You don't have to go to chow all the
7  time.  You get privileges in that dorm that you wouldn't get in
8  another dorm, so you have to be very well-behaved and very --
9  it's a picked, privileged position.

10  Q.      How long did it take you to get in the work-release
11  program?

12  A.      Almost a year.

13  Q.      Is that a year after you finished your G.E.D.?

14  A.      No, I got my G.E.D. and had a plan to go over to work
15  release and --

16  Q.      Were you glad to get into the work-release program?

17  A.      Extremely.

18  Q.      Why is that?

19  A.      Because I was just so proud of myself for actually
20  making a goal and accomplishing it.  It was the little win that
21  made me feel better about myself.  And it was not an easy task
22  because you can get violations; and if you would get a
23  violation, you are not considered for the work release or the
24  honor dorm.

25  Q.      So who determines if you get a violation?

1   A.      The guards do.

2   Q.      Can you tell the jury the kind of things where you

3   could get a violation?

4   A.      Lots of stuff.  If you have like tennis shoes that are

5   not your tennis shoes, they will give you a violation for that.

6   If you're not in your bed on count time, if your light's not on

7   for count, if you're not in the right place or building, if you

8   have any kind of contraband, which is anything that has not

9   been given to you by the state or bought on canteen with your

10  inmate number on it, you get a violation for.

11  Q.      Where did you work when you were on work release?

12  A.      In work release, you get selected, then you move over

13  to the honor dorm, and then you get put in administration,

14  which is in the admin building.  Then you go to the garage,

15  then you go to a crew.

16  Q.      And when you were in work release, where were you?

17  A.      When I first got there, I was in the administration

18  building.

19  Q.      I'm going to show you what has been marked as

20  Defendant's Exhibit 19.

21          COURTROOM DEPUTY:  Are you wanting the jury to see

22  this exhibit?

23          MS. McGRAUGH:  No, I just want the witness to see

24  it.  There we go.

25          COURTROOM DEPUTY:  That's all right.  Sometimes this

1  takes a little more finagling than normal.

2          MS. McGRAUGH:  If it has anything to do with

3  technology, I'm certain.

4          COURTROOM DEPUTY:  So we apologize.  Okay.

5          THE COURT:  So it's on my screen, and it's on the

6  court reporter's screen, but it's not on the witness screen.

7          COURTROOM DEPUTY:  I'm trying to figure out why it's

8  not coming up for --

9          MS. McGRAUGH:  If it would be easier, I'm happy to

10  approach the --

11          THE COURT:  Why don't you just -- unfortunately.

12  Okay, now it's working.

13          COURTROOM DEPUTY:  It just took several tries.

14  Sorry, Judge.

15          THE COURT:  That's okay.  Now it's working.

16  BY MS. McGRAUGH:

17  Q.      Ashley, let me ask you to look at what's been marked as

18  Defendant's Exhibit 19 and stipulated to.  Can you tell me what

19  this is?

20  A.      A map of the Chillicothe Correctional Center.

21  Q.      Okay.  And as you recall, is this a true and accurate

22  copy?

23  A.      Yes.

24          MS. McGRAUGH:  Your Honor, I move to admit.

25          THE COURT:  Any objection?

1    MS. ROTHERMICH:  If we may approach, Your Honor.

2    THE COURT:  Sure.

3    (Counsel approached the bench, and the following

4    proceedings were had:)

5    MS. ROTHERMICH:  Your Honor, my objection has to do

6    with -- my objection has to do with the fact that D19 has

7    several pages, and we've only laid foundation for one.

8    THE COURT:  Is it stipulated to?

9    MS. ROTHERMICH:  It's my understanding it was not

10   stipulated to, so I'm not sure that --

11   THE COURT:  Okay, we'll just --

12   MS. McGRAUGH:  Okay.  I thought that we had

13   stipulated to this.  Otherwise, I will mark each individually.

14   I have exhibits --

15   THE COURT:  The first page of Exhibit 19 -- so do

16   you object to the first page of 19?

17   MS. ROTHERMICH:  I do not.

18   THE COURT:  Okay.

19   (The following proceedings were had in open court:)

20   THE COURT:  The first page of Exhibit 19 is

21   admitted.

22   (Page 1 of Defendant's Exhibit 19 was admitted into

23   evidence.)

24   MS. McGRAUGH:  Your Honor, I am going to mark this

25   as Exhibit 19A.

1        THE COURT:  19A will be admitted.

2          (Defendant's Exhibit 19A was admitted into evidence.)

3        MS. McGRAUGH:  Thank you, Your Honor.

4   BY MS. McGRAUGH:

5   Q.    Let me ask you to look at -- this will be D19A.  Can

6   you tell me, is this the same map?

7   A.    Yes.

8        MS. McGRAUGH:  Okay.  Your Honor, may I please ask

9   the witness to come down from the stand to use this map?

10        THE COURT:  I think it would be helpful if you would

11  set it up over there so that everyone can see.  And, yes, now

12  she may step down.

13  BY MS. McGRAUGH:

14  Q.    Would it help you to explain your testimony, Ashley, if

15  you were able to show the jury on a map where these places

16  were?

17  A.    Yes.

18  Q.    Would you step down, please?  And I'm going to give you

19  a blue marker.

20        MS. McGRAUGH:  Your Honor, I move to admit 19A for

21  demonstrative purposes only.

22        THE COURT:  Any objection?

23        MS. ROTHERMICH:  No, Your Honor.

24        THE COURT:  The -- so by that, you mean the --

25        MS. McGRAUGH:  The poster board, Your Honor.  So I

1  guess the record should reflect that the witness is looking at

2  a blowup of D19 that's been placed in front of the jury.

3          Can you see that?  Do you need me to move it?  Okay.

4  We'll get in big trouble if we draw on that.

5  BY MS. McGRAUGH:

6  Q.      So you mentioned -- tell the jury what's in -- let's

7  start with that.  Tell the jury what's in this diagram.

8  A.      These --

9              (Reporter interruption.)

10          THE COURT:  I'm not real confident this is going to

11  work because she can't hear what she's saying.

12          MS. McGRAUGH:  If it's not going to work, I'll

13  withdraw.

14          THE COURT:  She can mark on the screen in front of

15  her.  This monitor, she can mark on it.  She just doesn't speak

16  loud enough for us to be able to hear her.

17          MS. McGRAUGH:  I understand, Your Honor.  Why don't

18  you step back up.  Let's do it this way.

19  BY MS. McGRAUGH:

20  Q.      The map in front of you, you said, is a map of the

21  prison?

22  A.      Yes.

23  Q.      Okay.  Is it the entire prison?

24  A.      Yes.

25  Q.      Okay.  Now, you were just speaking about being on work

1  release; is that correct?

2  A.    Yes.

3  Q.    What was the name of the area where you were on work

4  release?

5  A.    The administration building.

6  Q.    Okay.  And where on the map is the administration

7  building?

8  A.    Right here.

9  Q.    Okay.  What buildings are in the administrative

10 building?

11 A.    The offices of the warden, the roll-call room, the male

12 locker room where they get dressed and go into the shift.  We

13 cleaned all of that.  We cleaned the lobby, the offices, the

14 roll-call room.

15 Q.    I'm now going to show you Defendant's Exhibit 19B and

16 ask you to -- this is a different exhibit, but it's still part

17 of 19.  It's admitted already, correct?

18        THE COURT:  It's my understanding that the first

19 page of 19 was not objected to and was admitted.  I don't

20 believe, then, that the other pages have been admitted.

21        MS. McGRAUGH:  If we could just show this to the

22 witness and the Court, please?

23 BY MS. McGRAUGH:

24 Q.    I'm not sure how well you can see that, but can you

25 tell me what this exhibit is?

1  A.     The administration building.

2  Q.     And is it a map?

3  A.     Yes.  It looks like it, yes.

4         MS. McGRAUGH:  Your Honor, we'll move to admit

5  Defendant's 19B.

6         THE COURT:  Any objection?

7         MS. ROTHERMICH:  No, Your Honor.

8         THE COURT:  Exhibit 19B will be admitted.

9         (Defendant's Exhibit 19B was admitted into evidence.)

10 BY MS. McGRAUGH:

11 Q.     And so this is the administrative building, you said?

12 A.     Yes, ma'am.

13 Q.     Okay.  Can you make out where in the administrative

14 building you would enter?

15 A.     I believe it was over around here.

16 Q.     Okay.  So that's that second circle at the top?

17 A.     Yes.

18 Q.     So you managed to get this position in work release

19 cleaning the administrative building.  Who was your supervisor?

20 A.     Mrs. Dooley.

21 Q.     Did you work one shift or different shifts?

22 A.     I worked split shift.

23 Q.     And why don't you tell the jury what split shifts are.

24 A.     Split shift is we would go in and clean from 7:00 to,

25 like, 1:00, and then we would be off until 5:30 to 8:30.  So we

1   would just have to go in and clean in the morning and in the

2   evening too.

3   Q.      So from 7:30 to 1:00, that's in the morning; is that

4   correct?

5   A.      Yes.

6   Q.      And the 5:00 to 8:00 was p.m.?

7   A.      Yes.

8   Q.      When you arrived at the administrative building to

9   clean at 5 p.m., was it full of people?

10  A.      No.

11  Q.      Who was there?

12  A.      Bearden.

13  Q.      I'm sorry?

14  A.      Bearden.

15  Q.      Was, for example, the -- any of the administrative

16  employees there?

17  A.      No, they all go home.  They all cleared out.  Everyone

18  had -- it's usually empty.  We just do the trashes and stuff

19  and clean up so it looks nice for the next day when they get

20  back to work.

21  Q.      So there were not people walking the hallways?

22  A.      No, there was not.

23  Q.      How many women were on your crew?

24  A.      Probably six, but we didn't all go up there at the same

25  time.  It was usually three go up in the morning, three go up

1 at night, and then the next day the other three go.

2 Q.    Who was the guard supervising that detail when you were

3 in the administrative building?

4 A.    Mr. Bearden was up there.

5 Q.    Was that the first time you met Mr. Bearden?

6 A.    No.

7 Q.    Can you tell the jury the first time you met

8 Mr. Bearden?

9 A.    Yes.  I was working in the warehouse, and we had just

10 got done unloading a truck for canteen, which a semi-truck

11 would come with all of the stuff and we unloaded it and sorted

12 through it and put it all away.  And it was the end of the --

13 the end of the workday where we were about done.  All the other

14 inmates were walking out, and I had got my cup that I had drawn

15 on and was walking out, and Mr. Bearden stopped me and grabbed

16 his penis through his pants and said, "You know you want that,

17 don't you?"

18 Q.    Do you recall when this was?

19 A.    Probably around -- in the afternoon.  It was close to

20 mealtime at dinner.  So...

21 Q.    Can you -- I'm going to switch.

22        I'm now going to show you Defendant's Exhibit 19C.

23 Can you tell me what this is?

24 A.    That is a map of where the warehouse was, like the

25 central -- like inside the central administration building.

1    MS. McGRAUGH:  Your Honor, I move for admission of

2    19C.

3        THE COURT:  Any objection?

4        MS. ROTHERMICH:  No, Your Honor.

5        THE COURT:  19C will be admitted.

6        (Defendant's Exhibit 19C was admitted into evidence.)

7    BY MS. McGRAUGH:

8    Q.    Okay.  So you said the first time you had this exchange

9    with Officer Bearden, you were in the warehouse.  Can you show

10   them where the warehouse is?

11   A.    Right here.

12       MS. McGRAUGH:  Excuse me, Your Honor.  Okay.

13   A.    Right here.

14   BY MS. McGRAUGH:

15   Q.    That's the warehouse?

16   A.    Yes.

17   Q.    Where would you work when you were unloading the

18   trucks?

19   A.    Over here.

20   Q.    All right.  Now, the first time Mr. Bearden approached

21   you, where in the warehouse were you, if you recall?

22   A.    I think we were getting -- I was right here.  There's a

23   table right here, and we were getting ready to leave out this

24   way.

25   Q.    Okay.  And you had this exchange with Officer Bearden,

1  correct?

2  A.      Yes.

3  Q.      Did you report it?

4  A.      No.

5  Q.      Did you have another incident with Edward Bearden?

6  A.      Yes.

7  Q.      Can you tell us when that happened?

8  A.      When I was working in the administration building.

9  Q.      Okay.  And I'm going to put Exhibit 19B back on for you

10 to look at.

11         THE COURT:  So there's a way to clear out the

12 markings that you've made.  Do you see on the monitor anywhere

13 it's evident where you can do that?

14         MS. McGRAUGH:  Counsel was kind enough to show me

15 how to do it.

16         THE COURT:  Okay.

17         MS. McGRAUGH:  Thank you.  Okay.

18 BY MS. McGRAUGH:

19 Q.      Can you -- you showed us where you went in.  The day

20 this second incident happened, were you on work release?

21 A.      Yes.

22 Q.      What was your assignment?

23 A.      To clean the administration building.

24 Q.      In order to clean the administration building, do you

25 have to get equipment?

1   A.     Yes.

2   Q.     Where is that equipment located?

3   A.     In the janitor closet.

4   Q.     Can you see on this map where the janitor's closet is?

5   A.     I assume somewhere in here.  I can't see it very well.

6   Q.     Okay.  And what would be in the janitor's closet?

7   A.     Our cleaning supplies, our mops, our mop heads, our

8  brooms, our big yellow cart that we use to clean everything

9  with.

10  Q.     Okay.  Can you tell the jury what happened the second

11  time with Edward Bearden?

12  A.     Yes.  I was -- so right down the hall, there's a small

13  break room down there, and he told me to go get the trash out

14  of the small break room.  And there was no other girls around,

15  and I went in there to get the trash, and it was under a

16  cabinet.  And it's down the hall, and it's like the office, a

17  small break room, so there's no cameras in there.  And I was

18  going under the cabinet to get the trash, and he came up behind

19  me, and he slid his hand in my pants and my underwear.

20  Q.     And what happened next?

21  A.     And he put his fingers in my vagina.  He put his

22  fingers in my vagina.

23  Q.     And was he in front of you or in back of you when this

24  happened?

25  A.     He was behind me with his penis on my butt.

1   Q.     Could you feel his penis on your butt?

2   A.     Yes.

3   Q.     Did you give him consent to put his fingers in your

4 vagina?

5   A.     No, I did not.

6   Q.     How did it feel when he put his fingers in your vagina?

7   A.     It burned.

8   Q.     How long did he leave his fingers in there?

9   A.     I have no idea. It felt like forever. I think it was

10 just a few minutes, though.

11   Q.     Did he say anything to you while this was going on?

12   A.     Not at this time, no.

13   Q.     What happened after he took his fingers back out of

14 your vagina?

15   A.     He left and walked out of the room.

16   Q.     What did you do?

17   A.     I was shocked. I collected myself, and I went back to

18 the janitor closet where the other girls were, and we all left.

19 We had to go get stripped out. We left. I went back to my

20 housing unit, and I went to the bathroom.

21   Q.     When you went to the bathroom, did you notice anything

22 unusual?

23   A.     I had spotting on my toilet paper when I wiped.

24   Q.     Spotting of blood?

25   A.     Yes.

1  Q.      And were you still experiencing pain?

2  A.      Yes.

3  Q.      How long did that pain last?

4  A.      I would say probably about a week.

5  Q.      Now, did you tell anybody after this happened?

6  A.      No.

7  Q.      Tell the jury why you didn't go report this.

8  A.      Because if you tell anybody, from my understanding, I

9  lose everything.  I would lose my job, I would lose --

10         MS. ROTHERMICH:  Objection, Your Honor.

11  Speculation.

12         THE COURT:  Overruled.

13  BY MS. McGRAUGH:

14  Q.      So you would lose your job, your work-release job?

15  A.      I had just worked so hard to get into it.

16  Q.      Okay.  Anything else?

17  A.      Everything.  You lose visits, you lose phone calls.

18  From what I understand, they take everything away from you, and

19  you go to the hole.

20  Q.      And what's in --

21  A.      I didn't --

22  Q.      I'm sorry.

23  A.      I didn't want to lose my job.  I worked so hard to get

24  there.

25  Q.      If you lost your job, what would happen?

A.     Well, I wouldn't have any money in my books, which is

kind of a stupid thing to not tell on someone for doing that,

but at the time -- I guess.  I don't know.

Q.     Would you -- do you know how long you would be in the

SHU?

A.     No.  I've seen girls go down there for months and

months and months.

          THE COURT:  So we've been going for about an hour

and a half.  Why don't we go ahead and take our afternoon

break.

          Ladies and gentlemen, we'll take a 15-minute break.

We will come back at about 3:45.  During this break, don't

discuss this case among yourselves, don't discuss the case with

anyone else, don't permit the case to be discussed in your

presence, and we will be in recess until about 3:45.

          (The following proceedings were had in the courtroom

out of the presence of the jury:)

          THE COURT:  So with respect to the exhibits -- I

meant to bring this up this morning, and it just slipped my

mind.

          It's my understanding that some of the objections

are -- some of the exhibits are stipulated to and some are not

objected to.  To the extent the parties, maybe not at this

break, but tonight can work through those exhibits -- what

those exhibits are, we can just either tonight or tomorrow

morning admit those because it just saves a significant amount
of time.  If you're not going to object to some of these
diagrams and the like that probably came from your client
anyway, I think it saves a lot of time and speeds things up for
the jury.

Again, you don't need to do this at this break.  To
the extent you can, I would appreciate if the parties could do
that tonight.

Anything else I can take up during this break?

MS. McGRAUGH:  No, Your Honor.

THE COURT:  Okay.  Then we'll be in recess for 15
minutes.

(A recess was taken from 3:34 p.m. to 3:48 p.m.)

THE COURT:  Ready to bring the jury out?

MS. McGRAUGH:  Yes, Your Honor.

THE COURT:  Okay.  Ma'am, I would ask that you go
ahead and please take the witness stand again.

And if you could bring the jury in, please.

(The following proceedings were had in the courtroom
in the presence of the jury:)

THE COURT:  Ms. McGraugh, you may continue.

MS. McGRAUGH:  Thank you, Your Honor.

BY MS. McGRAUGH:

Q.    Before the break, we were talking about the second time
you had the sexual assault incident in the administrative

1 building.  Is that correct?

2 A.      Yes.

3 Q.      All right.  Can you tell the jury what happened with

4 that situation?

5 A.      He again told me to go get the trash out of the small

6 break room; and then he again proceeded to come up behind me

7 and put his hands down my pants into my vagina, and his fingers

8 went in my vagina, and his penis was on my butt, I think just

9 for a few minutes again.  And when he stopped, he said, "You

10 know you like that, don't you?"  And I didn't say anything.

11 And he left.

12 Q.      What was going through your mind when this happened?

13 A.      Honestly, I couldn't believe that it was really

14 happening.  I was shocked.  I had never been approached by a

15 guard like that before, or ever.  I couldn't believe that it

16 was happening, and I just didn't know what to do.  I couldn't

17 tell because if I told, I'd have lost my job.

18 Q.      Who was on your cleaning crew with you?

19 A.      I had Ella Hoy and Terry Ward were on there with me.

20 Q.      Okay.  Both times?

21 A.      Yes.  I believe so, yes.

22 Q.      Were you frightened?

23 A.      Yes, I was terrified.

24 Q.      After it happened the second time, what did you do?

25 A.      I went and grabbed Ella Hoy, and I told her everything.

1  I said, "Look, Mr. Bearden is doing weird shit to me, and I

2  need your help.  I don't know what's going on."  And Ella was

3  like, "Listen, we'll make a buddy system.  It will be me and

4  you.  And if it's not me and you, we'll make sure that

5  everyone -- someone is always with you."

6  Q.      And why was that?

7  A.      Because I didn't think he was going to stop.  And I was

8  right.

9  Q.      Okay.  How -- do you remember how much distance

10  time-wise there was between the first incident and the second

11  one?

12  A.      I think like a week, if that.

13  Q.      Was there another incident with Edward Bearden?

14  A.      Yes.

15  Q.      What happened?  And start by telling us when, please.

16  A.      Right after the second incident, we were up there

17  cleaning, I believe it was on a Saturday or Sunday, I'm not

18  sure which day.  It was so long ago, I couldn't remember.  It

19  was in the evening.  And he was up in the administration

20  building, and we had to go and -- we still had the locker rooms

21  to do and the roll-call room.  And we had just got done doing

22  the roll-call room, and we went into the locker room.  And we

23  put the sign on the door, and we opened it and we propped the

24  cart in there because no one is allowed in there with an inmate

25  in there.

1   Q.      Let me back you up.  When you're cleaning the

2   bathrooms, who can be in there?

3   A.      No one.  Well, just the inmates.  The inmates that are

4   cleaning it can be in there.

5   Q.      Okay.  What about the guards?

6   A.      No, they're not allowed.  They're supposed to knock and

7   tell us to get out.

8   Q.      Are there cameras in the bathroom?

9   A.      No, there's not.

10  Q.      And in case I didn't ask, was there a camera in that

11  closet with the cleaning products?

12  A.      No, there's not.

13  Q.      So who went in the bathroom to clean?

14  A.      I did.

15  Q.      Did anybody go with you?

16  A.      Ella Hoy came with me.  And we went into the male

17  locker room; and I was on one side mopping, and she was on the

18  other side dry mopping.

19  Q.      And what's between the two sides?

20  A.      A big wall.  Like there's showers on one side and

21  toilets on the other side, and there's a big wall in between.

22  It's like a U, it's like a horseshoe with a wall in the middle.

23  Q.      And did you see Edward Bearden?

24  A.      Yes.  He came into the bathroom and seen me and

25  directly came over.  He came behind me and grabbed me by my

1  hair, pulled me around, and said, "You're going to suck my dick

2  today."

3          And Ella Hoy popped out of the side of the bathroom

4  and she's like, "What?"  And he took off so fast, it wasn't

5  even funny.  He left the locker room, and I don't believe that

6  he bothered me again.

7  Q.     Did you try to get transferred out of that assignment?

8  A.     Yes.

9  Q.     Can you tell the jury what happened with that?

10 A.     I went back to Miss Dooley, and I told her, "Look, I've

11 got to get out of here, I've got to get out of the admin

12 building.  Please, can we move me up to the garage?"

13 Q.     Now, did you tell her why?

14 A.     No.  No.  I told her that I just -- she kept asking,

15 "Well, what's going on" --

16          MS. ROTHERMICH:  Objection, hearsay.

17 BY MS. McGRAUGH:

18 Q.     Without telling what she said to you, excuse me, could

19 you tell us what you said to her?

20 A.     Yes.  I said, "I just got to get out of there.  Please,

21 I have to get out of there.  I can't be in there anymore, I

22 need to go over to the garage, or I'm just going to quit work

23 release altogether.  I have to get out of there or I'm going to

24 quit.  Just take me off of work release if you're not going to

25 get me out of admin."

1  Q.      What happened after that?

2  A.      She said, "Okay.  Okay."

3  Q.      I don't want you to tell me what she said.

4  A.      She moved me out of admin into the garage.

5  Q.      Okay.  Was that the last encounter you had with Edward

6  Bearden?

7  A.      Yes.

8  Q.      During the time you were in Chillicothe, did Edward

9  Bearden ever ask you to write him a letter?

10  A.      Yes.

11  Q.      Can you tell the jury what happened with that?

12  A.      He asked me to write him a letter and tell me what he

13  wanted me to do to him and tell me what he wanted -- he wanted

14  me to have done to me or he wanted me to have him do to me.

15  And if he wanted me to bring anything in for -- if he wanted me

16  to have anything brought in, put it in a letter and leave it in

17  my locker, because his locker room was in the administration

18  building.

19  Q.      So you could access his locker in the administration

20  building?

21  A.      Yes.

22  Q.      Was this before or after he sexually assaulted you?

23  A.      Before.

24  Q.      Did you write him a letter?

25  A.      I did.

1    Q.    Can you tell the jury what that letter said?

2    A.    It said, "Leave me the fuck alone."

3    Q.    What did you do with the letter?

4    A.    I put it in his locker.

5    Q.    Did you ever get a response?

6    A.    No.  No, I didn't.

7    Q.    When Mr. Bearden sexually assaulted you, were there

8    other guards around?

9    A.    No, there wasn't.

10    Q.    Okay.  He's the only -- he was the only guard in the

11    administration center?

12    A.    Right.  I believe there was a guard in the bubble.

13    Okay, so it's in between two locked doors with a bunch of TV

14    screens that looks at the cameras, at the prison, but they

15    weren't -- I mean, I don't think they could see anywhere where

16    we were cleaning.

17    Q.    Do you know why they call it the bubble?

18    A.    Because it looks like a bubble.

19    Q.    Does it have glass around it?

20    A.    Uh-huh.  Uh-huh.

21    Q.    Is where you were sexually assaulted anywhere near that

22    bubble?

23    A.    No.

24    Q.    Did you ever tell anybody besides Ella Hoy about the

25    sexual assaults?

A.     I told Adrienne Laswell and Amie Calder.  They were my good friends.

Q.     Did you ever tell anybody in the administration?

A.     No.

Q.     What did you do when you were released from Chillicothe?

A.     I got married and got off parole and was working.

Q.     Did Mr. Bearden's name resurface after you got out of Chillicothe?

A.     It did.

Q.     Can you tell the jury how that happened?

A.     I was getting my hair done at -- by, actually, a girl who was in prison with me.  She was in cosmetology.  She did my hair in prison, and then we got out, and she does my hair outside.  Her name is Jennifer N. Townsend.  We called her Barbie.

       I was getting my hair done by Jennifer, and she said "Did you hear about Karen?"  And I said, "No, what?"

Q.     Now, did you know who Karen was?

A.     I do, I did.

Q.     Did you know Karen in prison?

A.     As a BLAST instructor, yeah.

Q.     Okay.  So BLAST -- what is BLAST?

A.     She was our exercise instructor.  She did like Zumba, yoga, all of that other stuff.

```
 1   Q.      And this is Karen Keil?

 2   A.      Yes.

 3   Q.      Were you friends?

 4   A.      No, we weren't friends.  She was -- she helped me lose

 5   a lot of weight.

 6   Q.      Okay.  And -- but you know who --

 7   A.      I knew who she was, though.

 8   Q.      Okay.  And so what happened after that?

 9   A.      I heard -- Jennifer was talking to me, and she said, do

10   you --

11           MS. ROTHERMICH:  Objection, hearsay.

12   Q.      Don't --

13           THE COURT:  Okay.

14           MS. McGRAUGH:  I'll tell her, just give me a --

15           THE COURT:  Thank you.

16           MS. McGRAUGH:  Excuse me, Judge, is that

17   permissible?

18           THE COURT:  Yes.

19   A.      I'm sorry.

20   BY MS. McGRAUGH:

21   Q.      That's okay.  Don't tell us what she told you, just

22   tell us what you said and did, okay?

23   A.      All right.

24   Q.      Did she give you information?

25   A.      She did.
```

1  Q.      Did she give you information about Karen?

2  A.      She did.

3  Q.      Did she give you information about Karen and Edward

4  Bearden?

5  A.      She did.  And --

6  Q.      Did she -- did you make contact with Karen after that?

7  A.      I did.

8  Q.      Do you recall when this was?

9  A.      No.

10  Q.      And what did you do after she gave you that

11  information?

12  A.      I got ahold of Karen immediately, and I said, "It

13  happened to me too."  And she said, "I'll stop you right

14  there."

15  Q.      Okay.  We won't want to know what Karen said.

16  A.      Oh, I'm sorry.

17  Q.      Did Karen advise you to do anything?

18  A.      Just to call John.

19  Q.      John Ammann?

20  A.      Yes.

21  Q.      Okay.

22  A.      And that was it.  She said, "Don't say anything, just

23  call John."

24  Q.      Okay.  Thank you.

25  A.      Oh.

1  Q.    It's hard to remember.

2  A.    Sorry.

3  Q.    Okay.  How did you get Karen's phone number to call

4  her?

5  A.    My friend, Teresa Buckner, she was on work release with

6  me, and she is one of Karen's good friends, her and Karen are

7  friends.  And I asked her, "I need to talk to Karen," and she

8  said, "Well, what's going" --

9  Q.    And was she able to provide you with the number for

10  Karen?

11  A.    Yes, she was.  She gave me her number.

12  Q.    Okay.  Now, this whole time, Ashley, we've been talking

13  about Edward Bearden.  Do you see Edward Bearden, the man who

14  sexually assaulted you, in this courtroom?

15  A.    I do.

16  Q.    Can you point to him and identify him for the record,

17  please?

18  A.    He's sitting right over there.

19  Q.    What's he wearing?

20  A.    A suit top, and has glasses and a purple shirt, I

21  think.

22        MS. McGRAUGH:  Can the record reflect, Your Honor,

23  that she's identified Defendant Edward Bearden?

24        THE COURT:  The record will so reflect.

25        MS. McGRAUGH:  Thank you.

BY MS. McGRAUGH:

Q.     I want to talk now about your -- I think there's a
tissue right next to you.

          I want to talk to you now about kind of the
aftermath of these sexual assaults.  How has, have these sexual
assaults affected you?

A.     I think that they have affected me tremendously.

Q.     How so?

A.     With my relationship with my husband, we're not able to
be intimate, I am not able to be intimate.

Q.     Why are you unable to be intimate with your husband?

A.     I just can't do it.

          MS. ROTHERMICH:  Objection.  Calls for an expert
opinion.

          THE COURT:  Overruled.

A.     I just can't do it.  I don't --

BY MS. McGRAUGH:

Q.     Have you tried?

A.     I have.  And he's so patient with me, but --

Q.     And what about your relationship with your daughter?
Has that suffered?

A.     It has.  It has.  So she -- when she comes up behind me
and puts her arm around me, I just -- I freak out.  She has to
come in front of me.  I can't have anyone coming behind me and
putting their arms around me, and that's her favorite thing.

1  She loves to hug on me, and she just doesn't understand why.

2  Q.    What about your mental state, how is that?  Do you have

3  any symptoms?

4  A.    I have nightmares all the time where I feel like I

5  can't breathe.  I wake up, I'm covered in sweat, my heart is

6  racing, my hands are sweating.  It's like it's hard to breathe.

7  Q.    Is that a panic attack?

8  A.    Yes.

9  Q.    Have you sought help from a therapist?

10 A.    I have.  I started going to therapy, and then Covid

11 happened, and they shut it all down.  And they tried to go back

12 on, like, videoconference, but I couldn't figure out how to do

13 that.  I'm back in line to get in to a therapist at Burrell in

14 Springfield, but it's 40 minutes away from my house.  So...

15 Q.    Are you still waiting to get --

16 A.    I'm still waiting to get in, yes.

17 Q.    Were these the first time you had panic attacks after

18 you were sexually assaulted?

19 A.    I had a couple, like, probably four in my entire life.

20 Q.    And how old were you then?  Do you recall?

21 A.    I think like 16, 17, 19.

22 Q.    Okay.  And at that time, did you have a diagnosis?

23 A.    Bipolar depression.

24 Q.    Has your current therapist diagnosed you with

25 bipolar --

1    MS. ROTHERMICH:  Objection, Your Honor.  This is an

2  expert opinion.

3    THE COURT:  Overruled.

4  A.    I believe they said bipolar depression and PTSD.

5  BY MS. McGRAUGH:

6  Q.    Do you know what PTSD stands for?

7  A.    Post-traumatic stress syndrome.

8  Q.    Okay.  What about anxiety?

9  A.    Yes, and anxiety.

10  Q.    Is there a situation that is more likely to make you

11  have a panic attack?

12  A.    Yes.

13  Q.    Can you tell the jury what that is?

14  A.    Yes.  When I was working at the Welk, we have big key

15  rings, and it sounded just like Mr. Bearden's belt because his

16  keys always jingled.  You could hear him before you could see

17  him.  And when I heard those keys, I ran into the bathroom, I

18  locked the door, I was sweating, I couldn't breathe.  It felt

19  like I was under water.  My hands and my face went numb, my

20  heart was racing.  And I just left.  I couldn't even -- I just

21  left.  I don't even know why.  I couldn't do anything, I just

22  left.

23  Q.    And do those panic attacks affect your employment?  Has

24  there been a situation where they occurred?

25  A.    Yeah, I was working --

1  Q.     Can you tell the jury?

2  A.     I was working when that happened.  I was at the Welk

3  working, and we had big keychains.  And I ran into the bathroom

4  and had a panic attack.  When I collected myself, I left.  I

5  didn't quit, I didn't go back, I just -- I just left.  I can't

6  go shopping because being in a big crowd like this, especially

7  around a man in uniform, is terrifying.

8  Q.     I want to ask you about another difficulty you have.

9  Do you have difficulty using the bathroom to have a bowel

10  movement?

11  A.     I do.

12  Q.     Could you tell the jury when that began?

13  A.     When I was on 8-House.

14  Q.     What is 8-House?

15  A.     8-House is the housing unit I lived on in Chillicothe

16  when I worked on work release.  It's the two-man cells, so

17  there's two bunks, and your toilet is in the room.

18        I was in my cell using the restroom, and Mr. Bearden

19  seen that I was in there.  He opened the door and said, "I

20  guess I just missed all the fun."  And I was on the toilet

21  going -- I was taking a poop.  And he just flung the door open,

22  he was just standing there.  I couldn't move, I couldn't -- I

23  just stopped everything.  My roommate finally seen that he was

24  down there, and so she came back to the room, and he left.  And

25  I could finish up after he left.

Q.      And how has that created a problem for you?

A.      I am constipated a lot now.  I think I'm -- I'm scared to poop.  Sometimes it just -- I have flashbacks of it.

Q.      Have you ever had suicidal thoughts as a result of the sexual assaults?

A.      I have.

Q.      I want to just finish by talking about some of the things you're doing now and things you're looking forward to. All right?

A.      Okay.

Q.      You told us that you're hoping to get into therapy.

A.      Yes.

Q.      How do you feel about your future?

A.      I am hopeful that the future will be better, that I can just get this off my chest and put it behind me.  And I would like to gain more confidence in myself because I used to be a confident person, and I don't feel like I have that anymore.

Q.      Do you think you're going to get it back?

A.      Yes, I do.

        MS. McGRAUGH:  Okay.  I have no further questions, Your Honor.

        THE COURT:  Cross-examination?

        MS. ROTHERMICH:  Thank you, Your Honor.

                     - - -

1    CROSS-EXAMINATION

2    By Ms. Rothermich:

3    Q.    Good afternoon, Miss Zieser.

4    A.    Hi.

5    Q.    First of all, am I saying your name correctly?  Is it

6    Zieser?

7    A.    Zieser.

8    Q.    I apologize.

9    A.    That's okay.  No one ever gets it right.

10   Q.    I wanted to ask you a few questions about your

11   testimony today.

12           So the first question I have is you said that there

13   were the incidents that occurred in the admin building with

14   Mr. Bearden that you testified to.  And you said that those

15   were at the night shift when you were the porter; is that

16   right?

17   A.    Right.  I believe so.

18   Q.    All right.  Thank you.

19           And then you went through with Ms. McGraugh your

20   convictions, your felonies.  I want to just make sure that we

21   have it for the record because I was a little off on my time

22   with that.

23           So the first was the felony conviction from the

24   early 2000s for forgery.  Is that correct?

25   A.    Yes, I had two of those.

1  Q.     Okay.  And then there was a second one in 2010 to 2013;

2  does that sound about right?

3  A.     Right.

4  Q.     So about ten years after that first one, right?

5  A.     Right.

6  Q.     Okay.  And then a felony conviction for possession of

7  controlled substance; is that correct?  That was the third?

8  A.     Yes.

9  Q.     Okay.  And I'm sorry to have to ask you to say it out

10  loud, but it's just we have the court reporter.

11  A.     That's all right.

12  Q.     And then No. 4, the felony conviction for assault on a

13  law enforcement officer; is that correct?

14  A.     Yes.

15  Q.     Okay.  And then the fifth, another felony conviction

16  for possession of controlled substance; is that right?

17  A.     That is correct.

18  Q.     Okay.  So a total of five felony convictions.

19  A.     I believe there's one more possession.

20  Q.     One more possession?

21  A.     Yes.

22  Q.     Okay.  So six felony convictions?

23  A.     Yes.

24  Q.     And you were talking a little bit earlier about your

25  time at Chillicothe.  So initially you were sent up to

1 Chillicothe just for a treatment program; is that right?

2 A.     That's correct.

3 Q.     Okay.  And you were there from about January to April

4 of 2014; is that correct?

5 A.     That is.

6 Q.     Okay.  And then you had the incident with the law

7 enforcement officer; is that right?

8 A.     Yes.

9 Q.     And then one of the felony possession charges -- or

10 convictions?

11 A.     Yes.

12 Q.     Okay.  So you were sent back to the Department of

13 Corrections in December of 2014; is that right?

14 A.     Yes.

15 Q.     Okay.  And then, I think we went through this, finally

16 released from Chillicothe in May of 2017, correct?

17 A.     Yes.

18 Q.     Okay.  And you were kind of testifying earlier about

19 things, you know, that you had -- that you went through in

20 prison like the little toothbrush, the clothing, everything

21 like that.  I mean, just to be sure for the jury, I want to

22 clear the record on this.  I mean, that's something that all of

23 the inmates had to do; is that correct?

24 A.     Absolutely, yes.

25 Q.     Okay.  And prison is not supposed to be fun; we can

1  agree with that, right?

2   A.     Absolutely right.

3   Q.     Okay.  So -- and you agree that safety and security is

4  a concern with prison, correct?

5   A.     I would, yes.

6   Q.     Okay.  So things like the little toothbrush, the extra

7  tennis shoes, things like that, you don't know yourself as a

8  former inmate necessarily why those rules were created; is that

9  right?

10  A.     Right.

11  Q.     Okay.  It's not something that just applied to you,

12  right?

13  A.     Correct.

14  Q.     Okay.  Now, you -- during your time at Chillicothe, you

15  did -- you worked a lot; is that correct?

16  A.     Yes.

17  Q.     Okay.  And you talked about how in December of 2015,

18  you started working as a porter in the administration building;

19  is that right?

20  A.     Yes.

21  Q.     Okay.  And you held that job for about six or seven

22  weeks; is that fair?

23  A.     That's correct.

24  Q.     Okay.  And your job in that role was to clean

25  everything from top to bottom; is that right?

1    A.     Yes.

2    Q.     Okay.  And you said that there were two shifts, and the

3    incidents that we're talking about happened on the night shift,

4    correct?

5    A.     I believe so.

6    Q.     Okay.  Now, we heard a little bit -- I wanted to ask

7    you about the penis-grabbing incident that you described.  You

8    said that this occurred in the warehouse; is that right?

9    A.     Yes.

10   Q.     And the warehouse is part of the secured part of the

11   facility; is that right?

12   A.     It is.  It's inside the prison.

13   Q.     Okay.  And I just want to describe for the jury what

14   that means because I'm assuming they've maybe never been into a

15   prison.  So in order to get into the secured part --

16             MS. McGRAUGH:  Your Honor, I'm going to object to

17   her making a statement to the jury.  She can ask the questions

18   of the witnesses.

19             THE COURT:  Overruled.

20   BY MS. ROTHERMICH:

21   Q.     So in order to get into the secured part of the

22   facility, you go into a security when you enter into the

23   correctional facility; is that correct?

24   A.     Yes.

25   Q.     And then to get into the secured part of the facility,

1  there are extra gates that you have to go through.  If you're a

2  visitor, you have to have an ID, just some extra levels of

3  security; is that fair?

4  A.      Yes.

5  Q.      Okay.  So the warehouse was inside of the secured part

6  of the facility, right?

7  A.      It was.

8  Q.      And the administration part was outside of the secured

9  part of the facility; is that right?

10 A.      It was.

11 Q.      Okay.  Now, Miss Zieser -- did I say that correctly?

12 A.      That's okay.

13 Q.      Did I say that correctly?

14 A.      Yeah.

15 Q.      Okay.  You said that the penis-grabbing incident

16 occurred in the secured part of the facility in the warehouse;

17 is that right?

18 A.      Yes, I believe so.

19 Q.      Okay.  And that's your testimony from today.

20 A.      Yes.

21 Q.      Do you recall giving a deposition in this case on July

22 the 28th of 2021?

23 A.      Yes.

24 Q.      And I believe -- due to the circumstances of Covid and

25 everything, I believe yours was by Zoom; is that correct?

1  A.     Yes, it was.

2  Q.     Okay.  And do you recall giving testimony under oath

3  regarding your allegations in the case?

4  A.     Yes, I do.

5          MS. ROTHERMICH:  Your Honor, I would like to put up

6  her testimony here.  Can I just use this?  I just want to be

7  sure it's not published for the jury.

8          Okay.  I apologize for that.  I was trying to get

9  you a good copy.  So here we go.

10         THE COURT:  So, again, it's not on the witness

11  monitor, although it's on mine and the court reporter's.  There

12  it goes.

13  BY MS. ROTHERMICH:

14  Q.     Okay.  So Miss Zieser, I'm going to ask you -- I'm

15  going to read the questioning in the deposition, and I want to

16  be sure that I'm reading it correctly.  And if you can just

17  kind of follow along on the deposition here.

18         So at Page 20, Line 7, the question was:  "This was

19  in the warehouse?"

20         The answer:  "I believe that was up in admin.  That

21  was in the admin building, the supply closet in admin, and it

22  was in December."

23         Question, Line 11:  "Okay.  What happened?  Tell me

24  about that."

25         Answer:  "We had gotten there, and it was -- I'm not

1  sure, but it was a quiet day.  I'm not sure where everyone was,

2  but it was a quiet day, so it might have been like a Saturday.

3  We had gone into the roll-call room.  We were cleaning up the

4  roll-call room, and I was going to fill the mop bucket to -- we

5  had to mop it and dry mop it after we had cleaned it.  I was in

6  there filling up the mop bucket, and Mr. Bearden was working

7  there that day, and he walked by and caught me completely off

8  guard because he -- he was like, hey, hey, and he grabbed his

9  penis and said, 'You like that.'  And I was like, 'What?'

10  Because nobody had ever acted like that before, so it caught me

11  completely off guard."

12          You agree that that is what you testified to just

13  about a year ago in your deposition?

14  A.      Yes.

15  Q.      Okay.  And you agreed previously that the warehouse is

16  different than the admin building.

17  A.      Yes.

18  Q.      Okay.  Thank you.  And so you agree that your testimony

19  with regard to that incident has changed.

20  A.      Well, I believe it was in the admin building, actually.

21  But in the warehouse, when we were getting off in the

22  warehouse, he was up there, and he was making derogatory

23  comments.  I can't remember exactly what, but he had made

24  derogatory comments at the warehouse, as well.

25  Q.      Okay.  But the testimony that we heard about the penis

1  incident that you just testified to with your attorney, that we

2  heard you say was in the secured part of the facility, is

3  different from the admin area that's not in the secured part of

4  the facility, correct?

5   A.     Correct.  They are in different places.

6   Q.     Thank you.  Now, I don't want to go through all of the

7  incidents, I just want to be sure that we're clear for the

8  record.  You agree that you did not report those incidents to

9  administration at Chillicothe, correct?

10  A.     No, I did not.

11  Q.     Okay.  And you also here today -- we talked a little

12 bit about your employment history, so I just want to go through

13 a little bit of that for the jury since you are claiming

14 damages relating to that.  So you're asking this jury here

15 today to award you lost income due to these incidents, correct?

16  A.     Yes.

17  Q.     Okay.  And in -- just, I want to kind of go through

18 this with the jury.  In 2015, you had not had any employment

19 since 2009; is that correct?

20  A.     I believe so, yes.

21  Q.     So from 2009 until 2015 or '14 when you went into

22 Chillicothe, you had not been employed.

23  A.     Right.

24  Q.     Okay.  Now -- so no employment history for that time

25 period, nothing to put on your resume.

1   A.      No.

2   Q.      Okay.  And no source of income during that time period,

3   correct?

4   A.      Correct.

5   Q.      Okay.  And you previously had had your Certified

6   Nursing Assistant license; is that right?

7   A.      It is.

8   Q.      And that included special training to get that.

9   A.      Yes.

10  Q.      And you don't have that anymore; is that correct?

11  A.      Right.

12  Q.      Okay.  And it's expired or something?

13  A.      It is, yes.

14  Q.      Okay.  And you would need to be recertified in order to

15  do that.

16  A.      Right.

17  Q.      Okay.  And you haven't done that; is that right?

18  A.      No, I haven't.

19  Q.      Okay.  And you testified that you worked at the Welk

20  Resort down in Branson.  And just to orient the jury, that's a

21  resort down in the Branson area, correct?

22  A.      It is.  It's like a big hotel resort with time shares

23  in it too.

24  Q.      Okay.  And that was $11 an hour, correct?

25  A.      It was.

1    Q.    And full time.

2    A.    Yes.

3    Q.    And you held that job at Welk for about three months;

4    is that right?

5    A.    That's right.

6    Q.    And after that, you also worked for your husband's

7    company for a while; is that right?

8    A.    Yes.

9    Q.    And that went on for about two years; is that correct?

10   A.    Uh-huh.

11   Q.    Is that correct?

12   A.    Sorry, yes.

13   Q.    In that capacity, he would kind of let you -- it seemed

14   like he would let you work your own hours, or you didn't have

15   to work if you didn't really want to, correct?

16   A.    Right.

17   Q.    So the time periods that you weren't working for your

18   husband's company during that time was due to your own choice.

19   A.    Right.

20   Q.    Okay.  Now, that was commission-based, correct?

21   A.    Yes, it was.

22   Q.    And no guess as to how much you actually brought home

23   from that, correct?

24   A.    Right.

25   Q.    And you have not applied for any jobs since March of

1  2020; is that correct?

2  A.      Right.

3  Q.      And to be fair, that was around the -- we all know

4  that's around the time that Covid hit, right?

5  A.      Right.

6  Q.      And that was because you yourself did not want to be

7  around people and working with a bunch of people around that

8  time, correct?

9  A.      Correct.

10  Q.      Okay.  And also to be fair, your job opportunities are

11  limited due to being a convicted felon, correct?

12  A.      Yes.

13  Q.      Okay.  All right.  Now, we also heard some testimony

14  about physical injuries that you are asking the jury to

15  compensate you for.  Is that correct?

16  A.      Yes.

17  Q.      Okay.  Now, today, as we sit here today, you're

18  alleging that you have physical injuries that you're claiming

19  from these incidents; is that correct?

20  A.      Well, I don't have them right now.

21  Q.      You had -- I apologize.  That was a bad question.

22          You had physical injuries from these incidents; is

23  that correct?

24  A.      Right.

25  Q.      Okay.  Now, again, do you recall giving your deposition

1  in this case?  Is that correct?

2  A.     Yes.

3         MS. ROTHERMICH:  And I'm going to put up, again,

4  just so that she can see it and I can see it --

5  BY MS. ROTHERMICH:

6  Q.     Again, you were under oath; is that right?

7  A.     Yes.

8  Q.     Okay.  Hold on.  Wrong page.  All right.  So as long as

9  you can see this, I'm going to ask you to take a look at Page

10  71, Line 12.  Are you there?

11  A.     Yes.

12  Q.     Okay.  Question:  "Do you have any physical injuries

13  from the incidents with Mr. Bearden in Chillicothe?"

14         Line 14, answer:  Witness shakes head.

15         Question:  "No?"

16         Answer:  "No."

17         And, again, this deposition occurred just last July.

18  Is that correct?

19  A.     Yes.

20  Q.     Okay.  Now, we heard a little bit about emotional

21  damages that you are claiming, as well.

22  A.     Uh-huh.

23  Q.     Well, let me ask you about your physical damages.  So

24  your testimony has changed from your deposition to today; is

25  that accurate?

1          MS. McGRAUGH:  Objection, Your Honor.  That's

2    misstating the evidence.

3          THE COURT:  Sustained.

4    BY MS. ROTHERMICH:

5    Q.    Miss Olsen -- or I apologize, Miss Zieser.  Your former

6    name was Miss Olsen, correct?

7    A.    Yes.

8    Q.    Sorry.  So I want to kind of go through with you, your

9    testimony is that you have panic attacks when you have to be

10   alone with men; is that correct?

11   A.    Yes.

12   Q.    Okay.  And you're currently married; is that right?

13   A.    I am.

14   Q.    Okay.  You started going to a therapist when you were

15   19 or 20 years old; is that correct?

16   A.    It is.

17   Q.    And that was for bipolar depression; is that right?

18   A.    Yes.

19   Q.    And you've been in treatment for substance abuse; is

20   that right?

21   A.    Yeah, that's correct.

22          MS. ROTHERMICH:  Okay.  And I would like to put up

23   Exhibit D31 for the witness to identify.  Okay.

24   BY MS. ROTHERMICH:

25   Q.    So do you recognize this document as your handwriting?

1  A.       I do.

2  Q.       Okay.  And you recall writing this as part of a

3  treatment program?

4  A.       I remember we had to write it.  I don't remember

5  writing it, but, yeah.

6  Q.       Okay.

7  A.       I mean, I'm sure I did.  I see it.

8  Q.       And that's your handwriting up at the --

9  A.       Yes, it is.

10  Q.       -- upper -- and it says Ashley Olsen on there.

11  A.       It does.

12  Q.       And this is a multi-page document.  And, actually, we

13  have books over there if you want to look at the whole

14  document.

15          But I'm going to ask you, you know, if you recognize

16  this as your handwriting, that you wrote it, and then I'm going

17  to ask for it to be admitted into evidence.  But are the books

18  on the --

19          THE COURT:  Is there any objection?  Is there any

20  objection to the document?

21          MS. McGRAUGH:  Yeah, I don't know that it's been

22  properly authenticated, Your Honor.

23          THE COURT:  Okay.  Show her the document.

24          MS. ROTHERMICH:  Okay.  If I may approach.

25          THE COURT:  Yes.

1          MS. ROTHERMICH:  Thank you.

2          MS. McGRAUGH:  Your Honor, I would also object on

3     the grounds of relevancy at this point.

4          THE COURT:  Could counsel please approach?

5          (Counsel approached the bench, and the following

6     proceedings were had:)

7          THE COURT:  So how is this document relevant?

8          MS. ROTHERMICH:  Your Honor, it just talks about her

9     previous life experiences, which would bear on her emotional

10    distress damages.

11         THE COURT:  So, to me, you have to ask her about

12    those.  If she disagrees or says it's not true, then you can

13    use that to impeach her, but I don't see a basis to introduce

14    it as substantive evidence unless it is somehow relevant to an

15    impeachment issue.

16         MS. McGRAUGH:  There's a lot of irrelevant

17    information in there.

18         MS. ROTHERMICH:  Okay.  I'll ask her the individual

19    questions, then, and then -- so I can have her stop looking at

20    it.

21         MS. McGRAUGH:  May I ask if there's a certain

22    portion you're going to ask her about?

23         MS. ROTHERMICH:  I mean, the whole thing.  I mean,

24    just various things within it.

25         THE COURT:  Again, what's the relevance of this?

1          MS. ROTHERMICH:  Well, because she has previous life
2     experiences that would bear on her emotional distress.
3          THE COURT:  Okay.  So you can ask her about previous
4     life experiences that bear on her emotional distress claim.
5          MS. McGRAUGH:  Right.  But from the letter?
6     Shouldn't she be given an opportunity to give those answers
7     before a letter is -- it violates --
8          MS. ROTHERMICH:  I think she overruled -- I think
9     she sustained your objection.
10          THE COURT:  Ask the questions.  There's not an
11     objection -- you can ask questions about life experiences, and
12     then I'll take up any objections to those questions.  I can't
13     predict what the answer to any not-yet-lodged objections to
14     not-yet-asked questions are.
15          (The following proceedings were had in open court:)
16     BY MS. ROTHERMICH:
17     Q.     Okay.  Sorry about that.  So, Miss Zieser, you said
18     that -- or you were raised in Chicago; is that correct?
19     A.     Yes.
20     Q.     Until you were about 13 years old.
21     A.     Yes.
22     Q.     All right.  Your parents divorced when you were about
23     two years old; is that correct?
24     A.     Correct.
25     Q.     You have no contact with your father; is that right?

1  A.      Right.

2          MS. McGRAUGH:  Your Honor, I am going to object on

3  the grounds of relevancy.  This doesn't go to the purported

4  reason for the letter, which is her mental health experiences.

5          THE COURT:  The objection at this point is

6  overruled.  I do think your questions need to become a little

7  bit more focused to the topic that is relevant.

8          MS. ROTHERMICH:  Thank you.

9  BY MS. ROTHERMICH:

10 Q.      Okay.  And you experienced childhood abuse from your

11 mother; is that correct?

12 A.      I did.

13 Q.      Okay.  You testified earlier that you have trouble

14 being intimate with your husband; is that right?

15 A.      I did.

16 Q.      And you have a ten-month-old child; is that right?

17 A.      We do.

18 Q.      You have three other children; is that correct?

19 A.      Yes.

20 Q.      The two older children don't live with you; is that

21 right?

22 A.      No, they don't.

23 Q.      They live with their father's parents, correct?

24 A.      Yes, they do.

25 Q.      The father of the two older children was murdered; is

1  that correct?

2  A.      Yes, he was.

3  Q.      And that was a very traumatic experience for you; is

4  that right?

5  A.      Yes, it was.

6  Q.      You had been together with him since you were very

7  young; is that right?

8  A.      Yes.

9  Q.      Okay.  And I'm not trying to -- but the murder is still

10  not solved, correct?

11  A.      That is correct.

12  Q.      And his parents, who adopted --

13          MS. McGRAUGH:  Objection, Your Honor, relevancy.

14  May we approach?

15          THE COURT:  Yes.

16          (Counsel approached the bench, and the following

17  proceedings were had:)

18          MS. McGRAUGH:  There was a theory at one point that

19  Miss Zieser was the person who killed her husband.  She's never

20  been investigated, she's never been proven to have done it.

21          THE COURT:  So, yeah, are you going down that line

22  of questioning?

23          MS. ROTHERMICH:  Well, I mean, to the extent that

24  she's trying to get emotional distress damages from that.

25          THE COURT:  We're not getting into allegations that

1    she committed murder.  The objection is sustained.

2                (The following proceedings were had in open court:)

3    BY MS. ROTHERMICH:

4    Q.      And before you went into the -- in the Missouri

5    Department of Corrections, you had some serious problems with

6    anxiety and depression; is that right?

7    A.      I believe so, yes.

8    Q.      Okay.  And before prison, you were dealing with serious

9    substance abuse issues, correct?

10   A.      Yes.

11   Q.      You said you were doing meth, correct?

12   A.      Yes.

13   Q.      And that was on a daily basis; is that right?

14   A.      Yes.

15   Q.      And you were also in an abusive relationship with a

16   boyfriend, correct?

17   A.      I was.

18   Q.      He beat you up in front of your children; is that

19   right?

20   A.      He did.

21   Q.      And he threatened to kill you if you didn't drop out of

22   school; is that right?

23   A.      He did.

24   Q.      And there were other incidents besides that one

25   incident like that in your relationship with him; is that

1  correct?

2  A.      That's correct.

3  Q.      Okay.  And, again, you're remarried now?

4  A.      I am.

5  Q.      And your husband is not abusive to you now.

6  A.      No, he's not.  He's wonderful.

7  Q.      Okay.  Now, I just wanted to talk a little bit about

8  how you know some of the other plaintiffs.

9  A.      Okay.

10  Q.      You said -- or you knew Lynnsey Christie, or now she's

11  known as Lynnsey Betz, already before you filed the lawsuit,

12  correct?

13  A.      I'd seen her.  We don't really know each other like

14  that, though.  I seen her in the prison.  When I used to go

15  down to cosmetology to get my hair done, she was always down

16  there.

17  Q.      That was actually my next question to you.  So you

18  would see her when you were in cosmetology, correct?

19  A.      Yes.

20  Q.      And was she -- you would get your hair done while you

21  were down there, correct?

22  A.      Uh-huh.

23  Q.      And you would talk with her while you got your hair

24  done?

25  A.      Sometimes if she was up there talking, but usually she

1  was back there working.

2  Q.     Okay.

3  A.     I would get my hair done by other girls.

4  Q.     Okay.  And you would also do Zumba together; is that

5  right?

6  A.     Yes, she was in the Zumba classes.

7  Q.     Okay.  And Miss Karen Keil was the teacher of that

8  Zumba class; is that right?

9  A.     Sometimes.

10  Q.     Okay.  And you also said -- or let me ask this.  I

11  mean, Zumba is a class, a group fitness class in the prison,

12  correct?

13  A.     Uh-huh.

14  Q.     In the rec area; is that accurate?

15  A.     Yes, it is.

16  Q.     Okay.  And they have music going during that class; is

17  that right?

18  A.     Right.

19  Q.     Okay.  And it's kind of fun; is that fair?

20  A.     Yes, it was very fun.

21  Q.     Okay.  And you would chat with the ladies at your Zumba

22  class before and after class; is that fair?

23  A.     Sometimes, yeah.

24  Q.     Okay.  And I think you testified earlier that Miss Keil

25  was also your personal trainer; is that correct?

1    A.    Well, she just did the Insanity, which it was -- the

2    whole rec gym, they shut down the whole rec gym to do it, and

3    she -- her and three other instructors were up there doing it,

4    so it was her and three other instructors:  Maya -- who else?

5    I can't remember them all.  I mean, I know them too, but I

6    don't know know them.

7    Q.    Okay.  And Insanity is another type of group fitness

8    class, I'm assuming; is that correct?

9    A.    Correct.

10    Q.    Okay.  And again, fun; is that correct?

11    A.    Yes.

12    Q.    Okay.  And you said you lost a bunch of weight from it;

13    is that right?

14    A.    I did.

15    Q.    Okay.  And, again, you would chat before or after class

16    with the people in Insanity; is that correct?

17    A.    Right.

18    Q.    And I think you already testified you communicated with

19    Mrs. Keil, even when she got out of the facility; is that

20    correct?

21    A.    I did.

22    Q.    Okay.  And you called her --

23    A.    I did.

24    Q.    -- after you found out that she was filing this

25    lawsuit, correct?

1   A.     Yes.  Yes, I did.

2            MS. ROTHERMICH:  I have nothing further.

3            THE COURT:  Any redirect?

4            MS. McGRAUGH:  No, Your Honor.

5            THE COURT:  Thank you, ma'am.  You may step down.

6            Could counsel please approach?

7            (Counsel approached the bench, and the following

8 proceedings were had:)

9            THE COURT:  So given the fact that it's a quarter

10 till 5:00, if we were to break for the evening now, could we

11 still -- would we still be on schedule to finish Thursday

12 afternoon?

13            MS. McGRAUGH:  Yes.

14            (The Court conferred privately with court staff.)

15            THE COURT:  Oh, yes, we need to have the witness

16 back up.  We didn't have the jury ask any questions, so I'll

17 ask her to come back up.  And then, so we'll be fine to stay on

18 track to be finished by Thursday?

19            MS. McGRAUGH:  Yes, ma'am.

20            THE COURT:  Okay.

21            (The following proceedings were had in open court:)

22            THE COURT:  Ma'am, I apologize.  I'm going to ask

23 that you take the stand again.  I forgot, we give the jury the

24 opportunity to ask written questions.

25            So if you have any questions of this juror, I would

1   ask that you write them -- of this witness, write them on the

2   cards that you have with you.  I would ask that everyone turn a

3   card in, because then if there's only one card and only one

4   question, then other jurors have felt self-conscious because

5   everyone knows they asked the question.  I will ask the

6   questions of the witness, and then the attorneys will have a

7   brief opportunity to ask any follow-up questions.

8           So we'll take a couple of seconds.  If you have a

9   questions, if you could write them down on the note cards that

10  were provided to you, I would appreciate it.

11          Could counsel please approach?

12          (Counsel approached the bench, and the following

13  proceedings were had:)

14          THE COURT:  One question is, "How long have you had

15  suicidal thoughts?"  Any objection to that question?

16          MS. McGRAUGH:  No.

17          THE COURT:  Any objection?

18          MS. ROTHERMICH:  No.

19          THE COURT:  "Was there a criminal case against

20  Edward Bearden?"

21          MS. McGRAUGH:  They just don't give up.

22          THE COURT:  I'm not going to ask that question.

23          MS. ROTHERMICH:  Okay.

24          THE COURT:  "Were there cameras stationed in the

25  hallways that led to the closets where you were abused?"

1          MS. McGRAUGH:  I'm sorry?

2          THE COURT:  "Were there cameras stationed in the

3  hallways that led to the closets where you were abused?"

4          MS. McGRAUGH:  She can answer if she knows.  No

5  objection.

6          MS. ROTHERMICH:  She can answer if she remembers.

7          THE COURT:  I don't know what this question says.

8  "Opening statements, thought on her transferred out Saturday,

9  not for sure."  I'll open up that for any --

10          MS. ROTHERMICH:  I don't think that opening

11  statements can be evidence, so I would -- I don't know.

12          MS. McGRAUGH:  I object because I don't --

13          THE COURT:  If you want to clear it up on a future

14  witness.

15          Okay.  Thank you.  That's all.

16          (The following proceedings were had in open court:)

17          THE COURT:  So, ma'am, I have two questions for you,

18  and then the attorneys can ask, if they want, brief follow-up

19  questions.

20                         - - -

21                      EXAMINATION

22  By the Court:

23  Q.     How long have you had suicidal thoughts?

24  A.     After I got out, after it all happened, it was on and

25  off for a couple of years.

1   Q.     And when you say got out, you mean got out of

2  Chillicothe?

3   A.     Prison.

4   Q.     The Chillicothe facility?

5   A.     Yes.

6   Q.     Next question is, were there cameras stationed in the

7  hallways that led to the closets where you were abused?

8   A.     I don't believe so, no.

9         THE COURT:  Thank you.  Ms. McGraugh, do you have

10  any follow-up questions?

11         MS. McGRAUGH:  No, ma'am.

12         THE COURT:  Does counsel for defendant have any

13  follow-up questions?

14         MS. ROTHERMICH:  I do.  I have one, Your Honor.

15                       - - -

16              FURTHER CROSS-EXAMINATION

17  By Ms. Rothermich:

18   Q.     Miss Zieser, I just had a quick follow-up question from

19  that.  You had suicidal thoughts before you went to prison; is

20  that accurate?

21   A.     Not really, no.  I've never really been too suicidal.

22  These thoughts never really happened -- they never were serious

23  suicidal thoughts until afterwards.

24         MS. ROTHERMICH:  Thank you.

25         THE COURT:  Thank you, ma'am.  Now you may step

down.

So, ladies and gentlemen, we're going to go ahead and break for the day. The attorneys have assured me that by breaking a few minutes early, we will still be on schedule to finish this at the time that we indicated earlier today.

So now you're going to leave, and you're going to have access to your phone, and you're going to go home, and you're going to be tempted to talk to your spouse, your neighbor, your dog, get on your iPad and do some internet searches, and this is going to be one of the many times that I really honestly beg you to resist that urge.

As you can see by the number of times that I highlight this, one of the really core, basic provisions of our system is that you make a decision based on the evidence that you hear in this courtroom. And it's unfair to both parties if you do your own investigation, your own research, especially research that they don't know anything about.

So I would just ask that tonight you put this out of your mind, you resist any urge to do any Google searches and, heaven forbid, any posting about the case, and come back tomorrow with a fresh mind and an open mind.

We will be in recess, then, until 9 a.m. tomorrow.

(The following proceedings were had in the courtroom out of the presence of the jury:)

THE COURT: So I just want to -- Shauna is the

keeper of the exhibit list, so I don't want to make any

decisions regarding the exhibits, but I would like the parties

to discuss Exhibit No. 19 because it's a little unclear from

the exhibit list what's been admitted because we only have

Defendant's Exhibit 19, not A, B, and C.  If the parties could

agree to just admitting all of 19, then we could indicate that

on the exhibit list.  If not, we'll have to make some

modifications.

        So I don't, again, want to do anything right now

because Shauna needs to be present when any decision of that

sort is going to be made.  Again, like I said, I would ask that

the parties discuss the witness -- or the exhibit list and, to

the extent possible, agree on admission of exhibits as is

possible.

        Is there anything I can take up before we resume

tomorrow?

        MR. TAULBEE:  Nothing for defendant, Your Honor.

        MS. McGRAUGH:  Nothing for plaintiffs.

        THE COURT:  Then I would ask that everyone be here

at 8:30 tomorrow in the event that that changes and there is

something that you would like to discuss; but, otherwise, have

a good evening.

        (Trial adjourned for the evening.)

                        - - -

                        - - -

1    <u>CERTIFICATE</u>

2          I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4

5

6     June 27, 2022

7                                    /s/_____
                                     Kathleen M. Wirt, RDR, CRR
8                                    U.S. Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25