IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| KAREN BACKUES KEIL, | ) | No. 18-06074-CV-W-BP |
| LYNNSEY CHRISTIE BETZ, | ) | 18-06079-CV-W-BP |
| ASHLEY OLSEN ZIESER, and | ) | 18-06103-CV-W-BP |
| TRENADY GEORGE, | ) | 19-06161-CV-W-BP |
| | ) | |
| Plaintiffs, | ) | April 26, 2022 |
| | ) | Kansas City, Missouri |
| V. | ) | CIVIL |
| | ) | |
| EDWARD BEARDEN, | ) | VOLUME II |
| | ) | (Pages 104-407) |
| Defendant. | ) | |
| | ) | |

**TRANSCRIPT OF JURY TRIAL**

**BEFORE THE HONORABLE BETH PHILLIPS**
**UNITED STATES DISTRICT JUDGE**

Proceedings recorded by electronic stenography
Transcript produced by computer

Kathleen M. Wirt, RDR, CRR
United States Court Reporter
400 E. 9th Street, Suite 7452 * Kansas City, MO 64106
816.512.5608

                              **APPEARANCES**

**For Plaintiffs:**        MS. SUSAN MCGRAUGH
                           MR. JOHN J. AMMANN
                           MR. BRENDAN D. ROEDIGER
                           Saint Louis University School of Law
                           100 N. Tucker, Suite 704
                           St. Louis, MO 63101

                           MS. JENIFER C. SNOW
                           Law Office of Joan M. Swartz
                           3348 Greenwood Blvd.
                           Maplewood, MO 63143

**For Defendant:**         MR. NICOLAS TAULBEE
                           MS. ABBIE ROTHERMICH
                           Missouri Attorney General's Office
                           615 East 13th Street, Suite 401
                           Kansas City, MO 64106

                           MS. CARA HARRIS
                           Missouri Attorney General's Office
                           149 Park Central Square, Suite 1017
                           Springfield, MO 65806

1                    I N D E X

2                  VOLUME I
                (Pages 1-103)
3
APRIL 25, 2022

4
Pretrial matters                              7
5  Jury sworn                                 17

6  Plaintiffs' opening statement             17
   Defense opening statement                 28
7
PLAINTIFFS' WITNESSES:

8
     ASHLEY ZIESER
9        Direct Examination by Ms. McGraugh       34
         Cross-examination by Ms. Rothermich      74
10       Jury Questions asked by the Court        99
         Further Cross by Ms. Rothermich         100
11
                         - - -
12
                 VOLUME II
13              (Pages 104-407)

14 APRIL 26, 2022

15 PLAINTIFFS' WITNESSES (continued):

16     TRENADY GEORGE
         Direct Examination by Ms. McGraugh      116
17       Cross-examination by Mr. Taulbee        163
         Redirect Examination by Ms. McGraugh    193
18       Jury Questions asked by the Court       196

19     KAREN KEIL
         Direct Examination by Mr. Ammann        199
20       Cross-examination by Mr. Taulbee        247
         Redirect Examination by Mr. Ammann      283
21       Recross-examination by Mr. Taulbee      284
         Voir Dire Examination by the Court      289
22       Jury Questions asked by the Court       293

23     TERI DEAN
         Direct Examination by Ms. Snow          295
24       Cross-examination by Ms. Harris         315
         Redirect Examination by Ms. Snow        333
25       Jury Questions asked by the Court       337

LYNNSEY BETZ
    Direct Examination by Ms. McGraugh        339
    Cross-examination by Ms. Rothermich     373
    Redirect Examination by Ms. McGraugh   396
    Recross-examination by Ms. Rothermich  398
    Jury Questions asked by the Court      401
    Further Recross by Ms. Rothermich      402

- - -

VOLUME III
(Pages 408-699)

APRIL 27, 2022

PLAINTIFFS' WITNESSES (continued):

DORA SCHRIRO
    Direct Examination by Mr. Ammann       417
    Cross-examination by Ms. Harris        447
    Redirect Examination by Mr. Ammann     476
    Recross-examination by Ms. Harris    477
    Jury Questions asked by the Court      479

MELISSA PIASECKI
    Direct Examination by Mr. Roediger    481
    Cross-examination by Ms. Harris        523
    Resumed Cross-examination by Ms. Harris  570
    Redirect Examination by Mr. Roediger   582
    Recross-examination by Ms. Harris    585
    Jury Questions asked by the Court      586

DEFENSE WITNESSES:

KENNETH CHRISTOPHER McBEE
    Direct Examination by Mr. Taulbee    588
    Cross-examination by Mr. Ammann      626
    Redirect Examination by Mr. Taulbee   636
    Jury Questions asked by the Court     641

EDWARD BEARDEN
    Direct Examination by Mr. Taulbee    645
    Cross-examination by Ms. McGraugh    660

- - -

**VOLUME IV**
**(Pages 700-843)**

APRIL 28, 2022

DEFENSE WITNESSES (continued):

DAVID SAVAGE
 Direct Examination by Ms. Harris   717
 Cross-examination by Ms. McGraugh  753
 Redirect Examination by Ms. Harris  761
 Recross-examination by Ms. McGraugh 770
 Jury questions asked by the Court  776

ROBIN DYSART
 Direct Examination by Ms. Rothermich 778
 Cross-examination by Ms. McGraugh  804
 Jury questions asked by the Court  807
 Further Redirect by Ms. Rothermich  808

- - -

**E X H I B I T S**

| PLAINTIFFS' EXHIBITS | OFFERED | ADMITTED |
|---|---|---|
| 21 - Bible cover and page | 150 | 151 |
| 22 - CV of Dr. Schriro | 447 | 447 |

| DEFENDANT'S EXHIBITS | OFFERED | ADMITTED |
|---|---|---|
| 1-7 - time and attendance records | 566 | 567 |
| 8 - duty assignments | 566 | 567 |
| 9 - duty assignments | 566 | 567 |
| 10 - duty assignments | 566 | 567 |
| 11 - FMLA notice | 566 | 567 |
| 12 - letter regarding sick leave | 566 | 567 |
| 13 - ENGAGE meeting notes | 566 | 567 |
| 14 - Bearden resignation memo | 566 | 567 |

| | | |
|---|---|---|
| 15 - resignation acceptance | 566 | 567 |
| 19 - building layouts | 110 | 110 |
| 21 - memo regarding COs | 763 | 764 |
| 22 - Dean work summary | 567 | 567 |
| 23 - Dean housing history | 567 | 567 |
| 24 - Keil mental health records | 567 | 567 |
| 25 - Keil mental health records | 567 | 567 |
| 26 - Keil mental health records | 567 | 567 |
| 27 - Keil mental health records | 567 | 567 |
| 28 - Betz mental health records | 567 | 567 |
| 29 - Betz mental health records | 553/567 | 553/567 |
| 30 - Zieser mental health records | 567 | 567 |
| 32 - George mental health records | 125 | 126 |
| 33 - George mental health records | 527 | 528 |
| 40 - Keil housing history | 567 | 568 |
| 41 - Keil roommate history | 567 | 568 |
| 42 - Zieser housing history | 567 | 568 |
| 43 - Zieser roommate history | 567 | 568 |
| 44-110 - chronological logs | 568 | 568 |
| 111-199 - photos of facility | 568 | 568 |

* * * * *
* * * *

APRIL 26, 2022

- - -

1    (The following proceedings were had in the courtroom
2    out of the presence of the jury:)

3    THE COURT:  Good morning.  So did the attorneys have
4    the opportunity to review the exhibits and come to any
5    agreement with respect to admission of some of the exhibits?

6    MR. ROEDIGER:  So I think that -- and, Nick, correct
7    me if I'm wrong -- our position is that we have no doubts about
8    all authenticity, foundation, et cetera, but I want to reserve
9    the right, given context, to make a relevance objection, and
10   that's it.

11   THE COURT:  So we're going to continue to use time
12   introducing exhibits that the parties agree on, in short.

13   MR. TAULBEE:  I don't think there's any objection to
14   D19.

15   MR. ROEDIGER:  To D19, no, certainly not.

16   THE COURT:  Okay.  So D19 -- well, all of D19 will
17   now be admitted.

18   (Defendant's Exhibit 19 was admitted into evidence.)

19   MR. TAULBEE:  The parties did file a stipulation to
20   several exhibits, agreeing to the admissibility of them.

21   THE COURT:  Okay.  Here is what I would ask, then.
22   If you agree to foundation, don't spend a lot of time trying to
23   lay foundation.  If the argument is relevance, then let's just

1  focus right on the issue of relevance.  And so if you know that

2  foundation has been stipulated to, move to admit it; and if you

3  don't have any problem, then agree to it.  If the issue is

4  relevance, we can address that issue at that time.  We're just

5  spending a lot of time that isn't necessary on foundation when

6  the parties don't disagree.

7          MR. ROEDIGER:  You won't hear foundation objections,

8  Your Honor.

9          THE COURT:  Okay.  Okay.  Any other issues that the

10 parties would like to discuss before we begin for the day?

11          MR. TAULBEE:  I think we do briefly have one, Your

12 Honor.  And the -- initially, you had reserved ruling on Teri

13 Dean's conviction for second degree murder and the amount --

14 what the Court was going to allow us to say.  I believe she's

15 on --

16          THE COURT:  And you're right, I had after the

17 pretrial conference deferred ruling on that issue.  Ms. Snow,

18 are you taking lead on this issue?

19          MS. SNOW:  Are we on Teri Dean right now?

20          THE COURT:  I'm sorry?

21          MS. SNOW:  Yes, Your Honor, I am.

22          THE COURT:  So here is the thought I have is that,

23 No. 1, I'm not -- well, let me back up.

24          My recollection is my concern or reservation was

25 whether or not the conviction for murder in the second degree

1    was more prejudicial than probative.  Given the fact that Miss

2    Dean is not a party to this particular lawsuit, it doesn't seem

3    to me -- it seems to me to change the analysis with respect to

4    more prejudicial than probative in that it's not prejudicial to

5    the plaintiffs in this case because she's not a plaintiff to

6    this case.  And so upon reflection, my leaning at this point is

7    to permit cross on that particular conviction because the

8    analysis changes, given the fact that she's not a party to this

9    particular lawsuit.

10              MS. SNOW:  And would that be limited the way the

11   other convictions in the case are limited?

12              THE COURT:  Yes.

13              MS. SNOW:  Just the date, the offense, and the

14   sentence?

15              THE COURT:  Right.  So that will be my ruling on

16   that particular issue.

17              Are there any other issues that I can take up at

18   this time?

19              MR. TAULBEE:  There is, yes, just one sort of

20   tangential issue to the Court's previous ruling on the

21   convictions.

22              As a part, or maybe just separately from Miss Keil's

23   embezzling conviction, stealing convictions, there was a civil

24   judgment entered against her to repay her employer a certain

25   amount of money that wasn't restitution, but it was a civil

1  judgment that our position is that it would be relevant, and I

2  believe plaintiffs will object to that, so --

3          MR. AMMANN:  We are objecting, Your Honor.  We can't

4  see how that's relevant to this case.

5          THE COURT:  So let me back up and make sure I

6  understand the facts.  So she was charged and convicted with

7  some type of embezzlement crime?

8          MR. TAULBEE:  Yes, Your Honor.

9          THE COURT:  And as a separate matter, the employer

10 then obtained a civil judgment against her in connection with

11 the criminal case.

12         MR. TAULBEE:  Correct.

13         THE COURT:  Or related to the criminal case.

14         MR. TAULBEE:  Yeah, it was to recover the amount

15 that had been embezzled.

16         MR. AMMANN:  But not formally restitution in the

17 criminal case.

18         THE COURT:  Right.  So how is the fact that she has

19 a civil judgment against her relevant to credibility or any

20 other issue?

21         MR. TAULBEE:  I think a couple of things, Your

22 Honor.  It goes to motive.  It also --

23         THE COURT:  Well, she pled guilty, right?  So we

24 know motive exists, right?

25         MR. TAULBEE:  Yeah, and it also -- just motive for

1  being here. There's a judgment against her, and she's also --

2  I mean, they've said that she's going to say she's accepted

3  responsibility for her actions; and I believe the evidence

4  would be that while the criminal case was pending, she paid

5  some $10,000 back, and she hasn't paid anything else back to

6  her employer since.

7  THE COURT: Yeah. I just think that's too remote

8  and opens up a whole other issue. You know, when was the

9  judgment entered? Has she paid anything? Has the plaintiff in

10  that case taken any action to try to garnish her wages or

11  anything of that sort? So I think that that's too remote to

12  the issues in this case and, therefore, not relevant, and I

13  will, I guess, preliminarily sustain the objection or motion in

14  limine, or however we want to phrase this, to that topic.

15  MR. AMMANN: Relatedly, Your Honor -- and I think

16  Mr. Taulbee and I agree on this, that, as we did yesterday,

17  we'll talk about the conviction and the sentence for Miss Keil

18  and nothing else.

19  THE COURT: I think the date of the conviction is

20  appropriate under the rule. The date of the conviction, the

21  nature of the conviction, and the sentence that was handed

22  down.

23  MR. AMMANN: But details of the crime and what it

24  was for, the amount the crime involved would not be coming in.

25  THE COURT: Right.

1         MR. AMMANN:  Okay.

2         THE COURT:  I believe under the -- under 609, I

3 think it is, that's all that's limited.

4         MR. AMMANN:  I think Nick agrees, we just wanted to

5 clarify with you that that's the course we're taking.

6         THE COURT:  Okay.

7         MR. TAULBEE:  And that includes mention of the

8 victim.  We can say --

9         (Reporter interruption.)

10         MR. TAULBEE:  We can say she embezzled or stole

11 money, but not from whom.

12         THE COURT:  Right.

13         MR. AMMANN:  Thanks, Judge.

14         THE COURT:  Any other topics I can bring up

15 before -- or take up before the --

16         MR. TAULBEE:  Nothing from the defendants, Your

17 Honor.

18         THE COURT:  Okay.  Anything on behalf of plaintiff?

19         MR. ROEDIGER:  No, Your Honor.

20         THE COURT:  Okay.  Then as soon as the jury is here

21 and I -- oh.  Yeah, we do have all plaintiffs.  So as soon as

22 all the members of the jury are here, Shauna, let me know, and

23 I'll come back out.

24         (A recess was taken from 8:42 a.m. to 8:58 a.m.)

25         THE COURT:  I think the jury is here a little bit

1  early.  But since they're here, everyone ready to go ahead and

2  get started?

3           (The following proceedings were had in the courtroom

4  in the presence of the jury:)

5           THE COURT:  Good morning, ladies and gentlemen.  I

6  hope you had a good evening.  I appreciate the fact that you're

7  here not only promptly, but a little bit early; and as a

8  result, we're ready to start.

9           Is counsel for plaintiff ready to call your next

10  witness?

11          MS. McGRAUGH:  Yes, Your Honor.  The plaintiff will

12  call Trenady George.

13          THE COURT:  Ma'am, if you could step forward and

14  come to this lady right here, and she'll swear you in.

15                              - - -

16                         TRENADY GEORGE,

17   being first duly sworn by the courtroom deputy, testified as

18  follows:

19          THE COURT:  If you could have a seat right up here

20  at the witness chair.

21                              - - -

22                       DIRECT EXAMINATION

23   By Ms. McGraugh:

24  Q.      Good morning.

25  A.      Good morning.

1  Q.    Can you give the jury your name, please?

2  A.    Trenady George.

3  Q.    Trenady, how old are you?

4  A.    I'm 41 years old.

5  Q.    Do you have any kids?

6  A.    I do.

7  Q.    Can you tell the jury your kids' names and ages,

8  please?

9  A.    I have three children.  My oldest is 19, my middle son

10 is 14, and my youngest daughter is ten.  My oldest is Brayden,

11 my middle son is Keegan, and my youngest daughter is Gracie.

12 Q.    Have you ever been a plaintiff in a lawsuit before?

13 A.    No, ma'am.

14 Q.    I want to begin by discussing the time that you were in

15 Chillicothe Correctional Center.  Could you please tell the

16 jury when you first entered Chillicothe Correctional Center?

17 A.    I believe I arrived in Chillicothe Correctional Center

18 in May of 2015.

19 Q.    And can you tell the jury what you were convicted of?

20 A.    I was convicted of four counts of Class B felony of

21 attempted identity theft.

22 Q.    And what was the sentence that you received?

23 A.    I received on each of those charges four ten-year

24 sentences.  They were run concurrently.

25 Q.    Are you still under that sentence?

1  A.      I am currently on parole.

2  Q.      And when will that end?

3  A.      I was just informed by my parole officer it will be May

4  of 2024.

5  Q.      And approximately how long were you -- and if I say

6  Chillicothe, do you understand that that's the prison?

7  A.      Yes, ma'am.

8  Q.      Okay.  How long were you in Chillicothe, approximately?

9  A.      Approximately two years and four months.

10 Q.      Can you describe for the jury what your introduction to

11 Chillicothe was like when you got to the prison?

12 A.      When I arrived at the prison, it was -- it looked like

13 Alcatraz.  All of the buildings are huge, plain concrete

14 buildings.  Very dark, gloomy.  All of the buildings are lined

15 up in a horseshoe shape.  Just everybody was solemn.  It

16 wasn't -- I was just terrified.

17 Q.      We heard defense counsel yesterday use the term fun.

18 Was it fun?

19 A.      Fun?  No, by no means.

20 Q.      Were you able to secure a job in Chillicothe?

21 A.      I was.

22 Q.      Could you tell the jury, was it one job or several

23 different jobs?

24 A.      I started out with several different jobs because I was

25 trying to work my way up.  I was indigent, so I needed to find

1  a pay slot.

2  Q.      So can you explain to the jury what that means that you

3  were indigent?

4  A.      That means I had no out -- really any outside help from

5  family or friends to put money on my books.

6  Q.      And so you were looking for, did you say pay slot?

7  A.      A pay slot.

8  Q.      Can you tell the jury what a pay slot is?

9  A.      So a pay slot is basically -- and it usually goes to

10 longer-term inmates.  But a pay slot is something that you can

11 earn like, say, $50 a month, rather than just the state pay

12 that the state would provide if you didn't have, you know,

13 money or didn't even have a job.  Or if you were in education,

14 trying to get your G.E.D., you didn't get to get that extra

15 money.

16 Q.      Was that extra $50 a month significant to you?

17 A.      Absolutely.

18 Q.      And could you tell the jury what kind of things you

19 needed to use that $50 a month for?

20 A.      I needed to use that $50 a month to purchase hygienes.

21 That was my biggest concern was to make sure that I had plenty

22 of hygiene.

23 Q.      What about phone calls?

24 A.      I'm going to be honest with you.  Phone calls, I knew

25 that my family was tough love.  So to have outside access, I

1  really didn't have that, so phone time to me was not as

2  important as it usually is to most inmates.

3  Q.      Now, did you work as a cook?

4  A.      I started out as a cook, yes.

5  Q.      How about tutoring?

6  A.      I did tutoring, as well, yes.

7  Q.      Was tutoring a paid job, or was that on your own time?

8  A.      It started -- it started out in education, and it was a

9  paid job.  But once I left tutoring, the girls and Mr. Leonard,

10 who was my boss, asked if I could continue to help the girls

11 achieve the goal of getting their HSEs.

12 Q.      Because you do have a formal educational background; is

13 that correct?

14 A.      I do.

15 Q.      Can you tell the jury what that is?

16 A.      I have a bachelor's degree in criminal justice.  I also

17 have an associate's degree in marketing and business.

18 Q.      How long -- so did you ever work in the canteen?

19 A.      Yes, ma'am.

20 Q.      How long did you work in the canteen?

21 A.      I want to say right at nine and a half, ten months.

22 Q.      Was that during the middle of your stay, end of your

23 stay?

24 A.      Right in the middle.

25 Q.      And what was -- what were your jobs when you were in

1  canteen?

2  A.  My jobs when I was in canteen, I came in, and everybody

3  was pretty much old head; but because I had educational

4  experience, as well as a degree --

5  Q.  I'm going to ask you to slow down just a little bit.

6  A.  Okay.

7  Q.  Okay.

8  A.  I was appointed to do the inventory, which is a really

9  hard slot to do, but I was trusted, a trusted inmate, so they

10  allowed me to do the inventory.

11  Q.  And what would that be?

12  A.  That consisted of going through the walk-in cooler, as

13  well as the freezer, and making sure that all of our numbers

14  matched up, making sure that there were no items missing

15  because then the inmates were looked at that maybe they were

16  carrying things out.  Also going back into what we considered

17  our warehouse area for, like, our paper goods and things like

18  that.

19  Q.  Okay.  Are the warehouse and canteen connected?

20  A.  They are connected -- the actual warehouse itself is

21  connected, but there's a chain-link fence that cuts off the

22  actual warehouse to our little warehouse that goes into our

23  canteen.

24  Q.  Okay.  Do you see Edward Bearden in the courtroom

25  today?  Do you need to stand up?

1    A.    Yes, I do.

2    Q.    Can you point to him and describe what he's wearing,

3    please?

4    A.    Can you step to the side?

5    Q.    Okay.

6    A.    Sorry.  Yes, he's sitting in the far back end of this

7    table here.  He's wearing a black suit with a plaid shirt

8    underneath.  He has a white goatee.

9          MS. McGRAUGH:  Your Honor, can the record reflect

10   she's identified Mr. Bearden?

11         THE COURT:  The record will so reflect.

12   BY MS. McGRAUGH:

13   Q.    You may sit down.  Thank you.

14         Did you encounter Mr. Bearden when you were in

15   Department of Corrections?

16   A.    Yes.

17   Q.    Okay.  Deep breath.  When did you -- and there's

18   Kleenex right next to you.

19         When did you first encounter Mr. Bearden at the

20   Department of Corrections?

21   A.    I first met Mr. Bearden when I was working in canteen.

22   Q.    What was his role?

23   A.    He was a security officer or corrections officer.

24   Q.    Who worked in canteen with you?

25   A.    I was in canteen, as well as, I believe it was six or

1  seven other girls, as well as two -- they're considered COs,

2  but it's like CO I or CO II.  They were in street clothes.

3  Q.      Are there cameras in canteen?

4  A.      There are cameras in the front of canteen.  There are

5  cameras in the back of canteen, but when you have cameras -- we

6  stacked our inventory so high because we were overcrowded, so

7  our inventory continued to grow, so the boxes would continue to

8  be stacked where it was actually blocking the views of all of

9  the cameras.

10  Q.      When you say you were overcrowded, are you referring to

11  the prison?

12  A.      Yes, ma'am.

13  Q.      What was your first encounter with Mr. Bearden?

14  A.      I was actually doing inventory in canteen with one

15  other girl, and I was on the inside of what I would consider

16  like a chain-link fence, fenced-in area, and he was on the

17  outside of the fenced area.

18  Q.      Did he make any comments to you?

19  A.      He did.  He was walking by, and he stopped.  And I was

20  stacking oversized boxes of what the chips would come in, and I

21  was like bending over and picking them up, bending over and

22  picking them up, and he asked if I could do that one more time

23  so he could see my backside.

24  Q.      Were there any other comments about your body that

25  Mr. Bearden made that you can recall now?

1  A.      He told me that I had a nice chest, and he just kept

2  referring -- honestly, he just kept referring to my butt.

3  Q.      Did you report those comments?

4  A.      I actually went to the front, and I talked to Miss

5  Toni, which is a CO.

6  Q.      Okay, what's a CO?

7  A.      She is a correctional officer, but she's in street

8  clothes.

9  Q.      And what did you say to Miss Toni?

10 A.      I told Miss Toni, "There's an officer standing outside

11 of the gate that probably shouldn't be there, just making

12 irrational comments."

13 Q.      How long were you in the canteen?

14 A.      Nine or ten months.

15 Q.      What kind of programs are offered at Chillicothe?  And

16 I should limit that to job programs, job training.

17 A.      There are several, but they also have, like, a

18 vocational school where you can, if you choose to, apply to

19 better yourself, or if you're going to be there for an

20 extensive amount of time.  So they have cosmetology, they have

21 like a chef's course that you can take.  There's MVE.  There's

22 several different things you can do.  Work release.

23 Q.      Was there anything that particularly interested you?

24 A.      I was very, very interested in the cosmetology course

25 that they offered.

1   Q.      And why were you especially interested in cosmetology?

2   A.      I was interested in the cosmetology course because --

3   being that I was sentenced to prison, and prior to prison I

4   had -- in 2011, I had obtained my criminal justice degree.  I

5   knew that I screwed up and I knew when I came home, there was

6   no way I would ever be able to utilize my degree.

7           With that being said, cosmetology caught my eye, and

8   I knew if I applied for the cosmetology classroom and I got

9   accepted, that I could better myself for not just myself, but

10  for my children on the outside.

11  Q.      What did you have to do to get into the cosmetology

12  program?

13  A.      You basically couldn't -- you couldn't have any

14  violations while you were there.  And you had to wait to see

15  the parole board to see when your release date was because if

16  you were getting released prior to or less than a year, they

17  wouldn't accept you into the program because they wanted -- if

18  they were going to spend that money on you, they wanted to make

19  sure that you were going to be there for the full time.

20  Q.      How long did it take you to get into the cosmetology

21  program?

22  A.      Thirty-two days.

23  Q.      Okay.  So can you describe, was this a theoretical

24  classroom class?  What did the training consist of?

25  A.      So the training consisted of -- there were two

1  different sides.  You had your classroom side, and then you had

2  your practical side.  When I say practical, I'm referring to

3  the fact that we actually performed hair coloring, hair cutting

4  on the inmates.  And if you worked in the barber shop, you'd

5  performed those cuts on the officers, as well.

6  Q.    Are the barber shop and the cosmetology shop located in

7  the same place?

8  A.    No, they are not.

9  Q.    Okay.  The barber shop is in the administration

10  building?

11  A.    That's correct.

12  Q.    Where is the cosmetology shop?

13  A.    It is at the very end of the vocational building.

14  Q.    Who was the CO in charge of cosmetology?

15  A.    Well, in the cosmetology sitting in the hallway, there

16  was usually Miss, I believe her name was Gilgour, but Miss

17  Grant was the one that was over the entire vocational school.

18  And then while I was in class, my actual teacher, her name was

19  Mrs. Bixenmen.

20  Q.    Bixenmen?

21  A.    Uh-huh.

22  Q.    If you could spell that, you would save us trouble.  Do

23  you know?

24  A.    Okay.  It is spelled B-I-X-E-N-M-E-N.

25  Q.    We would not have guessed that.  Thank you.  That's for

1  the record.

2         So you told the jury there were comments, sexual

3  comments made to you in canteen.  Between the time you were in

4  canteen and cosmetology, did Edward Bearden make any other

5  sexual comments to you?

6  A.    He did.  He approached me on the walk.

7  Q.    Could you explain to us what the walk is, please?

8  A.    Sure.  The walk is the main walk, which you can walk in

9  front of -- which I believe is Housing Unit 12 is what they

10 considered the entire administration building, vo-tech, you had

11 the rec area, as well as the canteen building and warehouse.

12 And then you had a horseshoe-shaped walk that actually went in

13 front of all of the housing units.

14 Q.    Did you see Edward Bearden during that time on the

15 walk?

16 A.    I did.

17 Q.    And were there any comments?

18 A.    Yes.

19 Q.    What were the comments, if you can recall?

20 A.    "Good morning beautiful.  You're looking good today."

21 Just several derogatory.

22 Q.    Did you think those were compliments?

23 A.    After the incident that happened in canteen, I felt

24 like -- no, I did not.

25 Q.    How did they make you feel when he said those things to

1  you?

2  A.      Very, very uncomfortable.

3  Q.      Did you say anything to him in response to these

4  comments?

5  A.      No.  I just continued to walk faster.  The faster I

6  could get away from him, the better I felt.

7  Q.      Did he ever -- did you ever have an opportunity to work

8  on a Christmas party while you were at Chillicothe?

9  A.      Yes, I did.

10  Q.      Okay.  And that was a Christmas party for the other

11  prisoners?

12  A.      Yes.  We had a Christmas carnival that usually was held

13  in December, and we started working on it usually late October,

14  first part of November.

15  Q.      What was your role?

16  A.      I was to make -- we were creating games.  Would you

17  like me to elaborate?

18  Q.      What game did you work on?

19  A.      I worked on a game called ring toss.

20  Q.      Can you tell the jury what that setup looks like?

21  A.      So the ring toss is -- I don't know, the original ring

22  toss is a miniature board game, but they make now those

23  oversized yard board games.  And it was an oversized X is what

24  the base of the ring toss looked like, but it had also a piece

25  that come up the center.  And these were blowups, so we used a

1  little machine to put air into them and everything to blow them

2  up, and we were going to make -- wrap them to make them look

3  like snowflakes.

4  Q.     Did you see Edward Bearden during the time you were

5  working on this Christmas party?

6  A.     I did.  He was in the rec building.

7  Q.     Did he say anything to you?

8  A.     Yes, he did.

9  Q.     What did he say?

10  A.     When he was walking by myself and one of the other

11  offenders, he told me he was -- "I would like to see you sit on

12  that and spin."

13  Q.     How did those comments make you feel?

14  A.     Very uncomfortable.

15  Q.     Did you do anything as a result of hearing that

16  comment?

17  A.     I did.

18  Q.     Could you tell the jury what you did?

19  A.     I -- again, there was a correctional officer there, she

20  was a CO, but she was in street clothes.  She was not -- she

21  did not have to wear a uniform.  And I approached her, and I

22  talked to her about the situation without -- I was informing

23  her of what was going on without mentioning certain things that

24  she would have to automatically send me to the hole for.

25  Q.     Okay.  So I think you were here yesterday when Ashley

1  was talking about the consequences of revealing that you've

2  been sexually assaulted or sexually harassed by a guard.  Were

3  you here for that?

4  A.      Yes.

5  Q.      Can you tell the jury what happens if you report sexual

6  abuse, sexual assault?

7  A.      Any allegation that's made towards sexual abuse or

8  sexual assault is taken seriously.  If you attempt to claim

9  PREA or anything like that, they -- whether you're innocent or

10 not, they will take you to the hole and put you under

11 investigation, and you can be there anywhere from 30 days to

12 120 days.  You just don't ever know.

13 Q.      And when Edward Bearden made that comment to you about

14 sitting and spinning, did you feel safe?

15 A.      Absolutely not.

16 Q.      Did you feel secure?

17 A.      No, ma'am.

18 Q.      When you say you -- I'm sorry if I've already asked

19 that.  What was the guard's name that you spoke to about this

20 incident?

21 A.      Her name was Mrs. Womack.

22 Q.      And when you say you told her but you didn't tell her,

23 can you describe to the jury what that looked like?

24 A.      So I pulled her to the side and -- I had spoken to her

25 before on different levels, but she had -- may I elaborate?

1  Q.    You may, but let me ask you this first.  Please do not

2  tell us anything that Ms. Womack said to you.

3  A.    So I had pulled her to the side.  She had seen me

4  play -- I was very involved while I was in prison because I was

5  trying to take a negative situation and turn it into something

6  positive.  So I was taking many classes, I played sports.  I

7  just tried to stay very busy.  And she seen that and noticed

8  that.

9         So I pulled her to the side, and we spoke a little

10 bit about the situation that was going on.  And from the

11 conversation that we had, I knew that it was best that I just

12 not say anything to anybody.

13 Q.    Did Ms. Womack help you get away from Edward Bearden?

14 A.    She did.

15 Q.    What did she do?

16 A.    She relieved me.  She told me I didn't have to stay in

17 the rec area.

18 Q.    Was there an incident with Edward Bearden when you were

19 in Unit 7 housing?

20 A.    Yes, ma'am.

21 Q.    Could you tell the jury what happened then?

22 A.    I was on Housing Unit 7, and I'd been sent home from my

23 cosmetology class because I'd gotten sick that day, sent home

24 early.  And so I was laying on my -- I was on the top bunk, and

25 my room was actually at the very end of the housing unit.

1  Q.      I'm going to stop you just to ask you to discuss the

2  rules of male guards entering your cell.  Are there rules in

3  the prison about male guards entering a female's cell?

4  A.      There are.

5  Q.      Could you tell them what the rule is?

6  A.      It's called a two-square rule.

7  Q.      And what does that refer to?

8  A.      There are tiles on the floor, one-foot tile, and the

9  officer is not to step across that threshold or enter your

10 cell.

11 Q.      So you told us you had come back early from cosmetology

12 class.  Did you see Edward Bearden?

13 A.      I did, and the only reason I seen him is because, like

14 I said, I wasn't feeling well.  So I was actually sleeping -- I

15 was laying down in my bed, and I had -- at that point, I'd come

16 back from cosmetology, so I had taken my khakis off, so I was

17 just in my T-shirt and some comfortable gym shorts that I had

18 purchased from the canteen.

19 Q.      May I ask you, were you wearing a bra?

20 A.      Yes.  All of a sudden I heard this big bang, and so it

21 startled me, and I sat up, and I turned and looked, and it was

22 him standing at the window.

23 Q.      Was the door to your cell open or closed at this time?

24 A.      It was closed.

25 Q.      Is the door solid?

1   A.     No.  The doors are steel, but they have plexiglass

2  windows.

3   Q.     Please continue.

4   A.     He had startled me by hitting that plexiglass window

5  with his Maglite or his flashlight.  And I turned and I looked

6  at him, and at that point in time, he actually let himself in

7  my room.

8   Q.     And what did you think when he let himself into your

9  room?

10   A.     I was really startled again at that time.  I knew that

11  he wasn't supposed to be in there, and so I backed myself up as

12  close to my locker or my bunk as I could.

13   Q.     What did you do -- I'm sorry.  What did he do next?

14   A.     He stepped -- like I said, he stepped into the entire

15  room, and then he asked me to raise my shirt and expose myself

16  to him.

17   Q.     What specifically did he want you to expose?

18   A.     He wanted to see my breasts.

19   Q.     How did he say that?

20   A.     "Will you lift your shirt for me so I can see your

21  breasts?"

22   Q.     Did he use the term breasts?

23   A.     I think he said boobs, actually.

24   Q.     Are you certain?

25   A.     Yes, actually, I'm pretty certain.

1    Q.      Okay.  What happened after that?

2    A.      I asked him to get the fuck out of my room.

3    Q.      Okay.  What did he do?

4    A.      He immediately backed up and left.

5    Q.      Did he touch you?

6    A.      No, he did not.

7    Q.      How close was he to you as you lay in your bed?

8    A.      Square-wise, I would probably say four or five feet

9    from me.

10   Q.      Okay.  But was it inside or outside of the two-square

11   rule?

12   A.      He was violating the two-square rule.

13   Q.      What did you feel like after that happened, after he

14   had entered your room and seen you in bed and asked you to

15   expose your breasts?

16   A.      I felt very violated.  I felt dirty.

17   Q.      Did you feel safe?

18   A.      No.

19   Q.      Did you feel secure?

20   A.      No.

21   Q.      All right.  Deep breath.

22           I'm now going to ask you to describe to the jury the

23   instances of sexual abuse that he perpetrated on you.  Did

24   Edward Bearden ever touch you?

25   A.      Yes.

1  Q.     Okay.  Can you tell the jury, when was the first time

2  that Mr. Bearden touched you?  Approximately.  Was it when you

3  were in cosmetology or before cosmetology?

4  A.     It was -- I just -- I had started cosmetology, so I was

5  about a month or so into cosmetology.

6  Q.     Okay.  What happened?

7  A.     So when I was in cosmetology, we had certain cleaning

8  duties and stuff that we had to do to maintain -- to meet state

9  regulations.  And so Mrs. --

10  Q.     Deep breath.

11  A.     So Mrs. Bixenmen had a list of jobs that she would like

12  for us to complete.  Your rank is based on how long you've been

13  in the cosmetology class.  So the longer you've been there, the

14  less you really have to clean.  I was a newbie, so I got stuck

15  with cleaning out, like, the hair traps, and, in doing so, I

16  had to retrieve, like, chemical bottles and stuff like that, as

17  well as a shop vac.

18  Q.     Now, was there normally a permanent CO that was

19  assigned to that area?

20  A.     Are you referring to inside the cosmetology classroom

21  or outside?

22  Q.     Outside the cosmetology classroom.

23  A.     Yes, ma'am.

24  Q.     Who was that?

25  A.     Mrs. Gilgour.

1  Q.      Mrs. Gilgour.  G-I-L-G-O-U-R?

2  A.      Yes, ma'am.

3  Q.      Did you get along with Miss Gilgour?

4  A.      Yes, she was a very polite CO.

5  Q.      Now, at some point, did Miss Gilgour leave?

6  A.      On many occasions, yes.

7  Q.      Okay.  Did she ever take vacation leave?

8  A.      Yes, ma'am.  She was doing it quite frequently.

9  Q.      Okay.  Getting near retirement?

10 A.      She was getting near retirement.  She was super

11 excited.

12 Q.      Did she ever get replaced with Edward Bearden?

13 A.      Yes, she did.

14 Q.      When we discuss the time that you were sexually

15 assaulted, was that when Miss Gilgour was there or when

16 Mr. Bearden was substituting for her?

17 A.      It was when Mr. Bearden was filling in for her.

18 Q.      Can you tell the jury what happened during the first

19 assault?

20 A.      So like I told you previously, I was at the bottom of

21 the list, so I was required to go get chemical bottles or spray

22 bottles or any kind of cleaning materials that we needed out of

23 the storage closet, as well as the shop vac.  All of the

24 materials used to have been located inside cosmetology, but due

25 to theft, they were moved and secured into a different closet.

1    Q.      And I think you said the problem was bleach?

2    A.      They had bleach, acetone, like nail polish, hair

3    lighteners, just several things that inmates would like to get

4    their hands on.

5    Q.      So what was your job?

6    A.      My job was to, like, retrieve the chemical supply --

7    the spray bottles and the shop vac and stuff so that I could

8    use these cleaning supplies.

9    Q.      Where were the cleaning supplies kept?

10   A.      They were kept in a storage closet or an office that

11   was being used as a storage -- temporary storage closet.

12   Q.      Were you allowed to walk to that closet yourself?

13   A.      No, you had to be escorted.

14   Q.      And who escorted you during the week that Miss Gilgour

15   was on vacation?

16   A.      I was escorted by Edward Bearden.

17   Q.      So that day, did you need to place chemicals back in

18   the storage closet?

19   A.      I didn't need to place them back into the storage

20   closet, I actually needed to retrieve them, as well as the shop

21   vac.

22   Q.      When you -- are you familiar with that storage closet?

23   A.      Unfortunately, yes.

24   Q.      Can you describe for the jury what it looks like,

25   including whether or not there is a camera in that storage

1  closet?

2  A.      So you exit the cosmetology classroom, you pass the

3  bathrooms that are on the right.  The next hallway to your

4  right, you stand and you're facing Mrs. Grant's office; and to

5  the left is a secretary's counter, and to the right is a

6  doorway, an entryway into the -- they used it as a staff

7  lounge, basically.  But on the other side, if you enter into

8  that lounge room, on the back side of that is a small storage

9  closet.

10  Q.      Are there -- is there storage shelving or anything in

11  that storage closet?

12  A.      There's makeshift shelving.  They use, like, those big

13  long tables that you can buy, like, at Sam's Club or things

14  like that, and they're actually in a U-shape in that room.

15  Q.      And where is the shop vac?

16  A.      The shop vac, if you were to walk into the door, is

17  across the way and underneath the table.

18  Q.      Okay.  So I think you were telling us that you were

19  escorted by Mr. Bearden to go get the shop vac and the

20  chemicals.

21  A.      Yes, ma'am.

22  Q.      Could you tell the jury what happened next?

23  A.      So I was escorted to the storage room.  You're not

24  allowed to walk behind the officers, you always have to be in

25  front of the officers for safety purposes.  And so I was in

1 front of Mr. Bearden, and I was walking into the lounge, and

2 then from the lounge, I went into that storage room. I entered

3 the doorway, and I spotted the shop vac on the floor underneath

4 the table.

5 And to retrieve it, obviously, I had to get down

6 low. So I was bending over to get that, but I noticed, like --

7 it has attachments. The attachments weren't quite where I

8 could reach them, so I had to get even, like, closer to, like,

9 down to my knees or whatever. So I did that and, in doing so,

10 I backed back out to turn and reach for spray bottles that I

11 needed, and at that point in time I was stopped by Mr. Bearden

12 and asked where I was going.

13 Q.    Was the door to the storage room open or closed at this

14 point?

15 A.    It was open.

16 Q.    Please continue.

17 A.    And I was like, "What do you mean, where am I going?

18 I'm taking this stuff back to the cosmetology classroom."

19 Q.    And what did he say?

20 A.    He said, "No, you're not." I said, "What do you mean,

21 I'm not?" He said, "You have a favor that you're going to do

22 for me." And I was, "No, no, I'm not."

23 At this point -- at this point in time, he starts to

24 unzip his pants, and he starts to expose himself.

25 Q.    Okay.

A.     And he forces me down to my knees by pushing on my right shoulder, and he holds me there.  And he was like, "Do you see this?"  He said, "I even made a -- I even designed a man cut for you.  Do you see this?  I know you want this."  And he --

Q.     And what is a man cut?

A.     I'm assuming he was referring to the way that he trimmed his pubic hairs.

Q.     And did you notice he had trimmed his pubic hairs?

A.     My eyes were actually closed.  I was very terrified at that moment.

Q.     Okay.  And what happened next?

A.     He grabbed me by the back of my head and forcefully put my mouth onto his erected penis.

Q.     Now, what did you do?

A.     There wasn't much I could do.  He was holding the back of my head, and he wouldn't let go.

Q.     How long did he leave his erect penis in your mouth?

A.     He left it there long enough to -- until he --

Q.     Until he ejaculated?  In your mouth.

A.     (Nodding head.)

Q.     What happened next?

A.     After he finished, he reached into his back pocket. And he had a handkerchief in his back pocket, and he pulled it out.  And as he was putting himself away, he looked at me, and

1 he threw the handkerchief at me, and he said, "You need to

2 clean yourself up before anybody finds out."

3  Q.    What did you take that to mean?

4  A.    Basically, I didn't think anybody -- that there was

5 going to be consequences.

6  Q.    I'm sorry, I couldn't hear you.

7  A.    I'm sorry.

8  Q.    Why don't you have a sip of water.

9         After Mr. Bearden forced you to perform oral sex on

10 him, did you tell anyone?

11  A.    I did not.

12  Q.    Did it happen again?

13  A.    Yes, ma'am.

14  Q.    Did it happen the same way?

15  A.    Yes, ma'am.

16  Q.    Did it happen in the same place?

17  A.    Yes, ma'am.

18  Q.    Why didn't you tell anyone?

19  A.    Because I'd worked so hard to get to where I was at.  I

20 was in cosmetology, and anytime you get sent to the -- or you

21 get caught or say anything, they automatically assume you're

22 guilty or whatever the situation may be, and they take you to

23 the hole.  And if you go to the hole, you lose absolutely

24 everything that you've worked for.

25  Q.    Would you have been kicked out of the cosmetology

1  program if you reported his sexual assaults?

2  A.      Yes, ma'am.

3            MR. TAULBEE:  Objection, speculation.

4            THE COURT:  Overruled.

5  BY MS. McGRAUGH:

6  Q.      Yes?

7  A.      Yes, ma'am.

8  Q.      When Mr. Bearden put his hand on your shoulder and

9  pushed you down, could you please show the jury where on your

10 body he pushed you down from?

11 A.      He would grab me right here on my right shoulder with

12 his hand, and he would force me to the floor, and he would keep

13 his hand on my shoulder.

14 Q.      After the first time that he forced you to perform oral

15 sex on him, was there any marks on your shoulder?

16 A.      I didn't notice any marks until they were brought to my

17 attention when I was in my room on Housing Unit 7.

18 Q.      When it was brought to your attention, what did you

19 see?

20 A.      There were bruises, there were actually fingerprints

21 where you could tell that I had been -- somebody had held on to

22 my shoulder.

23 Q.      And when you were forced to kneel, what is the surface

24 on the bottom of the closet?

25 A.      It's a tile floor.

1  Q.      Is there any padding?

2  A.      No, ma'am.

3  Q.      Can you tell the jury how long these assaults continued

4  for?

5  A.      These assaults continued from about November -- from

6  about November of 2016 to about July or August of -- probably

7  the beginning of September of 2017.

8  Q.      And was Edward Bearden working in cosmetology vo-tech

9  during that time?  If you recall.

10  A.      If I recall correctly, he was; but I know that one time

11  that he was not supposed to be in cosmetology, actually Miss

12  Gilgour was actually there that day, but he appeared to be in

13  the cosmetology area.

14  Q.      And he was a utility worker; is that correct?

15  A.      I was unaware of that until that was brought to our

16  attention.

17  Q.      Okay.  As a result of the repeated sexual assaults, did

18  you develop any physical problems?

19  A.      I -- to this day currently, I still have problems with

20  a torn rotator cuff.  I do and am seeking physical therapy for

21  it and was also told that it is so severe, and being that I'm

22  41 years of age, it would really do no good to go in and do

23  reconstructive surgery on it or even to replace it, just to

24  continue to do physical therapy and do what I can do.

25  Q.      Is it correct that permanent injury is a result of

1  being forcefully pushed down on your knees by your shoulder?

2  A.      Yes, ma'am, that would be correct to say.

3  Q.      And the damage to your knee, can you describe that?

4  A.      So I chipped my knee playing volleyball while I was

5  incarcerated in Chillicothe and basically really never -- the

6  most they did for me there was the x-ray.  And they kept me on

7  my crutches and, then, my knee brace without ever seeing me

8  again once the initial incident had happened.

9  Q.      I just want the jury -- can you just take off the knee

10 brace and stop using it?

11 A.      Okay.  So, no, you cannot.  If you're issued anything

12 by medical, you have to continue utilizing the materials that

13 they provided to you.  If you're seen without them, you could

14 be, again, violated or sent to the hole.

15 Q.      So even if your knee had felt better, you were not free

16 to take your brace off?

17 A.      No, I was not, because I was not released by the

18 medical staff.

19 Q.      Did you have on that knee brace during the times that

20 you were forced to perform oral sex on Edward Bearden?

21 A.      The first few times, which began in November of 2016 --

22 I actually got the knee injury in January of 2017 playing

23 volleyball, and at that time is when I had everything.  So

24 prior to that when the sexual assaults were occurring, I didn't

25 have the knee brace, nor the crutches, but after that, yes, I

1  did.

2  Q.    Was it painful to be forced onto your knee?

3  A.    It was very, very painful to the point where my knee

4  was swelling and there was actual bruising, and you could

5  see -- I mean, it didn't even look like a kneecap.

6  Q.    Do you know approximately how many times that this

7  happened to you?

8  A.    Not -- I mean, I wasn't counting or anything, but it

9  was probably close to 45 to 50 times.

10  Q.    Did it happen every week?

11  A.    It started out slowly at first, and then more towards,

12  like, my -- when I knew that I might be up for an early

13  release, it was more often.

14  Q.    And let me interrupt you there.  Early release means

15  you'd be released from prison?

16  A.    Yeah.  If you were able to go to the parole board and

17  they thought that you weren't really causing problems, or

18  whatever the situation may be, you could get six months,

19  released six months early.

20  Q.    Do you know whether or not Mr. Bearden knew you were

21  approaching your release date?

22  A.    Actually, yes, I do know that he knew that.

23  Q.    How do you know that?

24  A.    He actually told me he knew that I was coming up for my

25  six-month hearing.

1  Q.     How did that make you feel?

2  A.     Very, very uncomfortable because I just -- how do you

3  know that?  Why do you know that?

4  Q.     Did it make you feel more safe having that correctional

5  officer have that personal information?

6  A.     No, ma'am, it did not.

7  Q.     At some point, did Mr. Bearden tell you he had seen

8  your Facebook page?

9  A.     Yes, ma'am, he did.

10  Q.     Did Mr. Bearden tell you he knew that you had children?

11  A.     Yes, ma'am.

12  Q.     And that he had seen a picture of your children?

13  A.     That is correct.

14  Q.     How did you perceive that information?

15  A.     I felt like he was stalking me.  I felt like that -- I

16  was very uncomfortable, but I felt like not only was he paying

17  attention to the things that were going on in the inside, now

18  it's gotten to the point where he wanted to know more, so he

19  was utilizing his tools or whatever he had to do on the outside

20  to find out what was going on or who I was or, you know, about

21  my family life, things like that.

22  Q.     Did he ever ask you to call him?

23  A.     In February of 2017, I was approached by him.  I was

24  coming out of the bathroom outside of the cosmetology

25  classroom.

1    Q.      And what did he say to you?

2    A.      He stopped me and said that I needed to look on my

3 cosmetology vanity because he had left a surprise for me.

4    Q.      Did he say what that surprise was?

5    A.      No, ma'am.

6    Q.      Did you go to look for the surprise?

7    A.      I was cautious, but, yes, I wanted to know what he said

8 he had left for me.

9    Q.      And what did you find and where did you find it?

10    A.      I found a hot pink sticky note that had a cell-phone

11 number on it with a note that said, "You know who this is

12 from," and it had been placed inside the little cubby area of

13 the vanity that I used.

14    Q.      Can you describe what that cubby area looks like?

15    A.      It looks like a vanity, and then it has like two open

16 holes, one on the left and one on the right, where you could

17 keep, like, books or things like that with a glass top, but it

18 wasn't really like glass because you're in prison, so it was

19 more like a plexiglass-type stuff.  And he had placed the hot

20 pink sticky note up in between, like, a list of things that I

21 had to accomplish before I left the class, before I could

22 graduate, and it was stuck up in there, but up against the

23 glass.

24    Q.      Did you remove the pink sticky note?

25    A.      Yes, ma'am, I did.

1  Q.      And what was on the pink sticky note?

2  A.      It was a cell-phone number.

3  Q.      How did you interpret that cell-phone number?

4  A.      I interpreted that as he wanted me to call him.

5  Q.      Is it allowable for guards and prisoners to have

6  outside phone calls from outside of the prison?

7  A.      No, ma'am.

8  Q.      And this is a rule that you were taught?

9  A.      Absolutely.

10  Q.      Did you call Edward Bearden after you got that sticky

11  note?

12  A.      I did not call him after I got the sticky note.

13  Q.      Why did you not call him?

14  A.      I was scared.  I knew that, again, if I was caught,

15  because you're not allowed to have any of those extra sticky

16  notes or whatever in prison, that I could go to the hole.  So I

17  refrained from calling that number.

18  Q.      And if you had a parole date set and you were violated

19  and put in the hole, what would happen to your parole date?

20  A.      Well, you can kiss it good-bye because you wouldn't get

21  to go.

22  Q.      So it would be reset?

23  A.      It would be reset.

24  Q.      At some point, did you decide to call Mr. Bearden?

25  A.      Yes, ma'am, I did.

1   Q.     Can you tell the jury why you decided to call him?

2   A.     So I got the pink sticky note in February of 2017, and

3  I finally decided to make that telephone call to Mr. Bearden in

4  June or July of 2017.

5   Q.     Was there a reason why?

6   A.     Yes.  Because I was on the yard, and we were at a --

7  they call it BACA, Bikers Against Child Abuse.  It was a

8  program that this Christian group would bring in their

9  motorcycles and stuff, and we would have a chance to walk up

10  and down.  Sometimes they have live music.

11          And I was on the yard at that time.  And he had

12  approached me on the yard as I was sitting on the ground and

13  nudged me in the back with his knee and said -- once he got my

14  attention, and said to me, "I have not received that phone call

15  yet."

16   Q.     And how did you interpret that?

17   A.     I interpreted that as basically like a threat that I

18  better make the telephone call.

19   Q.     Is this around the same time he was discussing your

20  children with you?

21   A.     Yes, ma'am, it was.

22   Q.     What did you do with the pink sticky note?

23   A.     I took it back to my housing unit, Housing Unit 7.

24   Q.     And what did you do with it there?

25   A.     I was involved in a lot of classes, like I had said

1  earlier.  So I had the opportunity to have a lot of paperwork,

2  and I was able to stash away the hot pinky note in between a

3  couple of pieces of paper that I had kind of glued together to

4  keep for safe having just because I knew in the back of my mind

5  that I would want to use that sticky note later on down the

6  road.

7  Q.     Did you transfer that number into something else?

8  A.     So once I got my release date and I knew that I was

9  going home, and I took all of my property to property so that I

10 would be able to be released the next day.

11 Q.     Can you take all of your property?

12 A.     No, ma'am, you cannot.

13 Q.     What can you take?

14 A.     So when you walk out of the prison doors, you can have

15 a hygiene bag, and you can just have your Bible in your hand.

16 Q.     Are you allowed to take your papers from the prison

17 with you when you leave?

18 A.     No, ma'am, you are not.

19 Q.     I'm going to show you what's marked State Exhibit 21.

20 Plaintiff's Exhibit 21, excuse me.  I'm sorry.

21        Can you see this?

22 A.     Yes, ma'am.

23 Q.     What is it?

24 A.     That's a picture of my Bible, my personal Bible.

25        MS. McGRAUGH:  Your Honor, we'll move for admission

1  of 21.

2          MR. TAULBEE:  No objection.

3          THE COURT:  Exhibit 21 will be admitted.

4          (Plaintiffs' Exhibit 21 was admitted into evidence.)

5  BY MS. McGRAUGH:

6  Q.      So is this photograph a true and accurate depiction of

7  your purple Bible that you had in prison?

8  A.      Yes, ma'am.

9  Q.      I will now show you 21.  Is that a different

10 photograph?

11 A.      Yes, ma'am.

12 Q.      And what is that a photograph of?

13 A.      That is an interior picture of a page in my Bible.

14         MS. McGRAUGH:  Move for admission of Exhibit 21.  I

15 believe it's previously been admitted.  Excuse me, Your Honor.

16         MR. TAULBEE:  No objection.

17         MS. McGRAUGH:  These are both 21.

18         THE COURT:  Okay.  21 has been admitted.

19         MS. McGRAUGH:  Plaintiffs' 21.

20 BY MS. McGRAUGH:

21 Q.      So if the jury looks at this page, could you tell them

22 what this is?

23 A.      So within the blue circle, you can see an asterisk and

24 lightly see a name, James.

25 Q.      Can you keep your voice up, please?

1  A.      In the center of that circle, you can see an asterisk,

2  and you can lightly see the name James with several underlines;

3  and underneath that, you can see a cell-phone number.

4  Q.      What is the relevance of that name and cell-phone

5  number?

6  A.      So my best friend for many, many, many years, his name

7  was Michael James.  And in reference to that, I used a SAM

8  name.  The reason why I used a SAM name is because if anybody

9  were to thumb through my Bible and go through anything and see

10  an officer's name or anything like that, again, you could be

11  under investigation and sent to the hole.

12  Q.      So you put James after your friend Michael James.

13  A.      That is correct.

14  Q.      Why did you move the number to the Bible?

15  A.      I moved the number to the Bible because I knew that the

16  hot pink sticky note was in all the paperwork that I couldn't

17  walk out of prison with; and I knew that when I got out of

18  prison, this was secure and it would be with me, and I would

19  know what the reference was.

20  Q.      Did you show anyone this phone number after you got out

21  of prison?

22  A.      After I got out of prison, yes.

23  Q.      Who did you show it to?

24  A.      I showed it to my fiance, and then I talked to my

25  attorneys about it.

1  Q.      And am I correct that you put the number in the Bible

2  so you would have proof when you left prison that Mr. Bearden

3  had you call?

4  A.      Yes, because this was the only physical evidence I

5  could walk out with and know that I would still have it, and

6  hopefully it would trace back.

7  Q.      To Mr. Bearden?

8  A.      That is correct.

9  Q.      Can you tell the jury whether or not you called Edward

10  Bearden pursuant to his demands?

11  A.      I did.  I made one telephone call.

12  Q.      You called the number, and who was on the other end?

13  A.      Edward Bearden.

14  Q.      Now, had you asked Edward Bearden to provide you with

15  counseling?

16  A.      No, ma'am, I did not.

17  Q.      Would you ever have asked Edward Bearden to be your

18  counselor?

19  A.      Absolutely not.

20  Q.      Do you recall generally what the content of the

21  conversation was?

22  A.      I do.  I remember that we had to keep our voices kind

23  of disguised, you could say, and also that knowing that I

24  wasn't supposed to be making this telephone call.

25  Q.      So let me stop you there.  Can you make telephone calls

1  on the other women's canteen accounts?

2  A.    You're not supposed to.  If you get caught, again, you

3  could be violated or go to the hole for that.

4  Q.    Did you have any money for phone calls?

5  A.    I told -- I had spoke earlier, and I told you guys that

6  was not of importance to me because of the tough love I was

7  receiving, and, therefore, I did not have phone -- or money on

8  my account to make that phone call.

9  Q.    Did you use somebody else's money?

10  A.    I used my roommate Christy Jaco's account.

11  Q.    So you generally had a discussion with Mr. Bearden.

12  What -- do you recall what topics?  Did you ask him for

13  counseling, to counsel you?

14  A.    No, ma'am, I did not.

15  Q.    What was the general tenor of the phone call?  Did you

16  yell at him, did you scream?

17  A.    There was no yelling, there was no screaming.

18  Q.    Where are the phones located that you used?

19  A.    They're located right inside the housing units, right

20  inside the front doors.

21  Q.    Are they private?

22  A.    No.

23  Q.    So during this telephone call, do you recall what

24  Mr. Bearden said to you?

25  A.    I remember along the lines of -- he was talking about

1  Puerto Rico.  He wanted to take myself and my kids to Puerto

2  Rico.  He also was telling me that he wanted to be with me on

3  the outside, and he was going to meet me at the gates, be there

4  to pick me up when I was released.

5  Q.      Is this while he was married?

6  A.      I actually -- I didn't know that Mr. Bearden was

7  married.

8  Q.      Okay.  Did you have reason to think he was married?

9  A.      I did.

10  Q.      You previously gave a deposition in this case.  Is that

11  correct?

12  A.      Yes, ma'am.

13  Q.      And that was under oath, correct?

14  A.      That is correct.

15  Q.      Who took your deposition?

16          MR. TAULBEE:  I'm going to object, Your Honor, as to

17  relevance.

18          THE COURT:  I'm not real sure how that's relevant.

19          MS. McGRAUGH:  I was just trying to put it in

20  context, Your Honor.  I can move on.

21          THE COURT:  Okay.  Thank you.

22  BY MS. McGRAUGH:

23  Q.      Were you asked during your deposition what the content

24  of the conversation was on the phone?

25  A.      Yes, ma'am.

1  Q.     Did you tell them Puerto Rico?

2  A.     I did.

3  Q.     Do you have reason to believe that's incorrect?

4  A.     I do have reason to believe now that that isn't

5  correct.

6  Q.     Did you discuss your children with Mr. Bearden on the

7  telephone call?

8  A.     My children were repeated numerous amounts of times on

9  that phone call.

10  Q.     Do you recall how long that call lasted?

11  A.     I know that, I believe that the phone calls are only --

12  you're only allowed 15 minutes, but depending on how much money

13  you have on your account -- I just remember that he's the one

14  that had to cut the phone call off.  I don't really remember

15  anything after.

16  Q.     Do you have the purple Bible still?

17  A.     Yes, ma'am, I do.

18  Q.     Did you have any concerns about your safety and

19  security after having this phone call with Edward Bearden?

20  A.     It wasn't so much more myself now that it was more

21  about my children.  And I knew -- like I said before, I knew

22  that those telephone calls were recorded, and I was hoping,

23  honestly, that somebody was listening and that somebody could

24  hear the conversation.

25  Q.     Have you had any contact with Edward Bearden since you

1  got out of Chillicothe?

2  A.      Absolutely not.

3  Q.      I want to talk to you now about the emotional

4  repercussions of the repeated forced sodomies.  Can you tell

5  the jury how this has affected your mental health?

6  A.      So when I first came home, it was very, very difficult.

7  And I wasn't even really looking for a relationship.  But --

8  when I say relationship, I'm not just talking about a

9  relationship with a man, I'm talking about relationships with

10  my children.  And at that time, my children were very young.

11  Q.      And how did your relationship with your children

12  change?

13  A.      It changed drastically just because my children -- my

14  children actually had to start asking to give me hugs.  Okay,

15  I'm a very -- I've always been super close -- I've never been

16  away from my children up until I was incarcerated.  I never

17  left them with baby-sitters.  If I was home, my kids were

18  there.  That was just who I was.

19  Q.      When you were at home.

20  A.      That is correct.

21  Q.      And what were the -- can you tell the jury, what were

22  the mental health ramifications in terms of anything that

23  interfered with your daily life?

24  A.      It wasn't just -- like I said, it wasn't just about the

25  relationships.  I had a goal, and I wanted to achieve that as

1  far as getting my cosmetology license.

2  Q.     And let's stop for a minute.  What was that goal?

3  A.     Like I told you before, I messed up when I went to

4  prison, and I knew I wasn't going to be able to use my criminal

5  justice degree.  But in graduating and receiving my cosmetology

6  license, my goal was -- my goal was to open up a kiddie salon.

7  And in order to do that, I was going to contact and franchise

8  Target because everybody -- obviously, you know that Cost

9  Cutters and such are located in Walmart, but Target doesn't

10 have anything like that.  So in my eyes, this was a chance to

11 not only utilize my cosmetology license that I had achieved and

12 set my, you know, sights on, I was going to be able to get with

13 them and open a salon and better myself, not just myself, but

14 my life for my children and move forward.

15 Q.     So people might call that a pipe dream?

16 A.     Probably.

17 Q.     Okay.  Did you think you could do it?

18 A.     I knew I could do it.

19 Q.     Did you get a job in cosmetology after you left the

20 prison?

21 A.     I did.  I immediately received an offer to work for

22 Fantastic Sams.

23 Q.     How did that go?

24 A.     It went well up until probably 45 days into the job.

25 Q.     And what happened?

1  A.      Working at Fantastic Sams, we have what they call $10

2  Tuesdays, and that was gentlemen's cuts.  So you had gentlemen

3  in and out of your salon all day long, in and out of your

4  chair.  And when you do gentlemen's cuts, you don't just cut

5  their hair.  If they want a beard trim -- if they want a beard

6  trim or any kind of facial shave, you have to provide that, you

7  can't tell them no.

8  Q.      Did -- please.

9  A.      From standing behind, it wasn't an issue.  It was not

10  an issue until I had to be in front and I had to lean over and

11  get up close and personal.

12  Q.      Was there a time when you realized you could not

13  continue in that job?

14  A.      After the third time of leaving my client in his chair

15  and having to go to the bathroom and throwing up, I had to tell

16  my manager.  At that point in time, I just couldn't do it

17  anymore.

18  Q.      Did you quit your job?

19  A.      I did.  I did, and I settled for something less.  I

20  settled -- knowing that I had a degree and a license, I settled

21  for a job at McDonald's.

22  Q.      How long did you work at McDonald's?

23  A.      I worked there for a while, and I -- not only did I

24  work at one, I worked at another one.  So I was back and forth.

25  Q.      How was that experience for you?

1  A.      I felt less than.  I knew that I was very well

2  educated.  I would see people from the community, and they're

3  like, "Hmm, why are you working at McDonald's?  Why are you not

4  utilizing your cosmetology license?"

5  Q.      Would it be fair to say that was a humbling experience?

6  A.      Yes, ma'am.

7  Q.      What other symptoms have you had?  You've talked about

8  the physical injury to your shoulder.  What emotional?

9  A.      On a regular basis -- so when I came out of

10 Chillicothe -- I did not want to seek help while I was in

11 Chillicothe.  There was just too many bad things that were

12 going on, that I didn't want to be involved with any other CO

13 or anything if I didn't have to.  So I did not sign up for

14 counseling or anything.

15         But when I came home, it was a whole different

16 story, and I sought to put myself in counseling myself.  I knew

17 that I needed counseling, I needed somebody to talk to.  In

18 doing so, I was diagnosed with PTSD, post-traumatic stress

19 disorder.  I was diagnosed with severe anxiety.  I was

20 diagnosed with night terrors, at which time I actually was in

21 the hospital for 48 hours.  In doing so, they ran, I believe

22 it's called an ECG or EKG.

23 Q.      KG?

24 A.      And it's basically, they watch you while you're

25 sleeping.

1  Q.    And what happens while you sleep?

2  A.    I wake up, but not in sound mind.  So screaming,

3  fighting, I just -- I don't know where I'm at.  I'm lost.

4        I would see just different places.  Like I could be

5  running through a field and just run right into Edward Bearden.

6  He would appear in my dreams, and it was over and over and over

7  again.  It was so bad to the point that they actually put me on

8  a blood pressure medicine called lisinopril.

9  Q.    What does lisinopril do?

10  A.    For somebody with night terrors, it actually drops your

11  blood pressure low enough to basically knock you out so that

12  you can sleep.

13  Q.    Had you had some mental health difficulties before you

14  went to prison?

15  A.    I didn't really have any kind of mental health issues.

16  Q.    Not OCD?

17  A.    Okay, mental health.  I guess obsessive-compulsive

18  disorder is considered --

19  Q.    It is.

20  A.    Okay.

21  Q.    And how does that manifest?

22  A.    So obsessive-compulsive disorder is -- it can be a

23  number of things, honestly.

24  Q.    How did it -- did it manifest in any specific way in

25  prison?

1   A.      It got worse when I got home.  I don't know -- just

2   trauma-wise, I'm not sure.  Okay.  May I back up?

3   Q.      Yes.

4   A.      Okay.  So obsessive-compulsive disorder.  When I got

5   home, I couldn't get clean.  And I don't mean clean as being an

6   addict, I mean I was dirty, I felt dirty, my body felt dirty.

7   So I would take four or five showers a day.  And I was already

8   OCD, but that was cleaning my house.  This was my body.  Just

9   different things like that.

10   Q.      Looking forward, how do you feel about your future?

11   A.      I feel very hopeful, honestly, about my future.  I've

12   been in the same relationship for the last five and a half

13   years.

14   Q.      And what's your partner's name?

15   A.      His name is Troy Branstetter.  I'm a very difficult

16   person to live with, I'm not going to lie, but he's stuck

17   through it, thick and thin.  He's there for my children, which

18   is absolutely amazing.

19   Q.      Have you had any difficulties in your relationship with

20   Troy because of the trauma you suffered?

21   A.      When Troy and I first dated, yes.  I elaborated a

22   little bit, but I did not go into detail about my situation.

23   But I told him that I was struggling with some things and to

24   just please bear with me.  And honestly, we didn't even get

25   intimate until about seven months into our relationship.  So

1  that's how patient he was.  He didn't push me.  He wasn't

2  expecting anything.  He was just a really good friend.

3  Q.     What are you most looking forward to going into your

4  future after this trial?

5  A.     After this trial, and I hope not just to do it for

6  myself, but for others, to be a voice and to speak out and to

7  know that I made a difference.  I would like to eventually,

8  maybe in the next five years, hopefully be able to put all of

9  this behind me and shoot for the stars and possibly open that

10  kiddie salon that I wanted to open.  That would be awesome.

11          MS. McGRAUGH:  Thank you.  I have no further

12  questions, Your Honor.

13          THE COURT:  Any cross-examination?

14          MR. TAULBEE:  Yes, Your Honor.

15                    - - -

16              CROSS-EXAMINATION

17  By Mr. Taulbee:

18  Q.     Good morning, Miss George.

19  A.     Good morning.

20  Q.     You testified a couple of times that you weren't really

21  interested in making phone calls.  Is that right?

22  A.     That is correct.

23  Q.     You made somewhere around 400 phone calls while you

24  were in Chillicothe; is that correct?

25  A.     Within two and a half years, probably.

1   Q.      Okay.  So when you say you were uninterested, you still

2   made a number of phone calls.

3   A.      When -- for access to my children, yes.

4   Q.      And to your then boyfriend?

5   A.      I didn't have a boyfriend.

6           MS. McGRAUGH:  Objection, Your Honor, irrelevant.

7           THE COURT:  Overruled.

8   BY MR. TAULBEE:

9   Q.      To the father of your children?

10  A.      Yes.

11  Q.      And you would speak with him.

12  A.      Yes.

13  Q.      You testified a couple of times you have a bachelor's

14  degree in criminal justice, correct?

15  A.      Could you slow down?  I'm having a really hard time

16  understanding you.

17  Q.      I sure can.

18          You testified a couple of times that you have a

19  bachelor's degree in criminal justice.

20  A.      That is correct.

21  Q.      You received that in 2011.

22  A.      Yes.

23  Q.      You also have an associate's degree in marketing?

24  A.      Yes.

25  Q.      And you got your cosmetology license while you were

1  incarcerated at Chillicothe Correctional Center?

2  A.     That is correct.

3  Q.     And you testified that you were incarcerated for

4  identity theft, right?

5  A.     Yes.

6  Q.     You pleaded guilty to four felonies on February 4,

7  2015?

8  A.     Yes, sir.

9  Q.     Four Class B felonies of identity theft.

10  A.     Yes, sir.

11  Q.     You were sentenced to ten years on each count?

12  A.     Yes, sir.

13  Q.     And you said those were to run concurrently to each

14  other.

15  A.     That is correct.

16  Q.     And you talked a little bit about your previous mental

17  health before you went to Chillicothe, right?

18  A.     Yes.

19  Q.     And before you were incarcerated, you had been

20  diagnosed with ADHD?

21  A.     I do have ADHD, yes.

22  Q.     And depression, and you'd been diagnosed with

23  depression in 2005 or 2006?

24  A.     I don't recall.  I was diagnosed with ADHD as a child,

25  but I don't recall the depression.

1   Q.    Do you remember me taking your deposition on April 27,

2  2021?

3   A.    I remember a gentleman by the name of Nick; so if

4  you're Nick, yes.

5   Q.    That's me.

6   A.    Okay.

7   Q.    I might have looked a little bit different.  And that

8  was by Zoom.

9   A.    Yes, I do remember that, yes.

10   Q.    You were at your house?

11   A.    Yes.

12   Q.    And I was in my office, presumably, I guess.  And you

13  were under oath when you gave that deposition?

14   A.    I was.

15   Q.    There was a court reporter there?

16   A.    Yes -- not physically.

17   Q.    There was a court reporter on the Zoom --

18   A.    Yes, that is correct.

19   Q.    -- meeting.

20       Your testimony today is that you had not been

21  diagnosed with depression in 2005 or 2006?

22   A.    I don't recollect being diagnosed with that.  I know I

23  was, again, diagnosed after I got out of prison with that, and

24  I am on Zoloft today for depression.

25   Q.    I'm going to show you Page 81 of your deposition and

1  have you look at -- I'm going to direct your attention to Line

2  8.  And the question is:  "Had you been diagnosed with any

3  other mental health disorders?"

4          Answer:  "I was diagnosed with ADHD and depression

5  in probably 2005 or 2006."

6          Did I read that correctly?

7  A.      Yes, you did.  I just said I didn't recollect.

8  Q.      Does that refresh your recollection?

9  A.      Yes, sir.

10  Q.      And you had also experienced the highs and lows of

11  bipolar disorder before your time at Chillicothe Correctional

12  Center, correct?

13  A.      Yeah, that was associated with the ADHD and the OCD.

14  Q.      Before your incarceration, you were a corporate trainer

15  at Bob Evans?

16  A.      That is correct.

17  Q.      You earned $14.50 an hour?

18  A.      Yes, sir.

19  Q.      And worked 40 hours a week.

20  A.      Yes, sir.  Forty-plus hours a week.

21  Q.      And you've held several jobs since your release from

22  Chillicothe, right?

23  A.      That is correct.

24  Q.      You testified about working at Fantastic Sams?

25  A.      Yes.

1    Q.    Two different McDonald's?

2    A.    Correct.

3    Q.    And then you also worked at a Hot Salons during your

4    time?

5    A.    I did.

6    Q.    And that was delivering chemicals?

7    A.    Delivering chemicals and taking telephone calls.

8    Q.    Then you went to Wright Printing?

9    A.    Wright Printing for marketing.

10   Q.    And then Pro Design?

11   A.    Pro Designs for marketing.

12   Q.    Bishop Glass?

13   A.    Bishop's Glass for marketing.

14   Q.    And then to Excess CustomZ?

15   A.    Excess CustomZ started out with marketing, and now

16   today, for a year and two months, I've been the administrative

17   assistant.

18   Q.    And all of those jobs were 40 hours a week?

19   A.    Yes, sir.

20   Q.    And do you still earn $13.50 an hour at Excess CustomZ?

21   A.    Yes, I do.

22   Q.    And you testified about your dream to open a kiddie

23   salon at Target, correct?

24   A.    That is correct.

25   Q.    Have you ever had any conversations with Target about

1  that?

2  A.      Phone calls?

3  Q.      Any conversations with Target.

4  A.      I've written letters.

5  Q.      Have you heard back from them?

6  A.      No.

7  Q.      They've never told you they were interested in having

8  you open a kiddie salon?

9  A.      It didn't make it that far, probably due to all of the

10 trial and everything that I'm going through.

11 Q.      And did you disclose to them that you were a felon?

12 A.      Everybody I come in contact with, it is my job as a

13 parolee to let them know that I am a felon.

14 Q.      And you haven't heard back from Target.

15 A.      No, I have not.

16 Q.      And you testified that was just -- that was a pipe

17 dream.

18 A.      I can achieve it.

19 Q.      You were first sent to the Missouri Department of

20 Corrections in May 2015, right?

21 A.      That is correct.

22 Q.      Started out -- and the Department of Corrections isn't

23 supposed to be fun; would you agree with that?

24 A.      Yes.

25 Q.      You weren't sent there to have fun.

1  A.     No, I was not.

2  Q.     But you testified about different sporting activities

3  you participated in, correct?

4  A.     That is correct.

5  Q.     You did volleyball?

6  A.     Yes.

7  Q.     Sports?

8  A.     Yes.

9  Q.     Softball?

10  A.     Yes.

11  Q.     You talked about a carnival?

12  A.     Yes.

13  Q.     There were games for the inmates?

14  A.     Yes, sir.

15  Q.     Ring toss?

16  A.     Yes, sir.

17  Q.     That was fun, right?

18  A.     Yes.

19  Q.     You started out at the Women's Eastern Reception and

20  Diagnostic Center, right?

21  A.     I did.

22  Q.     Diagnostic Correctional Center?  WERDCC?

23  A.     Vandalia, yes.

24  Q.     That's a lot easier.  And then you got to Chillicothe

25  June 16, 2015?

1  A.      Yes, that is correct.

2  Q.      And you were released November 17, 2017.

3  A.      That is correct.

4  Q.      And before your release, you had one parole hearing; is

5  that correct?

6  A.      That is correct.

7  Q.      And had you already received your release date for

8  November 17, 2017, when you had that parole hearing?

9  A.      No, I had not.  You had to wait -- you had to have that

10  parole hearing before they -- I had to be on the yard for two

11  and a half years before they would give me a release date.

12  Q.      Do you have any idea when your release date was set?

13  A.      My original release date?

14  Q.      When your release date was --

15  A.      All right.  So I had my parole hearing -- I was

16  supposed to have my parole hearing in February of 2017.  I got

17  my answer back, I believe, around March, or the middle of March

18  of 2017, and I was released November 17th of 2017.

19  Q.      So you didn't hear until March of your release date in

20  November, is that --

21  A.      I didn't -- I got the response back that they were not

22  going to release me early, that is correct.

23  Q.      Earlier than November of 2017.

24  A.      I believe that's right, yes.

25  Q.      Okay.  Because you said you were sentenced to ten

1  years, right?

2  A.    Yes, I was.

3  Q.    Okay.  And you didn't serve ten years.

4  A.    I'm currently on parole now, so I'm still serving my

5  time.

6  Q.    Okay.  You said you weren't going to be released early.

7  I was just trying to clarify what you meant by that.

8  A.    Well, you only have to do a percentage of your time

9  your first time down.

10  Q.    Throughout your time at Chillicothe, you did a lot with

11  the recreation department, right?

12  A.    With the recreation as far as participation?

13  Q.    Yes.

14  A.    Yes.

15  Q.    You spent a lot of time in the recreation building?

16  A.    Yes.

17  Q.    Fair to say you were always there?

18  A.    Always there?

19  Q.    Yes.

20  A.    No, it's not fair to say that.

21  Q.    When you could be?

22  A.    When I could be, yes.

23  Q.    And then you testified that during your last year, you

24  were a cosmetology student?

25  A.    I was a cosmetology student.

1   Q.      I want to go back -- you said you worked in the

2   warehouse; is that correct?

3   A.      That is not correct, that is not what I said.

4   Q.      You said you worked in the canteen.

5   A.      That is correct.

6   Q.      Which is adjacent to the warehouse?

7   A.      That is correct.

8   Q.      And I believe you talked about boxes blocking the

9   cameras.

10  A.      Yes.  Chip boxes.

11  Q.      What kind of boxes?

12  A.      Potato chip boxes.

13  Q.      Chip boxes.  And you don't have access to camera

14  monitors; is that right?

15  A.      Yes, I did.

16  Q.      You had access to camera monitors --

17  A.      I did.

18  Q.      -- as an offender?

19  A.      Yes.

20  Q.      Where were those --

21          (Reporter interruption.)

22          THE COURT:  We just kind of need to slow down.

23  Everyone is talking a little bit too quickly.

24          MR. TAULBEE:  I'm sorry.

25          THE COURT:  So why don't you ask a question.

1          MR. TAULBEE:  Sure.

2   BY MR. TAULBEE:

3   Q.      You did have access to camera monitors.

4   A.      I did.

5   Q.      And where were those monitors?

6   A.      Mrs. Toni and Mr. O.'s office.

7   Q.      They allowed you in the office?

8   A.      I was in the office.  I did all of the ordering and

9   stuff.

10  Q.      You testified that Miss Toni -- and what was the last

11  name?

12  A.      Mr. O.

13  Q.      You said they were corrections officers?

14  A.      I'm assuming.  They had different -- they wore street

15  clothes.  They weren't in uniform.

16  Q.      Okay.  So you don't know whether they were actually

17  corrections officers, that was just -- that's your guess?

18  A.      CO I, CO II, so I'm assuming corrections officer.

19  Q.      Okay.  You think they were actually -- their title was

20  CO I or CO II?

21  A.      It would just be better to say I don't know.

22  Q.      Okay.  And the same with Miss Womack.  You testified

23  that she was a CO, right?

24  A.      That is correct.

25  Q.      She was a recreation officer, correct?

1  A.      She was an officer, so I don't know what you --

2  Q.      She worked in recreation?

3  A.      Yes.

4  Q.      She didn't have the uniform on like the other ones?

5  A.      No, she did not.

6  Q.      Okay.  It's just your assumption that she was a

7  corrections officer?

8  A.      She wore a belt, she wore her handcuffs.  She had all

9  of her stuff, she just wore street clothes.

10 Q.      And you are not claiming that Mr. Bearden had physical

11 contact with you when he was in the warehouse and you were in

12 the canteen, right?

13 A.      I am not claiming that, is that what you're asking me?

14 Q.      Right.

15 A.      He didn't have physical contact with me.  He did not

16 touch me.  Is that what you're asking?

17 Q.      That is exactly what I'm asking.

18 A.      No, he did not touch me.

19 Q.      But you're saying that he found out you worked in rec

20 and did extracurriculars?

21 A.      I'm having a hard time understanding what you're asking

22 me.

23 Q.      You're testifying that he found out you worked in

24 recreation, right?

25 A.      I did say that, yes.

1  Q.     And did extracurriculars.

2  A.     That I did extracurriculars?  Yes.

3  Q.     And he began to follow you?

4  A.     Yes.

5  Q.     And you testified that he put his knee in your back at

6  a BACA event, right?

7  A.     Yes.

8  Q.     It was a large crowd of people?

9  A.     Yes.

10 Q.     A lot of people around?

11 A.     Yes.

12 Q.     A lot of inmates?

13 A.     Yes.

14 Q.     A lot of corrections officers?

15 A.     No.

16 Q.     Not a lot of corrections officers?

17 A.     No, sir.

18 Q.     Where was this?

19 A.     This was on the yard near the central walk.

20 Q.     And were there yard officers working that day?

21 A.     In the yard -- in the guard shack.

22 Q.     Okay.  And there were other corrections officers on

23 duty that day?

24 A.     In the guard shack.

25 Q.     All of the corrections officers were in the guard

1  shack?

2  A.      Yes, sir.

3  Q.      And you remember that?

4  A.      I do remember that.

5  Q.      And nobody was out watching the inmates?

6  A.      They were watching the inmates from the guard shack.

7  It was covered and had air conditioning.

8  Q.      And then you testified that Mr. Bearden began sexually

9  assaulting you when you started the cosmetology program, right?

10  A.      In November of 2016.

11  Q.      And just to kind of orient ourselves, you started that

12  October 11, 2016, correct?

13  A.      That's correct.

14  Q.      And you testified -- well, let me back up.

15          Cosmetology took place in the vocational-education

16  building.

17  A.      That is correct.

18  Q.      And you testified earlier that the barber shop was in

19  the administration building, the admin building, right?

20  A.      Yes.

21  Q.      The barber shop is located in the recreation building,

22  right?

23  A.      Across from the recreation, next to the chapel.

24  Q.      It's across from the gym?

25  A.      Yes.

1  Q.     So it's within the secure part of the facility?

2  A.     I don't understand, when you say secure, what you're

3  referring to.

4  Q.     You didn't leave the secure part of Chillicothe to go

5  into another building.

6  A.     I didn't leave the gated area?

7  Q.     Right.

8  A.     That is correct.

9  Q.     Okay.  So when you said administration building, you're

10 not saying it was outside the secure perimeter?

11 A.     That is correct.

12 Q.     You testified that he forced you to perform oral sex in

13 the vocational-education building, right?

14 A.     Yes, I did testify to that.

15 Q.     And that it started in November of 2016?

16 A.     That is correct.

17 Q.     Did you testify what day of the week that was?

18 A.     Started on Thursdays, but it became random days after

19 that.

20 Q.     And you testified that afterwards, he threw a

21 handkerchief at you.

22 A.     Only the first time, sir.

23 Q.     He only threw the handkerchief at you one time.

24 A.     The first time, sir.

25 Q.     And you didn't throw the handkerchief away?

1  A.    No, sir, I did not.

2  Q.    You didn't keep it?

3  A.    No, sir, I did not.

4  Q.    You didn't pick it up and take it with you?

5  A.    No, sir, I did not.

6  Q.    And Mr. Bearden left the room before you did, right?

7  A.    That's correct.

8  Q.    You testified that he forced you to perform oral sex on

9  him 45 to 50 times?

10  A.    That's correct.

11  Q.    And that he was assigned to cosmetology, at least your

12  understanding, the majority of these times?

13  A.    That is correct.

14  Q.    And when you say assigned to cosmetology, you mean in

15  the vocational-education building.

16  A.    That is correct.

17  Q.    And you testified that it happened each time in a room

18  adjoining the staff break room, right?

19  A.    Yes.

20  Q.    And that it occurred always when you were going to get

21  supplies to clean?

22  A.    Yes.

23  Q.    I believe you testified that it started out slowly at

24  first, but then it increased its frequency?

25  A.    Yes, it started out slowly at first.

1    Q.     Never happened more than once a week, right?

2    A.     Honestly, I'm not -- I don't remember that.  I know

3 that it happened very often.

4    Q.     But you don't remember whether it was more than once a

5 week?

6    A.     It started out once a week.  Like I said, it started on

7 Thursdays, but it became random after that.  I don't really

8 remember.

9    Q.     Okay.  Did you only retrieve the chemicals to clean

10 once a week?

11    A.     No, per state policy, we had to clean every day, but

12 there were certain chemicals that they had to keep locked up.

13    Q.     You only retrieved chemicals and the shop vac once a

14 week, right?

15    A.     It wasn't just the chemicals, it was -- there were

16 spray bottles, mop heads, different things like that.  Trash

17 bags.

18    Q.     But the chemicals and the shop vac you only retrieved

19 once a week.

20    A.     Generally, yeah.  If I needed an escort to the storage

21 room, yes, that's what I was retrieving.

22    Q.     So if you were -- if you had an escort, that's what you

23 were retrieving?

24    A.     If I was escorted to the storage room, that's what I

25 was retrieving.

1    Q.     Okay.  And that was only once a week?

2    A.     It started out as once a week.  I'm not sure if it was

3  more than that after.

4    Q.     And you testified about bruises that he left on your

5  shoulders?

6    A.     That's correct.

7    Q.     And you had bruises on your right shoulder from

8  February or March 2017 to September of 2017?

9    A.     That's correct.

10    Q.     While you were at Chillicothe, did you report that

11  Mr. Bearden forced you to perform oral sex on him?

12    A.     No, I did not.

13    Q.     And you never claimed PREA, as you called it, right?

14    A.     I did not.

15    Q.     And you never were sent to administrative segregation,

16  right?

17    A.     No, I was not.

18    Q.     Do you know the names of any offenders who were sent to

19  administrative segregation?

20    A.     I could probably give you --

21         MS. McGRAUGH:  Objection, Your Honor.  Irrelevant.

22         THE COURT:  Overruled.

23    A.     I could probably give you a list of a couple that I --

24  Sarah was one of them that I had talked about previous, and

25  Jennifer Saling, I believe, maybe was one of them.  Those are

1  the ones I can remember, recollect that were there for long

2  term.

3  BY MR. TAULBEE:

4  Q.     And you don't have access to their prison records,

5  right?

6  A.     To the prison records?

7  Q.     Correct.

8  A.     Well, no.

9  Q.     So you don't know why they were sent to administrative

10  segregation?

11  A.     Let me back up on that.  Yes, I do know why they were

12  sent to administrative segregation.  Because when I worked in

13  canteen, I received the list of people that was in canteen, and

14  next to that was why they were in segregation.

15  Q.     You had a list that told you about Sarah and Jennifer

16  Saline?

17  A.     And several other inmates, yes.

18  Q.     And it said that they were in administrative

19  segregation because they were a victim of a PREA?

20  A.     Either PREA or under investigation.  I mean, that's

21  what it could say, either PREA, under investigation.

22  Q.     Well, there can also be offenders that are not victims

23  of PREA that are accused, that are offenders of PREA, right?

24              MS. McGRAUGH:  Objection, Your Honor, irrelevant.

25              THE COURT:  Overruled.

1    A.      Can you explain what you're asking me?

2    BY MR. TAULBEE:

3    Q.      Yeah.  Offender-on-offender sexual contact also

4    violates PREA, correct?

5    A.      It should, yes.

6    Q.      And those individuals who --

7    A.      Yeah, so -- I see what you're saying now.

8            Yeah, so if Jane Doe said that so-and-so touched her

9    in the wrong way and she wasn't comfortable with it, they would

10   both go to the hole.

11   Q.      Okay.  And you testified that February 2017,

12   Mr. Bearden placed a hot pink sticky note on your vanity?

13   A.      In or about that time, yes.

14   Q.      And you'd been in cosmetology, the cosmetology

15   classroom as a client that day; is that right?

16   A.      That morning, yes.

17   Q.      You had went to the restroom?

18   A.      I had used the restroom.

19   Q.      And the sticky note wasn't on your vanity when you left

20   for the restroom.

21   A.      No.

22   Q.      And you would have seen it if it had been there?

23   A.      Yes, it was hot pink.  It would have stood out.

24   Q.      It was very noticeable.

25   A.      Very noticeable.

1   Q.      It wasn't hidden in your vanity.

2   A.      It was placed inside my vanity.

3   Q.      Where you could see it.

4   A.      Where I could see it, yes, because I had to look for

5   it.

6   Q.      So are you saying it was hidden in your vanity?

7   A.      It was placed inside my vanity, and our vanities did

8   not sit close to each other when we were in cosmetology.  We

9   had spaces in between them.

10  Q.      But it wasn't hidden.  You're not saying it was hidden

11  in your vanity.

12  A.      I'm saying that I probably was the only offender that

13  could see it, yes.  Unless you actually got inside -- you

14  didn't have to open a drawer or anything, it was an open hole

15  just like this but a little bit bigger.  Unless you actually

16  got inside -- and the only reason why I did is because I was

17  pulling out that list that I told you about --

18  Q.      But it -- sorry.

19  A.      The list that I told you about earlier where if I had

20  to do 24 perms or whatever, and I had completed two that day, I

21  needed to mark those off.  And so when I pulled that list out,

22  that sticky note was underneath that list.

23  Q.      So it was hidden in your vanity.

24  A.      Yes, I guess.  Concealed.

25  Q.      I'm going to show you your deposition again.  And,

1  again, you were under oath when I took your deposition, right?

2  A.    Yes.

3  Q.    Is that on your screen?

4  A.    Yeah, I can see it.

5  Q.    I just want to direct your attention to Page 56, Line

6  2.

7  A.    Which line?

8  Q.    Two.

9        Question:  "It wasn't, like, hidden in your vanity

10  or anything like that."

11        Answer:  "No, sir."

12        Did I read that right?

13  A.    It is, but, as I said before, it's a clear top, so in

14  my eyes, it's not.  Anybody can walk by and see anything that's

15  inside your vanity.

16  Q.    So your testimony is that it wasn't hidden in your

17  vanity.

18  A.    I had to pull out the list that I told you about that

19  was viewable from the glass top, and that is when I found the

20  hot pink sticky note that was left by Mr. Bearden with his

21  telephone number on it.

22  Q.    And you threw the sticky note away before you were

23  released?

24  A.    Yes, I did.

25  Q.    And you did not report that Mr. Bearden put a sticky

1   note on your vanity with a telephone number on it, correct?

2   A.      Not to an officer.

3   Q.      And you testified that he threatened you if you didn't

4   call him?

5   A.      I didn't say that he threatened me.  What I said to you

6   was, and everybody else that was listening, is that he made

7   comments about my children, and I perceived that as a threat.

8   Q.      Okay.  You perceived that he threatened you.

9   A.      I did.

10  Q.      But he didn't actually threaten you?

11  A.      I felt like that was a threat.

12  Q.      And your testimony today has changed about that phone

13  call; is that right?

14  A.      It has changed?

15  Q.      Yes.

16  A.      I'm not --

17  Q.      Well, I believe you previously testified that you were

18  incorrect about some details.  Is that right?

19  A.      At the time of my deposition -- at the time of my

20  deposition, I was going off of a conversation that I had had

21  with Edward Bearden.  Maybe those two conversations ran

22  together.  But I had a chance to listen to the telephone call,

23  and at that point in time, that telephone call went back to the

24  basis of us talking about what he wanted to do afterwards and

25  my children time and time again, where my children were at,

that he knew about my children.

Q.     You previously testified that he was familiar with the Lake of the Ozarks area, right?

A.     Did I testify about that?

Q.     You've previously --

A.     In my deposition, yes.

Q.     That his family owned a pawnshop there.

A.     He told me that his family owned a pawnshop.

Q.     And that was a part of the phone call, correct?

A.     I don't remember.

Q.     Well, you've listened to the call since then, right?

A.     Over a year ago.

Q.     But you know sitting here today that there was nothing about Puerto Rico in that call, right?

A.     Not in the telephone call.

Q.     And there was nothing about his retirement in the telephone call, right?

A.     Not that I remember.

Q.     And you previously testified that he mentioned his retirement?

A.     He did mention his retirement, $3400 a month to be exact.

Q.     You said that was in the telephone call, right?

A.     At that time I thought it was.

Q.     But it wasn't.

1    A.      I don't know.

2    Q.      There was nothing about, in that telephone call about

3    him taking care of you and your kids, right?

4    A.      It was about my kids, yes, it was.

5    Q.      He didn't say anything about him --

6    A.      I don't recollect that.

7    Q.      -- taking care of your kids?

8           THE COURT:  Okay, it's important that he finish his

9    question before you provide your answer.

10          THE WITNESS:  I apologize.

11   BY MR. TAULBEE:

12   Q.      And during the telephone call, you specifically asked

13   him if he knew the Lake of the Ozarks area, right?

14   A.      I don't recollect that.

15   Q.      He said, "No, not very much at all."

16   A.      I don't recollect that.

17   Q.      You knew the call was recorded, didn't you?

18   A.      Absolutely I did.  That's why the phone call was made.

19   Q.      And you did not report the phone call to anybody,

20   correct?

21   A.      No, I called because it was a recorded phone call.

22   There would be records.

23   Q.      You made the phone call so you could have a recording

24   of Mr. Bearden on the phone?

25   A.      Yes, so that -- in hopes that -- I'm told that these

1  phone calls are recorded.  In hopes that somebody is actually

2  listening and can hear that there is an officer that's trying

3  to make contact with an inmate or inmates.

4  Q.     And you testified earlier that you specifically wrote

5  that phone number down in your Bible so you'd have it when you

6  left the prison, right?

7  A.     Absolutely, for physical evidence.

8  Q.     You're currently in a relationship, correct?

9  A.     That is correct.

10 Q.     And you testified you've been in that relationship for

11 five and a half years?

12 A.     Close to it, yes.

13 Q.     And that began when you got out of prison?

14 A.     That it did.

15 Q.     And you've had to work to be in public and groups of

16 people, right?

17 A.     I've had to work?

18 Q.     Work so that you're able to.

19 A.     Yes.  So if I am out in public, I try not to be around

20 other people or large groups.

21 Q.     Did that just start in the fall of 2020?

22 A.     I'm sorry?

23 Q.     Did you just start trying to work to get out in crowds

24 of people in the fall of 2020?

25 A.     Fall of 2020, that's when Covid hit.  I'm not sure what

1  you're asking me.

2  Q.    I'm just asking when you started to get out in crowds

3  of people again.

4  A.    When my children started playing sports.

5  Q.    When was that?

6  A.    They were in Girl Scouts, baseball, softball.  They

7  play all kinds of sports.  They started in the spring of 2018,

8  the fall of 2018.

9  Q.    And you're able to get out in public now, right?

10  A.    Actually, no.  I get out in public, but I do not sit in

11  large crowds.  And I don't sit where there's anybody behind me.

12  Q.    But you've been to -- in 2019, you went to a

13  Springfield Cardinals game, right?

14  A.    When?

15  Q.    In 2019.

16  A.    I did.  I took my children to the Springfield Cardinals

17  game.

18  Q.    And you attended with them.

19  A.    And my fiance.

20  Q.    And you've been to monster truck rallies.

21  A.    Absolutely.  I'm not going to seclude myself from doing

22  things with my children, but I refrain from being in large

23  crowds.  I don't sit by groups of people.

24  Q.    Been out bowling.

25  A.    Bowling?

1   Q.    Bowling.

2   A.    Yes.

3   Q.    It's a group of people.

4   A.    No, there's only six of us.

5   Q.    Okay.  That's not a group?

6   A.    Six people, it's not a large group.

7   Q.    Okay.  And you said you quit the Fantastic Sams job

8   because you had to shave a customer's beard?

9   A.    Not just one.

10  Q.    Three?

11  A.    How many?

12  Q.    You said three?

13  A.    No, I did not say that.  I said many.

14  Q.    Okay.  I thought you said after the third time you had

15  to go to the bathroom and throw up that you --

16  A.    After the third encounter of making myself sick, not

17  just the third encounter of shaving three beards.

18  Q.    Okay.  And you were okay behind the chair.

19  A.    I was okay.

20  Q.    Your fiance, does he have facial hair?

21  A.    Yes, he does.

22  Q.    You know Karen Keil, correct?

23  A.    I'm sorry?

24  Q.    You know Karen Keil?

25  A.    Karen Backues?

1  Q.    Yeah, her --

2  A.    That's who I knew her as.

3  Q.    You know now her current name is Karen Keil?

4  A.    From this court case, yes.

5  Q.    And you knew her as Karen Backues?

6  A.    In prison, her name was Karen Backues.

7  Q.    You knew her from workout classes that she ran in

8  recreation?

9  A.    I knew she was a BLAST instructor.

10 Q.    The BLAST instructors run workout classes, right?

11 A.    To my understanding, yes.

12 Q.    And you had contact with Miss Keil in November or

13 December of 2017, correct?

14 A.    She sent me a message on Facebook Messenger, I believe

15 it was.

16 Q.    It was right after you were released from Chillicothe?

17 A.    I'm not sure exactly when it was, maybe a month or so.

18 Q.    You were released in mid-November 2017, right?

19 A.    Yes.

20 Q.    And it was sometime in November or December of 2017?

21 A.    I'm not sure really the date.

22 Q.    Does that sound right?

23 A.    Possibly.

24 Q.    You said she contacted you on Facebook?

25 A.    She sent me a message through Messenger.

1  Q.     You weren't friends with Miss Keil at Chillicothe?

2  A.     No, I was not.

3  Q.     Did not regularly hang out with her?

4  A.     No, I did not.

5  Q.     Just saw her when you were in rec?

6  A.     Occasionally, yes.

7  Q.     And you were in rec a lot, right?

8  A.     Playing sports.  She wasn't really involved in the

9  sports.

10         MR. TAULBEE:  I don't have anything else for you.

11  Thank you.

12         THE COURT:  Redirect?

13         MS. McGRAUGH:  Briefly.

14                         - - -

15               REDIRECT EXAMINATION

16  By Ms. McGraugh:

17  Q.     Mr. Taulbee asked you about going in crowds, and you

18  said you went with your partner, fiance?

19  A.     That's correct.

20  Q.     Can you tell the jury how big your fiance is, please?

21  A.     I can.  I feel very comfortable with my fiance.  He's

22  almost seven foot tall, 325 pounds.

23  Q.     Does that make you feel more safe and secure when

24  you're with your fiance?

25  A.     Absolutely.

1          MS. McGRAUGH:  No further questions.

2          THE COURT:  Any redirect?

3          MR. TAULBEE:  No, Your Honor.  Thank you.

4          THE COURT:  Ladies and gentlemen, what we'll do is

5  if you have any questions, please write them down.  And we'll

6  conclude this witness, then take our morning break.  So we'll

7  give you a couple of seconds, if you have any questions, to put

8  them on your cards.

9          Could counsel please approach?

10          (Counsel approached the bench, and the following

11  proceedings were had:)

12          THE COURT:  First question is, "First CO complaint.

13  Was it followed up on?"  What I would propose is that I

14  slightly reword the question to ask, "After you made the first

15  complaint to a CO, to your knowledge, did anyone follow up on

16  it?"  Any objection to that?

17          MS. McGRAUGH:  No objection.

18          MR. TAULBEE:  No objection.

19          THE COURT:  So I think I'm going to just sua sponte

20  object to this question, but I'll let you know what it is.

21  "When speaking of the hole, was the Chillicothe prison

22  investigating the events as to why you people were sent there?"

23  Do you agree that is not an appropriate question?

24          MS. McGRAUGH:  I agree, Your Honor.

25          MR. TAULBEE:  I agree.

1          THE COURT:  This one I would entertain arguments

2    both ways.  I don't know enough of the facts to know for sure.

3    "What does the hole entail?"  Was she ever in the hole?  Does

4    she have any experience regarding what the hole is, or would it

5    all be hearsay?

6          MS. McGRAUGH:  Well, Nick solicited that she spoke

7    to people who went to the hole.

8          MR. TAULBEE:  She testified she had never been in

9    administrative segregation, though.

10          THE COURT:  And I think her testimony was a little

11   bit more that because of the position she had, she knew a list

12   of people that were in the hole, not that she spoke to people

13   who were in the hole.  And so I fear that what would be

14   elicited is hearsay testimony, and I'm sure you've got some

15   other witness who can testify what the hole entails.  So I'm

16   not going to ask that question either.

17          MS. McGRAUGH:  No objection.

18          THE COURT:  Okay.

19          (The following proceedings were had in open court:)

20          THE COURT:  Okay.  Ladies and gentlemen, as is

21   frequently the case, some of the questions that were asked are

22   going to be hopefully answered by other witnesses a little bit

23   further into the case.

24                        - - -

25

1          EXAMINATION

2   By the Court:

3   Q.      So I only have one question for you, ma'am.  You

4   discussed a -- the complaint that you made to one of the COs,

5   the first complaint that you made to the CO.  To your

6   knowledge, was the complaint followed up on by anyone?

7   A.      The only thing that I -- and if you're referring to the

8   conversation I had with Miss Womack, which was the first one --

9   Q.      I believe so, yes.

10  A.      The only thing -- she followed up with me just to see

11  how things were going and if anything else was being said or

12  done.  As far as going to a higher authority, I'm not sure.

13          THE COURT:  Okay.  Thank you.

14          Do you have any brief follow-up?

15          MS. McGRAUGH:  No, Your Honor.

16          THE COURT:  Mr. Taulbee, do you have any brief

17  follow-up?

18          MR. TAULBEE:  No, Your Honor.

19          THE COURT:  Thank you, ma'am.  You may step down.

20          So we're going to go ahead and take our morning

21  break today.  Because we went a little bit later to finish up

22  this witness, we'll probably go a little bit later after lunch,

23  just so if you want to get a snack or something at this break.

24  We'll probably take a break closer to 12:15 or 12:30, depending

25  on how long the next witness takes.

1　　　　　During this break, don't discuss this case, don't

2　discuss the case with anyone else, don't permit the case to be

3　discussed in your presence.  Don't do any type of research,

4　internet or otherwise.  Again, it's important that you keep

5　your mind open.

6　　　　　We will be in recess until close to 11 o'clock.

7　　　　　(The following proceedings were had in the courtroom

8　out of the presence of the jury:)

9　　　　　THE COURT:  Please be seated.  Is there anything

10　that I can take up during this recess?

11　　　　　MS. McGRAUGH:  No, Your Honor.  Miss Zieser really

12　had to use the restroom, and I told her it was okay to leave.

13　　　　　THE COURT:  Yeah, that's fine.  Anything I can take

14　up on behalf of defendant?

15　　　　　MR. TAULBEE:  Nothing on behalf of defendant.

16　　　　　THE COURT:  Okay.  We'll be in recess for about 15

17　minutes.

18　　　　　(A recess was taken from 10:42 a.m. to 11:01 a.m.)

19　　　　　THE COURT:  So who is the plaintiffs' next witness?

20　　　　　MR. AMMANN:  Karen Keil, Your Honor.

21　　　　　THE COURT:  I've been talking with someone from the

22　marshal's service regarding the remaining plaintiff.

23　　　　　MR. AMMANN:  Teri Dean?

24　　　　　THE COURT:  No.

25　　　　　MS. McGRAUGH:  Lynnsey Betz.

1        THE COURT:  Lynnsey -- yes, and her testimony.  And

2  they're concerned with her moving in front of the jury, not

3  having anyone near her.  So when she testifies, we'll have to

4  take a break and move her to the witness stand.

5        MS. McGRAUGH:  Okay.  She's our last before our

6  experts.

7        THE COURT:  And so that most likely will be this

8  afternoon, do you think?

9        MS. McGRAUGH:  Yes, ma'am.

10        THE COURT:  Okay.  Then let's make sure that we time

11  that properly so that she can get moved.  They're also

12  concerned about not having anyone next to her when she --

13  because she is in custody.  So between now and then, let's be

14  thinking about ways that we could have, you know, a chair

15  behind the TV and have someone seated there in a suit while

16  she's testifying is my thought.

17        But since it won't be until this afternoon, we'll

18  get back to you on that.  But we'll take a break before she

19  testifies, and then we'll kind of brainstorm about how best to

20  have someone in a suit seated there that is as unobtrusive as

21  possible.

22        MR. AMMANN:  We appreciate that.

23        THE COURT:  She may be back there.  I didn't mean to

24  suggest she couldn't come out.  But we'll be back in touch,

25  Nelson.

1        Are we ready to bring the -- let's get her out here.

2   Okay.  Since she is here, are we ready to bring the jury out?

3            MR. AMMANN:  Yes, Your Honor.

4            MR. ROEDIGER:  Yes, Your Honor.

5            THE COURT:  Okay.

6            (The following proceedings were had in the courtroom

7   in the presence of the jury:)

8            THE COURT:  Is the plaintiff ready to call your next

9   witness?

10           MR. AMMANN:  Your Honor, the plaintiffs will call --

11   would call Karen Keil.

12           THE COURT:  Miss Keil, if you could come forward and

13   stand somewhere in that area so you can be sworn.

14                        - - -

15                   KAREN KEIL,

16   being first duly sworn by the courtroom deputy, testified as

17   follows:

18           THE COURT:  If you could please take the witness

19   stand.  You may proceed.

20                        - - -

21                 DIRECT EXAMINATION

22   By Mr. Ammann:

23   Q.    Good morning, Karen.

24   A.    Good morning.

25   Q.    Karen, could you state your full name for the Court,

1  please?

2  A.    Karen Backues Keil.

3  Q.    And how do you spell Keil?

4  A.    K-E-I-L.

5  Q.    And Backues, how do you spell Backues?

6  A.    B-A-C-K-U-E-S.

7  Q.    And what name did you use while you were in prison?

8  A.    Karen Backues.

9  Q.    So if we see records or people refer to you as Karen

10 Backues, it's the same person as Karen Keil?

11 A.    Yes.

12 Q.    Karen, in which state do you currently reside?

13 A.    I live in Georgia.

14 Q.    Who resides with you?

15 A.    My husband and my 17-year-old daughter Brynn.

16 Q.    How old is she?  I'm sorry.

17 A.    Seventeen.

18 Q.    How long have you been married?

19 A.    Oh, my gosh, 25 years?

20 Q.    Okay.  Do you have other children other than the child

21 who lives at home with you?

22 A.    Yes, I do.

23 Q.    Do you have any adult children?

24 A.    Yes, I do.

25 Q.    How many adult children, and what are their names?

1    A.     I have four adult children:  Kyle, Whitney, Lacey, and

2  Gunner.

3    Q.     And your fifth child is Brynn who lives at home with

4  you?

5    A.     Yes.

6    Q.     Do you have any grandchildren?

7    A.     I'm sorry?

8    Q.     Do you have any grandchildren?

9    A.     Yes, I have -- yes.

10   Q.     How many grandchildren, and what are their ages and

11  names?

12   A.     I have five grandchildren.  I have Ezra, who is five;

13  Eliza, who is three; Elliott, who is six months; and I have a

14  set of twin grandbabies who are two years old.

15   Q.     Karen, at times in your life, have you lived in

16  Missouri?

17   A.     Yes, I have.

18   Q.     And do you have family in Missouri now?

19   A.     Yes, I do.

20   Q.     In what year did you go to the Chillicothe Correctional

21  Center?

22   A.     2011.

23   Q.     Did you go -- when you were first incarcerated, did you

24  go first to Chillicothe, or did you go to another prison?

25   A.     I went to another prison.

1  Q.      And was that Vandalia on the other side of the state?

2  A.      Yes, Vandalia.

3  Q.      How long were you in Vandalia before they transferred

4  you to Chillicothe?

5  A.      I think it was right around six weeks.

6  Q.      Is that pretty standard, most women go through Vandalia

7  first and then either stay there or get shipped out?

8  A.      Yes, sir.  It's -- there are no -- process is what they

9  call it, and that was standard then that everybody went through

10 R&O, and then either stayed there or shipped to Chillicothe.

11 Q.      During what years were you in the Chillicothe

12 Correctional Center?

13 A.      2011 to 2017.

14 Q.      What convictions did you have that led you to be

15 incarcerated in the state of Missouri?

16 A.      I had stealing and forgery convictions.

17 Q.      And how long of a sentence did you serve for those

18 convictions?

19 A.      Six years.

20 Q.      Did you plead guilty or have a trial?

21 A.      No, I pled guilty.

22 Q.      And did you deserve to go to prison?

23 A.      Yes.

24 Q.      Did you also have a conviction prior to that from the

25 state of Nebraska?

1   A.      Yes.

2   Q.      Karen, did you have any jobs while you were at the

3   Chillicothe Correctional Center?

4   A.      Yes.

5   Q.      Tell us what jobs you had.

6   A.      Initially when I got to Chilly, I worked in the kitchen

7   until I was approached by the G.E.D. education center.  So I

8   was a tutor for the maximum amount of time, which was one year.

9   And then I worked towards being a BLAST instructor or aerobic

10  instructor.

11  Q.      Let's talk about the tutoring.  Was there a specific

12  subject that you were best in?

13  A.      Probably math.

14  Q.      And were you able to tutor, in part, because of your

15  education?

16  A.      I believe so.

17  Q.      Let me ask you this.  Do you have a college degree?

18  A.      Yes.

19  Q.      In addition, then, to the tutoring, what other jobs did

20  you have?

21  A.      After I was dismissed from the tutoring position, they

22  only let you work one year, I applied for a job in the

23  recreation department so that I could work towards becoming a

24  BLAST instructor or aerobic instructor.

25  Q.      So tell us what BLAST means, either what the initials

1  stand for or what the program is?

2  A.    BLAST stands for Better Living Awareness Support Team,

3  and it's essentially just an aerobic program within the prison,

4  and it is a recognized certification that you can also get

5  outside of prison.

6  Q.    So while you were in that program, were you in training

7  to become an instructor?

8  A.    Yes.

9  Q.    And at any point before you left, did you get a

10  certification to be a fitness instructor?

11  A.    Yes.  I actually received two certifications.

12  Q.    Can you tell us what they were?

13  A.    The first one was a Certified Aerobic Instructor, and

14  the second one was a Certified Personal Training, which is a

15  little more advanced, one-on-one training of individuals for

16  extensive exercise and nutrition.

17  Q.    So did you provide classes in aerobics and other things

18  for the women at Chillicothe?

19  A.    Yes.

20  Q.    Did you provide any classes to train people to do what

21  you did?

22  A.    I -- after I had been an aerobic instructor for a while

23  and after I had received my personal training certification, I

24  was asked by two of the female rec officers that oversaw the

25  aerobics program to see if I was interested in teaching some of

1  the other BLAST instructors the next level of personal training

2  certification, and I agreed to do that.

3   Q.      Where did this aerobics activity and the BLAST activity

4  occur in the prison?

5   A.      In the recreation department in the gymnasium.

6   Q.      And you've heard previous testimony that the recreation

7  department and gym are close to the chapel and the barber shop.

8  Is that your recollection?

9   A.      Yes.

10   Q.      Karen, I want to ask you about visits with your family

11  while you were in prison.  During the years you were in prison,

12  did your family visit with you?

13   A.      Yes.

14   Q.      I want to specifically ask you about your daughter

15  Bryn, who is now 17, correct?

16   A.      Yes.

17   Q.      How often did Bryn come to visit you on average?

18   A.      On average, at least every other weekend in the regular

19  visiting room, and then we also did -- or we tried to do a

20  monthly PATCH visit.

21   Q.      Let me stop you there.  We're going to talk about PATCH

22  in a minute.

23          When Bryn came for the every-other-week visits, who

24  came with her?

25   A.      My husband.

1  Q.      Did any of your adult children visit you while you were

2  in prison?

3  A.      Yes.

4  Q.      How often would that occur?

5  A.      Sometimes they came with my husband.  Other times, they

6  came on their own.  I have -- my adult son, my oldest, is out

7  of state, so he wasn't able to come as frequently, but he did

8  anytime he was in town.

9  Q.      So let's talk a little bit about the PATCH program.  We

10  may hear more about that this week.  Do you know what PATCH

11  stands for?

12  A.      Parents with children, I believe, something similar to

13  that.

14  Q.      Tell the jury what that program does or what it is.

15  A.      It's really a wonderful program.  It's a program that

16  allows women to have visitation with their minor children in a

17  different atmosphere than the regular visiting room.  It's kind

18  of a one-on-one situation.  It was in what reminded me of,

19  like, a preschool classroom setting.  There were no clothed

20  guards around, which, you know, would make the kids

21  uncomfortable.  There was usually one to two PATCH

22  representatives, which were volunteer women from usually within

23  the Chillicothe area that would come in, you know, sit by, and

24  just help with your visit, help provide any toys, Crayons,

25  coloring, anything the kids wanted to do.

1   Q.     Did you get any special food during those visits?

2   A.     Yeah, they allowed us to order pizza, which is like

3 five-star dining.  And, of course, it always went over really

4 good with the kids.  So it was such a breath of fresh air.

5   Q.     And tell us again, how often did you try to arrange

6 PATCH visits with your daughter?

7   A.     As often as I could, at least every six weeks.

8   Q.     Okay.  You went into prison in 2011.  How old was Bryn

9 at the time you went into prison in 2011?

10   A.     I think she had just turned six.

11   Q.     So obvious question, but were those visits important to

12 you?

13   A.     Oh, absolutely.

14   Q.     Tell us why.

15   A.     Well, when I initially was arrested, I was in the -- I

16 was in the county jail for a couple of months, I believe, and

17 Bryn was very young.  She was a baby and really had no idea why

18 I was gone.  And I remember my husband bringing her into the

19 county jail, and there was no contact visits.  And she would --

20 she would bang on the glass and yell why I couldn't come home.

21        So when I was released -- prior to me being

22 sentenced, there was probably about a year that I was going

23 through the trials of being sentenced.  I tried very hard to

24 reassure her that I was going to be okay, knowing that I was --

25   Q.     Karen, I'm sorry to interrupt you.  We want to talk

1  about the time while you were in prison too.  I understand you

2  were out for a while.

3           But were those visits important to you from the day

4  you arrived at Chillicothe?

5  A.      Absolutely, because I had to reassure my daughter that

6  I was going to be okay and try to keep her life as normal as

7  possible at that point.

8  Q.      Karen, are you familiar with Edward Bearden?

9  A.      Yes.

10 Q.      How do you know Mr. Bearden?

11 A.      He was a guard at Chillicothe.

12 Q.      To your knowledge, was he a corrections officer or

13 guard at Chillicothe the entire time you were there?

14 A.      Yes.

15 Q.      Do you remember the first occasion or occasions when

16 you interacted with Mr. Bearden?

17 A.      I don't remember the exact date, but I know once I

18 was -- or came onto the Chillicothe prison, he was one of the

19 first guards that approached me.

20 Q.      Did he say anything to you?

21 A.      Yes, I was told that I looked out of place, and what

22 was I doing in a place like this.

23 Q.      Do you remember any other comments that he made in the

24 early days you were there?

25 A.      He flattered me.  He told me I was beautiful.  He told

1  me he liked my red hair.

2  Q.    Did he ever ask you, or comment about the work you were

3  doing, either as a tutor or a BLAST instructor?  I think you

4  said that first year it would have been tutoring, correct?

5  A.    Right.

6  Q.    Did he ever comment about your tutoring or what you

7  were doing?

8  A.    He seemed overly attentive, that I was tutoring and

9  that I was helping women with math outside of tutoring out in

10 the yard and, you know, bragged in front of them and me that I

11 was so intelligent about this math.

12 Q.    Karen, I want to talk to you about interactions with

13 Mr. Bearden and some categories.  And the first category I want

14 to talk to you about is anytime he may have touched you through

15 your clothing.  Do you understand what I'm saying?  Not

16 skin-to-skin touch, but through your clothing.  Okay?

17       Was there ever a time where Mr. Bearden did touch

18 you physically through your clothing?

19 A.    Yes.

20 Q.    On what occasions would that happen?

21 A.    During pat-downs when I left different buildings within

22 the prison.

23 Q.    Describe -- I'm sorry.  Describe for the jury what a

24 pat-down is.

25 A.    I guess similar to a little bit of what you might see

1    if you were selected, you know, at the airport, but it's with

2    their hands and not a wand.  So you stand with your feet

3    shoulder-width apart and your arms out, and they basically feel

4    under your arms, along the side of your body, in between your

5    legs.  Just supposed to be a brief pat-down to make sure that

6    you're not, I guess, carrying anything that you're not supposed

7    to be or -- you know.

8    Q.    At any point, did a pat-down by Mr. Bearden feel

9    inappropriate to you?

10   A.    The very first time he patted me down felt very

11   inappropriate.  I felt very violated.

12   Q.    Okay.  Can you show us what he did during that pat-down

13   and other pat-downs?

14        MR. AMMANN:  And, Your Honor, if I may, if I could

15   ask Miss Keil to stand.

16        THE COURT:  Yes, you may stand.

17   BY MR. AMMANN:

18   Q.    Please stand up.  And you're going to have to speak

19   loudly because you're further away from the mike.

20        THE COURT:  You can pull the microphone up.  Thank

21   you.

22   BY MR. AMMANN:

23   Q.    Karen, show for us what Mr. Bearden would do during a

24   pat-down.

25   A.    So I would hold my hands out like this, and he would

1  take his hands, hit under my armpits, touch the side of my

2  breast and go down my abs, and then brush off.  And then he

3  would take his hand and go between my legs.  Which they're

4  supposed to feel up your pant leg to some degree, but he would

5  hit my vagina with his hand.

6  Q.    You can have a seat.  Thank you.

7        Had you been patted down by other male guards at

8  Chillicothe?

9  A.    Yes.

10 Q.    Were you ever patted down in that manner by any other

11 guard?

12 A.    No.

13 Q.    At some point, did -- and I'm going to use the word

14 cross-gender pat-downs, and what that means is a male guard

15 patting down a female.  Do you understand what I'm getting at?

16 A.    Correct.

17 Q.    At some point, did cross-gender pat-downs become

18 improper at the prison and against the rules?

19 A.    Yeah.  I don't remember the exact date, it actually

20 caught me by surprise.  But I guess PREA stepped in and

21 disallowed men from patting down women, and I think there were

22 some -- some situations where they could, maybe emergency

23 situations, but it pretty much -- I mean, from the day it hit

24 camp, it was like just, boom, it just ended.

25 Q.    You mentioned PREA, and I think we'll hear more

1   testimony about that.  But generally, what are you referring to

2   when you say PREA?

3    A.     PREA is the organization that comes and, I guess,

4   audits the prisons to make sure they're following protocol.  It

5   stands for Prison Rape Elimination Act.

6    Q.     Karen, we're talking about Edward Bearden.  Do you see

7   him in the courtroom today?  Stand up if you need to.

8    A.     I think I'm going to need you to move.  Yes, I see him.

9    Q.     Can you point him out to us?  Tell us where he's

10  sitting and what he's wearing.

11   A.     He's sitting at the front of that table.  Has a beard.

12  I can't tell if that's a blue or black jacket, and a shirt.

13   Q.     Okay.  Anything else?

14          MR. AMMANN:  Your Honor, let the record reflect Miss

15  Keil has identified Mr. Bearden.

16          THE COURT:  The record will so reflect.

17          MR. AMMANN:  Thank you.

18   BY MR. AMMANN:

19   Q.     How many times would you say in these pat-downs when

20  they were still allowed would Mr. Bearden touch your breast and

21  vagina through your clothes?

22   A.     A minimum of at least ten times.

23   Q.     I want to ask you another category now.  Did

24  Mr. Bearden ever touch his penis against you through his

25  clothing?

1    A.      Yes.

2    Q.      Okay.  Can you describe when and how that happened?

3    A.      I was working at the recreation department in the

4    audiovisual room sitting at a desk.  I recall it being an early

5    morning, and I was the only offender at the time that was in

6    the room.  And he walked in and came behind me and put his

7    hands on my breast, and his erect penis was on my back.

8    Q.      Did he say anything to you at that time?

9    A.      I honestly don't recall.

10   Q.      Of the things we've talked about so far, did you report

11   those to anybody at the prison?

12   A.      No.

13   Q.      At some point, did Mr. Bearden ever touch you with his

14   hands anywhere on your body under your clothing?

15   A.      Yes.

16   Q.      Can you tell us about that incident or incidents?

17   A.      I recall at least twice where he pulled me into a room

18   within the housing unit outside of the wing that I was in and

19   grabbed my arm.  One incident, he stuck his tongue down my

20   throat; and another, he -- as I recall, it was the same thing,

21   but he put his pants -- he put his hands down my pants and

22   inserted his fingers into my vagina.

23   Q.      Did he say anything to you before, during, or after

24   either one of those incidents?

25   A.      One of those incidents -- I mean, I was so shaken and

1  wanted to get away that I abruptly remember going back into my

2  wing, and he followed shortly after and asked me if he had hurt

3  me.  And that was when I noticed -- the next day, I actually

4  had bruising on one arm that he had grabbed me with.  You could

5  really see the fingerprints.

6  Q.    Did you report that to the medical unit or to anybody

7  else?

8  A.    No, but I did have to report the bruising on my arm

9  because I was so fearful of going to the hole because something

10 like that, if another guard or faculty or anybody saw bruising

11 on the arm, they could probably come up with a hundred -- they

12 would question why I had bruising and fingerprints on my arm.

13 It was on my --

14 Q.    Did you report how you got the bruise?

15 A.    I basically got a -- Mr. Kavanaugh who at that time was

16 like, I guess, the rec director, to acknowledge -- I don't know

17 what their process is.  I told him it was an incident in the

18 exercise so that I wouldn't have to go to the hole.  I mean, I

19 did not tell him the truth.  I did not tell him what actually

20 happened, but I was trying to protect myself from going to the

21 hole.

22 Q.    And the incident where he put his hand down your pants

23 and inserted his fingers into your vagina that you just

24 described, did he forcibly restrain you?

25 A.    Yes.

1    Q.      In what way?

2    A.      He held my arm.

3    Q.      Can you describe the room and what it's used for where

4    these attacks occurred?

5    A.      That particular room is -- I don't know what it's

6    called, but it's the room where we on a weekly basis would be

7    summoned usually in the evening to pick up our uniforms that

8    had been washed on a weekly basis.

9            There's four wings within each housing unit, and I

10   recall usually after dinner, the guards would call in the

11   bubble, you know, like Wing A report, you know, to pick up your

12   laundry.  And we literally would just stand in a long line.

13   And this room was close to the caseworkers' offices, but I

14   really don't know the name, the particular name, but it had

15   shelves in it, and all the offenders' uniforms were folded and

16   they were all in alphabetical order.

17           It was also the same room where they stored, from

18   what I could see, it looked like some mop supplies and rags and

19   probably some of the less harsh chemicals for the cleaning

20   crews.

21   Q.      Did you notice if there were any cameras in that room?

22   A.      There was not a camera in that room.  There was a

23   gigantic, like, old, like, mirror they used to see in the old

24   days.  I mean, everything is so technically savvy now.  But it

25   was a large mirror, and it was positioned -- if you walked in

1  the room, it was positioned on the left-hand side, upper

2  ceiling, just a big large mirror.

3  Q.     Were there other rooms in the housing units that were

4  called laundry rooms, other than the one you were describing?

5  A.     Yeah.  I mean, every wing -- there were four wings in a

6  housing unit.  Every wing had its own laundry room.

7  Q.     Is that where offenders could go to do their laundry?

8  A.     Yeah, it was within your housing wing and, you know,

9  there were two washers, two dryers.

10  Q.     In earlier statements, including your deposition, you

11  referred to the two incidents you just talked about as being in

12  the laundry room.

13  A.     Yes.

14  Q.     Were you talking about the laundry room where the

15  offenders do their washing and drying?

16  A.     No, I was talking about the laundry room where all the

17  laundry was stored and that we picked up on a weekly basis.

18  And -- yeah.

19  Q.     Since you're not sure what it was called, I mean, could

20  we distinguish the two by saying there's the laundry room where

21  the offenders did their wash, and the other room could be

22  the -- could we call it the uniform room?

23  A.     Yeah, that makes more sense.

24  Q.     Were there other times you were sexually assaulted by

25  Mr. Bearden by his hands being on you, either inside your

1  vagina or other parts of your body?

2  A.     Yes.

3  Q.     Approximately how many sexual assaults were committed

4  with his hands?

5  A.     At least 10 to 12.

6  Q.     Okay.  At any point, did Mr. Bearden expose his penis

7  to you?

8  A.     Yes.

9  Q.     What, if anything, did he do with his penis?

10  A.     Are you referring to the rapes?

11  Q.     You describe what happened.

12  A.     He took me back to another room within the housing

13  unit, past the uniform room that was past the caseworkers and

14  past the IPOs, which is an in-house parole officer that worked

15  with offenders from time to time.

16          There were several rooms back there.  They

17  weren't -- they weren't -- I don't know specifically the names

18  of the room.  The room he took me to had similar shelving as

19  the uniform room.

20  Q.     Could you tell what that room was used for?

21  A.     Well, from what I could see, I saw everything from

22  offender televisions, lamps, stuff that you would normally see

23  in individual cells or rooms, and there were also tons of

24  storage bins from offenders, each --

25  Q.     Karen, in your experience being at the prison, were

1  there times when offenders' property had to be placed somewhere

2  other than their cell?

3   A.     Yeah.  When an offender was out on a medical call, they

4  were leaving the prison for a medical, leaving prison maybe for

5  a court appearance, or maybe somebody was sick and they were in

6  the hospital part of the prison, if you were going to be gone

7  for an extended period of time, your two bins that you kept in

8  your room under your bunk bed would be put in that storage area

9  for safekeeping.

10  Q.     Did Mr. Bearden ever escort you to that room for that

11  purpose, to either place or retrieve the property of other

12  prisoners?

13  A.     Yes, he did.

14  Q.     How often would that occur?

15  A.     Well, as time went by, I didn't actually retrieve or

16  take any bins or equipment down there, but the initial few

17  times, it was like in -- you know, a guise to pick -- to either

18  take somebody's tote down there -- that's what they were

19  called, the storage bins, we called them totes -- or to

20  retrieve and bring them back.

21  Q.     So did -- the first time you went to that room with

22  Mr. Bearden, what happened?

23  A.     He gave me a directive to follow him down.  I didn't

24  know at that time that we were going to that room.  He just

25  motioned me to come to him.  You know, if a guard gives you

1    that sign or tells you it's a directive, you have to follow it.

2    And I followed him through those doors, the initial doors,

3    walked past the caseworkers' offices, and then went around the

4    corner again.  And there's more, like, conference rooms,

5    there's other counselor or the IPOs' offices, and we went back

6    to that far room where that equipment was at.

7    Q.    Tell us what happened in that room.

8    A.    He followed me in that room, and he pushed me over the

9    table, and he raped me.

10   Q.    I'm sorry I'm going to have to do this, but I need to

11   ask you for the details of exactly what he did.

12   A.    He unzipped his fly and exposed his penis, and he

13   pulled me over a table, and he raped me.

14   Q.    Did he stick his penis in your vagina?

15   A.    Yes.

16   Q.    Did he do that from the front of you or from behind?

17   A.    From behind.

18   Q.    Did he say anything while this was happening?

19   A.    He said several things throughout the different times

20   that he raped me.

21   Q.    We'll get into that in a minute.  Let's just talk about

22   the initial one, and then we'll talk about other attacks.

23         Do you have information or evidence that led you to

24   believe he ejaculated inside of you?

25   A.    Yes.

1   Q.      Tell us what evidence you have of that.

2   A.      Because it was wet, and he wiped himself off, and it

3   smelled.

4   Q.      Smelled like ejaculation?

5   A.      Yes.

6   Q.      Did you see what he used to wipe himself off with?

7   A.      It was either a tissue or a rag that he used and that

8   he had on him.

9   Q.      So whatever he used he had with him when he came into

10  the room?

11  A.      Yes, I believe so.

12  Q.      And did he give you anything to wipe yourself off with?

13  A.      I don't recall that.  He might have.  I don't recall.

14  Q.      Did this type of attack occur any other time?

15  A.      Yes.  It occurred many times while I was incarcerated.

16  Q.      Approximately how many times -- well, let me ask you

17  this.  Were all of the attacks that were rapes, did they all

18  occur with Mr. Bearden entering your vagina from behind you?

19  A.      Yes.

20  Q.      Approximately how many times were you raped by

21  Mr. Bearden?

22  A.      At least 20.

23  Q.      You described this property room, for lack of a better

24  term, where things were stored where you were raped.  Were you

25  raped in the same property room every time, or were there

1  different property rooms?

2  A.      I was raped in the same room, but in different housing

3  units.

4  Q.      So the jury understands, are you saying that each

5  housing unit has the same layout?

6  A.      Yeah, their layouts are identical.

7  Q.      Do you remember which housing units you were living on

8  when these rapes occurred?

9  A.      6 and 7, mainly.

10 Q.      After any attack, did he say anything to you about

11 cleaning up or taking a shower?

12 A.      Yeah.  He told me to go clean up.  The first initial

13 times, he followed me into the actual wing to make sure that I

14 was going to the showers.

15 Q.      He followed you to the shower?

16 A.      The showers are within the housing wings, but they're

17 like -- in the area, there's, I don't know, four or five of

18 them together.  So he would just follow me into the wing to

19 make sure I went back to my wing and told me to take a shower.

20 And there were occasions that he -- I mean, I could see his

21 feet, so he was close enough while I was showering to know that

22 he was standing there to make sure that I was cleaning up.

23 Q.      Did you ever see Mr. Bearden at any time in a position

24 where he could watch you take a shower?

25 A.      Yes.  On many occasions, I would be in the shower --

1  and each wing had an upstairs, and those showers had doors that

2  were viewable to a certain level on the bottom and viewable

3  from top level, so it was just like a -- it just covered, I

4  don't know, a standard size.  So if you were short like me or

5  tall, you were really kind of at a disadvantage.  And he sat or

6  he stood on that upper level and looked down.  I mean, I could

7  see him completely, so I knew he could see me.

8  Q.      Did Mr. Bearden's actions ever cause you any physical

9  pain or injury --

10 A.      Yes.

11 Q.      -- while you were at the prison?

12 A.      Yes.

13 Q.      Can you describe what pain or injury you believe you

14 had?

15 A.      Just -- just the forcefulness and just being raped

16 was --

17 Q.      Did you have pain --

18 A.      -- very uncomfortable.

19 Q.      Sorry.  Did you have pain during the attack?

20 A.      Yes.

21 Q.      Did you have pain after the attack?

22 A.      Yes.

23 Q.      Where was the pain?

24 A.      My vagina.

25 Q.      Did it cause you any problems with bodily functions?

A.      Yes.  I had pain while urinating, and I had discomfort

for days after, which was very difficult teaching classes and

even walking.

Q.      Did you have any issues after the attacks with

nighttime, using the bathroom?

A.      I had nightmares at night.  I mean, being in prison,

there's a lot of noise, and you kind of get desensitized to all

of the door-slamming and guards walking and keys clinking.  But

every time I heard a loud noise, I would wake up in a panic

that he was at my door.

Q.      Did you have any issues with bed-wetting while you

were --

A.      Yeah.  I mean, it's humiliating, but, yes, I woke up,

and I had wet my pants on many occasions because I woke up so

terrorized that it was --

Q.      Did you have a problem with bed-wetting before you went

to prison?

A.      No.

Q.      During which years -- so you were in Chillicothe from

2011 to 2017, correct?

A.      Yes.

Q.      During which of those years did these rapes occur, if

you remember?

A.      2011 to 2016, maybe.

Q.      Did they occur almost to the time you were released?

1  A.     Yes.

2  Q.     Because you were released in early 2017; is that right?

3  A.     Yeah, February, I believe.

4  Q.     Did Mr. Bearden's actions ever cause you any emotional

5  harm, stress, anything other than the physical pain?  Any

6  emotional harm that you felt?

7  A.     I was -- I mean, prison is not a fun place.  I totally

8  agree.

9  Q.     And I didn't mean to gloss over the nightmares, so I

10  understand about the nightmares, but were there other emotional

11  things?

12  A.     Yeah, I lived in constant fear.  I mean, on top of

13  being incarcerated, which was my fault, I take full

14  responsibility, but I lived in constant fear of this man being

15  around.  The anxiety and stress I lived, I don't know how I did

16  it.  I don't know how I did it.

17  Q.     Karen, I want to ask you another series of questions.

18  Did you understand what type of corrections officer Mr. Bearden

19  was?  And, by that, I mean what his assignments were.

20  A.     I mean, I had some general -- just common sense, you

21  could -- you know, I know sometimes he was on different shifts,

22  or I saw throughout the years that I was incarcerated that he

23  was working different shifts.

24  Q.     Do you know if there was a title to the type of officer

25  he was?

1  A.     Not really.  I just thought he was a corrections

2  officer.  He was what I called a blue shirt.  A blue shirt was,

3  I think, just a standard prison guard.

4  Q.     Because the white shirts are the guys --

5  A.     The white shirts were the higher-ups.  It sounds kind

6  of -- but, I mean, I never understood the CO I or CO II thing,

7  I just know that he was in a blue shirt, and I would see, you

8  know, white shirts out in the yard.  There were less of them,

9  and they seemed to be the ones that gave direction to the blue

10 shirts.

11 Q.     Did he ever indicate to you that he was a utility

12 officer?

13 A.     Yeah.

14 Q.     What was your understanding of what utility officers

15 did?

16 A.     I think they were just kind of jack-of-all-trades.

17 They would go wherever they were needed.

18 Q.     Did you ever see Mr. Bearden in more than one building

19 during a given day?

20 A.     Oh, yeah, absolutely.

21 Q.     Give us an example of a day where you saw him in more

22 than one place.

23 A.     Well, I mean, I would be in recreation, and he would

24 come into recreation, and yet it didn't seem like he was there

25 all day.  And then I would leave recreation, and he would be

1 down the hall in the same building hanging out by the barber

2 shop. And then I would walk out of recreation, either to

3 attend chow or maybe go back to my wing, and he would be out in

4 the yard. So I mean --

5 Q. In the times you saw Mr. Bearden at the prison, did you

6 see any supervisor within eyesight of him supervising him?

7 A. Yes.

8 Q. How often would you see that? Was it all the time, I

9 guess, is what I'm asking.

10 A. Yeah, I mean, you always saw a white shirt somewhere,

11 you know, especially out in the yard. I mean, I remember

12 always seeing a white shirt and you would see, you know,

13 several blue shirts out there in the yard. The yard is a big

14 place.

15 Q. Did a white shirt go into the property room with

16 Mr. Bearden?

17 A. No.

18 Q. Okay. So were there any white shirts around when any

19 of these attacks occurred?

20 A. No.

21 Q. Are there any verbal comments Mr. Bearden made to you

22 that we haven't discussed already, either during the attacks or

23 separate from the physical attacks? Did he say anything about

24 your anatomy, for example?

25 A. He made frequent comments about my breasts, my

1    buttocks.  He asked me about the color of my pubic hair, if it

2    was the same as my red hair.  He was raping me once and told me

3    that he had --

4    Q.     Let me ask you a question if that helps you, okay?

5           Did Mr. Bearden ever mention his wife during any of

6    these attacks?

7    A.     Yes, he --

8    Q.     What did he say about his wife?

9    A.     That when he was fucking her, he was thinking of me.

10   Q.     Were those his words?

11   A.     Yeah.  Well, he used the F word.  I don't remember a

12   quote, the exact quote, but he --

13   Q.     Did Mr. Bearden ever come to find you while you were

14   working in the recreation building?

15   A.     Yes.

16   Q.     How often would you say you saw him in the recreation

17   building?

18   A.     I don't know that I can really say, but he --

19   Q.     Occasionally, frequently?

20   A.     I would say he was there frequently.

21   Q.     Did he ever make any comments to you while he was

22   there?

23   A.     Yes.

24   Q.     What did he say?

25   A.     I was teaching an aerobic class, it was a lower-body

1  class where we did squatting, lunges, anything that worked the

2  lower body.  And after class, he came up and asked if I would

3  sit on his face.

4              Another time, I was running on the treadmill.  There

5  were five or six of them lined up, and he literally walked

6  between the treadmill and made a comment about my breasts

7  moving while I was running.

8              He also made comments about -- to make sure I didn't

9  get too muscular, I didn't get too many muscles on me from

10 working out, that it wouldn't look good.

11 Q.     I want to go back to the rapes and the other sexual

12 assaults.  In any of those instances, did you consent to the

13 actions of Mr. Bearden?

14 A.     No, absolutely not.

15 Q.     Were there any instances where you tried to resist or

16 push him away?

17 A.     I always tried to keep myself as far away from him as I

18 could.

19 Q.     Were you successful?

20 A.     Not always.  I mean, sometimes you just -- you have to

21 be at a certain area.

22 Q.     I'm talking about the rapes now and the sexual

23 assaults.  During those attacks, did you ever try to push him

24 away?

25 A.     I tried to close my body off as much as I could, but I

1  was in a position where I couldn't do anything.

2    Q.    We asked you about some of the earlier attacks, but on

3  any of these rapes or sexual assaults, did you report to

4  anybody at the prison initially?

5    A.    Not initially.

6    Q.    At some point, did you report to someone?

7    A.    Yes, I did.

8    Q.    And who did you report Mr. Bearden's attacks to?

9    A.    I reported it to a mental health professional.

10   Q.    Would it be like a counselor?

11   A.    Yeah.

12   Q.    So let's just make it clear.  The prison provides

13  medical care for physical needs, right?

14   A.    Right.

15   Q.    And there's a mental health unit, or tell us what it's

16  called, but that provides mental health counseling; is that

17  right?

18   A.    Right.

19   Q.    And how did you get an appointment with a mental health

20  counselor?

21   A.    There's just a request that you fill out.  It's the

22  same for -- I believe -- it's been a long time since I've seen

23  one, but I believe it's the same form, and you either mark that

24  you are requesting a medical appointment or a mental health

25  appointment, and I think even dental appointment was on there,

1  they provided.

2  Q.      So you requested an appointment with the counselor?

3  A.      Right.

4  Q.      Did you tell this counselor about what Mr. Bearden had

5  been doing to you?

6  A.      Yes.

7  Q.      Did you go into detail with the counselor about what he

8  did?

9  A.      Enough for him to know I was being raped, yes.

10 Q.      After you reported to the counselor, did Mr. Bearden

11 continue to rape you and sexually assault you?

12 A.      Yes, he did.

13 Q.      Did the assaults, the rapes stop at any time until

14 shortly before you left?

15 A.      No, they did not, until I left.

16 Q.      While you were at the prison, you started to talk about

17 this I think a minute ago, did you do anything to stay

18 physically out of view of Mr. Bearden or out of places where he

19 might be?

20 A.      I immersed myself in every activity that I could do

21 while I was incarcerated.  I took every class I could think of

22 that they offered that I qualified for, which I don't really

23 know of any that I didn't qualify for, other than, you know, I

24 wasn't interested in any of the technical school.  But I did

25 all of the classes, ICBC, they offer a lot of mental health

1  classes.

2  Q.      So you kept yourself busy.

3  A.      Yeah.  I mean, I just tried to stay out of my housing

4  unit.

5  Q.      Did you change any meal patterns because of

6  Mr. Bearden?

7  A.      I skipped a lot of meals because of Mr. Bearden

8  because --

9  Q.      Why is that?

10  A.      Because I didn't want that pat-down.  And even after

11  the pat-downs were no longer allowed, the officers were still

12  allowed to come up and check -- if you had a jacket or

13  something on in the winter months, they could ask for your

14  jacket and go through your pockets and stuff.  But they could

15  still be there when you walked out of chow or recreation and be

16  right in front of you and, you know, ask you questions and

17  stuff.  So it was still stressful because he was still in a

18  position to be that close to my face and say things to me that

19  just were that much more stressful.

20  Q.      So Karen, at any point, did Mr. Bearden ever indicate

21  to you that he knew what house you were going to be living in?

22  A.      He always knew where I was at.

23  Q.      How do you know that?

24  A.      Because he always made a point of trying to get on that

25  house.  He went so far as to tell me about positions that were

1    open and that he was trying to get on specific houses that I

2    was on.

3    Q.    Did he ever express to you that he was upset that you

4    would be moved --

5    A.    Yes, I --

6    Q.    -- to his knowledge?

7    A.    -- on several occasions tried to move from a particular

8    house, and it was not a guaranteed process.  You would have to

9    go to your caseworker, ask for a move.  You had to be in good

10   standing.  You couldn't have violations or be wanting to move

11   to a house that you possibly had an issue with, you know, a

12   friend or an enemy that would cause trouble.

13         So I went in and put a request to move to Housing

14   Unit 8 towards the end of my incarceration.  And I didn't know

15   that I was at the end of my incarceration, but I put a move in

16   to Housing Unit 8.

17   Q.    And what happened?

18   A.    You don't find out until the last minute that you got

19   it.  So right before dinnertime, they announced the names, and

20   they told me, "You're moving to Housing Unit 8, so they want

21   you to report after chow."  To pack your stuff up and get ready

22   to move and --

23   Q.    And, Karen, I want you to get directly to what

24   Mr. Bearden did in response to that.

25   A.    Well, I packed up and moved.  And as I was walking out

1   of Housing Unit 7 to 8, he was on the walk, and he was just

2   beside himself that I had moved to 8-House without informing

3   him.

4   Q.      Another category of questions, Karen.  Did Mr. Bearden

5   ever contact you in any written form while you were in prison?

6   A.      Yes.  I received two cards that I recall from him while

7   I was incarcerated.

8   Q.      Do the rules at the prison allow for guards to send

9   mail to you, to prisoners --

10  A.      No.

11  Q.      -- at Chillicothe?

12  A.      No.

13  Q.      Tell us about the first card.  Describe the envelope

14  first of all.  What was on the envelope?

15  A.      It was addressed to me, Karen Backues.  It had my DOC

16  number.

17  Q.      What was the return address?

18  A.      It just -- the name was George, no last name, and the

19  address was just Chillicothe, Missouri, the same ZIP Code.

20  Q.      Do you know anybody named George in Chillicothe?

21  A.      No.

22  Q.      What was the -- was there anything on the outside of

23  the card?  Was it some type of card?

24  A.      It was just like a regular greeting-card type.  I mean,

25  I don't remember if it was a specific brand, but it was a

1  greeting card.

2  Q.    Was there a preprinted message on the inside?

3  A.    Yeah.  It was a valentine card.  I don't remember what

4  the preprinted message was.

5  Q.    Was there any handwritten message?

6  A.    Yeah.  It was like "love" or "love always" or

7  something.  I don't recall the specifics of it.  The card did

8  have, I can't remember if it was puppy dogs or kittens.  There

9  were two, some kind of animals on the outside of it.  It was

10 essentially a Valentine's Day card.

11 Q.    How do you know that card came from Mr. Bearden?

12 A.    Because he asked me if I got something special, and he

13 did on both occasions that I got two cards.  So I knew it was

14 from him.

15 Q.    And did he ask you close in time to the time you got

16 the card?

17 A.    Yeah, just a couple of days.

18 Q.    Describe the second card.  What was the envelope like?

19 A.    The same thing.  George, Chillicothe, Missouri.  My

20 name, my DOC number.

21 Q.    What about the inside?

22 A.    I don't -- it was not a card specific to a holiday, it

23 was just like one of those feeling cards, love cards, whatever.

24 Just another generic-type greeting card.

25 Q.    Did you keep those two cards?

1  A.     I did for a while.

2  Q.     And then what happened to them?

3  A.     I came home one day from the recreation department, and

4  my roommates and I were standing out -- I tried to get in the

5  room, and my roommates were standing outside of the room, and

6  they looked at me and said that the guard was going through my

7  locker.

8         So when I went up to the door, it's a steel door

9  with, like, a plexiglass window, I saw an officer sitting

10 there, and he was literally going through my brown folder that

11 had all of my correspondence from family and friends, and he

12 was reading my letters.

13        Nothing was ever said, but after that, I ripped

14 everything up.  I was totally fearful that I -- that someone

15 speculated or knew something and that they were -- I was going

16 to go to the hole, and I didn't want any kind of evidence.

17 Q.     Karen, did Mr. Bearden ever ask you to contact him in

18 any other manner?

19 A.     Yes, he did.

20 Q.     And you heard Miss George testify that Mr. Bearden gave

21 her a phone number.  Did he ever give you a phone number to

22 call?

23 A.     He routinely told me he was going to get a telephone,

24 and because he wanted to stay in touch with me during his off

25 days.

1  Q.      Did he ever give you the number?

2  A.      No.   Towards the end of my stay while I was on 8-House,

3  he kept approaching me and trying to give me his number, asking

4  me if I wanted to write his number down before I left.

5  Q.      And did you write it down?

6  A.      No.

7  Q.      Karen, do you know if Mr. Bearden knew you had a minor

8  child?

9  A.      Yeah, I knew he knew.

10  Q.      How did Mr. Bearden know you had a child?

11  A.      Because of his utility status, I had several visits

12  where he was actually one of the guards on the visits.  So I

13  know he saw my husband, he saw my minor child.  I even had an

14  adult child with a newborn, my first-born grandbaby that came

15  for a visit that day.  And they were all present, and he ruined

16  my visit because he walked around the whole time and stared at

17  my family and me.  I mean, visits three or four hours long, you

18  get some solace and, you know, talk with your family, and he

19  was there.

20          Another incident, I had had a PATCH visit.  That

21  visit is outside the normal visiting room.  It's the classroom

22  setting I talked about.  And in that little classroom setting,

23  there was a little outside area that had a chained-in outside

24  area that had a picnic table and a basketball court.  And I

25  would routinely go out there with my daughter, and we would eat

1  our pizza out there on nice weather.  And one day, he was

2  sitting in a car flashing his lights directly at my child and

3  I, and my daughter even asked who was that.  And it was

4  Bearden, who was obviously on some kind of a perimeter detail

5  in one of the Chillicothe cars, and he was driving around, and

6  he was able to park in a position just above where that little

7  yard was at where we were sitting and could see full view of my

8  daughter and I out there eating our pizza.

9  Q.     Okay.  Thank you, Karen.

10         Did Mr. Bearden ever say things indicating to you

11 that he knew when your sentence was over or when your parole

12 date was coming up?

13 A.     He knew I had gone to the parole board the first time.

14 My first visit to the parole board, it took like four or five

15 months to get my answer back.  So he routinely was asking me

16 about what my answer was.  And then when I got my answer back,

17 I mean, I told him, I said, "I have another parole hearing in

18 two years," and he routinely made reference to that.

19 Q.     Karen, other than the report to the mental health

20 counselor, after that, did you -- and you said the attacks

21 continued.  Did you report to anybody else after that?

22 A.     Not while I was incarcerated.

23 Q.     And why not?

24 A.     I was petrified of going into the hole.  I would have

25 lost all of my aerobic-instructing responsibilities and duties.

I would have lost all of my visitation. I was actively
involved in 4-H Club and the PATCH Parenting Club, and I would
have lost all of that, and I could not fathom not being able to
see my daughter. It would have -- I don't know that I could
have survived without seeing my family.

Q.    While you were in prison, were you afraid of
Mr. Bearden?

A.    Yes.

Q.    Are you afraid of him still today?

A.    Yes.

Q.    I want to ask you about how you're doing today. Do you
still have effects, either physically or emotionally, of the
attacks by Mr. Bearden?

A.    Yes.

Q.    Can you describe what those effects are?

A.    I'm -- I kind of consume myself with just staying busy
to the point to where I try not to think about the situation.
It's very difficult for me to be emotionally -- to physically
hug my daughter and my husband. I'm kind of -- you can see me
and say that I'm cold or I'm kind of within myself, but it's
kind of how I function.

Q.    Let's be specific. Now, you mentioned your husband.
How has what happened affected your relationship with your
husband?

A.    Well, I thank God every day that I have a husband that

1  has been supportive of me, but we have a very, very limited

2  physical relationship because I have a very rough time trying

3  to separate the relationship with my husband from what I

4  endured with Mr. Bearden.

5  Q.      What about your relationship with your daughter?  Does

6  it affect that still today?

7  A.      Yeah, it's hard for me to hug her.  I love her to

8  death, she's such a great kid, but I just feel at times that I

9  just need my little glass shelf around me as protection.  And

10  she's aware of that, she's older now, and we work through it,

11  but it's --

12  Q.      What, if any, symptoms do you have emotionally that you

13  haven't already described?

14  A.      I have a lot of anxiety.  I have a lot of what they

15  call hypervigilance, so I am always looking for something out

16  of the darkness.  I'm worried about being home alone and

17  someone getting into the house.  I have night terrors.  I dream

18  horrible things at night.  I still dream about waking up and

19  feeling like I have him looking literally right at me.  I wake

20  up frequently and look at the wall to make sure that I'm not in

21  prison anymore.  I look for that cinder block that our rooms

22  were constructed of.

23  Q.      Karen, do you remember anything specific to this day

24  about Mr. Bearden's appearance or the way he smelled?

25  A.      He wears a certain cologne that I don't know the name

1  of it.  It's extremely strong, and it was something that during

2  the attacks that was just very real in my mind.  And I came

3  across it once I had been released, and it just sent shivers

4  down my spine.  I mean, I literally wanted to curl up in a ball

5  and just hide.  It was just almost like a trigger.

6  Q.      Karen, I want to move on to another category of

7  questions about how you know the other three women at the

8  table, the other plaintiffs.  Have you at any time talked to

9  the other three plaintiffs about your specific allegations?

10  A.      No, I've never talked to them about my civil complaint.

11  Q.      Have they ever talked to you about the details about

12  what happened to them?

13  A.      No.

14  Q.      What information, if any, did you provide to the -- to

15  Miss Zieser, Miss George, and Miss Betz?  If anything.

16  A.      The only thing I gave to Amy was your telephone number,

17  and she actually contacted me through a mutual friend.  And

18  honestly, when she said her name, I knew the name, but I didn't

19  know the face.  I came into so much contact with women teaching

20  aerobic classes, I was more apt to recognize the name than the

21  actual face, until she made a comment about thanking me for

22  helping her lose all that weight.  Then I remembered who she

23  was physically.

24          But she just called me and told me, "It happened to

25  me too."  And I kind of froze, and I said, "Don't tell me

1  anything, I don't want to know," and I gave her your number.

2  Q.    Were you close friends with any of these three women

3  while you were in prison?

4  A.    I would say the one that I probably knew a little

5  better was Lynnsey.

6  Q.    Did you at any time tell these three women what they

7  should say in a lawsuit or in court today?

8  A.    No, absolutely not.

9  Q.    Did any of the three of them talk to you about what

10 they were going to say or about what you should say?

11 A.    No.

12 Q.    Almost home.  Let's talk a little bit about work.  What

13 generally -- what general kind of work did you do prior to

14 going to prison?

15 A.    Accounting, HR, human resources.

16 Q.    Okay.  Since you've left prison, have you been able to

17 go back to that type of work?

18 A.    No.  I mean, I'm accepting the fact that having a

19 felony conviction will prevent me from ever working in my field

20 again.

21 Q.    Are you working anywhere now for pay?

22 A.    I work primarily as a baby-sitter and house cleaner.  I

23 have a few families that I've come to know since I've resided

24 in Georgia.  And, I mean, they pay me to baby-sit, I watch

25 their pets when they go on vacation.  I'm a big animal lover.

1  And I clean houses, and it kind of works good with my

2  propensity for wanting to stay busy all the time.  If I stay

3  busy and keep my mind focused on doing stuff and doing stuff to

4  help people, it makes me feel better and worthy.

5  Q.      Do you feel like you're getting better since you left

6  prison?

7  A.      Oh, absolutely.  I couldn't -- five years ago, I could

8  not have sat up here and talked to you guys.  And it's still

9  very difficult, but I am so much better.  I have a wonderful

10  therapist.

11  Q.      It's even harder when I keep cutting you off, right?

12  A.      Yeah.  I'm sorry.

13  Q.      Sorry.  Are you getting any professional help?

14  A.      I have been seeing my therapist now for over three

15  years, and I --

16  Q.      What is your therapist's name?

17  A.      Her name is Ginger Hubbard.  I call her GiGi.

18  Q.      And is she in Georgia where you are?

19  A.      Yeah, she's in Georgia.

20  Q.      And do you feel that the therapy has been successful?

21  A.      Oh, yeah, absolutely.

22  Q.      Do you think -- is it your understanding you'll need

23  more therapy, however?

24  A.      Yeah, I know I will, but I'm accepting of that.  And

25  I'm comfortable enough with her that, you know, I've been able

1  to say things that I couldn't say for years, or come to terms

2  with accepting about myself for years.  And she's probably the

3  only person that I don't feel like I have to prove something to

4  or that I have to make excuses for thinking that I'm not good

5  enough.

6  Q.    Are you taking any medication for mental health issues

7  right now?

8  A.    Yeah, I'm on -- just right now, I'm on Lexapro.  I was

9  on some other stuff early on when I started therapy with her,

10  but I no longer need that.  She's given me some different

11  coping tools that, you know, really make a difference, and I

12  don't want to be on a whole bunch of medicine because it

13  just -- you know, even though it works, sometimes it still kind

14  of makes you feel a little off.

15  Q.    Since you're doing better, what's the dream?

16  A.    What's the dream?

17  Q.    What do you want to be doing next year, two years from

18  now?

19  A.    I've kind of gone from one extreme to the next.  I

20  think a couple years ago, I seriously considered going to

21  school and getting my law degree and working with this --

22  working for individuals that have suffered some of the trauma

23  that I have.  But I think, given my age and now that I have

24  five grandbabies, I'd like to spend a little bit more time

25  with -- I really want to make a difference.  I want -- would

1  like to educate some of the people outside in society to have a

2  better feel of what being locked up is like, and how we as

3  society can better serve men and women who have been locked up,

4  and helping them re-enter into society.  But my dream --

5  Q.       Have you -- sorry.

6  A.       I'll make it quick.  I talked about PATCH Parenting.

7  That organization was so instrumental in the stability of my

8  family and my daughter during my years of incarceration, that I

9  really would like to be able to start a PATCH organization

10  within a Georgia women's prison, and that's what I really am

11  going to try to focus on here in the next five years.

12          MR. AMMANN:  Your Honor, I have one or two questions

13  left, but could I take a small break to confer with co-counsel?

14          THE COURT:  Yes.

15          MR. AMMANN:  Thanks.

16          (So done.)

17  BY MR. AMMANN:

18  Q.       I hope it's my last question.  I never want to say that

19  because you never know.

20          Do you know the date that you filed the lawsuit

21  against Mr. Bearden?

22  A.       I don't know the exact date.  It was in -- I believe in

23  March of '18, 2018.

24  Q.       Okay.

25  A.       I was released in February of '17.  It was -- yeah --

1  Q.      Do you have a red binder up there somewhere?

2          MR. AMMANN:  Can I approach the witness, Your Honor?

3          THE COURT:  Yes.

4          MR. AMMANN:  I thought we had one up there.

5          THE COURT:  It may be on the floor.

6          MR. AMMANN:  Oh, it's on the floor.  Sorry.

7  BY MR. AMMANN:

8  Q.      Karen, if you could look at that binder and look at

9  Tab 1.  Do you see Tab 1, the document there?

10  A.      Yes.

11  Q.      Does that appear to be the lawsuit you filed?

12  A.      Yes.

13  Q.      And do you remember the specific date your lawsuit was

14  filed?  Without looking at that document, do you remember the

15  specific date, for sure, without looking at that?  Don't look,

16  I just wanted you to find it.  Do you remember the exact date

17  you filed?

18  A.      I don't remember it.

19  Q.      Okay.  Would looking at the actual lawsuit refresh your

20  memory?

21  A.      Okay.  May 29th of 2018.

22  Q.      So you think that's the date it was filed?

23  A.      Yeah.

24          MR. AMMANN:  Okay.  That's all I have, Your Honor.

25          THE COURT:  Why don't we go ahead and take our lunch

1  break before we turn to cross-examination.  We will take an

2  hour break, although if an hour yesterday wasn't enough, given

3  the fact that we don't have that many close restaurants around

4  here, let Shauna know, and we can extend that break, if

5  necessary.  Unless we hear that you need a longer break, we'll

6  come back in at 1:20.

7          During this break, don't discuss this case, don't

8  permit the case to be discussed in your presence.  Do not do

9  any type of research on the internet or otherwise regarding the

10 case.  Please keep your mind open from any outside information,

11 and we will be in recess for approximately one hour.

12         (The following proceedings were had in the courtroom

13 out of the presence of the jury:)

14         THE COURT:  Is there anything that I can take up

15 before we resume this afternoon?

16         MR. TAULBEE:  Nothing from the defendants, Your

17 Honor.

18         THE COURT:  Anything on behalf of plaintiff?

19         MR. ROEDIGER:  No, Your Honor.

20         THE COURT:  If we hear otherwise that they -- I

21 meant to have Shauna ask them beforehand, and I forgot.  But if

22 we hear that they need more than an hour for lunch, we'll let

23 Shauna know.  But if you don't hear anything, assume that we

24 come back in at 1:20.

25         (A recess was taken from 12:23 p.m. to 1:26 p.m.)

1          THE COURT:  Are we ready to bring the jury back?

2          MR. TAULBEE:  Yes, Your Honor.

3          THE COURT:  Why don't we go ahead -- Miss Keil, if

4   you could take the witness stand before we bring them in.  And

5   thank you very much for agreeing to sit there, I appreciate it.

6          And then we're going to move to Miss Dean after

7   this, correct?

8          MS. McGRAUGH:  Yes, ma'am.

9          THE COURT:  And you're ready to begin your

10  cross-examination?

11         MR. TAULBEE:  I am.

12         (The following proceedings were had in the courtroom

13  in the presence of the jury:)

14         THE COURT:  Mr. Taulbee, are you ready for

15  cross-examination?

16         MR. TAULBEE:  Yes, Your Honor.  May it please the

17  Court.

18         THE COURT:  You may proceed.

19                            - - -

20                     CROSS-EXAMINATION

21   By Mr. Taulbee:

22   Q.      Good afternoon, Miss Keil.

23   A.      Good afternoon.

24   Q.      You've testified that Mr. Bearden raped you 20 times,

25   approximately --

1    A.      Yes.

2    Q.      -- while you were at Chillicothe Correctional Center?

3    A.      Yes.

4    Q.      Additionally, you testified that Mr. Bearden sexually

5    assaulted you ten to twelve times; is that right?

6    A.      Yes.

7    Q.      And since you've been out of prison, the trauma has

8    affected your memory; is that correct?

9    A.      Yes.

10   Q.      You have a hard time putting things in sequence?

11   A.      I don't think so.  I don't know.

12   Q.      Do you remember things that feel to you like they

13   happened yesterday?

14   A.      I'm sorry, what?

15   Q.      Remembering things that feel to you like they happened

16   yesterday.

17   A.      Remembering things -- I didn't hear that one word.

18   Q.      That feel to you like they happened yesterday.

19   A.      Yes.

20   Q.      That's what you mean when you've noticed the trauma

21   affecting your memory?

22   A.      To some degree, yes.

23   Q.      You have a master's degree in business with an emphasis

24   in finance?

25   A.      Yes.

1  Q.      And you testified about this in direct.  In 1997, you

2  were convicted in Nebraska of embezzling, right?  Embezzlement?

3  A.      Yes.

4  Q.      And then you pleaded guilty to six felonies on March

5  31, 2011, correct?

6  A.      Yeah, I'm not sure of the March 31st, but if that's

7  what it is.  I don't recall that exact date, but, yes.

8  Q.      For embezzling.

9  A.      Stealing and forgery.

10  Q.      It was embezzling?

11  A.      Yes.

12  Q.      And you had three counts of stealing?

13  A.      Yes.

14  Q.      Three counts of forgery?

15  A.      Yes.

16  Q.      You were sentenced to nine years on the stealing

17  charges?

18  A.      Yes.

19  Q.      They were -- those sentences were to run concurrently

20  to each other, right?

21  A.      Yes, concurrent.

22  Q.      And then you were sentenced to six years on the felony

23  charges, right?

24  A.      Yes.

25  Q.      And those sentences were to run concurrent to each

1 other.

2 A.     Correct.

3 Q.     And then the nine years on the stealing charges and the

4 six years on the forgery charges were to run consecutively to

5 each other, right?

6 A.     Correct.

7 Q.     So ultimately, you were sentenced to 15 years?

8 A.     Yes.

9 Q.     And that was on June 2, 2011?

10 A.     Yes.

11 Q.     You testified about some of the issues that you went

12 through with your daughter Bryn during your sentencing process,

13 correct?

14 A.     Yes.

15 Q.     You talked about the no-contact visits at Platte

16 County, right?

17 A.     Yes.

18 Q.     You talked about the difficulty explaining to her that

19 you were going to be okay when you went to the Department of

20 Corrections, right?

21 A.     Yes.

22 Q.     All of those hardships, those aren't part of your

23 lawsuit, right?

24 A.     No.

25 Q.     Those hardships were all based on your conduct in

1  committing a crime.

2  A.      Yes.

3  Q.      Before you pleaded guilty in 2011, you had two suicide

4  attempts; is that right?

5  A.      Yes.

6  Q.      And then ultimately in 2017, the circuit court reduced

7  your sentences on the stealing; is that right?

8  A.      Yes.

9  Q.      Changed them from felonies to misdemeanors?

10  A.      Yes.

11  Q.      So instead of the nine years, you were sentenced to a

12  year in the county jail.  Does that sound right?

13  A.      I didn't serve a year in county jail, so I'm not quite

14  sure how that interpretation --

15  Q.      Well, what you know is as a result of that change, you

16  left Chillicothe; is that fair?

17  A.      Yes.

18  Q.      After the court reduced those felony charges, Platte

19  County fought that decision; is that correct?

20  A.      Yes.

21  Q.      And they started fighting it shortly after the court

22  resentenced you in January of 2017?

23  A.      Resentenced me -- oh, before the judge made that

24  determination, you mean?

25  Q.      Shortly after the judge changed your felonies to

1  misdemeanors, Platte County started fighting on it, right?

2  A.     I don't know the specific date, but, yeah, there was

3  sometime they filed an appeal.

4  Q.     And you know they fought about it.

5  A.     Yes.

6  Q.     And they fought about it all the way to the Supreme

7  Court of Missouri?

8  A.     Yes.

9         MR. AMMANN:  Objection, relevance, Your Honor.

10  We're in a lot of detail here.

11         THE COURT:  Yes, I'm not real sure how this is all

12  relevant.  Why don't you approach?

13         (Counsel approached the bench, and the following

14  proceedings were had:)

15         THE COURT:  It seems to me if it was reduced to a

16  misdemeanor, then it's not necessarily -- we shouldn't be

17  telling them that it was a felony if the Supreme Court said it

18  was a misdemeanor.

19         MR. TAULBEE:  I guess, here is my problem.  Both my

20  office and the Missouri Board of Probation and Parole got

21  letters from her attorney telling them -- asking them to drop

22  the appeal because of this lawsuit.

23         MR. AMMANN:  That's not what it says.  And --

24         MR. TAULBEE:  It's not from you, it's from --

25         (Reporter interruption.)

1    MR. TAULBEE:  It's from her -- her criminal attorney

2 sent both our office and the Board of Probation and Parole

3 letters specifically referencing this lawsuit, asking them to

4 drop the criminal appeal, or that he thinks it would be in the

5 best interests to drop the criminal appeal based on this

6 lawsuit.

7    THE COURT:  Do we know that she knows that her

8 attorney sent that letter?  And, if so, was it at her

9 direction?

10    MR. TAULBEE:  I was going to ask her was it on her

11 behalf.

12    THE COURT:  As we all know, lawyers send letters on

13 behalf of their clients all the time and the clients don't know

14 about it.  So I'm going to at this point foreclose this line of

15 questioning.  We can question her outside of the presence of

16 the jury on this issue and then go down that path if you think

17 it's necessary, but this is highly prejudicial without knowing

18 what her answer is going to be on this.  So at this point, the

19 objection is sustained.

20    (The following proceedings were had in open court:)

21 BY MR. TAULBEE:

22 Q.    You testified that you current -- sorry.

23    You currently do housekeeping; is that right?

24 A.    Yes, and baby-sitting.

25 Q.    And baby-sitting?  Dog-sitting?

1   A.      Uh-huh, yes.

2   Q.      Other than that, you're not currently employed?

3   A.      No.

4   Q.      Is it right you earn approximately $250 a week doing

5   those jobs?

6   A.      That's correct.

7   Q.      You've looked for other jobs?

8   A.      Yes.

9   Q.      As soon as they find out about your felony convictions,

10  it's pretty much a no; is that accurate?

11  A.      Yes.

12  Q.      You were incarcerated at Chillicothe Correctional

13  Center?

14  A.      Yes.

15  Q.      First went to Vandalia after you were sentenced, right?

16  A.      Yes.

17  Q.      And you arrived at Chillicothe on July 19, 2011?

18  A.      That sounds correct.

19  Q.      And you were released from Chillicothe on February 1,

20  2017?

21  A.      Yes.

22  Q.      And you were not sent back?

23  A.      No.

24  Q.      So you were at Chillicothe from around July 19, 2011,

25  to February 1, 2017?

1  A.      Yes.

2  Q.      You testified you had anxiety from your time at

3  Chillicothe; is that right?

4  A.      Yes.

5  Q.      And while you were in prison, one of your children was

6  sent to DOC; is that right?

7  A.      Sent where?

8  Q.      Was sent to the Department of Corrections?

9  A.      Yes.

10  Q.      And that situation caused you anxiety, as well, right?

11  A.      Yes.

12  Q.      I just want to try to walk through your housing units

13  at Chillicothe.  You started out on Housing Unit 8; is that

14  right?

15  A.      Yeah, I think that's correct.  I think that's where

16  in-coming was.

17  Q.      Then you moved to Housing Unit 5?

18  A.      I believe so, yes.

19  Q.      You lived there for almost a year?

20  A.      I mean, I don't recall, but that should be easy enough

21  to find out.  I don't remember the exact dates of where I --

22  how long I stayed at each house.

23  Q.      Would it sound right if you were in 5-House starting in

24  February -- February 12, 2012; does that sound about right?

25  A.      I stayed until February of 2012?

1   Q.      Started February of 2012 in 5-House?

2   A.      Yeah.  I mean, that sounds right.

3   Q.      And moved from 5-House July 5, 2012?

4   A.      I don't know when I moved.

5   Q.      Just don't know?

6   A.      No.

7   Q.      At some point you moved to Housing Unit 6; is that

8   right?

9   A.      I was on Housing Unit 6, yes, sometime during my stay.

10  Q.      And then you moved back to 5-House after that?

11  A.      Yeah.

12  Q.      And then you moved to 7-House.

13  A.      Yes, I remember --

14  Q.      And that's --

15  A.      Yes.

16  Q.      Sorry.  And that's where you lived for the majority of

17  your time at Chillicothe.

18  A.      Yes.

19  Q.      And you don't remember the dates of when that was?

20  A.      No.

21  Q.      And it wouldn't matter if I read some dates to you,

22  that's not going to help you?

23  A.      No.

24  Q.      And then you testified that you moved to 8-House

25  shortly before you were released; is that right?

1   A.      Yes.

2   Q.      You testified you were a G.E.D. tutor when you first

3 arrived at Chillicothe, or shortly after you arrived?

4   A.      Yes.

5   Q.      And you testified, I believe, that your best subject

6 was math; is that right?

7   A.      It's the subject I enjoy the most, yes.

8   Q.      Also good at English?

9   A.      Yeah.  Yes.

10   Q.      And you tutored for an entire year.

11   A.      Yes.

12   Q.      And I think you said that until you were dismissed, but

13 you weren't fired, just you were only allowed to do it for a

14 year.

15   A.      Yeah, they give you a term of twelve months.

16   Q.      And you continued to tutor other inmates after you --

17   A.      Yes.

18   Q.      -- you could no longer do the job, do it as a job.

19   A.      Yes.

20   Q.      And for most of your time at Chillicothe, you worked in

21 the recreational department; is that right?

22   A.      Yes.

23   Q.      You got your exercise instructor certificate --

24   A.      Yes.

25   Q.      -- certification?

1    A.       Yes.

2    Q.       You taught classes?

3    A.       Yes.

4    Q.       I think you called them BLAST classes?

5    A.       Yes.

6    Q.       And you talked about lower-body exercise earlier, I

7    think, right?

8    A.       Yeah.  Yes.

9    Q.       And I believe we've heard testimony about Zumba

10   classes?

11   A.       Yes.

12   Q.       And then --

13   A.       Yes.

14   Q.       An Insanity --

15   A.       Yes.

16   Q.       -- workout program you did?

17   A.       Yes.

18   Q.       And then you also taught classes to get the

19   certification; is that right?

20   A.       For the personal training certification, yes, the next

21   step up.

22   Q.       Mr. Bearden did not physically pat you down after PREA

23   prohibited cross-gender pat-downs; is that correct?

24   A.       No.  Or, yes, that was correct.

25   Q.       I believe you testified that he continued to call you

1 out for inspections.

2 A.     Yes.

3 Q.     And that was when you were leaving the food hall?

4 A.     Food hall, recreation.

5 Q.     And other inmates were leaving the food hall, correct?

6 A.     Yeah.  And were also being -- what was the word you

7 used?

8 Q.     Inspected?

9 A.     Yeah.  They just couldn't physically pat you down

10 anymore, but they still -- as you exited buildings, they could

11 inspect you.

12 Q.     And when they could pat you down and then when they

13 inspected you, there were other inmates leaving the food hall

14 during those times, right?

15 A.     Yes.

16 Q.     And there were other corrections officers conducting

17 pat-downs or inspections.

18 A.     Yes.

19 Q.     You never reported that Mr. Bearden conducted

20 inappropriate pat-downs?

21 A.     No.

22 Q.     You never reported that he continuously called you out

23 of line?

24 A.     No.

25 Q.     You talked about Mr. Bearden being in the recreation

1 building frequently, right?

2 A.     Yes.

3 Q.     I believe you previously testified that -- or you

4 previously testified that he would watch a whole 45-minute

5 exercise class; is that right?

6 A.     He would be aware of a whole 45-minute exercise class,

7 yes.

8 Q.     You also testified that Mr. Bearden mailed you at least

9 two cards while you were at Chillicothe, correct?

10 A.     Yes.

11 Q.     Love cards?

12 A.     What?

13 Q.     Love cards?

14 A.     Yes.

15 Q.     And at least one of them had a handwritten message in

16 it?

17 A.     Yes.

18 Q.     But you didn't keep those, did you?

19 A.     No.

20 Q.     You ripped them up?

21 A.     Yes.

22 Q.     And threw them away?

23 A.     Yes.

24 Q.     And you did not report that Mr. Bearden had sent you

25 two cards, correct?

1   A.      No.

2   Q.      You also testified that you had bruises following one

3  of your encounters with Mr. Bearden; is that right?

4   A.      Yes.

5   Q.      And you testified that you actually told the rec

6  director -- you talked to the rec director about your bruises,

7  right?

8   A.      Yes.

9   Q.      And you told them that you got them exercising.

10   A.      Right.  Yes.

11   Q.      And your testimony is that you actively concealed from

12  the rec director what happened?

13   A.      Yes.

14   Q.      You also testified that you moved from 7-House to

15  8-House to get away from Mr. Bearden; is that right?

16   A.      Yes.

17   Q.      And that had something to do with your cellmate Lindy

18  Berger; is that correct?

19   A.      Wanting to leave for 8-House?

20   Q.      Uh-huh.

21   A.      Well, I might have -- not directly, no.

22   Q.      You don't remember when you moved to 8-House?

23   A.      Excuse me?

24   Q.      You don't remember when you moved to 8-House, correct?

25  You just know --

1  A.      No, it was definitely during -- it was my last move,

2  and it was close to my release.

3  Q.      And you testified that Mr. Bearden rubbed up against

4  you in the audiovisual room, right?

5  A.      Yes.

6  Q.      And that audiovisual room is within the recreation

7  department?

8  A.      Yes.

9  Q.      It's in the gymnasium?

10  A.      Yes.

11  Q.      That's an area where there's a recreation director?

12  A.      Yes.

13  Q.      There are rec officers?

14  A.      Yes.

15  Q.      There's a corrections officer stationed in the

16  recreation building?

17  A.      Yes.

18  Q.      You did not report Mr. Bearden's behavior to any of

19  those individuals, correct?

20  A.      No.

21  Q.      You testified that he sexually assaulted you in the

22  prison laundry room, right?

23  A.      Yes.

24  Q.      And you made a point to say that that wasn't in the

25  laundry room where you could do laundry, correct?

1    A.    Correct.

2    Q.    It's in a different room.

3    A.    Outside the housing unit, yes.

4    Q.    You say outside the housing unit, but it's outside the

5    housing --

6    A.    The wing, yes, correct.

7    Q.    It's in -- it's in what's called -- going down the hall

8    in what's called the E-Wing right?

9    A.    The what wing?

10   Q.    E-Wing.

11   A.    I wasn't aware it was called E-Wing.

12   Q.    Okay.

13   A.    But, yes, it was outside the wing of the housing unit.

14   Q.    And that's the same hall you'd go down to go to the

15   offender property room that you talked about earlier, right?

16   A.    Yes.

17   Q.    And I believe you testified that there are no cameras

18   in that laundry room that you're talking about; is that right?

19   A.    No, a mirror.

20   Q.    So there is a mirror, but there's no camera.

21   A.    Correct.

22   Q.    And you didn't have access to the monitors to any of

23   the cameras while you were at Chillicothe; is that right?

24   A.    No.

25   Q.    Sorry.  That is correct, right?

1  A.     Oh, yes, correct.

2  Q.     And so you testified that that room had a mirror,

3  right?

4  A.     Yes.

5  Q.     And you said it was one of those big mirrors that you

6  see in, like, a supermarket or something --

7  A.     Yes.

8  Q.     -- is that right?

9         And when these assaults occurred, was the door to

10  that room open or closed?

11  A.     Yes.

12  Q.     Was it opened or closed?

13  A.     It was open.

14  Q.     And the door has a window also, right?

15  A.     I don't recall.

16  Q.     And the room is in a hall where offenders had access?

17  A.     Offenders weren't allowed in that room without a

18  specific reason being there.

19  Q.     I'm talking about the hallway.

20  A.     Oh, the hallway?  To come through those doors, you

21  either had to have a pass, or it was open-door with your

22  caseworker on certain days for each wing.

23  Q.     Because that's where the case management staff were,

24  right?

25  A.     The first several offices, yes.

1  Q.      So case management staff had access to that area?

2  A.      Yes.

3  Q.      Corrections officers had access to that area?

4  A.      Yes.

5  Q.      The first time that Mr. Bearden sexually assaulted you,

6  you lived in Housing Unit 6; is that correct?

7  A.      I can't say 100 percent.  It was either 5 or 6.

8  Q.      Do you believe that it was in Housing Unit 6?

9          MR. AMMANN:  Asked and answered, Your Honor.

10         THE COURT:  Overruled.

11 A.      I really can't say because they all looked the same.  I

12 mean, even the colors are the same, so it's hard to --

13 BY MR. TAULBEE:

14 Q.      Sitting here today, you don't remember?

15 A.      I don't remember if it was 5 or 6.

16 Q.      You previously testified in a deposition in this case,

17 correct?

18 A.      Yes.

19 Q.      That deposition was on July 20, 2021?

20 A.      The video one, yes.

21 Q.      You were in your home?

22 A.      Yes.

23 Q.      And I was on the Zoom meeting?

24 A.      Yeah.  Yes.

25 Q.      Would it refresh your recollection to see your

1   testimony from your deposition about where the first incident

2   occurred?

3   A.      I mean, if you've got it in front of you and I said 6,

4   I just can't say 100 percent if it was 5 or 6, but I was on

5   both of those houses.

6   Q.      We'll just try -- do you see that in front of you?

7   A.      Uh-huh.

8   Q.      And the question is:  "And when was this, do you

9   recall?"

10          And your answer is:  "I believe it was on -- I want

11  to say 6-House.  I believe it was 6-House, I'm not sure of the

12  actual date."  Is that right?

13  A.      Yes.  To me, that's -- I'm still -- if I read that, I

14  feel like I'm still being kind of unsure.  Maybe more confident

15  with 6, but not 100 percent, so...

16  Q.      You don't say anything about 5-House there.

17  A.      Correct.

18  Q.      And is it correct, the first sexual assault, you

19  remember it occurred in the daytime; is that correct?

20  A.      Yes.

21          MR. AMMANN:  I'm not sure -- it sounds like an "or"

22  question and she said yes.  Maybe I missed it.

23          THE COURT:  You can clarify it on redirect.

24          MR. TAULBEE:  I can just ask a better question.

25  BY MR. TAULBEE:

1  Q.     The first sexual assault occurred in the daytime,

2  right?

3  A.     Yes.

4  Q.     You don't recall the first time he raped you; is that

5  right?

6  A.     No.

7  Q.     You don't recall the actual date.

8  A.     No.

9  Q.     It occurred sometime after the first sexual assault

10 that you spoke of, right?

11 A.     Yes.

12 Q.     And I believe -- you claim that all 20 of the rapes

13 occurred in these property storage rooms?

14 A.     Yes.

15 Q.     You testified that Mr. Bearden escorted you to the

16 property room?

17 A.     Yes.

18 Q.     You said as time went by, Mr. Bearden didn't retrieve

19 or take bins down there; is that what you testified to?

20 A.     That I didn't.  He didn't take bins down there.

21 Q.     And at some point you didn't either?

22 A.     Correct.

23 Q.     So initially, you were going down to the property

24 evidence room to carry somebody's bin or to retrieve them; is

25 that accurate?

1   A.     Yes.

2   Q.     And after a time, you weren't even going to get the

3  bins?

4   A.     Correct.

5   Q.     And you said that when you would walk to the property

6  and evidence room -- or the property room, you would walk by

7  case managers, right?

8   A.     Yes.

9   Q.     IPOs?

10   A.     Yes.

11   Q.     And those are institutional parole officers; is that

12  right?

13   A.     Yes.

14   Q.     Other staff members?

15   A.     Possibly, yes.

16   Q.     There are other classification staff that are back in

17  those offices?

18   A.     I just know of caseworkers and IPOs.

19   Q.     Okay.  Did you have any interaction with Functional

20  Unit Managers during your time at Chillicothe?

21   A.     Not that I recall.

22   Q.     You testified on direct that the rapes occurred from

23  2011 to 2016, right?

24   A.     Yes.

25   Q.     And so your testimony is as soon as you got to

1  Chillicothe, the rapes began?

2  A.      How soon is soon?  That's a broad --

3  Q.      Well, you got to Chillicothe July 19, 2011, correct?

4  A.      Uh-huh, yes.

5  Q.      So you would say within the first six months, the rapes

6  began?

7  A.      At least the first sexual assault.

8  Q.      I want to be clear here because you testified on direct

9  that the rapes occurred from 2011 to 2016.

10  A.      Yes.

11  Q.      Okay.  And you said that the -- these sexual assaults

12  or rapes occurred when you were either -- your testimony was

13  you believed it was in 6-House, but it could have been 5-House,

14  right?

15  A.      Some of them could have been in 5-House, yes.

16  Q.      Do you know whether you were even living in 5-House by

17  the end of 2011?

18  A.      Yes, I'm sure I was in -- well, you said I was in

19  5-House for a year.  So if I got there in July of 2011, then,

20  yes, I was still in 5-House, so he raped me in 5-House.

21  Q.      Do you know whether you'd moved to 5-House from 8-House

22  by the end of 2011?

23  A.      That I moved from 5-House to 8-House?

24  Q.      I'm sorry, 8-House to 5-House.

25  A.      I was only at 8-House, I believe, for a couple weeks.

1 It's just where they put all the new people coming in until

2 they assigned us rooms, so I don't recall being on 8-House for

3 that long of a time when I initially got to Chillicothe.

4 Q.    I want to talk to you about a specific incident that

5 you say Mr. Bearden raped you.  You had your TV confiscated

6 while you were at Chillicothe, correct?

7 A.    Yes.

8 Q.    It was confiscated for 30 days?

9 A.    I think so.

10 Q.    And that was because of some sort of -- it was for

11 sleeping through the count, right?

12 A.    It was what?

13 Q.    For sleeping through count?

14 A.    Yeah, might have been.  I had -- yeah.  Yes.

15 Q.    There are some violations you can get at Chillicothe

16 that don't get you put in the hole, correct?

17 A.    Yes.

18 Q.    Okay.  For instance, they might take your TV for 30

19 days.

20 A.    Yes.

21 Q.    And when you could get your TV back, you went and got

22 it, right?

23 A.    Yes.

24 Q.    And that was in the early evening?

25 A.    I believe so, yes.

1  Q.      And this would have been in January of 2014; does that

2  sound right?

3  A.      I have no idea.

4  Q.      But you know that it was when your TV was confiscated?

5  A.      When what was when my TV was confiscated?

6  Q.      One incident of rape that you're claiming happened when

7  your TV was confiscated.

8  A.      Yes.

9  Q.      The room where the offender property was, you said it

10 was down the hallway; is that right?

11 A.      It was down the hallway.  You had to make some turns

12 and go to the very back of that building, so it wasn't straight

13 down the hallway.

14 Q.      You go down the hallway, and then you go around, and

15 it's in back, is that --

16 A.      Right.  Correct.

17 Q.      And you said there were no cameras in that room?

18 A.      No.

19 Q.      There are cameras in the hallway outside of it, though,

20 correct?

21 A.      I believe so.

22 Q.      There's also one of those mirrors that you talked about

23 that was in the laundry room?

24 A.      I don't recall seeing a mirror.

25 Q.      And you said that he cleaned himself with a towel or

1  rag of some sort --

2  A.      Something.

3  Q.      -- that he had brought with him?

4  A.      He had it on him, yes.

5  Q.      And you did not report any of these incidents while you

6  were at Chillicothe, correct?

7  A.      No.

8  Q.      Eventually you spoke to a Mr. Shreve Bentley; is that

9  right?

10  A.      While I was in Chillicothe?

11  Q.      After you were out of Chillicothe.

12  A.      Was he the PREA -- guy from PREA?  The name Shreve

13  Bentley...

14  Q.      That's fair.  You met with somebody from DOC at some

15  point, correct?

16  A.      I think, yes, from my first -- yes.  The first time I

17  talked about it, yeah.

18  Q.      That was in January of 2018?

19  A.      Okay.

20  Q.      Okay, it was?

21  A.      Well, I mean, I was released in February of '17.  When

22  did you say the --

23  Q.      January 2018, you met with --

24  A.      Okay.

25  Q.      -- the PREA investigator?

1   A.      Yes.

2   Q.      You had been sexually assaulted several times before

3 you went to prison; is that correct?

4   A.      Yes.

5   Q.      You were raped at age 14 by a friend's brother?

6   A.      Yes.

7   Q.      You were molested between the ages of 15 and 18 by your

8 high school track coach?

9   A.      Yes.

10   Q.      You were raped at age 24 by your boss Terry at either

11 Farmland Industries or Carey Salt Company?

12   A.      Yes.

13   Q.      You were sexually assaulted by one of the partners at

14 an accounting firm that worked for your former employer.

15   A.      Yes.

16   Q.      You were mentally and physically abused by your mother

17 from age 4 to 18?

18   A.      Yes.

19   Q.      You did not report to anyone at the time that you were

20 raped when you were 14 by your friend's brother, correct?

21   A.      No.

22   Q.      You did not report to anyone at the time that you were

23 molested by your high school track coach when you were between

24 15 and 18 years old, right?

25   A.      No.

1  Q.      You did not report to anyone at the time that you were

2  raped by your boss at Farmland or Carey Salt Company?

3  A.      No.

4  Q.      You did not report to anyone that you were sexually

5  assaulted by the partner at the accounting firm, correct?

6  A.      No.

7  Q.      And to this day, other than speaking here today and

8  with your counselor and therapist, you have not reported any of

9  those to anybody else, correct?

10 A.      The previous ones prior to prison?

11 Q.      Right.

12 A.      No.

13 Q.      Not to anybody in authority?

14 A.      No.

15 Q.      And you began therapy after you'd been charged with

16 crimes that brought you to Chillicothe, right?

17 A.      Yes.

18 Q.      And it was in those therapy sessions when you first

19 divulged that you'd been sexually assaulted in the past?

20 A.      Yes.

21 Q.      You first visited the parole board in 2012; is that

22 right?

23 A.      What was that date again?

24 Q.      2012?

25 A.      I don't recall going to the parole board that quickly

1  after I came to Chillicothe, but if that's what the record

2  reflects.  I thought I was there for a couple of years before

3  my first parole board hearing.

4  Q.      Could have been 2013?

5  A.      You're asking me could it be 2013?

6  Q.      You said it was a couple of years.

7  A.      It seems like it was a couple of years.  Is there not a

8  record of that?

9  Q.      And you didn't get an answer you wanted, right?

10  A.      Yeah, they just -- yeah, yes.  Or correct.

11  Q.      Were you upset?

12  A.      Yes, very much.

13  Q.      And angry?

14  A.      I wasn't angry, I was just upset.

15  Q.      Do you know Maya Gasa?

16  A.      Yes.

17  Q.      Who is Maya Gasa?

18  A.      She was one of the BLAST instructors.

19  Q.      Did you have a conversation with Maya Gasa after you

20  got the answer from the parole board?

21  A.      No, not that I remember.  I don't believe I knew Maya

22  Gasa that early in my stay at Chilly, or Chillicothe.

23  Q.      You don't believe she was a BLAST instructor at that

24  time?

25  A.      She had been there quite a while.  I think she was

1  already an instructor.  She was someone that some of us newbies

2  that were in training learned from, but I didn't know her later

3  until I became an instructor and then worked with her.

4  Q.      When did you become a BLAST instructor?

5  A.      Maybe 2014.  I'm not for sure.  I mean, I have a

6  license somewhere that should state my initial certification.

7  Q.      I'm assuming you don't have it up there with you right

8  now.

9  A.      No.

10  Q.      And we talked a little bit earlier, and we were just

11  talking about your work in recreation, right?

12  A.      That I what?

13  Q.      That you worked in recreation, the recreation area?

14  A.      Yes.  Until I became certified, and that in itself is a

15  position within recreation.  It's considered a job.  Before

16  that, I worked in rec, was a rec worker, so I did whatever they

17  needed us to do as far as cleaning, cleaning the gym and

18  equipment and all of that stuff.

19  Q.      You had numerous jobs in recreation?

20  A.      Yeah, I was just pretty much a rec worker until I got

21  my certification.

22  Q.      And you spent a lot of time in the recreation building?

23  A.      Yes.

24  Q.      Taught a lot of classes?

25  A.      Yes.

1  Q.      You were a BLAST instructor?

2  A.      Yes.

3  Q.      And you were Miss Betz's BLAST instructor?

4  A.      I was not her BLAST instructor.

5  Q.      You were not Miss Betz's BLAST instructor?  You were

6  not?

7  A.      You're not really anybody's BLAST instructor.  I was an

8  instructor for the recreation department.  I did some personal

9  training in which she was awarded for her points.  There was a

10  point system, so when she took so many classes and had good

11  behavior, they would let her get personal training, which was

12  one-on-one training with one of the BLAST instructors, and I

13  drew her name.  So I personal-trained her for maybe two weeks.

14  However, I can't remember how many sessions she got free.  It

15  was like a rewards program in the recreation department.

16  Q.      Okay.  So you weren't her BLAST instructor, but she

17  attended your classes?

18  A.      Yeah.

19  Q.      And you personally trained her?

20  A.      Yes.

21  Q.      Okay.  And Miss Betz contacted you in 2019, right?

22  A.      I don't remember the date, but, yeah, she contacted me.

23  Q.      And you spoke with her?

24  A.      Yes.

25  Q.      And I believe it was your testimony that you didn't

1 talk to her about your case.

2 A.      Yes, I did not.

3 Q.      And you --

4 A.      I did not talk to her about my case.

5 Q.      And you didn't talk to her about her case.

6 A.      No.

7 Q.      But you talked to her about filing lawsuits, this

8 lawsuit.

9 A.      I gave her the name of my attorney.

10 Q.      With the possibility that she'd file this lawsuit,

11 right?

12 A.      I didn't know that that's what she wanted to do.

13 Q.      And you had a friend of yours reach out to Miss Betz,

14 right?

15 A.      I don't recall that, but yeah.  I don't recall.  I'm

16 not sure how we got in touch with each other.

17 Q.      But you know Teresa Davis, right?

18 A.      Yes, yes.

19 Q.      And you don't recall having her reach out --

20 A.      Yes, I do now.  Yes.  Teresa Davis.

21 Q.      And you had her reach out to Miss Betz.

22 A.      Yes.

23 Q.      And Mrs. Zieser attended your classes, as well?

24 A.      Mrs. who?

25 Q.      Mrs. Zieser?  You may know her as Miss Olsen?

1  A.     Oh, yes.  Yes.

2  Q.     And I don't say this to -- you called her Amy earlier,

3  but I believe you were speaking about Ashley Zieser?

4  A.     Ashley, yes.  Sorry.

5  Q.     That's fine.  I just wanted to make sure that was --

6  A.     Yeah.

7  Q.     -- clear for the record.

8         You also spoke with Miss Zieser in 2019, correct?

9  A.     Yes.

10  Q.     Miss Doe -- or Miss George, I apologize, also

11  frequented the rec department?

12  A.     Not as much, but she was sports.  So, you know, I saw

13  her in there.

14  Q.     And you believe that, at least at one point, that you

15  taught Miss Doe or Miss George, as well, right?

16  A.     Instant Messenger, yes.

17  Q.     I'm sorry, a different question.  You believed at one

18  point that you taught Miss George?

19  A.     That I taught Miss George?  She might have attended

20  some of the BLAST classes that I taught, but I never

21  personal-trained her one-on-one or anything like that.

22  Q.     And you spoke with her when she got out of prison?

23  A.     Yes.

24  Q.     And it would have been sometime after November 2017; is

25  that accurate?

1    A.      Sometime after her release, yes.

2    Q.      And you heard her testify that was in November of 2017?

3    A.      I heard her testify what?

4    Q.      That that was in November of 2017?

5    A.      When she was released?  Yes.

6    Q.      And I believe it was your testimony that you didn't

7    speak to Miss George about her allegations either, right?

8    A.      Yes, correct.  I did not.

9    Q.      And you didn't report any of the things you testified

10   today while you were at Chillicothe, correct?

11   A.      I'm sorry, say that again?

12   Q.      You did not report any of the things that you testified

13   about today to anybody in authority at Chillicothe, correct?

14   A.      Just the mental health coordinator or mental health

15   provider.

16   Q.      And you saw a mental health provider for a period of

17   time; is that right?

18   A.      Yes.

19   Q.      And then you were removed from seeing him?

20   A.      Yes.

21   Q.      And that was because of over-familiarity during group

22   sessions?

23   A.      I believe --

24           MR. AMMANN:  Object, Your Honor.

25           THE COURT:  Could you please approach?

1    (Counsel approached the bench, and the following

2 proceedings were had:)

3    THE COURT:  What's the nature of the objection?

4    MR. AMMANN:  Relevance.  I think we're going down a

5 dangerous path because I thought the ruling was we weren't

6 going to talk about assaults by anybody else, and this is the

7 therapist who assaulted her.  And we've stayed away from that.

8    THE COURT:  Is this the therapist who assaulted her?

9    MR. TAULBEE:  That's what she said, yes.

10    MR. ROEDIGER:  But the DOC sustained it, so...

11    THE COURT:  Okay.  Well, I don't see -- and wasn't

12 there a settlement?

13    MR. TAULBEE:  No, it was -- oh, yeah, there was.

14    THE COURT:  I don't think we need to be going down

15 this path.  I don't think it's relevant.  I think it opens up

16 the door to the fact that there was another therapist in the

17 facility who settled a -- and so if you want to open up that

18 door, you can go down there, but I think you need to understand

19 if you keep asking questions on this line of thought, then I'm

20 going to accept any arguments on behalf of plaintiffs that

21 you've opened up the door to claims against another employee at

22 the facility.

23    MR. ROEDIGER:  You don't believe that saying

24 over-familiarity crossed that line?

25    THE COURT:  I don't believe that her answer was

1  heard, and so I don't think that there's -- to the extent
2  you're asking for a curative instruction, you know, I'll
3  entertain that suggestion that they're to disregard the answer
4  to that question, if that's what you're asking for.  Are you
5  asking for that?
6          MR. ROEDIGER:  Sorry, John, I'm stepping on your
7  toes.
8          MR. AMMANN:  Go ahead and finish up.
9          MR. ROEDIGER:  No, Your Honor.
10          MR. AMMANN:  Not at this time.
11          THE COURT:  Okay.
12          (The following proceedings were had in open court:)
13  BY MR. TAULBEE:
14  Q.    Just to make sure I understand, you testified that you
15  filed this lawsuit May 29, 2018; is that right?
16  A.    Yes.
17          MR. TAULBEE:  Nothing further for you, Miss Keil.
18  Thank you.
19          THE COURT:  Any redirect?
20          MR. AMMANN:  Just a couple of questions, Your Honor.
21  Were you done, Nick?  I'm sorry.
22          MR. TAULBEE:  I was.
23                          - - -
24
25

1          REDIRECT EXAMINATION

2    By Mr. Ammann:

3    Q.      Karen, just a couple of quick questions.  You heard

4    Mr. Taulbee ask you about retrieving your TV that had been

5    confiscated because of some violation, correct?

6    A.      Yes.

7    Q.      And he asked you about whether you could retrieve it

8    after 30 days.  Do you remember that?

9    A.      Yes.

10   Q.      Do you remember if you retrieved your TV on the first

11   day you could get it, or did you wait awhile?

12   A.      I remember there was a delay because you're kind of at

13   the power of whether someone is going to do it for you.  You

14   can't go up there and demand and say, "Hey, my 30 days is over,

15   let me have it."  It's going to be on their time.  And

16   honestly, I wasn't a TV person anyway, I just didn't watch it

17   much, so really it was no big deal.  It was more my roommates

18   reminding me to ask about my TV.

19   Q.      Do you know how many days after the 30-day period ran

20   out that you retrieved it?

21   A.      It was -- seems like it was a good week.

22           MR. AMMANN:  Okay.  Nothing further, Your Honor.

23           THE COURT:  Any redirect?  Or excuse me, recross?

24                            - - -

25

1    RECROSS-EXAMINATION

2  By Mr. Taulbee:

3  Q.    You said it might have been a week?

4  A.    It was -- it definitely wasn't the 30 days.  It was at

5  least a good week, within a week probably before I actually got

6  it.

7  Q.    Within a week from that 30-day period?

8  A.    I mean, I can't say for sure.  I just know that I had

9  to be reminded from one of my roommates who I let watch my TV

10 that, hey, my time was up.  But I was busy with rec and so many

11 things that I just really wasn't in any big rush to get it.  So

12 I don't -- I don't recall exactly, but it was within a week at

13 least, maybe 7 to 10 days of when I could have gotten it.  I

14 don't recall.  That was --

15 Q.    Do you remember whether it was a weekend or a weekday?

16 A.    No, I don't.

17 Q.    But you believe it was the early evening, correct?

18 A.    I don't remember that.

19 Q.    You don't remember whether it was early evening or not?

20 A.    No, I don't.

21        MR. TAULBEE:  Nothing further, Your Honor.

22        THE COURT:  Could counsel please approach again?

23        (Counsel approached the bench, and the following

24 proceedings were had:)

25        THE COURT:  So before we ask questions, do you want

1    to make a record on the issue that her counsel sent the letter

2    and have me determine whether or not that's relevant and

3    admissible, or have you decided to forgo that?  Just to make it

4    clear, I haven't made a ruling; but before I make a ruling, I

5    want to hear from her and her testimony and flesh this issue

6    out a bit.

7         MR. TAULBEE:  I would like to ask her some

8    questions, Your Honor.

9         THE COURT:  I'll tell the jury we're taking a break.

10        MR. TAULBEE:  Thank you.

11        (The following proceedings were had in open court:)

12        THE COURT:  So we need to take up a very brief

13    issue.  And I know this white noise is terribly irritating; so

14    rather than making you sit through the white noise, I'm going

15    to give you all about a five to ten-minute break, probably a

16    ten-minute break if I had to guess.  We'll be in here working

17    during this break, but I don't want you to have to sit through

18    the white noise.  So it's 2:15.  We'll take a break until 2:25,

19    most likely.

20        Again, during this break, don't discuss this case

21    among yourselves, don't discuss the case with anyone else,

22    don't permit the case to be discussed in your presence, and

23    don't do any type of research, internet or the otherwise.

24    We'll be in recess for about ten minutes.

25        (The following proceedings were had in the courtroom

1  out of the presence of the jury:)

2       MR. AMMANN:  Your Honor, could we confer with the AG

3  for just a minute?

4       THE COURT:  Sure.

5       (So done.)

6       THE COURT:  Ma'am, you can go ahead and step down

7  for a minute.

8       Okay.  Are we ready to proceed?

9       MR. TAULBEE:  Yes, Judge.

10      THE COURT:  Okay.  So I need to make sure whether or

11  not -- how this is relevant, regardless of what Miss Keil's

12  answers are.  So it's my understanding that Miss Keil's

13  appellate attorney sent a letter to the AG's Office and the

14  Department of Corrections.

15      MR. TAULBEE:  Two letters, one to the AG's Office,

16  one to the head of probation and parole.

17      THE COURT:  And in that, the attorney said, drop the

18  appeal or it will have a negative impact on the civil lawsuit.

19      MR. TAULBEE:  We filed a civil lawsuit.  You should

20  drop your appeal in this case because it will have -- it could

21  have negative consequences to your civil lawsuit.  And sounds a

22  lot like leveraging the civil lawsuit to get her criminal

23  appeal dismissed.

24      THE COURT:  It wasn't dismissed, right?

25      MR. TAULBEE:  No, it wasn't.

1       THE COURT:  And, in fact, it was ultimately decided

2   in her favor on appeal?

3       MR. TAULBEE:  Yes.

4       THE COURT:  And so I guess it just seems to me to be

5   an ancillary issue that is really going to open up a whole

6   other set of questions that we'll have to investigate and

7   answer a bunch of questions for the jury.

8       So I don't really understand how that's leverage.

9   She's using the civil lawsuit to get the appeal dismissed when

10  the appeal was ultimately decided in her favor.  How are you

11  going to argue that to the jury?

12      MR. TAULBEE:  The first one I think is trying to get

13  us to dismiss the appeal.

14      The second one is to, even in spite of the appeal,

15  just to let her go on parole because her parole had ended, so

16  just to let her out, the one to head of probation and parole.

17      THE COURT:  So did the letter to head of probation

18  and parole reference the civil lawsuit?

19      MR. TAULBEE:  It did.  It just didn't reference the

20  appeal, or at least it was less about the appeal because,

21  frankly, I think he probably thought he was going to lose the

22  appeal.

23      THE COURT:  That's speculation.

24      MR. AMMANN:  It was on file.  It wasn't threatening

25  a suit, he was making them aware of the lawsuit which was

1  already filed.

2          MR. TAULBEE:  I think that's our point.  She filed

3  a -- she filed a lawsuit and then used that lawsuit to try not

4  to go back to jail.

5          THE COURT:  But she didn't ultimately go back to

6  jail.  Could I see the letters?

7          MR. AMMANN:  I was going to suggest that, Your

8  Honor.

9          THE COURT:  So what I've been handed is Defendant's

10  Exhibit 17 and Defendant's Exhibit No. 18.  Defendant's No. 17

11  is a letter from the law offices of Kent Gipson to the Chairman

12  of Missouri Board of Probation and Parole.  So the one to

13  probation and parole just seems to be a request, given, as they

14  say, the unusual circumstances that she not be re-incarcerated,

15  that she be able to -- ordered immediately to the jail and then

16  transferred to the Department of Corrections.  Which, if the

17  normal bureaucratic procedures are not streamlined, would

18  result in her unnecessary incarceration for several months

19  until the board again re-released her.

20          So I'm not understanding how this is a threat.

21          MR. TAULBEE:  I don't know that it's a threat.

22          THE COURT:  Well, or leverage, leveraging her civil

23  suit against her circumstances with the Board of Probation and

24  Parole.

25          MR. TAULBEE:  I mean -- part of those circumstances

1  are the --

2          THE COURT:  Can you move closer to the microphone,

3  please?

4          MR. TAULBEE:  Part of her circumstances are the

5  allegations in this lawsuit, Your Honor.

6          THE COURT:  Well, I don't see how I'm going to admit

7  this, but let's -- ma'am, could you take the stand again, and

8  let's see if she even was aware that these were sent on her

9  behalf.  Obviously, it's not uncommon for counsel to send

10 letters on their clients' behalf.

11          Let me ask a couple of questions, and then,

12 Mr. Taulbee, if you want to follow up with any questions on the

13 record, then you can.

14                          - - -

15                       EXAMINATION

16  By the Court:

17  Q.     Ma'am, I've just been provided two letters in

18 connection with your appeal.  It's my understanding that on

19 your appeal, you were represented by Kent Gipson; is that

20 correct?

21  A.     Yes, ma'am.

22  Q.     And did you have any conversations with Mr. Gipson

23 regarding a letter that he sent to the head of the Missouri

24 Board of Probation and Parole?

25  A.     No, I did not.

1  Q.     Were you aware prior to the conversations today that

2  Mr. Gipson sent a letter to the head of board of -- the head of

3  the Board of Probation and Parole on your behalf?

4  A.     No, I was not.

5  Q.     Did you have any conversations with Mr. Gipson

6  regarding a letter that he sent to the Missouri Attorney

7  General's Office?

8  A.     No.

9  Q.     Prior to conversations today, did you have any

10  knowledge that Mr. Gipson sent a letter to the Attorney

11  General's Office on your behalf in connection with both the

12  appeal that you had filed in your criminal case and the civil

13  case that we're here today on?

14  A.     No, I did not.

15          THE COURT:  Do you have any other questions you'd

16  like to ask of her?

17          MR. TAULBEE:  I suspect not, without getting an

18  objection for attorney/client privilege, Your Honor, so...

19          THE COURT:  I don't see this as relevant.  Even if

20  she was aware of them, I think that the connection is tenuous

21  and is a stretch.  Given the fact she didn't know about it and

22  given the fact it's not uncommon for attorneys to send letters

23  on behalf of their clients that their client isn't aware of, I

24  don't believe it's appropriate to introduce this evidence to

25  the jury and will sustain the objection.

1        What I'd like to do is bring the jury back out

2  because we still have to give the jury the opportunity to ask

3  Miss Keil questions.  At the same time, I am probably not

4  inclined to take another break for about an hour, hour and a

5  half.  So if the parties would like about a five to ten-minute

6  break now to use the restroom or the like, I'm happy to do so.

7        And I'm seeing some nodding heads yes.  So why don't

8  we go ahead and take about a ten-minute break.  Will that be

9  sufficient?  And if you could, Shauna, let the jury know that

10  we're taking a ten-minute break, but we'll be right back out.

11        We'll be in recess until then.

12        (A recess was taken from 2:26 p.m. to 2:37 p.m.)

13        THE COURT:  So what we're going to have to do is

14  bring the jury out and give them an opportunity to ask Miss

15  Keil questions.  I'll then tell the jury that we have a

16  logistical modification, change that we need to make, and we'll

17  have the jury go back out for just a few seconds.

18        Do we have the marshal ready to bring Miss Dean in?

19  Is that all set up?  Okay, awesome.  Then we'll do that real

20  quickly and bring the jury back out.  Not ideal, but we don't

21  have any other choice.

22        So if you want to bring the jury out.

23        (The following proceedings were had in the courtroom

24  in the presence of the jury:)

25        THE COURT:  So we've reached the end of Miss Keil's

1 testimony, which means now you have the opportunity to write

2 down any questions that you have of her. So if you could take

3 a few minutes to jot down any questions and/or hand in a blank

4 card, I would appreciate it.

5              (So done.)

6              THE COURT: Could counsel please approach?

7              (Counsel approached the bench, and the following

8 proceedings were had:)

9              THE COURT: So there are only two questions, one of

10 which is, "TV confiscated. Why?" I think she testified to

11 that, someone just didn't catch the answer. Any objection to

12 asking her that question?

13              MR. AMMANN: No.

14              THE COURT: Any objection?

15              MR. TAULBEE: No.

16              THE COURT: The next one I don't believe is

17 relevant. "Why didn't she report the sexual assault before

18 Chilly, age 14?"

19              MR. AMMANN: I object. That's not relevant.

20              THE COURT: Okay. I'm not going to ask that

21 question. Okay. That's all.

22              (The following proceedings were had in open court:)

23              THE COURT: Okay. Ma'am, I have one question I'm

24 going to ask you.

25                        - - -

1    EXAMINATION

2    By the Court:

3    Q.    You testified your TV was confiscated.  Can you tell us

4    why your TV was confiscated?

5    A.    I believe it was my second sleeping-through-count

6    violation, so usually they would confiscate a piece of property

7    that they deemed valuable to you for punishment of the second

8    violation.  Sleeping through count was not being prepared for

9    official count time.  I believe it was in the morning, 5:30.

10   Some officers will give it to you if you are -- didn't have

11   your eyes open, even if you were sitting up on your bunk bed,

12   not having your ID placed appropriately.  From what I can

13   recall, I believe that's what my TV was taken for.

14            THE COURT:  Okay.  Thank you.  Any additional

15   questions on behalf of plaintiff?

16            MR. AMMANN:  No, Your Honor.

17            THE COURT:  Any brief follow-up?

18            MR. TAULBEE:  No, Your Honor.

19            THE COURT:  Okay.  Thank you, ma'am.  You may step

20   down.

21            So we're ready to move to plaintiffs' next witness.

22   We have a very quick logistical issue that we need to take care

23   of.  I know this is very disruptive, but we're going to take

24   another just two-minute recess, and then we will resume very

25   shortly.

1    Again, you all know what to not do during this

2 break.  So we'll come back and get you in just a couple of

3 minutes.

4         (The following proceedings were had in the courtroom

5 out of the presence of the jury:)

6         THE COURT:  Okay.  If we could go ahead and have

7 Miss Dean brought out.

8         DEPUTY MARSHAL:  Yes, ma'am.

9         THE COURT:  Thank you.

10        And, Ms. Snow, are you doing Miss Dean's direct?

11        MS. SNOW:  I am.

12        THE COURT:  I'll just ask you if you're ready to

13 call your next witness, and you can just say Teri Dean, and

14 we'll ignore the fact that she's already on the stand.  But

15 we'll have her sworn after you call her.

16        MS. SNOW:  Would you prefer I do that from here or

17 at the podium?  Do you have a preference?

18        THE COURT:  I have no preference.

19        Ma'am, if you could come forward.  I'm going to ask

20 that you take the witness stand right over here.

21        Here is what we're going to do:  Have you take the

22 witness stand, we'll bring the jury back out, and then Ms. Snow

23 will actually call you as a witness, and at that time I'll ask

24 that you stand and be sworn.  Okay?  Okay.

25        Why don't we go ahead and bring the jury back in.

 1          (The following proceedings were had in the courtroom

 2    in the presence of the jury:)

 3          THE COURT:  Ms. Snow, are you ready to call your

 4    next witness?

 5          MS. SNOW:  I am.  Plaintiffs call Teri Dean.

 6          THE COURT:  I would ask that Miss Dean please be

 7    sworn in.

 8                              - - -

 9                            TERI DEAN,

10     being first duly sworn by the courtroom deputy, testified as

11    follows:

12          THE COURT:  If you could go ahead and be seated.

13    And it sounds like you're very soft-spoken; so if you could be

14    sure to speak into the microphone that's right there, I would

15    appreciate it.

16                              - - -

17                      DIRECT EXAMINATION

18     By Ms. Snow:

19    Q.    Good afternoon.

20    A.    Good afternoon.

21    Q.    Would you state your name for the record, please?

22    A.    Teri Dean.

23    Q.    And Miss Dean, do you have any children?

24    A.    Yes, I do.

25    Q.    How many?

1    A.    I have one.

2    Q.    And what is his name and age?

3    A.    Christian Dean, and he's 19.

4    Q.    Okay.  And what is he doing right now?

5    A.    He's enrolled at SWIC doing the nursing program.

6    Q.    Okay.  And do you get to see him often?

7    A.    I do.

8    Q.    Okay.  And when is the last time you saw him?

9    A.    Friday.

10   Q.    How was that?

11   A.    It was good.

12   Q.    Great.

13         Have you ever been incarcerated at Chillicothe

14   Correctional Center?

15   A.    Yes.

16   Q.    And when were you at Chillicothe?

17   A.    July of 2012 to October of 2018.

18   Q.    Okay.  And were you convicted of felonies, is that why

19   you were sentenced to go to Chillicothe?

20   A.    Yes.

21   Q.    And what were you convicted of?

22   A.    I was convicted of two counts of distributing

23   controlled substance, endangering welfare of a child, second

24   degree murder, and two tampering with physical evidence.

25   Q.    Okay.  And what was your total sentence for all of

1 those convictions?

2 A.      Twenty-three.

3 Q.      And are you still serving time?

4 A.      I am.

5 Q.      Okay.  And when you were at Chillicothe -- and, again,

6 you said that was July 2012 to October of 2018; is that right?

7 A.      Yes, ma'am.

8 Q.      Did you have any jobs while you were there?

9 A.      Yes, I did.

10 Q.      Can you tell the jury what you did when you were there?

11 A.      When I was in Chillicothe, I was a barber for most of

12 my time.  I also did yard crew, I was a cook in the kitchen,

13 and then I also worked in the hole as janitorial service.

14 Q.      And we heard testimony the last few days of this hole.

15 What -- can you explain what the hole is really?

16 A.      It's ad seg, disciplinary action.

17 Q.      So how is it -- is it different than other housing

18 units?

19 A.      Yes, it is.

20 Q.      How so?

21 A.      You aren't let out of the room, you're in there with

22 one other person, it's a wet cell, they have a toilet, and

23 you're locked down 24 hours a day.

24 Q.      And when you say it's a wet cell, does that just mean

25 there's a toilet in that cell?

1    A.    Yes.

2    Q.    And is that different than Housing Units --

3    A.    Yes.

4    Q.    -- 5, 6, 7, 8?

5    A.    Yes.

6    Q.    And where are the toilets in those --

7    A.    Well, in Housing Unit 8, that is also what's -- you can

8    come and go out of your room.  Housing Unit 4, 5, 6, 7, 8 --

9    well, besides 8, they all have four rooms, four bunks in there.

10   And then there's no toilet in there, and you can come in and

11   out of your room unless it's count time.

12   Q.    And where did you -- what housing units were you at

13   between 2012 and 2018?

14   A.    I've lived on 1-House, 2-House, 4-House, 5-House,

15   6-House, 7-House, and 8-House.

16   Q.    So you were, like, all over the place?

17   A.    Yes.

18   Q.    And I believe the records will show that you were at

19   7-House for the majority of your time there; is that your

20   recollection?

21   A.    Yes.

22   Q.    Or at least on and off, but you were at 7-House a lot,

23   right?

24   A.    Yes.

25   Q.    And does 7-House have a code name or a key name that

1  the kind of campus at Chillicothe calls it?

2  A.      7-House is the honor dorm.

3  Q.      And what does that mean?

4  A.      You have three or less violations and that you just get

5  special privileges.

6  Q.      And three or less violations in any given time frame,

7  or just --

8  A.      In a year.  In a year.

9  Q.      So three or less in one year, and you can stay on the

10  dorm -- honor dorm?

11  A.      Correct.

12  Q.      Okay.  And what special privileges are you allowed

13  there?

14  A.      You can pretty much pick your own roommates, you can go

15  in and out of each other's room, you get ten food visits a

16  year, you get to eat first, and I think that's it.

17  Q.      Did you say ten food visits?

18  A.      Correct.

19  Q.      And what's a food visit, for the jury?

20  A.      When your family brings in either homemade food or

21  bought food from somewhere into the institution during your

22  regular visit.

23  Q.      And is that something pretty special?

24  A.      It is special, if you ever ate in DOC.

25  Q.      Before we get into how you know Correctional Officer

1   Bearden, I kind of wanted to run through the plaintiffs in this

2   case really quick. Oh, never mind, I actually wanted to talk

3   to you about education.

4         In your time at Chillicothe, were you taking classes

5   of any kind?

6   A.     In Chillicothe, I was -- I didn't take any -- I took

7   some Pathways to Change and ICBC classes.

8   Q.     What about now? Are you going to school now?

9   A.     Yes, I'm in Washington University right now.

10   Q.     Okay. And what degree are you pursuing?

11   A.     Business.

12   Q.     And how many years is it going to take you to pursue

13   that degree?

14   A.     Well, I should get it in 2028.

15   Q.     Okay. And how many people -- is this program -- was it

16   through a program through DOC that you applied to Wash U and

17   got in?

18   A.     Yes.

19   Q.     And how many people applied to that, do you think?

20   A.     Over 200.

21   Q.     How many people got in?

22   A.     Twenty.

23   Q.     Now I want to run through the plaintiffs and the

24   lawsuits that we're here for.

25         The first one is Karen Keil. Do you know Karen?

1   A.   I do.

2   Q.   Do you know her well?

3   A.   We were on a housing unit dorm together.

4   Q.   Okay. Do you remember how long you were on the same

5 housing unit?

6   A.   Maybe a couple of years.

7   Q.   Okay. Do you know her from any other interactions at

8 Chillicothe?

9   A.   Not really.

10   Q.   I believe you told us in the past that she was a BLAST

11 instructor?

12   A.   Yes.

13   Q.   Did everyone pretty much know the BLAST instructors?

14   A.   Yes.

15   Q.   Okay. So it wouldn't be weird that you knew Karen

16 because she was just one of the BLAST instructors.

17   A.   Correct.

18   Q.   Have you had any contact with Karen since she left

19 Chillicothe?

20   A.   No, ma'am.

21   Q.   Have you ever talked to Karen about her lawsuit that

22 we're here today about?

23   A.   No.

24   Q.   I'm going to move on to Lynnsey Betz. Do you know her

25 at all?

1  A.  I've seen her in Chillicothe.

2  Q.  Okay.

3  A.  But I don't know her.

4  Q.  Ever talk to her about this lawsuit?

5  A.  No.

6  Q.  Do you know Trenady George?

7  A.  Yes.

8  Q.  How do you know her?

9  A.  Doing time in Chillicothe.

10  Q.  Okay.  Would you say you know her well?

11  A.  No, I don't know her well.

12  Q.  Would you guys hang out, or would you guys just see

13  each other in the hallways or in rec or playing sports?

14  A.  We would just see each other.

15  Q.  Okay.  Have you ever talked to Trenady George about her

16  lawsuit pending in front of this court?

17  A.  No.

18  Q.  Have you had any contact with Karen, Lynnsey, or

19  Trenady since they left Chillicothe?

20  A.  No.

21  Q.  The last plaintiff, Lynnsey Zieser [sic], have you --

22  do you know Lynnsey?

23  A.  No.

24  Q.  Have you had any recent contact with her?

25  A.  No.

1    Q.     Have you talked to her at any time throughout the years

2   about her lawsuit that's pending before this court today?

3   A.     No.

4   Q.     Do you know correctional officer Defendant Bearden?

5   A.     I do.

6   Q.     Do you remember the first time you met him?

7   A.     When I was in the barber shop working.

8   Q.     Okay.  Do you have any idea either, I don't know, the

9   year, time of year?

10   A.     It was in 2012, probably end of August.

11   Q.     Okay.  And what sticks out in your mind about that

12   first interaction with him?

13   A.     He was over friendly, and he complimented a lot.

14   Q.     What would he say to you?

15   A.     He would just tell me I looked nice, or if I had curled

16   my hair or something, he would tell me that my hair would look

17   nice.

18   Q.     And after that first interaction with Correctional

19   Officer Bearden, how many times would he compliment you?

20   A.     Every time I would see him.

21   Q.     Did his compliments either increase or change at all?

22   A.     They changed as they got sexual.

23   Q.     Can you elaborate on that for me?

24   A.     He would comment about my breasts, or he would comment

25   about my rear.

1  Q.    And what exactly would he say about your breasts?

2  A.    He would just say that I had nice breasts.

3  Q.    And what would he say about your rear?

4  A.    That I had a nice A-S-S.

5  Q.    And thank you for spelling that for the Court.

6        Did you ever hear him talk about his physical

7  appearance or his private parts at all?

8  A.    Yes.

9  Q.    And what did he say to you?

10 A.    When he worked inside the bubble inside of rec, he

11 would -- he would motion to himself and pull his pants tight

12 where you could see that he had an erection.

13 Q.    And did he make any other offensive comments about his

14 erection or private parts?

15 A.    When I was in the barber shop, if I would have a comb

16 or a brush, he would state that his penis was larger.

17 Q.    Larger than what?

18 A.    Larger than the comb or the brush.

19 Q.    Okay.  Did he ever talk about any of his grooming

20 styles with you?

21 A.    He did.

22 Q.    What did he tell you?

23 A.    He would talk and say that he was man-scaped in his

24 private areas, and that he would say that his boys were shaven.

25 Q.    At any time did his offensive comments turn physical?

1  A.      Yes.

2  Q.      And what was, I guess, initially the physical contact

3  he would have with you?

4  A.      The first time that Mr. Bearden assaulted me was in the

5  utility closet on 7-House.

6  Q.      And I just want to rewind really fast.  Did you ever

7  experience overinvasive pat-downs by Bearden?

8  A.      Yes.

9  Q.      Can we talk about those before we go into utility

10  closet assaults?  I just want to talk about these pat-downs

11  really quickly.

12          Where did you get pat-downs?

13  A.      Out front of the housing units and outside recreation,

14  outside chow hall, inside chow hall, inside the housing unit.

15  Just wherever they wanted to.

16  Q.      And when you say they, you mean the correctional

17  officers, right?

18  A.      Correct.

19  Q.      And did Correctional Officer Bearden's pat-downs of you

20  differ from other male guards' pat-downs of you?

21  A.      Yes.

22  Q.      How so?  Explain that to the jury, please.

23  A.      Mr. Bearden was overzealous with his pat-downs.  He

24  would go up and pick up your breasts and go up underneath them.

25  He would go up in between your legs and into your private

1  areas.  Mr. Bearden would comment if you had a pad or a tampon

2  on.  Mr. Bearden would pick you out of the crowd if he liked

3  you.

4    Q.    Is there a way that you can tell me how many times

5  these overzealous, overinvasive pat-downs of Bearden happened

6  to you?

7    A.    I couldn't give you a number.  It happened from the

8  time I hit Chillicothe until 2015 when they stopped

9  cross-gender pat-downs.

10   Q.    And now I do want to turn to physical assaults, and I

11 believe you started to tell us about a utility closet

12 situation.  But before we get there, I just want the jury to

13 hear the locations of the physical assaults, if you could just

14 lay those out for us, please.

15   A.    In the 7-House utility closet, in the barber shop, and

16 in the recreational utility closet.

17   Q.    I am going to show you what has been marked as D19 --

18         MS. SNOW:  And this is Page 1, for the record.  We

19 can show it to the jury, too.

20 BY MS. SNOW:

21   Q.    Can you see that?

22   A.    Uh-huh.

23   Q.    What is this a diagram of?  Or what does it appear to

24 be a diagram of?

25   A.    This is the recreational building, chow hall and 1- and

1  2-House.

2  Q.     Where were Houses 3, 4, 5, 6, 7, and 8 from here?

3  A.     1, 2, and 3 were to the left, and the other houses you

4  can -- they're viewed around the ball field.

5  Q.     Okay.  And did all of the housing units have the same

6  layout?

7  A.     Besides 8-House and 1-House and 2-House and 3-House.

8  Q.     Okay.  I'm just going to show you what has been marked

9  as Exhibit D19, Page 9.  Does this look like Housing Unit --

10  can you see that okay?

11  A.     Yes.

12  Q.     Does this look like Housing Unit 7?

13  A.     Yes.

14  Q.     Okay.  You said just now that the first place we're

15  going to talk about is the utility closet on Housing Unit 7.

16  Can you find that utility closet on this diagram?

17  A.     It's -- if you walk in, there's that bubble.  And if

18  you keep going, there's a hall, like a staff hallway, and it's

19  there to the left.

20  Q.     Is there a way you could circle that, or is it too

21  small to do that?

22         THE COURT:  So actually -- if you just put your

23  finger on the screen -- yes.

24         THE WITNESS:  Oh, I think I went over it.

25         THE COURT:  Since she's tried it once, why don't you

1  clear it out and have her try it again, now that she has a

2  sense of it.

3           THE WITNESS:  Sorry, Judge.

4           THE COURT:  That's okay.

5           (So done.)

6           THE COURT:  Okay.

7  BY MS. SNOW:

8  Q.     Okay.  If I look really, really closely at that -- and,

9  again, this is Defendant's 19, Page 9.  The jury will be able

10 to take these back to the deliberation room and look at them

11 closely.

12          It looks like you've circled where it says inmate

13 toilet; is that right?

14 A.     That's correct.

15 Q.     And it looks like there are two little rooms that say

16 "inmate toilet," "inmate toilet," and across from that it says

17 "staff toilet," "staff toilet," right?

18 A.     Correct.

19 Q.     Were these inmate toilets actual toilets for you to

20 use?

21 A.     No.

22 Q.     What were those two rooms?

23 A.     They were like holding areas for brooms and mops and

24 cleaning supplies.

25 Q.     Both of those rooms?

1  A.    Yes.

2  Q.    Did the inmates have UA tests ever?

3  A.    Yes.

4  Q.    Did, where did that happen?

5  A.    Sometimes it would happen there.

6  Q.    Okay.  In one of --

7  A.    Yes.

8  Q.    -- the toilets?

9  A.    Yes.

10  Q.    The other one was a closet of sorts, utility closet?

11  A.    Yes.

12  Q.    Okay.  What did, or how did -- I guess how did Bearden

13  get you in that closet or meet you inside that closet?

14  A.    He sent me in there for some brooms and mops.

15  Q.    And then did he follow you in there?

16  A.    He followed me in there.

17  Q.    Did he leave the door open or closed?

18  A.    He pulled it almost shut.

19  Q.    But there was still like a crack open?

20  A.    Yes.

21  Q.    And what did he do the first time he pulled you into

22  the utility closet in 7-House?

23  A.    He leaned against me, and he started rubbing my

24  breasts.

25  Q.    How many times, if you had to estimate, did he take you

1  into the utility closet on 7-House?

2  A.      Four to five times.

3  Q.      Did the four to five times differ at all?

4  A.      Each time -- the second time was worse than the first,

5  the third time was worse than the second.  He got more

6  aggressive each additional time.

7  Q.      And when you say more aggressive, what do you mean?

8  A.      He would yank my arms, he would try to rub my privates,

9  he would lean his knee into my private areas.

10  Q.      Did you tell him to stop at any time?

11  A.      Repeatedly.

12  Q.      Did he stop?

13  A.      No.

14  Q.      I think the next place you talk about is the barber

15  shop, and I'm going to show you what's been marked as

16  Defendant's Exhibit 19, Page 13.  What is this a diagram of?

17  A.      Recreational building.

18  Q.      Okay.  And is the barber shop in that building?

19  A.      Yes.

20  Q.      Can you see it?

21  A.      Yes.

22  Q.      Can you please circle it?

23          (So done.)

24  Q.      And I know you talked earlier about your employment,

25  and you said you were a barber pretty much your whole time at

1  Chillicothe.  Was that your testimony?

2  A.      Yes, ma'am.

3  Q.      And did you -- is there a difference between being a

4  barber for the correctional officers or being a barber for

5  other inmates?

6  A.      When I was first hired in 2012, there was only staff

7  barbers, you were only allowed to cut the staff's hair.  It

8  wasn't until the end of 2018, or maybe beginning of 2018, where

9  you were allowed to cut the offenders' hair, as well, after

10  cosmetology closed.

11  Q.      And even when you were allowed to cut staff and

12  offenders' hair, did you still routinely cut Bearden's hair?

13  A.      Yes.

14  Q.      Did you cut Bearden's hair the entire time you were at

15  Chillicothe?

16  A.      I did.

17  Q.      And I guess I just want you to explain to the jury what

18  physical assaults happened in the barber shop.

19  A.      When Mr. Bearden would come in, if I was standing up,

20  he would rub against my breasts before he sat down.  When I was

21  cutting his hair, he would lean his head back into my breasts

22  and rub them.  Underneath the cape, he would rub up in between

23  my legs into my private areas.

24  Q.      And how many times do you think, if you had to guess,

25  these physical assaults happened in the barber shop?

1  A.    I couldn't tell you how many times.

2  Q.    Could you even guess how many times you cut his hair

3  over the years?

4  A.    No.

5  Q.    Did you ever tell him -- tell him to stop in the barber

6  shop?

7  A.    Yes.

8  Q.    Did you ever do anything to make him stop?

9  A.    On two different occasions.  On one occasion, I pushed

10  clippers into the back of his neck, and one occasion when he

11  got rough with me, I cut his ear.

12  Q.    Did you draw blood both times?

13  A.    I did.

14  Q.    Did he continue assaulting you even after that?

15  A.    He did.

16  Q.    And I think the third location you said was the

17  recreation utility closet.  Is that right?

18  A.    That's correct.

19  Q.    Do you see that on this same map?

20  A.    Yes.

21  Q.    And where is it located compared to the barber shop or

22  in relation to the barber shop?  Okay.  Perfect.

23        What was in that utility closet?

24  A.    Cleaning supplies and a place to put our dirty towels.

25  Q.    Did you have the freedom to go into that closet

1  whenever you wanted --

2  A.    I did.

3  Q.    -- as a barber?

4  A.    Correct.

5  Q.    Did -- or did anyone ever direct you to go into that

6  closet to get something?

7  A.    I came and went in and out of that closet as I pleased.

8  Q.    Okay.  Did Bearden ever tell you to go into that

9  closet?

10  A.    He sent me in there for cleaning supplies.

11  Q.    Did any other correctional officer or staff member ever

12  send you in there to get cleaning supplies?

13  A.    No.

14  Q.    Would Bearden follow you into that closet after he told

15  you to go in there?

16  A.    He would.

17  Q.    Every time?

18  A.    Almost every time, yes.

19  Q.    And what happened next?

20  A.    He would pin me against the wall.  He would pin me

21  against the wall, and he would -- he was trying to get into my

22  pants.  He pulled my shirt up over my bra and fondled my

23  breasts.

24  Q.    And when he fondled your breasts, that was skin-to-skin

25  contact, right?

1    A.     Correct.

2    Q.     How many times did these assaults in the utility closet

3 of the rec center happen?

4    A.     Between 8 and 10 times.

5    Q.     To your knowledge, is there a camera in the utility

6 closet on 7-House?

7    A.     No.

8    Q.     Is there a camera in the barber shop?

9    A.     Yes.

10    Q.     How would Bearden do these things, knowing there was a

11 camera in the barber shop?

12    A.     Because it only showed certain areas.  There was blind

13 spots on the cameras.

14    Q.     Do you think Bearden knew what those blind spots were?

15        MS. HARRIS:  Objection.  Calls for speculation.

16        THE COURT:  Sustained.

17 BY MS. SNOW:

18    Q.     To your knowledge, did the utility closet in the rec

19 hall that you just circled, the second circle on this map, have

20 a security camera?

21    A.     No.

22    Q.     Did you ever tell Bearden to stop the assault in the

23 utility closet in the recreation building?

24    A.     Yes.

25    Q.     Did he ever stop?

1    A.      No.

2    Q.      Do you see Correctional Officer Edward Bearden today in

3    this courtroom?

4    A.      I do.

5    Q.      Can you explain to the jury what he is wearing or what

6    he looks like?

7    A.      He has a goatee and a black jacket and a collared

8    shirt.

9            MS. SNOW:  Your Honor, can the record reflect that

10   Teri Dean has identified Defendant Bearden?

11           THE COURT:  The record will so reflect.

12           MS. SNOW:  I have nothing further.

13           THE COURT:  Any cross-examination?

14           MS. HARRIS:  May I begin, Your Honor?

15           THE COURT:  Yes.

16           MS. HARRIS:  Thank you.

17                              - - -

18                      CROSS-EXAMINATION

19   By Ms. Harris:

20   Q.      Miss Dean, my name is Cara Harris.  I have a few

21   questions for you.

22           Starting at the end about the cameras, did you ever

23   have the opportunity when you were at Chillicothe Correctional

24   Center to look at the monitors of what the cameras were

25   showing?

1 A.  No.

2 Q.  Okay.  So you're unaware of where there might be blind

3 spots, you're just assuming there are some blind spots based

4 upon your own assumptions?

5 A.  No, it was based on what the officers had said.

6 Q.  Someone told you there are blind spots?

7 A.  Yes.

8 Q.  Okay.  You never saw them for yourself, however.

9 A.  Correct.

10 Q.  Okay.  In the -- let's talk about the barber shop

11 first.

12    In the barber shop, there are cameras; is that

13 correct?

14 A.  There's one.

15 Q.  Okay.  And the barber shop is just what we would think

16 of as a normal barber shop.  It actually has a barber pole

17 outside of it in the hallway, doesn't it?

18 A.  No, there's no pole.

19 Q.  There's no pole?

20 A.  No.

21 Q.  At least there wasn't when you were there?

22 A.  That's correct.

23 Q.  Okay.  Does it have a sign that says it's a barber

24 shop?

25 A.  In the window.

1  Q.      Okay.  And are there two chairs, two barber chairs?

2  A.      There was three when I was there.

3  Q.      Okay.  Is there a shoe-shine station?

4  A.      There was when I was there.

5  Q.      Okay.  How many barbers work in the barber shop at a

6  time?

7  A.      It just depends.

8  Q.      How many can there be?  As many as three, I guess, if

9  there's three chairs?

10  A.      Correct.

11  Q.      Okay.  Were there times when there would be only one

12  barber working in there?

13  A.      Yes.

14  Q.      Okay.  Was there times when there would be a shoe-shine

15  person in there, as well?

16  A.      Yes.

17  Q.      And in -- the staff people, they made appointments; is

18  that correct?

19  A.      They just usually came in.

20  Q.      There was no appointments made?

21  A.      On rare occasions did they make appointments.

22  Q.      Okay.  So you didn't know whose hair you were going to

23  be cutting?

24  A.      If a certain officer wanted you to cut their hair, they

25  could call you in.

1 Q. They could call you in; is that what you said?

2 A. Yes, ma'am.

3 Q. Okay. And what time was the barber shop opened?

4 A. It was opened all night.

5 Q. What time does that mean?

6 A. It's open 24 hours.

7 Q. Okay. So it's open 24 hours a day. And during the

8 time that the rec is open -- it's in the rec building; is that

9 correct?

10 A. It's down from rec, yes.

11 Q. Okay. Is it in the same building as the rec?

12 A. Yes.

13 Q. Okay. And the rec has a certain hallway where there's

14 the gym and the game room and things like that; is that

15 correct?

16 A. Correct.

17 Q. And then there's a hallway that has the barber shop.

18 A. Yes.

19 Q. Okay. Is there a corrections officer, like the rec

20 officer in that building, is there an office for him near the

21 barber shop?

22 A. It's as soon as you walk into that building.

23 Q. Okay. And how far is the barber shop from that?

24 A. I'm not sure. I mean, it's pretty far.

25 Q. Okay. And --

1  A.      The barber shop is almost at the end of that hallway.

2  Q.      Okay.  So different ends of the hallway is what you're

3  telling me?

4  A.      Yes, ma'am.

5  Q.      Okay.  And you said there's a window in the barber

6  shop.

7  A.      Correct.

8  Q.      Because that's where the sign goes.

9  A.      Yes.

10  Q.      That's where the sign is?

11  A.      Yes.

12  Q.      Okay.  If you're standing in the hallway, are you able

13  to see inside the barber shop, see the three chairs, see who is

14  in there?

15  A.      Yes.

16  Q.      Okay.  And you're -- you said there is a camera in the

17  barber shop.

18  A.      Correct.

19  Q.      Okay.  As far as the barber shop and the assault you

20  said took place, there's a rule that COs are not even supposed

21  to touch an offender; is that correct?

22  A.      Correct.

23  Q.      Okay.

24  A.      After 2015, no cross-gender.

25  Q.      That's the pat-downs.

1  A.      Correct.

2  Q.      So they've stopped that.  So if they're not doing a

3  pat-down and if there's no emergency, like they're having to

4  break up a fight, or some security emergency or a medical

5  emergency, the COs are not supposed to touch you unless one of

6  those three things are going on, correct?

7  A.      They're not supposed to.

8  Q.      Okay.  So when you're saying that Mr. Bearden came in,

9  you said when he came in to the barber shop, he would brush up

10 against you and touch your breasts; is that right?

11 A.      That's correct.

12 Q.      Okay.  So every time he did that, was there no one else

13 in the barber shop?

14 A.      He would just say, "Excuse me."

15 Q.      Okay.  And so other people -- you're testifying other

16 people would see him do that?

17 A.      There was other people -- there could have been other

18 people in the barber shop.

19 Q.      Were there other people in the barber shop that saw him

20 do that?

21 A.      I'm not sure.

22 Q.      Okay.  So you're not sure if he ever did that when

23 there was ever anybody else in the barber shop.

24 A.      Mr. Bearden was bold, so I'm sure he did.

25 Q.      Well, do you remember him doing it?

1   A.      Yes.

2   Q.      Okay.  So your testimony is now that there were other

3   people in the barber shop, he walked in, brushed up against

4   you, which is against the rules, and no one else said anything

5   or did anything.

6   A.      That's correct.

7   Q.      Okay.  Now, when you said he would be in the chair, he

8   would also touch you, correct?

9   A.      That's correct.

10  Q.      Okay.  And I think one of the things you said was that

11  he would, as you were, I assume, coming around in front of him

12  is what I'm thinking, you said he would actually -- under his

13  cape, he would somehow go up into your leg area, between your

14  legs; is that what you testified to?

15  A.      That is what I testified to.

16  Q.      Okay.  And that was, I assume, when you were either to

17  the side or in front of him.

18  A.      That's correct.

19  Q.      If you're behind him, he's not able to do that.

20  A.      That's correct.

21  Q.      Okay.  And when you're talking about a cape, you're

22  talking about a cape like any one of us, if we go get our hair

23  cut, the beautician or cosmetologist, barber, would put around

24  us right?

25  A.      Yes.

1  Q.      So if he's sitting in the barber chair, the cape is

2  going -- covering him so that any hair would fall to the floor,

3  correct?

4  A.      Correct, yes.

5  Q.      So when he's doing this, he has his hands under the

6  cape, correct?

7  A.      Yes.

8  Q.      So he moves in front of you, and the cape is actually

9  moving, as well as his hand, into your leg up your thigh and

10 into your private area, correct?

11 A.      That's correct.

12 Q.      Okay.  And your testimony is he's doing that also when

13 there are other people in the barber shop?

14 A.      No.

15 Q.      So he only did that when he was alone with you in the

16 barber shop?

17 A.      That's correct.

18 Q.      Okay.  And how many times was he actually alone with

19 you in the barber shop?

20 A.      Many times.

21 Q.      And how did that work?

22 A.      Mr. Bearden would call me in for a haircut.  He would

23 send the shoe shiner on an errand, and then we would be alone.

24 Q.      And he would do that when there was no other barber in

25 there?

1  A.      That's correct.

2  Q.      And I assume if they're able to call you in at any

3  time, it's possible anybody else could have walked in to also

4  get a haircut at the same time.

5  A.      That's correct.

6  Q.      Okay.  And he's in there alone with you, but he's still

7  doing this under the cape?

8  A.      That's correct.

9  Q.      Okay.  Now, let's talk about the utility closet in

10  Housing Unit 7.

11          MS. HARRIS:  Can you put that up?  I want to see if

12  we can get it any bigger.  Can you do Exhibit 19 with the

13  housing unit?  I think it's Page 9.  No, that's the rec.  Is

14  that right, is that the housing unit?  Let's see if we can get

15  this a little bigger if that's okay, Judge.  That's what I'm

16  trying to do.  If we can't get it on there, we'll go back to

17  the Elmo.  We'll go this way.

18  BY MS. HARRIS:

19  Q.      We're going to look back at what Ms. Snow showed you

20  and has already been admitted as an exhibit.  It's part of

21  Exhibit 19, and this is the Housing Unit 7.

22          MS. HARRIS:  So do you know how we zoom in?  Oh,

23  good, we're able to zoom in on that.  Thank you, Abbie.

24  BY MS. HARRIS:

25  Q.      Miss Dean, are you able to see this now?

1  A.     I am.

2  Q.     Okay.  And I want to talk to you a little bit more --

3  can you circle again on here now where the utility closet is

4  that you contend that Mr. Bearden assaulted you in?

5  A.     Do you have it upside down?

6  Q.     I don't know.  I think it was upside down earlier, but

7  do you want me to -- because I have the writing going the right

8  way.  I think this is the door, like this is the door going

9  into the housing unit where my finger is.  I think you need to

10 go -- about right in that area is where you were a minute ago,

11 I think.  Are you able to get your bearings?

12 A.     Yeah, it was before here.  That's laundry?

13 Q.     Are you writing -- are you trying to push on it?

14 A.     Right around in here.

15 Q.     Okay.  All right.  So we're right there.

16        Now, tell us this big thing, the big diamond-shaped

17 thing almost there in the middle, what is that?

18 A.     That's the bubble.

19 Q.     And tell the jury what a bubble is in a housing unit in

20 a prison.

21 A.     A bubble in housing units is where the officers sit and

22 watch the wings.

23 Q.     Okay.  How many officers are there typically in a

24 bubble?

25 A.     It depends.

1   Q.      How many can there be?

2   A.      Two.

3   Q.      Okay.  And the bubble -- I think someone testified

4   earlier it's called a bubble because it looks like a bubble; is

5   that right?

6   A.      Correct.

7   Q.      Okay.  And it looks like a bubble because it's fully

8   glass all the way around you, is that correct, so they can see

9   every wing?

10  A.      Correct.

11  Q.      Okay.  So officers would have had -- how far away is

12  that, five or six feet from where the bubble is as to where the

13  utility room is?

14  A.      The glass windows are facing each wing.

15  Q.      Back to my question.  How far away is the bubble, the

16  closest part of the bubble to that utility room?  Do you have

17  an estimation?

18  A.      Maybe ten feet.

19  Q.      Okay.  And it's your testimony that when Mr. Bearden

20  was working in Housing Unit 7 that he followed you into this

21  closet and assaulted you there and no one noticed?

22  A.      That's correct.

23  Q.      Okay.  And he pulled the door almost shut; is that

24  right?

25  A.      That's correct.

1  Q.    And no one noticed that either.

2  A.    The doors were almost always shut all the time.

3  Q.    Even when people were in there?

4  A.    When the UAs happened at night, they were open.  The

5  officer was standing there watching you.

6  Q.    So did this happen in the evening, Miss Dean?

7  A.    Yes.

8  Q.    Okay.  Now, the pat-downs that you talked about,

9  there's already been testimony and you said a little something

10  about it too, at some point they stopped doing cross-gender

11  pat-downs.  Is that correct?

12  A.    That's correct.

13  Q.    Okay.  And after they stopped doing the cross-gender

14  pat-downs, would you agree with me that Mr. Bearden didn't do

15  any more pat-downs when he actually touched you?

16  A.    That's correct.

17  Q.    Okay.  And even when he was doing the pat-downs, and I

18  know you've said they were aggressive, they were over your

19  clothes; is that correct?

20  A.    That's correct.

21  Q.    Okay.  And the pat-downs you indicated were in areas

22  such as if you were coming out of the dining hall or if you

23  were out in the yard, correct?

24  A.    Correct.

25  Q.    And the pat-downs were occurring to make sure you

1  didn't have some sort of contraband --

2  A.      Correct.

3  Q.      -- is that your understanding?

4  A.      Yes.

5  Q.      And in the yard or coming out of the dining hall is a

6  pretty busy place; is that correct?

7  A.      Correct.

8  Q.      And there would have been other officers also

9  conducting pat-downs of other offenders; is that correct?

10  A.      That's correct.

11  Q.      Okay.  And is it your testimony that at no time another

12  officer or offender or anyone noticed or reported Mr. Bearden

13  doing these overly aggressive pat-downs?

14  A.      That's correct.

15  Q.      Okay.  Now, at the time that all of these egregious

16  acts occurred that you've testified about, did you ever report

17  it to anyone at Chillicothe?

18  A.      Leslie Carsey.

19  Q.      Who is that?

20  A.      She's a PREA investigator.

21  Q.      When did you do that?

22  A.      In 2018.

23  Q.      And none of these -- that was at the time that none of

24  these had occurred; is that right?  I mean -- let me ask a

25  better question.

1          That's several months after any of these occurred,

2   correct?

3    A.     That's correct.

4    Q.     Okay.  At the time that any of these actually occurred,

5   so shortly thereafter I'll even say, did you ever report them

6   at the time or shortly after they occurred?

7    A.     I did not.

8    Q.     Okay.  Now, at the time that you reported these to the

9   PREA officer at Chillicothe that you just told me, you knew

10  about Miss Keil, Miss Betz, and Miss Zieser's allegations; is

11  that correct?

12   A.     That's incorrect.

13   Q.     You didn't know about them?

14   A.     No.

15   Q.     Okay.  The times that you cut Mr. Bearden with the

16  scissors or with the clippers that you testified to, did you

17  get a conduct violation for either of those times?

18   A.     No.

19   Q.     Is that something that you could have gotten a conduct

20  violation for?

21   A.     Yes.

22   Q.     Okay.  The times that you believe Mr. Bearden -- have

23  testified that Mr. Bearden followed you into the utility closet

24  in Housing Unit 7, those were spread out over your first --

25  between your first stint in Housing Unit 7 and the third time

1  that you were there; is that correct?

2  A.      That's correct.

3  Q.      Okay.  Now, you were living in Housing Unit 7 at the

4  same time that Miss Keil was; is that correct?

5  A.      That's correct.

6  Q.      Okay.  A housing unit itself is a pretty busy place; is

7  that correct?

8  A.      That's correct.

9  Q.      And you testified earlier that, especially Housing Unit

10 7, there are actually special privileges, correct?

11 A.      Yes, ma'am.

12 Q.      Okay.  And a lot of people tend to think -- well, I

13 shouldn't say that, probably shouldn't.  But sometimes I think

14 people think prison inmates are in their cell most of the day

15 or all of the day.  At Chillicothe, are people who are in

16 Housing Unit 7, are they in their cells, their rooms all day?

17 A.      It depends on the inmate.

18 Q.      Okay.  Do they have the freedom to leave if they want

19 to?

20 A.      They do.

21 Q.      Okay.  What time can you leave your cell?  What time do

22 they open?

23 A.      After count, after 7:30 count.

24 Q.      Okay.

25 A.      Whenever that clears.

1  Q.     Okay.  Is that usually before 8 o'clock?

2  A.     Maybe a little after.

3  Q.     Okay.  And how long are you free to roam around?

4  A.     Until 11:15.

5  Q.     And then is there another count?

6  A.     Yes.

7  Q.     At that point, do you have to go back to your room,

8  your cell?

9  A.     Correct.

10 Q.     And they clear another count?

11 A.     Yes, ma'am.

12 Q.     Then are you free to again go about your business?

13 A.     Yes.

14 Q.     Okay.  And then when do they do another count?

15 A.     At 4:30.

16 Q.     And are you free then after that count to go around?

17 A.     That's correct.

18 Q.     And what's the final count?

19 A.     10 o'clock count.

20 Q.     Okay.  So from 4:40 until the 10 o'clock count, in

21 Housing Unit 7 especially, you said people not only are able to

22 leave their own cells and go to rec or go to the chapel or

23 education or their job, but you can actually go into other

24 people's cells in Housing Unit 7; is that correct?

25 A.     That is correct.

1  Q.    And that's slightly different than some of the other

2  housing units?

3  A.    Yes, ma'am.

4  Q.    In other housing units, are you supposed to stay in

5  your own assigned cell?

6  A.    Yes, ma'am.

7  Q.    Okay.  So there's also a laundry facility in each

8  housing unit; is that correct?

9  A.    Yes.

10  Q.    And are people, offenders free to do their laundry when

11  they want to?

12  A.    Yes.

13  Q.    You have showers, correct?  We've had some testimony.

14  A.    Yes.

15  Q.    Are you free to take a shower when you want to?

16  A.    Yes.

17  Q.    Okay.  So within Housing Unit 7, there's really no

18  restrictions on an offender's going, walking around Housing

19  Unit 7 if they're assigned to that housing unit, correct?

20  A.    That's correct.

21  Q.    Okay.  How many guards, if you know, are assigned to

22  Housing Unit 7 on any one shift?

23  A.    It depends.

24  Q.    What does it depend upon?

25  A.    It depends if people have called in or they're

1  shorthanded.

2  Q.    Okay.

3  A.    If they're shorthanded, then they have less officers.

4  Q.    Okay.  Was there at least always two correctional

5  officers each shift in Housing Unit 7, or do you know?

6  A.    I would assume there would be at least two.

7  Q.    Okay.  The recreation building is also a fairly busy

8  building; is that correct?

9  A.    That is correct.

10  Q.    And the recreation building, again, is the same

11  building where the barber shop is, correct?

12  A.    Yes, ma'am.

13  Q.    And it's also where this utility closet is that you

14  talked about that Mr. Bearden also assaulted you in; is that

15  correct?

16  A.    Yes, ma'am.

17  Q.    Okay.  And your testimony is that no one ever saw any

18  of this conduct go on between you and Mr. Bearden.

19  A.    That's correct.

20  Q.    Okay.  Did you take the BLAST classes, go to them?

21  A.    No.

22  Q.    You never did?

23  A.    No.

24  Q.    Okay.  But you did live with Karen Keil in Housing Unit

25  7 for at least a year?

1   A.      Yes.

2   Q.      Okay.  And you testified that you knew Trenady George;

3   is that correct?

4   A.      I said we were acquaintances.  I knew her, but we

5   weren't hang-around friends.

6           MS. HARRIS:  Okay.  Can I confer with co-counsel for

7   one quick moment?

8           THE COURT:  Sure.

9           MS. HARRIS:  Okay.  I don't have any other questions

10  of this witness.  Thank you, Your Honor.

11          THE COURT:  Any redirect?

12          MS. SNOW:  Briefly.

13          THE COURT:  Okay.

14                           - - -

15                  REDIRECT EXAMINATION

16  By Ms. Snow:

17  Q.      I'm just going to go back to this exhibit where you

18  circled.  You don't have your glasses on, do you?  Oh, you do

19  have them with you?

20  A.      Yeah, I do.  I have them on now.

21  Q.      Okay.  Can we maybe, if I can figure this out.  Oh,

22  very good.  Okay.

23          I believe you told us that the location of the

24  assault on 7-House was in a utility closet, right?

25  A.      Yes.

1  Q.     And when you and I were talking moments ago, you said

2  it was actually -- you circled a toilet.

3  A.     Correct.

4  Q.     And it was a toilet -- it's marked as toilet on these

5  maps, but it's actually converted into a storage closet, right?

6  A.     That's right.

7  Q.     Okay.

8         THE COURT:  Just so that we're not confusing anyone,

9  can you erase what you -- okay.  Thank you.  Just because it's

10  not in the right location when you changed.

11         MS. SNOW:  Sorry.  Yes.

12  BY MS. SNOW:

13  Q.     Can you see the closet, what is titled toilet, but the

14  closet where the assaults happened, again, just to clarify this

15  point?

16  A.     Yeah, it's here.

17  Q.     Okay.  And I'm going to attempt to clear that again

18  just to zoom in.

19         Do you still see that same closet, and, again, it's

20  marked toilet, but what is used as a storage closet on that

21  map?

22  A.     They're here.

23  Q.     Okay.  And what is between the bubble and those closets

24  in that diagram?

25  A.     There's a door.

1    Q.      Okay.  And I think -- that's all on this.  I'll leave

2    it.

3            I think Ms. Harris just asked you, and I just want

4    to clarify.  You and Karen Keil were in 7-House together.  You

5    were never roommates with Karen, right?

6    A.      That's correct.

7    Q.      You were just in the same house, in this house at the

8    same time.

9    A.      That's correct.

10           MS. SNOW:  Okay.  I have nothing further.

11           THE COURT:  Any recross?

12           MS. HARRIS:  No, Your Honor.

13           THE COURT:  Ma'am, if you wouldn't mind sitting

14   there for just a minute, we let the jury ask written questions.

15   So I'm going to see if the jury has any written questions of

16   you.

17           THE WITNESS:  Yes, ma'am.

18           THE COURT:  Could counsel please approach?

19           (Counsel approached the bench, and the following

20   proceedings were had:)

21           THE COURT:  So there are three questions.  First

22   question is, "Did all your assaults happen on a back shift?"  I

23   don't recall hearing the phrase "back shift."

24           MS. HARRIS:  I didn't either, and I don't know what

25   that means.

1    THE COURT:  Do you know what that means?  Is that

2  evening shift?

3    MS. HARRIS:  That would be my guess, but I don't

4  think that term has been used either.

5    THE COURT:  The next question is, "Are there

6  normally less officers on the back shift?"

7    So I'm inclined to not ask this question, but it may

8  be important for someone to clear this up on a subsequent

9  witness if you choose to.  But given the fact that "back shift"

10  wasn't used, I don't know that I know what back shift means,

11  and, therefore, I have no reason to think that the witness

12  would know what back shift means.

13    The next question is, "Why didn't she report the

14  assaults?"  Any objection to that question?

15    MS. SNOW:  No.

16    THE COURT:  Any objection?

17    MS. HARRIS:  No.

18    THE COURT:  Okay.  Then what I intend to do after

19  this is have -- take another break, probably a ten-minute break

20  and our last break of the day so that we can move her off of

21  the witness stand and move Miss Betz to the witness stand and

22  then proceed.  I assume that's your next witness?

23    MS. SNOW:  Yes.

24    THE COURT:  Okay.  Then that's what we'll do after

25  this question.

1    (The following proceedings were had in open court:)

2    THE COURT:  So, ma'am, I have one question for you.

3                          - - -

4                       EXAMINATION

5    By the Court:

6    Q.    Can you tell us why you didn't report the assaults?

7    A.    Because I was scared of retaliation.

8    THE COURT:  Thank you.  Ms. Snow, do you have any

9    follow-up questions?

10   MS. SNOW:  I have nothing further.

11   THE COURT:  Ms. Harris, do you have any follow-up

12   questions?

13   MS. HARRIS:  I do not.

14   THE COURT:  Thank you, ma'am.

15   We're going to take a ten-minute break, and it will

16   be our last break of the day, and then we'll probably go right

17   up until 5 o'clock today.

18   So we'll be in recess for about ten minutes.  Again,

19   don't discuss the case or do any type of research during the

20   next ten minutes, and we'll be out in just a few.

21   (The following proceedings were had in the courtroom

22   out of the presence of the jury:)

23   THE COURT:  Okay.  Thank you, ma'am, you may step

24   down.

25   So I told them we would take a ten-minute break,

1  thinking we could have one more brief restroom break.  And then

2  have Miss Betz testify, and it's my understanding we'll have a

3  similar setup with someone sitting up there.  I don't care who

4  it is, but with someone sitting up there, as we did with the

5  last witness.  Any issues with that, or other issues I can take

6  up?

7         MS. McGRAUGH:  No, Your Honor.  I just wanted to

8  clarify that the folks from the sheriff's office don't -- they

9  have told me they don't need to walk her up there.  I don't

10 know if that was a concern.

11        THE COURT:  It's not my concern.  I leave that to

12 the marshal here.  I don't know anything about courthouse

13 security and don't pretend to meddle in that.

14        MS. McGRAUGH:  And I'm not trying to tell the

15 marshal what to do.  I have enough experience to know not to do

16 that.

17        THE COURT:  If the marshal thinks she needs to be

18 walked up, she can be walked up; if not, then no, and then

19 we'll just have someone seated there during her testimony.

20        I'll be back out in about five or six minutes.

21        (A recess was taken from 3:40 p.m. to 3:46 p.m.)

22        THE COURT:  Are we ready to -- let's see, we're

23 missing some counsel.  Are we ready to bring Miss Betz to the

24 stand and bring the jury out?

25        MS. McGRAUGH:  Yes, ma'am.

1          THE COURT:  Was she still back in the holding cell?

2          Ma'am, if you could go ahead, we're going to do the

3   same thing, ask you to take the stand here, and then bring the

4   jury in, and then ask that you be sworn.

5          Do you want to go get the jury?

6          And, Ms. McGraugh, are you doing the direct of this

7   witness?

8          MS. McGRAUGH:  Yes, ma'am.

9          (The following proceedings were had in the courtroom

10  in the presence of the jury:)

11         THE COURT:  Ms. McGraugh, are you ready to call your

12  next witness?

13         MS. McGRAUGH:  Thank you, Your Honor.  Plaintiff

14  will call Lynnsey Betz.

15         THE COURT:  Miss Betz, I would ask that you remain

16  standing and ask that the clerk please swear you in.

17                         - - -

18                      LYNNSEY BETZ,

19   being first duly sworn by the courtroom deputy, testified as

20  follows:

21                         - - -

22                  DIRECT EXAMINATION

23   By Ms. McGraugh:

24   Q.    Would you please state your name for the record?

25   A.    Lynnsey Marie Betz.

1  Q.    How are you feeling right now?

2  A.    I'm okay, I think.

3  Q.    How old are you?

4  A.    I'm 38.

5  Q.    What year were you born?

6  A.    1984.

7  Q.    Where do you live?

8  A.    Trenton, Missouri.

9  Q.    And who else lives there?

10  A.    My whole -- my mom, my children, my husband, and his

11  parents.

12  Q.    So the whole family is from the area?

13  A.    Yes.

14  Q.    Are you married?

15  A.    I am.

16  Q.    Can you tell the jury what your husband's name is?

17  A.    His name is Daniel Betz.  We've been married ten years.

18  Q.    Do you have any children?

19  A.    We do.  We have three kids.

20  Q.    I'm going to ask you to do me a favor and speak a

21  little bit more slowly, okay?

22  A.    Okay.

23  Q.    Can you tell us the names and ages of your children?

24  A.    Harley is 12, Brianna is seven, and Blaze is four.

25  Q.    Blaze is the baby?

1 A.     Him is the baby.

2 Q.     Okay.  What was your job history like before you

3 entered the Department of Corrections?

4 A.     I've had lots of different jobs.  I worked in motels,

5 restaurants, bars, I've been a CNA.

6 Q.     Is your CNA license still active?

7 A.     It is not.

8 Q.     Could you tell the jury why you were imprisoned in

9 Chillicothe?

10 A.     Burglary and stealing.

11 Q.     Were there any other charges?

12 A.     No.

13 Q.     After you got out of Chillicothe, did you get new

14 convictions?

15 A.     Yes, I did.  I am on probation for those right now.

16 Q.     And what charges are they?

17 A.     They're burglary and stealing.

18 Q.     Did you go to high school?

19 A.     I did.

20 Q.     Did you get a degree?

21 A.     I got a G.E.D., and then I have a degree in

22 professional gardening and landscaping.

23 Q.     Okay.  When did you go into Chillicothe women's prison?

24 A.     2014, I think, '15.

25 Q.     And what sentence were you doing?

1  A.     I was doing time on my five-year sentence.

2  Q.     When you received the five-year sentence, was that for

3  the first burglary and stealing?

4  A.     Yes, ma'am, it was.

5  Q.     And did you attend any other programs before you went

6  into the prison?  After getting to the prison, excuse me.

7  A.     Yes, I did.  That's where I got my professional

8  gardening and landscaping, I did ICBC, Pathways to Change, I

9  did --

10  Q.     I'm going to ask you to slow down.

11  A.     Sorry.  I did several PATCH parenting courses.  I went

12  to AA and NA twice a week every week for two years, and I went

13  to church every Sunday.

14  Q.     Did you do any drug or alcohol treatment courses?

15  A.     I did.  That's the AA and NA that I went to twice a

16  week the whole time I was there.

17  Q.     Do you have a drug addiction?

18  A.     I do.

19  Q.     What were you addicted to when you went into

20  Chillicothe?

21  A.     Methamphetamines.

22  Q.     Have you since developed another different drug

23  addiction?

24  A.     I have.

25  Q.     Can you tell the jury what it is?

1    A.      Opiates.

2    Q.      And are -- okay.  Can you tell the jury what it was

3    like when you first got to Chillicothe?

4    A.      It's a lot different from Vandalia.  Of course,

5    everybody goes to Vandalia first, and it's red and they kind of

6    look like barns, and it's a little bit different.

7             Chillicothe is very gray, and the buildings are very

8    big, so it's kind of a shell-shock at first.  But --

9    Q.      Did you have a plan when you got to prison?

10    A.      I don't know that I necessarily had a plan.  I think I

11    just thought I would try to do whatever I could do to make

12    myself better.

13    Q.      Were you going to keep your head down?

14    A.      No.

15    Q.      Okay.  Was it a fair sentence?

16    A.      It was.

17    Q.      Did anything good come of that sentence?

18    A.      It did, yes.

19    Q.      Can you tell the jury what that was?

20    A.      I got my degree in professional gardening and

21    landscaping.

22    Q.      Do you recall how long you were in Chillicothe for?

23    A.      Almost two years.

24    Q.      Do you recognize Edward Bearden?

25    A.      You're going to have to move over, I can't -- or do you

1  want me to stand up?

2  Q.     I'm always in everybody's way.  Okay.

3  A.     I do.

4  Q.     Can you point to him and tell the jury what he's

5  wearing?

6  A.     He's right there.  He has the white goatee, the

7  glasses, and the plaid-looking shirt, and the suit jacket.

8          MS. McGRAUGH:  Okay.  Your Honor, can the record

9  reflect she has identified Edward Bearden?

10          THE COURT:  The record will so reflect.

11  BY MS. McGRAUGH:

12  Q.     I noticed that looked difficult for you.  Is it

13  difficult to see Edward Bearden?

14  A.     That's the first time I've seen him in any way, shape,

15  or form since we started all of this.

16  Q.     I want you to tell the jury about your interactions

17  with Edward Bearden at Chillicothe Correctional Center.  What

18  do you recall being the first incident where you saw him?

19  A.     When my boss was gone on vacation.

20  Q.     Okay.  Where were you working?

21  A.     At the vo-tech.

22  Q.     Vo-tech is vocational --

23  A.     Yes, sorry.

24  Q.     Is it a school?

25  A.     It is.

1  Q.     Were you enrolled there?

2  A.     I was.

3  Q.     What did you study when you were in vo-tech?

4  A.     The professional gardening and landscaping.

5  Q.     When you finish that program, do you have an option of

6  going onto the yard or doing that sort of work around the

7  penitentiary?

8  A.     You have so much time to find a job.  If you're not in

9  full-time school, then you have to work, and so I had a limited

10  amount of time to find a position.

11  Q.     Did someone make you an offer of a job?

12  A.     I actually had two offers, yes.

13  Q.     What were your choices?

14  A.     I could stay up there and work for Mrs. Gilgour in

15  vocational, or I could be on the gardening crew.

16  Q.     What did you choose?

17  A.     I chose the vo-tech.

18  Q.     All right.  What was your job in vo-tech?

19  A.     We cleaned, basically like janitorial services.  We

20  mopped and swept the hallway, the classrooms, emptied the

21  trash.  We did the offices, the lounge.

22  Q.     Would you be there during the course of a day?

23  A.     During class hours, yes.

24  Q.     During class hours?

25  A.     Yes.

1  Q.     So how many hours a day would you be there?

2  A.     It would just depend on how long it took us to get done

3  cleaning.  She was pretty lenient as far as, if you got your

4  job done, you could be done for the day.

5  Q.     Okay.  And you said this is Ms. Gilgour?

6  A.     I did.

7  Q.     Do you remember what the title of the job position was

8  that you held?

9  A.     I think they're porters I think is what they call them.

10  Q.    Who was the CO providing supervision?

11  A.    Miss Gilgour.

12  Q.    And she was there when you started working, correct?

13  A.    Yes.

14  Q.    Did she ever go on vacations or breaks?

15  A.    She did.

16  Q.    Who was assigned to fill that?

17  A.    Utility officers.

18  Q.    And was Mr. Bearden one of those utility officers?

19  A.    He was.

20  Q.    Where would you sit when you were not working?

21  A.    She has a desk that's at the end of this little hallway

22  when you first come into the building, and then two hallways go

23  off this way and one goes this way and one goes that way, which

24  is where the classrooms are.  But where they meet there in the

25  middle is her desk, and there's two chairs next to that.

1  That's where we sat.

2  Q.    And who was working as a porter with you?

3  A.    I had several that worked over the period of time, but

4  during this time, it was Teresa.

5  Q.    What's Teresa's last name?

6  A.    Davis.

7  Q.    Did you consider Teresa Davis to be your friend?

8  A.    Well, we worked together every day.  I mean, I would

9  say yeah, she was my friend.

10  Q.    A co-worker friend?

11  A.    Yeah.

12  Q.    Okay.

13  A.    We were on the same housing unit for a while too.  She

14  was on 5-House on the same wing with me for a while.

15  Q.    Were you working in vo-tech at the same time Trenady

16  George was working in vo-tech?

17  A.    I don't remember her being there when I was there.

18  Q.    Do you know her?

19  A.    I don't, no.

20  Q.    When was the first time you met her?  Do you recall?

21  A.    Here.

22  Q.    Here at the trial?

23  A.    Yes.

24  Q.    Okay.  I just wanted to make sure the jury knew you two

25  didn't work together at the same time.

1   A.      No.

2   Q.      Okay.  So what were your jobs as a porter?  Let me take

3   that back.

4           Were you responsible for getting cleaning supplies

5   when you were a porter?

6   A.      I was, yes.

7   Q.      Where were the cleaning supplies kept?

8   A.      Those two chairs where we sat, there's a closet right

9   next to it.

10          MS. McGRAUGH:  If you will bear with me a moment,

11  Judge.

12          THE COURT:  Sure.

13  BY MS. McGRAUGH:

14  Q.      Excuse me, Lynnsey, I'll get there.

15  A.      Okay.

16  Q.      I'm going to show you Exhibit 19-1, I believe.  Can you

17  recognize this?

18  A.      It looks like the vo-tech.

19  Q.      Okay.  And can you see where the desk you've been

20  referring to is located?

21  A.      It's kind of blurry up here.

22  Q.      It's kind of blurry here too.

23  A.      Yeah.

24  Q.      Okay.  All right.  So this wouldn't help you explain?

25  A.      No.

1  Q.      All right.  So there's a desk, there's two chairs.  And

2  were the cleaning solvents, mops, those things kept next to

3  your station?

4  A.      Yes, they were.

5  Q.      Where were they kept?

6  A.      Inside that closet.  There's a cabinet when you first

7  walk in, and then to the other corner towards the back is like

8  the drain thing where you dump the mop -- dump and fill the mop

9  bucket.

10 Q.      Was there any other CO working that hallway when you

11 were there besides Edward Bearden?

12 A.      No.

13 Q.      And his desk was how far from that closet?

14 A.      A couple of steps.

15 Q.      There were other people who worked in that area; is

16 that correct?

17 A.      They worked in the back offices.

18 Q.      So they were all in offices?

19 A.      Yes.

20 Q.      Were there periods of time when the only people in the

21 hallway were you and Edward Bearden and Teresa?

22 A.      Yes, every day.

23 Q.      So people would file out of the classrooms and then go

24 somewhere else; is that correct?

25 A.      We worked during class, so everybody was in classrooms.

1   Q.    Okay.  So there weren't other COs around?

2   A.    No.

3   Q.    And this bubble everybody has talked about, is there a

4 bubble in that area?

5   A.    No.

6   Q.    If you needed to get the cleaning supplies out of the

7 closet, could you do that on your own?

8   A.    Yes, I could.

9   Q.    Did you ever go get your cleaning supplies by yourself?

10   A.    Yes, I did.

11   Q.    Were you ever accompanied into the cleaning, I'm going

12 to call it the cleaning closet, by any CO?

13   A.    No, I wasn't.

14   Q.    Did Mr. Bearden ever accompany you into the cleaning

15 closet?

16   A.    Not with my knowledge, no.

17   Q.    Okay.  So before the incidents in vo-tech, had you seen

18 Officer Bearden?

19   A.    Not really -- I mean, I'd seen him around, but I didn't

20 have any interaction with him, no.

21   Q.    So how many days had Mr. Bearden been working there

22 before the first sexual assault incident?

23   A.    I think Miss Gilgour was gone for two weeks.  I think

24 she took a two-week vacation.  I think we had three different

25 officers in that time period, so I think it was a matter of a

1  few days.  It was just a few days.

2  Q.     And the assaults you're going to describe to the jury

3  took place over how many days?

4  A.     Maybe three or four days.

5  Q.     Did Mr. Bearden make sexually suggestive comments to

6  you?

7  A.     He did.

8  Q.     Could you tell the jury what those comments were?

9  A.     He would make comments about the way my ass looked when

10  I walked away when I was mopping.

11  Q.     Did he say anything in particular that you can recall

12  today?

13  A.     That he likes the way it moves.

14  Q.     And he was referring to?

15  A.     My bottom, yes.

16  Q.     Your bottom.  Okay.

17        Any other comments that you can recall before the

18  actual sexual assault?

19  A.     No.

20  Q.     Can you tell the jury what happened that day?

21  A.     Teresa had left early.  I think she had a Pathways to

22  Change class or something.  She had a slip.  I don't remember

23  exactly what she left for.  And I was trying to hurry, and I

24  went into the closet to dump.

25  Q.     To dump what?

1   A.     My mop bucket. And I heard the door close. That door

2 has to be propped open or it won't stay open, and it locks

3 automatically when it shuts. You can get out from the inside,

4 but you can't open it from the outside. It locks

5 automatically.

6   Q.     Now, how would you get in if you needed something?

7   A.     It has to be opened by the officer. As far as I'm

8 aware of, that's the only key that there is.

9         I heard the door shut, and I went to turn around,

10 and he slammed his arm into my neck. And I --

11   Q.     Lynnsey, he, meaning who?

12   A.     Mr. Bearden.

13   Q.     Did you see him coming?

14   A.     I did not.

15   Q.     When he slammed his arm into your neck, was it the back

16 of your neck or the front of your neck?

17   A.     The front.

18   Q.     So you're face to face?

19   A.     Yes.

20   Q.     What happened next?

21   A.     He's got me pinned back. He keeps his arm at my

22 throat.

23   Q.     What were you pinned against?

24   A.     The wall.

25   Q.     What happened next?

1    A.      I hit my head pretty hard.  I wasn't really sure what

2   was happening for a minute until he put his hands in my pants.

3   And he was hurting me.  I know that he was talking, but I was

4   not -- I was not listening.  I just kept telling myself that I

5   had to get out of this closet, that I can't -- that I can't do

6   this again, that I have to get out.

7    Q.      So I'm really sorry to do this.  I'm going to take you

8   back a little bit, okay?  There's some water there if you need

9   to stop and take a drink.

10           So I think you've told us you hit your head against

11   the wall.

12   A.      I did.

13   Q.      And then what did Edward Bearden do?

14   A.      Kept his arm at my throat.

15   Q.      And what else did he do?

16   A.      He took his hands and put them down my pants and put

17   them inside of my vagina.

18   Q.      Okay.  How many fingers do you know that he put in your

19   vagina?

20   A.      I don't know, at least two, maybe three.

21   Q.      And what did you feel?

22   A.      He's rough.

23   Q.      It was rough?

24   A.      Yeah.

25   Q.      Okay.  And did it hurt?

1    A.    Yes, it did.

2    Q.    Did he leave his fingers in your vagina?

3    A.    Yes, he did.

4    Q.    Do you know for how long?

5    A.    I do not.

6    Q.    Did he say anything?

7    A.    He was talking, but I was not listening.  I know that

8  he was talking, but I was talking to myself.

9    Q.    Did he finally remove his fingers from your vagina?

10    A.    No, he did not.  He let loose of my throat, and I heard

11  his zipper, and somehow I'm outside the door, and I am running

12  to the bathroom.

13    Q.    So he -- while his fingers are in your vagina, you

14  heard his zipper.

15    A.    I did.

16    Q.    Do you recall which arm was up against your neck?

17    A.    I don't.

18    Q.    And when you heard the zipper, what did you do?

19    A.    I'm guessing I pushed past him somehow and out the

20  door.

21    Q.    Do you recall?

22    A.    I don't.

23    Q.    When you got out the door, where did you go?

24    A.    Straight to the bathroom.

25    Q.    Did you have to pull your pants back up, were they

1 down?

2 A.    I don't -- no, I don't think so.

3 Q.    When you got to the bathroom, what did you do?

4 A.    I went to a stall and tried to pull myself together

5 before I left to make sure that everything was in its place.

6 Q.    Okay.  Did you urinate?

7 A.    No, I did not.

8 Q.    Okay.  And when you say put yourself together, tell the

9 jury what you mean by that.

10 A.    Well, you asked if my pants were down.  I made sure

11 that my pants were right, my shirt, my hair, I made sure that

12 there was nothing on my neck, like nothing -- my head wasn't

13 bleeding.

14 Q.    What were you concerned about?

15 A.    Any marks, anybody seeing or knowing from the look on

16 my face or if I was crying.  I don't even know if I knew if I

17 was crying or not.

18 Q.    Why didn't you want people to see the look on your

19 face?

20 A.    Because I was afraid that they would know that

21 something was wrong.

22 Q.    And what would be wrong with that?

23 A.    Well, I didn't want anybody to know what happened.

24 Q.    Why not?

25 A.    Because you're the one that gets punished.

1  Q.      Now, there's been some talk about the hole.  You've

2  been in the hole.

3  A.      I have, yes.

4  Q.      Is that ad seg?

5  A.      Yes, it is.

6  Q.      Administrative segregation?

7  A.      Yes, it is.

8  Q.      Okay.  And you heard Teri Dean just talk about it,

9  correct?

10  A.      Yes.

11  Q.      And was your experience in the hole similar to Teri

12  Dean's?

13  A.      Yeah.  I wasn't there for very long, but, yeah.

14  Q.      Tell the jury why you were placed in the hole.

15  A.      I was doing a 120 treatment program, and there --

16  Q.      What's a 120 treatment program?

17  A.      It's a behavior modification or a drug treatment

18  program.

19          I was in there doing that, and there was a girl that

20  was trying to get me to fight with her to get me kicked out of

21  my treatment program, and they take both of you to the hole.

22  We both got in trouble.  I later got out after they did their

23  investigation and got to go back to treatment and completed

24  that successfully, and she got kicked out.

25  Q.      So prior to determining who was at fault --

1  A.     Right.

2  Q.     -- you were both thrown into the hole?

3  A.     Yes, we were.

4  Q.     And you remained in the hole while they investigated?

5  A.     Yes, I did.

6  Q.     How would you describe those two days?

7  A.     Long.

8  Q.     Did you ever go back?

9  A.     No, I did not.  I have not.

10  Q.     Did it help motivate you not to go back?

11  A.     Yeah, I'm not a fan.

12  Q.     Now, at some point prior to the sexual assault you have

13  just described, did Edward Bearden try to bribe you or give you

14  gifts?

15  A.     He did, yes.

16  Q.     Okay.  Do you remember when that occurred?  Before or

17  after the sexual assault?

18  A.     Before.

19  Q.     Before or after the mopping comments?

20  A.     After.

21  Q.     And what did he say?  Tell us how he tried to bribe

22  you.

23  A.     He left a soda and some sort of snack in my closet.

24  Q.     Do you remember what kind of soda?

25  A.     It was a Mountain Dew.

1   Q.    And where did he leave the items?

2   A.    We have that cabinet where we keep rags and extra dust

3  mops and mops and things like that, and it was in there.

4   Q.    Did he tell you ahead of time he was going to leave

5  something for you?

6   A.    He did tell me.

7   Q.    And what did you do when you found those items in

8  there?

9   A.    I told -- well, I made Teresa come with me to retrieve

10  those items, and I took them directly to the bathroom and threw

11  them in the trash.

12   Q.    Are they considered contraband?

13   A.    They are.

14   Q.    What's the rule for what you can have?

15   A.    Nothing that you didn't buy off of canteen.

16   Q.    Were you concerned when you realized he had left you

17  snacks?

18   A.    I was.

19   Q.    What was your concern?

20   A.    I just didn't want any special attention.

21   Q.    What comes with special attention?

22   A.    People notice.

23   Q.    So you've told us about the first sexual assault.  Was

24  there a second?

25   A.    There was an incident before the sexual assault, yes,

1    there was one other incident.

2    Q.    Okay.  Can you tell the jury what that was?

3    A.    I had stayed after to work on those projects that I did

4    for the holidays.  And I was in the staff lounge where they ate

5    their lunch, where the teachers ate their lunch.  I was back

6    there making their holiday decorations, and me and Teresa both

7    were, and I was -- tried to go out of the doorway to go to the

8    bathroom.  He was standing in that doorway talking to Miss

9    Anderson, and he grabbed my vagina as I walked past.

10   Q.    If he was talking to Mrs. Anderson, how did she not see

11   him grab your vagina?

12   A.    Because if she's sitting like this behind her desk, the

13   desk is this tall.

14   Q.    So you can't see her face?

15   A.    No, you cannot, not unless you're standing right at the

16   thing looking over.

17   Q.    So she had no ability to see --

18   A.    No.

19   Q.    -- you and Edward Bearden?

20   A.    No.

21   Q.    And did you give him consent to touch your vagina?

22   A.    I did not.  No, I did not.

23   Q.    And this was over your clothes.

24   A.    Yes, it was.

25   Q.    And the sexual assault you described earlier, did you

1 give him consent to do that?

2 A.     No, I did not.

3 Q.     Did you feel more or less safe in the Department of

4 Corrections after Mr. Bearden grabbed your vagina?

5 A.     Less safe.

6 Q.     Did you feel more or less secure?

7 A.     I didn't feel secure at all.

8 Q.     Now, I asked you if you had urinated when you had gone

9 right into the bathroom after the assault.  Did you at a later

10 time urinate?

11 A.     I did.

12 Q.     Where was that?

13 A.     Back at my housing unit.

14 Q.     And did you notice anything unusual?

15 A.     Yes, I was bleeding.

16 Q.     From your vagina?

17 A.     I was, yes.

18 Q.     Was it painful to urinate?

19 A.     It was.

20 Q.     Was your vagina scratched?

21 A.     I'm assuming so, yeah, on the inside.

22 Q.     What about your head?

23 A.     There was a large bump on the back of my head.

24 Q.     Do you know where the -- all right.

25 A.     I'm sorry.

1  Q.    I tell you to take a drink, and then I ask you

2  questions.  I apologize.

3             There was a bump on your head?

4  A.    Yes.

5  Q.    Like a goose egg?

6  A.    Yes.

7  Q.    What did you do about that?

8  A.    I had a lot of hair, so I just -- nothing.  I didn't do

9  anything about it.

10  Q.    You didn't report it to anyone.

11  A.    No, I did not.

12  Q.    Okay.  Why not?

13  A.    Who was going to believe me anyway?

14  Q.    Is it difficult to have to tell people about this

15  sexual assault?

16  A.    It is.  This is about the millionth time I've had to do

17  it.

18  Q.    How does it make you feel?

19  A.    I mean, it makes me feel dirty all over again.  I mean,

20  I don't want to do this anymore.

21  Q.    Did you feel degraded?

22  A.    I do, yes.

23  Q.    You still do?

24  A.    Yes, I do.

25  Q.    How did you feel, knowing you were going to come today

1  and have to tell the story in front of him?

2  A.      I never wanted to do this.  I didn't want him to take

3  anything else that was personal from me.  I did not want to

4  have to sit here and let him see the damage that he's caused my

5  life, and that he's still causing my life.

6  Q.      Now, you told us your vagina was injured, and you also

7  had an injury to your head?

8  A.      I did.

9  Q.      Did you go to medical?

10 A.      I did not.

11 Q.      Why not?

12 A.      Once again, who would believe me?  And I'm -- why would

13 I want to go to the hole after something like that and sit down

14 there.

15 Q.      Is it assumed when offenders and guards have sex that

16 it's consensual?

17 A.      No, it's not.

18         MS. ROTHERMICH:  Objection, speculation.

19         THE COURT:  Sustained.

20         MS. ROTHERMICH:  Your Honor, can we strike her

21 answer?

22         THE COURT:  No, I don't believe that's necessary.

23 BY MS. McGRAUGH:

24 Q.      What happens when you -- what happens when you make

25 an -- a female offender makes a report of sexual assault

1  against a correctional officer?

2  A.     She goes to the hole under investo, investigation.

3  Q.     And what else happens besides being in the hole?

4  A.     I lose everything.  I lose my visits with my kids, I

5  lose my job, I lose my phone privileges.  Basically you get

6  mail.  I mean, they've got to take you out of that cell to

7  shower.  You have to get permission to shower.

8  Q.     Do you go into the yard?

9  A.     No, you do not.

10 Q.     At the time, were you getting visitors?

11 A.     I was.

12 Q.     Your family?

13 A.     I was, yes.  I had earned PATCH visits with my

14 daughter.

15 Q.     And PATCH is the program Karen told us about, correct?

16 A.     Yes.

17 Q.     And they don't hand those to you, you earn them.

18 A.     No, you earn those, you work for those.

19 Q.     And how old was -- is this Haley?

20 A.     Harley, yeah.

21 Q.     I can't read my handwriting.

22        How old was Harley, do you remember?

23 A.     She was around seven, I think.

24 Q.     How often was she able to visit?

25 A.     I think we tried to do one once a month.

1   Q.      Did your husband bring her?

2   A.      No, my mom brought her.

3   Q.      Mom, okay.  Did anybody else visit you?

4   A.      My dad and my sister came every other week, I think,

5   there towards the end especially, yeah.

6   Q.      What's your sister's name?

7   A.      Samantha.

8   Q.      Did you get any of those food visits?

9   A.      I did not.

10   Q.      Okay.  But you still got to be with them?

11   A.      Yes, I did.

12   Q.      If you had reported that you had been sexually

13   assaulted by Edward Bearden, would you get to keep seeing your

14   daughter?

15   A.      No, I would not.

16          MS. ROTHERMICH:  Objection, speculation.

17          THE COURT:  Overruled.

18   BY MS. McGRAUGH:

19   Q.      If you reported Edward Bearden's sexual assault of you,

20   would you get to see your dad?

21   A.      No, I would not.

22   Q.      Would you get to see your sister?

23   A.      No, I would not.

24   Q.      Would you lose your job?

25   A.      I would lose everything that I had worked for in the

1  entire time I had been there.

2  Q.    And just to elaborate on what's in the hole, do you get

3  to take books?

4  A.    No.

5  Q.    TV?

6  A.    No.

7  Q.    Radio?

8  A.    No.

9  Q.    What do you do in there?

10  A.    Nothing.  You sit in your bed.  I mean, there's a

11  two-man cell with a toilet.

12  Q.    Is it noisy?

13  A.    It is.

14  Q.    What's the noise from?

15  A.    All the yelling.  Women are trying to talk to women at

16  the other end of the hall.  It goes on all day and all night

17  long.

18  Q.    Is there anything else that Edward Bearden did to you

19  that we have not discussed?

20  A.    Not that I can recall, no.

21  Q.    So it was that short period when --

22  A.    Yes, it was.

23  Q.    Now, let me ask you a couple of questions about the

24  ladies at this table.  And you've told us already you did not

25  know Trenady George until you got here.

1   A.      I do not.  Yeah, I do not.

2   Q.      Did you know Karen Keil?

3   A.      I do know who Karen is, yes.

4   Q.      And you knew her in prison; is that correct?

5   A.      I did, yes.

6   Q.      All right.  Is this going to be the BLAST class again?

7   A.      I took a lot of classes.  I took everybody's classes.

8   They have all kinds of classes, not just the big classes that

9   they do the Insanity and stuff.  They have individual classes,

10  and there's like 15 personal trainer -- or people that run

11  different classes.  There's a schedule, you can go get a

12  schedule, and you can go to a class every day all day if you

13  want to.  I mean, they have them all day long.

14          I did have her, and I had her as a personal trainer,

15  but I also had two other women as personal trainers, as well.

16  I earned those classes too.

17  Q.      So -- and I think Karen mentioned you earn the classes

18  by --

19  A.      Going to the regular classes.  You have a card, and

20  every time you do a fitness class, you get a punch.  And when

21  your card gets filled up, you get a personal trainer.  I

22  actually had four.  I had one woman twice, Judy Henderson I

23  think I had twice.

24  Q.      And how many times did you have Karen?

25  A.      I had Karen once --

1   Q.     As a personal trainer.

2   A.     -- and then I had Delila one other time.  Yeah.

3   Q.     Would you say you and Karen were friends in

4   Chillicothe?

5   A.     I mean, we didn't hang out outside of the gym, like the

6   people that I spent my time with on the yard was not Karen, but

7   I wouldn't say she wasn't my friend.

8   Q.     Right.

9   A.     Right.

10   Q.     Different context --

11   A.     Yes.

12   Q.     -- different friend groups.

13   A.     Yes.

14   Q.     All right.  How about Ashley?

15   A.     I mean, I remembered Ashley because of the Olsen twins,

16   Mary Kate and Ashley.  I didn't know who she was until we did

17   our mediation.

18   Q.     Okay.  And Ashley was there at the same time, but you

19   knew her, remembered her name because of the Olsen twins.

20   A.     I did, yeah.

21   Q.     Okay.

22   A.     But I couldn't put a face to the name.  Like, there's

23   1500 women in there.  I mean, I have women that come up to me

24   now and, like, "Do you remember me being in Chillicothe?"  And

25   I feel like I've never seen them in my life.

1   Q.      And what about Teri Dean?

2   A.      I knew who Teri Dean was, but I, once again, did not

3   put the face to the name until she was here today.

4   Q.      Okay.  Were you friends with her?

5   A.      I was not.

6   Q.      How did you come to file a lawsuit in this case?

7   A.      Teresa Davis actually got ahold --

8   Q.      Please don't tell me anything that Teresa Davis told

9   you, okay?

10  A.      Right.

11  Q.      Did you have contact with her?

12  A.      She got ahold of me, yes.

13  Q.      And how did she get ahold of you?

14  A.      I think she asked for my number on Facebook, if I

15  remember correctly.

16  Q.      Okay.  And then did you have a chance to speak with

17  her?

18  A.      I did, yes.

19  Q.      What did you do after you spoke to her?

20  A.      I think I talked to you guys.  Or John, anyway.

21  Q.      John meaning John Ammann?

22  A.      Yes.

23  Q.      How did you feel after you left Chillicothe?  Were you

24  able to put the sexual assault behind you?

25  A.      I was not.

1   Q.      Would you have preferred to?

2   A.      Yes, I would.

3   Q.      Okay.  Did you relapse and start using drugs again?

4   A.      I did.

5   Q.      Do you take responsibility for that relapse?

6   A.      I do.  I do.

7   Q.      Lynnsey, did you try to kill yourself afterwards?

8   A.      I have died ten times in the last six months.

9   Q.      From what?

10  A.      From heroin overdose.

11  Q.      Okay.  Was this the first time that someone had

12  sexually assaulted you?

13  A.      It is not.

14  Q.      I'm going to ask you to very briefly tell the jury what

15  had happened to you before, and I mean before you went into

16  Chillicothe.

17  A.      A family relative used to come in my room when I was

18  seven.  And then I ran away from home when I was 15, and that

19  happened in Memphis, Tennessee.

20  Q.      How do you feel telling that to the jury?

21  A.      I don't know.

22  Q.      Do you tell a lot of people about that, being a prior

23  rape victim?

24  A.      Everybody that knows me knows about the one that

25  happened when I ran away from home, but the one that happened

1  when I was a kid, my husband is the only one that knows until

2  today.

3  Q.    How do you feel telling these people?

4  A.    I don't know.

5  Q.    Okay.  Can you tell me -- all right.

6        When you were 15 and you ran away from home, what

7  happened?  And you can tell me very briefly?

8  A.    I was raped by three men in a hotel bathroom.  Please

9  don't make me tell that story.

10  Q.    All right.  Thank you for telling me.

11        When you left Chillicothe, how was your emotional

12  mental health?

13  A.    I don't know.

14  Q.    Okay.  How did your relationships suffer with the kids

15  or with Daniel?

16  A.    I just have really bad mood swings.  Sometimes I'm just

17  not even there.

18  Q.    Okay.  Do you like to be touched?

19  A.    My husband can touch me, yes, I do not have any issues

20  with my husband touching me.

21  Q.    Do you want other people to touch you?

22  A.    No, I do not.  No, I do not.

23  Q.    Do you have trouble at night?

24  A.    I do.  I have night terrors, and I have day terrors.  I

25  actually had one in the courtroom in Trenton, and I hadn't had

1    a day terror in a while.

2    Q.      How do you feel about being around groups of people?

3    A.      I don't really have problems in groups.  I just don't

4    like people behind me, and I don't like feeling like I'm

5    blocked in like I can't get out.

6    Q.      Like you're a prisoner.  And you said you have trouble

7    with your emotions?

8    A.      I do.

9    Q.      Now, we can imagine after the two other things that

10   happened in your life, you had some trauma from that.

11   A.      I do, yes.

12   Q.      And you had some depression, anxiety from that?

13   A.      I do, yes.

14   Q.      Is this that?

15   A.      I've always been kind of --

16          MS. ROTHERMICH:  Objection --

17          (Reporter interruption.)

18          THE COURT:  Do you want to lodge the objection

19   again?

20          MS. ROTHERMICH:  Objection, calls for expert

21   opinion.

22          THE COURT:  Overruled.

23   BY MS. McGRAUGH:

24   Q.      Is what you're feeling now just a by-product, was this

25   just one more sexual assault, or did it have an impact on you?

1  A.     This was kind of the straw that broke the camel's back

2  is what I kind of say.  You process things different when

3  you're a child, and I've been stuffing and self-destructing for

4  so long, I didn't know how to process anything else.  And I

5  just stuff and I just stuff until I just can't take it anymore,

6  until thing's just not okay.

7  Q.     Okay.  Did you think you would be safe in the

8  Department of Corrections?

9  A.     I did, yeah.

10  Q.     Were you?

11  A.     No, I was not.

12  Q.     Were the reason -- can you tell the jury, what's the

13  reason that you did not feel safe and secure in the Department

14  of Corrections?

15  A.     Well, I mean, if an officer can do things like that

16  blatantly and on camera and nobody has ever stopped him, then

17  what good am I ever going to do to make it stop.

18  Q.     Do you see the man who did that to you?

19  A.     Yeah.

20  Q.     Point at him.

21  A.     He's back there all the way in the back of the table.

22  Q.     What are your thoughts about your future?

23  A.     I don't know.  I'm hopeful.  I am going into some

24  treatment programs.  I will be doing a yearlong intensive

25  outpatient treatment program when I leave treatment.  But my

1  son is four, and so he needs his mother, and so I need to try

2  to do what I can do to not do this to myself anymore and not to

3  let him control my life, or any of the rest of them control my

4  life anymore.

5  Q.      And that's a good thing.

6  A.      It is a great thing.

7          MS. McGRAUGH:  No further questions.

8          THE COURT:  Any cross-examination?

9          MS. ROTHERMICH:  May it please the Court.

10         THE COURT:  You may proceed.

11                          - - -

12                  CROSS-EXAMINATION

13  By Ms. Rothermich:

14  Q.      Miss Betz, I think I'm going to do better with your

15  name than I did with Miss Zieser.  So -- she's been, I think,

16  called about five different things since we started this whole

17  thing.

18          I want to talk to you about the hole, your

19  experience in the hole, you talked about that with your

20  attorney here.

21          You were believed, you were believed in that

22  incident, weren't you?

23  A.      Not in the beginning, no, I was not.

24  Q.      You said that after there was an investigation, they

25  sided with you, and you got to go back to your treatment,

1 correct?

2 A.      Yes.

3 Q.      And you got to continue your PATCH visits and

4 everything else, correct?

5 A.      This was a completely different time in prison.  I was

6 just doing a 120, I wasn't on the yard.  There was no PATCH

7 visits, none of that stuff, I was just in treatment.  And, yes,

8 I got to continue my treatment.

9 Q.      And you got to do your PATCH visits after you were in

10 the hole that time, correct?

11 A.      No, this is a completely different time in prison.  I

12 did a 120, got out, and then went back, and this is the time

13 that Bearden -- it's a completely different --

14 Q.      Oh, okay.  So this was your first time at Chillicothe.

15 A.      It was, yes.

16 Q.      Okay.  So -- and just to be clear for the jury, your

17 experience in the hole that time was for fighting, correct?

18 A.      Yes, it was.

19 Q.      It was not for reporting a sexual assault --

20 A.      No, it was not.

21 Q.      -- correct?  Sorry to cut you off.

22          Now, let's talk about your times at Chillicothe.  So

23 you have six felonies, correct?  And I'll walk -- I'll withdraw

24 the question and we can walk through them.

25          You had your first incarceration for burglary and

1  for stealing in 2012; is that correct?

2  A.     Yes.

3  Q.     Those were two separate felonies, correct?

4  A.     Yes.

5  Q.     You were in drug court for those two convictions,

6  correct?

7  A.     Yes.

8           MS. McGRAUGH:  Objection, Your Honor, irrelevant.

9           THE COURT:  Overruled.

10  BY MS. ROTHERMICH:

11  Q.     You failed drug court three times, correct?

12           MS. McGRAUGH:  Objection, Your Honor, irrelevant.

13           THE COURT:  That is sustained.

14  BY MS. ROTHERMICH:

15  Q.     You failed drug court, correct?

16  A.     I did --

17           MS. McGRAUGH:  Your Honor?

18           THE COURT:  Could counsel please approach?

19           (Counsel approached the bench, and the following

20  proceedings were had:)

21           THE COURT:  Do you want to lodge your objection?

22           MS. McGRAUGH:  Your Honor, you just ruled she

23  couldn't go into it, and she went back to it.  Could you please

24  ask the jury to disregard her question about failing drug court

25  three times?

1      MS. ROTHERMICH:  If I may, Your Honor, the reason

2  why she was in Chillicothe was because she failed the drug

3  court, she failed her probation, and then she was sent to

4  Chillicothe.

5      THE COURT:  So what I've said in the past that you

6  can get into is the fact that she has a conviction, what the

7  conviction is for, and the date of the conviction.  The whole

8  process of failing and being revoked and being sent back to

9  prison is not relevant.  I gave you some leeway with respect to

10  the drug court, but there are no other questions to be asked

11  regarding the convictions or how she got in and out of prison.

12      MS. McGRAUGH:  Your Honor, can you please ask the

13  jury to disregard the comment about you failed drug court three

14  times?

15      THE COURT:  I've already given them an instruction

16  saying if I sustain an objection, you must ignore the question.

17  I've done it for both sides, so...

18      MS. McGRAUGH:  Yes, Judge.

19      MS. ROTHERMICH:  Can I ask, to be clear about what I

20  can ask next?

21      THE COURT:  Yes.

22      MS. ROTHERMICH:  Can I say, "You were eventually

23  sent to Chillicothe as a result of those two convictions?"

24      THE COURT:  Yes.

25      MS. ROTHERMICH:  Or -- and may I ask for the 120-day

1 | treatment program that she's --

2 | THE COURT:  Yes.

3 | (The following proceedings were had in open court:)

4 | Q.    Miss Betz, you were eventually sent to Chillicothe for

5 | that 120-day treatment program as --

6 | A.    Yes, I was.

7 | Q.    I'm sorry.  As a result of those two convictions,

8 | correct?

9 | A.    Yes.

10 | Q.    Okay.  Thank you.

11 | And ultimately, you went in December -- or let me

12 | ask you again.

13 | You went again to the Missouri Department of

14 | Corrections in the fall of 2014; is that right?

15 | A.    I'm not sure.  I'm just -- I'll just go ahead and say

16 | this.  That burglary and stealing charge, my very first

17 | conviction, I went to prison three times for the same

18 | conviction.  I did a 120, I went back and did like four months,

19 | and then I went back, and I finished my sentence, and I

20 | 12/12'ed on my case.  I maxed out on my case.

21 | Q.    Okay.

22 | A.    Okay.

23 | Q.    I just want to establish, you were there at the end of

24 | 2014 until around July of 2016; is that right?

25 | A.    Yes, I guess that's right.

1   Q.      Okay.  Thank you.  And Nos. 3 and 4, your convictions,

2   you got out of Chillicothe initially; is that correct?

3   A.      Yes.

4   Q.      And then you pled guilty to two more felonies.

5   A.      I did.

6   Q.      Second degree burglary and felony stealing in 2018; is

7   that correct?

8   A.      Yes.

9   Q.      Okay.  And then 5 and 6 was this past February, you

10  pled guilty to two more felonies having to do with drug

11  possession.  Is that correct?

12  A.      I haven't been sentenced on that yet.

13  Q.      You pled guilty, though, correct?

14  A.      They did a deferred sentence but, yes.

15  Q.      Okay.

16  A.      Yes.

17  Q.      I just wanted to be sure --

18  A.      Yes.

19  Q.      -- you were answering my question.

20  A.      Yes.

21  Q.      Okay.  Thank you.

22          So to orient the jury on the timeline, it's when you

23  were, had entered the MDOC system in or around October of 2014

24  to 2016; is that correct?

25  A.      Yes.

1  Q.    And you were sent to Chillicothe, correct?

2  A.    Yes.

3  Q.    And you said you worked in the vocational-education

4  building; is that right?

5  A.    Yes.

6  Q.    And you started working there in April of 2015, right?

7  A.    Yes.

8  Q.    Now, you said earlier that Mr. Bearden was filling in

9  for Miss Gilgour in the spring of 2016; is that correct?

10  A.    Yes, I did.

11  Q.    And it was while she was on a vacation; is that right?

12  A.    Yes.

13  Q.    Okay.  And you know that it was the spring because it

14  was when she always took her vacation; is that fair?

15  A.    Yes.

16  Q.    Okay.  Now, let's talk a little bit about the voc-rehab

17  building.  I want to orient the jury as to what this is.  It's

18  the building with all of the classes going on where inmates can

19  take classes to better themselves, correct?

20  A.    Yes.

21  Q.    Okay.  And let's walk through the classes.

22  A.    Okay.

23  Q.    So there's cosmetology, correct?

24  A.    Yes.

25  Q.    Culinary arts?

1    A.    Yes.

2    Q.    Business tech?

3    A.    Yes.

4    Q.    Gardening?

5    A.    Uh-huh.

6    Q.    And web design.

7    A.    When I was there, yes, that's what was there.

8    Q.    Okay.  To be -- yes, to be fair, yes.

9          So five different classes going on?

10   A.    Yes.

11   Q.    And they always had classes unless a teacher was sick,

12   correct?

13   A.    (Witness nodding head.)

14   Q.    Sorry, I don't mean --

15   A.    Correct, yes.

16   Q.    Thank you.  I just want to be sure the record is good.

17         Now, those classrooms had windows on them; is that

18   right?

19   A.    Yes, they did.

20   Q.    Okay.  And so -- there were students that were going in

21   and out of the building throughout the day; is that correct?

22   A.    No, that's not correct.

23   Q.    There were students in the building --

24   A.    Yes.

25   Q.    -- throughout the day, correct?

1   A.     Correct.

2         THE COURT:  So I think we need to just slow down

3 just a bit.  Let her finish the question before you answer.

4         THE WITNESS:  Okay.

5         THE COURT:  I know you can anticipate what the

6 question is, but for the court reporter, it's important that

7 only one person talk at a time.

8         THE WITNESS:  Okay.  Sorry.

9         MS. ROTHERMICH:  I'll try to be better too.

10 BY MS. ROTHERMICH:

11   Q.     I think we've heard mention of two ladies who worked

12 there, Miss Anderson and a Miss Grant maybe?  Do you recall

13 those ladies?

14   A.     Yeah.  Miss Grant is the, like, administrator, and Miss

15 Anderson is the secretary.

16   Q.     Okay.  So Miss Grant is like the principal of the whole

17 deal --

18   A.     Yes.

19   Q.     -- and Miss Grant is the secretary?

20   A.     Yes.

21   Q.     Okay.  And then you have the teachers; is that correct?

22   A.     Yes.

23   Q.     And the CO on duty; is that correct?

24   A.     Yes.

25   Q.     And the porters who are cleaning the building, correct?

1    A.    Yes.

2    Q.    So there are a number of people in the building.

3    A.    Yes.

4    Q.    It can be a busy place.

5    A.    Yes.

6    Q.    And there are cameras there.

7    A.    Yes.

8    Q.    And there's a mirror there.

9    A.    Maybe in the break room, the lounge.  I don't really

10   remember where all the mirrors are.

11   Q.    You don't remember where the mirrors are?

12   A.    No, I don't.

13   Q.    Okay.  Fair enough.

14         Now, the CO desk that we heard you talk about and

15   the supply closet were both near the bathrooms; is that

16   correct?

17   A.    Yes.

18   Q.    Okay.  They're kind of -- when you first enter the

19   building, there's a T-shape; is that correct?

20   A.    Yes.

21   Q.    And the CO desk sits right there, and then the supply

22   closet is to your right, and then the bathrooms are beyond

23   that; is that correct?

24   A.    Yes, it's kind of back a little bit, like pushed back a

25   little bit, I guess.  Actually, the culinary arts room is right

1  in front of the supply closet.

2  Q.     And that was my next question.  There's a classroom --

3  A.     And a --

4         (Reporter interruption.)

5  A.     Sorry.

6  Q.     There's a classroom room right across the hall from

7  that supply closet, correct?

8  A.     Yes.

9  Q.     That has a window.

10  A.     Yes.  There are blinds on that window too.

11  Q.     And the blinds are open, correct?

12  A.     Or they can be closed.

13  Q.     Okay.  It's your testimony that sometimes they're open,

14  sometimes they're closed.

15  A.     Yes.

16  Q.     Now, you talked a little bit about the snacks.  You

17  said that Mr. Bearden left snacks for you in that supply

18  closet; is that your testimony?

19  A.     One time, yes.

20  Q.     And it was your testimony that you did not eat them,

21  correct?

22  A.     No, I did not.

23  Q.     Because you didn't want to have special attention drawn

24  to you, correct?

25  A.     I didn't want to have anything to do with it.

1  Q.    And people notice when things are out of place, like an
2  inmate who has a Mountain Dew, correct?

3  A.    Yeah, in a bottle, yeah.

4  Q.    Miss Betz, how tall are you?

5  A.    Five ten, five eleven.

6  Q.    So -- and Mr. Bearden is shorter than you are; is that
7  correct?

8  A.    Yeah, that's correct.

9  Q.    And the incident that you described in the supply
10  closet is the closet that we just described in that hallway
11  where there are classes going on with a window, blinds open or
12  shut, you weren't sure in your testimony, I'm assuming; is that
13  accurate?

14  A.    Yes, that's accurate.

15  Q.    Teachers, students, Miss Anderson, the principal, other
16  porters could all be in the hallway, correct?

17  A.    I guess they could have been, but they weren't.

18  Q.    Okay.

19  A.    Okay.

20  Q.    They could have popped out at any time, someone could
21  have walked by; is that correct?

22  A.    Sure, yes.

23  Q.    All right.  And then the second incident that we talked
24  about in the doorway in front of Miss Anderson's desk, I want
25  to be sure that we're clear for the jury because you're sitting

1  a little elevated up from where we are, and you indicated where

2  her desk was.

3         So when she's sitting down, the desk -- the wall

4  that you're talking about that's on her desk is about at her

5  eye level; is that correct?

6  A.     No.  It's over her head.

7  Q.     It's your testimony that it goes above her head?

8  A.     Yes, it does.

9  Q.     Okay.  Now, Miss Anderson could see the doorway,

10 though; is that correct?

11 A.     Yeah, looking like this.

12 Q.     Okay.  And you allege that she was sitting there that

13 day when Mr. Bearden grabbed your crotch, correct?

14 A.     Yes, she was.

15 Q.     Okay.  And it happened right on the opposite side of

16 this wall or on the opposite side of her desk?

17 A.     Yes, it did.  Teresa saw it.

18 Q.     Okay.  So not only Miss Anderson was there and

19 present --

20 A.     Yes.

21 Q.     -- but Miss Davis, Teresa Davis was also there,

22 correct?

23 A.     Yes.  Yes.

24 Q.     Okay.  So there were two witnesses there, correct?

25 A.     Yes.

1  Q.      And you didn't report it to Miss Anderson; is that

2  correct?

3  A.      No, I did not.

4  Q.      And you didn't say anything or cry out, even in

5  surprise, correct?

6  A.      No, I did not.

7  Q.      And even though Miss Anderson was sitting right there;

8  is that correct?

9  A.      That's correct.

10 Q.      And the principal was also -- the office is right

11 there, as well; is that correct?

12 A.      Yes.

13 Q.      And even though Miss Davis was right there, as well?

14 A.      Yes.  I don't think you expect an officer to grab you

15 like that.

16 Q.      And, again, you didn't report it.

17 A.      No, I did not.

18 Q.      You described some physical injuries that you said that

19 you had from this incident, and I just want to clarify for the

20 jury.  Again, you did not go to medical; is that correct?

21 A.      No, I did not.

22 Q.      You did not have a vaginal exam as a result of this

23 incident, correct?

24 A.      No, I did not.

25 Q.      Now, you talked about people getting sent to the hole

1   for making accusations.  You don't know the names of anyone who

2   has actually been sent to the hole for making accusations about

3   sexual assault, do you?

4   A.      No, I don't know first and last names of people that

5   have been sent to the hole for accusations.

6   Q.      Okay.  So that assertion is based on your speculation.

7           MS. McGRAUGH:  Objection, argumentative.

8           THE COURT:  Overruled.

9   BY MS. ROTHERMICH:

10  Q.      Is that correct?

11  A.      It's what I've seen and heard, yes.

12  Q.      Now, Miss Betz, I want to get into your employment

13  history.

14          You were on unemployment for a while; is that right?

15  A.      Yes, that's right.

16  Q.      And you were working over at Johnson Controls for over

17  40 hours a week; is that correct?

18  A.      Yes.

19  Q.      And I apologize.  I need to establish, this is after

20  you got out of Chillicothe; is that right?

21  A.      Yes, it is.

22  Q.      Okay.  You lost your job over Covid; is that your

23  testimony?

24  A.      Yes.

25  Q.      And you had worked there for almost three years; is

1  that correct?

2  A.      Yes.

3  Q.      They actually asked you to come back.

4  A.      Yes.

5  Q.      Correct?

6  A.      Yes.

7  Q.      But you're not working there now.

8  A.      I am not.

9  Q.      You got about $14 an hour for that job, correct?

10  A.      Yes.

11  Q.      And to be fair, you have pled guilty to six -- or, I

12  mean, I shouldn't -- you have been convicted of six felonies,

13  correct?

14  A.      Yes.

15  Q.      So it's hard to find a job when you have a felony

16  conviction; is that correct?

17  A.      I don't know that I have a lot of trouble, no.

18  Q.      Okay.  Because you had the opportunity to work at

19  Johnson Controls again, and you haven't?

20  A.      Right.  And I could probably work at Modine, as well,

21  in Trenton.

22  Q.      Okay.  But you're not employed there.

23  A.      No, I'm not.

24  Q.      Okay.  And then I want to talk to you about your

25  emotional damages that you're claiming.

1          Before you went to Chillicothe, you had been on

2   medicine for bipolar disorder; is that correct?

3   A.      Previously, no.  Not before I went to Chillicothe, no.

4   Q.      Okay.

5   A.      Well, no, I take that back.  Right before I went, I did

6   an inpatient treatment, and they had just put me on that

7   medicine before I went to Chillicothe, yes.

8   Q.      Okay.

9   A.      Okay, sorry.

10  Q.      No, that's okay.  And before going to Chillicothe, you

11  were also diagnosed with anxiety, depression, and obsessive

12  thinking, correct?

13  A.      Yes.

14  Q.      Okay.  And you were on medication for sleep issues

15  before you went to Chillicothe.

16  A.      Yes, I took trazodone.

17  Q.      Okay.  And you were in treatment programs for substance

18  abuse.

19  A.      Yes.

20  Q.      You used marijuana.

21  A.      Yes.

22  Q.      You used opiates.

23  A.      Yes.

24  Q.      Used meth.

25  A.      Yes.

Q.     And I don't want to get into -- you've already
described the sexual assaults that you had previously been
through.

A.     Thank you.

Q.     Yeah.

       Now, you were referred to a substance abuse
assessment after you left Chillicothe, correct?

A.     I'm sorry, what?

Q.     You were referred to a substance abuse assessment after
you left Chillicothe; is that correct?

A.     I don't understand what that means.  I was referred to
what?

Q.     When you left Chillicothe in July of 2016, were you
referred to the Women's Substance Abuse Assessment?

A.     After I left?

Q.     Yes.

A.     No, I don't know what that is.

Q.     Okay.  When you were at Chillicothe in July of 2015,
were you referred to the Women's Substance Abuse Assessment?

A.     Yes, towards the end of my sentence?

Q.     And I -- yes, I apologize --

A.     In Chillicothe -- I was still in Chillicothe, though.

       (Reporter interruption.)

Q.     I apologize to the court clerk -- or to the reporter.
But I also apologize to you.  I misstated.

1    And you refused to participate in that; is that

2    correct?

3    A.    I did, yes.

4    Q.    Okay.  And you refused to participate in that because

5    you just didn't see what a difference it would make in your

6    treatment, correct?

7    A.    I mean, I'd already done a 120 treatment, and it's a

8    behavior modification, they don't focus on drug treatment, and

9    that's more what I need, and more a mental health.

10   Q.    And you -- again, you refused to participate in that.

11   A.    I did, yes.  I turned down to do another 120, yes, I

12   did.

13   Q.    Thank you.  And --

14   A.    But I have done outside treatment since then.

15              MS. ROTHERMICH:  If I may approach, Your Honor?

16              THE COURT:  Yes.

17              (Counsel approached the bench, and the following

18   proceedings were had:)

19              MS. ROTHERMICH:  I would like to ask her if she's

20   currently living with her family, and the reason why is I

21   believe that this goes to her emotional distress damages

22   because she said that she's on drugs because of Mr. Bearden.

23   Ms. McGraugh asked her specifically where she's living, and she

24   said that she's living with her family in Trenton, Missouri,

25   which she's not.

1        MS. McGRAUGH:  She's temporarily -- may I respond?

2        THE COURT:  Yes.

3        MS. McGRAUGH:  She's temporarily living in a jail.

4   We have already discussed whether or not the jail could --

5   well, I discussed it with Nick -- if he didn't tell you.  And I

6   asked Mr. Taulbee, are you going to try to elicit the fact that

7   my client is living in jail, and he said no.

8        THE COURT:  I'm not going to permit the question.

9   I'm also not to permit any argument that would suggest that

10  she's living at home.  I don't think that that's a comment that

11  the jury is going to pick up on, and I think that we can

12  properly limit argument so that she's not seeking any damages

13  based upon that, but at the same time avoid getting into the

14  fact that she's currently in custody.  So I will not permit a

15  question of that nature for those reasons.

16       MS. ROTHERMICH:  Thank you.

17       (The following proceedings were had in open court:)

18  BY MS. ROTHERMICH:

19  Q.    Miss Betz, I think you've already testified that you

20  knew Miss Keil while you were at Chillicothe, correct?

21  A.    Karen?

22  Q.    Yes.

23  A.    Yes.

24  Q.    And she was your personal trainer.

25  A.    Yeah, one of three.

1   Q.      You worked out in the gym with her, correct?

2   A.      Yes.

3   Q.      Okay.  And she was your friend; is that right?

4   A.      She was my workout friend, yes.

5   Q.      Okay.  And she was your friend; is that correct?

6   A.      I mean, I wouldn't say she wasn't my friend, but we

7   didn't hang out every day.  I had people that I hung out with

8   every day that I would consider friends.

9   Q.      You considered Miss Keil your friend.

10  A.      A friendly acquaintance, yes.

11  Q.      You considered Miss Keil your friend, correct?

12  A.      Karen is my friend, yes.

13  Q.      Thank you.  And that's how you got involved in this

14  lawsuit.  Miss Davis reached out to you on Miss Keil's behalf,

15  correct?

16  A.      No, that's not correct.

17  Q.      Miss Davis reached out to you.  You testified to that

18  earlier, correct?

19  A.      Yes, I did.

20  Q.      Told you to call Miss Keil, correct?

21  A.      No, she did not.  She called to apologize to me for

22  telling them what she saw Mr. Bearden do to me.

23          MS. ROTHERMICH:  Your Honor, I would object as

24  nonresponsive.

25          THE COURT:  Overruled.  I think you need to ask a

1  more focused question.

2  BY MS. ROTHERMICH:

3  Q.      Miss Davis reached out to you about this lawsuit,

4  correct?

5  A.      No, she did not.

6  Q.      You and Miss Davis are friends, correct?  On Facebook,

7  I apologize.

8  A.      Yes, we are.

9  Q.      Okay.  And she reached out to you via Facebook with a

10  Facebook communication and talked -- said to call Miss Keil,

11  correct?

12  A.      I don't remember that, no.

13  Q.      Okay.  Did she give you Miss Keil's phone number?

14  A.      I don't remember that either.

15  Q.      Okay.  And you don't -- you're saying that you don't

16  remember?

17  A.      Yes, that's what I'm saying.

18  Q.      Thank you.

19          MS. ROTHERMICH:  I am putting -- I don't want to

20  publish it.  I apologize.

21  BY MS. ROTHERMICH:

22  Q.      I'm putting Exhibit 39.  Miss Betz, does this -- and I

23  want to -- Miss Betz, I'm not trying to interrupt your reading,

24  but when you're getting toward the end of it, can you let me

25  know and I'll put it up a little bit?

1   A.      Yes.

2   Q.      Thank you.

3   A.      Yeah.

4   Q.      Are you finished?

5   A.      Yes.

6   Q.      Does this help refresh your recollection?

7   A.      I guess so, yeah.

8   Q.      Did Ms. Davis give you Miss Keil's phone number?

9   A.      It looks like she did, yeah.

10  Q.      Okay.  And she told you that Miss Keil was going to

11  file a lawsuit, correct?

12  A.      It looks like she did, yeah.

13  Q.      And you did not report any of these incidents to

14  medical or to anybody else, correct?

15  A.      No, I did not.

16  Q.      Not until you filed this lawsuit?

17  A.      That's correct.

18          MS. ROTHERMICH:  Thank you.

19          THE COURT:  Do you have any redirect?

20          MS. McGRAUGH:  Yes, I do.  May I please have that

21  Facebook page?  Thank you.

22          Let the record reflect I'm putting Exhibit 39 back

23  up.

24                          - - -

25

1      REDIRECT EXAMINATION

2  By Ms. McGraugh:

3  Q.      So the government made a point of saying that in this

4  Facebook communication, you were advised by Miss Davis that

5  there was going to be a lawsuit.  Is that correct?

6  A.      Yes.

7  Q.      And when she initially asked you what had happened, you

8  said she wanted to apologize to me; is that correct?

9  A.      Yes.

10  Q.      And isn't it true that in this very same Facebook

11  exchange, Teresa Davis said, "I talked to" --

12          MS. ROTHERMICH:  Objection, Your Honor.

13          THE COURT:  Could counsel please approach?

14          (Counsel approached the bench, and the following

15  proceedings were had:)

16          THE COURT:  What's the objection?

17          MS. ROTHERMICH:  Hearsay.  I think this is calling

18  for hearsay.

19          MS. McGRAUGH:  It's completeness doctrine, Your

20  Honor.

21          THE COURT:  Yeah, you opened up the door.  She can

22  put the statements and information in context.  The objection

23  is overruled.

24          (The following proceedings were had in open court:)

25  BY MS. McGRAUGH:

Q.    And isn't it true that Miss Davis wrote to you on Facebook, "I talked to an investigator and told them what I saw him do to you"?

A.    Yes.

Q.    And didn't she say, "I hope that was okay.  I wanted to find out from you but didn't know how to reach you other than Facebook"?

A.    Yes.

Q.    And didn't she also say, "Karen Backues Keil sent you a message"?

A.    Yes, but I wasn't aware of that.  I didn't read any message from Karen.

Q.    And she, Teresa, said to you, "This is all about Mr. Bearden.  He raped her the whole time she was there"?

A.    Yes, that's what she sent.

Q.    And you said, "Oh, my God, is she okay?  I knew he was a creep.  You saw what he did to me."

A.    Yes.

Q.    The government was saying that --

MS. ROTHERMICH:  Objection, Your Honor.  Can we approach?

THE COURT:  Yes.

(Counsel approached the bench, and the following proceedings were had:)

MS. ROTHERMICH:  I didn't say anything the first

1  time, but this is the second time she's referred to the defense

2  as the government, and we're not the government.

3           MS. McGRAUGH:  That's a -- I'm sorry.

4           (The following proceedings were had in open court:)

5  BY MS. McGRAUGH:

6  Q.      The attorney for Mr. Bearden made a point of discussing

7  that the culinary office was across the hall from the supply

8  closet where Edward Bearden sexually assaulted you; is that

9  correct?

10 A.      Yes.

11 Q.      Do you think that might be why Mr. Bearden shoved you

12 into the closet before he sodomized you?

13 A.      Yes, I do.

14          MS. McGRAUGH:  Nothing further.

15          THE COURT:  Is there any redirect?  Recross?

16          MS. ROTHERMICH:  Yes.  Exhibit 39 again.

17                         - - -

18                 RECROSS-EXAMINATION

19 By Ms. Rothermich:

20 Q.      You said in this message, "I have been wanting to talk

21 to Miss Keil," correct?

22 A.      Yes, I did.

23 Q.      Okay.  And you testified earlier that Miss Davis was

24 not there for the supply closet incident, correct?

25 A.      Yes, I did.

1  Q.      Okay.  And to your knowledge, she never reported this,

2  anything to the MDOC, correct?

3  A.      Not that I'm aware of, no.

4          MS. ROTHERMICH:  Thank you.

5          THE COURT:  Okay.  Ma'am, as you know, we let the

6  jury ask written questions; so if you could hold tight for just

7  a minute, and we'll see if the jury has any written questions.

8          Could counsel please approach?

9          (Counsel approached the bench, and the following

10 proceedings were had:)

11         THE COURT:  So there are a number of questions.

12 One, "Could you have asked for outside medical aid after the

13 abuse?"  Any objection?

14         MS. McGRAUGH:  I don't see the relevance.

15         THE COURT:  I think it's relevant in that could she

16 have sought medical assistance after the abuse.

17         MS. McGRAUGH:  Yeah.

18         THE COURT:  Maybe I'll just not say outside.  "Could

19 you have asked for medical aid after the abuse."

20         MS. McGRAUGH:  I request it be outside.  She already

21 said she did not seek medical from inside.

22         THE COURT:  So why would this question not be

23 appropriate?

24         MS. ROTHERMICH:  Well, just because -- I mean -- you

25 know what, I can ask her follow-up, so...

1    THE COURT:  Okay.  "Who was Miss Davis again?"  Any
2  objection?

3          MS. McGRAUGH:  No.

4          THE COURT:  Any objection?

5          MS. ROTHERMICH:  No.

6          THE COURT:  "After going to the hole and losing
7  privileges, can you earn them back?"  Any objection?

8          MS. McGRAUGH:  No.

9          THE COURT:  Any objection?

10          MS. ROTHERMICH:  Well, I think that calls for
11  speculation because I don't think she would be aware.

12          THE COURT:  I think she is.  She testified that she
13  went into the hole and lost the privilege of being in the 120
14  program and gained it back, so your objection is overruled.

15          "Why did you choose vo-tech over gardening if
16  landscaping is what you graduated for?"

17          MS. McGRAUGH:  Oh, my God.

18          THE COURT:  I'm not going to ask this question.
19  It's 5 o'clock.  We need to move on.  Any argument to ask this
20  question?

21          MS. McGRAUGH:  No.

22          MS. ROTHERMICH:  No.

23          THE COURT:  Okay.  A new issue has arisen.  My
24  sleuthing law clerks have seen that there is an article posted
25  on the *Kansas City Star* website regarding this.  I am inclined

1 to give them the general instruction that I give them, but a

2 very specific instruction to not get on the *Kansas City Star*

3 website and really to try to avoid all media because it's

4 unclear when something gets posted and reposted and things of

5 that sort, and to avoid watching television, local television

6 programs.  Any objection to an instruction of that sort?

7         MS. McGRAUGH:  No, Your Honor.

8         THE COURT:  Any objection?

9         MR. TAULBEE:  No.

10         (The following proceedings were had in open court:)

11         THE COURT:  So, ma'am, I have three questions for

12 you.

13                 - - -

14              EXAMINATION

15 By the Court:

16 Q.     No. 1, after the abuse you testified to, could you have

17 asked for outside medical aid?

18 A.     No, you cannot.

19 Q.     After going to the hole and losing privileges, can you

20 earn the privileges back?

21 A.     You can, but I'm not sure how long that takes.

22 Q.     Could you tell us again who Miss Davis is?

23 A.     Teresa Davis was the lady that I worked with.  She was

24 another inmate, but I worked with her at the vocational school.

25         THE COURT:  Okay.  Those are all of the questions I

1 have.  Do you have any follow-up questions?

2              MS. McGRAUGH:  No, I do not, Your Honor.

3              THE COURT:  Does defendant have any follow-up

4 questions?

5              MS. ROTHERMICH:  I do.

6                         - - -

7                FURTHER RECROSS-EXAMINATION

8 By Ms. Rothermich:

9 Q.      And I'm sorry to keep you, Miss Betz, but -- so the

10 outside medical aid, I just want to clarify for the jury.

11 There is internal medical assistance for inmates within the

12 Department of Corrections, correct?

13 A.      Correct.

14 Q.      Okay.  And that is provided by a medical service; is

15 that right?

16 A.      Yes, Corizon I think is who provided that service.

17 Q.      Yes.

18 A.      When I was there.

19 Q.      Yes.

20 A.      Sorry.

21 Q.      And you have utilized that in the past; is that

22 correct?

23 A.      Actually, I had utilized it after.

24 Q.      Okay.  And no inmate is able to go to just, like, a

25 doctor unless there's really --

1  A.      A serious problem, right.

2  Q.      Like an emergency, correct?

3  A.      Correct.

4          MS. ROTHERMICH:  Okay.  Thank you.

5          THE COURT:  Okay.  Thank you, ma'am.  You may step

6  down.

7          So that is going to conclude the testimony today.

8  We are still on track to have this case concluded by Friday, so

9  we're going to adjourn for the day and resume tomorrow at

10 9 a.m.

11         So you know the general rules, don't talk to anyone,

12 don't discuss the case.  I've got a new rule for you tonight,

13 and it's very important that you understand it.  I do believe

14 that there has been some reporting on this case, and I do

15 believe that there's been some reporting in this case on the

16 *Kansas City Star* website.  So I'm going to very specifically

17 direct you to not get on the *Kansas City Star* website because

18 you could very easily accidentally stumble upon this article.

19         I'm going to also ask that you not get on any other

20 local news sites because they could repeat that article, be it,

21 you know, Fox4, you know, KCTV, any of the -- really any local

22 article, given the fact -- or news outlet, given the fact that

23 this occurred in Chillicothe.

24         So for the next two nights, I'm going to give you

25 even more limited instructions and limit your activities, maybe

1  I should say, in that really there's nothing good in the news

2  anyway. So look at this as a vacation, a two-day vacation from

3  the news, and just stay away from the news. Friday you'll be

4  able to discuss this till your heart's content, you'll be able

5  to Google until your heart's content. At that point, you'll

6  even be able to look at the comments and know more than the

7  commenters to the article than they did when they commented.

8        So please, again, it's very important that you make

9  a decision based solely on the evidence that you hear in this

10  case, not what some reporter heard, not what some reporter

11  possibly got wrong, just what you hear in this case.

12        So with that, we will be in recess until tomorrow at

13  9 a.m.

14        (The following proceedings were had in the courtroom

15  out of the presence of the jury:)

16        THE COURT: So, Ms. McGraugh, do you believe that

17  you will conclude your case-in-chief tomorrow?

18        MS. McGRAUGH: I would defer to Mr. Roediger for

19  that answer. I believe so.

20        MR. ROEDIGER: Yes, absolutely.

21        THE COURT: Do you think it will take you all day,

22  or do you think there will be an opportunity for defendant to

23  put on witnesses?

24        MR. ROEDIGER: I cannot imagine that it will take

25  all day. It could take into the afternoon.

1          THE COURT:  Okay.  And so Mr. Taulbee, do you have a

2    better idea now of how long your case-in-chief is going to

3    take?

4          MR. TAULBEE:  I think no more than -- I don't think

5    it will take a full day, so I think we can get through our

6    witnesses in less than a full day.

7          THE COURT:  So do you think -- and this is a

8    question to both sides.  Do you think there's a chance that we

9    could close on Thursday?

10          MR. ROEDIGER:  I think it's probably better than a

11   chance.

12          MR. TAULBEE:  I really hope so, Your Honor.

13          THE COURT:  Good.  Music to my ears.  What we will

14   do is have a copy of the instructions to give to you tomorrow

15   so that we can discuss them to a certain extent tomorrow, but

16   then come in Thursday morning and finalize the discussion of

17   the instructions.

18          Just so you're aware, my procedure is really to give

19   you a copy of the instructions.  I've reviewed what each party

20   has submitted.  In this case, there really are very few

21   disagreements.  I will give you a copy of the instructions.  I

22   don't do what I call the Jackson-County approach, which some

23   may not know what I'm referring to.  I don't go through every

24   page of the instructions.  I give you the instructions ahead of

25   time, I give you the opportunity to lodge specific objections

1   to the instructions.  We finalize them, copy them, and then are

2   done with it.  So it's a bit of a shorter process than what I

3   know some state court judges, at least on this side of the

4   state, do.

5          With that, are there any issues that I can take up

6   before we recess tonight?

7          MS. McGRAUGH:  No, Your Honor.

8          MR. TAULBEE:  I may -- I just want to know -- I can

9   withdraw the writ for Delila Clay.  Do you want me to file

10  something, or can the Court do something upon an oral motion?

11         THE COURT:  I think I can do it on an oral motion.

12  How we actually accomplish that, we may need your help.  Is she

13  in the Department of Corrections?

14         MR. TAULBEE:  She is, and she's at Chillicothe.  So

15  I will let the warden know when I leave here that we're doing

16  it, to expect it.

17         THE COURT:  Just so they know not to bring her down

18  here is my most important thing.  But we'll enter something

19  voiding that writ, doing something to indicate they don't need

20  to bring her here.  But if you could be the one to

21  communicate --

22         MR. TAULBEE:  I would be happy to, Your Honor.

23         THE COURT:  -- that the department doesn't need to

24  bring her here, I think that would be helpful.

25         Anything else tonight?

1       MR. TAULBEE:  Nothing else from the defendant, Your

2  Honor.

3       MS. McGRAUGH:  No, Your Honor.

4       THE COURT:  Then I would ask that everyone please be

5  here at 8:30 tomorrow.

6       (Trial adjourned for the evening.)

7                    - - -

8                    - - -

9            <u>CERTIFICATE</u>

10      I certify that the foregoing is a correct transcript

11  from the record of proceedings in the above-entitled matter.

12

13

14  June 27, 2022

15                      /s/_____
                        Kathleen M. Wirt, RDR, CRR
16                      U.S. Court Reporter

17

18

19

20

21

22

23

24

25