IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| KAREN BACKUES KEIL, | ) | No. 18-06074-CV-W-BP |
|---|---|---|
| LYNNSEY CHRISTIE BETZ, | ) | 18-06079-CV-W-BP |
| ASHLEY OLSEN ZIESER, and | ) | 18-06103-CV-W-BP |
| TRENADY GEORGE, | ) | 19-06161-CV-W-BP |
| | ) | |
| Plaintiffs, | ) | April 27, 2022 |
| | ) | Kansas City, Missouri |
| V. | ) | CIVIL |
| | ) | |
| EDWARD BEARDEN, | ) | VOLUME III |
| | ) | (Pages 408-699) |
| Defendant. | ) | |

TRANSCRIPT OF JURY TRIAL

BEFORE THE HONORABLE BETH PHILLIPS
UNITED STATES DISTRICT JUDGE

Proceedings recorded by electronic stenography
Transcript produced by computer

|     | **APPEARANCES** |
|-----|-----------------|
| 1   | |
| 2   | For Plaintiffs:     MS. SUSAN MCGRAUGH |
|     | MR. JOHN J. AMMANN |
| 3   | MR. BRENDAN D. ROEDIGER |
|     | Saint Louis University School of Law |
| 4   | 100 N. Tucker, Suite 704 |
|     | St. Louis, MO 63101 |
| 5   | |
|     | MS. JENIFER C. SNOW |
| 6   | Law Office of Joan M. Swartz |
|     | 3348 Greenwood Blvd. |
| 7   | Maplewood, MO 63143 |
| 8   | For Defendant:     MR. NICOLAS TAULBEE |
|     | MS. ABBIE ROTHERMICH |
| 9   | Missouri Attorney General's Office |
|     | 615 East 13th Street, Suite 401 |
| 10  | Kansas City, MO 64106 |
| 11  | MS. CARA HARRIS |
|     | Missouri Attorney General's Office |
| 12  | 149 Park Central Square, Suite 1017 |
|     | Springfield, MO 65806 |

                    1

      **APPEARANCES**

2    For Plaintiffs:    MS. SUSAN MCGRAUGH
                        MR. JOHN J. AMMANN
3                       MR. BRENDAN D. ROEDIGER
                        Saint Louis University School of Law
4                       100 N. Tucker, Suite 704
                        St. Louis, MO 63101
5
                        MS. JENIFER C. SNOW
6                       Law Office of Joan M. Swartz
                        3348 Greenwood Blvd.
7                       Maplewood, MO 63143

8    For Defendant:     MR. NICOLAS TAULBEE
                        MS. ABBIE ROTHERMICH
9                       Missouri Attorney General's Office
                        615 East 13th Street, Suite 401
10                      Kansas City, MO 64106

11                      MS. CARA HARRIS
                        Missouri Attorney General's Office
12                      149 Park Central Square, Suite 1017
                        Springfield, MO 65806

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

VOLUME I
(Pages 1-103)

APRIL 25, 2022

Pretrial matters                                          7
Jury sworn                                               17

Plaintiffs' opening statement                           17
Defense opening statement                               28

PLAINTIFFS' WITNESSES:

    ASHLEY ZIESER
        Direct Examination by Ms. McGraugh              34
        Cross-examination by Ms. Rothermich             74
        Jury Questions asked by the Court               99
        Further Cross by Ms. Rothermich                100

                        - - -

VOLUME II
(Pages 104-407)

APRIL 26, 2022

PLAINTIFFS' WITNESSES (continued):

    TRENADY GEORGE
        Direct Examination by Ms. McGraugh             116
        Cross-examination by Mr. Taulbee               163
        Redirect Examination by Ms. McGraugh           193
        Jury Questions asked by the Court              196

    KAREN KEIL
        Direct Examination by Mr. Ammann               199
        Cross-examination by Mr. Taulbee               247
        Redirect Examination by Mr. Ammann             283
        Recross-examination by Mr. Taulbee             284
        Voir Dire Examination by the Court             289
        Jury Questions asked by the Court              293

    TERI DEAN
        Direct Examination by Ms. Snow                 295
        Cross-examination by Ms. Harris                315
        Redirect Examination by Ms. Snow               333
        Jury Questions asked by the Court              337

411

LYNNSEY BETZ
     Direct Examination by Ms. McGraugh          339
     Cross-examination by Ms. Rothermich         373
     Redirect Examination by Ms. McGraugh        396
     Recross-examination by Ms. Rothermich       398
     Jury Questions asked by the Court           401
     Further Recross by Ms. Rothermich           402

- - -

VOLUME III
(Pages 408-699)

APRIL 27, 2022

PLAINTIFFS' WITNESSES (continued):

DORA SCHRIRO
     Direct Examination by Mr. Ammann           417
     Cross-examination by Ms. Harris            447
     Redirect Examination by Mr. Ammann         476
     Recross-examination by Ms. Harris          477
     Jury Questions asked by the Court          479

MELISSA PIASECKI
     Direct Examination by Mr. Roediger         481
     Cross-examination by Ms. Harris            523
     Resumed Cross-examination by Ms. Harris    570
     Redirect Examination by Mr. Roediger       582
     Recross-examination by Ms. Harris          585
     Jury Questions asked by the Court          586

DEFENSE WITNESSES:

KENNETH CHRISTOPHER McBEE
     Direct Examination by Mr. Taulbee          588
     Cross-examination by Mr. Ammann            626
     Redirect Examination by Mr. Taulbee        636
     Jury Questions asked by the Court          641

EDWARD BEARDEN
     Direct Examination by Mr. Taulbee          645
     Cross-examination by Ms. McGraugh          660

- - -

VOLUME IV<br>(Pages 700-843)

<u>APRIL 28, 2022</u>

DEFENSE WITNESSES (continued):

DAVID SAVAGE
    Direct Examination by Ms. Harris      717
    Cross-examination by Ms. McGraugh    753
    Redirect Examination by Ms. Harris    761
    Recross-examination by Ms. McGraugh   770
    Jury questions asked by the Court    776

ROBIN DYSART
    Direct Examination by Ms. Rothermich  778
    Cross-examination by Ms. McGraugh    804
    Jury questions asked by the Court    807
    Further Redirect by Ms. Rothermich   808

- - -

E X H I B I T S

| PLAINTIFFS' EXHIBITS | OFFERED | ADMITTED |
|---|---|---|
| 21 - Bible cover and page | 150 | 151 |
| 22 - CV of Dr. Schriro | 447 | 447 |

| DEFENDANT'S EXHIBITS | OFFERED | ADMITTED |
|---|---|---|
| 1-7 - time and attendance records | 566 | 567 |
| 8 - duty assignments | 566 | 567 |
| 9 - duty assignments | 566 | 567 |
| 10 - duty assignments | 566 | 567 |
| 11 - FMLA notice | 566 | 567 |
| 12 - letter regarding sick leave | 566 | 567 |
| 13 - ENGAGE meeting notes | 566 | 567 |
| 14 - Bearden resignation memo | 566 | 567 |

| | | | |
|---|---|---|---|
| 1 | 15 - resignation acceptance | 566 | 567 |
| 2 | 19 - building layouts | 110 | 110 |
| 3 | 21 - memo regarding COs | 763 | 764 |
| 4 | 22 - Dean work summary | 567 | 567 |
| 5 | 23 - Dean housing history | 567 | 567 |
| 6 | 24 - Keil mental health records | 567 | 567 |
| 7 | 25 - Keil mental health records | 567 | 567 |
| 8 | 26 - Keil mental health records | 567 | 567 |
| 9 | 27 - Keil mental health records | 567 | 567 |
| 10 | 28 - Betz mental health records | 567 | 567 |
| 11 | 29 - Betz mental health records | 553/567 | 553/567 |
| 12 | 30 - Zieser mental health records | 567 | 567 |
| 13 | 32 - George mental health records | 125 | 126 |
| 14 | 33 - George mental health records | 527 | 528 |
| 15 | 40 - Keil housing history | 567 | 568 |
| 16 | 41 - Keil roommate history | 567 | 568 |
| 17 | 42 - Zieser housing history | 567 | 568 |
| 18 | 43 - Zieser roommate history | 567 | 568 |
| 19 | 44-110 - chronological logs | 568 | 568 |
| 20 | 111-199 - photos of facility | 568 | 568 |

21           * * * * *
              * * * *

22

23

24

25

APRIL 27, 2022

- - -

1    (The following proceedings were had in the courtroom
2  out of the presence of the jury:)

3    THE COURT:  Good morning.  So Max is going to give
4  you copies of the proposed instructions.  I wanted to highlight
5  two of the changes that I made that I think are going to work
6  better, but I want to let you know what they are so you can,
7  then, think about it and we can discuss at a later time whether
8  you object.

9    The first is -- I believe the first is on Page 19.
10  I think it's both Page 18 and 19.  I think that the parties
11  submitted instruction -- the definition of a 1983 claim and the
12  verdict director, separate instructions for each plaintiff.
13  And it seems to me that that's redundant and that can be
14  accomplished by putting the -- all plaintiffs' names in each of
15  the instructions and adding a sentence that "You must assess
16  these elements separately for each plaintiff."  And so that
17  language was added on to Paragraph 19.

18    Likewise, I don't recall whether or not the parties
19  submitted separate punitive instructions, a separate punitive
20  instruction, which is on Page 22 of the instructions.  But I,
21  when looking at it, am concerned that by not adding that last
22  sentence that I did in the first paragraph on Page 22 that "You
23  must assess punitive damages separately for each plaintiff,"

1  that if the defendant -- if the jury gets to this point and

2  then they look at the verdict form, they're going to be unclear

3  whether or not the punitives are -- you know, let's say

4  $1,000 -- $1,000 for each plaintiff or $1,000 total.  So that's

5  the reason I added the sentence to the punitive damage

6  instruction.

7          I think that those are the only major substantive

8  changes that were made to the instructions as the parties

9  submitted them.  Again, I don't need any argument on this at

10  this point.  I just wanted to highlight what the changes were

11  so that you can think about it; and if you disagree, we can --

12  if you plan to object, then we can discuss it and I can rethink

13  this approach.

14          With that, are there any issues that I can bring up

15  before we bring the jury out on behalf of plaintiff?

16          MS. McGRAUGH:  No, Your Honor.

17          MR. AMMANN:  No, Your Honor.

18          THE COURT:  How about on behalf of defendant?

19          MR. TAULBEE:  No, Your Honor, thank you.

20          THE COURT:  And so are we moving to the expert

21  witnesses now?

22          MR. AMMANN:  Yes, Your Honor.

23          THE COURT:  Okay.

24          MR. AMMANN:  Dr. Schriro is first.

25          THE COURT:  Okay.  As soon as the jury is here, I

1  will come back out.

2           (A recess was taken from 8:48 a.m. to 8:59 a.m.)

3           THE COURT:  Ready to bring the jury back in?

4           MR. AMMANN:  Yes, Your Honor.

5           THE COURT:  Okay.

6           (The following proceedings were had in the courtroom

7  in the presence of the jury:)

8           THE COURT:  Good morning, ladies and gentlemen.  I

9  hope you had a good evening, and we are ready to continue with

10 plaintiffs' case.

11          Is plaintiff ready to call its next witness?

12          MR. AMMANN:  Yes, Your Honor.  We would call

13 Dr. Dora Schriro.

14          THE COURT:  Good morning, ma'am.  Could you come

15 forward, either through -- around one of those tables, or

16 somehow get to this area of the courtroom.  It's rather

17 congested, I realize.  If you could stand in this area, this

18 lady right here is going to swear you in.

19                              - - -

20                         DORA SCHRIRO,

21  being first duly sworn by the courtroom deputy, testified as

22 follows:

23          THE COURT:  If you could, then, have a seat in that

24 chair right there.

25          You may proceed.

1                              - - -

2                      DIRECT EXAMINATION

3   By Mr. Ammann:

4   Q.      Good morning, Dr. Schriro.  How are you?

5   A.      I'm well, thank you.

6   Q.      Make sure to keep that mike close to you, okay?  Thank

7   you.

8            Dr. Schriro, would you state your full name for the

9   jury, please?

10  A.      Yes, my name is Dora Bess Schriro.

11  Q.      And can you spell your last name for us?

12  A.      S-C-H-R-I-R-O.

13  Q.      And what is your occupation, Dr. Schriro?

14  A.      At present?

15  Q.      Yes.

16  A.      I'm an expert.

17  Q.      And in what area do you serve as an expert?

18  A.      In the fields of corrections and immigration detention.

19  Q.      And do you have your own business where you do these

20  services?

21  A.      I have an LLC, yes.

22  Q.      And what is the name of that LLC?

23  A.      Dora B. Schriro Consulting Services.

24  Q.      Where do you currently reside?

25  A.      In the city of New York.

1   Q.      Did you ever reside in the state of Missouri?

2   A.      I did.

3   Q.      For how many years would you say?

4   A.      Oh, my gosh.  1989 to 2003.

5   Q.      During that period, were you employed by the State of

6   Missouri?

7   A.      I was.

8   Q.      And were you employed by the Missouri Department of

9   Corrections?

10   A.      I was.

11   Q.      And what was your title?

12   A.      Director, Missouri Department of Corrections.

13   Q.      So you were in charge of all of the prisons in

14   Missouri?

15   A.      That is correct.

16   Q.      And you would have been in charge of Probation and

17   Parole, as well?

18   A.      That is correct.

19   Q.      For how many years were you the Director of the

20   Missouri Department of Corrections?

21   A.      I was appointed in January of 1993, and I remained in

22   office through the spring of 2001, I think.

23   Q.      Do you remember the total number of prisoners --

24   A.      It might have been 2000, I'm sorry.  I'm a little bit

25   off on that.  I'm not sure.

1  Q.      Do you remember the total number of prisoners who were

2  in the Missouri prisons when you were Director?

3  A.      It was approximately 28,000.

4  Q.      Dr. Schriro, do you hold any degrees?

5  A.      I do.

6  Q.      What are they?

7  A.      Starting at the beginning, or...

8  Q.      Well, bachelor's degree?

9  A.      Bachelor's degree, cum laude, from Northeastern

10  University.

11  Q.      In what subject?

12  A.      Criminology sociology.

13  Q.      Do you have any advanced degrees?

14  A.      I do.

15  Q.      What are they?

16  A.      I have a master's in education counseling from Boston

17  State College, which is now University of Massachusetts Boston;

18  I have a doctorate from Columbia University; and, most

19  recently, a JD from St. Louis University School of Law.

20  Q.      Let's go back to your doctorate.  So that's a Ph.D.; is

21  that correct?

22  A.      It's an Ed.D.

23  Q.      I'm sorry.  But that's why we call you Doctor --

24  A.      That's correct.

25  Q.      -- because of that degree?

1    A.    Yes.

2    Q.    Is that right?

3    A.    Yes.

4    Q.    And give me a second to finish the question so we're

5    not talking over each other.

6    A.    Sorry.

7    Q.    We gave the court reporter fits yesterday, so I don't

8    want to do it again today.

9          You said you have a JD, which is a law degree; is

10   that right?

11   A.    That's correct.

12   Q.    Are you a practicing lawyer these days?

13   A.    I am not.

14   Q.    Dr. Schriro, you've been asked to be here today to talk

15   about prisons, correction officers, and offenders; is that

16   right?

17   A.    Yes.

18   Q.    Do you have experience working in prisons and running

19   prisons in any other state or locality other than the state of

20   Missouri?

21   A.    I do.

22   Q.    Can you tell us all the places where you have been

23   involved with corrections since the start of your career?

24   A.    Yes.  At the very beginning, I served as Director of an

25   early-release program in the state of Massachusetts.  I worked

1  with inmates from Norfolk State Prison.  I also served in New

2  York City as the educational coordinator, the Director of a

3  consortium that provided academic services to inmates in the

4  New York City jail system.

5          And then I was invited to St. Louis in 1989 to serve

6  as warden of the Medium Security Institution, which is a jail

7  in St. Louis City.  I was then appointed to Director of the

8  Missouri Department of Corrections and was there, as I

9  mentioned previously.

10  Q.    And did you hold correctional jobs after the state of

11  Missouri?

12  A.    I did.

13  Q.    And where were those?

14  A.    I went back to St. Louis City as Commissioner of the

15  Division of Corrections in the city's Department of Public

16  Safety, and from -- from there -- I'm sorry.  I got a little

17  bit nervous here.  Went out to -- I'm sorry.

18          Would you read that, please, my last sentence or

19  two?

20  Q.    That's all right.  I'll ask you some more questions.

21          In fact, you have prepared a resume of your

22  experience; is that right?

23  A.    I have.

24  Q.    I would ask you to look at the orange binder to your

25  right, I put that in front of you, and go to Exhibit 22.  Do

1 you see that exhibit?

2 A.    I do.

3 Q.    And could you tell the jury what that is?

4 A.    It's my resume.

5 Q.    Would it help you to refresh your recollection to have

6 that in front of you for the other places where you --

7 A.    Yeah, sure.

8 Q.    So after you left the City of St. Louis in 2003, where

9 did you go next?

10 A.    I went to the State of Arizona where I was Director of

11 the Arizona Department of Corrections.  I was there from 2003

12 to beginning of 2009.

13 Q.    And where did you go after that?

14 A.    I was selected to serve as senior advisor to the

15 Secretary of Homeland Security in Washington, D.C., and I was a

16 senior advisor on immigration, detention, and removal.

17 Q.    How about after that?

18 A.    While I was still there, I was then appointed to the

19 Founding Director of the Office of Detention Policy and

20 Planning at ICE.

21        After Washington, D.C., I returned to New York City

22 and was the Commissioner of the City Department of Corrections,

23 and I was there from 2009 to 2014.  And at the beginning of

24 2014, I then went to the state of Connecticut where I was --

25 I'll use it as an abbreviation, the Department of Public

1  Safety, which included Connecticut State Police and the crime

2  lab and four other divisions that used to be free-standing

3  departments.

4   Q.     Is it fair to say that you have experience running

5  dozens of prisons and jails?

6   A.     I have.

7   Q.     And is it fair to say that you would have been

8  responsible for hundreds of thousands of offenders?

9   A.     Yes.

10  Q.     Your resume ends at 2018.  Is that when you started

11  your consulting business?

12  A.     At the beginning of 2019, yes.

13  Q.     Is it fair to say also that you have devoted your

14  entire career to corrections?

15  A.     It is true.

16  Q.     Have you had jobs where you've had direct contact with

17  prisoners, where you were inside a prison or jail on a

18  day-to-day basis with prisoner contact?

19  A.     Yes.

20  Q.     I want to talk to you about terms a little bit as we go

21  forward today.  So what is the correct term that we should use

22  for a person who is employed at a prison and is responsible for

23  securing the safety of the prisoners?

24  A.     Well, generically it would be custody personnel, and

25  then there's specific ranks, each with their own title.

1    Q.      And you're familiar with Mr. Bearden from studying the

2  records; is that right?

3    A.      Yes.

4    Q.      And what was his title?

5    A.      Corrections officer.

6    Q.      And is corrections officer a common term for most of

7  the people who work doing security inside a prison?

8    A.      Well, it's the largest work group within the custody

9  class.

10   Q.      And for the people who reside in a prison, what term

11 should we use for them?

12   A.      Offender or inmate.

13   Q.      Were you hired in this case by our legal team to study

14 the cases of these four plaintiffs?

15   A.      Yes.

16   Q.      And were you asked to provide opinions about certain

17 matters related to how prisons operate?

18   A.      Yes.

19   Q.      And you're being paid for your work in studying these

20 cases and for being here today; is that right?

21   A.      Correct.

22   Q.      To date -- now, there's four cases, so let's do it per

23 case.  How much have you been paid per case to provide opinions

24 on these cases?

25   A.      It's been about $5,600 each.

1  Q.     Did you review any materials prior to your testimony

2  here today?

3  A.     Yes.

4  Q.     And those materials have been provided to you over the

5  course of the last couple of years, actually?

6  A.     Correct.

7  Q.     Can you tell us generally what you reviewed?

8  A.     Well, I reviewed my reports, and the material that form

9  the opinion in those reports were the pleadings, the personnel

10 file of Mr. Bearden, the institutional file for the four

11 ladies, and policies and procedures.

12 Q.     Did you ever visit the current prison in Chillicothe,

13 Missouri?

14 A.     No.

15 Q.     Are your opinions today dependent on having actually

16 visited the prison?

17 A.     No.

18 Q.     So let's start with some of those opinions.  What is

19 the nature of the authority of a corrections officer as it

20 pertains to an offender?

21 A.     Well, they have really total control.  They are in

22 direct contact with the population and are supposed to enforce

23 the rules and provide direction as required.

24 Q.     What is the responsibility of an offender as to the

25 correctional officers?

1   A.     It's to follow those orders.

2   Q.     Does an offender or inmate have a choice on whether to

3 follow a CO's, a corrections officer's order?

4   A.     They do not.

5   Q.     Do corrections officers have any authority to

6 discipline an offender?

7   A.     Well, they have the authority to write them up, and

8 then there would be a disciplinary process.

9   Q.     For what reasons can they write them up?

10   A.     Just about anything in the rule book.

11   Q.     We heard testimony yesterday about one of the

12 plaintiffs who was written up for sleeping through count.  Are

13 you familiar with what that term would mean?

14   A.     Sleeping through count?

15   Q.     Correct.

16   A.     Well, it could -- depending on how it's -- how it --

17   Q.     Let's start with the word "count."  So when we talk

18 about a count in prison, what are we talking about?

19   A.     You're talking about verifying that there's certain

20 numbers of people in a certain location, and you're also

21 identifying the identity of those people.  That's what in

22 particular is called a standing count.

23   Q.     And does that happen several times a day?

24   A.     Yes.

25   Q.     And if an offender isn't up out of their bed in time

1 for the count, could a CO write them up for that?

2 A.      They could.

3 Q.      In your experience, do people in prison, offenders --

4 do all offenders get some type of violation or write-up during

5 their time in prison?

6 A.      I don't know that.  I can tell you that it's -- the way

7 things are set up, it's really easy to get written up.  It is

8 hard to stay out of trouble.

9 Q.      Okay.  So if somebody stayed in the Chillicothe

10 Correctional Center for six years, it would be highly unlikely

11 they could go that time without being written up.  Is that

12 right?

13 A.      It would be difficult.

14 Q.      I'm sorry?

15 A.      It would be difficult.

16 Q.      Okay.  In your experience, what is the attitude of the

17 prison system with regard to the truthfulness of statements

18 made about an incident by a corrections officer and those made

19 by an offender?

20 A.      In general --

21          MS. HARRIS:  Objection, calls for speculation.

22          THE COURT:  Could counsel please approach?

23          (Counsel approached the bench, and the following

24 proceedings were had:)

25          THE COURT:  Do you want to elaborate on that?

1          MS. HARRIS:  Well, he asked a very general question

2     about all prison -- he said prison systems, and their -- how

3     they look at variations between what a guard says and an inmate

4     says.  Or offender, excuse me.  And I think it's a very broad

5     statement and calls for speculation.

6          THE COURT:  I do think it's a little bit broad.

7          MR. AMMANN:  I can be more specific on tying it to a

8     specific event.

9          THE COURT:  Or a facility here in the Missouri

10    Department of Corrections --

11         MR. AMMANN:  Yeah.

12         THE COURT:  -- so the objection is sustained.

13         MR. AMMANN:  Point taken.

14         (The following proceedings were had in open court:)

15    BY MR. AMMANN:

16    Q.    Dr. Schriro, let me ask you that in a different way.

17    In your experience at the Missouri Department of Corrections

18    when you were the Director, if there was an allegation or an

19    incident of some alleged misconduct by an offender, what

20    attitude or pre-existing framework did the Department of

21    Corrections have with regard to whether it believed the CO or

22    the offender?

23    A.    I think it's safe to say, in general, the premise is

24    that the officer would have reported accurately whatever it was

25    and that -- and that the inclination would be to take them at

1  their word.

2  Q.      And does that mean that the offender would be less

3  likely to believe -- be believed over the CO?

4  A.      All things equal, I would say yes.

5  Q.      And would that same framework hold true during any sort

6  of investigation by other prison officials, that the tendency

7  would be to believe that the CO was telling the truth and the

8  offender was not?

9  A.      Yes.

10  Q.      In your experience of running corrections facilities,

11  prisons and jails, have you seen instances where a female

12  offender has come forward with an allegation about sexual

13  misconduct?

14  A.      Yes.

15  Q.      In your experience, are women who allege sexual assault

16  or sexual abuse in prison believed when they come forward?

17  A.      Not necessarily, not usually.

18  Q.      In your experience, specifically in Missouri, but your

19  other experience, what is the probability that a woman who has

20  been the victim of sexual assault by a corrections officer

21  would come forward and report?

22          MS. HARRIS:  I'm going to object.  That calls for

23  speculation.

24          THE COURT:  Overruled.

25  BY MR. AMMANN:

1  Q.      You may answer.

2  A.      I'm sorry, could you --

3  Q.      What is the probability that a woman who has an

4  allegation of sexual abuse caused by a corrections officer

5  would come forward and report?  What is the probability of

6  that?

7  A.      Not high.

8  Q.      I'm sorry?

9  A.      Not high.

10  Q.      And explain why it's not high.

11  A.      Because the consequences can be quite severe.  Would

12  you like me to elaborate?

13  Q.      What would be the consequences of a woman reporting?

14  A.      Well, you always run the risk of having filed a false

15  report; and while that complaint is being investigated, it

16  is -- there's also the possibility that you're going to be put

17  in administrative segregation, which is a temporary holding

18  kind of condition while you're being, that report is being

19  investigated.

20  Q.      We'll talk about administrative segregation more in a

21  minute, but what other consequences?

22  A.      While you're in administrative segregation, then your

23  work is suspended and your opportunity to visit is suspended,

24  so there are a lot of immediate ramifications.  And then, of

25  course, if the determination is that you are not believed, then

1  you're subject to punishment, and the punishment then has, you

2  know, really long-lasting effects.  It can affect your custody

3  classification, and then that affects your housing assignment

4  and your access to other kinds of work, and then that affects

5  your ability to earn income.  Income is really too grand of a

6  word, but, you know, to receive the inmate pay for the work

7  that you do.

8  Q.      You talked about visits.  In your experience, do women

9  get as many visits from their family as men do in a men's

10 prison?

11 A.      By and large, no, they do not.

12 Q.      And why would that be?

13 A.      Well, my experience is that the -- that women in the

14 community are very proactive about bringing children or

15 grandchildren to visit the dad or the granddad.  But women

16 themselves do not receive nearly as many visits as do men, and

17 so that means they also don't have the same amount of contact

18 with their children while they're incarcerated.

19 Q.      In your experience in corrections, have you seen the

20 benefit of visits on the behavior and demeanor of female

21 prisoners?

22 A.      Absolutely.

23 Q.      And is it a positive one?

24 A.      It is a very positive one.  It really gets them

25 through.

1  Q.      We've had testimony from several sources about the

2  PATCH program.  Now, when you were the Director of the Missouri

3  Department of Corrections, was the PATCH program in place?

4  A.      It was.

5  Q.      And tell us what your understanding of PATCH is.

6  A.      Yeah.  It's a program -- the acronym is parents and

7  children, and it's an opportunity for -- it's really very

8  competitive, and women in particular are expected to be on

9  their best behavior, have no write-ups, you know, exceptional

10 institutional conduct.  In exchange, when their children come

11 to visit, these are much longer than -- a typical visit

12 wouldn't be more than an hour, and PATCH, as I recall, was

13 maybe four hours or so, and there was opportunity to bring food

14 or order food.  So it was really a sustained amount of time

15 where you really could, really have a chance to be with your

16 kiddos.

17 Q.      In your experience in your years at the Missouri

18 Department of Corrections, did you see the benefit of the PATCH

19 program on the women at the women's prisons?

20 A.      Yes.

21 Q.      Did you see that -- whether the women themselves valued

22 the PATCH program?

23 A.      Oh, yes.

24 Q.      You talked a little bit about administrative

25 segregation, and I think you've handled that pretty well.

1  Would a corrections officer like Mr. Bearden know that if women

2  make an allegation of sexual assault that the women are likely

3  to go to administrative segregation?

4  A.      I think that an officer would think that it was highly

5  likely that there would be ramifications.

6  Q.      And would a corrections officer like Mr. Bearden

7  understand what administrative segregation is?

8  A.      Oh, definitely.

9  Q.      Do all corrections officers understand what it is?

10  A.      Yes.

11  Q.      Do all corrections officers understand the privileges

12  that are lost when a prisoner goes there?

13  A.      I don't know how much they would think about it, but, I

14  mean, it's pretty obvious what the consequences are.

15  Q.      In fact, wouldn't corrections officers be responsible,

16  in part, for implementing the restrictions, such as not having

17  your TV and not having visits?  They would be part of the

18  process to enforce those restrictions; is that correct?

19  A.      Absolutely.

20  Q.      So is it your testimony, then, that a corrections

21  officer in the position of Mr. Bearden would know that women

22  for all the reasons you've said so far are not likely to come

23  forward to report sexual assault by a corrections officer?

24  A.      Yes.

25  Q.      I'm going to talk to you about cameras.  Were there

1   cameras in any -- apart from your experience in the state of

2   Missouri, were there surveillance cameras in any prisons or

3   jails in any other states?

4    A.      It's quite common, yes.

5    Q.      Were there surveillance cameras in all of the

6   institutions where you worked or had responsibility for?

7    A.      As best I can recall, yes.

8    Q.      What is the general purpose of surveillance cameras in

9   a prison?

10   A.      It's primarily to monitor the inmate population.

11   Q.      Is it also, in part, to monitor the corrections

12  officers?

13   A.      That's more after the fact if there's a report that

14  needs to be investigated.

15   Q.      Are cameras in place to cover with their view every

16  inch of a prison?

17   A.      No.

18   Q.      Are there specific areas where, in your experience in

19  Missouri and elsewhere, where cameras do not cover?

20   A.      Oh, definitely.

21   Q.      Can you give us some examples?

22   A.      Well, again, they're primarily where the population is,

23  and even there, there are some restrictions.  So, for example,

24  in the housing unit, the day room would be covered, but the

25  shower area and the toilet area would not.

1    Q.    Let me ask you some specific questions.  What about

2    supply closets?

3    A.    No.

4    Q.    What about equipment rooms or supply rooms?

5    A.    No.

6    Q.    What about the cells themselves?

7    A.    No, typically not, not unless you've got a suicide cell

8    or something of that sort.

9    Q.    What about a room where they store and clean uniforms?

10   A.    No.  Are you referring to the laundry, or what are you

11   referring to?

12   Q.    A storage room where uniforms would be stored.

13   A.    Oh, no.

14   Q.    Would there be cameras routinely in spaces that are

15   personal for the guards?  And I'll give you some examples.  The

16   guards' locker room, the guards' workout room, the guards'

17   break room, would you traditionally see surveillance cameras in

18   those areas?

19   A.    I don't recall ever seeing them anyplace I've worked.

20   Q.    In your experience, Dr. Schriro, do corrections

21   officers know where the cameras are in a prison?

22   A.    Certainly in the areas where they work, and probably

23   they are pretty well-versed throughout the facility.

24   Q.    And is it your understanding that the cameras at

25   Chillicothe are all in plain view?

1    A.    That's my understanding.

2    Q.    Is it common for prisons anywhere you've worked to have

3    hidden cameras?

4    A.    There might be, but the whole idea is that the camera

5    is intended, in part, to be a deterrent effect, so you want

6    them to be visible.

7    Q.    So, generally, you would say that there are no hidden

8    cameras that you're aware of in the Missouri prisons.

9    A.    Not that I can think of.

10   Q.    Is there any way for a corrections officer like

11   Mr. Bearden to know what the shot is of the camera, what part

12   of the view is actually being shown on the TV monitor?

13   A.    Certainly anyone who has had the opportunity to monitor

14   would know what the purview is.

15   Q.    And where would that monitoring take place?  Where are

16   the TV screens?

17   A.    Well, it could be one of several places.  One common

18   place is in the control room where the gates are controlled.

19   You may have secondary control rooms, as well, particularly

20   when you're dealing with outside perimeter cameras and things

21   like that, but that's not the subject of this conversation.

22   Q.    Are there TV monitors in the interior bubbles in the

23   prison?

24   A.    Well, that would be the control room.

25   Q.    Okay.  So you're talking about also the ones on the

1  interior of the prison.  You're talking about the perimeter,

2  but inside the buildings --

3  A.      Right.

4  Q.      So those would have TV monitors, as well?

5  A.      The control rooms, yes.

6  Q.      If a CO had not seen those specific monitors, is there

7  any other way he might know about what the actual view of the

8  camera is?

9  A.      Perhaps in conversation with other officers.

10 Q.      In your experience while you were here in Missouri and

11 elsewhere, is there someone always watching the video feed of

12 every camera at a prison?

13 A.      No.

14 Q.      Would there be enough staff to watch in realtime every

15 camera in a prison?

16 A.      No, not that I'm aware of.

17 Q.      In your review of the records, have you learned how

18 long the video surveillance tape, or electronic recording

19 nowadays, how long that is saved?

20 A.      I believe it's 30 days.

21 Q.      Does that mean to you that, if a woman doesn't step

22 forward in 30 days and make a complaint, that there's likely

23 not to be video of it to solve the situation?

24 A.      That is likely the case, yes.

25 Q.      What would that mean for a corrections officer if more

 1  than 30 days passes and either there's no complaint or a

 2  complaint is made after that?  Does a security -- does a

 3  corrections officer, would a corrections officer base any

 4  future action on what happened during that 30 days?

 5          MS. HARRIS:  I'm going to object.  That calls for

 6  speculation.

 7          THE COURT:  Sustained.

 8  BY MR. AMMANN:

 9  Q.      Are you familiar with the term utility officer?

10  A.      Yes.

11  Q.      And is that a term that sometimes applies to

12  corrections officers working at a prison?

13  A.      Yes.

14  Q.      And describe for us in your experience, what is a

15  utility officer?

16  A.      Utility officer is typically an officer who has a --

17  who doesn't have a specific assignment.  They are deployed day

18  to day to different parts of the facility.  There also are

19  occasions where they may also be deployed to more than one

20  place.  For example, if they're doing meal relief, they might

21  go from place to place to place in the course of a day.  But by

22  and large, their assignments vary considerably.

23  Q.      So if I have this right, you described two types of

24  situations:  a utility officer who is assigned for a certain

25  job for the day and stays in it that whole day, right, that's

1  one possibility?  And the second possibility is that he's a

2  utility officer that has several assignments in different

3  locations throughout the same day.

4  A.      Yeah.  It might be one or more.

5  Q.      Did you see any records or documents that you reviewed

6  that track a corrections officer's location throughout any

7  given day, like which buildings did he enter, where did he go,

8  when did he take lunch.  Did you see any records that kept

9  track of a corrections officer throughout a day?

10 A.      I did not come across any.

11 Q.      In your experience, Dr. Schriro, in Missouri and

12 elsewhere, if a guard is assigned to a post -- and let's talk

13 about the word "post."  When I say the word "post," what does

14 that mean to you as a corrections expert?

15 A.      Well, that's a specific assignment, and it's codified

16 by the department with what's called a post order, which would

17 be a description of what the duties would be on that particular

18 post.

19 Q.      So a post would be "go to this housing unit," or the

20 post might be "you're assigned to recreation"; would those be

21 examples of posts?

22 A.      Correct.

23 Q.      If a guard is assigned to a post, in your experience,

24 is it possible for that guard to leave his or her post?

25 A.      It is possible.  It's not permitted, not without

1  relief.

2  Q.      Does it happen -- in your experience in corrections in

3  Missouri and other states, have you seen situations where

4  corrections officers have left their post?

5  A.      Yes.

6  Q.      Is it easier for a utility officer to move around the

7  prison than somebody assigned, for instance, to a housing unit?

8  During the day, could a utility officer be more likely to be

9  able to move around?

10  A.      Yes.

11  Q.      Do utility officers have the same type and level of

12  supervision as a corrections officer who might be assigned to a

13  housing unit?

14  A.      Typically, no.

15  Q.      I want to talk to you about the staffing of prisons.

16  Give you some specific examples.  Are you familiar with

17  caseworkers who work in prisons?

18  A.      In general, yes.

19  Q.      What do they do?

20  A.      These are individuals, they frequently come up from the

21  uniform rank, and they handle various -- it could be,

22  classification would be one of their big responsibilities.  If

23  there was some anticipated parole hearing, they may have some

24  involvement with that.  If there was discipline -- it's really

25  all the things that would go into the institutional file would

1  be within their purview.

2   Q.      In your experience in Missouri as Director of the

3  Department of Corrections, did caseworkers work on the

4  weekends, generally?

5   A.      No.

6   Q.      Did caseworkers generally work into the evening?

7   A.      I'm sorry, into the evening?

8   Q.      Do caseworkers generally work after 5 o'clock?

9   A.      They were on the day shift.

10  Q.      Did caseworkers generally work -- well, let me ask you

11 another question.

12          Are you familiar with the term "IPO"?

13  A.      Institutional parole officer.

14  Q.      What do institutional parole officers do?

15  A.      My understanding is that they do the work to prepare

16 someone for a scheduled parole hearing.

17  Q.      And they work -- some of them work inside the prison;

18 is that right?

19  A.      Yes.

20  Q.      Do IPOs work on weekends, generally?

21  A.      No.

22  Q.      Do IPOs generally work into the evening after

23 5 o'clock?

24  A.      No.

25  Q.      We had a question come up yesterday about an offender's

1  ability to go to see outside medical help.  Are you aware of

2  how medical care is provided in the state of Missouri in the

3  prisons?

4  A.      During my tenure, for sure.

5  Q.      Okay.  And how is the medical care generally provided?

6  A.      There's -- the healthcare is provided by the

7  department, either directly or by a contract with a healthcare

8  provider.  It's provided on site under most circumstances.

9  Q.      And the women in Chillicothe are free to put in a

10  request to see the nurse or the doctor, right?

11  A.      They can put in a sick call, yes.

12  Q.      Can the women of Chillicothe put in a request to say,

13  "My family doctor is Dr. Smith in Kansas City, I'd like to go

14  see him next Tuesday"?  Can they make a request like that?

15  A.      They can make a request like that.  It would be denied.

16  Q.      Why would it be denied?

17  A.      Well, because it's -- the care is provided by the

18  provider.

19          I'll add for clarification that the provider, if, in

20  their opinion, believes that something cannot be handled by the

21  personnel assigned to the facility or needs some equipment

22  that's not available at the facility, then they may schedule an

23  off-site medical appointment.

24  Q.      But whose decision is it to allow a woman to see

25  somebody on the outside?

1    A.    It's the provider.

2    Q.    And would the Department of Corrections have to agree

3    also that a woman at Chillicothe could see somebody on the

4    outside, or is it deferred to the provider?

5    A.    Well, it really depends on -- if it's the DOC, then

6    it's all -- it's all internal.  If it's a provider, then they

7    have a contract, so it would have been laid out in the

8    contract.

9    Q.    So the provider makes that decision.

10   A.    That's -- that's my experience with the way it usually

11   works.

12   Q.    So hypothetically, if a woman wanted to consult with a

13   doctor about some sexual assault, sexual abuse, some trauma,

14   and, for obvious reasons, did not want to see somebody inside

15   the prison, would they automatically be able to get an

16   appointment with someone, a professional, outside the prison?

17   A.    No.

18   Q.    Would a corrections officer like Mr. Bearden understand

19   how the medical care is provided at the prison?

20   A.    I would imagine -- I would imagine to some extent he

21   would be, yes.

22   Q.    We've had some discussion about cross-gender pat-downs.

23   Is that a correct term?  Is that a term that you're used to in

24   your experience in corrections?

25   A.    Yes.

1  Q.    And what does a cross-gender pat-down mean?

2  A.    It's a particular technique that one is trying to

3  utilize in the event that a cross-gender pat-down search is

4  required.  And for clarification, the preference is that the

5  pat-down would always be done by a member of the same gender,

6  so a female officer would pat down a female offender, and the

7  same thing on the male side.

8  Q.    Are cross-gender pat-downs still allowed in Missouri

9  prisons?

10  A.    I believe they are, but, again, it should be only when

11  necessary.  That is, a female officer is not available.

12  Q.    Was there a policy change at some point in the last ten

13  years that ruled out or invalidated cross-gender pat-downs?

14  A.    I believe so.

15  Q.    And would that be under the Prison Rape Elimination

16  Act?

17  A.    I believe so.

18  Q.    So if there's evidence that Mr. Bearden did

19  cross-gender pat-downs up until about 2014, there would be no

20  reason to believe that was unauthorized, correct?  It was

21  allowed back then for sure.

22  A.    That's correct.

23  Q.    Dr. Schriro, do you believe that by allowing a man to

24  put his hands on a woman's body during a pat-down would create

25  an opportunity to abuse the corrections officer's authority?

1   A.     I'm sorry.  Ask the question again, please.

2   Q.     So by allowing a cross-gender pat-down and saying that

3 a corrections officer could place his hand on a woman's body,

4 now, there's parameters he should be following, but the fact he

5 has his hands on a woman's body, does that create an

6 opportunity for abuse of his authority?

7   A.     It does.

8   Q.     One more category, and we're getting home.

9        Dr. Schriro, in your experience, if a warden of a

10 prison has concerns about the behavior of a corrections officer

11 and there's an investigation, people are looking into what

12 happened, is there anything the warden can do to protect female

13 inmates, in particular, from that officer in the meantime?

14   A.     Short of putting them off on leave?

15   Q.     Short of putting them on leave, what can be done?

16   A.     They have what are referred to as non-contact

17 assignments, and so they may be temporarily reassigned to a

18 part of the facility or to a certain job where there shall be

19 no contact with the population.

20   Q.     So does that mean no in-person contact whatsoever?

21   A.     Well, it doesn't necessarily mean sight and sound.  It

22 would certainly eliminate physical contact.

23   Q.     What are the places where a corrections officer could

24 be assigned that are no-contact positions?

25   A.     Well, in my view, the preferred assignments would be

1  outside of the facility, per se, where there would be no

2  contact whatsoever with the population.

3          But within the facility, the bubble, as you refer to

4  it as, or the control room might be one of those places.

5  Q.      In your review of the records, did you find any records

6  indicating that Mr. Bearden was placed in a no-contact

7  position?

8  A.      Yes.

9  Q.      And to your recollection, what was the time period when

10  that happened?

11  A.      I believe the memo that I saw is dated July 2nd of

12  2018, and I believe it was effective immediately.

13  Q.      And where was he placed under that -- the memo you saw,

14  where did they place him to be no contact?

15  A.      Mr. Bearden was reassigned to the control room, control

16  center.

17  Q.      Did you see any records that after the early part of

18  July of '18 that he ever went back to a contact position?

19  A.      No.

20  Q.      To your knowledge, what was the next thing that

21  happened with regard to Mr. Bearden's employment?

22  A.      My understanding is he resigned.

23          MR. AMMANN:  No further questions, Your Honor.

24          THE COURT:  Any cross-examination?

25          MS. HARRIS:  Yes, Your Honor.

1    MR. AMMANN:  Your Honor, real briefly, we would

2  offer her resume, Exhibit 22, into evidence.

3    THE COURT:  Any objection?

4    MS. HARRIS:  No objection.

5    THE COURT:  Exhibit 22 will be admitted.

6    (Plaintiffs' Exhibit 22 was admitted into evidence.)

7    MS. HARRIS:  May I proceed?

8    THE COURT:  You may.

9    MS. HARRIS:  Thank you.

10                          - - -

11                    CROSS-EXAMINATION

12  By Ms. Harris:

13  Q.    Dr. Schriro, my name is Cara Harris, and I'm going to

14  have a few questions for you.

15         Let's start first with just kind of your background.

16  You testified a little bit about that, and your CV is in

17  evidence, as well, but I wanted to ask you, your JD you got at

18  St. Louis University; is that correct?

19  A.    Yes.

20  Q.    Okay.  And when did you obtain that?

21  A.    That was 2003 or '04.  I would have to check the

22  resume.

23  Q.    Okay.  And St. Louis University is actually where the

24  attorneys representing the plaintiffs are employed; is that

25  correct?

1  A.      Yes.

2  Q.      Okay.  Did you have any of the plaintiffs' attorneys as

3  professors when you were at St. Louis University?

4  A.      Mr. Ammann was a professor of a practicum that I did.

5  Q.      Okay.  You testified that you have had some time where

6  you actually worked inside a prison with inmates; is that

7  correct?

8  A.      Yes.

9  Q.      And is that your time in Massachusetts at the very -- I

10 mean, at the beginning of your career?

11 A.      It was Massachusetts, and then working for the

12 educational consortium in New York City where I delivered -- I

13 was responsible for providing all of the educational programs,

14 and that was a lot of inmate contact there, as well.

15         Of course, as warden in St. Louis City, I was, as I

16 call it, in the back working with the population on a daily

17 basis.

18 Q.      Okay.  Have you ever -- actually ever been a guard in a

19 prison?

20 A.      A corrections officer?

21 Q.      Corrections officer?

22 A.      No, I have not.

23 Q.      Okay.  You've also worked, as you had indicated, for

24 Homeland Security; is that correct?

25 A.      Yes.

1   Q.     And you did that under the Obama administration?

2   A.     Yes.

3   Q.     Okay. You were appointed to that after you left

4 Arizona. I think you were Arizona Director of Corrections

5 there, as well; is that right?

6   A.     That is correct.

7   Q.     And left there to go to D.C.?

8   A.     Correct.

9   Q.     Okay. You've actually never been to the Chillicothe

10 Correctional Center at all, correct?

11   A.     Not the current one, no.

12   Q.     Okay, that's what I was going to ask. When you were

13 Director of MDOC, there was a Chillicothe Correctional Center,

14 but that one is now gone, and we have a new one, which is the

15 subject of where these events allegedly occurred, correct?

16   A.     Yes.

17   Q.     Okay. Have you ever talked to anyone associated with

18 Chillicothe Correctional Center?

19   A.     Since I left the department?

20   Q.     Yes.

21   A.     No.

22   Q.     Okay. So in your preparation for testimony in this

23 case, you didn't talk to Warden McBee.

24   A.     No.

25   Q.     You didn't talk to the PREA coordinator.

1   A.      No.

2   Q.      Okay.  When you were the Director of Missouri

3   Department of Corrections, were there cameras in the closets,

4   such as the supply closet, utility closets?

5   A.      Not that I'm aware of.

6   Q.      And why not?

7   A.      For the very reason that I provided before, that the --

8   that the cameras that were provided were in areas that the

9   population frequent.

10  Q.      Okay.  When you were head of the Arizona prisons, did

11  every closet and utility room in Arizona have a camera in it?

12  A.      No.

13  Q.      Okay.  And why not?

14  A.      For the same reason.

15  Q.      Okay.  So when you were Director of Missouri Department

16  of Corrections, you would agree that there were places within

17  prisons where there was no camera coverage.

18  A.      Yes.

19  Q.      Okay.  And do you agree that in most prisons in the

20  United States, there are areas that there is no camera

21  coverage?

22  A.      I can't speak to that specifically, but I would say, in

23  general, that's correct.

24  Q.      Okay.  Did you do anything when you were Director of

25  Missouri Department of Corrections to try to remedy that

1  situation so that there would be more video surveillance in

2  areas such as the closets or things like that?

3  A.      We were -- no.  We were -- that was a time when there

4  was a lot of expansion going on in the state, so there were a

5  number of new facilities being built; and so whatever the

6  improvements that were available at that time were integrated

7  into that construction.

8  Q.      Okay.  Do you know how many cameras there are at

9  Chillicothe?

10  A.      If I recall correctly from documents I saw, I think it

11  was 449.

12  Q.      Four hundred and forty-nine is what you think?

13  A.      I believe so.

14  Q.      Okay.  I just wanted to make sure that was clear.

15          You talked about with Mr. Ammann that video cameras,

16  footage from what is observed on those cameras can only be kept

17  for about 30 days.  Do you recall that?

18  A.      Let me clarify your statement, if I may.  That's absent

19  a report being made, at which point it would have been

20  preserved.

21  Q.      Thank you for that.  And, obviously, if within the 30

22  days there's a report, we think there was a problem on this day

23  in this area, they're going to preserve that video.

24  A.      They should.

25  Q.      Okay.  Absent a report being made of any sort of

1  specific area with a problem, that video is going to get taped

2  over in about 30 days is your understanding.

3  A.      Correct.

4  Q.      Do you know, Doctor, of any way that we could keep all

5  video from every camera for, let's say, up to five years?

6  A.      I believe the technology is available.

7  Q.      And do you know how much that would cost or how it is

8  available?

9  A.      I don't because the technology has changed a lot.

10  Storage is not as cumbersome or expensive as it used to be, but

11  I don't know what it would be.

12  Q.      Okay.  And do you -- when you were Director of MDOC,

13  did you make any changes or suggest that we needed to keep

14  video longer than they're doing now?

15  A.      No.

16  Q.      Okay.  I noticed that when you were Director of

17  Missouri Department of Corrections, you wrote an article

18  entitled "Missouri's Parallel Universe:  Blueprint for

19  Effective Prison Management."  Do you recall that?

20  A.      Yes.

21  Q.      Okay.  In that particular article, did you address in

22  any fashion sexual harassment in prisons and how to confront

23  it?

24  A.      In the broadest sense, and that is that the way in

25  which the whole structure of how corrections operate would be

1   different where the relationship between officers and inmates

2   would be a more constructive arrangement where problem-solving

3   was also a big area of emphasis.

4           There's another article in there that speaks to

5   another part of parallel universe which had to do with

6   constituent services, about how to resolve issues at the

7   earliest opportunity.

8   Q.      Okay.  And just so we're clear, when you're talking

9   about constituent services in the sentence you just said,

10  you're talking -- the constituents are the inmates or the

11  offenders; is that correct?

12  A.      They were the target group, but it could be anyone

13  calling on their behalf.

14  Q.      Anyone calling on their behalf.

15  A.      Right.

16  Q.      You're not referring to the prison guards or any

17  employees of MDOC.

18  A.      In what --

19  Q.      When you're talking about constituents.

20  A.      If they had a concern about an offender, they could

21  certainly use it, as well.

22  Q.      Okay.  When you were Director of Missouri Department of

23  Corrections, did you put any plans into place to curb sexual

24  assaults in Missouri corrections facilities?

25  A.      PREA was not in effect at that time, but, again, the

1   constituent services was really a key.  One of the things --

2   and just briefly, the idea to constituent services, unlike

3   grievances, which is one complaint, one investigation, never

4   look at the root causes of the underlying concerns.  Through

5   constituent services, we -- where there were officers whose

6   names continued to come up frequently, at that time, uses of

7   force, improper uses of force, we generated a list of those

8   individuals and were able to intervene.  And so the same thing

9   would have been true for any kind of complaint where there was

10  a reoccurrence.

11  Q.     And do you know if those plans are still being used by

12  the Missouri Department of Corrections now?

13  A.     I do not, no.

14  Q.     Okay.  As the Director of Missouri Department of

15  Corrections, or former Director, excuse me, you're familiar

16  with the chronological logs that are filled out each day; is

17  that correct?

18  A.     In general, yes.

19  Q.     Okay.  And I want to -- I skipped ahead of myself, and

20  I apologize.

21         You used the term PREA a moment ago.  I think that

22  was used yesterday, but just so the jury is certain what we're

23  talking about, that is the Prison Rape Elimination Act; is that

24  correct?

25  A.     Correct.

1    Q.      And it went into effect in 2014?

2    A.      It was -- at the facility, that is -- or in the

3    department, that is my understanding.

4    Q.      You're talking about in Missouri.

5    A.      Yeah.

6    Q.      Okay.  So when you were here, it was not in effect?

7    A.      That is correct.

8    Q.      Okay.  One of the things that PREA stopped specifically

9    was the cross-gender pat-downs; is that right?

10   A.      Correct.

11   Q.      So when you were Director of MDOC, cross-gender

12   pat-downs were still perfectly fine and allowed; is that

13   correct?

14   A.      With the clarification that when an officer of the

15   opposite sex was conducting the pat gender -- sorry, the

16   cross-gender pat search, that there was a particular technique

17   where they did not use their, the palms of their hands to touch

18   the inmate.  So as much as you could at the time, that was

19   considered the best practice, that that's how it would have

20   been conducted.

21   Q.      Okay.  And certainly not getting into the specifics of

22   how it was done, but when you were Director of Missouri

23   Department of Corrections, a male guard could do a pat-down, a

24   full pat-down of a female offender.

25   A.      With the provisions that I just described.

1  Q.     Okay.  Which, again, would allow them to do anything

2  they needed to do, as long as they were doing it in the

3  appropriate fashion with their hands and palms -- not using

4  their palms; is that what you said?

5  A.     That's correct.

6  Q.     Back to the chrono logs.  You said you're somewhat

7  familiar with those; is that correct?

8  A.     Yes.

9  Q.     Those logs, there's a log for every shift of every day

10 in a prison; is that correct?

11 A.     Yes, generally.

12 Q.     There are typically three shifts in a prison?

13 A.     Yes.

14 Q.     Okay.  And do you understand that those logs show where

15 each person who is working that day is assigned, to what post

16 they are assigned?

17 A.     Yes.

18 Q.     Okay.  Have you had the opportunity to review any of

19 the chrono logs from the Chillicothe Correctional Center for

20 any of the time periods in which the plaintiffs are alleging

21 Mr. Bearden assaulted them?

22 A.     I don't recall.

23 Q.     You don't know if you've looked at the chrono logs?

24 A.     I can't recall having seen any.

25 Q.     Okay.  Do you agree that having done that, you could

1  have learned whether or not Mr. Bearden was actually assigned

2  to any of the places where the ladies were working or were

3  assigned for living at the time that they're alleging that he

4  did these acts?

5  A.      Not necessarily, because that would assume that the log

6  was correct.  Or are you asking that they were actually working

7  that day, or what are you asking?

8  Q.      Let's go with both of that.  That would have told you

9  whether or not Mr. Bearden was actually working, correct, on a

10 specific day?

11 A.      That he had signed in, yes.

12 Q.      Okay.  Now you've thrown out another thing.  Are you

13 somehow alleging that the Department of Corrections falsifies

14 their chrono logs?

15 A.      I'm not suggesting that the department does, but I'm

16 saying that an officer may be assigned to a place but not

17 actually have stayed in that place.

18 Q.      Okay.  So that's talking about that the officer would

19 have been assigned to go to, let's say, Housing Unit 4, but

20 you're saying, instead of -- that they were assigned to do

21 that, but instead of doing that, they went somewhere else?

22 A.      That's not what I intended to say.  What I'm saying is

23 that that was their -- that that was their assignment, but at

24 some point in the course of that shift, that they left that

25 post.

1  Q.      Okay.  Let's go ahead and skip up to that.  If someone

2  leaves a post -- you've talked about that they can leave a

3  post.  I think you said they should get relieved; is that

4  correct?

5  A.      That's correct.

6  Q.      And to get relieved, they would need to place a call to

7  their sergeant or supervisor and say, "Hey, I need to leave for

8  a few minutes, I'm going to go to X."  Is that correct?

9  A.      Yes.

10 Q.      Okay.  Are you suggesting -- well, let me withdraw that

11 question.

12          The reason they have to do that is for the safety

13 and security of the corrections officer and the facility; is

14 that correct?

15 A.      Well, certainly for the population because they were

16 assigned to be there to provide the supervision of them.

17 Q.      Okay.  And we have to wonder at times, or they can

18 wonder at times where the correctional officers are if they're

19 not where they're supposed to be; is that correct?

20 A.      I don't understand the question.

21 Q.      Sure.  If a supervisor believes that Corrections

22 Officer Smith is at Housing Unit 4 and they happen to go there

23 and he is not there, does that cause them to ponder, "Where is

24 Corrections Officer Smith?"

25 A.      It better.

1  Q.      Yeah.  And that could be not only we're wondering why

2  Housing Unit 4 is not being watched, but we're wondering where

3  Corrections Officer Smith is and if he is safe; is that

4  correct?

5  A.      Yes.

6  Q.      And there have been situations where corrections

7  officers have been taken hostage; is that correct?

8  A.      Yes.

9  Q.      And that's one of the reasons why supervisors need to

10 know where corrections officers are assigned and to make sure

11 that they're where they're supposed to be, correct?

12 A.      It's one of many reasons, yes.

13 Q.      Okay.  And, in fact, when you were at Arizona, there

14 was a hostage situation in one of the prisons there; is that

15 correct?

16 A.      Yes.

17 Q.      And, in fact, that was the longest prison hostage

18 situation in the history of the U.S., correct?

19 A.      It is.  It's also the only hostage situation of any

20 duration where everybody came out alive.

21 Q.      I'm very happy about that, but two guards were taken

22 hostage; is that correct?

23 A.      Why are you calling them guards?  Corrections officers.

24 Q.      Corrections officers, I apologize.

25         THE COURT:  Would you mind slowing down a little

1  bit?

2         MS. HARRIS:  Sure.  Sorry.

3   BY MS. HARRIS:

4   Q.     Two corrections officers were taken hostage in that

5   situation.

6   A.     Yes.

7   Q.     Okay.  And, again, that is one reason why, not only for

8   the safety and security of the facility, supervision -- or

9   supervisors and MDOC in general need to know where guards are

10  at and that they are where they're supposed to be, correct?

11  A.     Yes.

12  Q.     Okay.  Now, are you suggesting that at DOC in

13  Chillicothe that guards wander wherever they want without

14  following the rules?

15  A.     No, that's not what I'm suggesting.

16  Q.     Okay.  Very good.

17         Let's talk about -- let's skip ahead and talk about

18  utility officers a little bit because you talked about that.

19  You have indicated that you've understood Mr. Bearden to be a

20  utility officer, correct?

21  A.     Yes.

22  Q.     And you -- if I understood your testimony correct, you

23  believe there are two types of utility officers.  One is where

24  they go in and they get assigned to a different post every day

25  wherever they're needed; is that correct?

1  A.     That's a variation, yes.

2  Q.     Okay.  The other, you believe, is a situation where

3  they get there and they're not assigned to a specific post, but

4  instead, they're assigned just to go out into the prison and

5  take care of things.  Is that what you're saying?

6  A.     No.

7  Q.     Okay.  Well, I'm glad we're talking about this because

8  I thought you said -- you said they could be assigned to

9  several places in a day, correct?

10  A.     An example would be if you were assigned to meal

11  relief, then you would go from one post where an officer was

12  ready to be relieved for a meal, and, upon completion, would

13  then go to the next post to relieve somebody else.  That would

14  be an example.

15  Q.     Okay.  So is it your understanding that Chillicothe

16  Correctional Center has at least maybe one utility officer,

17  using that term as you have, that is going to be assigned

18  throughout the day to no particular post at the beginning of

19  the day, but throughout the day will be told, "You need to go

20  to Housing Unit 4 to relieve CO Smith"; and when he's done

21  there, "You're going to need to go to the dining hall now and

22  relieve CO Jones"?

23  A.     No.  Let me clarify.  As I recall the question when it

24  was asked is in my experience in Missouri and elsewhere, what

25  is the utility officer, and I gave you examples of the way in

1  which a utility officer is used.

2  Q.    Okay.  And I'm trying to follow up on that, and I'm

3  trying to understand the second part.  The first one I think we

4  agree on, that they're an officer that doesn't have a post that

5  they are specifically regularly assigned to each day, but they

6  go in, and if someone is sick, they might take that post.

7  Correct?

8  A.    Yes.

9  Q.    Okay.  I'm trying to understand what you believe the

10  second type of utility officer is.

11  A.    And it may not apply at Chillicothe, but I have seen

12  that application used in a number of locations.

13  Q.    Okay.  And when you're saying that application, you're

14  talking about the second one where they may go from post to

15  post to post throughout a day.

16  A.    Right.  Or, for example, someone gets a call that their

17  child is sick, they need to go home mid-shift, and so they need

18  to be relieved.

19  Q.    Okay.  And back to what you just said, you are unaware

20  of whether or not Chillicothe has that second type of utility

21  officer.

22  A.    That is correct.

23  Q.    All right.  Back to someone leaving their post, if

24  someone left their post without authority or getting relief,

25  would that be something that could be referred to as abandoning

1   their post?

2   A.      They could be charged with that.

3   Q.      And could that get the officer in trouble?

4   A.      It would -- it should result in a write-up.

5   Q.      You said that you reviewed Mr. Bearden's internal file;

6   is that correct?

7   A.      Yes.

8   Q.      Did you see where Mr. Bearden had ever been written up

9   for abandoning his post?

10  A.      No.

11  Q.      Okay.  Do you understand as former Director of Missouri

12  Department of Corrections that correctional officers are

13  mandatory reporters, as far as if they see another correctional

14  officer doing something inappropriate, that they're obligated

15  to report that to supervisors?

16  A.      Yes.

17  Q.      Okay.  Do you also understand that classification

18  staff, I think is how they're typically referred to, which are

19  the caseworkers, the Functional Unit Managers, the Probation

20  and Parole people in the prison, that they likewise are

21  required to report if they see anything going wrong with a

22  corrections officer?

23  A.      Yes.

24  Q.      Okay.  Are the inmates also required to report if they

25  see something going wrong?

1  A.     I don't believe so.

2  Q.     You don't believe they have any obligation to report?

3  A.     Well, I don't recall ever seeing it in a rule book.  I

4  mean, they're encouraged to report, but I don't believe there's

5  an obligation or a requirement that they report.

6  Q.     Okay.  Part of your opinion in your report talked about

7  your belief that the officers in Chillicothe Correctional

8  Center are not doing random walk-throughs where they're

9  checking just to see what's going on in the wings of a housing

10 unit.  Is that correct?

11 A.     My report talked about whether or not there were

12 adequate supervisors to make the required checks of subordinate

13 officers.  I don't recognize the question you're asking.

14 Q.     When you're talking about that, are you talking about

15 doing -- adequate supervisors walking around observing what

16 everyone is doing?

17 A.     I cited something in policy and procedure about the

18 requirement that supervisors make checks in the course of a

19 day.

20 Q.     Okay.  And that's exactly what I'm talking about.  I'm

21 glad we're on the same page now.

22         So do you believe that at Chillicothe Correctional

23 Center that is not being done?

24 A.     I opined that, given the shortages of staff, I don't

25 know that it's being done on a regular basis.

1   Q.     Okay.  Well, let's talk about that.  What information

2   do you have regarding staff shortages at Chillicothe

3   Correctional Center?

4   A.     I am relying on the PREA reports that I read for the

5   period of time that this occurred.

6   Q.     Do the PREA reports indicate the number of staff at the

7   Chillicothe Correctional Center?

8   A.     There is one report that I recall, I believe it was --

9   I would have to refresh my recollection.  They cited the

10   population at the time, I think was 1648, maybe, and I believe

11   the number of staff was 307.

12   Q.     Okay.  And do you know from what year that was?

13   A.     I would have to -- I would have to check back to the

14   reports.  I don't recall off the top of my head.

15   Q.     As you're sitting here today, you don't know when that

16   was?

17   A.     It was sometime in the period that was covered in the

18   report.

19   Q.     And it's your understanding that those numbers

20   represented a staff shortage?

21   A.     It would reflect that the ratio of officers to inmates

22   was -- that there were -- that there were not enough officers,

23   that the ratio was quite high.

24   Q.     And do you know for how long those numbers continued?

25   A.     Well, the reports -- the audits are done every three

1    years, there are some interim reports that are sometimes one

2    year, so I don't know how long it lasted.

3    Q.      Okay.  Do you know how many inmates or offenders there

4    are currently at Chillicothe?

5    A.      I do not.

6    Q.      Do you know how many staff members there are currently

7    at Chillicothe?

8    A.      I do not.

9    Q.      And within those numbers that you're talking about, the

10   300 and, I'm sorry, 50-some, I can't -- 40, I can't recall

11   exactly what you said as far as corrections officers, that is

12   only corrections officers, that does not include the

13   classification staff that works inside the prison; is that

14   correct?

15   A.      My understanding is when they refer to officers,

16   they're referring to all ranks, they're referring to all

17   uniformed people.  So if the classification staff are

18   considered uniform, they would be included.  If they are deemed

19   to be civilian, it would not be.

20   Q.      Okay.  Well, as the former Missouri Director of

21   corrections, are you aware if classification staff such as the

22   caseworkers, Probation and Parole people, the cooks, are those

23   people officers that fall within the category that you just

24   said?

25   A.      No.

1   Q.     Okay.  So back to my question, the 340 or whatever

2  number that you had in this one report that you recall would

3  not include the classification staff.

4  A.     That is correct.

5  Q.     Okay.  Do you agree with me that, at times, offenders,

6  just like anybody, might not be truthful?

7  A.     In general, everyone -- yes.  I mean, everybody.

8  Q.     Okay.  Are there any incentives at times for an

9  offender to, perhaps, be less than truthful when they're in

10  prison?

11  A.     I don't understand the question.

12  Q.     Okay.  If an offender doesn't like their cellmate, how

13  might they go about -- even if their cellmate's really never

14  done anything to them, is there any way that the offender might

15  be able to get a new cellmate?

16  A.     Ask for one.

17  Q.     And can they be untruthful in saying that the cellmate

18  did something to them that would immediately get a change?

19  A.     I don't know that there would be reason to do that.

20  They can simply request a change.  Whether or not they get it

21  is a different conversation.

22  Q.     Miss Keil testified yesterday that to change housing

23  units, you have to request and that you don't know if you'll

24  actually get it.  So in a prison, as I understand it, it's not

25  like a hotel room where you might say, "I don't like this hotel

1  room, I want a different room." There are certain processes

2  and procedures one has to go through typically to get a change.

3  Is that correct?

4  A.     Right.

5  Q.     Okay.  So if you wanted an immediate change, could an

6  offender be untruthful and say that their cellmate had done

7  something inappropriate to them that would result in an

8  immediate change?  Say, make a PREA complaint against their

9  cellmate?

10  A.     I'm not comfortable with the hypothesizing.  I mean,

11  anybody can ask for anything, it doesn't mean that they would.

12  Q.     If an offender says that their cellmate has violated

13  them under PREA, so there's been some sort of sexual contact

14  that they did not want, would that immediately get them a cell

15  change?

16  A.     It would initiate an investigation, and it may result

17  in the temporary removal of one or both of those individuals.

18  Q.     So that removal wouldn't be done until the

19  investigation was complete, or it would be immediately done?

20  A.     It would depend on what the facts were in that

21  particular case.

22  Q.     I'm talking about before there are any facts, Doctor.

23  Before there are facts, would it immediately get a change, if

24  you know?

25  A.     More likely than not, one of them would have been moved

1  temporarily.  Maybe both.

2  Q.    Okay.  And you're not aware, you can't think, as the

3  former Director of Missouri Department of Corrections, of

4  anything else that an offender might get an incentive by if

5  they were to tell an untruth?

6        MR. AMMANN:  Your Honor, objection.  Calls for

7  speculation in that it goes beyond the limits of what you said

8  she could testify to.

9        THE COURT:  With respect to the first, I do think it

10  calls for speculation.

11        MS. HARRIS:  Okay, I'll withdraw the question.

12  Thank you.

13  BY MS. HARRIS:

14  Q.    Do you agree, Doctor, that if it's determined by

15  looking at surveillance, it's verified that an offender has

16  told an untruth, that there should be consequences for that?

17  A.    In general, yes.

18  Q.    Not always?

19  A.    Well, it depends on what the circumstances were.

20  Q.    Okay.  When you were Director of Missouri Department of

21  Corrections, was it the policy that, if an offender made a

22  complaint that a CO had sexually assaulted them, that the

23  offender was immediately sent to ad seg, or the hole, as it's

24  been referred to a lot here?

25  A.    I would imagine that it would.  I don't know that for a

1  fact.

2  Q.      You don't know the answer?

3  A.      No.

4  Q.      Okay.  Do you see a problem with that?  You've

5  testified that's a problem; is that correct?

6  A.      I'm sorry.  You're using so many pronouns.  I'm --

7  Q.      Okay.

8  A.      -- not keeping up with you.

9  Q.      Let me ask a better question.

10         So you think it's possible when you were Director of

11  Missouri Department of Corrections that, if an offender made a

12  complaint saying that a corrections officer had sexually

13  assaulted her, that the offender was immediately sent to ad

14  seg; is that what you said?

15  A.      No.  There would need to be some separation of the --

16  of that individual and the officer.  Whether or not that

17  separation is vis-a-vis ad seg, it really depends on what the

18  facts of that circumstance were.

19  Q.      I'm really glad you clarified that because I did not

20  think that was the policy when you were MDOC Director, and I

21  misunderstood what you said.

22         So it was not the policy, as you understand it, when

23  you were there or now, that if an offender makes a complaint

24  against a CO, that they are automatically sent to ad seg.

25  A.      I don't know about now.

1  Q.    Okay.  It was not when you were there.

2  A.    No.

3  Q.    Okay.  As you said, the policy should be, or it was

4  when you got there, that they are separated from the alleged

5  offender, the corrections officer, correct?

6  A.    Yes.

7  Q.    But that can be done in a variety of ways.

8  A.    Yes.

9  Q.    And Mr. Ammann asked you about that, and you all said

10 short of, what was it, leave, but one of the things that could

11 be done is that the corrections officer could be put on leave,

12 correct?  To get them out of the facility.

13 A.    Yes.

14 Q.    Okay.  Another thing that could be done is, you did

15 talk with Mr. Ammann about, is they could be reassigned to a

16 post where they're not with offenders, correct?

17 A.    Correct.

18 Q.    And Mr. Ammann asked you for a few of those posts, and

19 you -- I think you all just kind of came up with the control

20 center.  I want to make sure that the jury understands, there

21 are -- there is a control center in the administration

22 building; is that correct?

23 A.    Yes.

24 Q.    Okay.  And that is where -- if the guards are going in

25 for the day, they have to go through there, show their ID, and

1   they walk through there; is that correct?

2   A.      Right.  The control center that I'm referring to is

3   within the facility where there is traffic control.

4   Q.      Traffic control, right, going from the unsecured part

5   of the world to the secure part of the facility.

6   A.      No.  I'm not referring to the administration building.

7   I was referring to inside of the facility where you have

8   corridors that are meeting up where one door -- where one gate

9   has to be shut before another gate can open so movement can

10  pass to different parts of the facility.

11  Q.      Is that sometimes referred to as a sally port?

12  A.      Well, it could be a sally port.  Sally port is

13  frequently -- that's more specific to where vehicles come in

14  and out, but they're all variations.

15  Q.      Okay.  At Chillicothe Correctional Center, have you

16  looked at maps of it?

17  A.      I have one map, but it is so teeny.

18  Q.      They're very hard to read, I agree.

19  A.      Oh, my gosh.

20  Q.      The administration building where people go from the

21  unsecure part of the world into the actual secure part, there

22  is a control center, and it's a glassed-in facility, there are

23  several people working there and lots of monitors.  Do you

24  understand what I'm talking about there?

25  A.      I do.

1  Q.      Okay.  People -- that's a place where a person who is

2  trying to be segregated from inmates could work safely,

3  correct?

4  A.      Yes.

5  Q.      Okay.  That person could also be in the mail room,

6  correct?

7  A.      Yes, and particularly if it's in the administrative

8  area.

9  Q.      Okay.  That person could also be at the -- in vehicle

10  or patrol patrolling the perimeter in a vehicle, correct?

11  A.      Correct.

12  Q.      Okay.  And could they be at the search point, which is

13  where people come into the prison, into the administration

14  building and they have to go through the scanner, kind of like

15  we have to do here?

16  A.      Are you talking where staff comes in, or in the

17  visiting area where visitors come in?

18  Q.      I'm talking about where staff comes in.

19  A.      Yes.

20  Q.      Okay.  Now, talking about when Mr. Bearden was placed

21  on this no-contact that Mr. Ammann asked you about, and I

22  believe you said it was July 2, 2018; is that your

23  recollection?

24  A.      Yes.

25  Q.      Okay.  Do you know why Mr. Bearden was placed on

1  no-contact at that point?

2  A.     I don't know specifically.  I believe that that was

3  about the time that there was an article inquiring about the

4  number of cases that had come up and that the officer hadn't

5  been moved.

6  Q.     Is that the first time that the Missouri Department of

7  Corrections was made aware that there were any allegations

8  against Mr. Bearden?

9  A.     That is not my understanding.

10  Q.     Okay.  When was the Department of Corrections made

11  aware that there were allegations against Mr. Bearden?

12          MR. AMMANN:  Again, Your Honor, I object.  This is

13  not part of the limits of what you --

14          THE COURT:  Could counsel please approach?

15          (Counsel approached the bench, and the following

16  proceedings were had:)

17          THE COURT:  I'm a little unclear, since the

18  department isn't a defendant in the case currently, how this is

19  relevant, and it does seem to be crossing the line in terms of

20  your motion to exclude portions of her testimony.  So I just --

21          MS. HARRIS:  I guess I'm just going there because he

22  went there.  I mean, it is relevant.  It's when he was -- it's

23  when they were first made aware, that's the date.  She's

24  indicated now differently.

25          MR. AMMANN:  Then do I get to show her our demand

1  letter in April to the Attorney General making a demand on the

2  case?  I mean --

3        THE COURT:  I don't --

4        MS. HARRIS:  I'll withdraw the question.  I can

5  withdraw the question.

6        THE COURT:  It just seems to me --

7        MS. HARRIS:  That's fine, I wasn't trying to get

8  afar.

9        MR. AMMANN:  I was being sarcastic.

10       THE COURT:  Okay.

11       (The following proceedings were had in open court:)

12  BY MS. HARRIS:

13  Q.    Doctor, do you have any numbers on how many people, how

14  many offenders, when they made complaints against a CO for

15  sexual misconduct, actually were sent immediately to ad seg?

16  A.    I do not.

17       MS. HARRIS:  Okay.  May I have one moment to confer

18  with co-counsel?

19       THE COURT:  Sure.

20       MS. HARRIS:  Thank you.

21       Thank you, Doctor, I don't have any further

22  questions.

23       THE COURT:  Any redirect?

24       MR. AMMANN:  Briefly, Your Honor.

25                          - - -

1          REDIRECT EXAMINATION

2     By Mr. Ammann:

3     Q.     Dr. Schriro, we want to talk a little bit more about

4     the cross-gender pat-downs.

5               So I want to make sure we complete the picture.  You

6     said when cross-gender pat-downs were allowed, male corrections

7     officers could not use the palm of their hands to pat down a

8     woman.

9     A.     That's correct.

10    Q.     It may seem obvious, but what would they do?  How would

11    they do it if they didn't use the palm of their hands?

12    A.     You actually use the back of your hand.

13    Q.     Okay.  Could you stand up for a second and demonstrate

14    what you mean?  How would an officer pat somebody down with the

15    back of their hand?

16    A.     Well --

17           (Witness demonstrating.)

18    Q.     Kind of hard to do.

19    A.     Yeah, but that's the expectation, the idea that you're

20    not using your palms where you're --

21    Q.     You can sit down.

22    A.     Oh.

23    Q.     Sorry.  I didn't mean to have you stand for that --

24    A.     Yeah, it's a little bit awkward, but it's intended to

25    be because the whole idea is you don't want -- you don't want

1   any impermissible touching, you don't want anything that could

2   appear to be groping or lingering on the person of another.

3   Q.     Because the fingers don't bend back very far on the

4   back of your hand, but with your palm, you can grab things?

5   A.     Right.

6   Q.     Dr. Schriro, in your experience, do corrections

7   officers, other than their exact post, are they in other parts

8   of the prison at certain times?  And I'm referencing

9   specifically the administration building, the guard break room,

10   the guard locker room, would corrections officers generally

11   almost every day be in those places?

12   A.     They certainly could be.

13         MR. AMMANN:  Nothing further, Your Honor.

14         THE COURT:  Any recross?

15         MS. HARRIS:  Very briefly, Your Honor.

16                 - - -

17             RECROSS-EXAMINATION

18   By Ms. Harris:

19   Q.     When corrections officers are doing these pat-downs,

20   many times there are several people around and other

21   corrections officers, as well; is that correct?

22   A.     Not necessarily.

23   Q.     Are there when they're leaving the dining room or in

24   the yard?

25   A.     Well, there's a lot of people around.  It's usually

1  quite chaotic.

2   Q.      If a corrections officer were doing a cross-gender

3  pat-down incorrectly or a pat-down of any course incorrectly,

4  as you've testified they should do, and would that -- is that

5  something that would look strange and be noticed?

6   A.      It might be noticed, but, again, when you're, for

7  example, exiting a dining room, there are a lot of people

8  coming out, there's a lot of movement.  I can't speak to that

9  there's really any sight line that you could observe that it's

10  being done incorrectly.

11              MS. HARRIS:  Thank you.  Nothing further.

12              THE COURT:  Ma'am, we permit the jury to ask written

13  questions; so if you could be patient for just a minute, we'll

14  see if any members of the jury have any written questions for

15  you.

16              Could counsel please approach?

17              (Counsel approached the bench, and the following

18  proceedings were had:)

19              THE COURT:  So there's only one question, and it

20  reads, "Staffing, what is the appropriate ratio for inmates to

21  staff?"  Any objection?

22              MR. AMMANN:  No.

23              THE COURT:  Any objection?

24              MS. HARRIS:  I don't think so.

25              THE COURT:  Okay.

1       (The following proceedings were had in open court:)

2       THE COURT:  So, ma'am, the jury has one question for

3  you.  I will ask the question; and then if they think it

4  necessary, the attorneys will have the opportunity for brief

5  follow-up questions.

6                          - - -

7                       EXAMINATION

8  By the Court:

9  Q.      With respect to staffing, what is the appropriate ratio

10 for inmates to staff?

11 A.      That's a good question.  In general, the ratio is 5.2

12 to 1.  And to explain that, that's spread over the seven days

13 and three shifts.  So as a practical matter, the number of

14 offenders in the purview of an officer is fairly large, but

15 that's how the manning formula, if you will, that's how it's

16 formulated.

17         THE COURT:  Okay.  Thank you.  Do you have any

18 questions of the witness?

19         MR. AMMANN:  No, Your Honor.

20         THE COURT:  Ms. Harris, do you have any follow-up

21 questions?

22         MS. HARRIS:  I do not.

23         THE COURT:  Thank you, ma'am, you may step down.

24         Well, although it's a little early, since we're

25 transitioning to a new witness, I think this is a good

1  opportunity to take our morning break.  We'll take a 15-minute

2  break.

3          As you know, don't discuss the case and don't do any

4  type of research on the case during this break.

5          We'll be in recess until about 10:40.

6          (The following proceedings were had in the courtroom

7  out of the presence of the jury:)

8          THE COURT:  Anything I can take up during the break?

9          MR. ROEDIGER:  No, Your Honor.

10          THE COURT:  Then we'll be in recess for 15 minutes.

11          (A recess was taken from 10:24 a.m. to 10:41 a.m.)

12          THE COURT:  Are we ready to bring the jury out?

13          MR. ROEDIGER:  Yes, Your Honor.

14          THE COURT:  Mr. Taulbee?

15          MR. TAULBEE:  Yes, Your Honor.  Sorry.

16          (The following proceedings were had in the courtroom

17  in the presence of the jury:)

18          THE COURT:  Counsel for plaintiff, are you ready to

19  call your next witness?

20          MR. ROEDIGER:  Yes.  Plaintiffs call Dr. Melissa

21  Piasecki, Your Honor.

22          THE COURT:  Ma'am, if you could come forward, and if

23  you could come around counsel table right there.  And come

24  generally to this area right here, and this lady right there is

25  going to swear you in.

- - -

MELISSA PIASECKI,

being first duly sworn by the courtroom deputy, testified as follows:

THE COURT: If you could take a seat in the witness stand on the riser right there.

You may proceed.

MR. ROEDIGER: Thank you, Your Honor.

- - -

DIRECT EXAMINATION

By Mr. Roediger:

Q.      Doctor, please state your full name.

A.      Good morning.  My name is Melissa Piasecki.

Q.      And can you spell that last name for me?

A.      P-I-A-S-E-C-K-I.

Q.      And before we get going, you're here at our invitation -- by our, I mean plaintiffs' counsel -- to talk about some of the mental health aspects of this case; is that right?

A.      Yes.

Q.      All right.  And I first want to talk to you just a little bit about your training.  What is your profession?  Not your job, but your profession.

A.      I am a forensic psychiatrist.

Q.      So I think a lot of us occasionally experience

1   confusion around psychology and psychiatry.  Can you talk to me

2   a little bit about what it means to be a psychiatrist?

3    A.      Yes, a psychiatrist is a medical professional.  So it's

4   an MD, it's a physician who followed the specialty path of

5   psychiatry, and then sub-specialized in forensic psychiatry.

6    Q.      So you are a medical doctor; is that correct?

7    A.      Yes.

8    Q.      Where did you go to medical school?

9    A.      I went to medical school at Washington University in

10   St. Louis.

11   Q.      And when was that?

12   A.      That was a while ago.  I graduated from medical school

13   in 1991.

14   Q.      So at this point, and I'll lead you just for a second,

15   you had completed undergraduate?

16   A.      Yes, also at Washington U in St. Louis.

17   Q.      You went to medical school?

18   A.      Yes.

19   Q.      And after medical school, what is sort of the next

20   step?

21   A.      After medical school, you have to specialize in some

22   specialty area.  I chose psychiatry, the area of medical

23   practice that addresses problems with emotions and behavior.

24   And then following a four-year residency program in general

25   psychiatry, I later -- not right away, but later did a forensic

1  program to sub-specialize in forensic psychiatry.

2   Q.     All right.  And I'm sorry, I'm not going to harp on

3  this too much, but I don't think that necessarily everybody

4  understands a residency.  So can you explain to me, to the

5  jury, what a residency is?

6   A.     Sure.  A residency program is for any medical

7  specialty.  Once you graduate from medical school, you have to

8  specialize in something these days, there's no more general

9  practice.  And so you pick family medicine or pediatrics or

10  psychiatry or obstetrics.  And when you pick that specialty,

11  you go through a program.  And it's a three- or four-year

12  training program, and psychiatry is a four-year program.

13   Q.     I would suggest having a drink of water.  It sounds

14  like you're going to start sounding like me in a minute.

15          We will talk about your employment, but sort of

16  sticking with, if we can call it educational training, you had

17  this residency, and I think you mentioned that you also had a

18  fellowship.  What's the difference between a residency and a

19  fellowship?

20   A.     So you need a residency in order to be licensed to

21  practice medicine in any of the 50 states.  You need to

22  complete a residency.  And so I completed my psychiatry

23  residency program and then was eligible for medical licensure

24  and to practice medicine, which I did.

25          But then I was interested in forensic psychiatry,

1   and so I wanted to sub-specialize.  And so to sub-specialize,

2   you do additional training, and I chose a fellowship program to

3   complete the training in forensic psychiatry so I could then

4   become eligible to be -- what we call board certification, to

5   have special credentials in forensic psychiatry.

6   Q.      And where was that fellowship?

7   A.      That fellowship was at University of Hawaii.

8   Q.      Okay.  And how long was the fellowship?

9   A.      It's one year.

10  Q.      One year.  And what did you do during that one year?

11  A.      During that one year of fellowship, you are required to

12  do a number of evaluations under supervision, write reports

13  under supervision, to participate in lectures and seminars, and

14  to also provide clinical care in correctional settings.

15  Q.      And so that was correctional settings in Hawaii?

16  A.      Yes.

17  Q.      So can you explain what is meant by board

18  certifications?

19  A.      Sure.  After you complete a residency program, you need

20  a license in order to practice medicine, regardless of which

21  state you're in or what specialty you have.  But you may choose

22  to also become board certified, which is to get a certificate

23  showing that you're competent and proficient in that specialty

24  area.

25          So board certification is a way of kind of meeting

the standard for that specialty.  It usually requires a written

exam, sometimes a practical or a clinical exam, as well.  In

general psychiatry, it requires both.

Q.     You have two; is that correct?

A.     Correct.  I have board certification in general

psychiatry and forensic psychiatry.

Q.     And the general psychiatry board certification, what is

this board?

A.     It's the Board of Psychiatry and Neurology, and what

that represents is the overlap between mental health and

behavioral disorders and neurological disorders because, at the

end of the day, it's all brain-based.  So about one third of

psychiatry boards relates directly to neurology.

Q.     Okay.  And what is neurology?  It might sound like a

silly question.

A.     Sure.  Neurology is the medical specialty that

specializes in disorders of the nervous system, so the brain

and then the nerves throughout the body.

Q.     And the second board certification that you mentioned

was forensic psychiatry?

A.     Correct.

Q.     Is that the same board?

A.     It's a specialty board.

Q.     Okay.

A.     So it's also out of the American Board of Psychiatry

1  and Neurology, it's just the sub-specialty certification exam

2  and requirements for forensic psychiatry.

3   Q.    And big question, maybe it's too big, but what is

4  forensic psychiatry?

5   A.    Forensic psychiatry is simply the place where

6  psychiatry, so the treatment and assessment of people with

7  emotional behavior problems, overlaps with the law.  Any kind

8  of legal issue, could be criminal, could be civil.

9   Q.    Would you mind giving us some examples from your own

10 career?

11  A.    Sure.  So in -- I mentioned criminal.  In the criminal

12 area, one of those overlapping areas relates to whether or not

13 somebody who has mental illness is competent to be in the

14 courtroom and to have a trial go forward.  So competency to

15 stand trial would be an area where those two things overlap if

16 somebody has mental illness.

17         In the civil area, there's a number of areas where

18 the psychiatry and the law overlap.  One would be does somebody

19 need to be hospitalized for mental health reasons, and there's

20 a hearing that goes into evaluation for what we call

21 involuntary hospitalization.  Another would be a case in which

22 there's a -- an allegation of an injury due to malpractice

23 would be another, if it was considered to be an injury that had

24 some kind of mental health component.

25  Q.    Within this forensic psychiatry, it's common to be in

1  court, to be around lawyers, to be sort of involved in the
2  legal system; is that correct?
3  A.      Yes.  That's the -- that's the work of a forensic
4  psychiatrist.
5  Q.      Okay.  And board certifications are different, and you
6  hit this a little bit, but they're different from licensure.
7  Can you explain how those two interact or if they interact at
8  all?
9  A.      Sure.  Licensure is state by state and says that you
10 are generally proficient to practice medicine.  Board
11 certification is you have demonstrated competency and completed
12 requirements and training for this particular specialty.
13 Q.      So how do states -- and if the answer is there are too
14 many variations, I understand.  But how do states determine who
15 is qualified to be licensed?
16 A.      States determine qualifications by national exams,
17 general medical knowledge, general medical practice, and then
18 training requirements.  You have to have completed so much
19 medical school, so much residency training at some accredited
20 residency program.  They don't care what specialty, but you
21 have to complete a residency program in order to be eligible
22 for a state medical license.
23 Q.      How many states would you be qualified to be licensed
24 in, given your qualifications?
25 A.      So I am eligible for licensure in all 50 states.  I

1 have licensure in three states.

2 Q.       Okay.  And what are those states?

3 A.       Nevada, Hawaii, and California.

4 Q.       And licensure is what allows you to practice; is that

5 correct?

6 A.       Correct.

7 Q.       And when I say practice, I might use that term a few

8 times, but what does practice mean to you?

9 A.       Practice is the clinical care of patients.  Evaluating

10 someone, offering them treatment or advice, basically being

11 their doctor.

12 Q.       Switching gears a little bit, and I said before we were

13 going to talk about profession.  Now we'll talk about your

14 actual job.  So what is your current position?

15 A.       So currently I'm employed by the University of Nevada,

16 Reno School of Medicine, and I've been there for 26 years.

17 Currently my role there is Dean of the medical school.

18 Q.       Okay.  And what is the Dean of the medical school?

19 A.       The Dean -- or I should clarify, acting Dean because I

20 am there in a temporary role.  The Dean of the medical school

21 is in charge of all of the operations, all of the academic

22 programs, all of the research programs, all of the hospital

23 affiliations of the medical school.

24 Q.       Okay.  And how long have you been at the university?

25 A.       Twenty-six years.

1  Q.     And can you, as briefly as you can, sort of take us

2  through your career progression at that institution?

3  A.     Sure.  I came to Nevada and the University of Nevada

4  from my residency program because I really enjoy teaching and

5  academics, and so I came as an assistant professor, which is

6  the entry level.  And after ten years, I had a professional

7  development leave, so I did that forensic psychiatry

8  fellowship.  Came back after the fellowship, was promoted to

9  associate professor.  Continued to teach, do more

10 administrative work, take on some leadership roles at the

11 school.  Became a full professor of psychiatry and behavioral

12 science, and then took on even more administrative work,

13 landing me now in the seat of the acting Dean.

14 Q.     Medical schools are a little bit different than schools

15 that I have experience with.  So before you take on

16 administrative obligations, what are your faculty duties?

17 Like, what are you doing on a yearly basis?

18 A.     As a faculty member, you teach, you teach medical

19 students, you teach residents in psychiatry or the specialty

20 that you're affiliated with to help them become specialized and

21 eligible for certification.  You do research, and you publish

22 and sometimes those -- that research is research where you're

23 studying the best way to teach students or the best way to

24 treat patients or the best way to convey information to

25 different groups of people.  And you do clinical practice as a

1  faculty member.  Most faculty at medical schools have some

2  clinical activity where they're seeing patients.  Sometimes

3  they're seeing patients in order to teach in that environment,

4  sometimes they're seeing patients in addition to the teaching

5  duties.

6  Q.     So how much -- I'm harping on practice.  How much

7  practice did you do as an assistant professor?

8  A.     As an assistant professor, my practice was 20, 30

9  percent of my week.

10  Q.     And as an associate professor?

11  A.     Probably a little bit less.

12  Q.     And then as a full professor?

13  A.     I decreased my clinical practice after I became a

14  forensic psychiatrist because I became more active in

15  nonclinical psychiatry roles.  So forensic psychiatry is not

16  clinical, it's not being somebody's doctor, it's evaluating a

17  person for a different reason, other than treating them.  And

18  so, as I shifted to forensic psychiatry, I tapered down and

19  discontinued my clinical practice.

20  Q.     So would it be fair to say that as you sort of

21  transitioned towards administrative duties in your academic

22  career, you transitioned towards sort of a more forensic focus

23  in your psychiatric work?

24  A.     Yes.

25  Q.     Has there ever been a point where you have not, quote,

1 unquote, practiced?

2  A.     No, I've always been active doing one type of practice.

3  Q.     Okay.  Would you be at all able to estimate how many

4 people you've seen in your practice over the years?

5  A.     I have seen thousands and thousands of people.  I have

6 seen them both for forensic purposes and for clinical treatment

7 purposes.

8  Q.     So when I was looking over your CV, your resume, I

9 promise I won't take you through every bit of it, but I noticed

10 an other-academic-affiliations section.  What is that?

11  A.     I am also on the faculty, not paid faculty, but

12 volunteer faculty, at University of Hawaii, I continue to work

13 with that institution.  And I'm on the faculty for the National

14 Judicial College, which is a -- kind of what it sounds like,

15 it's a college for judges that is located in Reno, Nevada.

16  Q.     What is a college for judges?  What does that mean?

17  A.     The National Judicial College provides training, both

18 basic training and then specialty training, for judges

19 throughout the country.  And the judicial college has programs

20 that range anything from an hour to a month for judges who are

21 interested in different kinds of either specialty training or,

22 again, general training.

23  Q.     Can you give me an example of what, like, a class or a

24 session for judges, for court personnel would be?

25  A.     There is a course on co-occurring disorders, which is

1 where mental health disorders and substance abuse disorders

2 co-occur, and that would be a one-week course where judges

3 would actually come to Reno and be in the classroom and do --

4 and have a variety of different kinds of educational exercises

5 or experiences.

6         Or it could be an online course.  Yesterday I had an

7 online course with the National Judicial College where it's

8 part of a series I'm doing on the neurobiology of addiction.

9 Q.    Have you worked with survivors of sexual violence?

10 A.    Yes.

11 Q.    I don't know how to quantify that, but do you have any

12 idea how many individuals you've worked with who have

13 experienced, survived sexual violence?

14 A.    I have evaluated or treated many people who have

15 experienced sexual violence because, for a period of time, I

16 was providing clinical services to a jail.  That would increase

17 the numbers considerably because there's sort of

18 overrepresentation, or more than you would expect, compared to

19 general numbers there.  So I would say several hundred would be

20 my estimate.

21 Q.    Have you worked with perpetrators of sexual violence,

22 people who are alleged to have committed sexual violence?

23 A.    Yes.

24 Q.    And approximately -- again, hard to quantify, but

25 approximately how many?

A.    More than a hundred.

Q.    And in what context have you done that work?

A.    Sometimes it was clinical work.  They were incarcerated, and I was providing clinical services in a jail.  Sometimes it was in the legal context.  Perhaps it was an evaluation.  As I mentioned earlier, there's the competency-to-stand-trial kinds of evaluations, or it could have been another criminal-related evaluation.

Q.    And you talked about teaching, you talked about practice, and you talked about administrative duties.  And I guess there's sort of this fourth pool of your obligations as a professional, and that's publishing, writing, research; is that right?

A.    Correct.

Q.    And can you talk a little bit -- do you write?

A.    I do.

Q.    And within your profession, what is the nature usually of those publications?

A.    A publication could be a chapter in a book, it could be an edited book, it could be an article that you publish in a scientific journal that -- where you publish the results of a research project that you did, or it could be an article that you publish where you bring together all of the latest news, kind of a review article, so that a reader can read all of the most recent research in one place.

1  Q.    Approximately, and, again, this is not meant to be a

2  trick question, but do you know how many publications you have?

3  A.    Fifteen or twenty.

4  Q.    And have you written about prisons from a psychiatric

5  perspective?

6  A.    I have.

7  Q.    And can you talk a little bit about that?

8  A.    Yes, I have -- I've published in a journal regarding a

9  review of a case, so it was a case report regarding a topic in

10 prisons; and then I have also authored a chapter and co-edited

11 two books on correctional psychiatry.

12 Q.    And what are these co-edited books?  What's the title,

13 what are they?

14 A.    I believe they're *Correctional Psychiatry*, Volume I and

15 Volume II.

16 Q.    Exciting title.

17 A.    Very exciting.

18 Q.    And what do they cover?

19 A.    They cover all the -- well, not all, but they cover

20 many different elements of understanding and treating people in

21 correctional settings.

22 Q.    And I guess I said there were four groups, but there's

23 sort of this fifth, and that is consulting forensic work

24 outside of a correctional institution; is that right?

25 A.    Yes, I would consider that separate from most of what I

do for the university.

Q.    Can you give some examples of the types of consulting expert work that you do?

A.    I am at times asked by a court to do an evaluation, sometimes by a private attorney, sometimes by a public attorney, either defense, public defenders, district attorneys. I also am a consultant for the Department of Justice Civil Rights Division in some of the work they do.

Q.    Have you ever worked with incarcerated populations, with jails, prisons?

A.    Yes.

Q.    Okay.  And when was that, what was that?

A.    I've worked with incarcerated people as a clinician in the jail in Reno, Nevada.  I've also provided some care, clinical care for people in correctional institutions in Hawaii.  And then in terms of the forensic work or the nonclinical work, I've -- as part of a Department of Justice team, I've -- I'm not sure I would say worked with, but I've assessed and interviewed and engaged with incarcerated people in other correctional settings.

Q.    Have you worked with prosecutors?

A.    I have.

Q.    Have you worked for prosecutors?

A.    I have.

Q.    Have you worked for courts, meaning you were appointed

1  by the judge?

2  A.      Yes.

3  Q.      Have you worked for nonprofits?

4  A.      Yes.

5  Q.      Have you worked for plaintiffs?

6  A.      Yes.

7  Q.      Have you worked for defendants?

8  A.      Yes.

9  Q.      Okay.  Is there any space that you tend to specialize

10 in out of that?

11 A.      I wouldn't call it specialty, but the people who are

12 most likely to call me are defense attorneys because they are

13 exploring whether or not their client has some kind of

14 psychiatric problem or substance abuse problem, and they may

15 call me to understand that better.  So that's the most frequent

16 call that I get.

17 Q.      So that would be criminal defense.

18 A.      Criminal defense work, yes.

19 Q.      Okay.  And when I say prosecutors, that's also in

20 criminal cases?

21 A.      It is.

22 Q.      And what might you do for prosecutors?

23 A.      For prosecutors, I may be called in to assess a person

24 alleging abuse in order to understand their behavior or their

25 disclosure.  Prosecutors have also asked me to evaluate

1 individuals with regards to claims that they make about their

2 mental state at the time of a crime and to address whether or

3 not my opinion is that they really did have an altered mental

4 state and, if they did, what kind of alteration was in their

5 mental state.

6 Q.    And this consulting, this expert work, you're paid for

7 it; is that right?

8 A.    Yes.

9 Q.    Or at least you intend to be paid for it.

10 A.    Yes.

11 Q.    Okay.  And I meant to ask about this before, but are

12 you being paid for your services here today?

13 A.    I'm paid for my time.

14 Q.    Okay.  And when you say you're paid for your time, you

15 can go ahead -- it's not a secret, how much are you being paid?

16 A.    So for this work I'm being paid $250 an hour.

17 Q.    And is that capped at any amount?

18 A.    It is.  It's capped at $6,000.

19 Q.    And so that is for four separate plaintiffs that are

20 sitting here today; is that right?

21 A.    I'm sorry?

22 Q.    Is that for each separate plaintiff that's sitting here

23 today?

24 A.    I believe that's the agreement, yes.

25 Q.    How many times have you given testimony as an expert

1  witness?

2   A.      Over 150 times.

3   Q.      And I think when we talked in the past, you said that

4  might be a little bit artificially inflated, you said.  And why

5  is that?

6   A.      It's not exactly artificially inflated, but it might be

7  more than typical because for a period of time, I was the

8  court-appointed expert for what we call commitment court, and I

9  would see ten or fifteen people a day.  It was a very -- it was

10  a very busy evaluation.  And then I would testify, and it would

11  be very short hearings.  So it's different from, say, a jury

12  trial where one expert -- you might have an expert have a jury

13  trial once a month in their career, and they would testify 12

14  times a year in a jury trial.  I might be testifying 12 times a

15  week in commitment court.  So it added up pretty quickly.

16  Q.      So of that 150-plus occasions, have you ever had your

17  testimony excluded or rejected by a court?

18  A.      No.  Sometimes there are parts of testimony that there

19  are rules about testifying to something or not testifying to

20  something, but I've never been excluded as an expert.

21  Q.      Can you tell us a little bit about what you were asked

22  to do in these cases?

23  A.      Yes.  I was asked to review records, to meet with the

24  plaintiffs, and to prepare reports.  I was asked to give

25  deposition testimony and to appear in court, if requested.

1  Q.    All right.  And so you said review records, and that's

2  pretty big.  So what did you look at?

3  A.    I looked at everything that was provided to me.  That

4  included the complaints that were filed, and those are the

5  official legal complaints that were filed; I reviewed medical

6  records when they were available; I reviewed something called

7  an interrogatory, which is a written question and answer that

8  one of the plaintiffs completed; and I reviewed my own

9  deposition transcript after I gave my deposition.

10  Q.    Were you able to meet, and I believe -- when I say

11  meet, I mean to evaluate any of the women?

12  A.    Yes.  I was able to personally meet with three of the

13  four women.

14  Q.    And those three were?

15  A.    Karen Keil, Ashley -- and I'm going to get her last

16  name wrong.  Begins with a Z.

17  Q.    Zieser, which has been said wrong a lot of times in

18  here today, or the past couple of days.

19  A.    And Lynnsey Betz.  And then I wasn't able to personally

20  meet with, though I was able to review records and

21  interrogatory -- including interrogatory medical records for

22  Trenady George.

23  Q.    And the reports and the information and the opinions

24  that you included in those reports and your testimony here

25  today, it's all based upon your medical training, right, your

1  expertise and published literature; is that right?

2  A.     Yes.

3  Q.     That's what you're relying on.

4         Now, published literature, what is that?

5  A.     It's the -- it's the world of medical textbooks and

6  articles and journals and all of the medical specialty

7  information that's been published after it was reviewed.  So

8  not necessarily something off the internet that wasn't

9  reviewed, but something that went through some process of

10 review to make sure that it was -- that it met the professional

11 standards for publication.

12 Q.     So you're talking about peer review.

13 A.     Peer review or editorial review, yeah.

14 Q.     Editorial.  Okay.

15        And is there one publication that sort of rises

16 above the rest, at least in terms of number of times it's

17 referenced in your profession?

18 A.     Of all of the documents that we use the most in the

19 medical specialty of psychiatry, there's one that we use a lot

20 for diagnosis.  It's -- for short, we call it the DSM, it

21 stands for Diagnostic Statistical Manual.  Basically, it's the

22 diagnostic manual for psychiatry.  Any psychiatric disorder

23 would be tied to that manual in terms of how do you make a

24 diagnosis, how do you understand the diagnosis.

25 Q.     And your opinion today, your diagnoses, they are --

1  they don't deviate from the DSM; is that right?

2  A.      That's correct.

3  Q.      So you believe that the DSM itself captures what we're

4  talking about here today.

5  A.      Yes.

6  Q.      The statements that you make here today are opinions

7  that you hold to a reasonable degree of medical certainty; we

8  can agree on that?

9  A.      Yes.

10 Q.      All right.  So these aren't just things that you are,

11 you know, halfway interested in or you might kind of think,

12 these are things that you believe because of your profession?

13 A.      Yes.

14 Q.      Before we talk about Ashley, Trenady, Karen, and

15 Lynnsey, can we talk a little bit more generally about sexual

16 assaults and trauma?

17 A.      Yes.

18 Q.      So are there hallmark or classic symptoms that

19 results -- and I use symptoms, even though maybe that's

20 inappropriate.  Symptoms, responses, whatever we want to call

21 them, that result from sexual assault?

22 A.      Sexual assault is a kind of trauma, and there's a human

23 response to trauma.  That human response shows up in different

24 ways in different people, but there are some responses that are

25 more typical or more common in people after trauma.  Some of

1  those responses are short lived, some of them are longer lived.

2  When they're longer lived and they start to interfere with

3  functioning well, we start to think of that as a clinical

4  problem because someone is not functioning well, that they have

5  so much distress or so much dysfunction in terms of their life

6  and their emotions that we start to think of that as a

7  disorder.

8         So what I think you're asking for is what does that

9  disorder look like if somebody has had sexual trauma and they

10 go on to have a psychiatric disorder; am I correct?

11  Q.    That's right.

12  A.    The psychiatric disorder, sometimes people have all the

13 symptoms of it, and they get the diagnosis of post-traumatic

14 stress disorder.  Sometimes they have some of the symptoms of,

15 and we call those symptoms of this, symptoms similar to or

16 symptoms that are part of this disorder, but we may not say

17 they actually have the full-blown diagnosis.

18  Q.    I'm going to interrupt really quick because there are

19 some phrases that have been introduced that I don't understand

20 entirely, and one of them is trauma.  I understand how it's

21 used on the news and in day-to-day life, but what do you mean

22 when you say trauma?

23  A.    Trauma is an overwhelming experience where someone is

24 exposed to a threat and they are -- they lose control over

25 their ability to manage that threat, and they are overwhelmed

1  with feelings.

2  Q.      And you also introduced post-traumatic stress disorder,

3  which we will hear more about.  Post-traumatic stress disorder

4  is something that can occur --

5  A.      It can occur --

6  Q.      -- after trauma; is that right?

7  A.      It doesn't occur with everyone, but it can occur after

8  a trauma.  Or symptoms of post-traumatic stress disorder can

9  occur after a trauma without the full diagnosis.

10 Q.      Okay, this is helpful.  I think I'm getting closer to a

11 good question, then.

12          So trauma can result in post-traumatic stress

13 disorder --

14 A.      Yes.

15 Q.      -- right?  And that trauma might not be sexual

16 violence, there are all sorts of trauma, right?

17 A.      Yes.

18 Q.      And, in fact, where does the diagnosis come from, PTSD?

19 A.      It traces back to military trauma.

20 Q.      Okay.  And so that would be another example of the

21 trauma causing PTSD.

22 A.      Yes.

23 Q.      So I guess what I'm asking is, are there specific

24 trauma responses, symptoms, right?  Variations of PTSD that are

25 sort of classic for sexual violence, for experiencing sexual

1   violence?

2    A.      So when people have post-traumatic symptoms, it takes

3   the shape of four different kinds of problems.  What happens

4   with people who have sexual trauma and who have PTSD symptoms

5   is the way that those symptoms take form within those four

6   categories are specific to a sexual trauma.  And I can give you

7   an example, if that's --

8    Q.      I would love an example.  Thank you.

9    A.      Okay.  So in PTSD, there's these four categories.  One

10  of the four categories is a change in your thinking about

11  yourself and about the world.

12          Within the sexual trauma, that thinking might be

13  specifically around the sexualized nature of the trauma:  I'm

14  no good, I'm dirty, I did something bad, I'm a bad person.  And

15  the way that that may show up in somebody's behavior would also

16  be specific to it having been a sexual trauma.  They may be

17  unable to be intimate in the way that they were before the

18  trauma, they may be unable to have the kind of normal sexual

19  intimacy that they had prior to the trauma because there's been

20  a change in their thinking and, therefore, a change in their

21  behavior.

22          Now, somebody who has combat trauma or car accident

23  trauma might also have changes in their thinking or their

24  behavior, but it wouldn't be that.  It would be something more

25  specific to the nature of the trauma they experienced.

1  Q.      So what I'm hearing is that there's -- there could be

2  internal ramifications and sort of external ramifications.  I'm

3  using my own language and it's probably wrong.  Is that

4  correct?

5  A.      Yes.  I think of the internal as being thinking and

6  emotions, and the external as being behavior.

7  Q.      So if we've heard testimony from someone that said, "I

8  feel cold," right?  Would that be an example of an internal?

9  A.      The feeling would be internal.  If they behaved cold,

10 then it would have been behavioral --

11 Q.      So that would be internal and external.

12 A.      Uh-huh.

13 Q.      So what about "I feel degraded"?

14 A.      That would be an example of a thinking or an internal

15 change that might relate to the trauma.

16 Q.      And what about, "I don't like people being behind me"?

17 A.      That would relate to thinking because I don't like

18 people being behind me because I have a fear of something

19 happening behind me.  Usually that I don't like this is tied to

20 a specific concern.  And then if somebody behaved in a way

21 where they didn't want to be around crowds of people or they

22 didn't want to be in a room with their back to a door, then it

23 would be behavioral.

24 Q.      All right.  So the internal relates to the external.

25 A.      Yes.

1   Q.     Okay.  And so would I be right in saying that this --

2   sort of the internal ramifications that -- you used self-image,

3   and we've heard testimony about "I don't feel the same about

4   myself."  What might that look like on the outside?

5   A.     When somebody experiences a change in their self-image,

6   it often changes their behavior because if they feel less

7   confident, if they feel less worthy, which sometimes occurs

8   when somebody feels degraded or dirty, they feel less worthy,

9   they're less likely to do things that are positive for

10  themselves, like engage in exercise or look for opportunities

11  to advance their career or do things just because they know

12  it's important for them to invest in themselves in some

13  personal way.

14  Q.     So does this all mean that -- does this mean that

15  everyone will have similar responses to sexual violence, that

16  we can expect people to, at least as we look at them, watch

17  them, look similar?

18  A.     We know that humans behave to -- behave in response to

19  trauma and stress differently, and the same would be true for

20  sexual trauma or sexual assault.  Although there are these

21  categories of changes that occur, the way that the actual

22  experience shows up in somebody's thinking or behavior could be

23  different.

24  Q.     So can you elaborate on that?  How might it be

25  different?

1   A.      So the four categories for when somebody has the

2   clinical problems following an assault, not everybody has these

3   clinical problems, but for people who do have the clinical

4   problems, the problems that get to the point where they

5   interfere with normal life, one of the areas where people --

6   one of those categories is intrusive memory or intrusive recall

7   of the trauma.

8          For some people, that will take the form of a

9   nightmare.  Not everybody will have nightmares.  Many people

10  will, but not everybody will have nightmares of a trauma.  Some

11  people will have something called a flashback, which is an

12  intense experience of actually re-experiencing the trauma,

13  feeling like it's happening all over again.  Not everyone will

14  have that, but some people will.

15  Q.      So one of the things you said that I found interesting

16  was that not everybody will have PTSD.  Did I hear that right?

17  A.      Yes.

18  Q.      Okay.  And so for some people, they will experience a

19  trauma?

20  A.      Yes.

21  Q.      And the end result of that will be that they recover

22  relatively quickly?  Am I hearing that correctly?

23  A.      Yes.  Most everyone after a trauma will have a period

24  of time where they are kind of getting back their balance.

25  Maybe their sleep isn't good for a few days, maybe they feel

1  rattled or nervous for a few days, maybe they have some bad

2  memories of it, but most folks are able to get back to a place

3  where they're functioning well.  Maybe they have some

4  unpleasant memories, maybe there's some reminders out there for

5  them, but it doesn't get in the way of functioning.

6  Some individuals, however, do go on to have the

7  kinds of problems that we're talking about today that are

8  associated with that diagnosis.

9  Q.    So are there environmental factors that play into

10  whether somebody sort of bounces back?  It's a terrible thing

11  to say, but, you know, gets better quickly, or develops the

12  long-term problems?

13  A.    There are.  There are a number of environmental factors

14  and what we would call social or interpersonal factors that

15  play a role.

16  Q.    So I hate to say positive outcome because we're talking

17  about -- by its very nature, we're talking about a traumatic

18  event.  But what sort of environmental factors would lead to a

19  better outcome?

20  A.    A better outcome is associated with people who talk

21  about their trauma afterwards and who have a supportive

22  environment or supportive response for disclosing or talking

23  about a trauma.

24  Q.    Okay.  And what would a supportive environment look

25  like?

A.    A supportive environment would be a place where somebody can talk to a trusted individual about what happened to them, that they can receive treatment, if they need immediate treatment, for an injury, and who can feel accepted and supported as they report and work through whatever the -- whatever they need to do about that trauma.

Q.    So in your opinion, would prison be such an environment?

A.    No.

Q.    Okay.  And what is it about prison that sort of lends itself to not being a good place to bounce back from trauma?

A.    Well, there's a number of reasons that prison would typically not be a supportive place.

Another social element to whether or not a trauma is more or less likely to cause post-traumatic stress disorder is whether or not the trauma is from a person versus, say, a tornado.  Another is the nature of the relationship of the person.  If it is a person who caused the trauma, what that person represents to you.

So in prison, a trauma would be difficult for that positive support system to come together, for one reason is that you don't have access to your family and friends in prison, so you are in some ways isolated from your natural support system.  And the support system that is there may not be helpful to you, and talking about the trauma could actually

1  be harmful to you.

2  Q.     Are there other ways in which sexual assault within

3  prisons and the ramifications of those assaults are distinct

4  from sexual assault generally?

5  A.     One of the differences between sexual assault in a

6  prison environment and not a prison environment is it's a

7  closed system.  People who are in prisons don't have a lot of

8  options about going to a different place, they can't really

9  choose where they're going to be, whether they're going to be

10  there.  They lack the ability to protect themselves, so there's

11  kind of a lack of escape, so to speak.

12          Another element in sexual assault in prisons, and

13  this would be more specific to sexual assault where a prison

14  employee is assaulting a prisoner, would be corrections

15  officers and the people who work in prisons are there to

16  protect the people who are in custody.  And we use the word "in

17  custody."  If you think about that, if you're in somebody's

18  custody, they're there to take care of you.  And so if the

19  person who is there to take care of you is actually the person

20  hurting you, that's very confusing, very troubling, and doesn't

21  leave you with a lot of options for how to get help and support

22  with that assault.

23  Q.     One of the things that has come up over the last couple

24  of days is people not reporting what happened to them.  Do you

25  have any opinions about -- first of all, just speaking

1  generally, do most women -- and I'm saying women because the

2  majority of those who experience sexual violence are women; is

3  that right?

4  A.     Yes.

5  Q.     Do most women report sexual violence?

6  A.     Most women do not report.

7  Q.     And do we know why?

8  A.     There's a number of reasons.  One is shame and stigma,

9  which would also apply to women in prison.  Another is fear of

10  not being believed, which would also apply in prison.  And then

11  there's always the question that women ask themselves, is it

12  going to help me to report?  Or could it actually hurt me to

13  report?  And that's a decision that's in some situations very,

14  very difficult to make.

15  Q.     What do you mean by that?

16  A.     There's some people for whom, if they report it, they

17  could face negative consequences.  That could happen in the

18  community, as well as in the prison systems, perhaps more

19  likely in the prison systems, but there's negative impact of

20  disclosing sex assault in some communities, some families, for

21  example.  You could be rejected, you could be blamed, you could

22  lose the support of family and friends.

23  Q.     So I'll ask you a very direct question.  Does the fact

24  that someone didn't make an immediate report that you -- if you

25  are meeting with someone, I assume that at the same time that

1  you are listening to them and caring about what they're telling

2  you, you're also assessing credibility and other things; is

3  that right?

4  A.     Yes.

5  Q.     Does the failure to have made an immediate report

6  impact your position regarding credibility?

7  A.     No.

8  Q.     And that's because you know that the literature, the

9  data says most people don't report?

10  A.     The data says most people don't report, and there's

11  research that shows when people do anonymous questionnaires

12  that are -- maybe they're filling it out in the middle age or

13  later in life, where they will fill out a questionnaire in a

14  research project and they will disclose sexual abuse that

15  happened 20, 30, 40 years ago, and they've never told another

16  person, they've just never told anyone.  The stigma or the fear

17  or the lack of support that they perceived was just was too

18  much for them to report.  So there are many people who don't

19  disclose their entire lives.

20  Q.     For Ashley Zieser, do you have an opinion on whether

21  her symptoms and her description of her experiences were

22  consistent with being sexually assaulted by a guard while

23  incarcerated?

24  A.     Yes.

25  Q.     Your opinion is what?

1  A.     That they are consistent, yes.

2  Q.     In your report you explain that Miss Zieser has PTSD;

3  is that right?

4  A.     Yes.

5  Q.     And in regular-person speak, again, we're talking about

6  the continuing effects of trauma.

7  A.     Yes, we're talking about signs and symptoms that

8  continue more than six months after a trauma that are -- that

9  fall into, again, those four categories or those four groups of

10 symptoms.

11 Q.     And what are -- this is going to be hard because I know

12 we're talking about four people.  And so if you need to refresh

13 your recollection with your reports, we'll take a minute.

14        But what are those effects for Ashley?

15 A.     A prominent is sleep disorder or difficulty sleeping,

16 intrusive recall, nightmares.  Another is intense anxiety, or

17 we would call it sort of like a whole-body response to cues or

18 reminders of the past trauma.

19 Q.     I'm going to stop you for a second.  So we often hear

20 about triggers out here in the world.  And cues, are they the

21 same as triggers?

22 A.     No.  I think what I'd like to do is to think about very

23 specific -- again, more of a medical approach to this, as

24 opposed to the general social term there, and to really focus

25 on the, we call it the diagnostic criteria and what are the

1  specific things that we can derive from the scientific

2  literature about cues that will, then, bring out -- or

3  reminders, specific reminders of the trauma.

4  Q.    And so getting specifically to Ashley, like, what are

5  those cues, reminders?

6  A.    I recall in her -- I recall her reporting that she once

7  heard a maintenance man who had keys on a belt when she was out

8  of prison and working in, I think, a hotel environment, and

9  that the sound of the keys were such a clear cue or such a

10  clear reminder of the abuse that she reported that she had a

11  whole-body response in terms of anxiety, as if it was happening

12  all over again.  That would be one of the symptoms that she

13  reported.

14  Q.    What about sort of the limited functioning in public

15  spaces?

16  A.    Yes.  She reported difficulty being in open spaces,

17  stores, public spaces, and to the point where things that she

18  had enjoyed prior to going into prison, such as exercise

19  classes, I remember Zumba was something that she did, that she

20  was no longer able to be in those environments or do those

21  activities because of the anxiety and because of the fears that

22  were associated with being in those spaces.

23  Q.    Leaving Ashley sort of specifically and talking more

24  generally, we've heard testimony about what I would call sexual

25  dysfunction, meaning sort of committed long-term romantic

1 relationships in which there is trust, but one is still unable

2 to function sexually, unable to have intercourse, or at least

3 struggles to have intercourse. Is that something that is

4 related to the experience of these traumas?

5 A.    Yes, and some of that is related to the fact that

6 sexual touching rekindles or cues the anxiety. Some of that is

7 related to the changes in one's thinking about -- again, things

8 that people say is, "I'm dirty, I'm worthless, who would want

9 to touch me."

10 Q.    For Trenady George, who I know you were -- we had

11 gotten used to calling Jane Doe, but she's using her name,

12 Trenady George, here today. Do you have an opinion on whether

13 her description of her experiences are consistent with having

14 been sexually assaulted by a guard while incarcerated?

15 A.    Yes.

16 Q.    Your opinion is that they are consistent?

17 A.    Yes.

18 Q.    Trenady talked about something -- and she shares a lot

19 of the story of those who are sitting around her, but she

20 talked specifically about something called hypervigilance,

21 which is not a term that I knew. Is hypervigilance something

22 that you're familiar with?

23 A.    It is.

24 Q.    And what is hypervigilance?

25 A.    Hypervigilance is being hyperalert, scanning the

1   environment for threats, wanting to continuously monitor for

2   anything or anyone who could be intending to harm you.

3   Q.      And she also talked about negative self-perception.

4   And could you help us understand sort of, what does that mean,

5   what does that feel like?  I don't know if you can describe

6   that, but what does that mean to shift into a negative

7   self-perception?

8   A.      In post-traumatic stress disorder and people with

9   symptoms of post-traumatic stress disorder, there's a change in

10  world view and there's a change in sense of self.

11          An individual can start -- a person can start to

12  think that they're less worthy and that they did something

13  wrong, that the harm came to them because they are themselves

14  flawed in some way, and that would be an example of that

15  negative self -- I'm sorry, negative self-perception.  When

16  people experience anxiety and they can't do the things they

17  used to be able to do, that contributes in some ways, that they

18  can't function, that they're not as good as they used to be.

19          And then they start to project that to their future,

20  their future is more limited.  Not only are they not as good as

21  they used to be, they'll never be as good as they used to be.

22  And so it becomes a little bit of a self-fulfilling problem

23  where people continuously struggle with feeling bad, not being

24  able to do what they used to be able to do, and then feeling

25  worse.

1  Q.      Might that lead to avoidance behaviors?

2  A.      Absolutely.

3  Q.      And what would be examples of avoidance behaviors?

4  A.      Avoidance behaviors would be not going on a job

5  interview, not going out in public, not going to exercise

6  class, not wanting to even hug another person because that --

7  avoiding physical contact with another person because that

8  could bring up or evoke some of the memories that happen that

9  are connected to the assault.

10  Q.      For Karen Keil, do you have an opinion on whether her

11  symptoms and her descriptions of her experiences were

12  consistent with being sexually assaulted by a guard while

13  incarcerated?

14  A.      Yes.

15  Q.      And, again, I'm happy to refresh your recollection with

16  the report.  But if you can speak to Karen, what were your --

17  what were your impressions, what were your opinions with regard

18  to Miss Keil?

19  A.      Miss Keil had significant symptoms consistent with

20  post-traumatic stress disorder and consistent with the traumas

21  that she reported.

22          One of the symptoms that was very prominent in her

23  reports was this flashback where she re-experienced the trauma.

24  She described it as a, sometimes as a night terror, waking up

25  in the night, not knowing if she was in prison or in her

1  bedroom, and having the sense that there may have been somebody

2  knocking on the door, similar to what she experienced in the

3  prison.

4       She also had significant changes in her sense of

5  self.  She described herself as somebody who had always been a

6  go-getter, and her career history suggested that she was

7  somebody that functioned at a very high level.  And then

8  following these experiences, she described herself as somebody

9  who really struggled to change out of her pajamas, somebody who

10  struggled to be in an environment where there were other people

11  because of the intense anxiety she felt being around other

12  people.

13       (Pause in proceedings.)

14       MS. HARRIS:  May we approach, Your Honor?

15       THE COURT:  Yes.

16       (Counsel approached the bench, and the following

17  proceedings were had:)

18       MR. ROEDIGER:  It was awkward silence.  I just

19  didn't want to --

20       MS. HARRIS:  I don't know if you want to take a

21  break with Miss Zieser being somewhat broken down.

22       THE COURT:  Are you opposed to taking a break?

23       MR. ROEDIGER:  I am not.  I also -- I would also be

24  okay with her leaving the room.  I would waive any objection to

25  that.

1          THE COURT:  Why don't we just go ahead and have her

2   step out.

3          MR. ROEDIGER:  You're okay with that?

4          THE COURT:  I'm okay with --

5          MS. HARRIS:  I'm fine with that.

6          THE COURT:  Yeah.

7          (The following proceedings were had in open court:)

8   BY MR. ROEDIGER:

9   Q.     By any miracle, do you remember the last question that

10  I asked?

11  A.     Yes.  It was about Karen Keil, and it was about

12  symptoms of post-traumatic stress disorder.

13  Q.     So with regard to Karen, I think you had talked a

14  little bit about nightmares.

15  A.     Night terrors or flashbacks, as well as avoidance of

16  people.

17  Q.     And that distinction between nightmares and night

18  terrors, can you explain that to us?

19  A.     Nightmares are when you're sleeping and you wake up and

20  you know you've been asleep.  Night terrors, and sometimes

21  people describe day terrors, is more of a flashback where you

22  are awake but feel like you are immersed or returned back to a

23  traumatic experience.

24  Q.     And that sort of dramatic sleep interruption, even in

25  adulthood, could that lead to urinating on yourself?

1    A.    It can, because of the fear response.

2    Q.    For Lynnsey Betz, do you have an opinion on whether her

3    symptoms and descriptions of her experiences were consistent

4    with being sexually assaulted by a guard while incarcerated?

5    A.    Yes.

6    Q.    What were your opinions with regard to Miss Betz?

7    A.    That the difficulties that she has had in terms of her

8    self-image, some of the -- so some of the mental internal

9    symptoms, but also some of the problems that she's had with

10   sleep, nightmares, working in different environments where

11   there are people around, that those are consistent with

12   post-traumatic stress symptoms.

13   Q.    And, again, I'm going to switch from the specific to

14   the more general.  We know from testimony over the last couple

15   of days that there are individuals who have experienced

16   significant trauma in their life before the events at

17   Chillicothe.  Is it common for somebody to experience trauma

18   multiple times?

19   A.    It is.

20   Q.    And I guess the question that I have is could it be

21   that someone has experienced so much trauma, is so hurt, that

22   you -- can you hurt a person who is hurt so badly?  Are there

23   effects that come if someone has already --

24         So let's say someone has been a victim of sexual

25   violence earlier in their life and they're sexually victimized

1  again.   How do you parse that out, Doctor?

2   A.      An additional trauma can add additional harm, and the

3  additional harm can occur for a couple of reasons.   One is that

4  the new harm or the new trauma can bring the old stuff back.

5  So somebody may have been able to manage some old trauma, but

6  new harm that comes to them brings that back, and it's no

7  longer under control or no longer below the surface.   It

8  becomes a problem again.

9          The other, however, is that the new trauma in itself

10 can be completely traumatizing and can add new -- can cause new

11 troubles and can hurt somebody in new ways and cause more

12 damage to an individual.

13  Q.      And so when you were meeting with these individuals,

14 were you looking for things that were new?

15  A.      I was looking for their history of previous traumas, as

16 well as an understanding of what the impact of those had been,

17 as well as their reports of sexual assault within the prison

18 and what symptoms they were reporting that were worse or

19 different from before.

20  Q.      Can new trauma, additional trauma impact healing, the

21 speed, right?   What -- can it change what recovery looks like?

22  A.      Yes.

23  Q.      In what ways can it do that?

24  A.      A number of ways.   It can reactivate or bring back to

25 the surface old trauma that was previously managed.   It can

1  also cause new problems.  So if somebody is experiencing

2  assault and they have symptoms that include -- we talked a lot

3  about the feelings of self-worth, that might get in the way of

4  somebody getting treatment, and that might prevent them from

5  being able to be recovering from old, as well as new trauma.

6          MR. ROEDIGER:  May I have one second, Your Honor?

7          THE COURT:  Sure.

8  BY MR. ROEDIGER:

9  Q.      Do Ashley, Trenady, Lynnsey, Karen, do any of them fit

10 into the category of people who are going to bounce back

11 quickly?

12 A.      Unfortunately, they do not.

13 Q.      What does the future look like?

14 A.      It will be different for everyone.  It depends on what

15 their life history has been, what their current resources are.

16 As I reviewed the medical records, I was impressed with how

17 variable treatment was, how one person may have had treatment

18 from somebody who was a trauma specialist and could really

19 provide great focused treatment, and another person did not,

20 another person was not receiving great focused treatment.  So

21 it depends on the resources available to them, as well as their

22 own life journey, their own histories.

23 Q.      So I understand that everyone is different, and I

24 appreciate that.  But are we -- in terms of need, right?

25 Counseling need, medical need, are we talking about weeks or

months or years?

A.    I believe we're talking about years.

MR. ROEDIGER:  Nothing further, Your Honor.

THE COURT:  Any cross-examination?

MS. HARRIS:  Yes, Your Honor.

May I proceed?

THE COURT:  You may.

MS. HARRIS:  Thank you.

- - -

CROSS-EXAMINATION

By Ms. Harris:

Q.    Dr. Piasecki, my name is Cara Harris, and I'm here representing Mr. Bearden.  I have some questions for you today.

As I understand it, you reviewed medical records that you could for each of the plaintiffs in this case; is that correct?

A.    That's correct.

Q.    And those were the medical records that were provided to you by their counsel, who should have had access to all of the records they needed; is that true?

A.    Yes.

Q.    Okay.  You also attempted to personally interview each of the plaintiffs and to do a thorough assessment; is that correct?

A.    Yes.

1  Q.      And as you mentioned -- well, scratch that.

2          You did not, however, talk to Mr. Bearden, did you?

3  A.      That's correct.

4  Q.      Okay.  Did you attempt to speak with him?

5  A.      I did not.

6  Q.      Did you speak with anyone at the Chillicothe

7  Correctional Center?

8  A.      I did not.

9  Q.      Did you attempt to do that?

10 A.      No.

11 Q.      Okay.  The plaintiffs, when they met with you, did they

12 have a clear understanding of who you were and what you were

13 doing?

14 A.      I believe so.

15 Q.      Okay.  You had been hired by their attorneys to assess

16 their condition?

17 A.      Yes.

18 Q.      Okay.  Now, as you testified, you were actually unable

19 to actually speak personally with Miss George, correct?

20 A.      Correct.

21 Q.      Okay.  But you did review her records and reached some

22 opinions regarding her, at least.

23 A.      Yes.

24 Q.      Okay.  In reaching your opinions that you've given to

25 the jury here today, you assumed that the plaintiffs were being

1  completely truthful with you about everything; is that correct?

2   A.     I assumed that their reports were credible.  I didn't

3  make assumptions about every specific -- so completely

4  truthful, I didn't make assumptions that every specific report

5  was accurate, but I made general determinations of credibility.

6   Q.     Okay.  And you assume as true for your opinions today

7  that each of these women were sexually assaulted by Mr. Bearden

8  while incarcerated at Chillicothe Correctional Center.

9   A.     Based on their reports, based on the -- all of the

10  materials that I've reviewed, yes.

11  Q.     Okay.  And you also believed, based upon what they told

12  you and what you reviewed, their past medical histories; is

13  that correct?

14  A.     Generally, yes.

15  Q.     Okay.  And their current medical history, where they're

16  at now.

17  A.     Yes.

18  Q.     Okay.  You, however, had no firsthand knowledge to the

19  truthfulness of what they may have told you.

20  A.     That's correct.

21  Q.     Okay.  Let's talk first about Miss George.  Again,

22  because you didn't actually speak with her, that limited you

23  somewhat in your opinions, correct?

24  A.     Correct.

25  Q.     Okay.  You didn't formally diagnose her.

1   A.      Correct.

2   Q.      Okay.  But you did reach some opinions about her.

3   A.      Yes.

4   Q.      Okay.  And you testified earlier in answer to one of

5   the questions that you believe her signs and symptoms are

6   consistent with being sexually assaulted by a guard, correct?

7   A.      Yes.

8   Q.      Okay.  You reviewed some -- well, let me ask you this

9   first.

10          Post-traumatic stress disorder, you believe three of

11  the plaintiffs suffer from that related to their alleged

12  assaults by Mr. Bearden, correct?

13  A.      Yes.

14  Q.      Okay.  One of the elements of post-traumatic stress

15  disorder is that it occurs after a traumatic event, correct?

16  A.      Yes.

17  Q.      Okay.  And the traumatic event that you believe is the

18  trigger for their post-traumatic stress disorder is the alleged

19  assault by Mr. Bearden.

20  A.      Yes, sexual violence.

21  Q.      Okay.  All of which occurred while they were

22  incarcerated at Chillicothe Correctional Center, allegedly.

23  A.      Yes.

24  Q.      Okay.  So Miss George was in the Chillicothe

25  Correctional Center from June of '15 to November of '17.  Do

1  you understand that?

2   A.      Yes.

3   Q.      Okay.  You had the opportunity to review some records

4  from Central Ozark Medical Center and Compass Health; is that

5  correct?

6   A.      Yes.

7   Q.      Okay.  And you took those records as being accurate.

8   A.      Yes.

9   Q.      Okay.  And that -- those records are in large part with

10  Miss George what you have based your opinions on; is that

11  correct?

12   A.      Those records, her interrogatory, and the complaint,

13  yes.

14   Q.      I'm sorry, say that again?

15   A.      Those records, but in addition, the interrogatory that

16  she completed, and the complaint.

17   Q.      Thank you.  I missed the interrogatory word.

18          I would like to look at Exhibit D33, which I

19  understand has already been stipulated to be admitted.

20          MS. HARRIS:  Is that your all's understanding, as

21  well?

22          MS. McGRAUGH:  Yes.

23          MS. HARRIS:  Can we -- I'm not sure, Judge, if these

24  have been formally admitted, if you want me to offer this or --

25          THE COURT:  I don't think there are any that have

1  been formally admitted.  But if there's no opposition, D33 will

2  be admitted.

3              MS. HARRIS:  Thank you.  And given that, is it okay

4  if we publish it to the jury, as well; is that correct?

5              THE COURT:  That's correct.

6              MS. HARRIS:  Thank you.

7          (Defendant's Exhibit 33 was admitted into evidence.)

8              MS. HARRIS:  We're going to see if we can do this on

9  the computer instead of with the paper.  Okay.  Does everyone

10  have that now?

11              THE COURT:  Yes.

12              MS. HARRIS:  Okay.

13  BY MS. HARRIS:

14  Q.      This is a record from Compass Health Network; is that

15  correct, Doctor?

16  A.      Yes.

17  Q.      Okay.  And this record was created January 23, 2019; is

18  that correct?

19  A.      Yes.

20  Q.      And in this record, Miss George tells us -- or tells

21  the provider, excuse me, that she had ADHD when she was a child

22  and has been taking medication for it; is that right?

23  A.      Yes.

24  Q.      She also reports that she's had anxiety forever,

25  correct?

1    A.      Yes.

2    Q.      And this is -- just to be clear -- so this is January

3    23rd of 2019.  She was released from prison in November of '17,

4    so we are a year and two months out from her release from

5    prison, so about 14 months; is that correct?

6    A.      Yes.

7    Q.      Okay.  And at that point, she reported she was working

8    40 hours a week; is that correct?

9    A.      Yes.

10   Q.      She also reported she has no concerns with depression,

11   correct?

12   A.      Yes.

13   Q.      The provider offered her assistance in the way of

14   outpatient therapy and a psychiatric visit, correct?

15   A.      Yes.

16   Q.      And an appointment was set up for her for therapy on

17   January 29 of '19, just six days later.

18   A.      I think that's on the next page.

19          MS. HARRIS:  Okay.  Can you change the page for us,

20   please, Jackie?

21   A.      Thank you.

22   BY MS. HARRIS:

23   Q.      Do you see that now?  It might be on the next page

24   even.  Let me look at my hard copy, and I'll be able to tell us

25   exactly where it's at.  Hang on a second.

1          MS. HARRIS:  Give me one moment, please, Judge.  I

2   apologize for my -- can we take a brief break for me to find my

3   place?  I apologize.

4          THE COURT:  Sure.

5          MS. HARRIS:  I'm confused on where my notes are

6   going.  I am on the wrong exhibit, I'm so sorry.  I did not

7   have that one tabbed.

8   BY MS. HARRIS:

9   Q.     Let's just go to the next page, which will show that

10  she had an appointment made on the 29th.  All right.  That's

11  it.

12         Do we see where -- note, there was an appointment

13  made for 1/29/19?

14  A.     Yes.

15  Q.     Okay.  And what does it show as far as how that

16  appointment went for Miss George when she had that appointment

17  made for her?

18  A.     It says that she did come to the appointment; and when

19  she was called by the therapist, Miss George said she was ill,

20  and then she rescheduled.

21  Q.     She was rescheduled for the next week?

22  A.     Correct.

23  Q.     And then -- so the next page shows that there was

24  another appointment made for March 5th of '19; is that correct?

25         MR. ROEDIGER:  Objection, Your Honor.  May we

1  approach?

2          THE COURT:  Yes.

3          (Counsel approached the bench, and the following

4  proceedings were had:)

5          MR. ROEDIGER:  I think it's obviously appropriate to

6  critique their failure to follow up.  I think that was with

7  them, though, it was the time to do that.  She's testified to

8  nothing about -- do you see what I'm saying?

9          MS. HARRIS:  I don't.

10          MR. ROEDIGER:  I mean, crossing her on the fact that

11  she was not taking care of herself mitigates damages, I think

12  that's absolutely true.  I don't know -- it's improper

13  impeachment for the expert.

14          THE COURT:  All she testified was that her symptoms

15  were consistent with someone who has suffered sexual assault,

16  and went through what the symptoms were, my words, not hers, of

17  it.  She didn't say anything about future care, other than it

18  would be required.  So how is this relevant to any of her

19  opinions?

20          MS. HARRIS:  I think it is relevant for the damage

21  portion and the fact that she thinks that Miss Trenady -- I'm

22  sorry, Miss George does need care; and, in fact, Miss George

23  has had the opportunity for care and has not sought it out --

24  or has not taken advantage of it.

25          THE COURT:  Right, but how does that affect her

1  opinions that she's --

2       MS. HARRIS:  I think it impeaches her opinions

3  that -- that she doesn't really need care, she's not sought it

4  out when she's had the opportunity to do so.

5       THE COURT:  I think that impeaches Miss George's

6  testimony, not this expert's testimony, and the objection will

7  be sustained.

8       MS. HARRIS:  Very good.

9       (The following proceedings were had in open court:)

10 BY MS. HARRIS:

11 Q.    You have also reviewed records, have you not, from the

12 Central Ozark Medical Center?

13 A.    Correct.

14 Q.    And that's Exhibit D32; is that correct?

15      MS. HARRIS:  Can you pull that up?  And that's

16 another one I believe that's been admitted previously; is that

17 correct?

18      THE COURT:  No.

19      MS. HARRIS:  I'm sorry, not admitted, but agreed to,

20 I apologize.  I'd like to admit D32.

21      THE COURT:  Any objection to D32?

22      MR. ROEDIGER:  It disappeared.  I'm sorry.

23      MS. HARRIS:  It's the Central Ozark Medical Records.

24      MR. ROEDIGER:  It's not on the screen, Your Honor.

25      THE COURT:  It's not on your screen?

1          MR. ROEDIGER:  No.

2          THE COURT:  Now it's on everyone's screen.  Do you

3   have a hard copy that you could review?

4          MR. ROEDIGER:  No objection, Your Honor.

5          THE COURT:  32 will be admitted.

6          (Defendant's Exhibit 32 was admitted into evidence.)

7          MS. HARRIS:  Thank you, Your Honor.

8   BY MS. HARRIS:

9   Q.     Are you able to see Exhibit 32?

10  A.     I am.

11  Q.     Okay.  Very good.  This is a record -- the first record

12  that we have from her having actually gone to see this doctor

13  after her release is on the 9th page of this exhibit.  At the

14  top, it says Page 7 out of 9.

15         MS. HARRIS:  Jackie, if you can find it, it's the

16  date 9/18/18.

17  BY MS. HARRIS:

18  Q.     Are you able to see that now, Doctor?

19  A.     I am.

20  Q.     Okay.  And in that record, Miss George is seen for back

21  pain and a desire to get back on her ADH medicine; is that

22  correct?

23  A.     Correct.

24  Q.     In this note, the doctor mentions that she's been in

25  prison and she was released in November of '17; is that

1  correct?

2  A.    Yes.

3  Q.    There's no mention of sexual trauma occurring in prison

4  in this record; is that correct?

5  A.    Not on that page, correct.

6  Q.    Okay.  And there's no mention of a lawsuit alleging

7  sexual trauma, correct?

8  A.    Correct.

9  Q.    Okay.  And we'll go up to the next page.

10        Down under examination, under the psych examination,

11  it indicates that at this visit, Miss George was alert,

12  oriented, and her mood and affect were full; is that correct?

13  A.    Yes.

14  Q.    Okay.  Now, the next visit is almost three months later

15  on December 5th.

16        MS. HARRIS:  And Jackie, that is Page 4 of 9 at the

17  top.  We need the December 5, Page 4 of 9.  One more back.

18  There we go.  All right.

19  BY MS. HARRIS:

20  Q.    Are you able to see that, Doctor, now?

21  A.    I am.

22  Q.    Okay.  And this is a visit that Miss George had with

23  her family doctor at the time on November [sic] 5, 2018; is

24  that correct?

25  A.    Yes.

1  Q.    And in this note, the doctor says that she actually

2  recounts her personal history of her incarceration; is that

3  correct?

4  A.    Yes.

5  Q.    Okay.  And there's no mention of her recounting any

6  sexual trauma in prison, correct?

7  A.    Correct.

8  Q.    Also no mention of a lawsuit, correct?

9  A.    Correct.

10 Q.    And Miss George told her doctor in this note that she

11 is very pleased with what she's been able to accomplish over

12 the last year, correct?

13 A.    Yes.

14 Q.    And she was working two jobs at this time?

15 A.    Yes.

16 Q.    And she has all three of her children back?

17 A.    Yes.

18 Q.    Has a good relationship with her mother?

19 A.    Yes.

20 Q.    Okay.  And at this point, we're a little more than a

21 year out from when she was released from prison, correct?

22 A.    Correct.

23 Q.    Okay.  And there's no mention in this note --

24       MS. HARRIS:  And, Jackie, go up to the next two

25 pages so the doctor can look at the entire note.

1    BY MS. HARRIS:

2    Q.    But what I'm wanting to ask you about, I don't see any

3    mention in here by Miss George or the provider that Miss George

4    is showing any symptoms or complaints of depression.  Is that

5    correct?  And I'll let you look through it.

6    A.    Correct.

7    Q.    You also don't see any mention that she's having night

8    terrors, correct?

9    A.    Correct.

10   Q.    No mention that she's having any anxiety, correct?

11   A.    Although it's listed as a past problem, it's not

12   included as a current problem.

13   Q.    Okay.  Thank you.  And you don't see where she's

14   mentioned as having any trouble sleeping?

15   A.    I don't believe it addresses sleep one way or another.

16   Q.    Okay.  No mention of any suicidal ideations; is that

17   correct?

18   A.    Correct.

19   Q.    The next visit is on January 22 of '19.  I have 22, but

20   I think it may be 23.  Here we go.  I am right.  January 22,

21   and this is page -- the first portion of the exhibit.  It's

22   Pages 1 of 9 at the top, it indicates.

23          MS. HARRIS:  Do we have that up?  Yes.

24   BY MS. HARRIS:

25   Q.    Are you able to see that note, Doctor?

1  A.      I see January 22, 2019.

2          MS. HARRIS:  Okay.  And Jackie, why don't you go

3  ahead and scroll and let the doctor look.  There's three pages

4  on that note.  Let her do a quick review of that, and then I

5  have some questions about it.  Yes, go to the next page, and

6  even the next page.  There's three.  Let her have time to read.

7          THE WITNESS:  Yes, thank you.

8  BY MS. HARRIS:

9  Q.      Okay.  This visit was a little more than a month out

10  from the one we just looked at.  In this visit, Miss George

11  mentions a lawsuit for the first time to this provider; is that

12  correct?

13  A.      Yes.

14  Q.      She also mentions for the first time that she has some

15  anxiety, and she tells this provider about working through

16  sexual abuse she was subjected to in prison, correct?

17  A.      Yes.

18  Q.      Okay.  The next visit is July 23rd of '19.

19          MS. HARRIS:  And it looks like the 15th page down,

20  Jackie.  I don't know if that helps you.  Okay.

21  BY MS. HARRIS:

22  Q.      And we have the July 23rd note up now.  Doctor, are you

23  able to see that?

24  A.      Yes.

25          MS. HARRIS:  Okay.  Jackie, it's two pages, if you

1  could let her look at that a little bit.  Thank you.  You can

2  go to the next page.

3         THE WITNESS:  Thank you.

4  BY MS. HARRIS:

5  Q.     Okay.  On this visit, now we're in July of '19, so

6  we're a year and a half out from her release from prison,

7  correct?

8  A.     Yes.

9  Q.     Okay.  And at this visit, she tells the provider she's

10 been on Adderall since she was seven for ADHD, correct?

11 A.     Yes.

12 Q.     And in this visit, she, again, doesn't mention having

13 any depression?

14 A.     Correct.

15 Q.     And, in fact, this visit is solely centered on ADHD and

16 trying to get medication for that and back pain; is that

17 correct?

18 A.     That's correct.

19 Q.     Okay.  She does mention prison, and that that's why she

20 went off the ADH medication to start with, correct?

21 A.     Yes.

22 Q.     But no mention in this visit of any alleged sexual

23 abuse at the prison.

24 A.     Correct.

25 Q.     No mention of the lawsuit.

1  A.     Correct.

2  Q.     She is still working two jobs, however.

3  A.     I believe so, yes.

4  Q.     Okay.  Now, this was on January -- I'm sorry.  Yeah,

5  January -- July, sorry.  July 23rd of '19.  The next visit is

6  not until February 20, '20.

7            MS. HARRIS:  And Jackie, that's on Page 21 of this

8  exhibit.  And if you could let the doctor look at that a little

9  bit, and I have some questions about it.

10           THE WITNESS:  Thank you.

11           MS. HARRIS:  Go to the next page for her.  This was

12  a three-page document.  So --

13           THE WITNESS:  Thank you.  Thank you.

14  BY MS. HARRIS:

15  Q.     Okay.  So now we're February 2020, 20th of 2020.

16  That's a lot of 20s in there.

17           So we are two years and four months away from her

18  being released from prison, correct?

19  A.     Yes.

20  Q.     Okay.  And in this particular visit, she's presenting

21  far differently than she has at any of the other visits that

22  we've had with this provider, correct?

23  A.     Yes.

24  Q.     And her depression screening, which I did not note had

25  even been done previously, shows that she has severe

1  depression.  Correct?

2  A.     Yes.

3  Q.     At this visit, she says she has, quote, little interest

4  or pleasure in doing things, end quote.  Is that correct?

5  A.     Yes.

6  Q.     She indicates more than half of the days she's feeling

7  down, depressed, or hopeless.  Correct?

8  A.     Yes.

9  Q.     More than half the days, she has trouble falling

10 asleep, staying asleep, or sleeping too much, correct?

11 A.     Yes.

12 Q.     Nearly every day, she's feeling tired or having little

13 energy?

14 A.     Correct.

15 Q.     Nearly every day, she has poor appetite or is

16 overeating.

17 A.     Correct.

18 Q.     And more than half the days, she's feeling bad about

19 herself, that she's a failure, or she's let herself or her

20 failure down -- or her family down, excuse me.

21 A.     Correct.

22 Q.     And several days she's thought she might be better off

23 dead and has thought about hurting herself.

24 A.     Correct.

25 Q.     Okay.  And she presented to the clinic specifically at

1  this point for depression, for the first time that she's

2  actually seen this provider for depression since she began

3  treating with the provider in September of '18.  Correct?

4  A.      Correct.

5  Q.      She's also tearful for the first time.

6  A.      Correct.

7  Q.      She talks about the lawsuit?

8  A.      Correct.

9  Q.      She mentions having night terrors for the first time

10 ever to this provider.

11 A.      Correct.

12 Q.      And she is now not working.

13 A.      Correct.

14 Q.      She also indicates that a counselor at her attorneys'

15 office told her she may have PTSD, correct?

16 A.      Correct.

17 Q.      Okay.  Before this visit, Miss George had not exhibited

18 any signs or symptoms of PTSD in her treatment with this

19 provider, correct?

20 A.      The provider had not documented any.  I don't know what

21 the -- the provider had not observed or documented any up to

22 this point.

23 Q.      Okay.  Is it typical that a provider would document if

24 someone came in and told them they were having night terrors?

25 A.      It depends on the questions that are asked, I think is

1    what this comes down to.  What we saw in the previous notes was

2    depression, we'll do a screening later.  Here is where they did

3    the screening and where all the symptoms are reported.  It's

4    kind of -- it's unclear to me whether or not this just never

5    came up before, like they never asked about these specific

6    symptoms before.  They refer to doing a screening in the

7    future, and this is the day they did it.  Or is it that the

8    symptoms were not present, and then they were present at this

9    time.  So it's not clear to me if it wasn't asked for or if

10   they just weren't present.

11   Q.    Well, the symptoms that she did tell the doctor about,

12   or her current condition that she told the doctors about in the

13   other visits is far different from what she's told the doctor

14   here.

15   A.    Yes.  I think this is the nurse practitioner, yes.

16   Q.    Okay.  And I apologize for that.  In the other visit

17   she's working.

18   A.    Yes.

19   Q.    Two jobs.

20   A.    Yes.

21   Q.    In the other visit, she's talking about how she's

22   feeling better.

23   A.    Yes.

24   Q.    She's doing well.

25   A.    Yes.

1   Q.      She's proud of what she's accomplished.

2   A.      Yes.

3   Q.      You see none of that here.

4   A.      Correct.

5   Q.      Okay.  Miss George also talked about being bipolar

6   years ago; is that correct?

7   A.      That's what the note says, yes.

8   Q.      Okay.  And in the general appearance --

9           MS. HARRIS:  Which is probably on at least the

10  second page, Jackie.

11  BY MS. HARRIS:

12  Q.      Yeah, second page near the bottom under examination,

13  the doctor -- or the nurse practitioner, excuse me, noted that

14  she was very emotional and upset.  Is that correct?

15  A.      Yes.

16  Q.      Okay.  And that's not something we've ever seen noted

17  by this doctor in any of the visits over the course of a year

18  and a half that Miss George had been treating with this

19  provider.

20  A.      That's correct.

21  Q.      Okay.  Now, I note that this provider diagnosed her

22  with acute depression.  That's at the top of the next page, the

23  third page.  It's the sixth finding up there.  Do you see that

24  at the very top?

25  A.      I do, yes.

1   Q.    Okay.  And it says it's -- primary it has after it.  So

2  let's talk first of all, I think we're all familiar with

3  depression, you've talked about that.

4         What does the word acute mean in front of that?

5   A.    I think what this provider wants to communicate is that

6  this is new onset.

7   Q.    Okay.  And what does primary mean in the parentheses

8  after that, if you know?

9   A.    That this is the primary diagnosis or the diagnosis of

10  the greatest focus at this time.

11   Q.    Okay.  And the next visit with this provider is about

12  four months later on June 2nd.

13        MS. HARRIS:  Which is Page 18 of the exhibit,

14  Jackie.  If we could give the doctor a minute to look at that,

15  and the jury.

16  BY MS. HARRIS:

17   Q.    I think there's two pages, Doctor.

18   A.    Thank you.

19   Q.    Okay.  And did you look at the second page yet?  No?

20  You're getting there now?  Okay.

21   A.    Thank you.

22   Q.    Okay.  In this visit, Miss George is still complaining

23  about depression; is that correct?

24   A.    Yes.

25   Q.    However, she's had some mild -- or some improvement,

1  I'm sorry, not mild.  Improvement with medication.  Correct?

2  A.     Yes.

3  Q.     Now, in this particular record, there's no mention

4  about the alleged sexual assault at the prison or the lawsuit.

5  A.     That's correct.

6  Q.     Okay.  And I don't see that we have any other later

7  records for Miss George.  Are you aware of any other records

8  for Miss George?

9  A.     I am not.

10  Q.     Okay.  Let's talk about Miss Zieser.  You spoke with

11  her on November 11, 2019; is that correct?

12  A.     Yes.

13  Q.     You spoke to her for about an hour?

14  A.     Yes.

15  Q.     And you didn't actually have any medical records to

16  review for any care that she's had at any point, correct?

17  A.     Correct.

18  Q.     Okay.  And you have opined here today that all of the

19  symptoms and problems emotionally, mentally that Miss Zieser

20  has relate to her alleged assault by Mr. Bearden; is that

21  correct?

22  A.     I might narrow it a little bit.  I would say that the

23  symptoms and the problems that I describe in my report I link

24  to post-traumatic stress symptoms related to the assaults.

25  Q.     Okay.  And that has to do with, particularly for Miss

1  Zieser, the problems she has with hearing keys, the problems

2  with open spaces, the problems with struggling with intimacy;

3  is that what you're saying?

4   A.      Amongst others, yes.

5   Q.      Okay.  What are the others because I didn't get those

6  down, I'm sorry.

7   A.      Problems being in a closed space, problems having the

8  door closed on her, problems being around men.

9   Q.      What problems does Miss Zieser have mentally or

10 emotionally that you do not relate to the alleged assaults by

11 Mr. Bearden?

12  A.      I'm not sure if I can identify any at this time.

13  Q.      Okay.

14  A.      I think my recall is mainly of the problems that I

15 included in my report.

16  Q.      Okay.  So just so we're clear, all of the problems that

17 you believe -- you have opined or found Miss Zieser to have,

18 then back to my original question, you do relate to the alleged

19 assault by Mr. Bearden?

20  A.      Yes.

21  Q.      Okay.  Miss Zieser did not disclose the abuse when she

22 was in prison; is that correct?

23  A.      Correct.

24  Q.      She likewise didn't disclose it immediately following

25 her release.

1   A.      Correct.

2   Q.      She began having panic attacks while she was in prison;

3   is that right?

4   A.      Yes.

5   Q.      Okay.  And you spoke with her about her capacity to

6   function in an intimate relationship since leaving prison; is

7   that correct?

8   A.      Yes.

9   Q.      And that's including as a marital partner?

10  A.      Yes.

11  Q.      Okay.  She has gotten married since she left prison?

12  A.      Yes.

13  Q.      Do you know that?

14  A.      Yes.

15  Q.      Okay.  And she actually has a ten-month-old baby; is

16  that correct?

17  A.      I don't think I knew that.

18  Q.      Okay.  She testified that she did, so you don't have

19  any reason to disbelieve that.

20  A.      Correct.

21  Q.      Okay.  The only traumatic experience Miss Zieser told

22  you about in her life was the alleged assaults in prison by

23  Mr. Bearden, correct?

24  A.      Correct.

25  Q.      Okay.  Do you know if Miss Zieser had any traumatic

1  events in her life prior to going to prison?

2  A.    I don't recall any.

3  Q.    Okay.  You're unaware that she had been diagnosed with

4  bipolar and depression when she was 19 or 20?

5  A.    I don't think I had that information.

6  Q.    Okay.  Did you have the opportunity to review her

7  deposition?

8  A.    I don't believe I did.

9  Q.    Okay.  She testified that before she went to prison,

10  she had serious problems with anxiety and depression.  Are you

11  aware of that?

12  A.    I don't think I was.

13  Q.    Okay.  She also testified that she suffered child abuse

14  at the hands of her mother.  Are you aware of that?

15  A.    I don't recall that.

16  Q.    Okay.  She testified she abused drugs prior to going to

17  prison.  Were you aware of that?

18  A.    I don't recall.

19  Q.    Okay.  She testified her two oldest children had been

20  removed from her home and have been adopted by their parental

21  grandparents; are you aware of that?

22  A.    I don't recall.

23  Q.    Okay.  I assume you're not aware that she's not allowed

24  to have contact with them now?

25  A.    Correct.

1  Q.      Are you aware that her oldest children's father had

2  been brutally murdered?

3  A.      No.

4  Q.      Were you aware that she described on the stand in her

5  testimony earlier that the murder of that man, the father of

6  her two children, was very traumatic for her?

7  A.      I wasn't aware until now.

8  Q.      Okay.  Something like that can be very traumatic for a

9  person, the murder of someone you love?

10  A.      Can be, yes.

11  Q.      Okay.  You would not be surprised if, indeed, when Miss

12  Zieser was asked to talk about that particular event, that she

13  broke down crying on the stand, correct?

14  A.      Correct.

15  Q.      Okay.  Were you aware that she had an abusive

16  relationship with another man after -- between high school and

17  going to prison?

18  A.      I don't recall.

19  Q.      Okay.  Were you aware that that man would beat her in

20  front of her children?

21  A.      I don't recall.

22  Q.      Okay.  Now, no medical provider other than yourself has

23  actually diagnosed Miss Zieser with PTSD, correct?

24  A.      Not to my knowledge.

25  Q.      Okay.  Since you didn't have all of that background

1  that we just talked about and you don't have any medical

2  records, you really aren't able to tell us whether or not Miss

3  Zieser had any of the symptoms that you relate to

4  post-traumatic stress disorder prior to going to prison and

5  having these alleged attacks, correct?

6  A.    Correct.

7  Q.    Okay.  Let's talk about Miss Betz.  Your opinion is

8  that Miss Betz's problems, mental and -- the emotional problems

9  is what I should say, all relate back to the alleged conduct of

10  Mr. Bearden at the prison; is that correct?

11  A.    Correct.

12  Q.    Okay.  You understood that Miss Betz was the victim of

13  sexual abuse prior to ever going to prison; is that correct?

14  A.    Yes.

15  Q.    And that included being raped by three men in a

16  bathroom in Memphis after she ran away from home when she was

17  15?

18  A.    I thought it was 16, but yes.

19  Q.    Okay.  In a teenaged year, that happened to her?  Okay.

20  That could be, obviously, a very, very traumatic event,

21  correct?

22  A.    Yes.

23  Q.    Okay.  You would not be surprised if I were to tell you

24  that when Miss Betz was asked to talk about that by her

25  attorney in her testimony, about that horrific assault, that

1 she broke down crying on the stand.

2 A.    Correct.

3 Q.    Okay.  Now, in your report, you have actually written

4 that Miss Betz did not experience the types, intensity, or

5 impact of PTSD on her daily life prior to these alleged attacks

6 by Mr. Bearden.  Is that correct?

7 A.    Correct.

8 Q.    Okay.  And you found Miss Betz to be currently, quote,

9 experiencing clinical significant distress and a decreased

10 ability to function.  Correct?

11 A.    Yes.

12 Q.    Okay.  And you felt those problems that you put into

13 that bucket included the night terrors, a relapse into drug

14 usage, and an avoidance of intimacy; is that correct?

15 A.    Yes.

16 Q.    And your report indicates that she avoids touching,

17 even with her husband, correct?

18 A.    Yes.

19 Q.    Okay.  If she testified on the stand that she has no

20 trouble with her husband touching her but she doesn't like

21 other people to touch her, that's slightly different than what

22 you based your opinions on, correct?

23 A.    Yes, that is slightly different.

24 Q.    Okay.  And she also told you and you believed in

25 reaching your opinion that she had no problems with intimacy

1  prior to going to Chillicothe, despite these three men having

2  raped her and that she broke down about?

3  A.    I don't think that my report reflected no problems with

4  intimacy, but that she was able to enjoy intimacy prior to

5  prison.

6  Q.    So she did have some problems with intimacy related

7  back to some of her pre-existing traumas.

8  A.    I don't know if she did or not, but my recall of her

9  report is that she was able to enjoy intimacy.  So there may

10 have been problems, but they weren't so significant that she

11 couldn't also enjoy intimacy.

12 Q.    Did you understand that Miss Betz had all of those

13 problems that we just went over, the night terrors, was using

14 drugs, and avoiding intimacy, even prior to ever going to

15 prison?

16 A.    I'm sorry, was the question did I know that?

17 Q.    Yes.

18 A.    I did not.

19 Q.    Okay.  If she was, that's different than what you based

20 your opinions on, correct?

21 A.    Yes.

22 Q.    Okay.  And like Miss George and Miss Zieser, Miss Betz

23 did not tell anyone in prison about the alleged abuse while she

24 was in prison.

25 A.    Correct.

1  Q.      She also didn't tell anyone about it until she was

2  released and had filed this lawsuit a couple of years later.

3  A.      I don't know.

4  Q.      Okay.  I'm going to refer you to some other records

5  from healthcare provider -- we're going to look at records from

6  when Miss Betz went into a drug rehab program.

7          MS. HARRIS:  This is Exhibit 29, and I don't

8  necessarily see that on the list that we have stipulated to.  I

9  would like to offer that, if you guys could look and see.  I

10 would like to offer Exhibit 29.

11         MR. ROEDIGER:  No objection, Your Honor.

12         THE COURT:  Exhibit 29 will be admitted.

13      (Defendant's Exhibit 29 was admitted into evidence.)

14         MS. HARRIS:  Thank you.

15 BY MS. HARRIS:

16 Q.      Did you have the opportunity, Doctor, to review the

17 records from Preferred Family Healthcare of Missouri for Miss

18 Betz?

19 A.      I believe so.  When I see the document, I'll be able to

20 confirm that.

21         MS. HARRIS:  All right.  Let's pull up Exhibit 29,

22 if we can.

23 BY MS. HARRIS:

24 Q.      Would you rather see a hard copy?

25 A.      Whatever is easiest.

1  Q.     Okay.  Thank you.

2          One of the reasons that Miss Betz went to Preferred

3  Family Healthcare of Missouri was due to a relapse in drugs,

4  and she was going to go into a program; is that your

5  understanding?

6  A.     Yes.

7          MS. HARRIS:  Okay.  And let's look to RFP076.  It's

8  on the bottom, Jackie.  Did you find it?  Yeah.  Okay.  So

9  we're starting with RFP074.  Those are pages at the bottom.

10         You guys have a copy; is that right?  I just want to

11 make sure.

12 BY MS. HARRIS:

13 Q.     This is the beginning, Doctor, as I understand it.  I'm

14 going to let you look through this.  This is a very long

15 document, actually.  But as I understand it, this is the intake

16 form from when she was going into this drug program.

17         MS. HARRIS:  So if you could, Jackie, scroll through

18 this a little bit.  And we're going to stop on Page 79, RFP079,

19 which is the fourth page into this.

20 BY MS. HARRIS:

21 Q.     Do you see that, Doctor?

22 A.     I do.

23 Q.     Are you familiar with this at all?

24 A.     I am.

25         MS. HARRIS:  Go to the next page, Page 4.  This is

1  what we want to talk about.  And go down so we can see the top

2  of it.

3   BY MS. HARRIS:

4   Q.     So this is a mental health screening that, as I

5  understand, Miss Betz took as part of entering this drug

6  program which she entered in April of '18.  Is that your

7  understanding?

8   A.     Yes.

9   Q.     Okay.  And just so we're clear, Miss Betz actually got

10  out of prison on -- in July of '16, so we are almost two years,

11  almost two years post her release from Chillicothe Correctional

12  Center, correct?

13  A.     Correct.

14  Q.     Okay.  And on this mental health intake form, which is

15  BetzRFP079, there are several questions, and we're going to

16  talk about these.

17          So the first one is, "Within the past month [sic],

18  have you talked to a psychiatrist, psychologist, therapist,

19  social worker, counselor" --

20          (Reporter interruption.)

21          MS. HARRIS:  I can, I'm sorry.

22          THE COURT:  And I think generally it would help if

23  you just talked a little bit more slowly.

24          MS. HARRIS:  I will try.  I've done that since high

25  school debate, and I will try very hard to slow down, I

1  apologize.

2          THE COURT:  Please do.

3  BY MS. HARRIS:

4  Q.      "Within the past 12 months, have you talked to a

5  psychiatrist, psychologist, therapist, social worker, or

6  counselor about an emotional problem?"  Do you see that?

7  A.      Yes.

8  Q.      Miss Betz's answer was no?

9  A.      Correct.

10  Q.      Okay.  The next question.  "Within the past 12 months,

11  have you felt you needed help with your emotional problems, or

12  have you had people tell you you should get help for your

13  emotional problems?"  Do you see that question?

14  A.      Yes.

15  Q.      And Miss Betz's answer was no.

16  A.      Correct.

17  Q.      Third question.  "Within the past 12 months, have you

18  been advised to take medication for anxiety, depression,

19  hearing voices, or any other emotional problems?"  Did I read

20  that correctly?

21  A.      Correct.

22  Q.      Miss Betz's answer was no, correct?

23  A.      Correct.

24  Q.      Yes, I'm sorry.  Thank you.

25          Fourth question.  "Within the past 12 months, have

1  you been seen in a psychiatric emergency room or been

2  hospitalized for psychiatric reasons?"  Miss Betz's answer was

3  no, correct?

4  A.      Correct.

5  Q.      Skipping to (6).  "Within the past 12 months, have you

6  been depressed for weeks at a time, lost interest or pleasure

7  in most activities, had trouble concentrating and making

8  decisions or thoughts about killing yourself?"  And Miss Betz

9  answered no, correct?

10  A.      Correct.

11  Q.      The next question, "Within the past 12 months, did you

12  attempt to kill yourself?"  Answer is no on that, as well.

13  A.      Correct.

14  Q.      Next question.  "Within the past 12 months, have you

15  had nightmares or flashbacks as a result of being involved in

16  some traumatic, terrible event?  For example, warfare, gang

17  fights, fire, domestic violence, rape, incest, car accident,

18  being shot or stabbed?"  Did I read that correctly?

19  A.      Yes.

20  Q.      Okay.  And the answer to that is no.

21  A.      Correct.

22  Q.      Okay.  Next question, within the past months, have you

23  experienced any strong fears?  For example, of heights,

24  insects, animals, dirt, attending social events, being in a

25  crowd, being alone, being in places where it may be hard to

1 escape or get help?  Did I read that correctly?

2  A.      Yes.

3  Q.      And Miss Betz answered no to that question, as well,

4 correct?

5  A.      Yes.

6  Q.      I'm sorry?  Thank you.

7          I'm going to skip to Question 11.  "Within the past

8 12 months, have you felt people have something against you

9 without them necessarily saying so, or that someone or some

10 group may be trying to influence your thoughts or behavior?"

11 And she answered no, correct?

12  A.      Correct.

13  Q.      The next Question, 12.  "Within the past months, have

14 you experienced any emotional problems associated with your

15 sexual interest, your sexual activity, or your choice of sexual

16 partners?"  And she said no to that, as well, correct?

17  A.      Correct.

18  Q.      Flipping down to 15, "Within the past 12 months, have

19 you had spells or attacks when you suddenly felt anxiety,

20 frightened, uneasy to the extent that you have begun sweating,

21 your heart has begun beating rapidly, you were shaking or

22 trembling, your stomach was upset, you felt dizzy or unsteady

23 or as if you would faint?"  And Miss Betz answered no; is that

24 correct?

25  A.      Correct.

1  Q.      And I think there is -- no, that's the end of that.

2          The top of that page actually gave directions to

3  Miss Betz on what she was supposed to be looking for when she

4  answered each of these, correct?

5  A.      Correct.

6  Q.      Okay.  And specifically it said, "Each item refers to

7  the past year of your life, not just your current situation."

8  Correct?

9  A.      Yes.

10 Q.      And it explains that that's why each of those questions

11 I read starts with "within the past 12 months," correct?

12 A.      Correct.

13 Q.      So this gives us a window into how Miss Betz was doing

14 from April '17, which is almost a year after she's been

15 released from prison, through April of '18, correct?

16 A.      Possibly.

17 Q.      If she's being truthful, it does?

18 A.      If she's reporting accurately, it does.

19 Q.      Do you think it's possible she's not reporting

20 accurately?

21 A.      Yes.

22 Q.      Okay.  It's possible she's not reporting accurately to

23 you, as well, correct?

24 A.      Yes.

25 Q.      Okay.  Now, you're telling the jury today that Miss

1  Betz has many of the problems that are asked about in this

2  particular questionnaire now, correct?

3  A.    At the time that I assessed her, yes.

4  Q.    Okay.  And your assessment was when?

5  A.    I assessed her in 2019.

6  Q.    Okay.  So in 2019, you believe she had many of the

7  problems that she denied having in April of '18?

8  A.    Correct.

9  Q.    Okay.  You don't actually know what problems she has

10  today.

11  A.    Correct.

12  Q.    Okay.  We're going to -- we're going to look next at

13  92, RFP092, which is still part of this assessment.

14        MS. HARRIS:  If you could get that, Jackie.  92,

15  you're getting there.  Okay.

16  BY MS. HARRIS:

17  Q.    I want to look at this page with you, if we could, the

18  interpretive summary.

19        MS. HARRIS:  Go up a little bit more so we can see

20  most of the interpretive summary, if you would.  Thank you.

21  BY MS. HARRIS:

22  Q.    In this particular summary under mental health

23  status/psychological/psychiatric history, they've written here

24  that Miss Betz told them -- consumer, which that would be Miss

25  Betz; is that your understanding?

1    A.    Yes.

2    Q.    Okay.  "Reports history anxiety, and currently

3    prescribed medication."  Is that correct?

4    A.    I'm not tracking where we're at.  Sorry.

5    Q.    Well, let me withdraw that question anyway.  I wanted

6    to ask you a different question.

7              Go up two lines.  Do you see where it says

8    employment -- stay on the same thing.  Employment/education?

9    A.    Yes.

10   Q.    Okay.  Next to that or below that is social

11   connectedness?

12   A.    Yes.

13   Q.    Okay.  And that says, "Consumer reports family history

14   of addiction," correct?

15   A.    Correct.

16   Q.    And it says consumer reports denied -- or denies past

17   trauma.  Correct?

18   A.    Correct.

19   Q.    Okay.  Now, as far as you understand, Miss Betz was put

20   into this program; is that correct?

21   A.    Yes.

22   Q.    And everything we've just seen is what she reported

23   when she was doing the intake in April of '18?

24   A.    Yes.

25   Q.    Okay.  We're going to look now to the July 2, 2018,

1  note.

2          MS. HARRIS:  It's RFP069.  Actually start with 68 so

3  we can see the first page, I apologize.

4  BY MS. HARRIS:

5  Q.  So this is what we wanted to look at.  This is a note

6  from July 2, 2018.  Do you see that at the top?

7  A.  I do.

8  Q.  Okay.  And this would be 63 days after the rehab

9  program that we just went over in April.

10          MS. HARRIS:  And go to the second page, if you would

11  now, Jackie, of this particular note.

12  BY MS. HARRIS:

13  Q.  And under the HPI -- what does that mean, Doctor?  Do

14  you know?

15  A.  History of present illness.

16  Q.  Thank you.  And in this particular place, she does

17  write now that patient states, I had an overdose, I had a

18  sexual trauma in prison.  I have a lot of anxiety.  DFS is

19  investigating my son's issue -- I can't read that.  Patient

20  last use three weeks, is that what you think that says?

21  A.  Yes.

22  Q.  Okay.  "For everything.  Cravings and using dreams.

23  Flashbacks all of the time day and night."  Correct?

24  A.  Correct.

25  Q.  This is a very different picture just 63 days later

1  than what she told them when she was doing the intake in April.

2  A.      It is very different, yes.

3  Q.      Okay.  And, in fact, in addition to having told them

4  about the sexual trauma in prison, she also has the trauma or

5  the problem of DFS investigating her son's issues; is that

6  correct?

7  A.      Yes.

8  Q.      And her son had actually been taken from her is why she

9  was entering this at all; is that correct?

10  A.      Yes.

11  Q.      Okay.  Let's look to the next page, Page 70, if we

12  could.  And go to the description of abnormal or psychotic

13  thoughts, if you could look at that.

14  A.      Yes.

15  Q.      Okay.  In this particular note, she indicates

16  "Flashbacks in the day and evenings of sexual trauma in

17  prison."  Is that correct?

18  A.      Yes.

19  Q.      Other sexual traumas from childhood.  It says, "and

20  other sexual traumas from childhood," correct?

21  A.      Yes.

22  Q.      "Patient reports no hallucinations or suicidal

23  ideations.  Overdose three weeks ago."

24  A.      Correct.

25  Q.      Down under mood and affect on that same page, it says,

1  "Depression high, suicide attempt three weeks ago, anxiety,"

2  and she indicates she is on a roller coaster, correct?

3  A.    Yes.

4  Q.    Under other findings, she also indicates flashbacks and

5  that her grandma died while she was in prison, which she said

6  complicated grief issues, correct?

7  A.    Correct.

8  Q.    And it says that she denies post-partum, though she's

9  very -- though had a very traumatic event of losing her son to

10  DFS right after his delivery.  Is that correct?

11  A.    Yes.

12  Q.    That would be something that would be a trauma, I would

13  assume?

14  A.    It would be highly distressing.  It wouldn't be a

15  trauma in the sense of the way we've been describing trauma or

16  categorizing trauma related to the diagnosis.

17  Q.    Okay.  Let's look now to 95, and we are almost done

18  with this, I promise.

19         MS. HARRIS:  RFP095, and we may need to start

20  with -- start with Page 93 to see the first page.

21  BY MS. HARRIS:

22  Q.    The first page shows that this is a note from July 23rd

23  of 2018; is that correct?

24  A.    Yes.

25         MS. HARRIS:  Okay.  And then, Jackie, take us to the

1  third page of this, 95.

2  BY MS. HARRIS:

3  Q.      At the very top of this, it indicates -- the date

4  range, and it says 7/13, and it says the patient reports not

5  having any flashbacks or bad dreams at all for the past week.

6  Patient reports, I'm feeling better, emotionally happier.

7  Still having some thoughts, but I am happy.  She reports, "I'm

8  happy and really sad rapidly"; is that correct?

9  A.      Yes.

10  Q.      Is being happy and really sad fast a sign of or a

11  condition of -- associated with PTSD?

12  A.      It's a sign of some kind of emotional disregulation or

13  emotional instability, but not specific to PTSD.

14  Q.      Is it actually sometimes associated with bipolar?

15  A.      Not the rapidity that's being described here.  Bipolar

16  is more of an interval of several weeks where somebody is

17  really up and an interval of several weeks where somebody is

18  down.

19  Q.      Okay.  Thank you.  We're going to next turn to Miss

20  Keil.

21          THE COURT:  I think this is a good time to take our

22  lunch break.

23          MS. HARRIS:  Okay.

24          THE COURT:  Ladies and gentlemen, it's 12:36.  So

25  why don't we take an hour break, and we'll come back in at

1    1:40.

2            Again, as you know well, during this break, don't

3    discuss the case among yourselves, don't discuss the case with

4    anyone else, don't permit the case to be discussed in your

5    presence, don't do any type of research, internet or otherwise,

6    and don't post anything on the internet about this.

7            We will be in recess until 1:40.

8            (The following proceedings were had in the courtroom

9    out of the presence of the jury:)

10           THE COURT:  Thank you, ma'am, you may step down.

11           I have a telephone conference that started -- well,

12   it won't start without me -- at 12:30, but I would -- and so if

13   you have something that you want to discuss, let Shauna know

14   and I'll come out early before we resume after lunch.  If you

15   have additional exhibits that you intend to introduce, if you

16   could let --

17           MS. HARRIS:  Sure.

18           THE COURT:  -- plaintiffs' counsel know so we could

19   get through that more quickly, I would appreciate it.

20           (A recess was taken from 12:37 p.m. to 1:32 p.m.)

21           THE COURT:  So it's my understanding that the

22   parties would like to admit some exhibits before resuming with

23   evidence; is that correct?

24           MR. TAULBEE:  That's correct, Your Honor.  Based on

25   the parties' agreement, the defendants would offer Defendant's

1  Exhibits 1 through 15.

2          THE COURT:  Okay.  Let's start with that.  Any

3  exhibit -- any objection to Exhibits 1 through 15?

4          MS. McGRAUGH:  No objection, Your Honor.

5          THE COURT:  Defendant's 1 through 15 will be

6  admitted.

7          (Defendant's Exhibits 1-15 were admitted into

8  evidence.)

9          MR. TAULBEE:  22 through 30.

10          THE COURT:  Any objection to 22 through 30?

11          MS. McGRAUGH:  No, Your Honor.

12          THE COURT:  Exhibits 22 -- Defendant's 22 through 30

13  will be admitted.

14          (Defendant's Exhibits 22-30 were admitted into

15  evidence.)

16          MR. TAULBEE:  Defendant's 32 and 33.

17          THE COURT:  I think those were admitted.

18          MR. TAULBEE:  Just a little bit ago?

19          THE COURT:  Yes.  Any other exhibits?

20          MR. TAULBEE:  Defendant's 40 through 199, I believe.

21          THE COURT:  40 through 199?  Any --

22          MR. TAULBEE:  I can do it 40 through 43 might be

23  easier.  I can do it in chunks.

24          THE COURT:  Okay.  Any objection to 40 through 43?

25          MS. McGRAUGH:  No, Your Honor.

1          THE COURT:  Exhibits 40 through 43 will be admitted.

2          (Defendant's Exhibits 40-43 were admitted into

3     evidence.)

4          MR. TAULBEE:  Exhibits 44 through 110, which are the

5     chronological logs from MDOC.

6          MS. McGRAUGH:  No objection, Your Honor.

7          THE COURT:  44 through 110?

8          MR. TAULBEE:  Yes, ma'am.

9          THE COURT:  Okay.

10          (Defendant's Exhibits 44-110 were admitted into

11    evidence.)

12          MR. TAULBEE:  Then Defendant's 111 through 199,

13    which are photos from Chillicothe Correctional Center.

14          THE COURT:  Any objection to 111 through 199?

15          MS. McGRAUGH:  No, Your Honor.

16          THE COURT:  Exhibits 111 through 199 will be

17    admitted.

18          (Defendant's Exhibits 111-199 were admitted into

19    evidence.)

20          THE COURT:  And then were there any exhibits to

21    admit from Plaintiffs' Exhibit list?

22          MR. ROEDIGER:  No, Your Honor.

23          MS. McGRAUGH:  Your Honor, are 21 and 22 admitted?

24    I believe they were, but I was just double checking.

25          THE COURT:  21 and 22 were admitted.

1              MS. McGRAUGH:  Thank you.

2              THE COURT:  No other exhibits?

3              MS. McGRAUGH:  No, Your Honor.

4              MR. ROEDIGER:  No, Your Honor.

5              THE COURT:  We still have about five minutes before

6    the jury is back.  I guess I should ask, any other topics I can

7    discuss while the jury is out?

8              MR. TAULBEE:  Nothing from defendant.

9              MS. McGRAUGH:  Nothing from plaintiffs, Your Honor.

10             THE COURT:  Just to clarify, if parties, attorneys,

11   anyone wants to leave during -- feels the need or needs to

12   leave or chooses to leave, I'm fine with that.  Obviously, Miss

13   Betz, we need some heads-up if you need to leave so it's not

14   apparent that you're in custody.  Other than that, if anyone

15   feels the need to leave, I have no problem with that.  Don't

16   need a warning, don't need permission, don't need requests,

17   nothing of the sort.  Other than the attorney who is handling

18   the witness who is on the stand.  With that big exception,

19   everyone else is free to come and go as they wish.

20             When the jury is here, I'll come back out.

21             MS. McGRAUGH:  Thank you, Your Honor.

22             (A recess was taken from 1:36 p.m. to 1:41 p.m.)

23             THE COURT:  So I would ask that if the witness could

24   take the -- sorry.  I couldn't see you back there.  If you

25   could go ahead and take the stand again.  And I think the jury

1   is back from lunch, so if we could bring them out.  Then, Ms.

2   Harris, we're going to move right into your continued cross.

3              (The following proceedings were had in the courtroom

4   in the presence of the jury:)

5              THE COURT:  Ms. Harris, are you ready to continue

6   with your cross?

7              MS. HARRIS:  I am.  Shall I proceed?

8              THE COURT:  You may proceed.

9              MS. HARRIS:  Thank you.

10                             - - -

11                 RESUMED CROSS-EXAMINATION

12   By Ms. Harris:

13   Q.     Doctor, before our lunch break, we were getting ready

14   to talk about your opinions regarding Miss Keil.

15   A.     Yes.

16   Q.     My understanding is that you have opined after talking

17   with Miss Keil over a video connection for about 60 to 90

18   minutes that her current symptoms, in your opinion, relate to

19   the alleged trauma that she sustained at the Chillicothe

20   Correctional Center; is that correct?

21   A.     Yes.  Just to clarify, the symptoms that were current

22   at the time of my assessment.

23   Q.     Okay.  And again, that was in 2019?

24   A.     Correct.

25   Q.     As far as her symptoms that she may have today and what

1  the cause of them may be, you don't have any particular

2  opinion?

3   A.     Correct.

4   Q.     Okay.  You had a history from Miss Keil or from the

5  records you reviewed that she had a history of sexual assaults

6  prior to going to prison; is that correct?

7   A.     Yes.

8   Q.     And, in fact, she was raped by a brother -- or I'm

9  sorry, her brother's friend when she was a teenager; is that

10  correct?

11   A.     I don't recall who it was, but when she was a teenager,

12  she did have an assault.

13   Q.     Okay.  And she was also raped by a coach when she was

14  in high school; is that correct?

15   A.     Yes.

16   Q.     She was raped by an executive at a company that she was

17  working for when she was older than a teenager; is that your

18  understanding?

19   A.     I didn't have that information.

20   Q.     Okay.  Do you have the information that she was raped

21  by an accountant who had been contracted to do some work for a

22  company she was working for?

23   A.     No.

24   Q.     So the only understanding of the pre-existing sexual

25  trauma she had sustained was two when she was a teenager, you

1  were unaware of the other two she testified about earlier this
2  week.

3  A.    Correct.

4  Q.    Okay.  She told you that she doesn't like to talk about
5  her problems with medical providers; is that correct?

6  A.    Correct.

7  Q.    Okay.  She also told you she was able to put her
8  previous assaults out of her mind.

9  A.    Yes.

10  Q.    And that would be all four of those that we talked
11  about, as you understand now.

12  A.    Yes.

13  Q.    Okay.  She told you she was not preoccupied with them,
14  she was functioning without daily problems prior to going to
15  prison; is that correct?

16  A.    Correct.

17  Q.    You noted, however, I'm assuming when you reviewed the
18  records, that when she first arrived at prison, she sought out
19  mental therapy or therapy for mental and emotional problems; is
20  that correct?

21  A.    I wasn't sure if it was when she just arrived, but when
22  she was in prison, yes --

23  Q.    Okay.

24  A.    -- she did seek out mental health support.

25         MS. HARRIS:  Judge, we're going to look at Exhibit

1  24 now, which has been previously admitted.  So, Jackie, if you

2  could pull that up.

3   BY MS. HARRIS:

4   Q.     Can you see that, Doctor?

5   A.     Yes.

6   Q.     It looks like it's getting published everywhere.  I

7  would purport to you that this is the part of the medical

8  records for Miss Keil while she was incarcerated with Missouri

9  Department of Corrections.  Would you agree with that?  Is that

10  your understanding?

11  A.     Yes.

12  Q.     Okay.  And if we look at the second note on this page

13  from 11/1 of '11, that is a note regarding treatment or a visit

14  that Miss Keil had with a provider at Missouri Department of

15  Corrections; is that correct?

16  A.     Yes.

17  Q.     She went into Missouri Department of Corrections on

18  July 19 of 2011, so this is about four months after she arrived

19  at DOC; would you agree with that?

20  A.     Yes.

21  Q.     Okay.  And in this note, she tells the provider that

22  she had started working on coping with her past trauma before

23  coming to prison, and she would like to continue with the

24  progress she's made; is that correct?

25  A.     Yes.

1  Q.    Okay.  And she said she's interested in taking the

2  trauma class offered in mental health department.  She talked a

3  lot about her past and seems that the trauma group would be

4  very beneficial to her.  Is that correct?

5  A.    Yes.

6  Q.    So at least at this point in her life, in November of

7  2011 when she arrived at prison -- in prison with DOC, she was

8  able to talk about her problems; is that correct?

9  A.    Yes.

10  Q.    Okay.  And she also indicated in October -- I'm sorry,

11  November of 2011 that she felt like she was still working on

12  dealing with those past traumas that we've talked about.

13  A.    Yes.

14  Q.    Okay.  If we look to the -- let's see here.  She did

15  attend the trauma group; is that your understanding?

16  A.    Yes.

17        MS. HARRIS:  Okay.  We're going to look to Page 6

18  now, Jackie, of the same notes.  This is still Exhibit 24.

19  BY MS. HARRIS:

20  Q.    And if we look at Page 6, you will see a note from

21  March 5, 2012.  It's near the bottom of that page, do you see

22  that?

23  A.    Yes.

24  Q.    Okay.  And on this particular day, she met with a

25  provider in response -- it says to an MSR.  Do you know what

1  that is?

2  A.     No.

3  Q.     Okay.  I think that may be a request for medical

4  services, but I'm not 100 percent certain, so I'm not going to

5  say that for the record, but since neither of us know.

6            She nevertheless met with this provider and then

7  indicates concerns about how to do therapy for the history of

8  trauma.  Is that correct?

9  A.     Yes.

10 Q.     So now we are in March of '12 and still having

11 treatment for and talking with providers about her past history

12 of trauma, correct?

13 A.     Yes.

14 Q.     And at this point, she said she wanted to do some

15 individual therapy, correct?

16 A.     Yes.

17            MS. HARRIS:  And go to the next page, if you would,

18 to see the rest of that note, please.

19 BY MS. HARRIS:

20 Q.     This note indicates that the trauma is identified as

21 consistent with PTSD.  Is that correct?

22 A.     Yes.

23 Q.     This would indicate that as early as March of 2012,

24 Miss Backues had a diagnosis of PTSD, correct?

25 A.     Or she had symptoms or identified consistent with PTSD.

1  Q.      All right.  Thank you.  And it indicates sleep, some

2  nightmares, the appetite is okay; is that correct?

3  A.      Yes.

4  Q.      Okay.  Now we're going to go to Page 11 of the same

5  exhibit.  She continued, as you understand it, to go through

6  different counseling classes that MDOC offered.  Is that your

7  understanding?

8  A.      Yes.

9  Q.      And then if we look to Page 11, on August 29, 2012, so

10 now we're not quite to a year of her being -- oh, we're over a

11 year, excuse me.  She went in in July, so she's now been in

12 prison for a year.  And she was here talking about she was

13 going to go to the board in March of '13, which I believe is

14 the parole board.  Would you agree with that, or do you have an

15 understanding?

16 A.      I would agree.

17 Q.      Okay.  It says that she has some sexual abuse history

18 and has done some counseling in the past.  Is that correct?

19 A.      Yes.

20 Q.      She states that she's interested in seeing someone once

21 a month?

22 A.      Yes.

23 Q.      And she states that she was also physically abused, and

24 her mother let it happen; is that correct?

25 A.      Yes.

1  Q.      States that as a teen, she became sexually involved

2  with a track coach, correct?

3  A.      Yes.

4  Q.      So those were all past events before she got to MDOC

5  that she's still dealing with in August of 2012, correct?

6  A.      Yes.

7  Q.      Okay.  We're going to go to Page 14 of this same

8  exhibit now, and we're going to look at a note from January 18

9  of 2013.

10         And Miss Keil saw a provider again, and I would note

11  it's -- I think it's already been established on the record,

12  but these records do say Karen Backues, but that was the name

13  she went by in prison; is that your understanding?

14  A.      Yes.

15  Q.      Okay.  If we look at the, kind of the middle of this

16  note from January 18 of 2013, we see where the patient, Miss

17  Keil, told this provider, childhood was extremely traumatic.

18  She relates that when she was 14 years old, a man on leave from

19  the service raped her several times in one afternoon.  She

20  states that for a period of X, she was involved with MOCSA -- I

21  don't know how to say that, M-O-C-S-A in Kansas City.  Are you

22  familiar with what that is?

23  A.      Yes.

24  Q.      Is that a treatment center for -- or I'm sorry, maybe

25  not a treatment center, but it's a place where people who have

1 been sexually abused can go for counseling?

2 A.     I believe the CSA stands for child sex abuse.

3 Q.     Reported that she's never come to any kind of

4 resolution on this issue, correct?

5 A.     Correct.

6 Q.     So by January of '13, she's telling a provider she's

7 not come to resolution of these childhood, teenage issues,

8 correct?

9 A.     Correct.

10 Q.     That is different from what you understood and what you

11 base your opinions on, correct?

12 A.     Not exactly.

13 Q.     Okay.  I thought you said a moment ago that you

14 understood Miss Keil had been able to put that out of her mind,

15 she was doing well.

16 A.     She was functioning at a high level and she had it out

17 of her mind, but she didn't have complete resolution.

18 Q.     So she was not preoccupied -- you understood or you

19 believed she was not preoccupied with the rapes, though.

20 A.     Correct.

21 Q.     Okay.  So it's still there.  Okay.

22        Reading on here, at this visit on January 18th of

23 2013, Miss Keil told this provider, "On a scale of 1 to 10 with

24 10 being the most severe, the patient states that at this" --

25 do you think X is time?

1    A.    Yes.

2    Q.    Okay.  "This time, her level of anxiety is a 7."  Do

3    you see that?

4    A.    Yes.

5    Q.    Okay.  7 is elevated anxiety, is it not, on a scale of

6    1 to 10?

7    A.    Yes.

8    Q.    Okay.  "The patient also states her current level of

9    depression is a 5."  Is that correct?

10   A.    Yes.

11   Q.    Does that also show a level of depression that, as a

12   psychiatrist, you would be somewhat concerned with?

13   A.    Yes.

14   Q.    Okay.  So those two, adding those two pieces of the

15   puzzle to Miss Keil as she was in January of 2023 [sic], would

16   you agree with me that she's still dealing with on a regular

17   basis these past traumas?

18   A.    I would agree that she has not resolved the past

19   traumas.  She may be dealing with those past traumas, but she

20   may also be dealing with other things that are going on at that

21   point in time.

22   Q.    She doesn't mention any other things, does she?

23   A.    She does not.

24   Q.    Okay.  Let's look at Page 15, it's the next page.  This

25   is a visit from January 29 of '13, and here again, she's

1  talking about the previous rapes.

2         MR. ROEDIGER:  Objection, Your Honor.  May we

3  approach?

4         THE COURT:  Yes.

5         (Counsel approached the bench, and the following

6  proceedings were had:)

7         MR. ROEDIGER:  I'm just trying to think ahead.

8  These are records of visits with John Dunn.  John Dunn was

9  subsequently convicted of having sexual intercourse with Kim

10  Hennessey, and the Department of Corrections sustained the

11  allegation that he also had sexual intercourse with Karen Keil.

12  And so the door is being opened in a way that it's going to be

13  hard to reshut.  And in particular, this visit is a visit where

14  those things are alleged to have occurred.

15         THE COURT:  And so what's your objection?

16         MR. ROEDIGER:  Well, I thought that we had limited

17  discussion during this trial of Mr. Dunn.

18         THE COURT:  So your thought is that by referencing,

19  eliciting testimony regarding conversations that were shared

20  during a visit with him opens the door that she was also having

21  sexual relations with him?

22         MR. ROEDIGER:  Well, this particular -- well, I

23  mean, it -- I'm saying that -- will I be allowed to come back

24  and say that?

25         MS. HARRIS:  I can -- I have about two more

1  questions, but I -- let me just say, if I could, I did not know

2  that this was a visit that involved the alleged action of what

3  I've been hearing him to say, so I can withdraw the question if

4  it's going to open up a big door I don't need to.

5          MR. ROEDIGER:  I just wanted to get ahead of it.

6          MS. HARRIS:  That's fine.  And like I said, that's

7  news to me.

8          THE COURT:  Okay.  Let's move on to another set of

9  records.

10          (The following proceedings were had in open court:)

11  BY MS. HARRIS:

12  Q.      Doctor, would you agree with me that, looking at the

13  records that we've looked at regarding Miss Keil, that she was

14  still having some ongoing conflict with the prior traumas that

15  she had had in her life?

16  A.      Yes.

17  Q.      Okay.  Understanding that Miss Keil had told you that

18  she was able to put those past traumas kind of aside and get on

19  and have a very high-functioning life, the same is -- assuming

20  that the allegations against Mr. Bearden are true and that they

21  have contributed to Miss Keil currently, it's possible that,

22  with treatment, Miss Keil could also do that with these alleged

23  traumas; is that correct?

24  A.      With the right dose and duration of treatment, it is

25  possible.  It's not guaranteed, but it's possible.

1    MS. HARRIS:  Okay.  I don't have any further

2  questions, Your Honor.

3        THE COURT:  Any redirect?

4        MR. ROEDIGER:  Briefly, Your Honor.

5                    - - -

6              REDIRECT EXAMINATION

7  By Mr. Roediger:

8  Q.    Would you be willing to go a step beyond that?  You

9  said Miss Keil has the capacity, the ability to recover from

10  what happened to her.  Would you agree that all four of these

11  women have the capacity, the ability over time with proper

12  support, proper resources to recover from what happened to

13  them?

14  A.    To recover, at least in part.  Hopefully fully recover;

15  but, knowing how difficult recovery can be for some folks, to

16  have at least improvement and maintain a goal of full recovery.

17  Q.    So your -- and I don't want to say pessimism, but we

18  left off on sort of a negative note, right?  That the future

19  was going to be difficult.  The future is not hopeless.

20  A.    No, no, not hopeless.  We should be hopeful.

21  Q.    Okay.  And there are people that, with the right

22  support, the right resources, move forward and have full lives.

23  A.    Yes.  They may have to continue to invest energy in

24  maintaining a balance and maintaining their mental health a

25  little bit more, perhaps, than someone who doesn't have a

1   history of trauma, but, no, we should be hopeful that people

2   can have full lives with the appropriate -- I said dose and

3   duration.  Access to the right professionals with the right

4   expertise.  It takes sometimes some special training and

5   expertise to be effective as a mental health professional in

6   this area.

7   Q.     So we talked about why individuals don't report acts of

8   sexual violence to people in authority.  Does that extend

9   beyond people in authority?

10  A.     Yes.

11  Q.     And who else are often not the recipients of this

12  information?

13  A.     Sometimes people who experience sexual violence don't

14  tell anyone.  They don't tell family members, they don't tell

15  their friends, they don't tell anyone.

16  Q.     So if you, for instance, in your practice, see an

17  intake sheet and somebody has marked no on every box, despite

18  the fact that they're there at a psychiatric office, right?

19  What does that tell you?

20  A.     It tells me that forms are limited and that giving

21  people boxes to check off is sometimes a start, but is in no

22  way a complete data set or a complete understanding of that

23  person.

24  Q.     In your experience, are people forthcoming with medical

25  providers about sexual abuse?

1  A.      If somebody has had a history of sexual abuse and has

2  had treatment for it and has had a way to talk about it where

3  they can have productive conversations and it doesn't bring all

4  kinds of fear or negativity, perhaps more symptoms come back,

5  if they have a way to control that, then they're much more

6  likely to disclose it.  If they don't have a way to manage it

7  because they haven't had the treatment, they don't have the

8  tools, they can't regulate, then they're less likely to

9  disclose it.

10  Q.      How does trust play into this?  I mean, common sense

11  would tell me that, you know, the first time I meet somebody

12  might not be the time, the tenth time might be.  Does trust

13  play into this?

14  A.      Yes, but trust with a capital T.  But you're looking at

15  trust that I will be believed, trust that this person will

16  respond in a supportive way, trust that this won't somehow

17  backfire on me, and trust that if I have some kind of emotional

18  response where I can't manage my emotions, that this person can

19  be supportive to me with that, as well.  So it's a lot of

20  trust.  You're really -- I think folks have a lot at stake when

21  they disclose sexual abuse, even to a health provider.

22          MR. ROEDIGER:  Thank you.  Nothing further, Your

23  Honor.

24          THE COURT:  Any recross?

25          MS. HARRIS:  Very briefly.

1                                    - - -

2                          RECROSS-EXAMINATION

3     By Ms. Harris:

4     Q.      Doctor, the reason that she went to the program where

5     we had the long list that we read, she said no to everything,

6     that was because her child had been taken away because she was

7     in trouble with Division of Family Services; is that correct?

8     A.      Well, I think that's the reason she was referred to it.

9     I think the reason she was in it was likely a combination of

10    that, plus a desire for treatment for addiction.

11              MS. HARRIS:  Okay.  Thank you very much.  Nothing

12    further.

13              THE COURT:  Doctor, we permit the jury to ask

14    written questions.  So if you could just be patient for a

15    minute, and we'll see if the jury has any written questions of

16    you.

17              Could counsel please approach?

18              (Counsel approached the bench, and the following

19    proceedings were had:)

20              THE COURT:  We only have one question.  "How much

21    time did you spend with each person?"  Any objection?

22              MR. ROEDIGER:  No objection.

23              THE COURT:  Any objection?

24              MS. HARRIS:  No.

25              (The following proceedings were had in open court:)

1      THE COURT:  Doctor, we only have one question.  I

2  will read the question to you.  After you provide an answer, if

3  the attorneys have any brief follow-up, they'll have the

4  opportunity to ask you very brief additional questions.

5                              - - -

6                          EXAMINATION

7  By the Court:

8  Q.      How much time did you spend with each person?

9  A.      The time that I spent on the videos varied a little

10  bit.  I think folks know that with Trenady George, I didn't

11  meet with her personally.  The others, it was, on average, an

12  hour.  Some were a little longer, like with Karen Keil; some

13  may have been a little less than an hour.

14      THE COURT:  Okay.  Thank you.  Any questions on

15  behalf of counsel for plaintiff?

16      MS. McGRAUGH:  No, Your Honor.

17      THE COURT:  Any questions on behalf of counsel for

18  defendant?

19      MS. HARRIS:  No.

20      THE COURT:  Okay.  Thank you, ma'am, you may step

21  down.

22      Is the plaintiff ready to call your next witness?

23      MS. McGRAUGH:  That would conclude the plaintiffs'

24  evidence, Your Honor.

25      THE COURT:  Okay.  Thank you.  Could counsel please

1  approach?

2            (Counsel approached the bench, and the following

3  proceedings were had:)

4            THE COURT:  I'm assuming that you have a motion that

5  you want to file at this point, or are you going to bypass

6  that?

7            MR. TAULBEE:  I'm going to bypass that, Your Honor.

8            THE COURT:  Are you ready to start your --

9            MR. TAULBEE:  I am, Your Honor.

10           THE COURT:  Okay, perfect.  I was going to defer

11  ruling on it because I want to move forward anyway, so I

12  appreciate that approach.

13           MS. McGRAUGH:  I did want to say that I have been

14  able to hear what you're saying up here from my seat right near

15  the jury box.

16           THE COURT:  Okay.  We'll cross that bridge.

17           MS. McGRAUGH:  I wanted you to know.

18           THE COURT:  No, I appreciate it.

19           (The following proceedings were had in open court:)

20           THE COURT:  Mr. Taulbee, is the defendant ready to

21  proceed with your case-in-chief?

22           MR. TAULBEE:  The defendant is, Your Honor.  We

23  would call Chris McBee.

24           THE COURT:  Sir, could you step forward through the

25  gate right there and come around the tables one way or the

1   other.  I'd like for you to eventually end up somewhere in

2   front of me right in this area right here.  It's a little

3   congested with all of the chairs.  I'm going to ask that you

4   stand in front of this lady, and she's going to swear you in.

5                           - - -

6                   KENNETH CHRISTOPHER McBEE,

7    being first duly sworn by the courtroom deputy, testified as

8   follows:

9           THE COURT:  Could you please take a seat in this

10  chair to my right on the riser.

11          MR. TAULBEE:  May I proceed?

12          THE COURT:  You may proceed.

13                          - - -

14                  DIRECT EXAMINATION

15   By Mr. Taulbee:

16  Q.      Good afternoon, Mr. McBee.  Would you go ahead and

17  state your name for the jury?

18  A.      Yes.  Kenneth Christopher McBee.

19  Q.      Where are you currently employed, Mr. McBee?

20  A.      Chillicothe Correctional Center.

21  Q.      What is your current position at Chillicothe

22  Correctional Center?

23  A.      I am the Warden at Chillicothe Correctional Center.

24  Q.      I want to briefly walk through your history with the

25  Department of Corrections.  When did you begin with the

1  Missouri Department of Corrections?

2  A.     I first hired on with the Department of Corrections

3  October of 1992 at Moberly Correctional Center in Moberly,

4  Missouri.

5  Q.     And how long have you been with the Missouri Department

6  of Corrections?

7  A.     Approximately 28 years.

8  Q.     And have you been there the entire time from 1992 until

9  today in 2022?

10  A.     No, sir.  I had a separation of employment from the

11  Department of Corrections for about 15 months.  That was, I

12  believe, November of 2006 to June of 2008.

13  Q.     At how many different facilities have you worked?

14  A.     I've worked a total of four facilities.

15  Q.     What facilities have you worked at?

16  A.     Moberly Correctional Center, Western Missouri

17  Correctional Center, Crossroads Correctional Center, and

18  currently Chillicothe Correctional Center.

19  Q.     Those are both men's prisons and then a women's prison;

20  is that right?

21  A.     That's correct.  The first three were all male

22  facilities, and the current one is a female facility.

23  Q.     What was your position when you started at the

24  Department of Corrections?

25  A.     A corrections officer.

1  Q.      And you worked your way up from corrections officer to

2  warden?

3  A.      Yes.

4  Q.      Does that include being a deputy warden before you

5  became warden?

6  A.      Yes.  I was a deputy warden at Western Missouri

7  Correctional Center and Crossroads Correctional Center.

8  Q.      When were you the deputy warden at Western Missouri?

9  A.      I believe that was 2010 to -- late 2010 to 2012.

10 Q.      And what were your duties as the deputy warden at

11 Western Missouri Correctional Center?

12 A.      Well, there are two deputy warden positions at that

13 facility.  One is over operations of the institution, which

14 includes maintenance, food service, religious services,

15 laundry, and a few other support areas.  And then the other

16 deputy warden position would be the Deputy Warden of Offender

17 Management, which would be over the custody of the facility,

18 classification, records department, and also served as a

19 liaison for our contracting staff, which would be medical, any

20 treatment that would have been available, and education staff.

21 Q.      So just generally speaking, you spoke of the custody

22 folks, and that's the corrections officers?

23 A.      Correct.

24 Q.      And then you spoke of the classification staff, and

25 we've heard about case managers, institutional parole officers,

1  positions such as that?

2  A.      Yes.

3  Q.      You said you went to Crossroads after that; is that

4  correct?

5  A.      Yes.  I laterailed to Crossroads Correctional Center as

6  a deputy warden.

7  Q.      How long were you there?

8  A.      That would have been 2012 to July of 2017 when I

9  promoted to Chillicothe Correctional Center.

10  Q.      And that's where you are today?

11  A.      Correct.

12  Q.      And when you promoted, you said you promoted to

13  Chillicothe Correctional Center, you mean you promoted to

14  warden?

15  A.      Yes, sir.

16  Q.      How many employees work at Chillicothe Correctional

17  Center?

18  A.      Approximately 540, to include our contracting staff.

19  Q.      And you said that includes contracting staff.  Does it

20  include custody and non-custody staff?

21  A.      Yes, sir.

22  Q.      How many custody staff do you have?

23  A.      Approximately 293.

24  Q.      Are you fully staffed?

25  A.      Pretty much.  Maybe just -- I think our last report

1  showed maybe eight vacancies.

2  Q.      How many inmates are at Chillicothe Correctional

3  Center?

4  A.      Changes daily, but approximately 1460.

5  Q.      What's the capacity at Chillicothe?

6  A.      1600.

7  Q.      And then of those 1460 offenders, how many of those are

8  in the general population?

9  A.      General population beds, that would be right at 1400.

10 Q.      How many housing units are there at Chillicothe?

11 A.      We have eight housing units.

12 Q.      How many wings in a housing unit?

13 A.      In our administrative segregation housing unit, there's

14 two wings, and that's Housing Unit 1.  In Housing Unit 2, which

15 includes our Social Rehabilitation Unit and our Women's

16 Empowerment Program, it's designed similar to our ad seg unit,

17 and it's two wings.  Housing Unit 3 is our treatment housing

18 unit.  It houses 200 offenders, and 100 to each wing, so

19 there's two wings.  And then all the remaining Housing Units 4

20 through 8 are all general population housing units, and they

21 have four wings.

22 Q.      And how many inmates in a wing in those four housing

23 units?

24 A.      56, a capacity of 56.

25 Q.      Capacity of 56?  I do not want to belabor this, the

1 jury has seen probably as much of these as they want to, but I

2 want to briefly go over some maps at Chillicothe Correctional

3 Center with you --

4 A.    Okay.

5 Q.    -- okay?  And these are marked as D19 and have been

6 previously admitted.  And can you just briefly tell us what

7 we're looking at here?

8 A.    It is a layout of Chillicothe Correctional Center.

9 Q.    And go ahead and walk us through.  Where is the

10 entrance to this campus?

11 A.    Okay.  The parking lot, of course, is right here, and

12 that would be on the west side of the facility.

13 Q.    Could you go ahead and circle that for me?  If you just

14 touch the screen.

15 A.    Oh, okay.  Here is the parking lot.

16 Q.    Okay.

17 A.    And the administration building is right here.

18 Q.    Okay.  And the administration building is outside the

19 secure perimeter; is that correct?

20 A.    That's correct, with the exception of the visiting

21 room.

22 Q.    Okay.  And then how do you get into the secure

23 perimeter from the administration building?

24 A.    Okay.  There is a control center after you walk through

25 the entranceway, that lobby, there's a control center and a

1  sally port that's located right in here, and that's how you

2  enter into the secure portion of the facility.

3  Q.      Okay.  And then we see a rather large building on here

4  called the Central Services.

5  A.      Yes, sir.

6  Q.      What's in the Central Services building?

7  A.      Central Services includes your recreation, program

8  services, to include chapel services.  Activity coordinator

9  office is also there in the recreation building.  Restorative

10  justice, we have two offices designated for restorative

11  justice.  A multi-purpose room, which is used for offender

12  banquets, staff training, things such as that.  And then we

13  have education.  I believe we have eight dedicated classrooms

14  for education, plus a library.  Two dining halls for food

15  service, to include also the kitchen, food storage, freezers,

16  coolers.  A laundry department, we have laundry.  We have staff

17  dining; MVE, which is Missouri Vocational Enterprises.  At

18  Chillicothe, we provide the -- make filters, trash bag liners,

19  and linens for the offenders, both male and female.  We have

20  maintenance departments also in Central Services and a

21  vocational department, to include, I believe, six classrooms

22  for vocational.

23  Q.      Generally speaking, in the Central Services building,

24  where is the recreational part of it?

25  A.      The recreational portion is right here at this end of

1   the central service building.

2   Q.      Okay.  And just to orient ourselves, where is the

3   vocational education?

4   A.      Vocational would be approximately right in here, not

5   quite all the way to the end.  Maintenance is at the very end.

6   Q.      Thank you.  I'm going to go to the -- I just want to

7   briefly look at the 7th, 8th, and 9th pages of D19.  I'll be

8   very brief with them.

9           What is Page 7?  Can you see that?

10  A.      Yes.

11  Q.      Can you tell the jury what that is?

12  A.      Yes, that is a layout of our -- one of our general

13  population housing units.

14  Q.      And so that would be Housing Unit 4, 5, 6, and 7?  Is

15  that right?

16  A.      Yes, 4, 5, 6, and 7 are all designed identically.  The

17  offenders, there's four to a cell, four bunks to a cell, and

18  then the showers, toilets, and sinks are located outside of

19  those cells.

20  Q.      And then Housing Unit 8 is designed a little

21  differently; is that right?

22  A.      Yes, that's correct.

23  Q.      In that there are only two inmates to a cell?

24  A.      Yes, only two offenders to a cell in Housing Unit 8.

25  Those are considered wet cells.  The sink and toilet is

1  actually in the cell.

2  Q.     I will show you what is Page 11 of D19.  And can you

3  tell the jury what that is?  Or can you see it well enough to

4  tell what that is?

5  A.     Appears to be a portion of the medical area.

6  Q.     Let me try it this way because it's a little bit far

7  out from you.  The admin building has a north portion and a

8  south portion; is that right?

9          MR. AMMANN:  Objection, leading, Your Honor.

10         THE COURT:  Overruled.

11 A.     Okay, now I see.  Yes, this is the administration

12 building.  Here is the -- okay.  Here is the lobby.  Yes, and

13 control center is right here, the airlock I was speaking of

14 directly through here into the secure portion of the facility.

15 So, yes, this is the entrance to the administration building.

16 BY MR. TAULBEE:

17 Q.     And when you see this, when you go in this every day,

18 there's another portion of this that contains the visitation

19 section; is that right?

20 A.     Yes.  Yes.

21 Q.     And that's not on this map.

22 A.     Correct, it's not on that map.

23 Q.     And then Page 13 I'm going to show you.  Do you

24 recognize what that is?

25 A.     Yes.  That includes our recreation department and

1  education.

2  Q.      And then one more.  Can you tell the jury what this map

3  is?  And it is Page 15 of D19.

4  A.      Yes, that would be our vocational -- our MVE, our

5  Missouri Vocational Enterprises.

6  Q.      Where is the vocational-education program on this map?

7  A.      Vocational, you enter through here.  Here is a hallway.

8  It's right up here is the hallway, and these are the

9  classrooms, with a couple of classrooms over here, as well.

10  Q.      I'm going to put this back up.  It looks like there's

11  cameras, pictures of cameras on this layout, right?

12              MR. AMMANN:  Leading again, Your Honor.

13              THE COURT:  Overruled.

14  A.      Yes.

15  BY MR. TAULBEE:

16  Q.      Does Chillicothe have cameras?

17  A.      Yes, sir.

18  Q.      How many cameras are there at Chillicothe?

19  A.      I want to say approximately 1400.

20  Q.      I'm sorry.  How many cameras?

21  A.      Approximately 1400.

22  Q.      Fourteen hundred cameras?  That sounds like a lot.  We

23  heard earlier it was around 403.

24  A.      Or 400 -- I'm sorry, not 14.  Approximately 400

25  cameras.

1   Q.      Okay.  How are cameras monitored at Chillicothe?

2   A.      We have monitors in designated areas:  shift

3   supervisor, administration, investigators.  We have -- in our

4   ad seg unit, we have monitors in the officers' module for

5   suicide cells.  And a select group of supervisors also have

6   monitors to monitor their work area.

7   Q.      When is the footage of those cameras reviewed?

8   A.      Basically, as needed.  If there's an event that takes

9   place and we need to review the video, whether it's for a

10  violation, to support a violation, to review a grievance

11  complaint, investigations, any form of complaint or concern can

12  be reviewed by video.  Again, altercations, any assaults,

13  offender assaults that may take place.  Also utilize to just

14  review performance to make sure people are doing their duties,

15  their rounds of their assigned area.

16  Q.      And how would you know to review footage?

17  A.      A staff member would make a request.  If they indicate

18  something that needs to be looked at, they would make a request

19  to review video, and we would assign usually a shift supervisor

20  or a lieutenant to review video.

21  Q.      How long is the footage saved?

22  A.      Approximately 30 days.

23  Q.      And when would footage be saved longer than for 30

24  days?

25  A.      Well, if -- in the event we was able to download the --

1    a recording, then obviously we would hold that as possible

2    evidence.

3    Q.      There is a group of binders on the floor -- well, I

4    guess it's been admitted, so I guess we don't need to do that.

5              So I'm going to show you what's been admitted as

6    D141.  Can you see that?

7    A.      Yes.

8    Q.      Can you tell the jury what they're looking at there?

9    A.      That's the entry hallway to the vocational area, and

10   that includes the officer's desk there at the end of that

11   hallway.  That's an intersection going into the hallway where

12   the classrooms are located.

13   Q.      What's on the wall above the officer's desk?

14   A.      A security mirror, along with a clock, and I can't

15   really -- other than maybe a bulletin board there?

16   Q.      But you recognize the mirror?

17   A.      Yes.

18   Q.      Let me show you what's been marked as Defendant's

19   Exhibit 142.  Do you recognize that?

20   A.      Yes.  That's a janitor's closet.  If you're facing the

21   officer's desk right here, it's directly to the right of the

22   officer's desk.

23   Q.      Okay.  And that's the officer's desk we were looking at

24   at the previous -- in the previous photo?

25   A.      Yes, sir.

1   Q.      We'll show you Exhibit 144.  What are we looking at in

2   Exhibit 144?

3   A.      That's the inside of that janitor's closet that I just

4   identified there in vocational.

5   Q.      I'm going to show you 145.  Tell the jury what they're

6   looking at in 145.

7   A.      That's a janitor's closet.

8   Q.      The same janitor's closet we were just looking at?

9   A.      Yes, sir.

10  Q.      A little bit different angle?

11  A.      Yes.

12  Q.      Okay.  Let's look at Exhibit 146.  Do you recognize

13  that picture?

14  A.      Yes.  That's a hallway, that would be going in the west

15  direction from the officer's desk in the vocational hallway

16  there at Chillicothe.

17  Q.      What's the door right to the right in that photo?

18  A.      That is the door to the janitor's closet.

19  Q.      And what's across the hall from that janitor's closet?

20  A.      Directly across the hall is our culinary arts

21  classroom.

22  Q.      Is it a solid wall?

23  A.      No, there's windows.

24  Q.      Are there blinds on that window, those windows?

25  A.      No, sir.

1    Q.      Why not?

2    A.      Well, again, an officer is assigned to this area, and

3    he or she is expected to make rounds and look into those

4    classrooms during class.  So not to be disruptive, but you need

5    to be able to view the layout of each classroom to ensure that

6    staff and offenders are both safe.

7    Q.      Are there any cameras in this photo?

8    A.      Yes.  There's one right here.

9    Q.      Any others?

10   A.      And one there.  And I think maybe one there.

11   Q.      So it looks like there are three cameras down this

12   hall?

13   A.      Yes, sir.

14   Q.      And so far we have been looking at these photos and we

15   haven't seen any people.  Is that normal?

16   A.      Yes, that is normal.

17   Q.      Are there usually people in the vocational education

18   building?

19   A.      Yes.

20   Q.      What people would be there?

21   A.      Offenders, officers, teachers, during session, when

22   class is in session.

23   Q.      And when is class in session?

24   A.      Generally, we have a work movement at approximately

25   8 a.m., followed by the education movement, which includes

1    education vocational, and they report to their classrooms at

2    that time.  And the class in vocational, that pretty much is

3    the entire day, that's the offender's assignment, and they get

4    to release back for what we call mainline for the afternoon

5    meal, and then they will return back to vocational for the

6    afternoon session, and that concludes at approximately 3:30 in

7    the afternoon.

8    Q.    How many inmates are in these classes?

9    A.    Approximately 15 to 20 per class.

10   Q.    And how many teachers per class?

11   A.    One teacher assigned to each classroom.

12   Q.    Who else works in this building, other than the

13   teachers?

14   A.    There's a vocational supervisor, and he has a -- he or

15   she has an office support assistant assigned to them.  And

16   then, of course, the corrections officer who is assigned to

17   vocational, as well.

18   Q.    And we previously heard the names of Miss Grant and

19   Miss Anderson.  Are they the former head of the

20   vocational-education program and her secretary?

21   A.    Yes, that's correct.

22   Q.    I'll show you what has been marked as Exhibit 148.  Can

23   you tell the jury what that is?

24   A.    Yes.  That is the entrance to the clerical desk right

25   here, and then further beyond that is the entrance into the

1  supervisor's office, vocational supervisor.

2  Q.      And we see a Ms. Anderson's name on the door?

3  A.      Yes, she was previously the clerical.

4  Q.      Look at Exhibit 149.  And what are we looking at in

5  Exhibit 149?

6  A.      This is a staff break room for the vocational staff.

7  Q.      Okay.  And to the left is that office we were just

8  looking at with Ms. Anderson's name?

9  A.      Correct.  This doorway is just directly across from the

10  desk that Miss Anderson had.

11  Q.      And we will look at 151.  What are we looking at in

12  151?

13  A.      That's within the break room I just identified, and

14  then this here is a restroom off of that break room.

15  Q.      Tell the jury what 152 is.

16  A.      That is the same break room.  Of course, I think you

17  got mail slots there, staff bulletin board, and then a storage

18  room.

19  Q.      And you said it's the staff break room.  You said it's

20  a staff break room.  What staff are we talking about?

21  A.      The vocational teachers and the officer assigned to

22  that area.

23  Q.      We'll keep moving, and I will show you 153.  Do you

24  recognize Exhibit 153?

25  A.      Yes, that's the portion of the break room again, and

1  then, again, the storage room off of that break room.

2  Q.    And what's next to that storage room?

3  A.    Appears to be a coffee pot.

4  Q.    Is there a refrigerator in this room?

5  A.    In the break room?

6  Q.    Yes.

7  A.    Yes, I believe there is.

8  Q.    And then I will show you 161.  And do you recognize

9  that?

10  A.    Yes.  That's the view from that storage room into the

11  break room, just the opposite direction.

12  Q.    And I believe we heard testimony, are there any cameras

13  in that room?

14  A.    No.  No.

15  Q.    Okay.  I've got a few more pictures for you, Mr. McBee.

16  Or several more --

17  A.    Okay.

18  Q.    -- I suppose.  I'm going to show you what's been

19  previously admitted as Exhibit 163.  And what is Exhibit 163?

20  A.    That's the front entrance to Housing Unit 6, general

21  population housing unit.

22  Q.    And what's 164?

23  A.    That's a sally port area as you enter the opposite side

24  of one of those -- it would be the right-side door that would

25  just show -- enter through here, and then here is the officers'

1  rotunda, and then entrance to two of the wings.

2  Q.    And what's that on the ceiling in this photo?

3  A.    You've got a camera there, and then, of course, the

4  light fixtures and sprinkler head.

5  Q.    Show you 165.  Tell the jury what they're looking at in

6  165.

7  A.    Okay.  Another wing entrance here, the rotunda, and, of

8  course, there's the officer module.  Ice machine, and then the

9  entrance to E-Wing, which is where our classification,

10  Probation and Parole offices are, as well as a few other

11  storage rooms.

12  Q.    What is Exhibit 166?

13  A.    Okay.  This is a view of the rotunda.  We also call it

14  the control module.  This is a view from E-Wing, and then as

15  you go on each side of the rotunda, you have the wings, four

16  entrances to the wings in each housing unit.

17  Q.    Is that control module also called the bubble?

18  A.    Correct.

19  Q.    So if we've heard testimony about a bubble in a housing

20  unit, that's it?

21  A.    Yes.  Some call it rotunda, control module, the bubble.

22  Q.    And are there windows on all side of that -- all sides

23  of that?

24  A.    Yes.  On both sides, there is.  The only exception

25  would be right up here, and that's where the officers exit, and

1    that's a solid wall leading to the front of the housing unit.

2    Q.      And what does that, the -- if you were standing in the

3    bubble in that last picture staring out the window that we're

4    facing, what would you be looking at?

5    A.      I would be looking at E-Wing.

6    Q.      I'm going to show you Exhibit 170.  What is that?

7    A.      That's the laundry room to a general population housing

8    unit, and that's there within E-Wing.

9    Q.      Are there cameras in those rooms?

10   A.      Yes, sir.

11   Q.      Is there also a mirror in that room?

12   A.      Yes, sir.

13   Q.      And it looks like there is a door on there.  Is it a

14   solid door?

15   A.      No.

16   Q.      What's in it?

17   A.      A window.

18   Q.      Show you Exhibit 171.  And can you tell the jury what

19   that is a photo of?

20   A.      Yes.  That's the entrance doorway to E-Wing, then you

21   got restrooms on each side, classroom, laundry room there next

22   to that back board was that laundry room we just pointed out.

23          And then beyond that, you have two doors on each

24   side, and those are the case manager offices.  We have four

25   case managers generally assigned to each housing unit.  And

1  then this is the doorway into the additional offices, to

2  include, I believe, a sergeant office, there's a little

3  kitchenette area right in there, unit manager,

4  probation/parole.  I think there's a staff break room,

5  janitor's closet.

6  Q.    And, again, we've been looking at these photos, and

7  there are no people in them.

8  A.    Correct.

9  Q.    Is it -- would it be normal for there to be no people

10 in this area and the areas of the housing unit that we've

11 previously looked at?

12 A.    During normal business hours, no, that would not be

13 normal.

14 Q.    What would be normal?

15 A.    We would have our classification, our case managers,

16 probation/parole, custody staff, obviously, there 24/7.  We

17 would have offenders coming back for scheduled appointments,

18 callouts to see their case manager and probation and parole

19 officer.  Again, custody staff can go to that area, take their

20 breaks, as well, since there's a kitchenette back there, as

21 well as a staff break room.

22 Q.    We previously looked at the bubble in a couple of

23 photos before, right?

24 A.    Yes.

25 Q.    And we didn't see any people in there either, right?

1   A.      Correct.

2   Q.      Are there normally people assigned to that area?

3   A.      Yes.

4   Q.      How many?

5   A.      Has to be at least one custody person 24/7 in that

6   control module.

7   Q.      And how many are on average assigned there?

8   A.      Generally there's three to four assigned to a housing

9   unit on day shift, and then third and first shift it's

10  generally three officers assigned to a unit, and at times to

11  include their supervisor, their sergeant.

12  Q.      Go to Exhibit 175.  What are we looking at in Exhibit

13  175?

14  A.      That's some of the office areas in E-Wing beyond the

15  point of -- that I had showed you where the kitchenette area

16  was.

17  Q.      And can you tell what housing unit we're in now?

18  A.      Yes, it's Housing Unit 7.

19  Q.      And we started in Housing Unit 6, but this is Housing

20  Unit 7, you can tell by that number?

21  A.      Yes.

22  Q.      And are you able to see a mirror in this photo?

23  A.      Yes, sir.

24  Q.      Can you see any cameras?

25  A.      Well, obviously, there's a camera at this end providing

1  that view, and the mirror right there.  I can't tell if that's

2  a camera there, possibly.

3  Q.    Okay.  We'll have a different photo in a minute.  I

4  just wasn't sure whether you could see it or not.

5        I will show you Exhibit 178.  Can you recognize what

6  178 is?

7  A.    Yeah.  It's one of the property storage rooms within a

8  general population housing unit.

9  Q.    Okay.  Exhibit 181.  What's Exhibit 181?

10 A.    That is the -- again, in Housing Unit 7, the hallway

11 area, and includes the mirror, or the camera.  I think that may

12 be one of the break rooms there, and then, of course, an

13 office.

14 Q.    Is this that same hallway we were just looking at?

15 A.    Yes.

16 Q.    All right.  And did you say that there were offices,

17 that was an office we're looking at?

18 A.    Yes.

19 Q.    So there are offices back there in that hallway?

20 A.    Yes.  In Housing Unit 7, we have some mental health

21 offices back there.

22 Q.    Has that always been the case?

23 A.    Since I've been at Chillicothe, that has been the case.

24 For Housing Unit 7, they include some of the mental health.

25 Q.    So since July of 2017?

1   A.     Yes.

2   Q.     Not too many more.  What are we looking at here?

3         MR. AMMANN:  What number is that?

4         MR. TAULBEE:  I'm sorry, did I not say?  I did not.

5 183.

6   A.     Okay.  This here is the main lobby to the

7 administration building.  This here would be the hallway going

8 from the main lobby to the north end of the administration

9 building.

10 BY MR. TAULBEE:

11   Q.     So if you're standing here looking down this hallway,

12 where is the entrance to the Chillicothe -- the administrative

13 building from the outside?

14   A.     Entrance to the administration building?

15   Q.     Yes.

16   A.     Okay.  That would be back that direction, back west.

17   Q.     So if I'm coming from the parking lot, I'm coming from

18 the left of this photo?

19   A.     That's correct.

20   Q.     And where is the control center from this photo?

21   A.     It would be to the right of this doorway, it would be

22 going in an east direction.

23   Q.     And before we go down this hallway, who works in this

24 lobby area that we're standing in at Chillicothe?

25   A.     Works in the lobby -- or in the lobby?  Or the hallway?

1  Q.      Yes, who would be assigned to work in the lobby, what
2  positions?
3  A.      That would be our check-point officer, the one that run
4  the walk-through metal detector, and as well as the x-ray
5  machine to search any personal belongings visitors or staff are
6  bringing in.
7  Q.      Anybody else?
8  A.      During normal business hours, we have a receptionist
9  assigned out there, as well, to run our switchboard.
10  Q.      And you said the control center is just to the right of
11  this?
12  A.      That's correct.
13  Q.      Does that -- does the control center -- it's also
14  called a bubble; is that accurate?
15  A.      Yes.
16  Q.      Does it have windows on it?
17  A.      It does.
18  Q.      Does it look out into a lobby?
19  A.      It does, yes.
20  Q.      Are there any other rooms off of this, this part that
21  have windows or people assigned to them?
22  A.      There's another doorway directly to the right of this
23  hallway which enters into our roll-call room, and those doors
24  are -- it's a double door, and it's pretty well open a majority
25  of the time.  Only on special circumstances do we close that

1  door.

2  Q.    Okay.  So walk the jury down this hall.  What all is

3  down this hall if we start going down it?

4  A.    Okay.  Directly here to the left is the men or women's

5  restroom/locker rooms.  Each of them have designated locker

6  rooms, and right in between those two locker rooms is a

7  janitor's closet right off the hallway there, just a small

8  janitor's closet for cleaning supplies, and a laundry -- or

9  it's a cleaning cart.  And then just some areas to store some

10  cleaning chemicals, toilet paper, paper towels, things such as

11  that.

12        Off here is the, another entrance to that roll-call

13  room that I just spoke of.  It also enters there, and that's an

14  area for staff together prior to shift, basically to sign in,

15  draw their keys from our key watch system.  We store all of our

16  keys in there.  Got some vending machines.  And we do have a TV

17  in there if staff want to go in there during their break to

18  watch TV.

19        Further down the hallway, we have our armory.  We

20  have an armory there.  Right next to that is the, our CERT,

21  which is our corrections emergency response storage room.

22  Folks that are part of the CERT team, they keep a lot of their

23  equipment and uniforms stored in there.

24        On this side, you go on past -- this is a solid wall

25  here, and you go on past there to the next opening, and there

 1  is a -- if you take a left there, you'll enter into a small

 2  hallway that includes staff mailroom where each staff member

 3  has a mailbox.  We have a small conference room right next to

 4  the mailroom, and then we also have a little kitchen in the

 5  administration building.  Has refrigerator, microwave, sink,

 6  ice water machine.

 7          You can come back out here in the hallway, and then

 8  directly past the CERT room is a staff fitness center, which

 9  includes treadmills, some exercise equipment.  And then beyond

10  that point, you're entering into the administration offices on

11  the opposite end of that hallway.

12  Q.      And where do you work at Chillicothe?

13  A.      At the administration end of the building.

14  Q.      How many -- do you know how many people work in that

15  area of the building?

16  A.      On a daily basis, there's probably -- probably

17  approximately 20 to 25 people who are assigned to that area

18  during normal business hours.

19  Q.      And that's just in that door at the end of the hall?

20  A.      Yes.

21  Q.      And then is there normally somebody assigned to the

22  armory?

23  A.      Yes.  We have an armory transportation officer assigned

24  to day shift.

25  Q.      Okay.  Six more photos, and I will move on.  So let's

1  look at Exhibit 185.  Can you tell the jury what that is?

2  A.      Yes.  That is one of the staff restrooms/locker rooms

3  that I had previously mentioned.

4  Q.      And it looks like those are toilets.

5  A.      Yes, those appear to be restroom stalls.

6  Q.      And we'll look at -- and, then, are those sinks to the

7  left?

8  A.      Yes.  All the sinks are right here.

9  Q.      And then is that a wall that's on the -- I guess the

10  sinks are on a solid wall?

11  A.      Yes.

12  Q.      Let's look at 188.  What are we looking at there?

13  A.      That is another view of a staff restroom/locker room.

14  Q.      And to the right we have a wall of lockers on it, is

15  that -- does that look right to you?

16  A.      Yes, sir.

17  Q.      Is that the other side of those sinks we just looked

18  at?

19  A.      Yes, sir.

20  Q.      And are those shower stalls to the left of that?

21  A.      Yes.  Yes, right in here.

22  Q.      And then what do we have in the back?

23  A.      Back here, additional lockers.

24  Q.      All right.  We'll look at 189.  What are we looking at

25  in 189?

1  A.     That's the photo of the hallway we previously spoke of,

2 to include the armory and CERT rooms.  This is the hallway here

3 leading to the staff mailroom, the small conference room, as

4 well as the kitchen in the administration building.  And then,

5 of course, fitness room off in here.

6  Q.     Do you see any cameras in that photo?

7  A.     Yes, sir.  There's one right here.

8  Q.     And where is that camera located in relation to that

9 hall you spoke about that has the staff mailroom and the small

10 conference room and the break room?

11  A.     That camera is located just east or just -- if you're

12 coming down the hallway, it's just to the right of that hallway

13 going to the mailroom.

14  Q.     So it can see down that hallway?

15  A.     Yes, sir.  Yes.

16  Q.     Okay.  We'll look at Exhibit 193.  And what are we

17 looking at in Exhibit 193?

18  A.     That's the kitchen break area in the administration

19 building.

20  Q.     Down that hallway that you just spoke about?

21  A.     Yes, sir.

22  Q.     What do we see on the wall?

23  A.     I see a clock.

24  Q.     What's the clock in between?

25  A.     Two windows.

1   Q.     What are those windows looking out onto?

2   A.     The parking lot in front of the administration

3 building.

4   Q.     So those cars we see out there are parked in the

5 Chillicothe Correctional Center parking lot?

6   A.     Yes, sir.

7   Q.     Just two more.  Show you Exhibit 196.  What are we

8 looking at here?

9   A.     That's just another view of that same kitchen break

10 room in the administration building.

11   Q.     And what do we see located in that room?

12   A.     Refrigerator, a couple of vending machines, sink,

13 coffee pot, microwave, and appears to be three tables with

14 chairs.

15   Q.     Do staff at Chillicothe Correctional Center use this

16 room?

17   A.     Yes.

18   Q.     Is it predictable when staff may be in here?

19   A.     No, not really predictable.  There would be maybe more

20 in there during the morning to get their coffee, and then

21 throughout the day to -- maybe if they need a snack or to

22 refill their drinks, and then obviously during their lunch

23 breaks.

24   Q.     There's not a specific time for staff to only be able

25 to use this room?

1    A.      Right.  In fact, most staff sort of rotate because, if

2    not, you're standing in line to use the microwave.  And then

3    also, especially from the clerical pool on the administrative

4    end, they try to rotate so that someone is available to be

5    available to take phone calls for incoming calls.

6    Q.      And just one more.  And what are we looking at in

7    Exhibit 198?

8    A.      That would be the corner of that same kitchen break

9    room, to include vending machine, the sink is located right

10   here, and, of course, your coffee pot and countertop.

11   Q.      Just another view of the room we were looking at?

12   A.      Yes, sir.

13   Q.      I want to talk to you briefly about the PREA process at

14   Chillicothe Correctional Center.  Tell the jury what that

15   process is.

16   A.      Prison Rape Elimination Act, federal law.  I believe

17   Missouri instituted that in 2012, and it's any claims of

18   harassment, retaliation, sexual abuse, rape, anything like

19   that.  It's an avenue for the offender to report and for the

20   department to investigate in any of those type of claims and

21   allegations.

22   Q.      What action is taken for those who report as victims of

23   a PREA violation?

24   A.      Who takes the report?

25   Q.      No, what action is taken after someone reports a PREA

1  violation?

2  A.    Okay.  There's a shift commander assigned 24/7 to each

3  shift, and they're designated as the person to complete what we

4  call the PREA checklist.  Any allegation that is reported has

5  to be reported to that shift supervisor so they can complete a

6  PREA checklist, and, depending on the allegation, whether it's

7  harassment, if there was any physical contact, there's a

8  notification that that shift commander has to follow, and

9  they're to -- some of the notification's just simply by e-mail.

10  Depending on the severity of it, it could be either in person

11  or by phone notification to administrative staff, mental health

12  staff, and medical staff, and investigators.

13  Q.    And what happens to the victim or the person reporting

14  the PREA allegation?

15  A.    We do a mental health referral on them if it's a

16  harassment or of that nature, that form of allegation.

17       If it's actually an assault of some sort, we would

18  do the mental health referral.  We also notify medical, as well

19  as investigators, for appropriate follow-up for any evidence.

20  Q.    And where is the victim placed while this is happening?

21  A.    Well, generally if it's just harassment of some sort,

22  they're usually interviewed by the shift commander or the

23  lieutenant to gather information and get an offender statement.

24       If there's one where they have claimed some type of

25  sexual assault, they're taken to medical.  We try to provide

1  them an advocate, as well.  We have some staff that are

2  designated as advocates, and, if need be, they would be taken

3  for a sexual assault examination.

4           So as far as placements of the offender, they would

5  be placed in general population, unless there was some need to

6  provide protection for them.

7  Q.      Where in general population?

8  A.      They would probably remain in their assigned cell, if

9  at all possible, to provide least restrictive housing for them.

10 Again, unless we are unable to determine who the perpetrator

11 may be; and until we have that information, that would be the

12 only time we would want to consider moving the offender to more

13 of a protective custody cell.

14 Q.      So you wouldn't generally just put them in

15 administrative segregation?

16 A.      No, sir.

17 Q.      Unless that is the least restrictive environment to

18 protect them from whoever the perpetrator is?

19 A.      That's correct.

20 Q.      If the perpetrator is a known corrections officer,

21 would they be put in administrative segregation?  Would the

22 victim be put in administrative segregation?

23 A.      No, not necessarily.

24 Q.      If there was another way to protect them, they wouldn't

25 be?

1    A.    Correct.

2    Q.    What discipline does an offender receive for reporting

3    a PREA violation?

4    A.    No discipline, unless through an investigation it's

5    determined that it's unfounded, and then at that point it can

6    be -- they can be given a violation for false information.

7    Q.    And what do you mean by unfounded?

8    A.    That means there's evidence that it did not, the

9    allegation did not happen or the offender admitted during an

10   investigation that it did not happen.

11   Q.    So it's demonstrably false, that's your --

12   A.    Correct.

13   Q.    And has that been an issue at Chillicothe Correctional

14   Center?

15   A.    Yes, it has in the past.

16   Q.    Tell me about that.

17   A.    I know when I first promoted to warden at Chillicothe

18   Correctional Center, having previously worked in the men's

19   facilities, just the number of PREA claims I felt was, you

20   know, concerning.  The majority of those were either

21   unsubstantiated or unfounded.  I found that a lot of offenders

22   were filing claims --

23           MR. AMMANN:  I'm going to object, Your Honor, to

24   lack of foundation and hearsay.

25           THE COURT:  Overruled.

 1  BY MR. TAULBEE:

 2  Q.      You may continue.

 3  A.      Just filing claims just to try to get room moves to a

 4  different housing unit or a different cell.

 5  Q.      And you're talking about offender-on-offender claims;

 6  is that correct?

 7  A.      Correct.  But it was still just the allegations alone,

 8  the number of allegations was concerning at that point.

 9  Q.      And you took the allegations seriously?

10  A.      Yes, sir.

11  Q.      Just broadly speaking, how do corrections staff know

12  where to be when they're on duty at the facility?

13  A.      As in custody staff?

14  Q.      Yes.

15  A.      Yes, the custody staff -- we have three assigned

16  shifts.  First shift is 11 p.m. to 7 a.m.; day shift, which is

17  second shift, is the 7 a.m. to 3 p.m.; and then the third shift

18  is 3 to 11 p.m.

19          Each shift is -- as they come on shift, they report

20  to that roll-call room in the administration building where

21  their shift supervisor has a chronological available with

22  everybody's name assigned for that shift.  And they come in,

23  they review that, and then they sign in to their location where

24  they're going to be working, so they've acknowledged where

25  they're placed at for that shift.  And then also the shift

1  supervisor is able to see that they've signed in and

2  acknowledged their work post for that 8-hour shift.

3  Q.     What is a work post?  Is that the location where

4  they're working on?

5  A.     Yes, that is the location they're assigned to work for

6  that particular shift.

7  Q.     What are your expectations as the warden for a

8  corrections officer remaining on their post during a shift?

9         MR. AMMANN:  Objection to the relevance of his

10 expectation.

11        THE COURT:  Overruled.

12 BY MR. TAULBEE:

13 Q.     Go ahead.

14 A.     My expectation is that they have an assigned post.

15 They are to remain at that post unless they're properly

16 relieved or the area is properly staffed to allow them to

17 routinely take a -- take their break or lunch.

18 Q.     Why is that your expectation?

19 A.     To provide the appropriate coverage for each assigned

20 post, offender housing units during the day shift.  A lot of

21 the central service areas have offender activity, as well, as

22 well as support staff, and we want custody presence in all of

23 those areas.

24 Q.     And what's the issue with staff not being where they're

25 supposed to be?

1  A.     The only issue would be there wouldn't be proper

2  security coverage for that given area.

3  Q.     Have you ever received complaints from staff about COs

4  being off their post?

5  A.     Yes, over my career, maybe, I've received a few.

6  Q.     At Chillicothe?

7  A.     At Chillicothe?  No, I've had complaints of maybe

8  someone complaining that their co-worker took too long of a

9  break; but as far as anybody abandoning their post, I've not

10 received any complaints.

11 Q.     But you have received complaints about staff taking too

12 long of breaks?

13 A.     Yes, sir.

14 Q.     Now, Warden, I want to talk to you about Edward

15 Bearden.  How do you know Mr. Bearden?

16 A.     I met him shortly after I transferred to Chillicothe.

17 Q.     Does Mr. Bearden still work at Chillicothe Correctional

18 Center?

19 A.     No, sir.

20 Q.     I'm going to go ahead and do it this way.  Pull up

21 what's been previously admitted as Defendant's Exhibit D15.

22 And briefly tell the jury what this is.

23 A.     That's an acceptance letter from my office regarding

24 Mr. Bearden's notice of retirement.

25 Q.     What's the date on this letter?

1   A.      May 11, 2018.

2   Q.      And what does it indicate Mr. Bearden's reason was for

3   leaving Chillicothe?

4   A.      Retirement.

5   Q.      And what is the effective date of Mr. Bearden's

6   decision to retire?

7   A.      Effective September 1, 2018.

8   Q.      We talked about staff complaints earlier.  What

9   complaints, if any, did you ever receive about Mr. Bearden

10  leaving his post?

11  A.      None.

12  Q.      What about Mr. Bearden taking too long on breaks?

13  A.      None.

14  Q.      What complaints have you received about Mr. Bearden?

15  A.      None that I recall.

16  Q.      I want to have Miss Lancaster pull up what's been

17  previously admitted as Exhibit D12.  Could you tell the jury

18  what this is?

19  A.      Appears to be an anonymous note regarding use of sick

20  leave and Mr. Bearden's scheduled sick leave.

21  Q.      What day did your office receive this?

22  A.      My office received it July 10, 2018.

23  Q.      And who is it from?  Did you say it was anonymous?

24  A.      Yes.

25  Q.      And the complaint is that Mr. Bearden's using sick

1  leave?

2  A.      Yes.

3  Q.      And the way he's using sick leave?

4  A.      Correct.

5  Q.      What did you do with this complaint when you received

6  it?

7  A.      Forwarded it to the Chief of Custody's office for Major

8  to look into the matter.

9  Q.      Do you remember what happened after that with this

10 complaint?

11 A.      Just Major looked into it and addressed it.

12 Q.      Do you remember what the ultimate conclusion was?

13 A.      He was not abusing his sick leave.

14 Q.      During your time as warden, did you ever recommend

15 discipline for Mr. Bearden?

16 A.      No, sir.

17 Q.      Mr. McBee, we looked at photos of the administration

18 building, right?  Do you recall that?

19 A.      Yes, sir.

20 Q.      Is there a warehouse in that building?

21 A.      No, there's not a warehouse in the administration

22 building.

23          MR. TAULBEE:  I don't have anything further for you.

24 Thank you, Mr. McBee.

25          THE WITNESS:  Thank you.

1          THE COURT:  Any cross-examination?

2                        - - -

3                  CROSS-EXAMINATION

4  By Mr. Ammann:

5  Q.     Good afternoon, Warden.

6  A.     Hello.

7  Q.     I just have a few questions for you.

8  A.     Yes, sir.

9  Q.     Some of the things you talked about I want to follow up

10  on.  You talked about being pretty much fully staffed now,

11  right?

12  A.     Yes, sir.

13  Q.     But you didn't arrive until 2017 at Chillicothe?

14  A.     That's correct.

15  Q.     You don't know whether they were fully staffed between

16  2012 and 2017, do you?

17  A.     No, I cannot speak to that.

18  Q.     Mr. Taulbee showed you a picture of the

19  vocational-education building and a desk in a hallway where you

20  say an officer was stationed next to some of the classrooms.

21  Do you remember that?

22  A.     Yes, sir.

23  Q.     And you said that officer makes rounds, right?

24  A.     Yes.

25  Q.     So that corrections officer does not sit at that desk

1  all the time.

2   A.      That's correct.

3   Q.      They leave that desk.

4   A.      Yes, sir.

5   Q.      We looked at a lot of pictures, okay?  Is it fair to

6  say that Mr. Bearden had access to every place that we saw in

7  those photographs?

8   A.      He would not have access to the armory.  The control

9  center, which is right off the lobby, he would have to be

10 assigned there to have access.

11  Q.      But the break room, the locker room, the hallways, the

12 housing units, all of the rest of that he would have had access

13 to?

14  A.      Yes.  I was just trying to think of all of the photos,

15 but, yes, of the hallways, the men's locker room, break rooms,

16 yes.

17  Q.      So we saw pictures of the break room.  That's the staff

18 break room, right?

19  A.      Correct.

20  Q.      That we saw.  Offenders don't go in there, do they?

21  A.      If they go in there, it's for cleaning purposes.

22  Q.      There are no cameras in the break room.

23  A.      That is correct.

24  Q.      We saw pictures of the locker room/restroom, right?

25 For the staff, the staff locker room and restroom, we saw

1  pictures, correct?

2  A.     Yes, sir.

3  Q.     There are no cameras in the staff locker room and

4  restroom, correct?

5  A.     Correct, no cameras.

6  Q.     No cameras.  Mr. Taulbee talked to you a little bit

7  about PREA and what happens to a woman if she reports a sexual

8  assault.  There are some women who get sent to administrative

9  segregation after they report sexual assault, correct?

10  A.     Not routinely.  Again, that would be an exception if we

11  was unable to determine who the perpetrator was.

12            MR. AMMANN:  May I approach the witness, Your Honor?

13            THE COURT:  Yes.

14            MR. AMMANN:  Excuse me.  I think I left something of

15  mine in there.

16  BY MR. AMMANN:

17  Q.     Warden, do you remember having your deposition taken on

18  March 18, 2021, by way of Zoom?

19  A.     Yes, sir.

20  Q.     Could you look at Page, I believe it's 61?  Are you

21  there?

22  A.     Page 61?

23  Q.     61.

24  A.     Yes, sir.

25  Q.     If you look at the bottom, line -- let me see.  Look at

1  Page 61, Line 18.  I'm going to read you the question.  Now,

2  you acknowledge your deposition was taken that day, and that

3  was under oath, right?

4  A.      Yes, sir.

5  Q.      "Question:  All right.  Are you aware in the last --

6  since you have been warden, has any woman at Chillicothe who

7  has reported a PREA-type violation been sent to the hole while

8  it's been investigated?"

9          Answer from you:  "I do believe there's been some,

10  but I don't recall how many."

11          Do you remember that answer?

12  A.      Yes, sir.

13  Q.      You didn't tell me then that it was rare.  You said

14  there had been some and you didn't know how many.  Correct?

15          MR. TAULBEE:  Objection, Your Honor.  Misstates his

16  testimony.

17          THE COURT:  Can I see his deposition?  Why don't you

18  approach, please.

19          (Counsel approached the bench, and the following

20  proceedings were had:)

21          MR. TAULBEE:  The very next question on Page 62

22  says, "I don't want to say" --

23          (Reporter interruption.)

24          MR. TAULBEE:  "But it's probably been very, very few

25  because" --

 1          THE COURT:  I can't even hear you.

 2          MR. TAULBEE:  I'm sorry.

 3          THE COURT:  Because he what?

 4          MR. TAULBEE:  He goes on to say that --

 5          THE COURT:  I can't -- so can you point to me what

 6   you're talking about?  I'm just not seeing it.

 7          MR. TAULBEE:  It says right here, it says --

 8          THE COURT:  Okay.

 9          MR. TAULBEE:  I'm sorry.  I mean, unless we're

10   quibbling about very, very few and rare.

11          THE COURT:  He does say very, very few.

12          MR. AMMANN:  He says probably very, very few after

13   he said he didn't recall how many.

14          THE COURT:  Right.  But I think in context, he said

15   he doesn't recall how many, but it's been very, very few I

16   think is the summary.  So I don't think that's a fair

17   impeachment.

18          MR. AMMANN:  Okay.

19          THE COURT:  So either you can clear it up, or you

20   can clear it up on redirect.

21          MR. TAULBEE:  Okay.

22          MR. AMMANN:  I'll clear it up.  I'll just have him

23   read that part, if that's all right.

24          THE COURT:  Yes.

25          (The following proceedings were had in open court:)

1    BY MR. AMMANN:

2    Q.      I want to make sure we have a complete picture of what

3    you said at the deposition.  Can you look at Page 63 of your

4    deposition?  Do you see that?

5    A.      Page 63, yes.

6    Q.      At the top, Line 2, it says, "Yeah, I don't want to say

7    there has not been because there -- I would say there probably

8    have been, but it's probably been a very, very few because,

9    again, our goal is to -- if they are truly a victim coming

10   forward with an allegation, we want to protect them."  Do you

11   see that?

12   A.      Yes, sir.

13   Q.      Warden, you talked about the sick leave memo, somebody

14   complained about Mr. Bearden taking too much sick leave.  Do

15   you remember that?

16   A.      Yes, sir.

17   Q.      But by July of 2018, he had already sent in his

18   retirement letter, correct?

19   A.      Yes.

20   Q.      And by July 12 when you got that memo, of 2018, you had

21   already placed him on restrictive no-contact duty; is that

22   right?

23   A.      I don't recall the exact dates on that, sir.

24   Q.      Okay.  Could you grab that red binder right there?  Can

25   you look at Tab 10?

1        Are you familiar with this Exhibit No. 10?

2    A.      Yes, that's orders for temporary -- temporary orders

3    for a job placement, assignment change.

4    Q.      And you would have been involved in approving this job

5    change; is that right?

6    A.      That is correct.

7    Q.      And it's dated July 3rd, is that right, of 2018?

8    A.      Yes, sir.

9    Q.      And can you read me what it says in the body of the

10   memo?  Well, first of all, who is it to?

11   A.      It's addressed to CO I Edward Bearden.

12   Q.      And what does it say?

13   A.      Effective immediately, CO I Bearden, you will be placed

14   in control center non-offender contact temporarily.  Offender

15   Bearden, you will continue to work the same hours -- excuse me,

16   the same regular days off as your bid position for the duration

17   until final action is determined on a pending inquiry.  And

18   then it gives the previous assignment and then the assignment

19   he's to go to.

20   Q.      And that said effective immediately, right?

21   A.      Correct.

22   Q.      And you issued that memo out of concern for the safety

23   of the women in the prison because of allegations that had been

24   made against Mr. Bearden, correct?

25   A.      It was due to an inquiry that was being completed.

1  Q.    We talked a little bit about the cameras, or you did

2  with Mr. Taulbee.  Those cameras are not viewed in realtime,

3  correct?

4  A.    They can be monitored realtime, again, at certain

5  locations where staff have authorization for monitors.

6  Q.    But you don't have the staff to monitor all the cameras

7  in realtime.

8  A.    No, sir.

9  Q.    And you keep the video 30 days unless somebody makes a

10 complaint, right?

11 A.    Yes, sir.

12 Q.    You don't know whether Mr. Bearden sexually assaulted

13 these four women, right?

14 A.    No, sir, I do not know.

15 Q.    Do you know what shift Mr. Bearden was working between

16 2012 and 2017 before you got there?

17 A.    No, I can't speak to his shift assignment prior to me

18 being there.  He was on 3:00 to 11:00 shift when I first

19 arrived at Chillicothe, I believe.

20 Q.    And a lot of your corrections officers work overtime;

21 is that right?

22 A.    Chillicothe, compared to other facilities, very little,

23 unless we're assisting actually another institution.  But we

24 have very little overtime at Chillicothe since I've been there.

25 Q.    But some officers do work overtime.

1   A.      Yes, some do transportation, or I guess due to call-ins

2   maybe on short notice, a few others.

3   Q.      I want to ask you about some of the rules at the prison

4   and how corrections officers operate.  Do the rules at your

5   prison allow for a corrections officer to send cards,

6   valentine's cards to offenders by U.S. Mail from outside the

7   prison into the prison to an offender?

8   A.      No, sir.  It's what we call avoidable contact.

9   Q.      And why are there rules against that?

10  A.      Over-familiarity.

11  Q.      And what would happen if that happened today if you

12  found out that a corrections officer was mailing a valentine

13  card to an offender inside the Chillicothe Correctional Center?

14  A.      As far as my responsibility, I would submit that for an

15  OPS investigation, which was our Office of Professional

16  Standards, and that would fall under the employee conduct unit,

17  and I would submit that for investigation, for review.

18  Q.      Could there be discipline for that type of activity?

19  A.      Yes.

20  Q.      Do the rules at the Chillicothe Correctional Center

21  allow a corrections officer to give a phone number, a phone

22  number for a Tracfone or a burner phone and the corrections

23  officer says to the woman, "Call this number, let's talk."  Do

24  the rules allow for a corrections officers to have phone calls

25  with offenders during their off hours by having offenders call

1  the corrections officers?

2  A.      No, sir.  That would be unauthorized contact.

3  Q.      And why would that be against the rules?

4  A.      It's basically against our employee standards and our

5  code of conduct.

6  Q.      Is it a safety issue for the women that puts them in

7  jeopardy?

8  A.      Yes, it could put both staff and offenders at risk if

9  there's unauthorized contact, communication.

10  Q.      There is no system that you have, either electronically

11  or manually, that tracks a corrections officer's location

12  throughout the prison during the day, is there?

13  A.      No, sir.

14  Q.      So you don't -- you know where a corrections officer is

15  assigned, correct, for the day?

16  A.      Yes.

17  Q.      You expect him or her to be at that post, correct?

18  A.      Yes, sir.

19  Q.      But you don't have any way to know where that

20  corrections officer is during the day.

21  A.      Other than review of camera footage.

22  Q.      Warden, you don't have any information that's come to

23  you to indicate these four women are making up these stories

24  about sexual assault, do you?

25  A.      No, sir.

1    MR. AMMANN:  Your Honor, could I confer for just a

2  minute?

3         THE COURT:  Yes.

4         MR. AMMANN:  That's all I have, Your Honor, thank

5  you.  Thank you, Warden.

6         THE WITNESS:  Thank you.

7         THE COURT:  Any redirect?

8         MR. TAULBEE:  Just very briefly, Your Honor.

9                    - - -

10                REDIRECT EXAMINATION

11  By Mr. Taulbee:

12  Q.    You testified that there were no cameras in that break

13  room, right?

14  A.    In the administration building?

15  Q.    That's correct.

16  A.    Yes, sir.

17  Q.    And no cameras in the guards' locker room in the

18  administration building, right?

19  A.    Yes, sir, that's correct.

20  Q.    But you also testified there's a camera outside those

21  areas in that hallway; is that right?

22  A.    Yes.

23  Q.    You saw the memo putting Mr. Bearden in a no-contact

24  post, right?

25  A.    Yes, sir.

1    Q.      Why do you do that?

2    A.      To allow time for appropriate inquiry or investigation

3    if we have a claim against staff member.  No. 1, if there's a

4    serious allegation, we're going to consider moving the staff

5    member.  But that also removes that staff member, not only for

6    maybe the offender's protection if there is, indeed, a concern

7    going on there, but also protects the staff member from any

8    further allegations made against them, at least from that area,

9    during the inquiry or investigation.

10   Q.      Does removing that staff member from a contact post

11   allow you to leave an offender in the general population?

12   A.      Yes, it also allows us to leave the offender in the

13   most least restrictive housing while we're reviewing the

14   complaint, following the PREA standards.

15   Q.      You also testified that you believed that Mr. Bearden

16   was assigned to the 3:00 to 11:00 shift when you arrived in

17   2017, right?

18   A.      Yes, sir.

19   Q.      Would there be a way for us to look at that?

20   A.      Yes, the shift chronologicals, which are generated by

21   the shift supervisor, to include the names of all of the staff

22   assigned to a shift at any given time.

23   Q.      And then does Chillicothe issue memos when they assign

24   staff to different shifts?

25   A.      Yes, they're given assignment change from the Chief of

1  Custody.

2  Q.      For instance, like the one that we just looked at for

3  the no-contact post?

4  A.      That's correct.

5  Q.      You were asked about whether the rules allow a

6  corrections officer to send cards to inmates, and you said

7  that's not allowed, right?  That's what you said, right?

8  A.      Yes, that's what I said.

9  Q.      When you were warden, did you ever receive any reports

10  that Mr. Bearden had sent cards to offenders?

11  A.      No, sir.

12  Q.      And, again, we looked at the one complaint that you had

13  received about Mr. Bearden, right?

14  A.      Yes.

15  Q.      You testified that the cameras would see a corrections

16  officer if they went off post.  Is that right?

17  A.      Yes, sir.

18  Q.      If you reviewed the footage.

19  A.      Yes.

20  Q.      Is there anybody else at the Chillicothe Correctional

21  Center that would see a corrections officer off post?

22  A.      You mean as far as review of camera?

23  Q.      No, I mean just at Chillicothe.

24  A.      Yes, co-workers, if he left his post.

25  Q.      So other custody staff?

1   A.     Yes.

2   Q.     If Mr. Bearden was going into an area where he was not

3   assigned, would there be co-workers to see him there?

4   A.     Yes.

5   Q.     Those would be the corrections officer assigned to that

6   post?

7   A.     Yes, sir.

8          MR. TAULBEE:  I don't have anything further.

9          THE COURT:  Any recross?

10         MR. AMMANN:  Nothing further, Your Honor, thank you.

11         THE COURT:  Sir, we permit the jury to ask written

12  questions.  So if you could be patient for just a minute, we'll

13  see if the jury has any written questions.

14         THE WITNESS:  Sure.

15         THE COURT:  Could counsel please approach?

16         (Counsel approached the bench, and the following

17  proceedings were had:)

18         THE COURT:  So obviously I have some questions.  The

19  first is, "Are there staff workers in the administration

20  building on the 3:00 to 11:00 shift?  If so, do they also work

21  the same hours as above?"  I know what the first question is.

22  "Are there staff workers in the administration building on the

23  3:00 to 11:00 shift?"

24         MR. TAULBEE:  My guess is do they work 3:00 to

25  11:00, as well.

1      MS. McGRAUGH:  That's what I thought.

2      THE COURT:  So are there workers in the building on

3  the 3:00 to 11:00 shift, do they work the 3:00 to 11:00 shift.

4  Sometimes I feel like I'm playing a word game when I read these

5  questions.  Do you have any objection?

6      MR. AMMANN:  No.

7      THE COURT:  Do you have any objection?

8      MR. TAULBEE:  No.

9      THE COURT:  "If PREA went into effect in 2012, why

10  are the inmates fearful of reporting assaults?  Why do they

11  assume they'll go to the hole?  Is it policy?"  Any objection?

12      MS. McGRAUGH:  May I ask if you could read it again?

13      THE COURT:  Sure.  "If PREA went into effect in

14  2012, why are the inmates fearful of reporting assaults?  Why

15  do they assume they'll go into the hole?  Is it policy?"

16      MR. AMMANN:  I don't think he's qualified to answer.

17  I don't think he's qualified to answer that.  It may be a

18  question for somebody else.

19      THE COURT:  Do you have an objection?

20      MR. TAULBEE:  I do.  I think it's speculation on

21  what the offender is thinking.

22      THE COURT:  I agree, the question won't be asked.

23      "Were blinds on the windows in the vocational area

24  on your arrival as warden in 2017?"  Any objection?

25      MR. AMMANN:  No.

1          THE COURT:  Any objection?

2          MR. TAULBEE:  No objection.

3          THE COURT:  "Could Chilly be short-staffed on any

4  given day that would leave a post unattended for a period of

5  time longer than to make rounds?"  Any objection?

6          MR. AMMANN:  No.

7          THE COURT:  Any objection?

8          MR. TAULBEE:  No.

9          THE COURT:  Okay.  Those are all -- I'll ask those

10  three questions.

11          (The following proceedings were had in open court:)

12          THE COURT:  Sir, so we have a few questions.  The

13  procedure is that I will ask the questions, and then the

14  attorneys will have the opportunity to ask brief follow-up if

15  they think it necessary.

16                         - - -

17                      EXAMINATION

18  By the Court:

19  Q.    So the first question is were blinds on the windows in

20  the vocational area on your arrival as warden in 2017?

21  A.    No, not that I recall.  Again, those windows in those

22  classrooms are for the officers viewing from outside without

23  having to enter the classrooms, to provide minimal interruption

24  to the offender learning.

25  Q.    So on the 3:00 to 11:00 shift, are there staff working

1  in the administration building?

2  A.      In the lobby area that we first spoke of, the entryway,

3  there's a -- that custody checkpoint, an officer is assigned

4  there to process anybody that enters 24/7.  Now, the reception

5  desk, that's just normal business hours.  There's a

6  receptionist out there to, again, run our switchboard and take

7  incoming calls.

8         So the checkpoint is 24/7 operation.  And then other

9  than that, it's just the control center staff in the control

10 module in the administration building on the evening shift,

11 probably after 4:00, 4:30 p.m.  And then until probably 7:00,

12 7 a.m., that's when some of our clerical staff, administrative

13 staff starts showing up of a morning.

14 Q.      So do the staff who work in the administration building

15 on the 3:00 to 11:00 shift, do they work the same shift, 3:00

16 to 11:00?

17 A.      Yes.  The staff assigned to the administration

18 building, which would be control center and that security

19 checkpoint, that's their mid-shift, 3:00 to 11:00.  If I

20 understood the question correctly.

21 Q.      I think so.

22 A.      Okay.

23 Q.      Your answer made sense to me.

24        Could the Chillicothe facility be short-staffed on

25 any given day that would leave a post unattended for a period

1   of time longer than to make rounds?

2    A.      I guess as far as -- only thing I can think of recently

3   would be maybe during inclement weather, there have been times

4   where we've been short-staffed, but the shift supervisor, which

5   is, again, the captain or the lieutenant, has the authority to

6   close down what I would consider a nonessential area if we have

7   an area of operation that just simply needs to be closed

8   because we cannot provide custody supervision to that area.

9           For example, education.  While that's an area we

10  want to keep open, but if -- due to critical staffing, we could

11  close that and move that officer to another location.  So there

12  are a few I consider in critical situations nonessential areas

13  that we can close and then remove the custody person to a --

14  maybe a housing unit or an area that's -- where offender

15  presence is and we have to provide the custody coverage.

16          THE COURT:  Okay.  Thank you.  Any questions on

17  behalf of defense counsel?

18          MR. TAULBEE:  No, Your Honor.

19          THE COURT:  Any questions on behalf of plaintiffs?

20          MR. AMMANN:  No questions for plaintiffs, Your

21  Honor.

22          THE COURT:  Thank you, sir, you may step down.

23          Well, I appreciate your patience.  I know this has

24  been a longer session than typical without a break, but I just

25  kept thinking that the witness would wrap up.  So we'll take a

1  15-minute break.  We'll come back in at about five till 4:00.

2  Obviously, during this break, don't discuss this

3  case or do any research, and we'll be in recess until about

4  five till 4:00.

5  (The following proceedings were had in the courtroom

6  out of the presence of the jury:)

7  THE COURT:  Anything I can take up during this

8  break?

9  MR. TAULBEE:  Nothing from defendant.

10  MR. AMMANN:  No, Your Honor.

11  THE COURT:  Okay.  Then we'll be in recess.

12  (A recess was taken from 3:38 p.m. to 3:51 p.m.)

13  THE COURT:  Okay.  Are we ready to bring the jury

14  out?

15  MR. TAULBEE:  Yes, Your Honor.

16  MR. AMMANN:  I think Ms. McGraugh might be -- there

17  she is.

18  THE COURT:  Okay.  Bring them out.

19  (The following proceedings were had in the courtroom

20  in the presence of the jury:)

21  THE COURT:  Mr. Taulbee, are you ready to call your

22  next witness?

23  MR. TAULBEE:  Yes, Your Honor.  Defendant calls

24  Edward Bearden.

25  THE COURT:  Sir, if you could step forward, and if

1   you could come to this area right here.  Either way.  May be

2   easiest going the direction you were originally going.  With

3   all of the chairs, it's congested.  If you could come to this

4   lady right here and be sworn in.

5                              - - -

6                        EDWARD BEARDEN,

7    being first duly sworn by the courtroom deputy, testified as

8   follows:

9            THE COURT:  Could you please take the witness stand

10  on the riser.

11           MR. TAULBEE:  May I proceed?

12           THE COURT:  You may proceed.

13                             - - -

14                      DIRECT EXAMINATION

15   By Mr. Taulbee:

16   Q.      Good afternoon.  Could you state your name for the

17  jury?

18   A.      Edward Bearden.

19   Q.      And you're going to need to speak up and speak into

20  that microphone, okay?

21   A.      Edward Bearden.

22   Q.      Mr. Bearden, you've been sitting in the courtroom the

23  last few days, correct?

24   A.      Yes, sir.

25   Q.      Have you heard the accusations against you?

1 A.  I have.

2 Q.  Did you sexually assault any of these women?

3 A.  No, I did not.

4 Q.  Did you sexually assault any other woman at Chillicothe

5 Correctional Center?

6 A.  No.

7 Q.  You've heard accusations that you raped Karen Keil 20

8 times. Do you recall that?

9 A.  I have.

10 Q.  And that you forced Trenady George to perform oral sex

11 on you 45 to 50 times?

12 A.  Yes.

13 Q.  Are you physically capable of that amount of sexual

14 activity?

15 A.  No.

16 Q.  Where are you from, Mr. Bearden?

17 A.  Pardon me?

18 Q.  Where are you from?

19 A.  Chillicothe, Missouri.

20 Q.  What is the highest level of education that you

21 completed?

22 A.  Twelfth.

23 Q.  Did you graduate from high school?

24 A.  No, sir.

25 Q.  So you have a high school equivalency diploma?

1   A.      I do.

2   Q.      When did you get that?

3   A.      In 2008.

4   Q.      You were previously employed by the Missouri Department

5   of Corrections, correct?

6   A.      Pre -- yes.  Yes.

7   Q.      What facility did you work at?

8   A.      Chillicothe Correctional Center.

9   Q.      Did you ever work at any other facility?

10  A.      No.

11  Q.      How long were you employed at Chillicothe?

12  A.      Almost ten years.

13  Q.      When did you start there?

14  A.      2008.

15  Q.      And why did you leave?

16  A.      Retirement.

17  Q.      When did you retire?

18  A.      In 2018.

19  Q.      I'm going to pull up what has been previously admitted

20  as Exhibit D14.  It should appear on that screen for you in a

21  second.  Do you see it there?

22  A.      Yes.

23  Q.      Tell the jury what they're looking at here.

24  A.      What this is is retirement, where I wrote a letter to

25  Mr. McBee.

1   Q.    And there's a -- what's the date on this, it says

2  interoffice communication?

3   A.    5/11/2018.

4   Q.    And the subject is retirement?

5   A.    Yes, it is.

6   Q.    Did you write this document?

7   A.    Yes.

8   Q.    Is that your signature on the bottom?

9   A.    Yes, sir, it is.

10   Q.    And did you handwrite that date on there?

11   A.    Yes, I did.

12   Q.    And what have you told the warden in this IOC?

13   A.    Pardon me?

14   Q.    What have you told the warden in this IOC?

15   A.    That I was preparing to retire.

16   Q.    What was the effective date of your retirement?

17   A.    The last day of August, 2018.

18   Q.    That would be your last working day?

19   A.    Yes, sir.

20   Q.    But you'd started thinking about retirement --

21        MS. McGRAUGH:  Objection, Your Honor, leading.

22        THE COURT:  Sustained.

23  BY MR. TAULBEE:

24   Q.    Mr. Bearden, had you started thinking about retirement

25  before May of 2018?

1  A.    Yes.

2  Q.    I'm going to show you what has been previously admitted

3  as Exhibit D13.  What is this?

4  A.    It's an ENGAGE meeting.

5  Q.    And what is -- tell the jury what an ENGAGE meeting is.

6  A.    It's like a performance appraisal.  You know, an

7  attaboy, so to speak.

8  Q.    When did this one take place?

9  A.    The date on this one is February 6, 2018.

10  Q.    And I want to direct your attention to the second

11  little paragraph from the bottom where it says, "What are your

12  goals?"  What are your goals for 2018 here?

13  A.    To retire, go fishing, be able to ride my Harley, and

14  to simply enjoy life.

15  Q.    Had you thought about your retirement before February

16  2018?

17  A.    Yes, sir.

18  Q.    What was your title during your time at Chillicothe

19  Correctional Center?

20  A.    CO I.

21  Q.    Did you have any other titles?

22  A.    FTO.

23  Q.    Tell the jury what an FTO is.

24  A.    It's a field training officer.

25  Q.    What were your duties as a correctional officer?

1  A.     Safety and security of the institution.

2  Q.     What were your duties as a field training officer?

3  A.     OJT training, so to speak, when the new hires come in

4  out of the academy.

5  Q.     What does OJT mean?

6  A.     On-the-job training.

7  Q.     Keep going.

8  A.     Yes, sir.

9  Q.     What did you do to train the new employees coming out

10 of the academy?

11 A.     I was a utility officer, so I would take them to

12 whatever their post may be assigned that morning, would take

13 them and kind of show them the ropes of what they needed to

14 know.  In the academy, they get an idea, but this is more

15 hands-on training.

16 Q.     Are there offenders at the academy?

17 A.     Pardon me?

18 Q.     Are there offenders at the academy?

19 A.     Offenders at the academy?  No.

20 Q.     So this is their first experience being --

21         MS. McGRAUGH:  Objection, Your Honor, leading.

22         THE COURT:  Overruled.

23 BY MR. TAULBEE:

24 Q.     Is this their first experience being around offenders?

25 A.     Yes, sir.

1    Q.    And how long were you a field training officer?

2    A.    Several years.  I'm not sure about the dates.

3    Q.    Why did you become a field training officer?

4    A.    So I'm not stuck in one post.  I can learn the whole

5    camp.  There's so many places inside the prison.

6    Q.    Mr. Bearden, I'm talking about field training officer.

7    A.    Yes.

8    Q.    Why did you become a field training officer?

9    A.    So I can help new hires learn.  They may have my back

10   someday, and I would want them to know how to do the job

11   correctly.

12   Q.    I do want to talk to you about your duty assignments at

13   Chillicothe Correctional Center, okay?

14   A.    Okay.

15   Q.    When you first started at Chillicothe Correctional

16   Center in 2008, where were you assigned?

17   A.    I was in 2-House.  It's mental health.

18   Q.    And how long were you assigned to 2-House?

19   A.    A couple of years.

20   Q.    And I'll pull up Exhibit D8, which has been previously

21   admitted.  It will appear on your screen there.

22   A.    Yes, sir.

23   Q.    What is this?

24   A.    It's a bid sheet for post assignments.

25   Q.    Okay.  And we don't see your name on the first page; is

1  that right?

2  A.      I do not.

3  Q.      Before we go from that, what's the date on this bid

4  sheet or duty assignment?

5  A.      January 31, 2012.

6  Q.      And what's the subject?

7  A.      Third shift CO I duty assignment.

8  Q.      And when does it say that these duty assignments will

9  become effective?

10  A.      February 11, 2012, at 11 p.m.

11  Q.      Okay.  And we'll move to Page 2 of Exhibit D8.  Do you

12  see your name on Page 2 of Exhibit D8?

13  A.      Yes, sir.

14  Q.      What does this memo tell you about your duty

15  assignment?

16  A.      I went from third shift, 3 p.m. to 11 p.m., Housing

17  Unit 2, mental health.  My days off were Sunday and Monday.  I

18  moved to a third shift, 3 p.m. to 11 p.m., to Housing Unit 5.

19  My days off were Monday and Tuesday.

20  Q.      And why were you moving from Housing Unit 2 to Housing

21  Unit 5?

22  A.      They shut 2-House down.

23  Q.      What were your duties as a corrections officer assigned

24  to Housing Unit 5?

25  A.      Safety and security of the institution, for one.  The

 1   other one, just maybe daily assignments in the house.  You do

 2   count numerous times.  Supplies up for porters, mops, rags, and

 3   cleaning supplies, whatever.  Do wing tours.  Just --

 4   Q.     How many other corrections officers would be assigned

 5   to you on Housing Unit 5 -- assigned with you on Housing

 6   Unit 5?

 7   A.     Every day probably three to four officers in that

 8   house.

 9   Q.     For your shift?

10   A.     Yes, yes.  Sorry, per shift.

11   Q.     And we're going to look at Exhibit D9 next.  It's also

12   been previously admitted.  Okay?  So it will come up on your

13   screen momentarily.

14          All right.  What are we looking at in Exhibit D9.

15   A.     It's another bid sheet.

16   Q.     What's the date on this bid sheet?

17   A.     December 29, 2012.

18   Q.     And where are you getting that date?

19   A.     Pardon me?

20   Q.     Where do you see December 29th?

21   A.     Subject, third shift, date, day assignment becomes

22   effective, Saturday, December 29, 2012.

23   Q.     I see.  You're saying the effective date of this one is

24   December 29, 2012?

25   A.     Yes, sir.

1   Q.      Do you see a date on the top of this one?

2   A.      I'm sorry, sir.  December 10, 2012.

3   Q.      And what does this bid sheet tell you about your duty

4   assignment?

5   A.      I am moving from third shift, 3 p.m. to 11, off of

6   Housing Unit 5, my days off are Monday and Tuesday.  I'm going

7   to third shift, 3:00 to 11:00, going to the yard/utility.  My

8   days off are Thursday and Friday.

9   Q.      And why did you move from Housing Unit 5 to

10  yard/utility?

11  A.      Get out of the house, get outside, work outside.

12  Q.      What were your duties as a corrections officer assigned

13  to the yard?

14  A.      Patrol the fence; you check for gates, make sure

15  they're all secure; doors, make sure they were secure.  From

16  3:00 to 11:00 there wasn't too many things that was open, so

17  you had to check the doors.  Just safety and security of the

18  institution.

19  Q.      Look at one more of these.  We'll pull up Exhibit D10,

20  which has also been previously admitted.  And what is this?

21  A.      This is another bid sheet, job assignment.

22  Q.      What's the date on this one?

23  A.      The date on this one is January 17, 2014.

24  Q.      And what is the effective date of this change?

25  A.      The effective date is January 25, 2014.

1    Q.      What --

2    A.      11 p.m.

3    Q.      What does this memo tell you about your shift

4    assignment?

5    A.      I am moving from third shift, 3:00 to 11:00,

6    yard/utility, Thursday and Friday.  I'm going to days, second

7    shift, which is 7:00 to 3:00, utility, Wednesday and Thursday.

8    Q.      And so if the effective date on this is Saturday,

9    January 25, 2014, at 11 p.m., that means you would have worked

10   your 3:00 to 11:00 shift on that date; is that correct?

11   A.      Yes, sir.

12   Q.      And then after that date, you would have been assigned

13   to the second shift?

14   A.      Correct.

15   Q.      Why did you make this assignment change?

16   A.      It's on days, for one.  Utility worker, it's more

17   variety of where you're working, what you're learning.

18   Q.      Did you change assignments, your shift, or your

19   schedule -- your scheduled days off any other time after this?

20   A.      No, sir, no.

21   Q.      And so after January 25, 2014, you were no longer on

22   the third shift --

23   A.      Correct.

24   Q.      -- correct?  And on second shift, unless you were

25   working overtime, which we heard a little bit about, what time

1 did you leave the institution?

2 A.     3 o'clock.

3 Q.     How long have you been retired from the department?

4 A.     Since 2019.

5 Q.     2018?

6 A.     2018.

7 Q.     You retired that date we saw earlier?

8 A.     Yes.  Yes.

9 Q.     Do you remember every time you took leave?

10 A.     As in vacation, sick leave?

11 Q.     Vacation, sick leave?  Do you remember every time?

12 A.     Not every time, no.

13 Q.     Do you remember every time you worked overtime?

14 A.     No, sir, I do not.

15 Q.     When you took leave, would you put in a leave slip?

16 A.     Yes.

17 Q.     When you worked overtime, would you put in a slip

18 requesting to get paid for that overtime?

19 A.     Yes, you would.

20 Q.     Did you ever work overtime at Chillicothe Correctional

21 Center that you didn't put in for?

22 A.     No, no.

23 Q.     You mentioned safety and security of the institution as

24 your primary duty in all of your assignments.  Is that right?

25 A.     That's true.

1  Q.     So when you say safety and security, what do you mean?

2  A.     Just what it is, safety and security.  Make sure

3  everything is safe, everything is secure.  No holes in fences.

4  Everything is going to be all right, you know.

5  Q.     Safe and secure for who?

6  A.     For COs and the offenders.

7  Q.     And what does Chillicothe have to make it safe and

8  secure?

9  A.     Cameras, radios, fence.

10  Q.     You say radios.  Who has those radios?

11  A.     Everybody's assigned a radio.

12  Q.     And what, if anything, must be reported by a

13  corrections officer at Chillicothe?

14  A.     Say it again, sir?

15  Q.     Sure.  What, if anything, has to be reported by a

16  corrections officer at Chillicothe?

17  A.     Anything that doesn't look normal.  You see something

18  suspicious, a car, or even a drone.  I mean, there was a big

19  thing about drones there for a while.  Just anything that looks

20  out of place.

21  Q.     And do you remember an incident November of 2017 where

22  you found something out of place?

23  A.     On a housing unit?

24  Q.     Sure.

25  A.     Yes.

1  Q.      Tell me about that.

2              MS. McGRAUGH:  Your Honor, I'm going to object on

3  the grounds of relevancy.

4              THE COURT:  Could counsel please approach?

5              (Counsel approached the bench, and the following

6  proceedings were had:)

7              THE COURT:  Where are you going with this?

8              MR. TAULBEE:  In an incident in 2017, they found an

9  unsecured door, which was one of those property room doors in

10 that back E-Wing that they reported and got put into a search

11 log because --

12             THE COURT:  Put into what?

13             MR. TAULBEE:  He put it into a search log because it

14 was unlocked as he was doing a tour of the area.  And then it

15 got -- he noticed that first the door was unlocked, that the

16 light did not come on when he entered the room, and so he

17 reported -- he reported in the search log, and the other CO I

18 then reported it up the chain of command.

19             THE COURT:  How is that relevant?

20             MR. TAULBEE:  It's an explanation of how things work

21 at Chillicothe, what's reported and why it's reported.

22             THE COURT:  Right, but how does it have anything to

23 do with reporting or not reporting sexual assaults or anything

24 regarding the facts of this case?

25             MR. TAULBEE:  In some way we're sort of arguing the

1  dog that didn't bark, Your Honor.  We have to show them the

2  employees at Chillicothe did report these things when there's

3  something wrong.

4        THE COURT:  I think if there's something more

5  similar to sexual assault, it would be relevant.  But reporting

6  the fact that a door didn't work and a light didn't come on is

7  too far afield from what we have here, and so I don't find it

8  relevant and I sustain the objection.

9        MS. McGRAUGH:  May I ask, are there other incidents

10 you intend to --

11       MR. TAULBEE:  No.

12       (The following proceedings were had in open court:)

13 BY MR. TAULBEE:

14 Q.    Mr. Bearden, before Miss Keil filed her lawsuit or made

15 these allegations against you, how many times while you were at

16 Chillicothe Correctional Center had you been accused of

17 sexually assaulting an inmate?

18 A.    Never.

19       MS. McGRAUGH:  Objection, Your Honor, relevance.

20       THE COURT:  Overruled.

21 A.    Never.

22 BY MR. TAULBEE:

23 Q.    How many times had you been accused of sexually

24 harassing an inmate?

25 A.    Never.

1  Q.    So until Miss Keil's allegations and lawsuit, you'd

2  never been accused of sexually assaulting an inmate at

3  Chillicothe Correctional Center?

4  A.    No, sir.

5  Q.    Did you rape Karen Keil?

6  A.    No, sir.

7  Q.    Did you sexually assault her in any way?

8  A.    No, sir.

9  Q.    Did you sexually assault Lynnsey Betz?

10  A.    No, sir.

11  Q.    Did you sexually assault Ashley Zieser?

12  A.    No, sir.

13  Q.    Did you sexually assault Trenady George?

14  A.    No, sir.

15  Q.    Did you sexually assault or rape any other inmate at

16  Chillicothe Correctional Center?

17  A.    No, sir.

18          MR. TAULBEE:  Thank you, Mr. Bearden.

19          THE WITNESS:  Yes, sir.

20          THE COURT:  Any cross-examination?

21          MS. McGRAUGH:  Yes, Your Honor.

22                  - - -

23             CROSS-EXAMINATION

24  By Ms. McGraugh:

25  Q.    Good afternoon, Mr. Bearden.

1    A.    Good afternoon.

2    Q.    My name is Susan McGraugh.  I believe we met before.

3    A.    Yes, ma'am.

4    Q.    And before we start, you and I were in the elevator

5    together this morning.

6    A.    Yes, ma'am.

7    Q.    And you said something to me.  Could you tell the jury

8    what you said?

9    A.    I believe I asked you if we were going to have a good

10   day.

11   Q.    Right.  Are we going to have a good day.

12   A.    Yes.

13   Q.    Can you tell the jury what that meant?

14   A.    It's a good day.

15   Q.    We, meaning?

16   A.    All of us, everybody.

17   Q.    You weren't trying to butter me up?

18   A.    No.  You were sitting on an elevator.  You need to say

19   something to somebody and not be rude.

20   Q.    Okay.  Even if they're the lawyer for the other side?

21   Yeah?

22   A.    Yeah.

23   Q.    Okay.  You admit you worked overtime?

24   A.    Sometimes.

25   Q.    You admit you worked evenings?

1   A.      After I got on days?

2   Q.      3:00 to 11:00.

3   A.      Yes, ma'am, sometimes.

4   Q.      Okay.  And in 2017, you were working 3:00 to 11:00, the

5   warden said that?

6   A.      Okay, yes, ma'am.

7   Q.      So when Mr. Taulbee said you changed your hours, that's

8   not correct, is it?

9   A.      Yes.

10  Q.      Yes, that it's incorrect?

11  A.      I seen it on the sheet, the hours that we changed, is

12  that what you're speaking about?

13  Q.      Are you saying the warden lied when he said you were

14  working 3:00 to 11:00 when he came on?

15  A.      Absolutely not.

16          MR. TAULBEE:  Objection, that misstates his

17  testimony.

18          THE COURT:  Overruled.

19  BY MS. McGRAUGH:

20  Q.      Are you saying that the warden of Chillicothe lied when

21  he said you worked 3:00 to 11:00 when he got there?

22  A.      I was working 3:00 to 11:00 when he got on.

23  Q.      Okay.  So --

24  A.      I don't know what the date was, ma'am.

25  Q.      I'm sorry.  I interrupted you, I apologize.

1   A.      Me also.

2   Q.      But when Mr. Taulbee asked you five minutes ago whether

3   you ever switched assignments again, you said no, that you were

4   still working the morning shift.  Isn't that right?

5   A.      I was working days in utility, yes.

6   Q.      Okay.  So I guess my question is that when you told Mr.

7   Taulbee you never switched, that was not true.

8   A.      I progressed different assignments through the years.

9   My last assignment that I worked was on days as a utility

10  officer.

11  Q.      Okay.  So -- and that's why I'm saying if the warden

12  told the jury that you were working 3:00 to 11:00 when he got

13  there, then the warden is wrong?

14  A.      I misunderstood you.  I could have possibly been

15  working 3:00 to 11:00 when the warden got there.

16  Q.      Okay.  Okay.

17  A.      It's when the warden got there that I didn't

18  understand.

19  Q.      Okay.  Okay.  So what you told -- the point I'm making

20  is what you told Mr. Taulbee wasn't accurate because you did,

21  in fact, switch back to 3:00 to 11:00?

22  A.      I did not switch back, no, ma'am.

23  Q.      Okay.  Let's move on.

24          So I want to ask some questions about this whole

25  retirement issue.  How long have you been -- had you been a

1  state employee by the time you retired?

2  A.    Almost 30 years.

3  Q.    Because you worked for Missouri Department of

4  Transportation before you went to the Department of

5  Corrections?

6  A.    Yes, ma'am.

7  Q.    And MOSERS is the retirement agency for the State of

8  Missouri, correct?

9  A.    Yes, ma'am.

10  Q.    And they have rules about how much pension you get,

11  correct?

12  A.    Yes.

13  Q.    And if you hit certain benchmarks, you get additional

14  retirement pension, correct?

15  A.    If you reach that mark, yes.

16  Q.    Right.  So in five years, you get a certain amount of

17  pension, ten, twenty, correct?

18  A.    Five years, you're vested.

19  Q.    Right.

20  A.    That's your time in the bank.

21  Q.    The amount of money you get in your pension when you

22  retire depends, in part, on how long you were a state employee,

23  correct?

24  A.    Correct.

25  Q.    And those benchmarks are in five-year increments,

1  correct?

2  A.      Yes, ma'am, I believe so.

3  Q.      And you retired two months and three weeks short of

4  your 25th anniversary.

5  A.      My 30th?

6  Q.      Your 30th anniversary.

7  A.      Yes, ma'am.

8  Q.      Okay.  Because if you had stayed until your 30th

9  anniversary, your pension would be more, correct?

10  A.      Possibly.

11  Q.      And you said that your plans for retirement were

12  hunting and fishing, correct, and riding your Harley?

13  A.      Yes, ma'am.

14  Q.      But isn't it true that now that you're retired, you are

15  working another job to bring in income?

16  A.      Sometimes.

17  Q.      You work for a drug store?

18  A.      Part-time, yes, ma'am.

19  Q.      Delivering?

20  A.      Yes, ma'am.

21  Q.      You get extra income?

22  A.      A little.

23  Q.      And you retired when you were only 62 years old; is

24  that correct?

25  A.      Yes, ma'am.

1   Q.      In all fairness, the jury should know that you had a

2   very ill wife at the time.

3   A.      Very ill, yes, ma'am.

4   Q.      And she passed away, am I correct?

5   A.      She did.

6   Q.      Okay.  Social Security.  You don't get full Social

7   Security, correct?

8   A.      I do.  I get partial Social Security at 62, and that's

9   why I chose 62.

10  Q.      Okay.  And you also no longer qualify since you left

11  for Missouri state health insurance, correct?

12  A.      Correct.

13  Q.      So you were two months and three weeks short of getting

14  more pension, correct?

15  A.      Correct.

16  Q.      And because you retired early, not only do you get less

17  pension, you get less Social Security, and you've lost your

18  medical benefits; is that true?

19  A.      That's true.

20  Q.      By two months and three weeks, correct?

21  A.      Yes, ma'am.

22  Q.      All right.

23  A.      I retired early because my wife had Stage 4 lung

24  cancer, and we were making a trip every three weeks to Tulsa.

25  Q.      Right.  And I understand that.  That's why I gave you

1  an opportunity to tell the judge about it.

2  A.     Okay.

3  Q.     Or the judge.  Excuse me, the jury about it.

4  A.     Thank you.

5  Q.     You're welcome.

6         Now, Mr. Ammann was asking Warden Taulbee about

7  over-familiarity -- I'm sorry?  McBee.  Promotion, maybe.

8         You heard this, the rules against over-familiarity?

9  A.     Yes, ma'am.

10  Q.     And that's for everybody's protection, right?

11  A.     That's true.

12  Q.     Now, I want you to look over at this table.  Do you

13  recognize any of these women?

14  A.     Two people.

15  Q.     Who do you recognize?

16  A.     Mrs. Backues and Miss George.

17  Q.     You recognize Miss George?

18  A.     Yes, ma'am.

19  Q.     Did you have an overly familiar relationship with Miss

20  George?

21  A.     No, ma'am.

22  Q.     Did you participate in conduct with Miss George that

23  violated that rule?

24  A.     I did.

25  Q.     Okay.  So you did have a contact with Miss George

1 during the time you were there that violated the

2 over-familiarity rule?

3 A.     I did.

4 Q.     Why don't you go ahead and tell the jury what you did.

5 A.     I purchased a Tracfone so we could have a conversation.

6 I know that it was wrong.  I know it is wrong.  I made a

7 mistake.  I'm not perfect, but I own up to that.

8 Q.     You own up to it now.

9 A.     Yes, ma'am.

10 Q.     You didn't own up to it the first time I asked you --

11 let me finish my question.

12              In November of 2018, I asked you if you had an extra

13 cell phone when you worked at Chillicothe, and you told me no.

14 A.     That's true.

15 Q.     You told me no, even though you were under oath?

16 A.     That's true.

17 Q.     You were under oath then like you're under oath now?

18 A.     That's true.

19 Q.     And you had a lawyer there, correct?

20 A.     And I had what, ma'am?

21 Q.     Had a lawyer there.

22 A.     Yes.

23 Q.     It wasn't just me.

24 A.     That's true.

25 Q.     And you said no, you never had another telephone.

1  Isn't that right?

2  A.      That's right.

3  Q.      And that was a lie.

4  A.      At that time, I was very, very nervous, scared.  I

5  forgot all about that other phone.  It was a mistake on my

6  part.

7  Q.      So you lied.

8  A.      At that time, yes, ma'am.

9  Q.      Okay.  And then a period of time passed.  And your

10  deposition, right, we keep hearing about these depositions, was

11  taken again April 7, 2021.  Correct?

12  A.      I believe so.  I don't have that date.

13  Q.      Two and a half years later?

14  A.      Okay.

15  Q.      Yes?

16  A.      Yes.

17  Q.      And you were under oath like you are today.

18  A.      Yes.

19  Q.      Between 2018 and 2021, did you ever tell either me or

20  your own lawyer about the second Tracfone?

21          MR. TAULBEE:  Objection.  Attorney/client privilege,

22  Your Honor.

23          THE COURT:  I think the question needs to be

24  rephrased.  The objection is sustained.

25  BY MS. McGRAUGH:

1   Q.      Did you ever tell anyone else about the Tracfone?

2   A.      Anyone else besides you or my lawyer?

3   Q.      Yes.

4   A.      No.

5   Q.      You didn't tell me.

6   A.      True, I did not.

7   Q.      So for two and a half years, you stuck to the story, "I

8   didn't have a second phone," correct?

9   A.      Correct.

10  Q.      And it wasn't until you were under oath again that John

11  Ammann asked you about a phone number, correct?

12  A.      Yes, ma'am.

13  Q.      And John Ammann asked you about a phone number,

14  660-247-1921.  Does that sound familiar?

15  A.      No, it does not.  But, I mean, if that's what's on the

16  paper, that's what it is.

17  Q.      I don't want to put words in your mouth.  Did

18  Mr. Ammann ask you, "And you're going to help us solve the big

19  mystery here.  So there's a phone number, 660-247-1921.  Can

20  you tell me what you know about that phone number?"

21  A.      If that's the phone number that was with that

22  Tracfone -- when you purchase a Tracfone, that phone number is

23  assigned to that phone.

24  Q.      Sir, my question is was that the first time that you

25  admitted that you had the Tracfone?

1  A.      I believe so.  I don't --

2  Q.      And he said can you tell me what you know about the

3  number two and a half years later, and what did you say?

4  A.      Pertaining to the Tracfone?

5  Q.      Yes, sir.

6  A.      What are you asking me to -- I don't know, I don't

7  understand your question.

8  Q.      "Question:  Can you tell me what you know about that

9  phone number?"

10         And I'm asking you to tell the jury what your

11 response was under oath in 2021.

12 A.      The phone number is assigned to the phone.

13 Q.      Sir, I'm asking you what you responded during the

14 deposition when you were asked.

15         MR. TAULBEE:  Your Honor, I'm going to object.  May

16 we approach?

17         THE COURT:  Uh-huh.

18         (Counsel approached the bench, and the following

19 proceedings were had:)

20         MR. TAULBEE:  I'm fairly confident that Mr. Bearden

21 doesn't remember exactly what he said in his deposition from

22 however long ago.

23         MS. McGRAUGH:  Well, Mr. Taulbee, it's the

24 foundation you used when you asked our witnesses.  That's why

25 I'm using the exact same foundation.  I'm giving him a chance

1  to answer.  If he says he doesn't know, then I'll read the

2  answer.  But he's not answering the question.

3         MR. TAULBEE:  Well, she's asking him what he

4  remembers about his answer.  If she wants to just ask him the

5  question, and he can --

6         THE COURT:  I think she asked him the question, and

7  now she's asking if he remembers.  Your objection at this point

8  is overruled; but if he doesn't have an answer to the question,

9  then at that point it's time to impeach him with his

10 deposition.

11        MS. McGRAUGH:  Yes, ma'am.

12        (The following proceedings were had in open court:)

13 BY MS. McGRAUGH:

14 Q.     Do you recall what you said to me, to Mr. Ammann in

15 2021 about that telephone number, 660-247-1921?

16 A.     No, I do not.

17 Q.     "Answer:  I think that phone number was for a Tracfone

18 that I purchased for the reason to talk to an offender."

19        Do you remember that?

20 A.     I agree with that.

21 Q.     Okay.  So a Tracfone is a burner phone, correct?

22 A.     Is a what?

23 Q.     You've never heard the term burner phone?

24 A.     No, it was just a cheap phone you can throw away after

25 you use it.

1   Q.    Okay.  So it's a phone you can use without registering

2  a cell account, correct?

3   A.    Correct.

4   Q.    It's untraceable, correct?

5   A.    I don't know that, but okay.

6   Q.    Well, you don't go in and give them your driver's

7  license and they write down "Edward Bearden owns this phone

8  number," correct?

9   A.    Correct.

10   Q.    It's anonymous, correct?

11   A.    Correct.

12   Q.    And you purposely bought an anonymous phone so you

13  could call one of the women in prison.

14   A.    Correct.

15   Q.    And the woman you spoke to was Trenady George.

16   A.    Correct.

17   Q.    I'm going to put up State's Exhibit 21, and this is

18  tough to read.  And if you need to -- Plaintiffs' Exhibit 21.

19  Can you read that?  And I'm going to move it.

20        Do you see this phone number?

21   A.    I can see that there's something there, ma'am, but I

22  can't read it.

23   Q.    It's very small.

24        MS. McGRAUGH:  May I approach?

25        THE COURT:  Yes.

1    A.       There's nothing on my screen.

2    BY MS. McGRAUGH:

3    Q.       There's not.  Okay.  I don't know why that is.

4    A.       It's on.

5    Q.       It's on your screen now?  Can you see what that phone

6    number is that's written there?

7    A.       It looks like 660-247-1 -- something.

8    Q.       1921?

9    A.       Right.

10   Q.       That's your phone?

11   A.       Okay.

12   Q.       Yeah?

13   A.       Yes, ma'am.

14   Q.       Okay.  And that's the phone you bought anonymously to

15   have contact with one of the women in the prison, correct?

16   A.       Yes, ma'am.

17   Q.       And you used it to talk to Trenady George.

18   A.       Yes, ma'am.

19   Q.       And did you give her a pink sticky with the number on

20   it?

21   A.       No, ma'am.

22   Q.       How did you give her the number?

23   A.       Verbally.

24   Q.       Where did you give her the number?

25   A.       Possibly on the walk.

1  Q.     On the walk?

2  A.     Maybe, yes, on the sidewalk in passing.  I don't

3  remember where I quoted her the number.

4  Q.     Well, you sought her out to give her the number,

5  correct?

6  A.     I didn't go looking for her, no, if that's what you're

7  implying.  I mean, it would have just been in passing.

8  Q.     It was a coincidence?

9  A.     Possibly.

10  Q.     Possibly.  Was the plan to wander the prison until you

11  found Miss George so you could give her the phone number?

12  A.     No.

13  Q.     Okay.  But the phone number was meant to be given to

14  Trenady George.

15  A.     That's why I purchased it -- I'm sorry.

16  Q.     It was meant to be given to Trenady George.

17  A.     Yes, ma'am.

18  Q.     That's why you bought the phone.

19  A.     Yes, ma'am.

20  Q.     And you gave her the phone number.

21  A.     Yes, ma'am.

22  Q.     And you told her to call.

23  A.     Yes, ma'am.

24  Q.     And she waited several weeks after you gave her that

25  phone number to call it.

1  A.     I don't remember the time, no.

2  Q.     You ever talk to her about her kids?

3  A.     That was the conversation, yes, about her kids and her

4  mom.

5  Q.     And is it still your testimony that you were going to

6  provide counseling to Miss George?

7  A.     I was trying to do a job that I was not qualified for,

8  ma'am.

9  Q.     Nor allowed to do, correct?

10  A.     No, ma'am.

11  Q.     And your testimony is that you were going to be her

12  counselor and help her with personal problems?

13  A.     In conversation, yes.

14  Q.     There are counselors at the prison, correct?

15  A.     There is.

16  Q.     Do you have a counseling degree?

17  A.     No, ma'am, I don't.

18  Q.     Do you have any experience in counseling?

19  A.     No, ma'am, I do not.

20  Q.     But you were going to counsel Trenady George, that's

21  what you're telling the jury?

22  A.     I was trying to help her.

23  Q.     You were trying to help her?

24  A.     Make her feel better.

25  Q.     Help her feel better?

1  A.     Yes.

2  Q.     Do you think as she sits here today she feels better?

3  A.     I hope so in some way.

4  Q.     You think she feels safe?

5  A.     I hope so.

6          MR. TAULBEE:  Objection, speculation.

7          THE COURT:  Sustained.

8  BY MS. McGRAUGH:

9  Q.     So you buy the Tracfone, you get some minutes, it's an

10 anonymous phone, and you arrange to have Miss George call you.

11 A.     Yes, ma'am.

12 Q.     And that's the only time you used that phone.

13 A.     No, ma'am.

14 Q.     Did you call another woman?

15 A.     I did not call, no.

16 Q.     Did another woman call you?

17 A.     Yes.

18 Q.     So not only did you give Trenady George your burner

19 phone number, you also gave it to another woman in the prison.

20 A.     Yes, ma'am, I did.

21 Q.     And would you consider the phone call you had with that

22 woman to be sexy?

23 A.     No.

24 Q.     Were there references to sex in there?

25 A.     No.

1  Q.      Did you say to the woman, "Stay wet"?

2              MR. TAULBEE:  Objection, relevance, Your Honor.

3              THE COURT:  Overruled.

4  BY MS. McGRAUGH:

5  Q.      Did you say to that woman at the end of the

6  conversation, "Stay wet"?

7  A.      Stay safe?

8  Q.      Stay wet.

9  A.      You're asking me to answer what you're -- stay --

10 Q.      Sir, you hear me.  Stay wet.

11 A.      Stay -- I don't know.

12 Q.      You don't know if you told the other offender, "Stay

13 wet"?

14 A.      No, I guess I don't know.

15 Q.      You're not denying you said it.

16 A.      No, I'm just denying -- I don't know what you're

17 talking about.

18 Q.      The words "stay wet"?

19 A.      Stay what?

20 Q.      Sir, W-E-T, wet.  Did you say that to another female

21 prisoner who you had call you on the phone?

22 A.      I'm sorry, ma'am.  I don't know what you're looking

23 for.

24 Q.      I'm looking for a yes or no, sir.

25 A.      Repeat the question, please.  I'm sorry, but it sounded

1  like you were -- stay what, like you were asking what.

2  Q.     Wet, W-E-T.

3  A.     Wet?

4  Q.     Did you say --

5  A.     No.

6  Q.     You did not say that.

7  A.     Not that I can remember, no.

8  Q.     Are you denying saying it?  Have you heard the tape?

9  A.     Yes, I've heard it.

10  Q.     You didn't hear you tell the female offender, "Stay

11  wet"?

12  A.     Not that I recall, no.

13  Q.     Do you remember one way other another?

14  A.     One way or another?  I'm trying to understand what

15  you're looking for, ma'am.

16  Q.     Just a yes or no.

17  A.     That I said, "Stay wet"?

18  Q.     Yes, sir.

19  A.     Not that I remember.

20  Q.     Which is not the same as saying, "No, I never said it,"

21  correct?

22  A.     No, it's saying that I don't remember saying that.

23  Q.     Could you have said it?

24  A.     I don't believe so.

25  Q.     Okay.  Do you even know?

1    A.       No, I don't.  I mean --

2    Q.       You don't know.  Okay.  That's fine.  That can be the

3    answer.

4            And you say you threw the Tracfone -- now, who did

5    you call first, Trenady George or this other woman?

6    A.       I believe it was Miss George.

7    Q.       Okay.  Did you ever testify under oath that you threw

8    the phone away after you talked to Miss George?

9    A.       Yes, ma'am, I did.  I did.

10   Q.       You said you threw it out the window of your car,

11   correct?

12   A.       Yes.

13   Q.       So which person did you talk to first?

14   A.       I think I talked to Miss George first and talked to the

15   other lady after that, and then destroyed the phone.

16   Q.       So when you testified under oath that you threw the

17   Tracfone out the window after the conversation, that's not

18   true.

19   A.       What's -- not sure which one I talked to first?

20   Q.       Sir, you just said you talked to the other woman

21   second, correct?

22   A.       Yes.

23   Q.       And you just said you destroyed the phone after you

24   talked to the second woman, correct?

25   A.       Yes, ma'am.

1    Q.    So this is my question.  Did you ever testify under

2  oath that you threw the phone out the window after talking to

3  Trenady George?

4    A.    Thinking that Miss George was the second phone call,

5  yes.

6    Q.    Because you were scared, you said you threw it away?

7    A.    I knew I did wrong.  Yes, I destroyed the phone.

8    Q.    Uh-huh.  Because that violates the policy of the

9  Department of Corrections, right?

10    A.    That's true.

11    Q.    So when the warden came in and said he didn't know of

12  any infractions you had ever committed, it's because he didn't

13  know about the Tracfone.

14    A.    He surely knows about the Tracfone now.

15    Q.    Right?

16    A.    True.

17    Q.    Because he has all the information.

18    A.    That's true.

19    Q.    Okay.  If they had caught you using the Tracfone, that

20  would be a violation.

21    A.    Yes, ma'am.

22    Q.    And if they caught you using the Tracfone to talk to

23  the second woman, that's another violation.

24    A.    Yes, ma'am.

25    Q.    And that's while you were working at Chillicothe?

1    A.    That's why I was working at Chillicothe?

2    Q.    While.

3    A.    Oh, yes, ma'am, while.  Yes, ma'am.

4    Q.    Yeah.  So when the warden says you have no violations,

5    it's because you weren't caught for this.

6    A.    That's true.  I wasn't on the property, wasn't at work.

7    This was afterwards.

8    Q.    Are you saying that makes it okay?

9    A.    No, ma'am, it does not make it okay.

10   Q.    It's how you avoided getting caught, correct?

11   A.    Correct.

12   Q.    Because you knew you had to use an anonymous phone

13   because they keep track of every phone call that comes into

14   that prison.

15   A.    That's true.

16   Q.    And they had yours.

17   A.    That's true.

18   Q.    And they had it twice.

19   A.    That's true.

20   Q.    But until 2021 when John Ammann asked you, no one knew

21   that was your phone because you never told anyone.

22   A.    That's true.

23   Q.    Until you got caught.

24   A.    That's true.

25   Q.    Someone else in the prison ended up with that phone

1  number, right?

2  A.      There's several people, I think, that's had it.

3              MR. TAULBEE:  Objection, Your Honor.

4              THE COURT:  Could counsel please approach?

5              (Counsel approached the bench, and the following

6  proceedings were had:)

7              THE COURT:  So the objection is --

8              MR. TAULBEE:  Relevance.

9              THE COURT:  -- relevance?  Why do you think this is

10 irrelevant?

11             MR. TAULBEE:  Because he has no idea how that number

12 got reassigned to somebody else at the prison.

13             THE COURT:  So there are records of multiple calls

14 made at the prison to this same Tracfone?

15             MR. TAULBEE:  The only ones coming to prison

16 after -- there are none coming from that phone after those two

17 he just talked about.  I mean --

18             MS. McGRAUGH:  Okay.  I'll let it go.

19             THE COURT:  Okay.

20             (The following proceedings were had in open court:)

21 BY MS. McGRAUGH:

22 Q.      Okay.  So I think we have established so far, right?

23 A.      Yes, ma'am.

24 Q.      That you did know Trenady George.

25 A.      Yes.

1  Q.     And that's after telling us you didn't know her, right?

2  A.     I know that she was an offender at CCC, yes.

3  Q.     Were you ever asked under oath if you knew her?

4  A.     Say it again, please.

5  Q.     Were you ever asked under oath if you knew Trenady

6  George?

7  A.     The name, yes; the face, no, not until this where you

8  can put a name and a face together, yes.

9  Q.     So it was only after she sued you for sexually

10 assaulting her that you remembered her face?

11 A.     It's only after she's walked through that door that I

12 knew her face.

13 Q.     Although you had talked to her on the phone?

14 A.     Yes.

15 Q.     You knew her enough to know who to give the phone

16 number to, correct?

17 A.     Correct.

18 Q.     So you're saying you don't have any idea who Ashley

19 Zieser is, correct?

20 A.     No, ma'am.  No, I do not.

21 Q.     How about Lynnsey Betz?

22 A.     No, ma'am.

23 Q.     You ever fill in in rec?

24 A.     I've been in rec, yes.

25 Q.     Been there many times?

1  A.      Whenever I'm assigned there or doing wing tours or

2  searches, yes.

3  Q.      Did you -- what's the name of the lady who supervises

4  rec, used to supervise rec, you worked with her?  Miss Gilgour?

5  A.      No, Womack, I believe.

6  Q.      What about Miss Gilgour?

7  A.      Miss Gilgour was a vocational-education CO.

8  Q.      Right.  And so did you ever fill in for Miss Gilgour

9  when she went on vacation?

10 A.      Yes.

11 Q.      And you sat at that desk next to the supply closet?

12 A.      Say it again, please.

13 Q.      You sat at the desk next to the supply closet?

14 A.      Yes, ma'am, in the hallway.

15 Q.      The supply closet that your lawyer showed you?

16 A.      Yes.

17 Q.      You are not denying you worked that assignment.

18 A.      No, ma'am, I'm not.

19 Q.      Okay.  You worked all of the assignments, right?

20 A.      Yes.

21 Q.      The warden said there wasn't a place in that prison you

22 hadn't been.

23 A.      I've been all over it.  I mean, utility, you have to

24 learn it all.

25 Q.      Right.  Did you know where the cameras were?

1    A.    Pardon me?

2    Q.    Did you know where the cameras were?

3    A.    That's part of you knowing the camp, yes.

4    Q.    So you know where the cameras are and you knew where

5    the cameras were not.

6    A.    This is true.

7    Q.    They were not in the closet.

8    A.    No, that's why you don't go in there.  You do searches

9    in the closet, but that's after the offenders have gone back to

10   their house or if they're in the classroom when there's nobody

11   around.

12   Q.    One of the things you did was escort people, right?

13   Escort women?

14   A.    If you go on a medical out-count and you're

15   transporting, yes, I have.

16   Q.    You escorted women within Chillicothe Correctional

17   Center.

18   A.    Sometimes.  Not very often.

19   Q.    But you did.

20   A.    I have, yes.

21   Q.    Because there are places like a storage closet with

22   chemicals in it that offenders aren't allowed to go to alone.

23   A.    That's true.

24   Q.    And you took them.

25   A.    Not -- I have, yes.

1   Q.     Okay.  So you admit you have escorted offenders to

2  supply closets to get chemicals, correct?

3   A.     You open the door and you stand in the hall, and they

4  go in the closet and they get the chemicals.

5   Q.     I know that's how it's supposed to work.  My question

6  is have you escorted female offenders to those supply closets?

7   A.     Yes.

8   Q.     So that much we all agree on, right?

9   A.     That was what, ma'am?

10   Q.     I said that much we all agree on?

11   A.     Yes, ma'am.  Yes, ma'am.

12   Q.     Okay.  So you denied at first knowing Trenady George,

13  Lynnsey Betz, and Ashley Zieser, but you said you knew Karen

14  Backues Keil, right?

15   A.     Yes, ma'am.

16   Q.     I say Karen Keil.  You know I mean this woman right

17  here?

18   A.     Yes, ma'am.

19   Q.     How long have you known her?

20   A.     I don't remember what date it was that I first seen

21  her.

22   Q.     Let me ask you this.  Do you remember the first day you

23  saw her?

24   A.     What stands out in mind was she was sitting in the day

25  room.  Is that what you're referring to?

1    Q.      Uh-huh, yes.

2    A.      Okay.  She was sitting in the day room, nobody else was

3    around -- I mean, sitting at the table with her, and there was

4    a full notebook sheet with numbers and letters and symbols and

5    a triangle shape, and at the bottom of that was an equals sign.

6    About that time, we were having people doing codes, different

7    little codes for messages that meant different things, and I

8    didn't know what that was that she was doing, and that's why I

9    stopped and asked her about that.

10          And that's when she told me she was a tutor in math

11   and that she knew what that answer was, and she was teaching

12   her students how to solve that problem.  I know nothing about

13   numbers, when it comes to numbers, letters, and symbols, and it

14   was fascinating to me how something like that would actually be

15   a math problem.

16   Q.      That's a very detailed memory about Karen Keil, isn't

17   it?

18   A.      We've been going through this since 2018.  Yes, I

19   remember it.

20   Q.      You remembered it in 2018, even though she had been

21   gone from the correctional center, right?

22   A.      I don't know when she left, ma'am.

23   Q.      Okay.  And when I asked you about Miss Keil earlier,

24   too, you gave me additional information.  So we've heard all

25   about how many women are in the penitentiary and the

1    correctional center, and it's a lot, right?

2    A.    Yes, ma'am.

3    Q.    And they're cycling in and out.

4    A.    Yes, ma'am.

5    Q.    And everybody is talking to each other and meeting each

6    other, right?

7    A.    Yes.

8    Q.    And you would walk around the prison and have

9    conversations with the women, correct?

10    A.    If they would say something, yes, you would have a

11    conversation -- I mean, you would answer them, you would talk

12    to them, you wouldn't just be cold and walk off.

13    Q.    Well, sir, you walked up to Karen Keil and initiated

14    that first conversation, didn't you?

15    A.    Yes, when I first seen that, I sure did.

16    Q.    Okay.  Was that part of your job as an officer at that

17    time, to initiate conversations with pretty redheads?

18    A.    It could have been.

19    Q.    Okay.

20    A.    I mean, I didn't know what that was.

21    Q.    Okay.  Okay, interesting.  And you were also to

22    remember -- you remembered after she'd left Chillicothe and

23    some years had passed that she worked in the rec center,

24    correct?

25    A.    Correct.

1  Q.    And, in fact, you were able to remember, despite the

2  thousands of women and thousands of conversations, that Karen

3  worked in rec center, correct?

4  A.    Correct.

5  Q.    And you watched her exercise, correct?

6  A.    Say it again, please?

7  Q.    You watched her exercise, correct?

8  A.    No, you didn't just stand there and watch.  I mean,

9  you're doing wing tours, you're walking around doing security

10 checks.  You don't just stand in the doorway and watch them do

11 their exercises, no.  That's not allowed.  I mean, there's

12 people there that will come and remove you, so, no, I did not

13 do that.

14 Q.    Well, you knew she taught Zumba because you told us.

15 A.    Do what, ma'am?

16 Q.    You knew she taught Zumba because you told us.

17 A.    It's an exercise class, yes.

18 Q.    Sir, how would you know she taught Zumba if you weren't

19 watching her?

20 A.    When you're a rec officer and you pay attention to what

21 people are doing -- I mean, I knew I had porters.  They were in

22 the mop closets and stuff like that.

23 Q.    We know that.

24 A.    Okay.  So why wouldn't you know that she was an

25 instructor?

1  Q.      Okay.  You said, "I did not stand around and watch

2  Karen Keil," correct?

3  A.      Correct.

4  Q.      But then I said, "Then, how did you know she taught

5  Zumba?"

6  A.      There's a difference between looking in a doorway and

7  seeing somebody doing a job and standing there watching them.

8  I didn't stand there and watch her.

9  Q.      You didn't.

10  A.      No.

11  Q.      Did you guess she taught Zumba?  That's an awfully

12  specific memory.

13  A.      No, I didn't guess.

14  Q.      You knew because you watched her?

15  A.      No, I knew because I seen her.  She's standing in the

16  front of the line, everybody else is facing her.  To me, that

17  would make her an instructor.

18  Q.      An instructor of Zumba?

19  A.      Of whatever it was.

20  Q.      Well, you told us Zumba in 2018.

21  A.      Well, okay.  Exercise class.

22  Q.      Okay.  What did other women teach in the rec center

23  when you were there?  Who else worked there?

24  A.      I think there was -- there were like games.  They had

25  volleyball, basketball.  I think there was some people that did

1    weights.

2    Q.    What other women taught exercise classes at Chillicothe

3    when you were there?

4    A.    I don't know if anybody did.  I think that she was the

5    class -- the instructor.

6    Q.    The only instructor in the whole rec center?

7    A.    I suppose.

8    Q.    Okay.  Do you know anything personal about Karen?

9    A.    Say it again, please.

10   Q.    Do you know anything personal about Karen?

11   A.    No, ma'am.

12   Q.    I'm correct, you've been married six times?

13   A.    Yes.

14   Q.    Two of those women were from Chillicothe Correctional

15   Center?

16   A.    No, they weren't.

17   Q.    Two of your wives did not work at Chillicothe

18   Correctional Center?

19   A.    Yes, ma'am, they worked there.

20   Q.    You did find two of your wives at the correctional

21   center.

22   A.    Yes, ma'am.

23   Q.    Sir, it would be fair to say you had your eyes open for

24   the ladies while you were there, right?

25   A.    No.  No.

1  Q.      Hmm.  Did you ask where Karen was after she left?

2  A.      Say it again, please?

3  Q.      Did you ask where Karen had gone after she left

4  Chillicothe?

5  A.      In conversation and in passing, I think I asked maybe

6  another rec worker, I said, "Where is Backues at?"  You know,

7  because she wasn't in there doing her job.  I thought maybe --

8  who knew?  Just in conversation.

9  Q.      Uh-huh.  So just in passing, you said, "Hey, what

10 happened to Karen?"  And you knew her name.

11 A.      No, I said, "Where is Backues at?"

12 Q.      Well, Backues is her name.  Yeah?

13 A.      Yes.

14 Q.      Okay.  And you switched to utility because you wanted

15 to move around the institution, correct?

16 A.      It's not only the institution, you go out on medical

17 out-counts.  Most of the time, I was on the road.  You go to

18 Vandalia on transfers.  You go to court, escorting offenders to

19 the courtrooms.  I mean, there's always a male and female.

20 Q.      Right.

21 A.      So you're not by yourself.

22 Q.      Right.  The correctional center does not want male

23 employees alone with the female offenders.

24 A.      That's true.

25 Q.      So when Mr. Taulbee asked you, you said you've never

1  sexually assaulted these women?

2  A.      No, ma'am.

3  Q.      Never put your penis in anybody's mouth?

4  A.      No, ma'am.

5  Q.      Okay.  You're a victim here of this?

6  A.      Yes, ma'am.

7  Q.      Okay.  You left-handed or right-handed?

8  A.      Say it again, please?

9  Q.      Are you left-handed or right-handed?

10  A.      Left-handed.

11  Q.      You're left-handed.  So if you have to do something

12  that requires dexterity, do you have to use your left hand?

13  A.      Somewhat, yes.

14  Q.      Well, you're left-handed.

15  A.      Yes.

16  Q.      Okay.  You write with your left hand?

17  A.      Yes.

18  Q.      And so if you need to do a task that requires fine

19  motor skills -- you know what I mean by that?

20  A.      Yes.

21  Q.      You have to use your left hand.

22  A.      Yes, ma'am.

23  Q.      If I'm looking at you, right, hold up your left hand,

24  and that's the hand you use for fine motor skills, correct?

25  A.      For writing, yes, whatever.

1  Q.      Okay.

2  A.      Okay.

3  Q.      And then your right hand, lift that.  And as I look at

4  you, which of my shoulders is directly across from that right

5  hand?

6  A.      It would be your left shoulder.

7  Q.      It sure would.  You were put in non-contact.

8  A.      Ma'am, I have hearing aids on, and I'm really having

9  trouble understanding -- I can hear you, but I can't understand

10  what you're saying.  Please?

11  Q.      Were you put in non-contact?

12  A.      Yes, I was.

13  Q.      Because of allegations of inappropriate activity.

14  A.      Yes, ma'am.

15  Q.      And when you retired two months and three weeks short

16  of your 30th work anniversary, you were still in non-contact?

17  A.      I believe so, yes.

18          MS. McGRAUGH:  May I confer with my colleagues for a

19  moment?

20          THE COURT:  Yes.

21          MS. McGRAUGH:  No further questions, Your Honor.

22          THE COURT:  Could counsel please approach?

23          (Counsel approached the bench, and the following

24  proceedings were had:)

25          THE COURT:  Do you have an idea of how long your

1  redirect is going to be?

2          MR. TAULBEE:  Well, Your Honor, given the testimony,

3  or Ms. McGraugh's statements about the second phone call, I may

4  have to play both phone calls, which will be 30 minutes at

5  least.

6          THE COURT:  Why don't we move into tomorrow.

7  Regardless of whether or not you play the phone calls, things

8  of that sort, let's recess.

9          (The following proceedings were had in open court:)

10         THE COURT:  Since it is 5 o'clock, we're going to go

11 ahead and take a recess or a break for the evening.

12         Again, as you know, during this break tonight, the

13 same rules are in place in terms of talking with anyone or

14 doing any type of research, internet, or otherwise.  I really

15 don't know what the status of any articles is today, but I

16 would have that -- I would impose that same rule.  Just don't

17 do any searches or read any type of local media or television

18 stations or radio stations or things of that sort.  There might

19 be news coverage, there may not, but out of an abundance

20 caution, I would ask for one more night you not do any

21 research.

22         I will let you know that I'm a big fan of setting a

23 low bar.  I think there's a reasonable likelihood that we could

24 be concluded with the evidence and argument tomorrow.  So

25 there's a possibility you could be completed tomorrow,

1  possibility it may go into Friday morning, but we're definitely

2  on track to have this case completed, if not tomorrow, then by

3  Friday morning.

4        So with that, we will be in recess, and have a good

5  evening.

6        (The following proceedings were had in the courtroom

7  out of the presence of the jury:)

8        THE COURT:  Sir, you may step down.

9        So, are there issues that you would like to discuss

10  before we take a break tonight?

11       MS. McGRAUGH:  No, Your Honor.

12       MR. TAULBEE:  I don't think there's anything from

13  defendants, Your Honor.

14       THE COURT:  Have either of the attorneys had the

15  opportunity to review the proposed jury instructions?

16       MR. TAULBEE:  Yes, Your Honor.

17       THE COURT:  And has counsel for plaintiff?

18       MR. ROEDIGER:  Yes, Your Honor.

19       THE COURT:  Do you have any preliminary thoughts?

20       MR. ROEDIGER:  We have conferred, and I think we

21  agree that the changes are fine.  Is that correct?

22       MR. TAULBEE:  Yes.

23       THE COURT:  So at this point, you don't have any

24  changes.  If over the evening you -- if that position changes,

25  I would ask that you let Max know.  I think you have his e-mail

1 address.

2         MR. ROEDIGER:  We do.

3         THE COURT:  Let Max know.  Otherwise, we will

4 probably finalize the instructions, sometime maybe tomorrow

5 morning, if we could, so that we can finish the witnesses and

6 roll directly into instructions and closing arguments.

7         On that subject, in the event that you want to

8 prepare for closing arguments tonight, I do -- I don't have, as

9 you know, any limits on opening statements, but I do limit

10 closing arguments.  I'm thinking, given the evidence in this

11 case, there would be no need for more than 30 minutes of

12 closing arguments.  Does anyone disagree with that?

13         MR. TAULBEE:  I don't know of anyone who wants to

14 listen to me longer than that, Your Honor.

15         MS. McGRAUGH:  I agree, I don't want to listen to --

16 I'm sorry.

17         THE COURT:  Is there willingness to have a shorter

18 amount of time?

19         MS. McGRAUGH:  Brendan says yes.  25 minutes?

20         THE COURT:  Okay.  You know what?

21         MR. ROEDIGER:  She's stuck on 30.

22         MS. McGRAUGH:  I will move, if that's what you want.

23         THE COURT:  How about 25.  Every minute that

24 attorneys are talking is like ten minutes in the mind of

25 jurors.  And don't take that personally.  They just -- they

1  hear this as droning and droning and droning.

2          Let's do 25 minutes.  And to the extent you're going

3  to split your argument, let Shauna know; and to the extent

4  either of you want any warnings, let Shauna know, and she can

5  either I think give an audible warning, or the last I knew,

6  those lights worked.  I don't know if they still work or not.

7  But work all of that out with Shauna.

8          And, again, let me know if there are any changes to

9  the instructions; but otherwise, I'll see everyone tomorrow at

10  8:30.

11          (Trial adjourned for the evening.)

12                          - - -

13                          - - -

14                       CERTIFICATE

15          I certify that the foregoing is a correct transcript

16  from the record of proceedings in the above-entitled matter.

17

18

19  June 27, 2022

20                              /s/_____
                                Kathleen M. Wirt, RDR, CRR
21                              U.S. Court Reporter

22

23

24

25