IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION


| | | |
|---|---|---|
| KAREN BACKUES KEIL, | ) | No. 18-06074-CV-W-BP |
| LYNNSEY CHRISTIE BETZ, | ) | 18-06079-CV-W-BP |
| ASHLEY OLSEN ZIESER, and | ) | 18-06103-CV-W-BP |
| TRENADY GEORGE, | ) | 19-06161-CV-W-BP |
| | ) | |
| Plaintiffs, | ) | |
| | ) | April 28, 2022 |
| V. | ) | Kansas City, Missouri |
| | ) | CIVIL |
| EDWARD BEARDEN, | ) | |
| | ) | VOLUME IV |
| Defendant. | ) | (Pages 700-843) |
| | ) | |
| | ) | |

TRANSCRIPT OF JURY TRIAL


BEFORE THE HONORABLE BETH PHILLIPS
UNITED STATES DISTRICT JUDGE


Proceedings recorded by electronic stenography
Transcript produced by computer

Kathleen M. Wirt, RDR, CRR
United States Court Reporter
400 E. 9th Street, Suite 7452 * Kansas City, MO 64106
816.512.5608

1                            <u>APPEARANCES</u>

2      For Plaintiffs:         MS. SUSAN MCGRAUGH
                               MR. JOHN J. AMMANN
3                              MR. BRENDAN D. ROEDIGER
                               Saint Louis University School of Law
4                              100 N. Tucker, Suite 704
                               St. Louis, MO 63101
5
                               MS. JENIFER C. SNOW
6                              Law Office of Joan M. Swartz
                               3348 Greenwood Blvd.
7                              Maplewood, MO 63143

8      For Defendant:          MR. NICOLAS TAULBEE
                               MS. ABBIE ROTHERMICH
9                              Missouri Attorney General's Office
                               615 East 13th Street, Suite 401
10                             Kansas City, MO 64106

11                             MS. CARA HARRIS
                               Missouri Attorney General's Office
12                             149 Park Central Square, Suite 1017
                               Springfield, MO 65806

13

14

15

16

17

18

19

20

21

22

23

24

25

                    Kathleen M. Wirt, RDR, CRR
                    United States Court Reporter
       400 E. 9th Street, Suite 7452 * Kansas City, MO 64106
                           816.512.5608

I N D E X

VOLUME I
(Pages 1-103)

APRIL 25, 2022

Pretrial matters                                        7
Jury sworn                                             17

Plaintiffs' opening statement                          17
Defense opening statement                              28

PLAINTIFFS' WITNESSES:

    ASHLEY ZIESER
        Direct Examination by Ms. McGraugh              34
        Cross-examination by Ms. Rothermich             74
        Jury Questions asked by the Court               99
        Further Cross by Ms. Rothermich               100

                        - - -

VOLUME II
(Pages 104-407)

APRIL 26, 2022

PLAINTIFFS' WITNESSES (continued):

    TRENADY GEORGE
        Direct Examination by Ms. McGraugh             116
        Cross-examination by Mr. Taulbee               163
        Redirect Examination by Ms. McGraugh           193
        Jury Questions asked by the Court              196

    KAREN KEIL
        Direct Examination by Mr. Ammann               199
        Cross-examination by Mr. Taulbee               247
        Redirect Examination by Mr. Ammann             283
        Recross-examination by Mr. Taulbee             284
        Voir Dire Examination by the Court             289
        Jury Questions asked by the Court              293

    TERI DEAN
        Direct Examination by Ms. Snow                 295
        Cross-examination by Ms. Harris                315
        Redirect Examination by Ms. Snow               333
        Jury Questions asked by the Court              337

LYNNSEY BETZ
        Direct Examination by Ms. McGraugh          339
        Cross-examination by Ms. Rothermich          373
        Redirect Examination by Ms. McGraugh         396
        Recross-examination by Ms. Rothermich        398
        Jury Questions asked by the Court            401
        Further Recross by Ms. Rothermich            402

- - -

VOLUME III
(Pages 408-699)

APRIL 27, 2022

PLAINTIFFS' WITNESSES (continued):

DORA SCHRIRO
        Direct Examination by Mr. Ammann            417
        Cross-examination by Ms. Harris             447
        Redirect Examination by Mr. Ammann          476
        Recross-examination by Ms. Harris           477
        Jury Questions asked by the Court           479

MELISSA PIASECKI
        Direct Examination by Mr. Roediger          481
        Cross-examination by Ms. Harris             523
        Resumed Cross-examination by Ms. Harris     570
        Redirect Examination by Mr. Roediger        582
        Recross-examination by Ms. Harris           585
        Jury Questions asked by the Court           586

DEFENSE WITNESSES:

KENNETH CHRISTOPHER McBEE
        Direct Examination by Mr. Taulbee           588
        Cross-examination by Mr. Ammann             626
        Redirect Examination by Mr. Taulbee         636
        Jury Questions asked by the Court           641

EDWARD BEARDEN
        Direct Examination by Mr. Taulbee           645
        Cross-examination by Ms. McGraugh           660

- - -

1    VOLUME IV
     (Pages 700-843)
2
     <u>APRIL 28, 2022</u>
3
     DEFENSE WITNESSES (continued):
4

5    DAVID SAVAGE
         Direct Examination by Ms. Harris          717
         Cross-examination by Ms. McGraugh         753
6        Redirect Examination by Ms. Harris        761
         Recross-examination by Ms. McGraugh       770
7        Jury questions asked by the Court         776

8    ROBIN DYSART
         Direct Examination by Ms. Rothermich      778
9        Cross-examination by Ms. McGraugh         804
         Jury questions asked by the Court         807
10       Further Redirect by Ms. Rothermich        808

11                        - - -

12               E X H I B I T S

13   <u>PLAINTIFFS' EXHIBITS</u>          <u>OFFERED</u>   <u>ADMITTED</u>

14   21 - Bible cover and page        150       151

15   22 - CV of Dr. Schriro           447       447

16

17   <u>DEFENDANT'S EXHIBITS</u>          <u>OFFERED</u>   <u>ADMITTED</u>

18   1-7 - time and attendance records  566     567

19   8 - duty assignments             566       567

20   9 - duty assignments             566       567

21   10 - duty assignments            566       567

22   11 - FMLA notice                 566       567

23   12 - letter regarding sick leave 566       567

24   13 - ENGAGE meeting notes        566       567

25   14 - Bearden resignation memo    566       567

| | | | |
|---|---|---|---|
| 1 | 15 - resignation acceptance | 566 | 567 |
| 2 | 19 - building layouts | 110 | 110 |
| 3 | 21 - memo regarding COs | 763 | 764 |
| 4 | 22 - Dean work summary | 567 | 567 |
| 5 | 23 - Dean housing history | 567 | 567 |
| 6 | 24 - Keil mental health records | 567 | 567 |
| 7 | 25 - Keil mental health records | 567 | 567 |
| 8 | 26 - Keil mental health records | 567 | 567 |
| 9 | 27 - Keil mental health records | 567 | 567 |
| 10 | 28 - Betz mental health records | 567 | 567 |
| 11 | 29 - Betz mental health records | 553/567 | 553/567 |
| 12 | 30 - Zieser mental health records | 567 | 567 |
| 13 | 32 - George mental health records | 125 | 126 |
| 14 | 33 - George mental health records | 527 | 528 |
| 15 | 40 - Keil housing history | 567 | 568 |
| 16 | 41 - Keil roommate history | 567 | 568 |
| 17 | 42 - Zieser housing history | 567 | 568 |
| 18 | 43 - Zieser roommate history | 567 | 568 |
| 19 | 44-110 - chronological logs | 568 | 568 |
| 20 | 111-199 - photos of facility | 568 | 568 |

21

* * * * *

22

* * * *

23

24

25

APRIL 28, 2022

- - -

1

2

3          (The following proceedings were had in the courtroom

4   out of the presence of the jury:)

5          THE COURT:  Good morning.  So the first thing I

6   would like to do before we bring the jury out is see if there

7   are any objections to the instructions that we provided.

8          One other comment I forgot to make yesterday was the

9   instruction on Page 15 regarding summaries at this point, I

10  wouldn't be inclined to give because I don't believe that there

11  have been any summaries that have been used.

12         MR. ROEDIGER:  That's the one thing I was going to

13  suggest was removing that.

14         THE COURT:  Mr. Taulbee, do you have any objection

15  to removing that instruction?

16         MR. TAULBEE:  I do not, Your Honor.

17         THE COURT:  With that instruction removed, does the

18  plaintiff have any objection to the instructions as we provided

19  them to you yesterday?

20         MR. ROEDIGER:  No, Your Honor.

21         THE COURT:  Mr. Taulbee, does the defendant have any

22  objection?

23         MR. TAULBEE:  No objection to the language of the --

24         (Reporter interruption.)

25         MR. TAULBEE:  I'm sorry.  The defendant's only

1  objection would be to the submissibility of punitive damages,

2  Your Honor.

3          THE COURT:  Okay, but to the language of the --

4          MR. TAULBEE:  No objection to the language, that's

5  correct.

6          THE COURT:  Okay.  And we can take that issue up if

7  you want to make a broader record on that issue at a later

8  time.

9          Okay.  Then we will finalize these instructions so

10  that we can quickly move into closing arguments and

11  instructions, assuming that we wrap up the case as we expect.

12          With that, is there anything else that I can take up

13  before we bring the jury out?

14          MS. McGRAUGH:  I think that it might be appropriate

15  to bring this up now.  My understanding, and please correct me

16  if I'm wrong, is that the defense intends to play part of an

17  audiotape of Mr. Bearden speaking with another offender; is

18  that correct?

19          MR. TAULBEE:  No, but the defendant does anticipate

20  playing Plaintiffs' Exhibit 12.

21          MS. McGRAUGH:  Which is?

22          MR. TAULBEE:  The audiotape with Plaintiff George.

23          MS. McGRAUGH:  Okay.  Then we anticipate playing --

24  to what end?

25          THE COURT:  Why don't you guys talk about this,

 1  then, before you get me involved.

 2          MS. McGRAUGH:  I don't think this is something on

 3  which an agreement is going to be forthcoming.

 4          THE COURT:  Okay.  So you object to playing of any

 5  of the tape?

 6          MS. McGRAUGH:  Yes.

 7          THE COURT:  And what's the basis for your objection?

 8          MS. McGRAUGH:  Relevance, and it violates best

 9  evidence -- I'm sorry.  He has testified as to what was on the

10  tape, she has testified about what was on the tape, so it's not

11  relevant to play the tape in its entirety because it's not at

12  issue what is on the tape.

13          THE COURT:  What's your argument as to why it's

14  relevant?

15          MR. TAULBEE:  The jury has heard about the tape, and

16  they've heard two different things about what's on the tape.  I

17  think the best evidence of what's on the tape is the recording

18  of the phone call.

19          THE COURT:  What are the two versions of what's on

20  the tape?  I don't recall there being a dispute as to what's on

21  the tape.

22          MR. TAULBEE:  Well, I mean, she's characterized it

23  one way, and we think the tape is different than that.

24          THE COURT:  And how did she characterize it?

25          MR. TAULBEE:  As being scared, as -- I believe she

1 testified about things that were on there, such as he would be

2 waiting at the gates for her, that she made the call because

3 she perceived it as a threat.

4         MS. McGRAUGH:  Your Honor?

5         THE COURT:  Uh-huh?

6         MS. McGRAUGH:  Should I wait until you finish --

7         THE COURT:  Let me review my notes real quickly.

8         (So done.)

9         THE COURT:  Okay.

10         MS. McGRAUGH:  Your Honor, my client never testified

11 as to what was on the tape.  She testified to what was in the

12 conversation, and she said she called because she was afraid.

13 Nothing in the tape serves to contradict that information or to

14 impeach my client.  So, again, I ask what the relevance of it

15 is.

16         THE COURT:  Well, there was something regarding

17 Puerto Rico that she said she testified to in her deposition

18 and that that was incorrect.  I don't know how that's

19 necessarily relevant, but I do think that aspect of the call

20 was discussed.

21         MS. McGRAUGH:  May I -- I'm sorry if I'm

22 interrupting.

23         What she said was originally she thought they had

24 discussed Puerto Rico during the phone call, but she's come to

25 realize that that was wrong.  That's what she said about Puerto

1  Rico.  So she's acknowledged it's not in there.

2          THE COURT:  So, again, Mr. Taulbee, explain to me

3  why you think that this is -- that the contents of the call are

4  relevant?

5          MR. TAULBEE:  Because the jury has heard all about

6  the phone call.  They've heard about the parties'

7  characterization of the phone call, particularly Miss George's,

8  from my client's perspective, obviously.  They've heard there's

9  a recording of the phone call.  I think it's relevant for the

10 jury to hear exactly what the phone call was, and, frankly,

11 what her mannerisms were when she was having that phone call.

12         MS. McGRAUGH:  She was available to answer that on

13 cross-examination, and defense counsel failed to bring that up

14 with her in any way, shape, or form, so it's not --

15         THE COURT:  Let me think about this for a minute and

16 go through my notes again as to what the testimony was

17 regarding the call.  So let --

18         MS. McGRAUGH:  It's a 15-minute phone call, Your

19 Honor.

20         THE COURT:  Let me take that under advisement.  And

21 it's only this call that you're looking to play?

22         MR. TAULBEE:  Yes.

23         THE COURT:  Okay.  Let me take that under

24 advisement.

25         Any other issues that I can take up before we bring

1  the jury out?

2  　　　　　MR. TAULBEE:  No.

3  　　　　　MS. McGRAUGH:  No, Your Honor.

4  　　　　　THE COURT:  Okay.  Let me think about this for a

5  minute.  And when the jury is here, I'll be out and obviously

6  make a ruling before the jury comes out.

7  　　　　　MR TAULBEE:  Thank you, Your Honor.

8  　　　　　(A recess was taken from 8:48 a.m. to 9:18 a.m.)

9  　　　　　THE COURT:  So this obviously took a little bit

10 longer than I thought, but I did have the opportunity to review

11 my notes regarding Mr. Bearden's testimony.  And his testimony

12 regarding the telephone call was essentially that he was trying

13 to do a job not qualified for, he was helping her with personal

14 problems, help her feel better, hope she feels safe.  Things

15 along that -- those lines.

16 　　　　　I then also reviewed the transcript of the call,

17 which really just reinforces that statement, that he was making

18 calls -- or statements asking where she's going to be, asking

19 if she's going to have a car, and the fact that you got to be a

20 mama, hopes -- and, you know, encouraging her to not let this

21 little setback hold her back.

22 　　　　　I just don't -- I don't think this is improper -- I

23 think that this would be improper bolstering of the testimony

24 that he provided on cross-examination.  It doesn't in any way

25 contradict his testimony and, therefore, I don't think that you

1  can make this relevant by using it to bolster his testimony.

2  And I don't see, introducing it through Mr. Bearden, how

3  there's any other purpose for it.

4         Is there any additional record you'd like to make on

5  this issue, Mr. Taulbee?

6         MR. TAULBEE:  I think I do need to make an offer of

7  proof of it, Your Honor, and play the audio.

8         THE COURT:  Okay.

9         MS. McGRAUGH:  Your Honor, could we stipulate to the

10  transcript as a record?  I'm just trying to save time.

11         MR. TAULBEE:  I think we actually have to play the

12  audio for the Court to hear the audio with the --

13         THE COURT:  Where did the transcript come from, was

14  that --

15         MR. TAULBEE:  From the audio, but, I mean, the

16  previous testimony about feeling threatened, and I think that

17  the tone of voice and, I guess, the way the conversation is --

18         THE COURT:  Right, but that was testimony that Miss

19  George provided, and you would have been cross-examining Miss

20  George on that testimony, and you chose not to.  And so I'm not

21  necessarily saying that this isn't admissible, I'm saying that

22  it is not admissible to either bolster or impeach Mr. Bearden.

23         MR. TAULBEE:  Okay.

24         THE COURT:  And so to the extent you want to,

25  obviously, mark the exhibit and preserve the issue for appeal,

1  I'm more than happy to have you do that.  But, you know, what
2  Miss George said on the conversation just isn't in play in
3  connection with Mr. Bearden's testimony, and so I don't see it
4  as improper -- I don't see it as proper impeachment or
5  proper -- or the flip side, I think it would be improper
6  bolstering, regardless of what Miss George said on the call.
7  So do you want to mark it as an exhibit?
8              MR. TAULBEE:  Yeah, it's marked, previously marked
9  as Plaintiffs' Exhibit 12, Your Honor.
10             THE COURT:  Okay.
11             MS. McGRAUGH:  No objection, Your Honor.
12             THE COURT:  Okay.  Then we will mark it for
13  identification purposes in the event that this issue comes up
14  on appeal.
15             So with that, are we ready to proceed and bring the
16  jury out?
17             MS. McGRAUGH:  Yes, Your Honor.
18             MR. TAULBEE:  Yes, Your Honor.
19             THE COURT:  Mr. Bearden, since this is a new day,
20  what I'll probably do is bring you up and have you sworn in
21  again and then ask that you take the stand once the jury comes
22  out.
23             So why don't we go ahead and bring the jury out.
24             (The following proceedings were had in the courtroom
25  in the presence of the jury:)

1          THE COURT:  Well, good morning.  I am sorry that
2     we're running late.  There was an issue that came up
3     unexpectedly that we had to address, and I assure you it was
4     purely coincidence that it was the day that we started late
5     that we also provided donuts for you.  But I hope you were able
6     to instead use that time to enjoy some LaMar's.
7          We're going to go ahead and proceed with the
8     redirect of Mr. Bearden; and since it's a new day, I'm going to
9     have him re-sworn again and then take the stand.
10          Mr. Bearden, could you please approach?
11          (Edward Bearden was duly sworn by the courtroom
12     deputy.)
13          THE COURT:  Sir, if you could, again, please take
14     the witness stand.
15          And, Mr. Taulbee, are you ready to proceed?
16          MR. TAULBEE:  I do.  I apologize, Your Honor.  I
17     don't have any more questions for Mr. Bearden.
18          THE COURT:  Okay, sorry.  You do need to go ahead
19     and take the stand because we do have the opportunity for
20     written questions.  But -- so if any of the members of the jury
21     have any written questions of Mr. Bearden, please provide them.
22          (So done.)
23          THE COURT:  Could counsel please approach?
24          (Counsel approached the bench, and the following
25     proceedings were had:)

1    THE COURT:  So two questions, one of which I'm not

2 going to permit for reasons we've already discussed, and one of

3 which I don't believe is relevant.

4    "If there is a tape of the phone call, where is it?"

5 I assume you have an objection to that question.

6    MS. McGRAUGH:  Yes.

7    THE COURT:  And I assume you would like that

8 question answered.

9    MR. TAULBEE:  Uh-huh.

10    THE COURT:  Is that a yes?

11    MR. TAULBEE:  Yes, sorry.

12    THE COURT:  For the reasons we've previously

13 discussed, I will not permit that question to be answered.

14    The other question is, "Who is the other offender

15 Mr. Bearden talked to on the Tracfone?"  Do you have any

16 objection to that question?

17    MS. McGRAUGH:  No.

18    THE COURT:  Do you have an objection?

19    MR. TAULBEE:  I object to relevance of it.

20    THE COURT:  I don't think it's relevant.  I think it

21 opens up a whole other can of worms that we don't need to, so

22 the objection will be sustained.

23    (The following proceedings were had in open court:)

24    THE COURT:  Mr. Bearden, as you could see, there

25 were a couple of questions; but due to the rules of evidence

1  and some other rulings I've made, neither of them will be

2  asked, so you may step down.

3          THE WITNESS:  Step down?

4          THE COURT:  Yes, please.

5          Mr. Taulbee, are you ready to call your next

6  witness?

7          MR. TAULBEE:  Yes, we call David Savage.

8          THE COURT:  I'm sorry, Ms. Harris.  I didn't realize

9  you were taking lead on this.

10         Sir, could you please step forward and come through

11  the gate and around either side of the table?  I'd like for you

12  to eventually end up in this area right here so you can be

13  sworn.

14                      - - -

15                  DAVID SAVAGE,

16  being first duly sworn by the courtroom deputy, testified as

17  follows:

18         THE COURT:  Thank you, sir.  If you could take a

19  seat in the chair on the riser over there.

20         MS. HARRIS:  May I proceed?

21         THE COURT:  You may.

22         MS. HARRIS:  Thank you, Judge.

23                      - - -

24

25

1    DIRECT EXAMINATION

2  By Ms. Harris:

3  Q.     Can you state your name for the record, please?

4  A.     David Savage.

5  Q.     And are you employed?

6  A.     Yes.

7  Q.     And where are you employed?

8  A.     With the Department of Corrections at Chillicothe

9  Correctional Center.

10  Q.     And what is your title there?

11  A.     I'm the major, the Chief of Custody.

12  Q.     And as the Chief of Custody, what is your role, what do

13  you do?

14  A.     I'm over the security, safety of the institution, and

15  I'm over the -- all the custody staff.

16  Q.     Okay.  There's been some talk about what custody staff

17  is.  Can you explain to the jury one more time what that means?

18  A.     Well, from the start, you're looking at Corrections

19  Officers I's, which is just a -- Corrections Officer I, and a

20  CO II was a sergeant, and CO III was a lieutenant, and CS I,

21  which is a Customer Supervisor I, is a captain, and then I'm

22  actually a CS II.

23  Q.     So you're over the captains --

24  A.     Yes.

25  Q.     -- even?  Okay.  How long have you worked for the

1  Department of Corrections?

2  A.      Since May of 1995.

3  Q.      And what did you -- how did you progress?  What did you

4  start out and do to get where you are now?

5  A.      I started off as a Corrections Officer I, and I

6  promoted through the ranks to a sergeant, a lieutenant, and a

7  captain, and then to major.

8  Q.      How long have you been at the Chillicothe Correctional

9  Center?

10  A.      Since '95.

11  Q.      Since 1995?

12  A.      Yes.

13  Q.      And the correctional center that you're at right now,

14  the physical plant, is that the same as it was in '95?

15  A.      No, in '95 it was on Third Street in Chillicothe, and

16  it was an older facility.

17  Q.      So are they at a newer facility now?

18  A.      Yes.

19  Q.      And when did that open, if you know?

20  A.      In 2008.

21  Q.      And you moved from the old one to the new one?

22  A.      Correct.

23  Q.      Okay.  How long have you been Chief of -- I'm sorry,

24  yeah, Chief of Custody?

25  A.      About four years.

1  Q.      Okay.  Tell us a little bit about the life at

2  Chillicothe Correctional Center.  How many inmates are there?

3  A.      1469, as of today.

4  Q.      Okay.  And how many corrections officers are employed

5  by the Department of Corrections?

6  A.      For the corrections officers, we're looking at about

7  300.  I think right now we have about 289, so...

8  Q.      Okay.  There's been discussion about there's three

9  shifts of workers at the correctional center; is that correct?

10  A.      Yes.

11  Q.      And first shift is what?

12  A.      First shift is 11 p.m. to 7 a.m.

13  Q.      Second shift is?

14  A.      Is 7 a.m. to 3 p.m.

15  Q.      And third shift is?

16  A.      Is 3 p.m. to 11 p.m.

17  Q.      Okay.  About how many people -- I'm sorry.  About how

18  many custody staff do you have working each shift?

19  A.      First shift from 11:00 to 7:00, we have an average

20  throughout the week of about 45; third shift, throughout the

21  week, an average of about 55; but day shift, we have so much

22  activity going on, and it's just -- it's busy enough, we have

23  closer to 90.

24  Q.      Okay.  Day shift would be the second shift --

25  A.      Yes.

1  Q.      -- 7 a.m. to 3 p.m.

2  A.      Yes.

3  Q.      Okay.  So the 11 p.m. to 7 a.m. shift you have less, in

4  part, because it's sleeping time?

5  A.      Yes, less activity.

6  Q.      Okay.  And then the 3 p.m. to 11 p.m., again, some down

7  time there where people are back in their dorms.

8  A.      Correct.

9  Q.      Or housing units, I guess.  Okay.

10         So in addition to the custody staff that you're in

11  charge of, and you've given us the numbers, are there other

12  staff that work at Chillicothe Correctional Center?

13  A.      Yes.

14  Q.      What does that include?

15  A.      That can include anywhere from classification, that is

16  kind of like your -- they handle case management of the

17  offenders.  We have a factory, so we actually have a factory

18  manager.  We have food service workers, cooks, that staff.  We

19  have maintenance crew.  We have the administration personnel,

20  Probation and Parole, stuff like that.

21  Q.      Okay.  When you're talking about the classification

22  staff, the caseworkers, Probation and Parole, the factory

23  supervisors, I guess, those are people who actually go into

24  the --

25         MS. McGRAUGH:  I'm going to object at this point to

1   the leading nature of these questions.

2        THE COURT:  Sustained.  If you could reword them.

3        MS. HARRIS:  Sure.

4  BY MS. HARRIS:

5  Q.    Are the classification staff that you just talked

6  about, are they inside the secure area of Chillicothe

7  Correctional Center on a regular basis?

8  A.    Yes.

9  Q.    Okay.  The classification, if we're talking about the

10  caseworkers and the FUMs, where are their offices?

11  A.    On the housing units.

12  Q.    Okay.  And I used the term FUM.  I think I know what

13  that is, I think you know what that is, but I'm not sure

14  everybody else does.  So can you tell us?

15  A.    It's a Functional Unit Manager --

16  Q.    Okay.

17  A.    -- with the housing unit, they would be in their part.

18  Q.    Does each of the housing units have an area where there

19  are classification staff offices?

20  A.    Yes.

21  Q.    Okay.  The factory workers, the cooks, the maintenance

22  people, are they also in the secure area of Chillicothe

23  Correctional Center on a daily basis?

24  A.    Yes.

25  Q.    Okay.  There's been a lot of talk about E-Wing in

1  housing units.  Is there an E-Wing in every housing unit?

2  A.      Yes.

3  Q.      And what all is on the E-Wing?

4  A.      E-Wing, you have your classification staff, and you

5  have -- there are some classrooms back there, if they need

6  them, laundry room.  Your Functional Unit Manager is back

7  there, as well.

8  Q.      Okay.  Does each housing unit -- well, that's not

9  correct because we've had testimony.  Does Housing Unit, I

10 think it's 4 through 8, do they all have five wings?  Is that

11 correct?

12 A.      Yes.

13 Q.      And four of those are --

14 A.      For offenders.

15 Q.      Where they're --

16         (Reporter interruption.)

17 Q.      What was your answer again?

18 A.      Yes, they have four wings where the offenders are

19 assigned in their housing units.

20 Q.      Okay.  And the fifth wing is what?

21 A.      That's the E-Wing.

22 Q.      That we just talked about?

23 A.      Correct.

24 Q.      Okay.  The classification staff that you've talked

25 about that are in E-Wing, the Functional Unit Managers, the

1  caseworkers, the Probation and Parole people, do they make

2  rounds in the housing units at times?

3  A.      Yes, they -- the case managers are also responsible for

4  making rounds in the wings and talking with the offenders and

5  seeing if they have any questions.

6  Q.      So is that something they're required to do or expected

7  to do?

8  A.      Yes, it's required.

9  Q.      And they would -- would that -- would they leave E-Wing

10  to do that?

11  A.      Yes.

12  Q.      And would they -- where would they go?

13  A.      They would go out to the A, B, C, or D Wings where the

14  offenders are.

15  Q.      Okay.  Are the offenders who are assigned to a regular

16  housing unit, not the ad seg unit or the treatment unit, are

17  they in their rooms or cells all the time?

18  A.      No.

19  Q.      What does a typical day --

20          MS. McGRAUGH:  Your Honor, I'm going to object.

21  This is cumulative.  We've already had an officer testify to

22  exactly these issues.

23          THE COURT:  Overruled at this point.

24          MS. HARRIS:  Thank you.

25  BY MS. HARRIS:

1  Q.      What's a typical day look like for an offender who is

2  not in ad seg or in the treatment program at Chillicothe

3  Correctional Center?

4  A.      Well, if you're not assigned, food service starts after

5  5:30 count clears, so you have movement for the workers that go

6  there and then -- after 5 o'clock count.  And then after the

7  7 o'clock count clears -- or sorry, 7:30 count, then that's

8  pretty much where the day begins for the institution.

9          So you have 8 o'clock worker movement, they're going

10  to their jobs.  Some will have medical appointments they'll

11  need to go to, some will have appointments with mental health

12  or the chaplain or other areas.

13  Q.      Okay.  The offenders, they at times have assigned jobs

14  that they're supposed to go to; is that correct?

15  A.      Correct.

16  Q.      Or assigned educational classes that they're supposed

17  to be at; is that correct?

18  A.      Correct.

19  Q.      Okay.  If a CO were to spend an unexpectedly longer

20  time in a single location, is that -- where they shouldn't be

21  assigned, is that something that should be noticed by anyone?

22  A.      Yes.

23  Q.      And who might notice that?

24          MS. McGRAUGH:  Your Honor, this is speculative, and

25  there's a lack of foundation for this question.

1          THE COURT:  I do find it a little speculative, and

2   so the objection is overruled.

3          MS. HARRIS:  Okay.

4          THE COURT:  I mean, sorry, the objection is

5   sustained, but I do think you can reword the question.

6   BY MS. HARRIS:

7   Q.     Are there rules about what COs are expected to do on

8   each post?

9   A.     Yes.

10  Q.     Okay.  And with the exception of a CO that is assigned

11  to be in the bubble, is a CO expected to make certain rounds?

12  A.     Correct.

13  Q.     Okay.  Are correctional officers allowed to touch

14  offenders if there's no medical or security issue going on at

15  the time?

16  A.     No.

17  Q.     If an offender were to ask a CO, "My back is itching,

18  can you scratch my back," are they able to do that?

19  A.     No.

20  Q.     Okay.  If a CO were observed by another CO or a

21  classification staff person, is there an expectation or a

22  requirement that they would report that?

23  A.     Yes.

24  Q.     Have you had people report -- have you had either

25  corrections officers or classification people report

1  corrections officers who are touching offenders?

2          MS. McGRAUGH:  Objection, Your Honor.  This is

3  irrelevant, and this is far afield.

4          THE COURT:  Overruled.

5  A.     Touching offenders?

6  BY MS. HARRIS:

7  Q.     Yes.

8  A.     Over the years, we -- we get a lot of statements where

9  this person might -- is hanging around this area, not sure what

10  they're doing here.  But as far as touching offenders, I'm not

11  sure if we did or not.

12  Q.     Okay.  When you say you've gotten reports of a person

13  hanging around too long, are you talking about a CO hanging

14  around somewhere longer than they should?

15  A.     Yes.  If anybody is doing anything that doesn't seem

16  quite right as of the daily activities, we tell everybody, all

17  staff that work there, not just custody, that it's their

18  safety, it's everybody's responsibility, and security is

19  everybody's responsibility.  So all employees that work there

20  know if they see something like that, they're to report it, if

21  they have any suspicions.

22  Q.     Okay.  And they're to report not only offenders that

23  they see, perhaps, doing something that's not allowed, but

24  other workers; is that correct --

25  A.     Correct.

1  Q.     -- or not?

2  A.     Correct.

3  Q.     Okay.  When offenders are going about their daily

4  routine going to their job or going to the rec center or going

5  to the dining hall, do they have to be escorted by a CO or

6  anyone else?

7  A.     No.

8  Q.     Okay.  There's been some discussion about the rec.

9  Tell us a little bit about what the rec is.

10  A.     The indoor recreation, that houses the gym, the workout

11  equipment.  They have a couple pool tables they can -- you

12  know, basketball court.  They can set up a volleyball court.

13  They have tournaments in there.  It houses like a BLAST program

14  for working out and stuff like that.

15  Q.     Okay.  Is the rec a busy place during the day?

16  A.     Yes, it is.

17  Q.     What times is the rec open during the day?

18  A.     Well, right now we're on an A side/B side due to Covid,

19  so we split them up.  But before Covid, the entire institution,

20  you know, if they wanted to go up there and hang out and, you

21  know -- capacity.  They can go up there, they can have

22  volleyball games and people could be watching.  There's

23  bleachers to watch the volleyball games and stuff like that.

24  Q.     Okay.  And what time -- does the rec have hours that

25  it's open?

1   A.      Yes, I believe it opens up not long after the 8 o'clock

2   movement.

3   Q.      Okay.  When you said you were on A/B now, just to

4   clarify, you have the inmates divided into groups; is that what

5   you mean?

6   A.      The housing units.

7           MS. McGRAUGH:  Judge, I don't see how any of this is

8   relevant.

9           THE COURT:  Overruled.

10  BY MS. HARRIS:

11  Q.      Is that what you mean by that?

12  A.      Correct.

13  Q.      Okay.  In the rec -- well, let me just talk generally.

14  There's been discussion about windows in doors, windows in

15  classrooms.  Why do you have windows in things?

16  A.      It's for security.

17  Q.      And what do you mean by that?

18  A.      So we can see in and they can see out.

19  Q.      Can you think of anywhere inside the secure portion of

20  Chillicothe Correctional Center where there are blinds or

21  curtains on windows?

22  A.      No, I can't think of any.

23  Q.      Okay.  And why is that?

24  A.      Basically because we have an open institution that

25  everything is transparent so we can see.  Staff safety,

1  offender safety.

2  Q.    As the Chief of Custody, are you the custodian of the

3  logs that are kept to show where people are working?

4  A.    Yes.

5  Q.    And what are those called?

6  A.    The chronological logs.

7  Q.    Okay.  And tell us a little bit about the chronological

8  logs.  What do they look like for a day?

9  A.    For a day, there's a format on the sheet, and there

10  will be all of the posts where a staff member could be assigned

11  to.  It's listed in two columns, and the name of the person

12  that's assigned to a certain post that's on there is typed in

13  next to that post.

14          On the bottom of the chrono logs will be a space to

15  where if people have scheduled off leave, their name will be

16  down there, if they've scheduled off, you know, sick leave or

17  annual or comp time.  If they've called in sick, they would be

18  handwritten on there because it's a change in the schedule.  So

19  if anything changes, somebody was moved at the beginning of the

20  shift due to staff levels, they would mark their name off the

21  chron and then write their name on a different spot.

22  Q.    Do some correctional officers go to the same post every

23  day?

24  A.    Yes, pretty much.

25  Q.    Okay.  And do some correctional officers not do that?

1  A.     Yes.

2  Q.     Okay.  A correctional officer who doesn't have a

3  regularly assigned post, what are they called?

4  A.     Utility.

5  Q.     Okay.  And in Chillicothe Correctional Center, a

6  utility officer, what does that mean?

7  A.     Utility officer means that you have no assigned post to

8  go to every day, you can be placed in any of the spots that's

9  on that chronological log.

10  Q.     Dr. Schriro, who testified earlier for the plaintiff,

11  testified she was aware there are two types of utility

12  officers, one which is what you have described where they don't

13  have a set post every day, but they go and they're assigned a

14  set post for the day.  Another one she described is a utility

15  officer who is just left to -- is not ever assigned a real

16  post, or normal post, but goes wherever they're needed in the

17  yard.

18         Does Chillicothe Correctional Center have that

19  second type of utility officer?

20  A.     No.

21  Q.     Okay.  When you assign a person, a CO to a post, what

22  is your expectation about them and what they're going to do

23  during the day?

24  A.     That they be on that -- excuse me, that they be on that

25  post on time, that they do their wing tours and their job as

1  expected.  Excuse me.  They stay on that post unless their

2  sergeant knows they're going to be stepping away for a break or

3  to step out to get something to eat in the cafeteria.

4   Q.     If they do need to leave their post, how do they let

5  the sergeant know that they're leaving?

6   A.     If the sergeant is on the post, because they may have

7  one or two units to be over, if they're on there, they'll just

8  talk to them.  Otherwise they'll need to radio them.  There's

9  some times where they may have enough officers on the post

10  where they can leave, but sometimes they'll have to be replaced

11  by another officer.

12   Q.     Who all working inside the secure area of Chillicothe

13  Correctional Center has a radio on a daily basis?

14   A.     Custody, everybody.

15   Q.     Okay.  How long is a CO allowed to be away from their

16  particular post assignment?

17   A.     Generally we're looking at two 15-minute breaks, and

18  then there's no set time for lunch, but we do a -- excuse me.

19  We do a working lunch to where we're expected to go over and

20  get something to eat; but if you get a radio call, you're

21  supposed to, you know, respond.  But that generally runs about

22  15, 20 minutes, I think.

23   Q.     Okay.  And I'm sorry, did you say the breaks are 15

24  minutes each?

25   A.     Correct.

1    Q.      Okay.  Thank you.

2            If a correction officer were away from their post

3    for longer than their 15-minute break or their lunch, would it

4    be noticed by someone?

5    A.      Yes.

6            MS. McGRAUGH:  Objection, Your Honor.  That's

7    speculative.

8            THE COURT:  Overruled.

9    BY MS. HARRIS:

10   Q.      I'm sorry, what was your answer?

11   A.      Yes.

12   Q.      Who would notice it?

13   A.      The other housing unit officers, for sure.

14   Q.      What would a person do if they were to notice that a CO

15   is away from their post for an extended time?

16           MS. McGRAUGH:  Again, Your Honor, that's speculative

17   to what a specific guard would do.  He can speak about his

18   expectations, but not what exactly is done on every occasion.

19           THE COURT:  Overruled.

20   A.      Yes, they contact their supervisor, their sergeant or

21   whoever is in the area, just to let them know that they left

22   and they're not back yet.

23   BY MS. HARRIS:

24   Q.      Why is it important that the COs are assigned to the

25   post that they're assigned -- or they're staying at the post

1  they're assigned to?

2  A.    Well, it's for the custody and security of the

3  institution, the safety of the offenders and the other staff,

4  and we need to -- we try to keep track of where all of our

5  staff are so if something -- somebody turns up missing, we need

6  to know where to go looking for them.

7  Q.    Is there any correction officer post that would require

8  or allow a CO to watch an entire exercise class for about 45

9  minutes in the rec?

10  A.    I don't believe so, unless the rec officer themselves

11  was in that area.

12  Q.    Is the rec officer an assigned job?

13  A.    Yes.

14  Q.    Okay.  To your knowledge, has Mr. Bearden ever had the

15  assigned rec officer --

16         MS. McGRAUGH:  Objection, Your Honor, it violates

17  the best evidence.  They have the logs.

18         THE COURT:  Overruled.

19  BY MS. HARRIS:

20  Q.    To the best of your knowledge, has Mr. Bearden ever

21  been the assigned rec officer?

22  A.    I don't know offhand.

23  Q.    Okay.  Where do offenders take showers?

24  A.    On the housing unit wings.

25  Q.    Is there a CO that's assigned to be in the shower room?

1  A.      Not in the shower room, no.

2  Q.      Okay.  There's been some testimony that if you go --

3  well, let me start over.

4          The housing wings where -- A, B, C, D where the

5  cells are, are those two-story?

6  A.      Correct.

7  Q.      Okay.  So there's been some testimony by Miss Keil that

8  you can go up to the second story and look down into the

9  showers and see an offender taking a shower.  Have you heard of

10  any complaints like that in your position?

11  A.      We have heard of some complaints.  And when we heard

12  the, you know, the initial one, myself and the PREA coordinator

13  walked on the wing and stood in those areas, and we could not

14  see down inside the shower.

15  Q.      When you're talking about the PREA coordinator, who is

16  that or what is that job?

17  A.      She coordinates over the Prison Rape Elimination Act.

18  Q.      And did she see any problem with that?

19  A.      No.

20          MS. McGRAUGH:  Objection, Your Honor.  That calls

21  for hearsay and speculation.

22          THE COURT:  Overruled.

23  A.      We both discussed it --

24          MS. McGRAUGH:  Your Honor, I ask it be continuing

25  through this line of questioning.

1    THE COURT:  Your request is granted.

2  A.    We both discussed it while we was up on the second tier

3  looking down, and we both agreed that there was no PREA

4  concerns.

5  BY MS. HARRIS:

6  Q.    We have already had some testimony from Warden McBee,

7  but I want to ask you as the custody person in charge of it.

8  In the administrative --

9        MS. McGRAUGH:  Objection, Your Honor.  This witness

10  cannot testify as to another witness's testimony.

11        THE COURT:  Why don't we hear the full question, and

12  then we can determine whether or not --

13        MS. McGRAUGH:  Yes, Your Honor.

14        THE COURT:  -- it's inappropriate or just putting it

15  into context.

16        MS. HARRIS:  Thank you.

17  BY MS. HARRIS:

18  Q.    Who is responsible for supervising the offenders

19  working in the administrative building?

20  A.    Control center.

21  Q.    And what types of work do any offenders do in the

22  administrative building?

23  A.    They're porters, hall tenders.

24  Q.    Okay.  And are there areas in the admin building that

25  if a porter was to go in to clean, they would need an escort?

1  A.      Yes, the staff mail room and the staff break room.

2  Q.      Okay.  Is the porter required an escort to go into the

3  male locker room?

4  A.      No.

5  Q.      Would it be odd for a corrections officer to follow an

6  offender into the male locker room?

7  A.      Yes.

8  Q.      Would you expect someone to notice that if it were to

9  happen?

10  A.      Yes.

11  Q.      Are the people who work in the administrative building,

12  are they free to move about as they need to or want to?

13  A.      Yes.

14  Q.      If the porters, the offender porters are cleaning one

15  of the restrooms in the administrative building, how do they

16  indicate they're doing that?

17  A.      They will knock on the doors and, you know, announce

18  themselves, make sure nobody answers and that there is nobody

19  in there.  Then they will prop the doors open and have them

20  open.  They also have, you know, those big push carts, the

21  cleaning carts, you might have seen them.  And I think it's

22  yellow, but it stays outside the door so any staff walking by

23  knows that, you know, they're in there cleaning.

24  Q.      If a staff member sees that the restroom or the locker

25  room is being cleaned, are they supposed to go into it?

1  A.    No.

2  Q.    We're going to talk now about some chrono logs.  They

3  have been admitted into evidence as D44 through D110.  And the

4  women who are, have brought these complaints and are the

5  plaintiffs were in Chillicothe Correctional Center, the time

6  frame for all of them start July '11 is the earliest date any

7  of them began, and the latest date any of them were there was

8  November of '17.  That's a six-year, four-month period.

9        If you were to look at the chronological logs for

10 that entire six years and four months, do you know roughly how

11 many pages of paper you would be looking at?

12 A.    You're looking at one chron for each shift, so you're

13 looking at three chrons a day at 365 days a year, so you're

14 looking at 22 or 2400 pieces of paper.

15 Q.    And if someone makes a complaint, an allegation against

16 a correction officer, are the chronological logs something you

17 go to look at to see where that officer was assigned or

18 anything?

19 A.    Correct.

20 Q.    Okay.  If someone makes a complaint against an officer,

21 do you also go and look at any video footage on any of the

22 cameras in the facility?

23 A.    Yes, we can do that.

24 Q.    If you get a complaint about an officer but it doesn't

25 say a specific date or time or place, what are you able to do

1   as far as investigating that?

2   A.      It kind of stops us.  We don't have anywhere to look or

3   the time frame.

4   Q.      Okay.  Did you look through the chron logs for this

5   period we just talked about?

6   A.      I think I reviewed a little over a thousand.

7   Q.      Okay.  Have you been able to memorize where Mr. Bearden

8   was on all of those days and pages that you've looked at?

9   A.      No.

10  Q.      Okay.  One of the specific times that the plaintiffs

11  have testified that they believe they were around Mr. Bearden

12  was Miss Betz who testified that he was assigned to the voc-ed

13  department when Miss Gilmore -- Gilgour, excuse me, was on

14  vacation.  Do you know Miss Gilgour?

15  A.      Yes.

16  Q.      And who is she?

17  A.      She was a vocational officer.  She was actually there

18  before I started.

19  Q.      Okay.

20  A.      She was a veteran officer.

21  Q.      Miss Betz was at the Chillicothe Correctional Center

22  from September '14 to July of '16.  Did you have the

23  opportunity to review those chronological logs?

24  A.      I believe I did some.

25  Q.      Okay.  And she was in voc-ed in 2016, so you reviewed

1  those, as well -- I mean, those chron logs?

2   A.     I believe I did some, yeah.

3   Q.     We're going to look at the chron logs now.  If we can

4  look at Exhibit 82, and I'm going to -- we're going to go over

5  a little bit and try to explain to the jury how to look at

6  these and what these show us.

7          MS. HARRIS:  And this has already been admitted,

8  Your Honor.

9   BY MS. HARRIS:

10  Q.     This is small, but hopefully people can see.  How do

11  you know what day this log is for?

12  A.     Well, on the very top black bar, you'll see the shift,

13  the day of the week, and the current date.

14  Q.     Okay.  So the one we're looking at, what shift is it

15  for?

16  A.     That is for second shift.

17  Q.     Okay.  Are you aware what shift Mr. Bearden was working

18  in 2016?

19  A.     I believe it was -- was it day shift, I think?  Yes.

20  Yeah, I believe it was day shift.

21  Q.     Okay.  And this is for March 1st of 2016; is that

22  correct?

23  A.     Yes.

24  Q.     Okay.  What is the first column here?  Tell us.

25  A.     The first column going down is the actual post that I

1  talked about earlier.  Those are the spots where the person

2  might be assigned to.

3  Q.     And is that part of the form that is the chronological

4  log?

5  A.     That's the basic format, yes.

6  Q.     Okay.  The third column, which is under Tuesday, what

7  is that?

8  A.     That's, again, more posts that a staff member may be

9  assigned to.

10  Q.     And is that also part of the form that comes up every

11  day?

12  A.     Yes.

13  Q.     Okay.  At the bottom, we see some areas.  What is that

14  for?

15  A.     This is the scheduled leave, which could be anything

16  from a doctor's appointment to taking a day of annual off.

17  Q.     If a CO has told you "I'm going to be gone," their name

18  is going to be down there?

19  A.     Yeah, they would submit a request to have it off, it

20  would be approved, and the shift commander would type their

21  name down there.

22  Q.     Okay.  Underneath the third column on the bottom, what

23  is that?

24  A.     Underneath the third column, that is for sick leave.

25  Q.     Okay.  Is that similar for the vacation?

1  A.      Yes.  This is approved leave.  The ones that are typed

2  in here are ones that was put on before, so they was -- they

3  had put in a request to be off for sick leave, it's been

4  approved.  The other ones that are hand wrote in there, that's

5  by the control center.  If a staff member was to call in --

6  they have to call in one hour prior to the shift; and if they

7  call in, control center has this sheet, and they'll mark their

8  name off the top and then write their name down there.

9  Q.      Okay.  Let's look at the next page, which I believe is

10  actually the -- would be the back page of this page as the

11  corrections center has it; is that correct?

12  A.      Yes.

13  Q.      Okay.  And tell us, the first column on this is what?

14  A.      It's the part of the format again, the post that --

15  posts.

16  Q.      Okay.  The third column is what?

17  A.      Part of the format too, it's the post.

18  Q.      Okay.  And the -- let's go back to the first page,

19  then.  The second column and the fourth column, what are those?

20  A.      That is the actual staff that are assigned to that

21  area.

22  Q.      Okay.  And there look to be some people written in

23  here.  Why would that be?  And some scratching out.

24  A.      If at the beginning of the shift they come in and they

25  see somebody has called in, they may have to replace them with

1  somebody else.

2  Q.     Okay.  And what are the initials?

3  A.     The initials, that's when the staff first come on into

4  the roll-call room.  And they'll look at this sheet, and

5  they'll find their name to make sure they're where they think

6  they are because they might have been moved.  And then they'll

7  initial next to their name, showing they know where they're at

8  and they're actually here.

9  Q.     Okay.  Let's look at the back page again.  What's at

10  the very bottom of this?

11  A.     The very bottom is the shift commander signature and

12  the control center sergeant signature.

13  Q.     Right above that, what does it say above their

14  signatures?

15  A.     It says, "I hereby certify that the above is a true and

16  accurate account of my shift."

17  Q.     Okay.  The shift commander, what's his position on a

18  shift?

19  A.     He is the -- if you go up in the other corner -- well,

20  it's on the other side, but he is the one that's shift

21  supervisor.  He's in charge of the shift.

22  Q.     Okay.  We're going to look at March 28, 2016, the chron

23  for that.  Are you able to see the date that this chronological

24  log is for?

25  A.     Second shift, Monday.  And it's kind of blurry.  I

1  can't tell if that's 3/23 of '16 or...

2  Q.     I believe it's 3/28.

3  A.     28?  It's a little blurry on the screen.

4  Q.     Okay.  Where does it tell us that Miss Gilgour is on

5  this particular date?

6  A.     It looks like she's on death leave, that's what the DL

7  is, and that would be her first day of death leave.

8  Q.     And just -- can you tell the jury where you're looking

9  at to see that?

10  A.     In the bottom right-hand corner under "other."

11  Q.     Okay.  And do you see where Mr. Bearden was assigned

12  for this day?

13  A.     It looks like he was in transportation and taking a bus

14  run.

15  Q.     Okay.  Let's go to March 29th.  Do you see that this --

16  and we're still on Exhibit 82, just the page number.  Can you

17  see what chronological log this is for, what date?

18  A.     This one just says March of -- and Tuesday, second

19  shift.

20  Q.     Okay.  What does it indicate as far as where Miss

21  Gilgour is?

22  A.     She is down in the box of "other," and she is on her

23  second day of death leave.

24  Q.     Okay.  And where is Mr. Bearden at?

25  A.     Trying to find him here.

1  Q.      We can go to --

2  A.      Yes, I found him.  He was on the yard.

3  Q.      Okay.  Let's go to March 31st.  Are you able -- I said,

4  yeah, that was the 30th we just did, was it?  Or I'm confused

5  now.  We're on the 30th now.  I'm sorry, I got ahead of myself.

6          Are you able to tell what log this is, what day it's

7  for?

8  A.      Yes.  March 30th of '16.

9  Q.      Okay.  And where does it indicate that Miss Gilgour is

10 at on this time?

11 A.      She's now on her third day of death leave, bereavement

12 leave.

13 Q.      Okay.  And do you see Mr. Bearden on here at all?  And

14 we can go to the second page, as well, if you need to look

15 there too, I believe.

16 A.      I don't see him on this page.  No, I don't see him.

17 Q.      Okay.  Information has been provided with Mr. Bearden's

18 testimony that at this point, his regular days off were

19 Wednesday and Thursday.  So if he was on a regular day off,

20 would he be on the chron?

21 A.      No.

22 Q.      Okay.  Let's go to the 31st, then, which is actually a

23 Thursday.  If that's his regular day off, would you expect to

24 see him on here?

25 A.      No.

1  Q.      And do we see where Miss Gilgour is at on this day?

2  A.      It looks like she's on her fourth day of death leave.

3  Q.      All right.  We're going to go to Exhibit 83 now, to the

4  first page, which is April 1st.  Do you see what day that one

5  is?

6  A.      April 1st of 2016.

7  Q.      Okay.  And where does it show Miss Gilgour is?

8  A.      She's on her last -- her fifth day of death leave.

9  Q.      Okay.  And where do we see Mr. Bearden working?

10  A.      He is in vocational --

11  Q.      Okay.

12  A.      -- education.

13  Q.      So of these five days, Mr. Bearden worked one day in

14  voc-ed; is that correct?

15  A.      Correct.

16  Q.      Okay.  We're going to look at Exhibit 84 now, which

17  is -- well, we'll get there.

18          Do you see Exhibit 84?

19  A.      Yes.

20  Q.      Okay.  And what chron -- what month is this for?

21  A.      5/1 of 2016.

22  Q.      Okay.  We're going to look at the second day of May,

23  which is going to be a couple of pages down.  Where does it

24  show that Miss Gilgour is on this particular chron?  Oh, we

25  haven't gotten there yet.

1   A.      Oh, she's still off on her "other."

2   Q.      And it says "core" above that.  Do you know what that

3 is?

4   A.      Yes, that's annual training they have to do once a

5 year.

6   Q.      Okay.  So she's out of the prison.  Where is

7 Mr. Bearden working this day?

8   A.      He is assigned to vehicle, vehicle patrol.

9   Q.      Okay.  We're going to look next to May 3rd.  Are you

10 able to tell if you're looking at the chronological sheet for

11 May 3rd of 2016?

12   A.      Correct, yes.

13   Q.      And where is Miss Gilgour on that day?

14   A.      She's still in core training.

15   Q.      Okay.  And where is Mr. Bearden?

16   A.      He is scheduled off three hours of sick leave, and he

17 was in control center for the first part of the shift.

18   Q.      All right.  May 4th and May 5th are Wednesday and

19 Thursday, his regular day off, according to his testimony.

20 We'll look at that briefly.  On May 4th, do you see where Miss

21 Gilgour was?

22   A.      Still in core training.

23   Q.      Okay.  Do you see Mr. Bearden assigned on May 4th?

24 We'll go to the second page so you can review that, as well.

25   A.      No.  No, I do not.

1  Q.      All right.  We'll go to May 5th.  Are you looking at

2  the May 5, 2016, chron?

3  A.      Yes, Thursday.

4  Q.      Where is Miss Gilgour?

5  A.      Still in training.

6  Q.      And where is Mr. Bearden?  This is a Thursday, so tell

7  us if you see him assigned here, and we'll go to the second

8  page if we need to.

9  A.      No, I do not.

10 Q.      Okay.  Go to May 6th.  Are you able to see if you're

11 looking at the chron for May 6th?

12 A.      Yes, Friday the 6th.

13 Q.      And where is Miss Gilgour?

14 A.      Still in training.

15 Q.      Okay.  And do you see where Mr. Bearden was working on

16 that day?

17 A.      He was assigned to vehicle patrol.

18 Q.      Okay.  We're going to stay with this exhibit in May of

19 '16 and look at May 9th, Page 17.  Are you able to see if we're

20 looking at the chron for May 9, 2016, now from Chillicothe

21 Correctional Center?

22 A.      Yes, Monday.

23 Q.      Okay.  Where does it show Miss Gilgour is?

24 A.      She has scheduled off the holiday.

25 Q.      Okay.  And where does it show Mr. Bearden was working

1  on that day?

2  A.      Vehicle patrol.

3  Q.      Okay.  Let's look to May 10th.  Are you able to see

4  that you're looking at the May 10th, 2016, chron for

5  Chillicothe Correctional Center?

6  A.      Correct, Tuesday.

7  Q.      And where do you see Miss Gilgour at?

8  A.      Scheduled off.

9  Q.      Okay.  And where do you see Mr. Bearden?  You may have

10 to go to the second --

11 A.      I see him in the yard, utility officer.

12 Q.      I just want to talk about this briefly.  Does it show

13 who was working in vocational ed while Miss Gilgour has been

14 off on this training, her bereavement leave, and now on annual

15 leave?

16 A.      Yes.

17 Q.      Okay.  So on this day, who was working there?

18 A.      Vocational ed officer was Mr. Wes Davis.

19 Q.      Okay.  All right.  We're going to look to the 11th now.

20 Are you able to see the chron log for May 11, 2016?

21 A.      Correct.

22 Q.      Where does it indicate Miss Gilgour is?

23 A.      She's scheduled off.

24 Q.      Okay.  And this is a Wednesday, which is Mr. Bearden's

25 regular day off, according to his testimony.  Do you see him on

1  the chron log anywhere?  And we'll go to the second page when

2  we need to.

3   A.    No.  No.

4   Q.    Okay.  Let's go to May 13th.  I got ahead of myself

5  again, May 12th.  This is a Thursday.  Do you see where Miss

6  Gilgour is at?

7   A.    Scheduled off again.

8   Q.    All right.  Who is working in -- who is assigned to

9  voc-ed that day?

10   A.    James Lowe.

11   Q.    Okay.  This is a Thursday, so look and see, that's

12  Mr. Bearden's day off, if you see him on the chron anywhere, if

13  you could.

14   A.    No, I do not.

15   Q.    Okay.  Let's stick to Friday, May 13th.  Where is Miss

16  Gilgour on this day?

17   A.    Scheduled off.

18   Q.    And where do you see -- well, who do you see working in

19  voc-rehab on -- or I said voc-rehab, I'm sorry --

20  vocational-education on that day?

21   A.    James Lowe again.

22   Q.    Okay.  And where do you see Mr. Bearden working?

23   A.    He was rec/chapel officer.

24   Q.    Thank you.  May 14 is a Saturday, we're going to look

25  at that.  Are you able to see the May 14, 2016, chron log?

1  A.    Yes, Saturday.

2  Q.    Where is Miss Gilgour?

3  A.    Oh, on a Saturday, that would be her day off.

4  Q.    That's what I was going to ask you.  Is voc-ed closed

5  at any point during the week?

6  A.    Saturday and Sunday.

7  Q.    Okay.  So those would be Miss Gilgour's regular day

8  off?

9  A.    Correct.

10  Q.    When voc-ed is closed, is there anyone in voc-ed?

11  A.    No.

12  Q.    Is there a CO assigned to voc-ed?

13  A.    No.

14  Q.    Okay.  So May 15th, Miss Gilgour is off and Mr. Bearden

15  is certainly not assigned to voc-ed.

16  A.    No.

17  Q.    Okay.  Let's look to Sunday, May 15th.  Is voc-ed

18  opened on Sunday, May 15th?

19  A.    No.

20  Q.    Let's move to May 16.  Are you able to see that chron

21  sheet in front of you now, Major?

22  A.    Monday, yes.

23  Q.    Okay.  And where is Miss Gilgour?

24  A.    Still scheduled off.

25  Q.    Okay.  And Mr. Bearden is assigned where?  And we may

1  need to look to the second page on this one.

2  A.      Yeah, I don't see him.

3          He is assigned to Housing Unit 3.

4  Q.      Okay.  Let's look to Tuesday, May 17.  Are you able to

5  see that chron log before you now, Major?

6  A.      Yes.

7  Q.      Okay.  Where is Miss Gilgour on Tuesday, May 17, 2016?

8  A.      Scheduled off.

9  Q.      And where is Mr. Bearden?

10 A.      Yes, he's transportation officer.

11 Q.      And who was working in voc-ed that day?

12 A.      James Lowe again.

13 Q.      All right.  Let's look to Wednesday, May 18, 2016.  Are

14 you able to see that in front of you now, Major?

15 A.      Yes.

16 Q.      Okay.  Where is Miss Gilgour on this day?

17 A.      Scheduled off.

18 Q.      And where -- this is a Wednesday, so we've already

19 established that's Mr. Bearden's regular day off.  Look and see

20 if you see him assigned on here anywhere, please.

21 A.      No, I do not.

22 Q.      Okay.  And who was assigned to voc-ed?

23 A.      That would be James Lowe again.

24 Q.      All right.  Let's go to Thursday, May 19th.  Are you

25 able to see that chron log?

1  A.      Yes.

2  Q.      And where is Miss Gilgour?

3  A.      Scheduled off.

4  Q.      And where is -- this is a Thursday.  Where is

5  Mr. Bearden?

6  A.      He would be on his day off.

7  Q.      Okay.  Who is assigned to voc-ed on that day?

8  A.      James Lowe.

9  Q.      Okay.  And let's look to Friday, May 20th.  Where is

10 Miss Gilgour?

11 A.      Scheduled off.

12 Q.      And where is Mr. Bearden working that day?

13 A.      Yes, he's yard officer.

14 Q.      Who is working in voc again?

15 A.      James Lowe.

16 Q.      Okay.  So that's the third day in a row I think we've

17 seen Mr. Lowe there.  Do you agree?

18 A.      Yes.

19 Q.      Okay.  So at any point while Miss Gilgour was on her

20 vacation between May 9th and May 20, 2016, was Mr. Bearden

21 assigned to the voc-ed department?

22 A.      No.

23 Q.      Okay.  Did you ever get any complaints about

24 Mr. Bearden being in places throughout Chillicothe Correctional

25 Center that he was not supposed to be?

1   A.      No, I don't believe so.

2   Q.      Did you ever get any complaints about Mr. Bearden not

3   being at the post that he was assigned to be at for the day?

4   A.      No.

5   Q.      Before 2018, did you have any complaints of Mr. Bearden

6   having sexually assaulted anyone at Chillicothe Correctional

7   Center?

8   A.      No.

9   Q.      Before 2018, did you have any complaints of Mr. Bearden

10  having sexually harassed anyone at Chillicothe Correctional

11  Center?

12  A.      No.

13          MS. HARRIS:  If I could have one quick moment?

14          THE COURT:  Sure.

15          MS. HARRIS:  Thank you.

16          I don't have any further questions for the Major.

17  Thank you.

18          THE COURT:  Any cross-examination?

19          MS. McGRAUGH:  Thank you, Your Honor.

20                              - - -

21                      CROSS-EXAMINATION

22  By Ms. McGraugh:

23  Q.      Good morning, Major Savage.

24  A.      Good morning.

25  Q.      How are you?

1    A.      I'm good.

2    Q.      Good.  So that was an awful lot of chronological logs,

3    correct?

4    A.      Yes.

5    Q.      And I'm guessing it look a long time to get through a

6    thousand pages?

7    A.      Yes.

8    Q.      And you said that you didn't see anything about Officer

9    Bearden working in rec.  That's not true, is it?

10          MS. HARRIS:  Objection.  Misstates his testimony.  I

11   didn't ask that question.

12          THE COURT:  Overruled.

13   BY MS. McGRAUGH:

14   Q.      You told the jury he worked in rec during that period,

15   right?

16   A.      I don't recall.

17   Q.      Rec?  You said rec and chapel, rec and chapel.  You

18   said one day Bearden was assigned to rec and chapel.

19   A.      Was that part of the chrons we just looked at?

20   Q.      It was your testimony, sir.  I believe it was May 13th?

21   A.      May 13th?

22   Q.      Yes, sir.

23   A.      If that's one of the ones I looked at.

24   Q.      Yes, sir.  Do you dispute that he was assigned to rec?

25   A.      I don't believe that's what I said, but...

1  Q.    Okay.  Would you like to see the log again?

2  A.    If you have the log, I'll look at it, yes.

3        MS. HARRIS:  We can put it back up.

4        MS. McGRAUGH:  I'm sorry?

5        MS. HARRIS:  We can put it back up.

6        MS. McGRAUGH:  Can you put it back up?

7        MS. HARRIS:  Sure.

8  BY MS. McGRAUGH:

9  Q.    And I'm going to apologize if I'm wrong, but I was sure

10 that's what I heard you say.  Rec/chapel officer.

11 A.    Yes, on the 13th, he is assigned to chapel.

12 Q.    He's assigned to what?  Rec and chapel.

13 A.    Rec/chapel.

14 Q.    Okay.

15 A.    I must have been mistaken.

16 Q.    Right.  Because he was assigned to rec.

17 A.    According to this sheet, yes.

18 Q.    So let me ask you this.  Is rec off limits to all

19 correctional personnel except those that are assigned to rec?

20 A.    No, it's in a building that has parts where the shift

21 manager's office is and the chapel.

22 Q.    So it's commonplace, in fact, isn't it, for officers

23 who are not assigned to rec to pass through rec, correct?

24 A.    If they was going to the shift commander's office.

25 Q.    Right.

1  A.      Other than that, it's not their assigned area.

2  Q.      Well, and we're talking about people staying in their

3  assigned area and people that are moving through the prison.

4  Those are two different things, right?

5  A.      Moving through the prison?

6  Q.      Yes, sir.

7  A.      If they're heading to the dining hall or if they're

8  being called to the shift commander's office --

9  Q.      Right.  They walk by rec.

10  A.      Well, I'm not going to say they walk by it.  If they're

11  going to the dining hall, they're in two separate areas.

12  Q.      Okay.  Some may go through rec, some may go a different

13  way; is that correct?

14  A.      To the dining hall?  No.

15  Q.      Okay.  You said when they asked you that you get

16  reports of COs hanging around places they don't belong.  Is

17  that correct?

18  A.      If it was to happen, I would, yes.

19  Q.      Sir, is that correct what you told them, that COs get

20  reported for hanging around places they don't belong?

21  A.      I believe it's happened in the past.

22  Q.      Did you tell them when they asked you that COs get

23  reported for being in places they don't belong?

24  A.      I said they have, yes.

25  Q.      Yes.  And there's actually something you do when that

1  happens, right?

2  A.      Yes.

3  Q.      And that's that you have to, what, go on the radio and

4  say, "Hey, only people who are assigned there should be there,"

5  correct?

6  A.      We wouldn't go on the radio.  We might go through the

7  chain of command and find out why they was there.

8  Q.      Sir, didn't you say when they asked you that then you

9  would have to say, "Everybody who is not in this post needs to

10  move on"?

11  A.      We would talk to the sergeant, and they would make sure

12  that if there was somebody in that area that wasn't supposed to

13  be there, they would be asked to leave.

14  Q.      It's enough of a problem that you have a protocol or a

15  system dealing with guards who are hanging out where they're

16  not supposed to be.

17  A.      It's a rare occasion.

18  Q.      Sir, do COs hang out where they're not supposed to be?

19  A.      Not regularly, no.

20  Q.      But they do.

21  A.      It's happened before in the past.

22  Q.      Okay.  How many times?

23  A.      I don't know.

24  Q.      Okay.

25  A.      It's rare, though.

1    Q.      That's what I thought.  All right.

2            So on May 13th, he was in rec.  How many officers

3    are assigned to be in vo-tech at one time?

4    A.      One officer.

5    Q.      One officer.  And so if that one officer was not where

6    he was supposed to be, there's not another officer to report

7    him, is there?

8    A.      There's other staff.

9    Q.      There's not another officer to report him, is there?

10   A.      No.

11   Q.      How many officers accompany the women when they clean

12   the administrative building during the third shift?

13   A.      When they're in areas where they need to be escorted,

14   it would be one officer.

15   Q.      One officer.  And if that officer is not where he's

16   supposed to be, is there another officer to report him?

17   A.      There's traffic in the area, so it could be, yes.

18   Q.      Sir, there's one officer, correct?

19   A.      One officer.

20   Q.      And if that officer is not doing what he's supposed to

21   be doing, there's not another officer to report him, is there?

22   A.      He's escorting the offender, but there's other officers

23   in the area.

24   Q.      Well, there's officers in the bubble, correct?

25   A.      Yes, and in search point.

1  Q.      And -- oh, which is at the front of the building, you

2  told us, right?  The sally port?

3  A.      I never told you that, but it's in the administration

4  building where you come in.

5  Q.      I'm correct, right?

6  A.      Yes.

7  Q.      Okay.  It's like arguing with my kids.  Just say I'm

8  correct.

9          If there's only one officer and that officer is not

10 doing what he's supposed to be doing, there's not officers

11 around to report him, correct?

12 A.      I'm not sure if I agree with that.

13 Q.      Sir, if there's one officer at a post and there's no

14 other offices like you told us in vo-tech, there's no other

15 officers, right?  Because you don't report on yourself,

16 correct?

17 A.      No.

18 Q.      Okay.  Some people might report on themselves, but not

19 everybody does.  Correct?

20 A.      I would assume so.

21 Q.      I would -- yeah.

22          Okay.  So there's one officer in vo-tech, there's

23 one officer when the staff cleans afterwards.  The

24 administration building, what time does that close?

25 A.      4:30.

1  Q.      And everybody goes home.

2  A.      Correct.

3  Q.      Got it.  So if I asked you to find me a day in spring

4  of 2016 where Lynnsey Betz was assigned, Edward Bearden was the

5  only guard, and Miss Gilgour was out of the office, does that

6  day exist in those logs?

7  A.      I don't know if it exists or not without seeing the

8  logs.

9  Q.      Sir, did you testify --

10  A.      It would be shown in the logs.

11  Q.      Did you see it in the logs?

12          MS. HARRIS:  I'm going to object because there is no

13  testimony as to when Miss Betz actually -- well, let me

14  withdraw that objection.  You're talking -- if you're talking

15  about voc-ed, I'll withdraw my objection.

16  BY MS. McGRAUGH:

17  Q.      Okay.  A day that Gilgour was gone --

18  A.      Uh-huh.

19  Q.      -- from voc-rehab and Bearden was the guard there, did

20  you find that day?

21  A.      I believe there might have been one day, but I'm not

22  sure.  There was a lot of paperwork I was going over.

23  Q.      Well, you reviewed it with Mr. Bearden's lawyers,

24  right?  Just now?

25  A.      Yeah, those days, yes.

1 Q.    And on April 1st, didn't you testify that Miss Gilgour

2 was gone from voc-ed and Mr. Bearden filled in?

3 A.    I believe so, yes.

4 Q.    Is that a yes?

5 A.    Yes.

6          MS. McGRAUGH:  Nothing further.

7          THE COURT:  Any redirect?

8          MS. HARRIS:  May I proceed?

9          THE COURT:  Yes.

10          MS. HARRIS:  Thank you.

11                    - - -

12                REDIRECT EXAMINATION

13 By Ms. Harris:

14 Q.    Major, are officers the only ones who are able to

15 report if they see something strange?

16 A.    No, everybody is supposed to report anything

17 suspicious.

18 Q.    Okay.  While there's one officer assigned to voc-ed,

19 where does that officer stay?

20 A.    They're out in the main hallway, which is by the main

21 entrance going in.

22 Q.    Okay.  If they're not at that post, is it easily

23 visible to people in the hallway?

24 A.    Yes.

25 Q.    Okay.  Are there other staff people, not officers, who

1  work in vo-tech?

2  A.    Yes.

3  Q.    Who all is that?

4  A.    There are the teachers of all of the classes that's

5  going on, there is the supervisor of the area that's over the

6  academic education, their secretaries.  You have a cosmo class

7  going on, there's all different classes.

8  Q.    And any one of those people could report if they

9  noticed that the officer in voc-ed was not where they were

10 supposed to be?

11 A.    Yes.

12 Q.    Is the voc-ed assignment one that, if you leave your

13 post, that you should get relief for?

14 A.    Yes.

15        MS. HARRIS:  If I could confer for just one moment.

16        THE COURT:  Sure.

17 BY MS. HARRIS:

18 Q.    Major, are you aware of any particular time when you've

19 been reported that COs have been off their post?

20 A.    If they, maybe they went on break and they was gone too

21 long, then that might have been reported.

22 Q.    Okay.  I would like to ask just the witness to look at

23 Exhibit 21.  It has not been admitted.

24        Are you able to see Exhibit 21?

25 A.    Yes.

1    Q.      Okay.  And is this a memo written to you from a

2  corrections officer?

3    A.      Yes, Lieutenant Leach.

4              MS. HARRIS:  I'd like to offer Exhibit 21.

5              MS. McGRAUGH:  Your Honor, it's irrelevant.

6  Nobody's name in that memo is a plaintiff or a defendant in

7  this case.

8              THE COURT:  Please approach.

9              (Counsel approached the bench, and the following

10  proceedings were had:)

11             THE COURT:  So how is this relevant?

12             MS. HARRIS:  It's relevant to show that there are

13  reportings of people not being where they're supposed to be and

14  doing things.  And it's also relevant in that the third page

15  actually shows that Mr. Bearden was part of the reporting.

16             MS. McGRAUGH:  Your Honor, we had this issue

17  yesterday, and you found yesterday it was completely

18  irrelevant.

19             MS. HARRIS:  I think we're in a different situation

20  now with how they're crossing Major Savage.

21             (Defense counsel conferred privately.)

22             MS. HARRIS:  Nick is thinking yesterday he also

23  didn't make the argument that it had to do with the

24  inappropriate conduct reporting.

25             THE COURT:  So you seem to have made the argument

1  that these are not reported and that it can happen frequently.

2  Why is this not relevant to rebut that argument?

3          MS. McGRAUGH:  Because it's one incident, and just

4  because -- they're only using it for character evidence to show

5  that Bearden would report other people.

6          MS. HARRIS:  No, I didn't say that.

7          MS. McGRAUGH:  What's the relevance?

8          MS. HARRIS:  That things are reported.  You're

9  trying to say that Chillicothe Correctional Center is amiss,

10 that people can go wherever they want and nobody does anything.

11         MS. McGRAUGH:  I did not --

12         THE COURT:  I think it's also important when

13 discussing objections to have a conversation with me, rather

14 than each other.

15         So I do think that, given the arguments that have

16 been made, that this is relevant, and it will be admitted.

17         MS. McGRAUGH:  Leave it up there, would you, please?

18         MS. HARRIS:  Sure.

19         MS. McGRAUGH:  Thank you.

20         (The following proceedings were had in open court:)

21         THE COURT:  D21 will be admitted.

22       (Defendant's Exhibit 21 was admitted into evidence.)

23         MS. HARRIS:  If we could publish that to the jury

24 now.  Thank you.

25  BY MS. HARRIS:

1    Q.      Major Savage, D21, tell us what this is.

2    A.      This is a memorandum from Lieutenant Leach to me.

3    Q.      And what's it regarding?

4    A.      Two officers acting inappropriately.

5    Q.      And what was the inappropriate action that the two

6    officers had?

7    A.      That they were -- sorry.  That they were flirting with

8    each other.  One had their leg on the other one's, across their

9    lap.  And at one point in time, they both went into an offender

10   property room and stayed in there for approximately 20 minutes.

11   Q.      And the memo, as you've indicated, is from Lieutenant

12   Leach.  Is he somewhere in the chain of command?

13   A.      Yes.

14   Q.      And is he the one who actually saw this conduct?

15   A.      No.

16   Q.      Who actually saw the conduct?

17   A.      Kyle Penrod -- I'm sorry, it would be Dylan Romesburg.

18   Let me see here.  Yeah, Romesburg.

19   Q.      Dylan Romesburg was assigned to work with Kyle Penrod

20   and Officer Hopper; is that your understanding?

21   A.      Yes.

22   Q.      Okay.  And Mr. Romesburg apparently observed this?

23   A.      Correct.

24   Q.      And what did he do?

25   A.      He reported it, as he should.

1   Q.      He reported to whom?

2   A.      To Lieutenant Leach.

3   Q.      And who was that to Mr. Romesburg, or Officer

4   Romesburg?

5   A.      He could have been the lieutenant over the area, or he

6   could have been the shift commander at the time.

7   Q.      And then what did Mr. Leach do, or Lieutenant Leach do

8   when he was told?

9   A.      He reported it to me.

10  Q.      Okay.  There's a couple of pages on this, so let's look

11  to the second page.  This is very tiny writing, and I apologize

12  to the jury.

13          This is what?

14  A.      Again, it's an IOC from, I believe it was from

15  Mr. Romesburg talking about the two officers that was acting

16  inappropriately, flirting.

17  Q.      And when you say IOC, do you mean interoffice

18  communication?

19  A.      Correct.

20  Q.      And this -- is an interoffice communication one of the

21  ways that people at DOC communicate with each other?

22  A.      Yes.

23  Q.      Okay.  So this is what, how Officer Romesburg reported

24  to Leach; is that correct?

25  A.      He probably reported it verbal and writtenly.

1    Q.      Okay.  And then the third page is what?

2    A.      The third page is from Mr. Zeornes, Randy Zeornes.

3            MS. McGRAUGH:  Your Honor, this is the exhibit

4    you -- may I approach?

5            THE COURT:  Yes.

6            (Counsel approached the bench, and the following

7    proceedings were had:)

8            MS. McGRAUGH:  Please correct me if I'm wrong, but I

9    believe this is the exhibit you refused to allow yesterday.

10           THE COURT:  I don't know if it's the exhibit I

11   refused to allow yesterday, but at the same time, I think that

12   the context has changed --

13           MS. McGRAUGH:  Okay.

14           THE COURT:  -- and I think, given the line of

15   questioning, to the extent I sustained an objection yesterday,

16   I'm now over -- I'm having a problem today between sustained

17   and overruled.

18           MS. McGRAUGH:  Me too.

19           THE COURT:  But to the extent yesterday I made a

20   different ruling, today I am overruling your objection and

21   permitting this document.

22           MS. McGRAUGH:  Very good.

23           (The following proceedings were had in open court:)

24   BY MS. HARRIS:

25   Q.      Back to my question.  What is the third page of Exhibit

1  21?

2  A.      It's a -- it's from Mr. Zeornes talking about

3  November 6, 2017, that he was doing a security check, and I

4  believe he found an unsecure -- a door was unsecure.  Said he

5  was approached by an Offender Hernandez and stated that she

6  observed Officers Hopper and Penrod go in E-Wing for

7  approximately an hour.

8  Q.      Okay.  Is this an interoffice communication?

9  A.      Correct.

10  Q.      And who is it from?

11  A.      Randy Zeornes.

12  Q.      Who is it to?

13  A.      Lieutenant Leach.

14  Q.      And is Lieutenant Leach, do you believe he was somehow

15  in the chain of command of Mr. Zeornes?

16  A.      Yes.

17  Q.      Okay.  And Mr. Zeornes is reporting regarding the same

18  night that Mr. Romesburg had reported; is that correct?

19  A.      The 26th, yes.

20  Q.      And Mr. Romesburg -- I'm sorry, Mr. Zeornes, what

21  exactly did he report?

22  A.      He reported that they was doing a security check on

23  E-Wing.  It was conducted by Mr. Bearden.  Can you blow it up

24  just a little bit, please?  Thank you.

25          That on November 26, 2017, a security check of

1  E-Wing was conducted by CO I Edward Bearden where Room E4126

2  was found to be unsecure and reported it on the search log.

3  And that he was approached by Offender Hernandez, and she

4  stated that she observed Officers Hopper and Penrod go in

5  E-Wing for approximately an hour.  And says that himself and

6  Mr. Bearden second-checked the room and found it to be

7  unsecure.

8  Q.     When it says unsecure, what does that mean?

9  A.     It's not locked.

10 Q.     And is it supposed to be locked?

11 A.     Yes.

12 Q.     Okay.  And Mr. Bearden, does it indicate that he did

13 anything when he found the room that was unlocked?

14 A.     I believe it was placed on the search log.

15 Q.     Okay.  And that's part of the supporting documents for

16 Mr. Leach having given you the memo about the two officers

17 being where they were not supposed to be?

18 A.     Yes.

19 Q.     Okay.  I got very confused about one of the first

20 questions that Ms. McGraugh asked you.  I believe I asked you

21 if Mr. Bearden was ever permanently assigned as his post to the

22 rec.  Do you recall that question?

23 A.     Yes.

24 Q.     Okay.  Was he ever permanently assigned to the rec as

25 his post?

1  A.     I don't believe he was ever a rec officer permanently.

2  Q.     Okay.  Was he at times assigned as a utility officer to

3  work in the rec area on a daily basis, as needed?

4  A.     As needed he could have been, yes.

5  Q.     Okay.  And is that what happened on, I think it was May

6  13th when he was assigned to the rec and chapel that

7  Ms. McGraugh went over?

8  A.     Yes.

9         MS. HARRIS:  Okay.  I don't have anything further.

10  Thank you.

11         THE COURT:  Any recross?

12         MS. McGRAUGH:  Yes, Your Honor.

13         So would you mind putting that memo back up, again?

14  Thank you.

15                        - - -

16                RECROSS-EXAMINATION

17  By Ms. McGraugh:

18  Q.     So you had documented an instance where Edward Bearden

19  reported two people having sex, impliedly, in the offender

20  property room; is that correct?

21         MS. HARRIS:  Objection.  Misstates what Mr. Bearden

22  wrote.  May we approach?

23         THE COURT:  Yeah, I need to see the exhibit.

24         (Counsel approached the bench, and the following

25  proceedings were had:)

1          MS. HARRIS:  Mr. Bearden found a room unlocked,

2    that's all it is.

3          THE COURT:  I think he found a room.

4          MS. McGRAUGH:  It's with the same report, Judge.

5    She said it was all one report.

6          THE COURT:  But your question was that Mr. Bearden

7    reported two people having sex, impliedly.

8          MS. McGRAUGH:  I don't -- I do understand that.

9          THE COURT:  The objection is overruled.  Or is

10   sustained.

11         (The following proceedings were had in open court:)

12   BY MS. McGRAUGH:

13   Q.     This report is an example of people reporting other

14   people, right?

15   A.     Correct.

16   Q.     Officers reporting other officers.

17   A.     Correct.

18   Q.     And Edward Bearden reporting that the door wasn't

19   closed.

20   A.     Correct.

21   Q.     Do you have other incidents of him reporting a

22   violation during his ten years at Chillicothe?

23   A.     That's a lot of time.  I would have a hard time -- you

24   know, I've been the major for four years, and I don't think

25   I've heard of any, but it doesn't mean it doesn't exist.

1  Q.      And you said you haven't heard of Bearden having any

2  violations; is that right?

3  A.      Not that I know of, no.

4  Q.      If you knew that Edward Bearden got a burner phone,

5  gave the phone number to two separate offenders, and asked

6  those offenders to call him on that telephone, would that be a

7  violation?

8  A.      Yes.

9  Q.      And if you knew that information was true, that would

10 change your answer, wouldn't it?

11 A.      I believe so, yes.

12 Q.      Okay.  But no one told you about that, right?

13 A.      Not in my four years of being major.

14 Q.      Okay.  All right.  So this memo, it looks like these

15 two guards snuck off into the offender property room for 20

16 minutes, correct?

17 A.      Correct.

18 Q.      So for the first 19 minutes they were in the property

19 room, they weren't reported, correct?

20           MS. HARRIS:  I'm going to object.

21           THE COURT:  What's the basis?

22           MS. HARRIS:  They weren't reported that evening at

23 all, necessarily.  I mean, I don't understand what she's

24 saying --

25           MS. McGRAUGH:  Oh, okay.

1          MS. HARRIS:  -- the first 19 minutes.

2          THE COURT:  Overruled.

3   BY MS. McGRAUGH:

4   Q.     Were they not reported at the time this happened?

5   A.     I can't confirm if it was verbally reported instantly.

6   It's -- the date that they said it was reported was the 26th,

7   which is the same date the IOC was wrote.  If you go back to

8   the other IOCs, we can check the dates on them.

9   Q.     Okay.  But the fact that they went into the offender

10  property room together wasn't reported the minute it happened,

11  was it?

12  A.     I don't think it was observed.

13  Q.     It was not observed when those two people went into the

14  offender property room together, correct?

15  A.     I'm assuming so, by the reports.

16  Q.     Well, you just told me it wasn't reported when they

17  went in, correct?

18  A.     I believe so, yes.

19  Q.     It was reported when they came out, right?

20  A.     I think it was an offender that reported it, wasn't it,

21  originally?

22  Q.     I don't know, sir.

23  A.     We'd have to go back and look at the IOC's if you want

24  to scan them back, but --

25  Q.     Did you have trouble with people having sex in the

1  offender property room?

2  A.    No.

3  Q.    So this was an anomaly, you're telling me.

4  A.    Yes.

5  Q.    But, of course, these two correctional officers knew

6  that was a safe space to do things they weren't supposed to do,

7  correct?

8  A.    I don't know what they was thinking.

9        MS. McGRAUGH:  Jackie, would you -- could you please

10  go to the second page?

11  BY MS. McGRAUGH:

12  Q.    So it looks like it's a CO who filed this report and

13  not an offender, right?

14  A.    Yes.

15  Q.    And I think that, to read between the lines, they were

16  in there having sex, correct?

17  A.    I wouldn't want to speculate.

18  Q.    He came out, his face was red, he was breathing hard.

19  A.    Again, I don't know --

20  Q.    I mean, I --

21  A.    -- what occurred in there, and I don't want to

22  speculate.

23  Q.    I don't want to speculate about it either.  Okay.

24        You said that in vo-tech, it's really busy, there's

25  people in the halls.

1  A.      Correct.

2  Q.      Do you know Warden McBee testified yesterday?

3  A.      Yes.

4  Q.      Do you know he testified that during class, at times

5  that classes were in session, those halls were empty?

6  A.      When they -- the staff might be walking around, yes.

7  I'm not sure what he testified to.

8  Q.      Do you dispute that when everybody is in their classes

9  and the staff are in their offices, that hallway is empty?

10  A.      It would be less frequently walked, yes, but there's

11  still staff in the area that would be walking around.

12  Q.      I'm not talking about the area, I'm asking you about

13  the hallway.  Warden McBee said when everybody is in their

14  classes, the hallway is empty.  Do you dispute what the warden

15  of Chillicothe said?

16  A.      I'm not sure what he testified to, ma'am, but I know

17  that there are other staff that may be walking -- it's usually

18  not offenders because they're in class --

19  Q.      Uh-huh.

20  A.      -- but there's support staff, there's supervisors in

21  the area that could be walking around.

22  Q.      Okay.  So you know better than the warden.

23  A.      I'm just testifying to what I know.

24          MS. McGRAUGH:  Uh-huh, okay.  Nothing further.

25          THE COURT:  Sir, we permit the jury to ask written

1  questions, if they have any.  So if you could be patient for

2  just a couple of minutes, we'll see if the jury has any written

3  questions.

4         Could counsel please approach?

5         (Counsel approached the bench, and the following

6  proceedings were had:)

7         THE COURT:  Only one question.  "What was the result

8  of the two officers that had a report on them?"  Any objection?

9         MS. McGRAUGH:  If he knows.

10        MS. HARRIS:  I don't care, if he knows.  I don't

11 know if he knows.

12        THE COURT:  Okay.

13        (The following proceedings were had in open court:)

14        THE COURT:  Sir, I have only one question, and here

15 is how this process works.  I will read the question, and then

16 if the attorneys have any brief follow-up related to this one

17 question, they have the opportunity to do so.

18                        - - -

19                     EXAMINATION

20  By the Court:

21  Q.     Do you know the result of the two officers that had a

22 report on them that we just recently discussed?

23  A.     The actual result, no.  I do know it was placed under

24 investigation.

25  Q.     Do you know the result of that investigation?

1  A.      Not offhand, no.

2          THE COURT:  Any follow-up?  I'm sorry.  This is not

3  your witness.  Any follow-up?

4          MS. HARRIS:  No, Your Honor.

5          THE COURT:  Any follow-up?

6          MS. McGRAUGH:  No, Your Honor.

7          THE COURT:  Okay.  Thank you, sir, you may step

8  down.

9          Let's go ahead and take our morning break since

10  we're at a witness break here.  It's 10:42, we'll take a break

11  until 11 o'clock.  During this break, don't discuss this case,

12  don't do any research.  Just take a break and enjoy the donuts.

13  So we'll be in recess until 11:00.

14          (The following proceedings were had in the courtroom

15  out of the presence of the jury:)

16          THE COURT:  Anything I can take up during this

17  break?

18          MS. McGRAUGH:  No, Your Honor.

19          MR. TAULBEE:  Nothing from defendant.

20          THE COURT:  Okay.  We'll be in recess until 11:00.

21          (A recess was taken from 10:42 a.m. to 11:00 a.m.)

22          THE COURT:  Ready to bring the jury out?

23          MS. McGRAUGH:  Yes, Your Honor.

24          MR. TAULBEE:  Yes, Your Honor.

25          (The following proceedings were had in the courtroom

1  in the presence of the jury:)

2          THE COURT:  Mr. Taulbee, are you ready to call your

3  next witness?  I'm sorry.  Miss Rothermich?

4          MS. ROTHERMICH:  Yes, Your Honor.  The defense calls

5  Robin Dysart to the stand.

6          THE COURT:  Sir, could you come forward through the

7  gate, and could you come around the table to your left -- or

8  right, whatever is easiest.  Or you're right.  That would be my

9  left, not your left.  If you could come to this lady right

10 here, she's going to swear you in.

11                              - - -

12                      ROBIN DYSART,

13  being first duly sworn by the courtroom deputy, testified as

14 follows:

15         THE COURT:  Could you please come over here now to

16 my right and have a seat in the chair that's on the riser?

17         MS. ROTHERMICH:  Your Honor, may I approach the

18 witness to give him a fresh thing of water?

19         THE COURT:  Sure.

20                              - - -

21                    DIRECT EXAMINATION

22  By Ms. Rothermich:

23  Q.     Good morning.

24  A.     Good morning.

25         MS. ROTHERMICH:  Or may it please the Court?  I

1  apologize.

2      THE COURT:  That's okay.  You may proceed.

3      MS. ROTHERMICH:  Okay.

4  BY MS. ROTHERMICH:

5  Q.    Sir, will you please state your name for the Court?

6  A.    Robin Dysart.

7  Q.    And do you currently work for the Missouri Department

8  of Corrections?

9  A.    I do.

10  Q.    When did you begin working for the Missouri Department

11  of Corrections?

12  A.    In December of 2004.

13  Q.    Sir, what is your current job title?

14  A.    Corrections Officer I.

15  Q.    And have you worked at -- or let me ask you, what MDOC

16  facilities have you worked in?

17  A.    I worked at Crossroads Correctional Center in Cameron

18  and Chillicothe Correctional Center in Chillicothe.

19  Q.    And where are you currently working?

20  A.    Chillicothe Correctional Center.

21  Q.    How long have you been at Chillicothe Correctional

22  Center?

23  A.    Since April of 2008.

24  Q.    And what sort of facility, just for the jury, is

25  Crossroads Correctional facility?

1  A.    Crossroads was a maximum, Level 5, facility.

2  Q.    Is that male, female?

3  A.    Male.

4  Q.    And then what sort of facility is Chillicothe?

5  A.    Chillicothe is an all-securities, just female

6  offenders.

7  Q.    Mr. Dysart, what is your current post?

8  A.    Chapel/recreation custody officer.

9  Q.    How long have you had that post?

10  A.    Since April of 2009.

11  Q.    And what is your current work schedule?

12  A.    I work Saturday through Wednesday.

13  Q.    And what shift?

14  A.    Second, day shift.

15  Q.    Okay.  And just to remind the jury, what are your

16  hours?

17  A.    7 a.m. to 3 p.m.

18  Q.    Have you had that shift for a while?

19  A.    Yes, since I've been at Chillicothe.

20  Q.    Now, tell the jury, how many recreation/chapel officers

21  are assigned to work in the rec area?

22  A.    There's two -- there's two positions, but most of the

23  time, there's just one officer on duty most days.

24  Q.    And are there any rec officers?

25  A.    Yes.

1  Q.      How many are -- how many rec officers are there?

2  A.      At any given time, there's between about one to five

3  rec officers in there a day.

4  Q.      Could you tell the jury, what are your day-to-day

5  duties as a CO I in the recreation area?

6  A.      We monitor offender activities, make sure they're not

7  doing anything -- they're not supposed to be getting too close

8  to each other, fighting.  Just monitor the rules, making sure

9  they're quiet, calm, make sure they're not in that area if

10 they're not scheduled to be in that area.

11 Q.      Can you tell the jury, I think we might know, but in

12 general, what is the rec area part of the facility?

13 A.      The rec area is the gymnasium, it has the chapels

14 there.  The captain's office, the lieutenant's office is there,

15 as well as a couple of institutional activities coordinators.

16 Q.      And what is your No. 1 goal as a CO I in the DOC

17 facility?

18 A.      To make sure that everyone stays safe.

19 Q.      And that includes the other COs?

20 A.      Yes.

21 Q.      And does it include the offenders, as well?

22 A.      Yes.

23 Q.      Do you have any offenders who are working for you?

24 A.      Yes.  I have four -- eight total offenders that work

25 for me.

1  Q.    Okay, and where -- what are their jobs or where do they

2  work?

3  A.    I have four that work in the barber shop that cut hair,

4  a shoe shiner, and then I have four hall tenders that just

5  clean the hall, the bathrooms, that kind of stuff.

6  Q.    And you kind of started to talk a little bit about

7  this, but what else beside the gym area is located in the

8  recreation area?

9  A.    The chaplain's office is there, the chapel is there,

10  institutional activities coordinator, the shift commander,

11  captains, lieutenants, as well as all of the rec officers work

12  up there.

13  Q.    Now, I would like to show you some exhibits that have

14  been previously admitted into evidence, just to kind of orient

15  the jury.

16         I'm showing you Exhibit 111.  Is that -- do you see

17  something on your screen?

18  A.    I do.

19  Q.    Okay.  Mr. Dysart, can you please tell the jury, what

20  is this a picture of?

21  A.    It is a picture in the hallway just outside of the

22  barber shop.

23  Q.    Is this picture a picture of a hallway in the

24  recreation area?

25  A.    Yes.

1   Q.     And do you see any cameras in this picture?

2   A.     I do.

3   Q.     Can you please circle the camera for the jury?

4       (So done.)

5   Q.     Are there any other cameras in this picture that you

6 can see?

7   A.     No.

8   Q.     Okay.  I'm now showing you what has been marked as

9 Exhibit 112.  Mr. Dysart -- well, I guess I shouldn't have

10 cleared that.  Could you please circle if you see any cameras

11 on this picture?

12   A.     On this picture currently on the screen?

13   Q.     Yes.

14       (So done.)

15   Q.     Thank you.  And -- can you please tell the jury, where

16 is this hallway located?

17   A.     It's between the chapel and the rec area.

18   Q.     Okay.  And it looks like at the end of the hallway,

19 there's a door leading -- with a window in it that looks

20 bright.  Is that a door leading outside?

21   A.     Yes, that's the exit door.

22   Q.     Are you able to see your office in this photo?

23   A.     Yes, I can.

24   Q.     Can you please circle your office for the jury?

25       (So done.)

1  Q.      Now, can you tell the jury, within your duties as a

2  CO I, do you make rounds?

3  A.      Yes, I constantly make rounds of the rec area when it's

4  open.

5  Q.      Okay.  And what do you mean by that?  What do you do

6  when you make a round?

7  A.      Usually start, and I go down the hallway, I go look

8  into the chapel.  I'll check in the IAC.  I'll also go into the

9  gym, I'll go through the weight room, through the gymnasium,

10  through the card room, and then usually back out the south door

11  there by where my office is located.

12  Q.      Sir, do you see any chairs in this photograph?

13  A.      Yes.

14  Q.      And can you tell the jury, what are those chairs there

15  for?

16  A.      Those chairs was the offenders that come up on their

17  scheduled day to receive a haircut, and that's where they would

18  wait, the first come, first served, wait in line to receive a

19  haircut.

20  Q.      And on the left of the photo there, you do see a door?

21  A.      Yes.

22  Q.      Okay.  And what is that doorway leading into?

23  A.      The door that is open is the door to the barber shop.

24  Q.      Okay.  I am now showing you Exhibit 114.  Can you

25  please tell the jury what this is a photograph of?

1    A.    That is the inside of the barber shop.

2    Q.    Do you see a barber pole in this photo?

3    A.    I do.

4    Q.    Has that pole been there for a while?

5    A.    It has.

6    Q.    Do you see any cameras in this photo?

7    A.    Yes.

8    Q.    Can you please circle the cameras?

9          (So done.)

10   Q.    Do you see a window in this photo?

11   A.    Yes.

12   Q.    Can you please circle the window for the jury?

13         (So done.)

14   Q.    To your knowledge, has there ever been a blind on that

15   window, sir?

16   A.    No, there's never been a blind.

17   Q.    And is the door to, leading into the barber shop

18   currently opened?

19   A.    It is currently open, yes.

20   Q.    Okay.  Can you explain to the jury the protocol

21   surrounding when that door is open or closed?

22   A.    Anytime the barber shop is open for business, that door

23   is usually -- is always open.  The only time it is ever closed

24   is when all of the offenders are currently gone out of the area

25   and it is no longer in service, and then we shut and lock the

1  door to secure all the equipment inside.

2  Q.    All right.  All right.  I'm going to show you Exhibit

3  116.  Is this another angle, another photo of the barber shop?

4  A.    Yes, correct.

5  Q.    Can you describe to the jury what we see through the

6  window there?

7  A.    Just right inside the window would be the chair, the

8  shoe-shine chair.  There's also two stations where staff and

9  offenders will -- would get their hair cut at.

10  Q.    And do the two stations have chairs?

11  A.    Yes.

12  Q.    And is there a mirror?

13  A.    Yes, there's a mirror.

14  Q.    And finally, I'm going to show you Exhibit 113.  Can

15  you please tell the jury what this is?

16  A.    That is the opposite end of the rec hallway that we

17  seen earlier right outside the barber shop, facing the other

18  direction.

19  Q.    And we already saw the cameras in this hallway; is that

20  correct?

21  A.    That's correct.

22  Q.    Do you see -- just for the record, do you see any

23  cameras in this particular photograph?

24  A.    No, there's no cameras in this photo.

25  Q.    Okay.  Now, sir, I want you to please describe for the

1    jury, what sort of activity throughout the day is occurring in

2    this particular hallway?

3    A.      It's usually a -- it's usually a travel path for

4    offenders that come in that can go to the gym, they come in and

5    go to different chapel services, to see the chaplain if they

6    need to.  Down there at the end of this hallway is restorative

7    justice.  They come up and they do crafting projects in there,

8    as well.  Or if they ever get called to the shift commander's

9    office, that's located in this hallway, as well.

10   Q.      Do people come in and out of this hallway in a

11   predictable schedule?

12   A.      Predictable, no.

13   Q.      I am now showing you what has previously been marked as

14   Exhibit 123.  Can you please tell the jury what this is?

15   A.      That is a picture of the gymnasium.

16   Q.      Okay.  And is this -- can you describe for the jury

17   where this entry into the gymnasium is located?  Like, where

18   are we standing?

19   A.      It is just right across from the entrance to the barber

20   shop, just at a little bit of an angle.

21   Q.      Okay.  So it's kind of at the end of that hallway?

22   A.      Yes.

23   Q.      Okay.  Sir, do you see any cameras in this picture?

24   A.      I do.

25   Q.      All right.  Can you please circle the camera for the

1  jury?  Or cameras.

2          (So done.)

3  A.      Just that one right there.

4  Q.      Okay.  Now, I am going to circle an area, and can you

5  please tell the jury what this is in the blue circle?

6  A.      The blue circle is the Rec III office, the guy that's

7  in charge of the recreation.

8  Q.      Okay.  And who is that?

9  A.      Darrell Sandy.

10  Q.     And when you say that he's in charge of the recreation,

11  does he have anybody working under him?  Any employees, I

12  should say?

13  A.     He does.

14  Q.     How many employees?

15  A.     I would say roughly about four to five employees at any

16  given time.

17  Q.     And is he in charge of this gym area, in general?

18  A.     Yes.

19  Q.     Okay.  And what is this area over to the left of his

20  office?

21  A.     That is known as the game/card room.

22  Q.     Can you tell the jury what happens in that particular

23  area?

24  A.     The offenders can come out and they can check out

25  puzzles, board games, cards; and there's several tables there

1  that they're allowed to sit at and play their -- play games,

2  cards during their open rec time.

3  Q.    Are there usually inmates in that area?

4  A.    Only when the gym is open.

5  Q.    Okay.  To be clear, there are only -- inmates are only

6  in the gym when the gym is open; is that fair?

7  A.    Yes.

8  Q.    I am now showing you what has been marked as Exhibit

9  122.  Can you please describe what this is to the jury?

10 A.    That is the weight room.

11 Q.    Can you tell the jury what happens in the weight room,

12 like what's the -- why you all have that?

13 A.    They come up and they lift weights.  There are several

14 treadmills lined along the wall for cardio.

15 Q.    Can you tell the jury and describe for them, are

16 inmates at Chillicothe allowed to come in and work out on these

17 machines whenever they want?  Can you let them know just in

18 general how the rec time for this area works?

19 A.    Yeah.  Currently, there's a schedule, like half the

20 camp at one time is allowed to come up, and from 9 a.m. until

21 10:45 a.m. they're allowed to use the equipment.  And then it

22 closes at 10:45, and then it opens up again at 2 o'clock, and

23 it runs until 3:45 for the other half of the camp.

24 Q.    Have they had this half/half schedule --

25          MS. McGRAUGH:  Objection, Your Honor, leading.

1        THE COURT:  She hasn't asked the question yet, so I

2   think it's premature, and at this point it's overruled.

3   BY MS. ROTHERMICH:

4   Q.      How long has that schedule been in place?

5   A.      Approximately two years.

6   Q.      What prompted that schedule going into effect?

7   A.      Covid-19.

8   Q.      So prior to Covid-19, what was -- was the rec area open

9   to inmates just coming in and out?

10  A.      Yes.  Prior to Covid-19, the recreation was open from 9

11  a.m. to 11:00.  That was for the entire camp, they could come

12  and go as they pleased during that time.

13  Q.      And just to clarify for the jury, when you say 11:00,

14  you mean 11 p.m. at night, correct?

15  A.      No.  Well, 9 a.m. to 11 a.m. in the morning, and then

16  it would open back up from 12 p.m. to 4 p.m. in the afternoon,

17  and then 6 p.m. to 8 p.m. at night.

18  Q.      Okay.  I apologize.  Why the hour lags there?

19  A.      During -- in the -- in those gaps would be our custody

20  counts.

21  Q.      Are there usually people using these machines?

22  A.      Yes.

23  Q.      And are they usually pretty full, or -- I mean, can you

24  give the jury just, like, an idea of how much usage there is of

25  these?

1   A.      Most generally, all the treadmills that are on that

2   wall are usually full.  They actually have a schedule where

3   they're allowed to check them out 30 minutes at a time because

4   there's so many offenders trying to use the treadmills.  The

5   weight room, weights itself, they get used frequently, but not

6   as frequent as the treadmills would get used.

7   Q.      All right.  I'm showing you what has been marked as

8   Exhibit 124.  Is this another angle of that weight area that we

9   just were discussing?

10  A.      It is.

11  Q.      Do you see any cameras in this photo?

12  A.      I do.

13  Q.      Can you please circle the cameras for the jury?

14          (So done.)

15  Q.      Okay.  Now, I also see a net here.  Can you tell the

16  jury what that is?

17  A.      It's just a mesh net.  It's to stop -- if somebody was

18  playing basketball, volleyball, badminton, it's to stop the

19  ball from going back there and possibly hitting or injuring

20  anybody that's using the equipment.

21  Q.      All right.  Moving on, I'm showing you Exhibit 125.

22  Can you please tell the jury what this is?

23  A.      That is a picture of the BLAST room.

24  Q.      And is there an open doorway leading into the BLAST

25  room?

1    A.    There is.

2    Q.    Is there also a window into the BLAST room?

3    A.    There is.

4    Q.    Can you please tell the jury, how many windows are

5    there?

6    A.    There is two windows and a giant door.

7    Q.    And do we see one of the windows in this photo?

8    A.    We do.

9    Q.    All right.  Can you please circle it for the jury?

10        (So done.)

11   Q.    And is it possible to see the other window in this

12   particular photo?

13   A.    Not in this picture, no.

14   Q.    I'm showing you what has been marked as Exhibit 127.

15   Sir, is this the photo of the BLAST room?

16   A.    It is, it's the BLAST room.

17   Q.    And where are we standing in this particular

18   photograph?

19   A.    It would be in the area where that net was at, the

20   doorway leading in.

21   Q.    Do you see a camera in this photo?

22   A.    I do.

23   Q.    Can you please circle that for the jury?

24        (So done.)

25   Q.    Now, Mr. Dysart, can you tell the jury what happens in

1  this BLAST room?

2  A.      The offenders are led by -- they have certified

3  instructors that get trained by the YMCA.  They come in and

4  teach the offenders on how to teach classes like BLAST, Zumba,

5  they do yoga, they do like wheelchair yoga, chair yoga for

6  elderly offenders, that kind of stuff.

7  Q.      Is there -- when we're imagining workout classes, is it

8  similar to workout classes on the outside of the institution?

9  A.      Yes.  It would be similar to, like, what you would see

10  at a YMCA or something.

11  Q.      Is there music playing?

12  A.      Yes.

13  Q.      I am showing you what has been marked as Exhibit 130.

14  And can you orient the jury as to where we are here?

15  A.      We are just right to the left side of the BLAST room

16  from that last picture we just saw.

17  Q.      And through that window, are we able to see into the

18  BLAST room?

19  A.      You can.

20  Q.      Are there mirrors in the BLAST room?

21  A.      There is.

22  Q.      Can you please circle for the jury where they are?

23          (So done.)

24  Q.      Do the mirrors take up that entire wall there?

25  A.      The majority of that wall, yes.

1    Q.      Do you see any cameras in this photo?

2    A.      I do.

3    Q.      Can you please circle that for the jury?

4            (So done.)

5    Q.      Thank you, sir.  I am now showing you Exhibit -- well,

6    let me back up a minute.

7            Mr. Dysart, you said you make rounds throughout your

8    shift.  Is that what you've testified to earlier?

9    A.      That's correct.

10   Q.      Do you ever stand and watch the BLAST class for a long

11   period of time, say 45 minutes?

12   A.      Never.

13   Q.      Have you ever observed another CO I doing that?

14   A.      No.

15   Q.      If they were doing that, would you report it?

16   A.      I would probably report it to my sergeant, yes.

17   Q.      All right.  I'm handing you -- or I'm showing you

18   Exhibit 131.  Is this the gym area that we previously

19   discussed?

20   A.      It is.

21   Q.      All right.  I'm going to circle an area in this

22   photograph.  Are those the bleachers?

23   A.      Yes, those are bleachers.

24   Q.      Are inmates ever on those bleachers?

25   A.      Yes.

1   Q.      Okay.  And what are they doing there?

2   A.      They're just sitting up there with their friends

3   talking or observing different games, tournaments, activities

4   that are in the gym.

5   Q.      And are there usually people sitting on those

6   bleachers?

7   A.      Most generally when the rec is open, yes, there's

8   usually people sitting up there.

9   Q.      And just so that the jury is aware, is the rec, this

10  gym area and the rec center a busy place when the rec is open?

11  A.      Yes, there's typically several offenders in there at

12  any given time during its open periods.

13  Q.      By several, can you please tell the jury just

14  approximately how many offenders are in there at any given

15  time?  And you can give a range.

16  A.      I would say the range -- in the morning time, it's

17  probably like 30 to 100; during the afternoon, it probably gets

18  up to around 100 or so; and then in the evening time, it will

19  get a lot of people in there, like 200-plus, depending on the

20  weather outside.

21  Q.      So pretty busy?

22  A.      Yes.

23  Q.      I'm showing you Exhibit 132.  Is this a photo of the

24  game room?

25  A.      It is the game room.

1  Q.    Sir, do you see the AV room in this photo?

2  A.    I do.

3  Q.    And can you please circle where that is?

4       (So done.)

5  Q.    And, sir, just to orient the jury, do you see the rec

6  officer's office?

7  A.    The Rec 3 office, yes, I see it right there in the

8  right-hand side.

9  Q.    Can you please circle that for the jury?

10      (So done.)

11 Q.    And is there a doorway to that office?

12 A.    Yes.

13 Q.    Where is that doorway?

14 A.    Just right on the other side of the net right there.

15 Q.    Is it right here along that wall?

16 A.    Yes, it is right there.

17 Q.    Okay.  So the doorway of the rec office faces the

18 doorway leading into the AV room?

19 A.    It does.

20 Q.    And, again, you testified earlier there are usually

21 offenders on the tables in that game area?

22 A.    Yes.

23 Q.    Now, I am showing you Exhibit 135.  Can you please tell

24 the jury what this is?

25 A.    That is a picture of the AV room.

1  Q.      Sir, is there a protocol in place regarding whether or

2  not the door to this AV room is open or closed?

3  A.      I don't know if there is a protocol, but usually if

4  it's -- if there's offenders in there, the door is always open.

5  Whenever rec gets closed, usually it gets locked and secured.

6  Q.      Do you have a key to this room?

7  A.      I do not.

8  Q.      And does the CO working rec/chapel have a key to this

9  room?

10  A.      We do not.

11  Q.      Who has the key to that room?

12  A.      Only the recreation officers do.

13  Q.      Now, can you tell the jury when the rec officers have

14  that door open or closed?  Like if they're on a break, is it

15  open?

16  A.      There's generally somebody in the gym; but if they go

17  out on a break or if they leave the gym completely, that door

18  is locked and secured.

19  Q.      And if that door is opened and unlocked, does that mean

20  there's a rec officer around?

21  A.      Yes, there will be a rec officer around.

22  Q.      Can you tell the jury, just in general, what is the AV

23  room like?  What's the purpose of this?

24  A.      The AV room, they call it the audio/video room, and in

25  there, they have access to two channels that they -- one that

1  they play a State movie on every day.  They have a Netflix

2  account where they get one movie, I think they play it every

3  two days now, or it keeps repeating for two days straight.  And

4  the other one is a -- they call it the information channel.

5  They play, like if you worked on a housing unit and you needed

6  a hall tender for your house, you could put up like a

7  help-wanted sign, they put the menu on there, just that kind of

8  stuff.

9   Q.     And who does that?  When you say they put it up, who is

10  doing that?

11   A.     Usually the offenders that work in there.

12   Q.     I'm showing you Exhibit 138.  Can you tell the jury

13  what this is?

14   A.     That is the opposite corner of the AV room, just

15  outside the AV room to the right.

16   Q.     Sir, do you see a camera in this photo?

17   A.     I do.

18   Q.     Can you please circle that for the jury?

19          (So done.)

20   Q.     Does that camera point into the AV room?

21   A.     It does.

22   Q.     Sir, would it be unusual for an officer, an employee to

23  go into the AV room and shut the door with an offender in that

24  room?

25   A.     It would be very unusual, yes.

1    Q.    And is that something that would be reported?

2    A.    Absolutely.

3    Q.    And if the door is open, the camera is able to capture

4    what's in that AV room, correct?

5    A.    Correct.

6    Q.    You said earlier that you walked the building on a

7    regular basis; is that right?

8    A.    That's correct.

9    Q.    How often do you do your rounds?

10   A.    It takes me roughly about 15 minutes, so I would say

11   about every 15 minutes I'll usually walk through the area.

12   Q.    And so you're saying you kind of just keep walking

13   throughout?

14            MS. McGRAUGH:  Objection, Your Honor.  Leading.

15            THE COURT:  Overruled.

16   BY MS. ROTHERMICH:

17   Q.    You're saying that you just keep walking throughout the

18   course of your shift?

19   A.    Most of the time, I stop and -- I stop and observe

20   different areas too, but it's usually not for more than just a

21   few minutes at a time.

22   Q.    Now, I want to ask you, you said earlier that this is a

23   pretty busy place, is that your testimony, the rec area?

24   A.    Yeah, rec is a busy place.

25   Q.    Now, we went through the jobs that are actually

1   assigned in that rec area.  Are there reasons why a CO would be

2   in the rec area when they're not assigned to that post?

3    A.     Yes, they could be up there for numerous different

4   things.

5    Q.     Can you tell the jury, what are reasons why a CO would

6   be in this rec area when they're not assigned to be there?

7    A.     They may be up there, because the shift commander's

8   office is there, if they're coming to get their job duties for

9   the rest of the day, if they had returned from an out count.

10  They could be coming up there -- we also are allowed to get our

11  hair cut on certain days in the barber shop, so they might be

12  up there waiting their turn to get a haircut.  We schedule

13  30-minute sessions for each different staff member.  They could

14  be coming up to get their shoes shined.  Or if they work on the

15  yard, they do not have access to a computer or bathroom outside

16  on the yard, so they come in to use a computer and the bathroom

17  in our rec area.

18   Q.     Now, just to be sure that we're clear, when you're

19  saying that the officers are coming in and out -- I'm going to

20  show you Exhibit 112.  Are we talking about this long hallway

21  here?

22   A.     Yes, that's the entrance to the rec area.

23   Q.     Now, just to clarify for the jury, did you ever see

24  Mr. Bearden in that gym area, hanging around watching inmates

25  work out?

1    MS. McGRAUGH:  Objection, Your Honor.  Asked and
2  answered.

3    THE COURT:  Overruled.

4  BY MS. ROTHERMICH:

5  Q.    You can go ahead and answer.

6  A.    Just standing around, like, watching them?  No.  I
7  mean, I'm sure he walked through the area and observed, but I
8  don't think he just stood and just watched them.

9  Q.    Sir, have you ever reported any staff over-familiarity
10  with an inmate?

11  A.    I have.

12  Q.    Can you tell the jury about what you reported?

13  A.    I observed a staff member one time in the barber shop
14  that was physically cutting an inmate's hair.

15  Q.    To your knowledge, was the staff member who was cutting
16  the inmate's hair a barber or cosmetologist?

17  A.    I believe she was a licensed cosmetologist.

18  Q.    So why did you report a staff member who was a licensed
19  cosmetologist cutting someone's hair?

20  A.    Because as a Correction Officer I, that's not our job
21  duties, we're not supposed to touch offenders.

22  Q.    Okay.  Is there ever any reason why you should be
23  touching an offender?

24  A.    Yes, there is different things that we -- reasons why
25  we can touch an offender.

1   Q.      Do they mostly have to do with emergency situations?

2   A.      Yes, it would be either medical emergency or a use of

3   force to try and protect somebody or yourself.

4   Q.      Were you trained as a CO I to report if there was

5   another staff member touching an offender?

6   A.      Yes.

7   Q.      Okay.  And what was your training, what is your

8   understanding as to what happens to you if you fail to report

9   that?

10  A.      It could lead up to termination if we fail to report

11  any...

12  Q.      Termination of your job?

13  A.      Termination of my job, correct.

14  Q.      And that's why you reported something as little as a

15  staff member cutting an inmate's hair?

16  A.      Correct.

17  Q.      Sir, did you ever receive any sort of allegation by

18  anyone that Mr. Bearden committed sexual assault on them?

19  A.      I did not.

20  Q.      Have any of your staff or anybody in the rec area ever

21  come to you and reported concerns about Mr. Bearden to you?

22  A.      No, never.

23  Q.      How about any offenders?

24  A.      No, no offenders, no staff.

25  Q.      Did you ever witness Mr. Bearden being overfamiliar

1  with any inmates or offenders?

2  A.      I did not.

3  Q.      Or at the recreation building or anywhere else?

4  A.      Nowhere.  Yeah, I did not -- I did not see him do

5  anything inappropriate with an offender.

6  Q.      Okay.  And, again, what would you have done, had you

7  seen anything inappropriate of that nature?

8  A.      I would have reported it to the shift commander

9  immediately.

10  Q.      Sir, how many people in Chillicothe are required to

11  report over-familiarity between an inmate and an employee?

12  A.      Everybody.

13  Q.      And what do you mean by everybody?

14  A.      Staff, offenders, contract staff.  Anybody that works

15  inside the prison is required to report it.

16  Q.      Is that hundreds of people?

17  A.      That is hundreds of people.

18  Q.      Hundreds of eyes?

19  A.      Hundreds of eyes.

20          MS. ROTHERMICH:  I have nothing further for this

21  witness.

22          THE COURT:  Any cross-examination?

23          MS. McGRAUGH:  Yes, Your Honor.

24                          - - -

25

CROSS-EXAMINATION

By Ms. McGraugh:

Q.    Good morning, Officer Dysart.

A.    Good morning.

Q.    How many times did you work with Officer Bearden?

A.    I do not know the exact number.

Q.    Okay.  So you know you worked with him, but you're not here to say you saw everything he did, correct?

A.    Correct.

Q.    You don't know anything about the sexual allegations, correct?

A.    Correct.

Q.    You're not here to say he didn't rape one of these women, are you?

A.    Could you repeat the question?

Q.    You're not here to say you know he didn't rape one of these women, correct?

        MS. ROTHERMICH:  Objection, calls for speculation.

        THE COURT:  Overruled.

BY MS. McGRAUGH:

Q.    Are you?

A.    No, I'm not here to say he raped anybody.

Q.    You don't have any knowledge of what happens with him when you're not with him, correct?

A.    Correct.

1    Q.      That's not your job to follow Edward Bearden around to

2  make sure he's doing what he's supposed to be doing, correct?

3    A.      Correct.

4    Q.      And you don't know of any instances of over-familiarity

5  with him?

6    A.      I do not know of anything, you're right.

7    Q.      Do you know that he bought a burner phone and gave it

8  to women to have them call?

9    A.      I'm not privy to that information, so I don't know

10  that, no.

11   Q.      Having that information now, does that change your mind

12  about whether he was too familiar with the women?

13   A.      It does not.

14   Q.      If you knew Edward Bearden had a burner phone and gave

15  the number to women inside to call him outside, you don't think

16  that's overfamiliar?

17   A.      It probably would be, yes.

18   Q.      Well, it's against the rules, isn't it?

19   A.      It is against the rules.

20   Q.      So that's overly familiar, right?

21   A.      By your terms, yes.

22   Q.      But that wouldn't change your opinion?

23   A.      I'm not privy to that information, so I have no idea if

24  that's true or not.

25   Q.      Okay.  Barber shop, what are the hours of the barber

1  shop?

2  A.      The hours for offenders is during their open recreation

3  time.

4  Q.      What about guards?

5  A.      The hours for staff would be from 8:00 to 11:00 and

6  12:30 to 3:00.

7  Q.      Okay.  Do you get your hair cut in there?

8  A.      I do.

9  Q.      You do.  And -- let me withdraw that question.

10        You get off at 3:00?

11  A.      Correct, I get off at 3 o'clock.

12  Q.      Okay.  So what goes on, if anything, in the barber shop

13  after 3 p.m., you don't know.

14  A.      Correct.

15              MS. McGRAUGH:  Nothing further.

16              THE COURT:  Any redirect?

17              MS. ROTHERMICH:  Nothing, Your Honor.

18              THE COURT:  Sir, we permit the jury to ask written

19  questions, if they have any.  So if you could be patient for

20  just a minute, and we'll see if the jury has any written

21  questions.

22              Could counsel please approach?

23              (Counsel approached the bench, and the following

24  proceedings were had:)

25              THE COURT:  We have two questions, one of which is,

1  "I noticed blinds in the AV room.  Are there blinds in any

2  other rooms in the rec area?"  Any objection?

3         MS. McGRAUGH:  No.

4         THE COURT:  Any objection?

5         MS. ROTHERMICH:  No.

6         THE COURT:  "Are COs allowed on the bleachers in

7  rec?"  Any objection?

8         MS. McGRAUGH:  No.

9         THE COURT:  Any objection?

10        MS. ROTHERMICH:  No.

11        (The following proceedings were had in open court:)

12        THE COURT:  Sir, so we do have two questions, which

13  I will ask you these written questions, and then, if necessary,

14  the attorneys will have the opportunity for brief follow-up

15  questions.

16                    - - -

17                 EXAMINATION

18  By the Court:

19  Q.    The first question is are COs allowed on the bleachers

20  in the rec area?

21  A.    There's nothing that says they cannot sit up there.

22  Q.    Second question is, I notice blinds in the AV room.

23  Are there blinds in any other rooms in the rec area?

24  A.    Yes, there's blinds in other rooms.

25         THE COURT:  Okay.  Thank you.  Let's see if the

1   attorneys have any follow-up questions.

2            Counsel for defendant?

3            MS. ROTHERMICH:  Yes.

4                        - - -

5              FURTHER DIRECT EXAMINATION

6   By Ms. Rothermich:

7   Q.     Sir, what rooms are there blinds in in the rec area?

8   A.     I'm not sure on all of them, but I know my office has

9   blinds, the chapel has blinds.  That's all I can remember off

10  the top of my head.

11  Q.     Sir, are offenders ever in your office?

12  A.     No.

13  Q.     And do you know the reasoning behind why there might be

14  blinds on the chapel?

15  A.     I do not know the reasoning.

16  Q.     Could it be for confidentiality?

17           MS. McGRAUGH:  Objection, Your Honor, leading.

18           THE COURT:  Overruled.

19  BY MS. ROTHERMICH:

20  Q.     Could it be for confidentiality?

21  A.     It could be, yes.

22           MS. ROTHERMICH:  Nothing further.

23           THE COURT:  Any follow-up questions?

24           MS. McGRAUGH:  No, Your Honor.

25           THE COURT:  Thank you, sir, you may step down.

1        Is the defendant ready to call your next witness?

2        MR. TAULBEE:  Your Honor, at this time, the defense

3    rests.

4        THE COURT:  Okay.  Ladies and gentlemen, what that

5    means is we'll --

6        Let me ask, do you have any rebuttal evidence?

7        MS. McGRAUGH:  No, Your Honor, we do not.

8        THE COURT:  Okay.  What that means is that we're

9    going to go ahead and take a break for lunch.  We have some

10   things that we need to do before we move into closing arguments

11   and instructions; but if we take, let's say, a break until a

12   quarter till 1:00, which is just a little over an hour, when

13   you come back from lunch, we will be ready to read some

14   additional instructions to you and move into closing argument.

15       So with any luck, this is the last time you will

16   hear me say, do not discuss the case with anyone, do not

17   discuss the case -- and now the last time I'm saying it, I'm

18   missing my rhythm here.

19       Do not permit the case to be discussed in your

20   presence, do not discuss the case with anyone else, and, most

21   importantly, maybe equally importantly, do not do any research,

22   internet or otherwise, regarding this case.

23       We will be in recess until 12:45.

24       (The following proceedings were had in the courtroom

25   out of the presence of the jury:)

1          THE COURT:  Mr. Taulbee, are there any motions that

2    you wish to make?

3          MR. TAULBEE:  No, Your Honor.

4          THE COURT:  Any issues, then, that I need to take up

5    before we move into instructions and closing arguments?

6          MR. ROEDIGER:  I don't believe so, Your Honor.

7          MR. TAULBEE:  I don't believe so, Your Honor.

8          THE COURT:  Okay.  Then we will be in recess for the

9    next hour.  We will immediately, then, move into closing

10   arguments -- I mean reading of the instructions and then

11   closing arguments.  Given the time of the closing arguments and

12   the instructions, I doubt there will be a need to take a break

13   in between closing arguments or anything of that sort.

14         Mr. Taulbee?

15         MR. TAULBEE:  I just want to make sure that we

16   objected to the submissibility of punitive damages.

17         THE COURT:  I will note that for the record.  I will

18   overrule the objection but will note it for the record.

19         MR. TAULBEE:  Can I ask a question?

20         THE COURT:  Sure.

21         MR. TAULBEE:  Is it okay with the Court if I turn

22   the podium?

23         THE COURT:  Sure.  Only if you ask Shauna to do it,

24   though.  Shauna knows how to make it turn, if you let Shauna do

25   it.

1    Also, just so the parties are aware -- this is my

2  second trial in two weeks, maybe I've already told you this,

3  but I do have the instructions placed on the Elmo.  Max will

4  place the instructions on the Elmo as I'm reading them, so the

5  instructions will be on the monitors.

6    As you can probably tell by inference, I read the

7  instructions before closing arguments.  I then send the

8  original instructions that have the verdict forms to the jury

9  room and seven additional copies of the instructions, so each

10 juror has a copy of the instructions.  I've had jurors that

11 have -- juries that have asked for their own copy of verdict

12 forms.  If they're requested, I will send them back, but I have

13 them start with one set of verdict forms.

14    I have no problems with the admitted evidence going

15 back to the jury room.  I only send it back upon request.  If

16 they request all of the evidence, I'll send all of the

17 evidence.  If they ask for specific pieces of evidence, I will

18 send those back.  But it is only on request, not just

19 automatically.

20    So any other questions regarding procedure or

21 otherwise?

22    MR. ROEDIGER:  No, Your Honor.

23    MR. TAULBEE:  Nothing from defendant.

24    THE COURT:  Okay.  Then we'll be in recess for an

25 hour.

1            (A recess was taken from 11:45 a.m. to 12:51 p.m.)

2            THE COURT:  So I think that Max, when providing a

3    copy of the instructions to the parties, outlined how we made a

4    last-minute change to the verdict directors.

5            Instruction No. 15 referenced the Eighth Amendment

6    claim.  Since it's the only claim, I don't see a reason to

7    reference the Eighth Amendment.

8            Most importantly, I noticed that the damages

9    included nominal and actual damages, but we never defined

10   nominal in any way, and I feared that that would confuse the

11   jury and injected an issue that we hadn't yet defined.

12           So does counsel for plaintiff have any objection to

13   the changes to the verdict forms that we made?

14           MR. ROEDIGER:  No, Your Honor.

15           THE COURT:  How about counsel for defendant?

16           MR. TAULBEE:  No, Your Honor.

17           THE COURT:  Are you ready to bring the jury in for

18   instructions and closing arguments?

19           MS. McGRAUGH:  Yes, Your Honor.

20           MR. TAULBEE:  Yes, Your Honor.

21           (The following proceedings were had in the courtroom

22   in the presence of the jury:)

23           THE COURT:  Ladies and gentlemen, I have a number of

24   instructions that I need to read to you.  As I'm reading them,

25   I'm going to have my law clerk put them on the Elmo.  If we

1  could -- yeah.

2          So that you can also follow along.  As I'm going to

3  mention in a few minutes, the -- a copy of the instructions, a

4  separate copy will be available to each of you in the jury

5  room.

6          (Closing instructions were read by the Court.)

7          THE COURT:  That concludes the instructions.  Is

8  counsel for plaintiff ready for closing argument?

9          MS. McGRAUGH:  Yes, I am, Your Honor.  Your Honor,

10  may I use this podium?

11          THE COURT:  Whichever you prefer.

12          MS. McGRAUGH:  Thank you.

13          Good afternoon, ladies and gentlemen.  This is my

14  opportunity to talk to you directly and to summarize for you

15  what the evidence has been in this case.

16          Do you remember opening statements?  It seems like

17  it was a week ago.  It was not, it was a couple of days ago.

18  And it was my opportunity to tell you what the evidence was

19  going to show, and then Mr. Taulbee got to tell you what

20  evidence the defense was going to go -- was going to show,

21  excuse me.

22          I told you that I was going to show you that Edward

23  Bearden considered Chillicothe women's prison to be his

24  personal hunting ground, and we did.  The testimony that you

25  have heard shows that he roamed that prison at will and that he

1  sexually assaulted these women.

2          Mr. Taulbee told you that he was going to prove to

3  you that there was a grand conspiracy between the women to make

4  up these stories in order to try to get money from the

5  defendant.  And I want you to remember those promises.

6          I had a grandpa named Mac, Mac McEachran from

7  Pontiac, Illinois, and he would always talk to us about

8  commitments and that you shouldn't make a commitment to

9  something that you're not going to follow through on.  I

10 believe we've followed through on our commitment, and this is

11 my chance to tell you why.

12          You're going to determine who to believe because

13 it's either/or, right?  Either they're telling the truth, or

14 he's telling the truth, and that's kind of a sticky situation

15 to be in.  And this is why Edward Bearden worked at

16 Chillicothe.  This is why Edward Bearden found the perfect job

17 for a sexual predator because he counted on some things

18 happening, and what he counted on was their silence.  He

19 counted on their shame and their humiliation, he counted on

20 them being quiet, he counted on them not reporting, and he

21 counted on you not believing what they said.  Because

22 there's -- they're prisoners.  Who is going to believe the word

23 of a woman who is in prison?  And because he knew that and

24 because he depended on you to ignore what they tell you, he

25 thinks he's sitting pretty.

1          So how do you determine the preponderance of the

2     evidence?  Right?  We're not talking beyond a reasonable doubt,

3     we're talking about is it more likely true than not.  Is it

4     more likely true that they were sexually assaulted, or is it

5     more likely true that Edward Bearden was wrongfully accused?

6     Hold me to my commitment.  I ask you to do that.  Hold me to my

7     commitment.  If I haven't proven this to you, that it's more

8     likely than not these women were sexually abused, that's on me.

9          So how do you determine who is telling the truth?

10    How do you know if something is more likely than not?  We look

11    at the evidence, but we look at all of the evidence.  Don't

12    just look at the evidence that I put on, don't just consider

13    the testimony of these ladies.  Determine whether or not the

14    evidence that has come in supports what these women have told

15    you happened to them, or does the evidence that has come in

16    support what he told you.

17         Ashley and Lynnsey.  They were porters in vo-tech,

18    and they told you they worked in a hallway with Mr. Bearden and

19    that Mr. Bearden sat in a chair, and that chair was next to a

20    supply closet.  And you saw a photograph of that hall, that

21    chair, and that supply closet.  And what did the warden tell

22    you?  That between classes, there is no one in that hallway.

23         Now, if Lynnsey and Ashley were going to coordinate

24    their stories, they would have had to do it in 2014, 2015,

25    2016.  So they would have had to have known eight years ago

that this was the plan, and there's no proof of that.  There's
no proof they worked together, but there is proof to support
their stories.  The photos show the exact area, exactly as they
described it.

One officer -- remember, one officer works in that
hallway, there's no camera in the supply closet, and that
Bearden worked in vocational tech, and he worked there when?
When Lynnsey said he worked -- that she worked there.  He
worked in vo-tech.

You saw the logs.  And it was a little difficult to
get a straight answer out of the DOC guy, but he admitted,
yeah, this has him working that day in vo-tech in the hallway,
by himself, next to the supply closet where these women were
sexually assaulted.  It's more likely true than not.

Trenady George.  She told you that she was working
the administration building after hours cleaning, that Edward
Bearden was the only person there, that there was no other
people, guards -- excuse me, correctional officers working
there except for the people in the bubble.  That there are no
cameras in the bathroom, and that they used a cart to prop open
the door when they went inside.

And what evidence did you hear from the Department
of Corrections themselves?  That Bearden had access to that
building, that he is the only guard who works there at that
time, that there are no cameras in the bathroom, that there's a

1  cart that the women use to keep the door open, and that Teresa
2  Davis knew what happened.  All of this information was verified
3  during the trial.  Evidence proves what Trenady George told
4  you.

5          And, in fact, remember the Facebook message about
6  "Call Karen Keil"?  Do you remember what else that said, that
7  Facebook message from Teresa?  Long before this started?  "I
8  told them I knew what happened to you."  There's no message
9  between them.  That's Teresa Davis disclosing, "Hey, I'm sorry,
10  some investigators from John Ammann's office called me, and
11  they wanted to know if I saw anything, and I told them I saw
12  you."  That's evidence.  That is evidence that supports Trenady
13  George, that does not support Edward Bearden.

14          Karen Keil told you Edward Bearden raped her in the
15  offender property room, that there are no cameras.  What did
16  you hear?  You heard that guards go in the offender property
17  room to have sex.  You saw a report that said two officers were
18  caught in the property room, speculating that they had sex.
19  That is exactly what Karen Keil told you happened and where she
20  told you it happened.  That supports what Karen Keil has told
21  you, that does not support what Edward Bearden has told you.

22          Because Edward Bearden, what did he say?  Was he on
23  for 15 minutes?  "I didn't do it."

24          COURTROOM DEPUTY:  Five-minute warning.

25          MS. McGRAUGH:  Thank you.

1           I'd like to take a minute to talk to you about

2   damages, then I get to talk to you again.

3           So when you go back, the first thing you're going to

4   do is talk about liability, is Edward Bearden responsible for

5   this conduct.  If you find that he is, and the evidence clearly

6   proves that he was, next you consider -- your next obligation

7   is to consider an award of an amount that will fairly

8   compensate each of these women.

9           I'm not going to give you a number.  I don't know

10  how you put a number on the things that these women have

11  suffered.  I don't know how you put a price tag on a stranger

12  shoving his fingers into a woman's vagina.  I don't know how

13  you put a price tag on a man ejaculating into his victim's

14  mouth, then throwing a rag at her.  We leave it to you to

15  determine what is fair compensation for a woman being raped.

16  What is the fair compensation for that?  We trust you, and we

17  leave it to you.

18          I do want you to consider also whether or not

19  punitive damages are appropriate.  And the judge read you

20  what -- read to you what punitive damages are.  And when

21  considering whether punitive damages are appropriate, you can

22  consider how vile, how harmful, how hurtful this person's

23  conduct was.  His conduct was, Edward Bearden.  And we ask that

24  you also consider that.

25          His wrongdoing wasn't the dog bite we talked about

1  in voir dire.  His conduct wasn't hitting somebody else's car

2  in the street.  His conduct was the most destructive possible

3  conduct that any person can impart on another human being, the

4  act of rape, the act of sexual assault suffered by women who

5  were prisoners, women who could not leave, women who could not

6  find solace in their families, women who could not drive

7  themselves to an emergency room.  Women who feared, most of

8  all, that, if they told anybody what had happened to them, that

9  they would end up in the hole, and those few moments they got

10  to spend with their kids in the PATCH program or with their dad

11  or with their sister were gone.  Those hard-won jobs were gone.

12  The opportunity to learn and get a cosmetology license was

13  gone.

14      We ask you to award punitive damages to make sure

15  that more women aren't sitting here someday going through what

16  these women are going through.

17      I get to come back and talk to you again.  When the

18  defense gets up here and says to you "safety and security," I

19  want you to say to yourself, "For who?"

20      MR. TAULBEE:  May it please the Court.

21      THE COURT:  You may proceed.

22      MR. TAULBEE:  Ladies and gentlemen, at Chillicothe

23  Correctional Center, people pay attention, people notice

24  special attention.  That's what Lynnsey Betz told you.  It's a

25  different way of saying what Edward Bearden told you, what

1 Robin Dysart told you.  Staff are expected to report anything

2 inappropriate.  It's what their paid expert, Dr. Dora Schriro,

3 told you.  Staff members are mandatory reporters.  Inmates are

4 encouraged to report, yet all the special attention that these

5 plaintiffs, that Karen Keil, Lynnsey Betz, Ashley Zieser, and

6 Trenady George claim to have received from Edward Bearden, no

7 one reported it.

8 You haven't heard from one person who noticed.  Is

9 that believable to you, ladies and gentlemen?  Because this

10 case is about who you believe, what you believe.  You have to

11 decide who is lying.

12 And I want to take you back to jury selection, as

13 well.  Because you guys made a couple of promises, and I think

14 that you've upheld your end of it.  You promised to wait until

15 the close of evidence to make a decision.  You promised that

16 you would follow the judge's instructions.  You promised that

17 you could judge the witnesses' credibility, and you received an

18 instruction on that.  You can believe all, part, or none of

19 what they told you.

20 And, ladies and gentlemen, you're not being asked to

21 decide societal issues here.  I want to put up the instructions

22 that the judge gave you about what you're actually deciding in

23 this case.  You're deciding whether Mr. Bearden had sexual

24 contact with these plaintiffs.

25 You've heard an awful lot about a phone call.

1   There's nothing on this instruction about an inappropriate

2   communication.  And there's no question that that was an

3   inappropriate communication, that it was wrong, that it should

4   have never happened.  That's not what you're being asked to

5   decide here today.  Otherwise, I wouldn't be up here arguing

6   about whether you could find in favor of Mr. Bearden or not.

7   You're being asked to decide whether he had sexual contact with

8   Trenady George, whether he had sexual contact with Lynnsey

9   Betz, whether he had sexual contact with Karen Keil, whether he

10  had sexual contact with Ashley Zieser.  And really, ladies and

11  gentlemen, this is a simple instruction.  You guys are the ones

12  that have to do the hard work.  You have a hard job.  You have

13  to decide who is lying.

14          So let's talk about what you've seen and heard.  And

15  before I do, Ms. McGraugh put a lot of words in my mouth from

16  what I told you in opening statement.  Let me be perfectly

17  clear.  It's plaintiffs' burden of proof in this case.  They

18  have to prove to you, they have to put on evidence to show you

19  that it's more likely true than not true that these things

20  happened.  It is not my burden, it is theirs.

21          And so let's talk about what you've seen and heard

22  because, once you've considered it, the just verdict is in

23  favor of Mr. Bearden.  And I know you heard a lot of facts, and

24  they may get confusing, and I just want to be perfectly clear.

25  No one is questioning that Karen Keil, Lynnsey Betz, Ashley

1  Zieser, and Trenady George were in Chillicothe Correctional

2  Center.  That's not at issue.  No one is questioning that they

3  were working in those positions.  No one is questioning that

4  they would know that there's a guard's desk in the place where

5  they worked.  That's not really at issue.

6          And so you heard from each of these plaintiffs, you

7  heard from Teri Dean, you've heard from their paid experts.

8  And so let's start with Karen Keil.

9          And before I do that, I want to show you Instruction

10 11 again, ladies and gentlemen, because this tells you that you

11 can consider their felony convictions to help you decide

12 whether to believe the witness.  You may only consider it to

13 help you decide whether to believe the witness and how much

14 weight to give their testimony.

15         And Miss Keil told you about her convictions.  In

16 1997, she was convicted of embezzlement.  In 2011,

17 embezzlement, three counts of stealing, three counts of

18 forgery.  Ladies and gentlemen, those are crimes involving

19 dishonest conduct.  You can consider that when you're deciding

20 whether she's telling the truth or whether she's being

21 deceitful.

22         And she talked to you -- and she was fuzzy on some

23 of the details.  She told you that she wasn't sure where she

24 was when these happened, she just couldn't remember.  And she

25 was a little clearer in her deposition that I showed her from a

while before where she said she believed it was Housing Unit 6.

And why does that matter?  Because what you've seen, the evidence you've seen, the exhibits you've seen showed you this.  Edward Bearden was assigned to Housing Unit 2, Edward Bearden was permanently assigned to Housing Unit 5, Edward Bearden was permanently assigned to the yard and utility, and Edward Bearden was assigned as a utility officer.  He was never permanently assigned to Housing Unit 6.  You've not seen anything that shows that he regularly worked in Housing Unit 6.

She also told you that he stood there and watched her in a 45-minute exercise class.  She told you that he would go up on the top of the walk and watch her shower.  And you heard from Robin Dysart and Major Savage that those things can't possibly be true.  Major Savage went up to the top walk to see whether he could see in the showers, and he couldn't.  Robin Dysart told you that a corrections officer can't stand there and watch an offender for 45 minutes, a 45-minute exercise class.  There's too many people around.  The offenders exercising, first of all.  There's hundreds of other possible people in recreation.  It would be impossible for that to go unnoticed.  I mean, use your common sense, ladies and gentlemen.  Would you notice that?

Now, you also heard that there were ten sexual assaults that occurred in the laundry rooms of the housing unit.  And you heard from Miss Keil that that room didn't have

1  a camera.  And then Warden McBee came up here, and he told you

2  absolutely that room has a camera.  You can decide who to

3  believe, whether you believe Karen Keil or Warden McBee.

4        She also told you that Edward Bearden raped her 20

5  times to completion.  She told you that he violently raped her

6  20 times to completion.  Mr. Bearden got up on that stand and

7  shared with you that he's not even physically capable of having

8  that amount of sexual activity.  And she told you that he raped

9  her in a property offender room in the back of the housing

10  unit.  And she told you to get there, she would walk down a

11  hallway and she would walk by case managers, caseworkers,

12  institutional parole officers.  You heard the Functional Unit

13  Managers work back there.  You heard that there are offices

14  back there.  You heard that there's a mirror on the wall.  You

15  heard that there are cameras in that hallway.

16        And, in fact, Miss Keil told you that eventually she

17  wasn't even carrying bins, either retrieving them or taking

18  them, and yet no one saw a thing, no one said a thing, no one

19  reported a thing.

20        Is that believable to you, ladies and gentlemen?

21  You've sat here for three days, and you've heard the type of

22  things that get reported at Chillicothe Correctional Center.

23  Two corrections officers going into the room and being in there

24  for 20 minutes, speculating or not what happened, got reported.

25  A corrections officer cutting another offender's -- or cutting

1  an offender's hair got reported.  But in a case like this, they

2  want you to believe that no one reported a thing.

3          Let's talk about Lynnsey Betz, and Miss Betz had six

4  convictions she told you about.  Burglary and stealing, and

5  then burglary and stealing again when she got out, and then,

6  most recently, two counts of possession of a controlled

7  substance.

8          And she told you -- and I want to be clear about

9  what she told you.  She told you that Mr. Bearden was working

10 because Miss Gilgour was on vacation.  That's how she knew it

11 was in the spring, because Miss Gilgour was on vacation, and

12 she was on vacation for two weeks, and there were two to three

13 officers that were working.

14         And so far so good.  You looked at those

15 chronological logs where Miss Gilgour was on vacation, and

16 there were two or three officers that worked during that time.

17 The problem was, one of them wasn't Mr. Bearden.  Mr. Bearden

18 didn't work during that time period.

19         You also saw chronological logs that we showed you

20 from earlier in that month.  It was when Miss Gilgour was on

21 death leave, when she was taking bereavement leave, that

22 Mr. Bearden worked one day.  Now, that would be something

23 except for Miss Betz told you that these incidents happened

24 over three to four days, and Mr. Bearden wasn't assigned there

25 three to four days over that time period.

1    She also told you that Mr. Bearden grabbed her

2 vagina in a doorway in front of Miss Anderson, in front of an

3 inmate.  And she told you that the desk that Miss Anderson sat

4 at was this high.  And you saw a photo of that desk, and it

5 wasn't that high.

6    So Miss Anderson is there, another inmate is there.

7 And maybe nobody was in the hallway, but you heard about the

8 window, the culinary arts, too, ladies and gentlemen.  And Miss

9 Betz told you that there were blinds there, but the warden told

10 you, no, there aren't, there weren't.  So there -- even if

11 there aren't offenders in the hall, there are offenders in a

12 room right across the hall from where this happened, where a

13 corrections officer on camera entered a room with an offender.

14 No one reported it.  No one saw a thing.  It's unbelievable,

15 ladies and gentlemen.

16    And apparently -- well, let's talk about Ashley

17 Zieser.  And apparently things got a little bit confusing here

18 because Ms. McGraugh just told you about Teresa Davis and

19 Ashley Zieser, and I don't believe you heard any testimony

20 about Teresa Davis having anything to do with Ashley Zieser.

21    And then she told you that Ashley Zieser -- or that

22 Teresa Davis had some sort of Facebook conversation with

23 Trenady George.  And I don't think you heard anything about a

24 Facebook conversation between Trenady George and Teresa Davis

25 either, because both of those things had to do with Lynnsey

1 Betz.

2          And so I want you to be sure that you're trusting

3 what you remember, what you remember of the evidence, and not

4 what you're being told up here.

5          So let's talk about Ashley Zieser.  Miss Zieser had

6 past convictions for felony forgery about ten years apart.

7 Then she had three convictions for possession of a controlled

8 substance and assault on a law enforcement officer.

9          And Miss Zieser told you that these incidents

10 occurred in the early evening.  That was important to her that

11 they occurred in the early evening in December or January of

12 2016.  But we know from the documents that we looked at that

13 Mr. Bearden was assigned to the day shift from January 2014

14 until he retired.  You did not see a single bid sheet, as

15 Mr. Bearden called them, or memo that showed him changing

16 shifts back to the third shift, either temporarily or

17 otherwise.  The next thing you saw after January of 2014 was

18 that temporary no-contact post in July of 2018, and that was

19 still on the second shift.

20          So they're telling you that Mr. Bearden worked the

21 evening shift, and they latched on to the warden's statement

22 that when he started, he believed that Mr. Bearden worked the

23 evening shift.  And you saw Mr. Bearden up there confused, not

24 wanting to call his warden a liar because that was the

25 question.  "Are you calling Warden McBee a liar?"  And he

1  wouldn't do that.

2          But, ladies and gentlemen, look at the documents

3  that we've seen.  Have you seen anything that shows you that

4  Edward Bearden switched back to the third shift after January

5  2014?  You haven't.  He didn't.

6          So why do this?  Why make a big deal about it being

7  early evening?  And ladies and gentlemen, it's because, well,

8  Miss Zieser told you it was early evening, and because they

9  have to make the building empty because the administration

10 building -- the administration building is busy.  There's at

11 least 45 people working there.  There's the control center, the

12 laundry, there's the wardens' offices and all of the clerical

13 staff that work in there, the wardens, the deputy wardens, the

14 Chief of Custody that you heard from.  There's the staff

15 roll-call room, the staff break room, the staff mail room.  And

16 so all of these people would be milling around.  So if it's in

17 the evening, it would be better for her.  But Mr. Bearden

18 didn't work the evening shift, ladies and gentlemen, not in

19 December or January of 2016, December of 2015 or January of

20 2016.

21         And Miss Zieser, when she was asked whether there

22 was a camera in that hallway, she told you she didn't believe

23 so.  I think you can trust your eyes, ladies and gentlemen.

24 You saw it in the photos.  Right outside that staff break room,

25 looking right into that staff break room, right in the middle

of that hallway.

Miss Zieser also told you about -- she told you that Mr. Bearden grabbed his penis and made a comment to her, and she said it happened in the warehouse. And then she was shown in her deposition from six months ago where she said it was in the administration building, and she changed her mind and said it was in the administration building in that hallway that we just talked about with all of those people with the cameras.

You decide who and what to believe, ladies and gentlemen. You can believe Miss Zieser or you can believe the photos, you can believe the documents.

Let's talk about Trenady George. Now, Miss George also was convicted for crimes involving dishonest conduct. She has four convictions for identity theft. And, again, you can consider that when you're deciding whether to believe her testimony and how much weight to give it.

And she told you on the stand that she had previously testified incorrectly about the contents of that phone call that you've heard so much about. And, again, the phone call was inappropriate. Mr. Bearden told you it was a horrible mistake, and it was, and he shouldn't have done it. He shouldn't have got the phone, shouldn't have given the number to an offender, shouldn't have answered the phone. It never should have happened. But, again, ladies and gentlemen, that's not the question that you're here to decide today.

1       The question that you're here to decide today is

2  whether Mr. Bearden sexually assaulted Trenady George, whether

3  he sexually assaulted her 45 to 50 times to completion.  You

4  heard him tell you he's not physically capable of that, ladies

5  and gentlemen.  He's not physically capable of that amount of

6  sexual activity.

7       And when Miss George told you about that phone call,

8  it was that she made that phone call so that she had evidence,

9  that she made -- or that she smuggled that phone number out of

10  the institution in her Bible under a fake name so she had

11  evidence.

12       And here we are, ladies and gentlemen.  This case is

13  about Karen Keil and her students.  Miss Keil told you that she

14  spoke with Miss Betz before filing the lawsuit.  She told you

15  that she spoke with Miss Zieser before Miss Zieser filed the

16  lawsuit.

17       Miss Keil first spoke to someone at the Department

18  of Corrections about her allegations in January of 2018, nearly

19  a year after she got out; and before she did that, she had a

20  phone conversation with Trenady George in November or December

21  of 2017.

22       Now, they told you Karen Keil and Trenady George

23  weren't friends.  They weren't particularly close.  They knew

24  each other from rec.  So why, ladies and gentlemen, as soon as

25  Trenady George gets out of Chillicothe, is she having a phone

1  call with Karen Keil?  And here they both are.

2            You get to decide whether you believe them when they

3  ask you to give them money.  You get to decide whether you

4  believe them when they tell you that this man sexually

5  assaulted them nearly 100 times collectively in a prison with

6  449 cameras, with 540 employees, with over 1500 offenders,

7  without getting caught, without a hint of suspicion.  Is that

8  believable to you, ladies and gentlemen?

9            And Mr. Bearden told you that the accusations of

10  rape and sexual assault by Karen Keil didn't happen, that the

11  accusations of sexual assault by Lynnsey Betz didn't happen,

12  that the accusations of sexual assault by Ashley Zieser didn't

13  happen, that the accusations of sexual assault by Trenady

14  George didn't happen.  He told you that he'd never had any

15  complaints like this before Miss Keil made her accusations in

16  January of 2018.

17            COURTROOM DEPUTY:  Two minutes.

18            MR. TAULBEE:  And, ladies and gentlemen, they're

19  asking you to award damages.  The just verdict in this case is

20  for Mr. Bearden; but if you are going to award damages, you

21  have to consider, they've not given you any evidence of lost

22  income.  They told you that they weren't working because they

23  chose not to and weren't because they're a felon.  And consider

24  all of the past trauma.

25            Their paid expert didn't know the half of it when

1  she got up and testified.  She hadn't heard anything from

2  Ashley Zieser about past trauma.  She didn't know a lot of what

3  you guys know.

4         This is a difficult case, ladies and gentlemen,

5  because you have to decide that someone is lying.  But you're

6  being asked to find whether they were raped or sexually

7  assaulted.  You're being asked to find that that man is a

8  rapist, that he sexually assaulted these women.  A verdict for

9  Mr. Bearden does not mean that you don't stand up against rape

10 or sexual assault.  That's not what you're deciding.  You're

11 deciding this case based on the facts that you've seen, the

12 evidence that you've seen.  A verdict for Mr. Bearden is just

13 that, a finding that you don't believe Mr. Bearden raped or

14 sexually assaulted these plaintiffs.  And to do that on the

15 verdict forms, on each of them, you'll write Defendant

16 Bearden's name on the line.

17        Thank you, ladies and gentlemen.

18        THE COURT:  I apologize for my coughing attack.  I

19 would have guessed that it would have occurred while I was

20 reading all of those instructions, but it's occurred when I was

21 least expecting it to.  Thank you very much.

22        Ms. McGraugh, are you ready for your rebuttal?

23        MS. McGRAUGH:  Yes, Your Honor, I am.

24        Someone should tell Mr. Taulbee about all of that

25 overtime that Mr. Bearden worked.  You remember that?  You

remember the warden and Officer Savage telling you about the overtime he worked? So, of course, he was working nights, he was working overtime. And when did he switch? December 15th. The evidence is that he did work evenings for two weeks, the first two weeks of December, and then he switched.

I'm not going to stand here and tell you what the witness has said because you heard it. I don't want you to remember things the way I tell you because -- right? I told you wrong because I mixed up the two women. Hold that against me. Those women didn't mix up their testimony, that was me.

But let's talk about the telephone calls. Why are the telephone calls important? Because they were telephone calls? They're not. They were important because they were -- it was truth and proof that that man sought to establish a relationship with my client. That was not a first phone call. He was trying to get into a relationship with her. And he lied about it when I asked him, and it took him two and a half years and having the phone number on this page put in front of him, or he never would have told you.

He's full of lies. This is the only one we caught him on because Trenady put it in her Bible. That's why it's important. Because if the evidence was different, he would be in here telling you a different story, but he got caught.

That's why the phone call's important. Because he was having sexual relations with all of these women in the

1    prison, and he didn't want anybody to know it, and he got

2    caught.  And, of course, he didn't have sex with people in the

3    hallway.  They didn't tell you they had sex in the hallway.

4    They told you he pushed them into a closet, a closet that you

5    know for a fact he had access to, a closet you know for a fact

6    he was able to push the women into because he was working right

7    there.

8            It is uncontroverted that this man had access to my

9    clients.  And it is uncontroverted that he sexually assaulted

10   those women, that he sodomized them, that he raped them, and he

11   does so with no apology.  Is he looking you in the eye?  Can he

12   even look up and look you in the eye right now?  He can't,

13   because of what he did to these women.

14           And, no, they didn't report right away.  And

15   Dr. Piasecki, who, by the way, was the only expert in this

16   courtroom who could talk about rape and sexual abuse of women,

17   and what did she say?  That women don't tell because it is

18   humiliating and it is shameful, and these women carry that in

19   their hearts, feeling dirty, feeling unworthy, feeling like

20   they should kill themselves.  Until they talked to that man at

21   our legal clinic, and that's why we're here today, ladies and

22   gentlemen.

23           The only liar in this courtroom -- and right?  I

24   told you, they're the perfect women to sexually abuse.  Why?

25   Because Mr. Taulbee gets up and says they have crimes, they're

1  criminals.  That's why you work in a prison if you're a sexual

2  predator, because no one will believe.

3        But they don't deserve it.  No one deserved to be

4  raped.  I don't care if they have 20 convictions.  That doesn't

5  make it right.  But that's why I'm saying he was banking on

6  that.  He was banking on no one believing them.  And let me

7  tell you, if the evidence had come out differently, you know

8  what he would have said?  Consent.  Were it not for that phone

9  number on that Bible that Trenady smuggled out of prison, we

10 wouldn't even be sitting here.

11       COURTROOM DEPUTY:  Five minutes.

12       MS. McGRAUGH:  But he underestimated these women.

13 He underestimated them.  Because he could keep them shut up

14 when they were in Chillicothe.  When they were prisoners and

15 they were locked in that prison, they kept silent because they

16 weren't safe.

17       You don't think that stuff goes on in the prison?

18 They told you, they brought you evidence that people are having

19 sex in the prison.  Is that a safe and secure prison?  Were

20 those people following the rules?  How brazen must they be to

21 have sex in the inmate property room during their shift in the

22 middle of a prison?  That's not safe and secure.

23       You've got to decide what's more likely.  Did the

24 evidence prove that it's more likely these women were raped and

25 sodomized, or did the evidence, in any sense whatsoever,

 1  support what he said to you in the 15 minutes he talked to you?

 2  And this thing about "I can't have sex that much," is it too

 3  much to ask for a doctor's note or a reason?

 4          He got up there and talked for 15 minutes and sat

 5  down, and my women did not have that luxury.  They had to

 6  recount for you each and every horrifying detail of their rape,

 7  sodomy, and sexual assault.  Do you want to get in front of a

 8  bunch of strangers and tell them that a man ejaculated in your

 9  mouth?  That's why women don't report.  That's humiliating,

10  that's shameful.

11          I'm really grateful that you sat and listened to

12  this because I know it was uncomfortable.  And the ladies are

13  very grateful that they got a chance to tell you what happened

14  and that they have an opportunity to be vindicated.  They're

15  asking you to do that.

16          When you come back -- go back to your jury room,

17  you'll deliberate.  I'm asking you, please, to consider what

18  the evidence proved, and it proved that it was more likely than

19  not that Edward Bearden sodomized and raped these women.  When

20  you do that, I ask you just to consider what they've been

21  through and to compensate them fairly.  Thank you.

22          THE COURT:  Well, that concludes both the evidence

23  and the argument in this case.  I have a copy of the

24  instructions with verdict forms here that I will send back with

25  the courtroom deputy.  There will be a set of seven additional

1  instructions that will not have the verdict forms, so there

2  will be one set of verdict forms back in the jury room for who

3  you select as foreperson to sign.

4        I will ask that you give your phones, to the extent

5  you haven't already, to Shauna because your phones are not

6  permitted during deliberations, and that you begin

7  deliberations and let us know if you either have a question or

8  a verdict, and we will be in recess until then.

9        (The jury retired to deliberate at 1:54 p.m.)

10        THE COURT:  And, Mr. Taulbee, I am very, very sorry

11  for the coughing attack I had in the middle of your closing

12  argument.  I try very hard to be invisible during closing

13  arguments, and I failed miserably this time, so I apologize.

14        I do want to compliment everyone on a very

15  well-tried case.  I know there's a lot of emotion in this

16  particular case, and I appreciate the fact that everyone was

17  professional and conducted themselves appropriately during the

18  trial.  I think that it was a very well-tried case.  I'm not

19  commenting either way on how the evidence is going to come out

20  because I am very happy that I'm not on this particular jury.

21        So I would ask that you have the evidence together

22  so that if they ask for any pieces of evidence, we can quickly

23  get it back to them.  To the extent you're going to leave the

24  courtroom or this immediate area, give Shauna your cell-phone

25  number so that if they have a question or verdict, we can very

1  easily get in touch with you and get you back to the courtroom.

2       Is there anything else that I can take up until

3  there's either a verdict or a question?

4       MS. McGRAUGH:  No, Your Honor.

5       MR. TAULBEE:  No, Your Honor.

6       MS. McGRAUGH:  May I approach on an informal matter?

7       THE COURT:  Sure.

8       (A recess was taken from 1:56 p.m. to 3:18 p.m.)

9       THE COURT:  So we do have a jury question, which is

10  signed by, it looks like, Robert Stalker, who is Juror No. 1.

11  And the language is "Need ages of plaintiffs."  Any thoughts on

12  a proposed response to this question?

13       MR. TAULBEE:  They just have to be guided by the

14  evidence.

15       MS. McGRAUGH:  Yeah.

16       THE COURT:  Well, one thought is that there were a

17  number of medical records that were introduced, and the medical

18  records most likely have the age.  I will be very honest, my

19  law clerk came up with that suggestion, not me, so I do not

20  want to take credit where credit is not due.  It's a thought.

21       I would hate to say "You must be guided by the

22  evidence," and then they ask for the medical records, and then

23  they say, well, it was in here, why didn't you give it to us.

24  But they don't specifically ask for the medical records, I will

25  be the first to admit.

1          MS. McGRAUGH:  I say you must be guided by the

2     evidence, unless Nick is --

3               (Reporter interruption.)

4          THE COURT:  If we're going to put this on the

5     record, we need to talk one at a time.

6          So, Mr. Taulbee, are you opposed to a response of

7     you must be guided -- I typically do a "You must be guided by

8     your collective memory of the evidence."  Mr. Taulbee, are you

9     opposed to that?

10         MR. TAULBEE:  I'm not opposed to that, Your Honor.

11         THE COURT:  Do you have any other suggestion?

12         MR. TAULBEE:  I don't.  I'm not sure if we have

13    medical records for all of the plaintiffs, which is my only

14    concern about providing medical records.  I know we have them

15    for maybe three of them.

16         THE COURT:  Looks like Keil, Betz, Zieser; and Doe

17    medical records, I assume, would be George?

18         MS. McGRAUGH:  Yes, Judge.

19         THE COURT:  Again, I will -- if there is a dispute

20    regarding the response, I will rule.  If both parties want "You

21    must be guided by your collective memory of the evidence," I'll

22    take that approach.  Mr. Taulbee?

23         MR. TAULBEE:  I'm fine with the

24    guided-by-the-evidence, Your Honor.

25         THE COURT:  Okay.  Okay.  We will send, "You must be

1 guided by your collective memory of the evidence," signed by

2 me, back to the jury. And if there are any other questions, I

3 will let you know.

4           (A recess was taken from 3:22 p.m. to 3:46 p.m.)

5           THE COURT: As I think everyone knows, we have a

6 verdict. So when Miss Betz gets here, we will bring the jury

7 in.

8           Okay. Could you go ahead and get the jury, please?

9           (The following proceedings were had in the courtroom

10 in the presence of the jury:)

11          THE COURT: Mr. Stalker, are you the foreperson?

12          FOREPERSON: Yes, I am.

13          THE COURT: And has the jury reached a verdict?

14          FOREPERSON: Yes, we have.

15          THE COURT: Could you please provide the verdict

16 forms to Shauna, and I will review them.

17          (So done.)

18          THE COURT: Okay. The verdicts appear to be in

19 order, and so what I'll do now is publish or read the verdicts

20 out loud.

21          On Plaintiff Keil's claim against Defendant Bearden

22 as submitted in Instruction No. 15, we find in favor of

23 Plaintiff Keil. We find plaintiff's damages to be $3,500,000.

24 We assess punitive damages against Defendant Bearden as

25 follows: $1,500,000. And it is signed and dated by the

foreperson.

On Plaintiff Trenady George's claim against Defendant Bearden as submitted in Instruction No. 15, we find in favor of Plaintiff George. We find plaintiff's damages to be $3,500,000. We assess punitive damages against Defendant Bearden as follows: $1,500,000.

On Plaintiff Ashley Zieser's claim against Defendant Bearden as submitted in Instruction No. 15, we find in favor of Plaintiff Zieser. We find plaintiff's damages to be $3,500,000. We assess punitive damages against Defendant Bearden as follows: $1,500,000.

And, as I forgot to mention with respect to Plaintiff George's verdict, it is signed and dated by the foreperson, as is the verdict form for Plaintiff Zieser.

On Plaintiff Lynnsey Betz's claim against Defendant Bearden as submitted in Instruction No. 15, we find in favor of Plaintiff Betz. We find plaintiff's damages to be $3,500,000. We assess punitive damages against Defendant Bearden at $1,500,000. And, again, it is signed and dated by the foreperson.

Would either party like the jury to be polled? Ms. McGraugh?

MS. McGRAUGH: No, Your Honor.

THE COURT: Mr. Taulbee?

MR. TAULBEE: No, Your Honor.

1          THE COURT:  Is there anything that I need to take up

2     with the attorneys before I dismiss the jury?

3          MS. McGRAUGH:  No, Your Honor.

4          MR. TAULBEE:  No, Your Honor.

5          THE COURT:  Well, ladies and gentlemen, this

6     concludes your service as a juror.  It also lifts all of the

7     restrictions that I placed on you with respect to any type of

8     research or commenting or discussing the case.  I know that I

9     speak on behalf of everyone when we -- when I say that we

10    appreciate your service in this case today.

11         We have your certificates and some other forms for

12    you in the jury room, so I'm going to ask that you go back to

13    the jury room.  I will make myself available in a couple of

14    minutes to come by and answer any questions that you have.  By

15    no means do you have to stay and answer questions.  You've had

16    a long week, and you're free to go.  But if you do have

17    questions, I'll be back there in a couple of minutes.

18         So with that, the trial is recessed.

19         (The following proceedings were had in the courtroom

20    out of the presence of the jury:)

21         THE COURT:  So is there anything else I can take up

22    at this time, Ms. McGraugh?

23         MR. ROEDIGER:  No, Your Honor.

24         MS. McGRAUGH:  No, Your Honor.

25         THE COURT:  Mr. Taulbee?

1        MR. TAULBEE:  No, Your Honor.

2        THE COURT:  So I don't really have a rule regarding

3   talking with jurors, except that if you approach them and they

4   say they don't want to talk, then please respect that fact.

5        So I will go back and talk with them for a few

6   minutes.  To the extent, then, that they're in the hallway, if

7   you choose to approach them, you may.  But, again, please don't

8   pressure them.  So thank you.

9        (Trial adjourned.)

10                              - - -

11                              - - -

12                         CERTIFICATE

13        I certify that the foregoing is a correct transcript

14   from the record of proceedings in the above-entitled matter.

15

16

17   June 27, 2022

18                         /s/_____
                            Kathleen M. Wirt, RDR, CRR
19                          U.S. Court Reporter

20

21

22

23

24

25